# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

**MARCELLUS WILLIAMS,**

**Petitioner,**

**v.**

**DONALD ROPER,**

**Respondent.**

**Case No.   4:05-CV-01474-RWS**

## PETITIONER'S TRAVERSE

**KENT E. GIPSON #34524**
**Attorney At Law**
**Public Interest Litigation Clinic**
**305 E. 63rd Street**
**Kansas City, MO  64113**
**816/363-2795 • fax 816/363-2799**

**LORI LEON  Ohio #0065584**
**Attorney At Law**
**Public Interest Litigation Clinic**
**305 E. 63rd Street**
**Kansas City, MO  64113**
**816/363-2795 • fax 816/363-2799**

# TABLE OF CONTENTS

**Page**

I.    **INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1**

II.    **STANDARD OF REVIEW** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4**

III.    **ISSUES REGARDING INDIVIDUAL CLAIMS FOR RELIEF** . . . . . . . . . **9**

**CLAIM 1 - THE *BRADY* CLAIMS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **9**

A.    **The Missouri Supreme Court decision addressing the state's failure to disclose material impeachment evidence regarding Henry Cole and Laura Asaro, rested upon an unreasonable determination of the facts.** . . . . **9**

B.    **The Missouri Supreme Court decision addressing the state's offers to help two defendants if they testified against petitioner involved an unreasonable application of Supreme Court precedent.** . . . . . . . . . . . . . . . **17**

**CLAIM 2 - TRIAL COUNSEL'S INEFFECTIVENESS IN FAILING TO IMPEACH HENRY COLE.** . . . . . . . . . . . . . . . . . . . . . . . . **19**

**CLAIM 3 - TRIAL COUNSEL'S FAILURE TO IMPEACH LAURA ASARO.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **26**

**CLAIM 4 - INNOCENCE/PERJURED TESTIMONY CLAIM** . . . . . . . . . . . . . **33**

**CLAIM 5 - THE *BATSON* CLAIM** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **37**

A.    **Introduction** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **37**

B.    **St. Louis County prosecutors have a pattern and practice of striking African-American jurors for racially discriminatory reasons.** . . . . . . . . . . **39**

**C.** **Because the Missouri Supreme Court failed to address the third element of the *Batson* test -- whether petitioner had shown that the St. Louis County prosecutors' proffered explanations for striking African-American prospective jurors were pretexts for purposeful racial discrimination -- the standard of review provisions of 28 U.S.C. § 2254(d) do not apply to this court's analysis of pretext.** . . . . . . . . . . . . . . . . . . . . . . **45**

**D.** **The Missouri Supreme Court decision's finding that the St. Louis County prosecutors' explanation for striking prospective Juror 64, Henry Gooden, an African-American man, because he physically resembled petitioner, also an African-American man, provided a valid, race-neutral explanation for the strike constituted an unreasonable application of Supreme Court law, as well as an unreasonable determination of the facts.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **47**

**E.** **The state's remaining purported reasons for striking prospective Juror 64, Henry Gooden, an African-American man, were pretexts for purposeful racial discrimination.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **51**

**F.** **The explanations for striking prospective Juror 65, William Singleton, an African-American man -- that he "was not definite enough" regarding whether he could consider the death penalty and that he had been court-martialed for stealing $160 -- were pretexts for purposeful racial discrimination.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **60**

**CLAIM 6 - THE *WIGGINS* CLAIM** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **63**

**CLAIM 7 - INEFFECTIVENESS OF APPELLATE COUNSEL REGARDING THE CONTINUANCE DENIAL** . . . . . . . . . . . . . . . . . . . . . . . . . . **77**

**CLAIM 8 - THE CONFLICT OF INTEREST ISSUE** . . . . . . . . . . . . . . . . . . . . **82**

**CLAIM 9 - THE GLENN ROBERTS TESTIMONY ISSUE** . . . . . . . . . . . . . . . **84**

**CLAIM 11 - THE PENALTY PHASE CLOSING ARGUMENT** . . . . . . . . . . . . **85**

**CLAIMS 10, 12, 13** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **90**

**CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **91**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

MARCELLUS WILLIAMS,    )
    )
    **Petitioner,**    )
    )    **Case No.   4:05-CV-01474-RWS**
**v.**    )
    )
**DONALD ROPER**    )
    )
    )
    **Respondent.**    )

## PETITIONER'S TRAVERSE

COMES NOW petitioner, by and through counsel, and hereby replies as follows to respondent's response to order to show cause why a writ of habeas corpus should not be granted.

## I.

## INTRODUCTION

This capital habeas case is unusual in many respects.  First, it is extraordinary that trial counsel would admit, under oath, that he was unprepared to competently represent petitioner in both the guilt and  penalty phases of his trial, largely due to the fact that he had just completed another high profile death penalty trial, involving

Kenneth Baumruk, two weeks before petitioner's trial commenced. (See Hab. Pet. Exh. 10). This case is also distinguishable from the vast majority of death penalty cases where the evidence of guilt is overwhelming and the only contestable issue is whether or not the defendant deserves to die for his crimes. No physical evidence links petitioner to the crime. The only direct evidence presented by the state to establish petitioner's guilt was the testimony of two paid informants with long criminal records who gave inconsistent accounts of petitioner's purported admissions to them regarding this murder. There is a great possibility that the state of Missouri is poised to execute an innocent man.

One aspect of this case that is not unusual, however, is the fact that the jury selection in this capital case, arising from St. Louis County, was tainted by racial prejudice. In this racially charged case, involving an African-American defendant from the inner-city accused of murdering the Caucasian wife of a prominent doctor in her home in an upscale gated community, the prosecutor utilized six peremptory strikes to exclude black veniremen from the jury. The Missouri Supreme Court has recently recognized a pattern and practice of racial discrimination by prosecutors in jury selection in St. Louis County capital cases. *See State v. McFadden*, 216 S.W.3d 673 (Mo. banc 2007)(Oral Arg. CD, submitted to this court with petitioner's Notice of Filing Exh. 15).

2

Sadly, this case is also not unusual because trial counsel, after petitioner was convicted, presented virtually no evidence or argument to attempt to convince the jury to spare petitioner's life.  Counsel's substandard performance, coupled with the compelling evidence of petitioner's mental illness and turbulent family history, childhood physical and sexual abuse, all of which was uncovered during post-conviction proceedings, removes any doubt that petitioner did not receive the effective assistance of counsel that the Sixth Amendment guarantees in capital punishment cases.  *See e.g. Wiggins v. Smith*, 539 U.S. 510, 524 (2003).

In defending this tainted conviction and sentence, respondent interposes several procedural and substantive arguments against petitioner's claims.  A great deal of the state's response consists of word by word regurgitations of the Missouri Supreme Courts' opinions and word by word citations to the record, followed by unelaborated assertions that the state courts' rulings are "reasonable." In a few instances, respondent also advances procedural bar arguments to certain claims.

Because of the nature of respondent's arguments, this traverse will reply to respondent's arguments on a claim by claim basis.  In addressing claims involving threshold procedural issues, petitioner will reply to the procedural bar issues before discussing the merits of the underlying claim.  In many instances, petitioner's arguments will focus on whether the Missouri decision was contrary to, or involved

3

an unreasonable application of existing Supreme Court precedent or, alternatively, was based upon an unreasonable determination of the facts necessary to entitle him to relief under 28 U.S.C. §2254(d). Petitioner is confident that this court, after a full and fair assessment of all the relevant facts and applicable law, will conclude that habeas relief is warranted.

**II.**

**<u>STANDARD OF REVIEW</u>**

Although the specific application of §2254(d) will be discussed regarding each of petitioner's constitutional claims, petitioner believes it would be beneficial to the court to set out the general parameters of the statute and the appropriate analysis that the court should employ in determining whether habeas relief is warranted.

Under 28 U.S.C. §2254(d)(1), a federal court may grant an application for a writ of habeas corpus for a claim adjudicated in state court if that adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States." The Supreme Court has held that the clauses "contrary to" and "unreasonable application of" have independent meaning. *Penry v. Johnson*, 532 U.S. 782 (2001); *Williams v. Taylor*, 529 U.S. 362 (2000). The "contrary to" clause applies, *inter alia,* when a state "applies a rule that contradicts the governing law set forth in [the Supreme

4

Court's] cases;" the "unreasonable application of" clause applies when the state applies the correct legal standard but applies it unreasonably. *Id*. at 405.

Where the Missouri courts did not apply the proper legal test or pertinent legal rules established by the Supreme Court, petitioner is entitled to relief under the "contrary to" clause if this court independently determines that a non-harmless constitutional violation occurred. *See e.g.  Williams v. Anderson*, 460 F.3d 789, 801-805 (6th Cir. 2006).  In other words, if this court finds that the "contrary to" clause applies to a claim for relief, it is free to review the claim *de novo* and grant relief if a non-harmless constitutional violation occurred.  *Id.*

In *Williams v. Taylor*, Justice O'Connor noted two possible ways that a state court decision might violate the "unreasonable application" clause of §2254(d)(1):

> First, a state-court decision involves an unreasonable application of this Court's precedent if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of a particular state prisoner's case.  Second, a state court decision also involves an unreasonable application of this Court's precedent if the state court either unreasonably extends a legal principle from our precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.

529 U.S. at 407.

In the aftermath of the decision in *Williams*, lower federal courts have grappled with the proper definition of and scope of the unreasonable application clause.

5

Because the Supreme Court did not give specific guidance as to what the term "objectively unreasonable" means, lower federal courts have had difficulty applying this standard. *See e.g. Maynard v. Boone*, 468 F.3d 665, 670-671 (10th Cir. 2006). (describing difficulty in defining and applying the unreasonable application clause).

Although the Eighth Circuit has granted relief under the unreasonable application clause, it has not given any precise meaning to the term "objectively unreasonable." *Carter v. Bowersox*, 265 F.3d 705 (8th Cir. 2001). The Tenth Circuit, however, in *Maynard* described the appropriate definition of "objectively unreasonable" as being more onerous than the "clearly erroneous" standard, but more lenient than the "unreasonable to any jurist" standard. 468 F.3d at 670-671.

But the best and most precise interpretation of the "objectively unreasonable" standard comes from the Second Circuit. In making the objectively unreasonable determination, reviewing courts should focus on "whether the state court decision reveals an increment of wrongness beyond error." *Francis S. v. Stone*, 221 F.3d 100, 110 (2nd Cir. 2000); *Henry v. Poole*, 409 F.3d 48, 68 (2nd Cir. 2005); *Monroe v. Kuhlmann*, 433 F.3d 236, 246 (2nd Cir. 2006).

For a habeas petitioner to prevail under this standard, he must meet the following test:

6

> Some increment of incorrectness beyond error is required.  We caution, however, that the increment need not be great; otherwise, habeas relief would be limited to state court decisions 'so far off the mark as to suggest judicial incompetence.'  We do not believe AEDPA restricted federal habeas corpus to that extent.

*Francis S.*, 221 F.3d at 111.

This interpretation of §2254(d)(1) has also been adopted by the First Circuit. *Santiago v. Spencer,* 346 F.3d 206, 211 (1st Cir. 2003).

It is also clear under the law of this circuit that it is necessary for reviewing courts to review caselaw from lower federal courts because such an inquiry is relevant to whether the state court unreasonably applied existing Supreme Court precedent. *See e.g. Atley v. Ault*, 191 F.3d 865, 871 (8th Cir. 1999).  In petitioner's view, the "unreasonable application" standard must be interpreted in such a manner that allows meaningful review of state court decisions.  To hold to the contrary would render this proceeding a futile and empty formality.

In deciding this case, this court must also address whether the Missouri decision "was based on an unreasonable determination of the facts . . ." under §2254(d)(2).  If the court determines that the Missouri decision rests upon a significant factual flaw, this court is free to review the claim *de novo* and grant relief if a non-harmless constitutional violation has occurred.  *See e.g. Simmons v. Luebbers*, 299 F.3d 929, 937-938 (8th Cir. 2002); *Ward v. Sternes*, 334 F.3d 696, 703-704 (7th Cir. 2003).  As

7

the Seventh Circuit noted in *Ward*:  "A state court decision that rests upon a determination of fact that lies against the clear weight of the evidence is, by definition, a decision 'so inadequately supported by the record' as to be arbitrary and therefore objectively unreasonable."  *Id.* at 704.  Relief is also available to petitioner under §2254(d)(2) if the state court misapprehends, misstates, or ignores a material factual issue that is central to a claim for relief.  *Miller-El v. Cockrell*, 537 U.S. 322, 346 (2003); *Wiggins v. Smith*, 539 U.S. 510, 528 (2003).

In this case, petitioner did not receive a post-conviction evidentiary hearing in state court on any of the claims he has raised in his federal habeas petition.  As the record reflects, the 29.15 motion court only granted an evidentiary hearing on one claim, an ineffectiveness claim regarding petitioner's right to testify, that is not before this court in the present habeas petition.  (29.15 L.F. 483, 780).

Both the Ninth and Tenth Circuits have held that state factual determinations made without granting the petitioner an evidentiary hearing are based upon a defect in the fact finding process that results "in an 'unreasonable determination' of the facts" under §2254(d)(2).  *Taylor v. Maddox*, 366 F.3d 992, 1001 (9th Cir. 2004); *see also Bryan v. Mullin*, 335 F.3d 1207, 1215-1216 (10th Cir. 2003).  Therefore, this court must conduct *de novo* review of all of petitioner's claims of ineffective assistance of counsel.  *Nunes v. Mueller*, 350 F.3d 1045, 1055 (9th Cir. 2003).  Likewise,

8

petitioner's claims involving prosecutorial misconduct, perjured testimony, and innocence are also entitled to *de novo* review because petitioner was never given a hearing on those issues in state court. *Killian v. Poole*, 282 F.3d 1204, 1208 (9th Cir. 2002).

## III.

## ISSUES REGARDING INDIVIDUAL CLAIMS FOR RELIEF

## CLAIM 1 - THE *BRADY* CLAIMS

A. **The Missouri Supreme Court decision addressing the state's failure to disclose material impeachment evidence regarding Henry Cole and Laura Asaro, rested upon an unreasonable determination of the facts.**

The Missouri Supreme Court, in addressing this claim, stated that:

Williams' argument that motion court clearly erred by not finding that the state failed to disclose impeachment evidence regarding Cole and Asaro is similarly without merit because the "prosecution has no obligation to disclose evidence of which the defense is already aware and which the defense can acquire." State v. Brooks, 960 S.W.2d 479, 494 (Mo. banc 1997). During discovery in the Rule 29.15 case, Williams filed extensive requests for production on the state that included Cole's and Asaro's medical and psychiatric records from a variety of different federal, state, and private institutions. The state responded by allowing defense counsel to inspect and copy everything in the state's file on the case. *If Williams' counsel wanted to acquire Cole's and Asaro's medical and psychiatric records, the discovery requests should have been directed at the entities holding those records.*

*Williams v. State,* 168 S.W.3d 433, 440 (Mo. banc 2005) (emphasis added).

9

This decision constituted an unreasonable determination of the facts under 28 U.S.C. §2254(d)(2) for several reasons. First, the decision failed to compare the impeachment evidence which the state failed to disclose to petitioner's defense counsel with the alleged impeachment evidence of "which [defense counsel were] already aware." *Williams v. State, supra,* 168 S.W.3d at 440. This was likely due to the post-conviction trial court's denial of petitioner's discovery requests, the quashing of his subpoenas, and its refusal to hold an evidentiary hearing. (29.15 L.F. at 42-48, 66-68) (denying requests for (1) police reports regarding a factually similar knifing in Pagedale, Mo; (2) Laura Asaro's social security and SSI records; probation and parole records; and other mental health or drug treatment records; (3) Henry Cole's social security and SSI records; Missouri Department of Corrections records; Michigan and Pennsylvania Departments of Corrections records; and other medical or mental health records); (29.15 L.F. at 381, 382-387, 390, 391-398, 403, 751, 753, 755) (quashing subpoenas).

Second, the decision's finding that the prosecutor permitted petitioner's *post-conviction counsel* to inspect and copy his file *is not the equivalent* of a finding that the state fully complied with its absolute and constitutional obligation to learn of and disclose *to death penalty defense trial counsel* both material and favorable evidence as to both guilt and punishment. *Strickler v. Greene,* 527 U.S. 263, 288-289 (1999);

*Brady v. Maryland,* 373 U.S. 83, 87 (1963).  The Missouri decision's reliance on the prosecutor's "open file" policy is also "contrary to" *Strickler* under §2254(d)(1).

Third, contrary to the decision's last sentence, petitioner's post-conviction counsel *did* subpoena entities holding records of Cole and Asaro's medical, psychiatric, and mental health information, *all of which were quashed by the post-conviction trial court.  See* p. 10, *infra*.

Post-conviction counsel noticed depositions for the: St. Louis Workhouse, Queen of Peace Center, Barnes Hospital, Missouri Public Defender (who had previously represented Henry Cole), St. Louis Empowerment Center, Division of Family Services, Hopewell Center, Connect Care, New Beginnings, Missouri Department of Corrections, and Clerk of Court, 22nd Judicial Circuit.  (29.15 L.F. at 364-365).  They also issued subpoenas duces tecum to records custodians at the:

> Missouri Department of Corrections, which requested production of medical records, mental health records, drug treatment records, social service records, classification records, and disciplinary records for Cole and Laura Asaro.  (29.15 L.F.at 367-370);
>
> Missouri Public Defender, which requested production of its file on *State v. Henry Cole,* St. Louis City Cause No. 941-4190 (29.15 L.F.at 371-372);
> Queen of Peace Center, St. Louis, Missouri, which requested production of medical, mental health, and drug treatment records for Asaro (29.15 L.F. at 373-374);

Barnes-Jewish Hospital, St. Louis, Missouri, which requested production of medical, mental health, and drug treatment records for Cole (29.15 L.F. at 375-376); and

Clerk of the Circuit Court, St. Louis, Missouri, which requested production of the court-ordered psychiatric evaluation of Cole in *State of Missouri v. Cole,* Cause 941-4190 (29.15 L.F. at 379-380).

The post-conviction trial court quashed all of these subpoenas. (29.15 L.F. at 381, 382-387, 390, 391-398, 403, 751, 753, 755). In addition, the motion court refused to hold an evidentiary hearing on this claim. (29.15 L.F. at 483, 780).

Fourth, the decision failed to address one specific and important item: a court-ordered psychiatric-psychological evaluation of Cole in *State of Missouri v. Henry Cole,* St. Louis Cause 941-4190, the existence of which was learned by post-conviction counsel. (29.15 L.F. at 61-64, ¶¶ 1-3, 8; pp. 409-471, ¶¶ 4-6). Post-conviction counsel filed a motion to compel production of this evidence on September 5, 2003, which detailed: that "Cole underwent a state psychological exam on 2/9/95 with Dr. Sam Parwatikar;" that"[t]he report was written on 3/22/95 and filed with the court on 4/4/95;" and post-conviction counsel's inability to access this report, which the state knew or should have known contained impeachment information as to Cole. (29.15 L.F. at 61-64,¶ 8). Counsel filed another motion on November 20, 2003, showing that petitioner's counsel:

requested the Cole file directly from the St. Louis City court, they discovered that the file was missing the examination/examination report. They were then informed by the court clerk that it kept such items separately, and that a court order was required in order to access the examination/examination report. Counsel's subsequent oral motion to the post-conviction court for such an order was denied. The post-conviction court then ordered counsel to subpoena Cole's psychological records from the St. Louis City court. Counsel did so: they subpoenaed the court clerk (Mariano Favazza), as well as the office of the Missouri Public Defender. But, upon motions by the court and defender, that court quashed counsel's subpoenas.

(29.15 L.F. at 409-471).[1]  Thereafter, the post-conviction trial court denied counsel access to this evidence, without a written opinion, on March 12, 2004.  (29.15 L.F. at 750).

A state's failure to disclose the mental health history of its key witness violates a defendant's due process rights under *Brady. East v. Johnson,* 123 F.3d 235, 238 (5th Cir. 1997).  In *East*, the state's key witness, who suffered hallucinations and had previously been found mentally incompetent to stand trial on an unrelated crime, testified at the penalty phase in the defendant's death penalty case regarding his future dangerousness in support of the state's request for  death.  *Id.* at 238-239.  The Fifth

---

[1]This motion also set forth the facts that Cole and Asaro had been treated for mental illnesses and addictions to illegal drugs; incarcerated multiple times; applied for SSI (supplemental security income) from the Social Security Administration on the grounds of mental illnesses and addictions to illegal drugs; and that Cole testified in his pre-trial deposition that his abuse of illegal drugs and alcohol caused him to experience hallucinations and memory loss.  (29.15 L.F. at 426-430).

13

Circuit found that the state's failure to disclose this mental health history deprived the defendant of material impeachment evidence and resulted in a denial of due process. *Id.* 241.  As in *East,* the state's failure here to disclose the mental health histories of Cole and Asaro, who were the only witnesses to directly implicate petitioner as the perpetrator, unconstitutionally deprived defense counsel from accessing and using material impeachment evidence.

Federal habeas courts have held that seriously flawed state fact-findings, similar to the situation here, constitute an "unreasonable determination of the facts in light of the evidence presented in the state court proceeding" under §2254(d)(2).  Factual findings made by state court without holding a hearing and giving petitioner the opportunity to present evidence, result in an "unreasonable determination of the facts." *See e.g. Bryan v. Mullen*, 335 F.3d 1207, 1215-1216 (10th Cir. 2003); *Weaver v. Thompson*, 197 F.3d 359, 363 (9th Cir. 1999). The factual mistake in the Missouri decision that overlooked or ignored petitioner's extraordinary efforts to subpoena Cole and Asaro's records was also unreasonable  under §2254(d)(2).  *Simmons v. Luebbers*, 299 F.3d 929, 937-938 (8th Cir. 2002); *Hall v. Dir. of Corr.*, 343 F.3d 976, 983 (9th Cir. 2003).  Finally, the fact that the state decision ignores the existence of a material and crucial piece of evidence (the court ordered psychiatric evaluation of Cole) also undermines the reliability of the fact finding process to a sufficient degree

14

to permit relief under §2254(d)(2).  *Miller-El v. Cockrell*, 537 U.S. 322, 346 (2003); *Taylor v. Maddox*, 366 F.3d 992, 1006-1008 (9th Cir. 2004).

Respondent's argument asserts that the state need not have"go[ne] on a fishing expedition into the mental health records of its witnesses" (Resp. at 14) is specious, because it ignores the state's absolute constitutional obligation to discover, and disclose to defense trial counsel,*all material exculpatory evidence* regarding guilt and punishment - including impeachment evidence - known to those acting on its behalf. *Banks v. Dretke,* 540 U.S. 668, 691, 695-696 (2004); *Strickler v. Greene,* 527 U.S. 263, 281 (1999); *Kyles v. Whitley,* 514 U.S. 419, 437-438 (1995); *United States v. Bagley,* 473 U.S. 667, 676, 682 (1985); *United States v. Agurs,* 427 U.S. 97, 103-108 (1976); *Brady v. Maryland,* 373 U.S. 83, 87 (1963).  In the case at hand, those acting on the state's behalf included, for example, the: St. Louis Workhouse, Division of Family Services, Missouri Department of Corrections, and Clerk of the Circuit Court (St. Louis, Missouri) (as well as the mental health expert who examined Cole in *State of Missouri v. Cole,* Cause No. 941-4190.[2]) For example, Cole testified at his pre-trial deposition that he had received treatment at the Department of Corrections and the St.

---

[2]This mental health expert's report would have been sent to the state.  *See* §552.020.6 RSMo. (2000)("The clerk . . . shall deliver copies of the report to the prosecuting or circuit attorney. . .").

Louis City Workhouse for his use of illegal drugs, including crack, marijuana, and heroin, which caused him to suffer from hallucinations and memory loss. (Cole pre-trial depo., 4/2/2001-4/3/2001, at 63, 137-139; 171-173; 29.15 L.F. at 115-117). Specifically, with respect to St. Louis Cause No. 941-4190, Cole was incarcerated in a Department of Corrections facility in order to receive rehabilitation treatment for his use of illegal drugs. (Cole pre-trial depo., 4/2/2001-4/3/2001 at 72-75).

Simply put, the state failed to comply with its obligations to disclose (1) Cole's mental health records maintained by these and other governmental entities acting on its behalf and (2) Asaro's medical and mental health records, including those to which it had waived any objection to (different) defense counsel obtaining them in a separate (non-death penalty) case against petitioner. *Williams v. Roper*, 2005 WL 2931933 at *20 (E.D. Mo. 11/4/2005).[3]

Respondent's argument that "Williams appears to argue that he is entitled to relief although he never explained to the state courts specifically what the relevant information is or how it would have made it more probable than not [t]hat he would have been acquitted," (Resp. 14), mischaracterizes both the facts and the law.

---

[3]The state then introduced the conviction of Williams in that separate case as an aggravator against him in the death penalty case at hand. *State v. Williams,* 97 S.W.3d 462, 470, 473 (Mo. banc 2003).

16

Petitioner and his attorneys did their best to attempt to discover and detail this information, but were thwarted by the state and the trial court at every turn. Respondent also misstates the *Brady* materiality test. (*Id.*). The correct standard for prejudice is whether there would be a *"reasonable probability" of a different result* in either the trial or penalty phases. *Strickler,* 527 U.S. at 280 (emphasis added).

Based upon the foregoing facts and the applicable law, this court should reconsider its prior rulings and grant discovery and an evidentiary hearing on this claim. Once the facts are fully developed, habeas relief will be appropriate under both §2254(d)(1) and (2).

**B.**   **The Missouri Supreme Court decision addressing the state's offers to help two defendants if they testified against petitioner involved an unreasonable application of Supreme Court precedent.**

The state engaged in misconduct when it tried to entice two incarcerated men, Kimber Edwards and John Duncan, to falsely implicate petitioner in this killing. (Hab. Pet., Exhs. 2 and 3). Edwards was arrested in August 2000 and, upon such arrest, taken to the University City Police Department. University City Detective Dorothy Dunn then spoke to Edwards: she told him she could help with his case if he would testify against petitioner and say that petitioner confessed in detail to him when both of them were at the St. Louis Workhouse. (Hab. Pet. Exh. 3). In reply, Edwards

replied that he knew nothing about petitioner's case and that he had not been at the

Workhouse at the time in question.  (*Id.*).  However, as Edwards recounts:

> This did not seem to matter to [Dunn].  She said the defense would never check on that.  She continued to insist that if I agreed to give this testimony, I could be given a break on my own case.  I declined to give false testimony in order to help myself.

(*Id.* at ¶8).

Similarly, the state approached Duncan, who was incarcerated with petitioner

at the Workhouse, and told him that another Workhouse inmate, Matthieu Hose, had

said that petitioner confessed in detail to him. (Hab. Pet. at Exh. 2).  Duncan said that

Hose could not have heard anything from petitioner because Hose was always in his

own cell and was never alone with petitioner.  (*Id.*).  The trial transcript fails to reflect

that the state disclosed Duncan's statements to petitioner's trial counsel.  It reflects

only that Prosecutor Larner stated that he would not use Hose's statement setting forth

this purported confession at petitioner's trial because he did not want to provide the

defense with any support for a continuance of the trial date.  (Tr. 100).

The Missouri Supreme Court's decision addressing this misconduct by the state

found that:

> It is speculative and conclusory to allege that the prosecutor's offer of assistance to two men who did not testify at trial is tantamount to the "manufacture" of evidence that negatively impacts the credibility of witnesses who testified and were subject to cross-examination. The

18

motion court did not err in denying this claim without an evidentiary hearing.

*Williams v. State, supra,* 168 S.W.3d at 440.

This decision involves an unreasonable determination of fact as well as an unreasonable application of Supreme Court law requiring disclosure of material and favorable evidence.  *Kyles v. Whitley,* 514 U.S. 419, 445 (1995); *United States v. Bagley,* 473 U.S. 667, 682 (1985).  Trial counsel could have used this evidence from Edwards and Duncan at trial to argue to the jury that the state's desperate efforts in "soliciting snitches" undermined the credibility of Cole and Asaro.  Coupled with Cole and Asaro's other credibility problems, this evidence could have tipped the scales in favor of acquittal.

The balance of the issues implicating *Brady v. Maryland*, 373 U.S. 83, 87 (1963), were adequately addressed in petitioner's habeas petition.

## CLAIM 2 - TRIAL COUNSEL'S INEFFECTIVENESS IN FAILING TO IMPEACH HENRY COLE.

Petitioner presented specific facts to the 29.15 motion court establishing trial counsel's ineffectiveness in failing to investigate and present available evidence from Henry Cole's family members which would have adversely impacted his credibility. (*See* Hab. Pet. Exh. 4-6, Affidavits of Johnifer Cole Griffin, Durwin Cole, and Ronnie Cole).  However, in addressing the claim, the Missouri Supreme Court stated:

19

To prevail on a claim of ineffective assistance of counsel for failure to call a witness, a defendant must show that: (1) trial counsel knew or should have known of the existence of the witness; (2) the witness could be located through reasonable investigation; (3) the witness would testify; and (4) *the witness' testimony would have produced a viable defense. Hutchison v. State*, 150 S.W.3d 292, 304 (Mo. banc 2004). Counsel's decision to not call a witness is presumptively a matter of trial strategy and will not support a claim of ineffective assistance of counsel unless the defendant clearly establishes otherwise. *Id.*

*Nearly all of the alleged testimony that Mr. Cole's family members could have offered involved prior misconduct such as domestic violence and drug and alcohol abuse.* Williams argues that this Court's decision in *State v. Long*, 140 S.W.3d 27, 30 (Mo. banc 2004), allows the admission of testimony from Mr. Cole's family to impeach his testimony. However, the *Long* decision did not abrogate the rule that extrinsic evidence of prior witness misconduct is generally inadmissible. To the contrary, *Long* expressly upheld the rule that extrinsic evidence of prior, specific acts of misconduct is generally inadmissible and held only that a witness may be impeached with extrinsic evidence "in some cases" where the "prosecuting witness" has made prior false allegations. *Id.* at 31. *Mr. Cole was neither a victim nor a prosecuting witness. Therefore, as the motion court found, any testimony regarding Cole's prior, unrelated misconduct was not admissible to impeach his trial testimony.* Trial counsel was not ineffective for declining to investigate and introduce inadmissible evidence. *State v. Ferguson*, 20 S.W.3d 485, 507 (Mo. banc), *cert. denied*, 531 U.S. 1019, 121 S.Ct. 499, 148 L.Ed.2d 582 (2000).

Williams also contends that counsel was ineffective for failing to investigate Cole's alleged mental illnesses in order to have him declared incompetent to testify. Williams' Rule 29.15 motion alleged that Cole had previously been treated for drug addiction and mental illness and did not specify any information in his records that would have established Cole's incompetence to testify. From this assertion, Williams concludes that the information in Cole's records would have caused the trial court to find Cole incompetent to testify. *Williams' allegations are speculative*

20

*conclusions, not facts,* and the motion court properly dismissed this claim without an evidentiary hearing.

*Williams v. State, supra,* 168 S.W.3d at 441 (emphasis added).

This court must review this claim *de novo* because the Missouri decision was based upon an unreasonable determination of the facts under §2254(d)(2) for two reasons. First, as noted earlier, the 29.15 motion court denied petitioner's discovery requests, quashed his subpoenas, and denied him an opportunity to present evidence at a hearing. *See e.g. Nunes v. Mueller*, 350 F.3d 1045, 1055 (9th Cir. 2003). Second, the decision misapprehended and ignored a material factual issue and material evidence that supported this claim for relief. *Miller-El v. Cockrell*, 537 U.S. 322, 346 (2003); *Hall v. Dir. of Corr.*, 343 F.3d 976, 983 (9th Cir. 2003).

For example, the testimony that Cole's family members would have offered involved *far more* than simply "prior misconduct such as domestic violence and drug and alcohol abuse." *Williams v. State, supra,* 168 S.W.3d at 441. The state decision entirely failed to address the substance of this testimony, indicating that Cole had: (1) bragged that he had a "caper" going on and something "big" was coming; (2) a long history of making false allegations against others and lying in the past; and (3) an established reputation for making such false allegations about others to the police in exchange for lenient treatment. (Hab. Pet. Exh. 4, ¶¶ 19, 22, 30-31, 34, 36; Exh. 5, ¶¶

21

13-15, 17, 19; and Exh 6, ¶¶ 8, 11; 29.15 L.F. at 129-131, 136-138).  Cole's relatives

would have also testified regarding Cole's long history mental illnesses, abuse of illegal

drugs, and related problems, including his failure to take his psychiatric medications

and his experiences of hallucinations.[4]  Because the state decision misapprehended and

ignored the nature of this crucial impeaching evidence, this claim is reviewable *de novo*

under §2254(d)(2).  *Taylor v. Maddox*, 366 F.3d 992, 1006-1008 (9th Cir. 2004).

The Missouri Supreme Court found that petitioner was not entitled to relief

because he could not specify the information in Cole's records regarding mental illness

and competence to testify, ignoring the fact that the 29.15 motion court precluded

petitioner from developing facts by denying discovery, quashing all of petitioner's

subpoenas, and denying an evidentiary hearing on this issue.  This entire process was

---

[4]All of this testimony would have been admissible because it would have
rebutted Cole's trial testimony that he "[did]n't have no reason to tell no lies about
nothing." (Tr. 2458).  *See State v. Long, supra,* 140 S.W.3d at 30-31 (not limiting
examination of credibility to that of prosecuting witness; "Where, as in this case, a
witness' credibility is a key factor in determining guilt or acquittal, excluding
extrinsic evidence of the witnesses' prior false allegations deprives the  fact-finder
of evidence that is highly relevant to a crucial issue directly in controversy; the
credibility of the witness. An evidentiary rule rendering non-collateral, highly
relevant evidence inadmissible must yield to the defendant's constitutional right to
present a full defense;" "Prior false allegations are relevant to the witness'
credibility.").

patently unfair.[5]  For the reasons advanced under Claim 1, this court should revisit the issues involving discovery of Cole's mental health records and grant an evidentiary hearing.

The state decision is also "contrary to" Supreme Court law because its finding that "[t]o prevail on a claim of ineffective assistance of counsel for failure to call a witness, a defendant must show that: . . . . the witness' testimony would have produced a viable defense," *Williams v. State, supra,* 168 S.W.3d at 441, interjects an additional condition to the *Strickland* test not mandated by clearly established Supreme Court law.  §2254(d)(1); *Williams v. Taylor,* 529 U.S. 362, 394-397 (2000); *Strickland v. Washington,* 466 U.S. 668, 687-688 (1984).  Instead, clearly established law holds that a habeas petitioner need *only* show that counsel's performance was objectively unreasonable, *Strickland, supra,* 466 U.S. at 688, and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the

---

[5]Joseph Heller, Catch-22, ch. 5 (1955):

"There was only one catch and that was Catch-22, which specified that a concern for one's own safety in the face of dangers that were real and immediate was the process of a rational mind.  Orr was crazy and could be grounded.  All he had to do was ask; and as soon as he did he would no longer be crazy and would have to fly more missions....  If he flew them he was crazy and didn't have to; but if he didn't want to he was sane and had to....  'That's some catch, that Catch-22,' he [Yossarian] observed.  It's the best there is," Doc Daneeka agreed."

23

proceeding would have been different," with "a reasonable probability [being] a probability sufficient to undermine confidence in the outcome." *Id.*, 466 U.S. at 694. In assessing deficient performance, counsel's "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 690-691.

In the case at hand, petitioner's trial counsel failed to undertake a complete or reasonable investigation, as evidenced by Mr. Green's statement in his affidavit that he "was very interested in finding out everything he could about the state's snitches, Henry Cole and Laura Asaro." (*See* Hab. Pet., Exh. 10 at ¶ 8). In fact, Green had learned (only) a brief version of Cole's mental health history and abuse of drugs and alcohol, and felt that this "area of investigation w[as] critical to the credibility of the witnesses . . . because they [Cole and Asaro] were the only witnesses who could connect [Petitioner Williams] with the crime." (*Id.* at ¶¶ 9-10). Nonetheless, he failed to interview Cole's family despite petitioner's urging to do so. (*Id.* at ¶¶ 15-16, 18).

"Had [trial counsel] investigated . . .Cole's family members and learned the information contained within their [post-conviction] affidavits," they would have presented these members as witnesses in the guilt phase in order to impeach Cole and support their theories that petitioner did not commit this killing, and that Cole was

24

mentally ill and would say anything for money, in addition to the fact that Cole may not have been competent to testify. (*Id.* at ¶¶ 16-18).

In opposing relief on this claim, respondent cites the Missouri decision, quoted above, finding that Cole's prior acts of misconduct would be inadmissible to impeach him under state law. (Resp. 18). Citing *Schleeper v. Groose*, 36 F.3d 735 (8th Cir. 1995), respondent argues that a federal court may not reexamine a ruling involving the admissibility of evidence under state law. (Resp. 18).

Respondent's argument is meritless. As noted earlier, the Missouri Supreme Court decision misapprehended and ignored the true nature of the impeachment evidence at issue. As the Cole family affidavits reflect, the true nature of this evidence was that Cole made statements to them suggesting that he was fabricating his testimony against petitioner to benefit himself, Cole's mental illness was serious and involved hallucinations, and that Cole had a poor reputation in the community for truthfulness. Evidence of this nature is undeniably admissible under established evidentiary rules to impeach a witness. *See United States v. Lindstrom*, 698 F.2d 1154, 1163-1164 (11th Cir. 1983); *State v. Cross*, 343 S.W.2d 20, 23 (Mo. 1961); *Kuehne v. State*, 107 S.W.3d 285, 294 (Mo. Ct. App. W.D. 2003). Moreover, had the trial court excluded this material impeachment evidence, it would have denied petitioner his Sixth Amendment right to confront his accuser and his due process right

25

Case: 4:05-cv-01474-RWS   Doc. #: 45   Filed: 08/31/07   Page: 30 of 95 PageID #: 504



to present exculpatory evidence in his defense. *See e.g. Davis v. Alaska*, 415 U.S. 308, 315-317 (1974); *Chambers v. Mississippi*, 410 U.S. 284 (1973).

The *Schleeper* case is clearly distinguishable because the issue before that court was the adequacy of Missouri's escape rule which was held to be an adequate and independent state procedural bar to obtaining federal habeas relief. 36 F.3d at 736-737. No such issue is presented in the case at hand.

Because the Missouri decision rested upon an unreasonable determination of fact and misapprehended and ignored the true nature of the impeachment evidence involved, §2254(d) is no impediment to habeas relief. Because Cole's credibility was one of the paramount issues for the trier of fact to determine, this additional impeaching information could have reasonably affected the outcome at the guilt and penalty phase of trial under the *Strickland* prejudice test. 466 U.S. at 694. Habeas relief is warranted.

## CLAIM 3 - TRIAL COUNSEL'S FAILURE TO IMPEACH LAURA ASARO.

The Missouri Supreme Court's post-conviction decision found, in part, that (1) testimony from two potential witnesses whom defense trial counsel should have called at the guilt phase "would have been cumulative to the evidence at trial because the record contained evidence of [Laura] Asaro's drug addiction, prostitution, and that she might receive reward money for testifying at trial"; (2) the "allegation that [Asaro's

26

mother] knew that Williams' car was inoperable during the time the murder was committed is conclusory because it is based only upon the allegation that on several occasions in August 1998 she saw Asaro and Williams use public transit"; (3) the "allegation that Asaro gave her mother some coupons does not establish that they were, in fact, the same coupons that had been in the victim's purse"; and (4) counsel's failure to test Asaro's "'blood, hair, and fibers' in order to connect her to the crime scene . . . rely upon speculative conclusions that if such testing was performed, it would show that Asaro was present at the crime scene." *Williams v State,* 168 S.W.3d 433, 441-442 (Mo. 2005).  Because the Missouri decision failed to analyze petitioner's counsel's performance under the *Strickland* standard, this court must review this question *de novo.  See e.g. Dickerson v. Bagley*, 453 F.3d 690, 697 (6th Cir. 2006).

*Strickland* requires a petitioner presenting a claim of ineffective assistance of counsel to show that counsel's performance was objectively unreasonable. *Strickland, supra,* 466 U.S. at 688.  Regarding performance, counsel's "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 690-691.

27

It is evident that counsel's investigation here was less than complete and less than reasonable. Mr. Green *knew*, for example, that Asaro "had not been ruled out as a suspect" in the killing of the victim. (Hab. Pet. Exh. 10, ¶ 22). However, he and his co-counsel failed to investigate and present available evidence that would have demonstrated Asaro's utter lack of credibility and her personal interest in implicating petitioner so that she would be "ruled out as a suspect." A reasonably competent attorney would have interviewed Asaro's family, friends, and neighbors and obtained this impeaching information. *See Williams v. Washington*, 59 F.3d 673, 681 (7th Cir. 1995).

The Missouri decision also unreasonably applied the *Strickland* prejudice test in finding that "additional evidence of Asaro's drug addiction, prostitution, and anticipation of receiving reward money" was "cumulative" of other trial testimony. *See Workman v. Tate,* 957 F.2d 1339, 1346 (6th Cir.1992) (counsel ineffective in failing to present testimony from two witnesses whose testimony was cumulative in some respects to trial evidence, because it would have contradicted the arresting officers' testimony). *See also, Parker v. Bowersox*, 188 F.3d 923, 930 (8th Cir. 1999). As set forth in greater detail below, the testimony of Edward Hopson and Colleen Bailey was not, in any way, cumulative to the information elicited at trial that Asaro was a drug-addicted prostitute who expected a reward for her testimony.

28

Instead, the available testimony that counsel failed to obtain and present to the jury consisted of direct evidence that Asaro fabricated her identification of petitioner as the perpetrator in order to obtain reward money, as well as direct evidence of Asaro's long history of dishonesty and her career as a police informant. *See Williams v. Taylor*, 529 U.S. 362, 416 (2000)(relief appropriate under unreasonable application clause of §2254(d)(1) where state decision "reveals an obvious failure to consider the totality of the omitted . . . evidence.").

The Missouri decision further unreasonably construed material facts when it held that Asaro's mother's knowledge that petitioner's car was inoperable during August 1998 (which was the month in which the killing at hand occurred) was "conclusory" on the basis that she saw Asaro and petitioner use public transportation "on several occasions" that month. *Williams v State, supra,* 168 S.W.3d at 441-442. This logic fails to recognize that Asaro's mother's testimony was relevant circumstantial evidence which the jury was entitled to hear and consider in order to infer that petitioner's car was inoperable. *See e.g. State v. Lasley*, 583 S.W.2d 511, 515-516 (Mo. 1979)(defining circumstantial evidence as "evidence which, without going directly to prove the existence of a fact, gives rise to a logical inference that such fact does exist.").

29

Similarly, the Missouri decision's finding that petitioner's "allegation that Asaro gave her mother some coupons does not establish that they were, in fact, the same coupons that had been in the victim's purse" was an unreasonable application of *Strickland*. *Williams v. State, supra,* 168 S.W.3d at 441-442.  Like the car evidence, the court failed to recognize that the jury was entitled to consider this circumstantial evidence to reasonably infer that Asaro obtained these coupons from the victim's purse.        Finally, the state decision unreasonably found that counsel's failure to test Asaro's "'blood, hair, and fibers' in order to connect her to the crime scene" lacked factual support.  *Id.*  Counsel had knowledge that (1) no physical evidence linked petitioner to the killing, (2) testable trace evidence existed that did not match petitioner, the victim or her husband, and (3) Asaro had not been ruled out as a suspect.  (Hab. Pet. Exh. 10, ¶ 22).  However, the court stated:

> The allegations contain "no specific facts" and "speculative conclusions that if such testing was performed, it would show that Asaro was present at the crime scene."

*Williams v State, supra,* 168 S.W.3d at 441-442.

As noted before, this finding is unreasonable under §2254(d)(2) because it ignored the 29.15 motion court's denial of discovery, quashing of  subpoenas, and denial of a hearing that precluded the development of "specific facts." (*See* pp. 10-13, *infra*.).

30

Additionally, the Missouri decision's analysis of prejudice involves an unreasonable determination of the facts under §2254(d)(2) because it completely ignored the testimony of Edward Hopson and Colleen Bailey. (Hab. Pet. Exh. 7). *See* 28 U.S.C. §2254(d)(2). Hopson, who has known Asaro since she was eight years old and who dated Asaro's mother, averred that Asaro "had sex with many members of the St. Louis Police Department for drugs or money," "cultivated a tight relationship with the police officers," and "would say whatever they wanted her to say" when they needed her to be an informant. (Hab. Pet. Exh. 7, ¶ 6). Asaro was "a paid informant for years." (*Id.* at ¶¶ 9, 10). Additionally, she "falsely accused men of rape and had them thrown in jail." (*Id.* at ¶ 13). She even "convinced her daughter to falsely accuse [Hopson] of having sex with [the daughter]." (*Id.* at ¶ 14).

Hopson also confirmed that Asaro had told Colleen Bailey that she "was looking forward to testifying in the case because she was anticipating receiving a substantial amount of money for her testimony." (*Id.* at ¶ 15). Bailey, a long-time neighbor of Asaro's mother, Cynthia, "would have testified that she had many conversations with Asaro during the time immediately prior to" petitioner's trial, and told Bailey that "she was setting up her drug dealer boyfriend and was going to testify against him at trial" in exchange for "a substantial amount of money." (29.15 L.F. at

31

155-156). Like Hopson, Bailey knew that Asaro was a police informant who had previously cooperated with the police in exchange for money and drugs. (*Id.*)

The Missouri decision's implicit determination that the aforementioned evidence from Hopson and Bailey was cumulative to the impeachment evidence at trial that Asaro was a drug-addicted prostitute rests on an "unreasonable determination" of material fact. As a result, this court is free to review this issue *de novo* and grant relief under §2254(d)(2). *See Simmons v. Luebbers*, 299 F.3d 929, 937-938 (8th Cir. 2002). The aforementioned discussion removes any doubt that the post-conviction evidence provided by Hopson and Bailey was qualitatively different from the impeachment evidence introduced at trial. Because the Missouri decision ignored and misapprehended material evidence supporting this claim for relief, §2254(d)(2) is no impediment to granting habeas relief. *See e.g. Taylor v. Maddox*, 366 F.3d 992, 1001 (9th Cir. 2004). In addition, like the prior two claims for relief, this claim is reviewable *de novo* under §2254(d)(2) because the state findings are fundamentally flawed because they were issued without the benefit of an evidentiary hearing. *Id.*

This evidence is a far cry from what the jury heard regarding Asaro's unsavory lifestyle. Additionally, Asaro's history as an informant was relevant impeachment evidence indicating her specific interest and motivation in testifying favorably for the state. *See Kuehne v. State*, 107 S.W.3d 285, 294 (Mo. Ct. App. W.D. 2003); *State*

32

*v. Williams*, 492 S.W.2d 1, 6 (Mo. Ct. App. E.D. 1973). Mr. Hopson's testimony, based upon the fact that he has known Ms. Asaro since childhood, would also have been admissible impeachment evidence under Missouri law on the issue of Asaro's reputation in the community for truthfulness and veracity. *See e.g. State v. Cross*, 343 S.W.2d 20, 23 (Mo. 1961).

This additional evidence would have utterly destroyed Asaro's credibility in the eyes of the jury. *Strickland* prejudice is established because Asaro and Cole were the state's "make-or-break witness[es]." *See Killian v. Poole*, 282 F.3d 1204, 1209-1210 (9th Cir. 2002). Coupled with the lack of physical evidence and the inherent lack of credibility of Mr. Cole, had the jury heard of Ms. Asaro's history of fabricating stories to assist the police and the direct evidence that she was framing her current boyfriend for the reward money, there is more than a reasonable probability that the outcome at both stages of the trial would have been different. *See Reynos v. Giarbino*, 462 F.3d 1099, 1116 (9th Cir. 2006)(finding prejudice in failing to impeach snitches where there was no physical evidence of guilt). Habeas relief is warranted.

### CLAIM 4 - INNOCENCE/PERJURED TESTIMONY CLAIM

In addressing this issue, respondent raises a threshold procedural bar argument, arguing that the aspect of the claim alleging perjured testimony is defaulted because it

was not raised in state court. (Resp. 24). As set forth under Claim 1, petitioner did brief a *Brady* claim involving Cole and Asaro on his 29.15 appeal.

Respondent's argument ignores the inescapable fact that there is considerable overlap between *Brady* and perjured testimony claims, particularly when the nature of the claim involves the prosecution's failure to disclose deals with a snitch or correct inaccurate testimony given by a cooperating witness. In such situations, there are distinct and interrelated due process violations involving the failure to disclose impeaching information as well as the failure of the state to correct the witness' false testimony that they either knew or should have known was false. *See e.g. Napue v. Illinois*, 360 U.S. 264, 269 (1959). The same situation is presented here.

Principles of exhaustion and procedural default require a prisoner to have "fairly presented" his claims in state court. *Picard v. Connor*, 404 U.S. 270, 275 (1971). A federal habeas claim need only be "closely related" to the one advanced in state court, and the case law requires only an "arguable factual commonality" between the two. *Kenley v. Armontrout*, 937 F.2d 1298, 1302-1303 (8th Cir. 1991). A petitioner may amplify a state court claim with additional facts and legal arguments so long as the "substance" of the claim is presented. *Odem v. Hopkins*, 192 F.3d 772, 776 (8th Cir. 1999). Although this claim could have and should have been more artfully raised, the *Brady* claim raised on direct appeal also fairly presented the substance of the perjured

34

testimony claim now before this court for review. *See Clemmons v. Delo*, 124 F.3d 944, 952 (8th Cir. 1997). There is no procedural bar to this claim.

Assuming for the sake of argument that a procedural default does exist, petitioner can overcome such bar, if granted discovery and an evidentiary hearing, under the gateway innocence test of *Schlup v. Delo*, 513 U.S. 298 (1995). In addressing the gateway innocence issue, respondent contends that petitioner cannot rely on actual innocence because none of his evidence is new and because it could have been presented earlier through the exercise of due diligence. (Resp. 23). This argument is refuted by the record.

As petitioner pointed out in Claim 1, *infra*, state post-conviction counsel exercised extraordinary diligence in attempting to obtain information to establish that Cole and Asaro were unworthy of belief. Counsel were thwarted at every turn by both the government and the trial court. In particular, the trial court quashed all of state post-conviction counsel's subpoenas in which they sought to discover the evidence to prove this claim for relief. (*See* pp. 10-13. *infra*.)

In addition, as petitioner's prior discovery and evidentiary hearing motions set forth, there is available genetic material never subjected to DNA testing that could conclusively establish petitioner's innocence. If DNA testing produces a match through the law enforcement database of another individual, this would certainly

35

constitute new and inconvtravertible evidence of innocence. Respondent also neglects to mention anything about the issue of the Debra McClain murder in Pagedale. Petitioner, in the interest of brevity, will not rehash the arguments he has already made in regard to the aforementioned discovery and evidentiary hearing motions.

However, it is clear that if DNA tests matched the unknown trace evidence from the scene of the killing to another individual, this "new evidence" would clearly suffice under *Schlup* to permit review of the perjured testimony claim. *See House v. Bell*, 126 S.Ct. 2064 (2006). Obviously, if DNA testing conclusively establishes that petitioner was not the perpetrator, Cole and Asaro were obviously lying when they identified him as the killer. This court should revisit these issues and grant appropriate discovery and an evidentiary hearing to permit petitioner to develop this claim of innocence.

Respondent also argues that freestanding claims of actual innocence are not cognizable in this circuit. (Resp. 23). Petitioner must candidly concede that there is case law to that effect. However, the Eighth Circuit view is contrary to *Herrera v. Collins*, 506 U.S. 390 (1993), and the views of other circuits. *See e.g. Triestman v. United States*, 124 F.3d 361, 379 (2nd Cir. 1997); *Felker v. Turpin*, 83 F.3d 361, 379 (11th Cir. 1997). In the event of a DNA exoneration, as noted above, this action would provide an ideal test case for discretionary review of the viability of free-

36

standing innocence claims before the Eighth Circuit *en banc* as well as the United States Supreme Court.

Finally, respondent argues that petitioner cannot have a hearing or discovery to develop his innocence claim because he advanced only bare allegations of innocence, citing *Weeks v. Bowersox*, 119 F.3d 1342 (8th Cir. en banc 1997). (Resp. 23-24). *Weeks* is clearly distinguishable from petitioner's case because there are tangible facts here indicating that persuasive evidence of innocence could be developed. This is particularly true with regard to the trace evidence/DNA testing issue, the unsolved McClain murder in Pagedale,[6] and evidence that mental health records and other impeaching information regarding Cole and Asaro actually do exist. In *Weeks*, in contrast, the petitioner claimed he had several witnesses who could provide exculpatory evidence. However, *Weeks* did not provide a single affidavit to the court from any of these witnesses. *Id*. at 1352-1353.  As the record in this case reveals, this case presents a "horse of a different color."  This court should reconsider its previous rulings and grant discovery to preclude the constitutionally intolerable risk of the execution of an innocent man. *Herrera v. Collins*, 506 U.S. at 419. (conc. op's of O'Connor and Kennedy, JJ.)

---

[6] There are extraordinary similarities between the Gayle and McClain homicides, according to Dr. Mary Case. (*See* Exh. 16, attached hereto).

## CLAIM 5 - THE *BATSON* CLAIM

### A.      Introduction

In petitioner's case – a high-profile, first-degree murder/death penalty case in which petitioner, an African-American man from the inner-city, was accused of killing a well-liked, upper-middle class Caucasian woman, who wrote for the St. Louis Post-Dispatch and was married to a prominent physician -- St. Louis County Prosecutors Mark Bishop and Keith Larner used 6 of 9 peremptory strikes (that is, 67 percent) against all but one (that is, 6 of 7, or 86 percent) of the African-American prospective jurors.  (Tr. 1568) (listing State's peremptory strikes against Prospective Jurors 8, 14, 18, 53, 58, 64, 65, 69, and 72); (Tr. 1569) (listing Prospective Jurors 8, 12, 58, 64, 65, 69, and 72 as African-American); (Tr. 3202; 3210).  *See Miller-El v. Cockrell ("Miller-El I"),* 537 U.S. 322, 342 (2003) (where prosecutors used 10 of 14 peremptory strikes (that is, 71 percent) against African-American prospective jurors, this "statistical evidence alone raises some debate as to whether the prosecution acted with a race-based reason when striking prospective jurors"), and *Miller-El v. Dretke ("Miller-El II"),* 545 U.S. 231, 239, 240-241 (2005) (same case) ("[t]he numbers describing the prosecution's use of peremptories are remarkable").[7]  As a result, eleven

-------

[7]*See also Ford v. Norris,* 67 F.3d 162, 164, 167 (8th Cir. 1995) (affirming grant of habeas relief under *Swain v. Alabama,* 380 U.S. 202 (1965), where

Caucasian (and only one African-American) jurors sat on petitioner's case. Despite the fact that no physical evidence or eyewitness linked petitioner to the crime, the jury found him guilty and sentenced him to death.

## B. St. Louis County prosecutors have a pattern and practice of striking African-American jurors for racially discriminatory reasons.

Earlier this year, at the oral argument in *State v. McFadden ("McFadden II")*, 216 S.W.3d 673 (Mo. banc 2007),[8] the Missouri Supreme Court recognized and voiced their disapproval of St. Louis County prosecutors' pattern and practice of using peremptory strikes against African-American prospective jurors:

---

prosecutor struck all African-American prospective jurors); *Devose v. Norris*, 53 F.3d 201, 203-205 (8th Cir. 1995) (affirming grant of habeas relief under *Batson v. Kentucky,* 476 U.S. 79 (1986), where prosecutors used all peremptory strikes to strike 60 percent of African-American prospective jurors).

[8]Petitioner cites this decision as *McFadden II* in order to distinguish it from *State v. McFadden ("McFadden I"),* 191 S.W.3d 648 (Mo. banc 2006). In both cases, the Missouri Supreme Court reversed the murder convictions (for different crimes) and death sentences of Vincent McFadden, an African-American, under *Batson* because St. Louis County Prosecutor Mark Bishop's explanations for his peremptory strikes against African-American prospective jurors were pretexts for purposeful racial discrimination. *See McFadden I, supra,* 191 S.W.3d at 656; William C. Lhotka, *Murder Conviction Rejected, But Defendant is Expected to Face Execution in Another Killing*, St. Louis Post-Dispatch (May 17, 2006), 2006 WLNR 8502544; William C. Lhotka, *Woman's Killer Gets Death Penalty*, St. Louis Post-Dispatch (May 25, 2006), 2006 WLNR 9024098.
Prosecutor Bishop, incidentally, prosecuted petitioner. (*See, e.g.,* Tr. 1095).

39

Justice: *It's disappointing that there are no African Americans on the jury again in St. Louis County.   Now that's troublesome.*

Justice: *An awful lot of our Batson cases come from there.*

Justice: *All of them recently.*

Oral Arg. CD, submitted to this court with petitioner's Notice of Filing, Exh. 15.

(emphasis added);

Justice: What about the statement of the prosecutor, not so much the judge's motives.   What about the statement of the prosecutor that you're calling me a liar and a racist?   That was never refuted.

Counsel
for State: Well, nobody, and I'm not saying it did or didn't happen.   But -

Justice: Well what's wrong with him defending himself about it?

Counsel
for State: I think there's nothing wrong, nobody wants to be called a racist and, you know,  there's a tendency

Justice: *But is it okay to behave like a racist?*

State: *Right.*

(*Id.* at 26:14-26:37) (emphasis added);

Justice: But can you tell us something about the makeup of the panel too?   *I mean, how did it happen?   Again?   In St. Louis County?*

Counsel

40

for State:      Honestly Your Honor, I can't because there are jury questionnaires in the record. I don't recall that those listed the race of the jurors. I don't recall anything in the record.

Justice:        They don't? On the jury information sheets?

Counsel
for State:      I don't remember seeing it and maybe I just missed it, but I don't remember seeing that.

Justice:        But the counsel doesn't need a selection as to see whether there are African Americans in the jury or not.

(*Id.* at 28:32-29:03) (emphasis added); and

Justice:        And prior to *Batson*, after *Batson*, I have to say in the civil context, which is where most of my life experience came from, we struck and kept jurors all the time because of who they were, ethnically, racially and so forth. It's part of life. So if you're going to eliminate racial bias in peremptory challenges, it strikes me that the way to do that is to eliminate peremptory challenges. But that doesn't solve your problem because your problem is that *we have a fairly repetitive pattern, as Judge Limbaugh indicated, of having a problem with St. Louis County. Because St. Louis County is a county, it's the county where I reside, that has a substantial African American community and we are having, we are seeing still all white juries and that's not mathematically probable.*

(*Id.* at 31:48-32:48) (emphasis added).

The Missouri Supreme Court thereafter reversed McFadden's murder conviction and death sentence in a *per curiam* opinion, holding that Prosecutor Bishop used five of nine peremptory strikes against minority prospective jurors, and

41

that his explanation for one such strike – that the prospective juror had "crazy red hair"[9] -- was implausible and race-based, thus constituting a pretext for purposeful racial discrimination. *McFadden II, supra,* 216 S.W.3d at 674-677.

St. Louis County prosecutors, as *McFadden II* reveals, have a notorious reputation for using peremptory strikes against African-American prospective jurors for racially discriminatory reasons. McFadden's other murder conviction and death sentence was also reversed because Prosecutor Bishop's explanations for striking five African-American prospective jurors were all pretexts for purposeful racial discrimination. *McFadden I,* 191 S.W.3d 648, 656, 657 (Mo. banc 2006). And in 2005, another murder conviction from that county was reversed because the trial court improperly accepted a proposed remedy (the strike of a similarly situated Caucasian juror) from a St. Louis County prosecutor in exchange for his racially discriminatory strike of an African-American prospective juror. *State v. Hampton,* 163 S.W.3d 903, 904-905 (Mo. banc 2005). The court held that:

---

[9]The trial court had agreed with Bishop that the prospective juror's hair "[made] her separate from the crowd, and very individualistic," and denied McFadden's *Batson* challenge. *McFadden [II], supra,* 216 S.W.3d at 676. *Cf. State v. Hopkins,* 140 S.W.3d 143, 156-157 (Mo. Ct. App. 2004) (reversing conviction under *Batson*; trial court held St. Louis prosecutor's partial explanation of strike against African-American prospective juror as not liking juror's hair was race-based).

42

> Having determined there was a Batson violation, the *only* appropriate remedy was to quash the state's strike of [African-American prospective juror] Jones.... Instead, the trial court allowed the state to strike a similarly situated white venireperson, thus leaving the racial composition of the jury intact as if no attempt had been made to remedy the Batson violation. The trial court's remedy does not comport with this Court's precedent regarding the appropriate remedy for a Batson violation because it does not vindicate the equal protection rights of Jones or [defendant] Hampton.

*Id.* at 905.

Missouri's intermediate appellate courts have also reversed a number of St. Louis County convictions because prosecutors struck African-American prospective jurors for racially discriminatory reasons. *See State v. Hopkins,* 140 S.W.3d 143 (Mo. Ct. App. 2004) (prosecutor's explanations for striking three minority prospective jurors were pretexts for purposeful racial discrimination); *State v. Holman,* 759 S.W.2d 902 (Mo. App. Ct. 1988) (rejecting prosecutor's explicit explanation for striking African-American female prospective juror because she was a "woman" and "black"); *State v. Robinson,* 753 S.W.2d 36 (Mo. Ct. App. 1988) (prosecutor struck the only three African-American prospective jurors and failed to rebut defendant's *Batson* challenge); *State v. Williams,* 746 S.W.2d 148, 157 (Mo. Ct. App. 1988) (prosecutor struck the only three African-American prospective jurors; his explanation

43

for one such strike, that the juror was same age as the defendant, was a pretext for purposeful racial discrimination).[10]

Pattern and practice evidence regarding a county's prosecutors' peremptory strikes against African-American prospective jurors constitutes persuasive relevant evidence to a reviewing court's *Batson* analysis. *Miller-El I, supra,* 537 U.S. at 347 (pattern and practice evidence "is relevant to the extent it casts doubt on the legitimacy of the motives underlying the State's actions in petitioner's case"); *Miller-El II,* 545 U.S. at 253 ("the appearance of discrimination is confirmed by widely known evidence of the general policy of the Dallas County District Attorney's Office to exclude black venire members from juries at the time Miller-El's jury was selected."); *Id.* at 263 ("for decades leading up to the time this case was tried prosecutors in the Dallas County office had followed a specific policy of systematically excluding blacks from juries"). *See also, Lark v. Beard*, _ F.Supp 2d _, 2007 W.L. 2007967 (E.D.PA. 2007)(prosecutor's "habit" of striking minority jurors is relevant to pretext inquiry).

---

[10]In addition to this caselaw, petitioner attached Exh. 11 to his Habeas Petition, which consisted of nine affidavits from regularly-practicing St. Louis County criminal defense lawyers, all of whom averred that St. Louis County prosecutors for many years systematically struck African-American prospective jurors. (See also Hab. Pet. at 65-68).

Under *Miller-El*, evidence of systematic discrimination by the prosecutor over a long period of time persuasively demonstrates pretext.

**C.** **Because the Missouri Supreme Court failed to address the third element of the *Batson* test -- whether petitioner had shown that the St. Louis County prosecutors' proffered explanations for striking African-American prospective jurors were pretexts for purposeful racial discrimination -- the standard of review provisions of 28 U.S.C. § 2254(d) do not apply to this court's analysis of pretext.**

The Missouri Supreme Court decision here failed to address both the first *Batson* element (that is, whether petitioner made a *prima facie* showing that the State exercised its peremptory strikes on the basis of race)[11] and the third *Batson* element (whether petitioner showed that the prosecutors' explanations for their strikes were pretexts for purposeful racial discrimination). *State v. Williams,* 97 S.W.3d 462, 471-472 (Mo. banc 2003) (analyzing *only* second *Batson* element; finding that the State presented race-neutral explanations for its strikes). *See Batson v. Kentucky,* 476 U.S. 79, 96-98 (1986) (setting forth test's three elements).  While the first question (of the *prima facie* showing) becomes moot upon a prosecutor's offer of a race-neutral explanation, *Hernandez v. New York,* 500 U.S. 352, 359 (1991),[12] *the third question*

---

[11]Neither the state decision nor respondent disputed that petitioner met this first element.

[12]"A neutral explanation... here means an explanation based on something other than the race of the juror. At this step of the inquiry, the issue is the facial

45

*(of whether such an explanation was a pretext) does not so evaporate* in the *Batson*

inquiry. *Miller-El II, supra,* 545 U.S. at 251-252 (*Batson requires* plausibility of

prosecutor's explanation to be assessed "in light of all evidence with a bearing on it**"**);

*Miller-El I, supra,* 537 U.S. at 329, 338 (court must determine whether defendant has

shown purposeful discrimination); *Purkett v. Elem,* 514 U.S. 765, 768 (1995) (error

occurs where Batson's second and third questions are conflated: "[i]t is not until the

*third step* that the persuasiveness of the [prosecutor's] justification becomes

relevant-the step in which the...court determines whether the opponent of the strike has

carried his burden of proving purposeful discrimination.") (emphasis added) (citing

*Batson, supra,* 476 U.S. at 98; *Hernandez, supra,* 500 U.S. at 359); *Batson, supra,*

476 U.S. at 98 (after race-neutral explanations for strikes are offered, court has "*duty*

to determine if the defendant has established purposeful discrimination") (emphasis

added).[13]

---

validity of the prosecutor's explanation." *Hernandez*, supra, 500 U.S. at 360.

[13]This third *Batson* element, pretext, focuses on the plausibility, persuasiveness, and credibility of the State's explanations for its peremptory strikes of African-American prospective jurors. Implausible explanations by the State, such as those asserting reasons applicable to similarly situated non-African-American prospective jurors whom it did not strike, are pretexts for purposeful discrimination. *Miller-El II, supra,* 545 U.S. at 246, 252, 258 n. 17; *Purkett, supra,* 514 U.S. at 768; *Ford v. Norris,* 67 F.3d 162, 169 (8th Cir. 1995) (under *Swain*); *Walton v. Caspari,* 916 F.2d 1352, 1361-1362 (8th Cir. 1990) (under *Swain*); *Garrett v. Morris,* 815 F.2d 509, 513-514 (8th Cir. 1987) (under *Swain*).

Thus, the standard of review set forth in 28 U.S.C. §2254(d) does not apply to this Court's analysis of the third element of the *Batson* test.  *See Wiggins v. Smith,* 539 U.S. 510, 534 (2003) (where element of relevant legal test is not reached by state court, standard of review in 28 U.S.C. §2254(d) does not apply); *Skillicorn v. Luebbers,* 475 F.3d 965, 972 (8th Cir. 2007); *Honeycutt v. Roper,* 426 F.3d 957, 961 (8th Cir. 2005) (citing *Wiggins, supra*); *Nooner v. Norris,* 402 F.3d 801, 810 (8th Cir. 2005) (same); *Taylor v. Bowersox,* 329 F.3d 963, 967-968 (8th Cir. 2003). Alternatively, the state decision's failure to conduct a comparative juror analysis in order to evaluate pretext is "contrary to" Supreme Court precedent and involves "an unreasonable determination of the facts" under §§2254(d)(1) and (2).  *See e.g. Kesser v. Cambra*, 465 F.3d 351, 358 (9th Cir. en banc 2006).

**D.** **The Missouri Supreme Court decision's finding that the St. Louis County prosecutors' explanation for striking prospective Juror 64, Henry Gooden, an African-American man, because he physically resembled petitioner, also an African-American man, provided a valid, race-neutral explanation for the strike constituted an unreasonable application of**

---

Unpersuasive explanations -- for example, proffers of a prosecutor's alleged concern about which he never inquired of the African-American prospective juror before striking him -- are pretexts for purposeful discrimination. *Miller-El II, supra,* 545 U.S. at 250 n. 8.  And, the credibility of a prosecutor's explanation "can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy." *Miller-El I, supra,* 537 U.S. at 338.

47

**Supreme Court law, as well as an unreasonable determination of the facts.**

The St. Louis County prosecutors explained that they struck prospective Juror 64, Henry Gooden, an African-American man, because: Gooden "looked very similar to the defendant [Williams]" and "reminded [Prosecutor Larner] of the defendant [Williams]," (Tr. 1586); *Williams, supra,* 97 S.W.3d at 471-472. The Missouri Supreme Court decision found that this explanation of Gooden's physical resemblance to Williams -- that is, the one African-American man's physical resemblance to another African-American man -- was neither "an overt, racially motivated reason" nor "inherently race based." *Williams, supra,* 97 S.W.3d at 472. This was an unreasonable application of the *Batson* line of cases, as well as an unreasonable determination of the facts, as perhaps even respondent now realizes, because he has specifically declined to defend this justification in his response. (Resp. 24-26, 28).

This decision was an unreasonable application of the *Batson* line of cases because the prosecutors are prohibited from striking African-American men on the basis of their race (as well as their gender[14]). *See, e.g.*, *Georgia v. McCollum,* 505

_____

[14]*See Rice v. Collins,* 546 U.S. 333, 126 S.Ct. 969, 973 (2006) (in evaluating prosecutor's peremptory strike against African-American prospective juror, trial court correctly disallowed prosecutor's reliance on prospective juror's gender, as

48

U.S. 42, 59 (1992) ("the exercise of a peremptory challenge must not be based on...

the race of the juror"). Additionally, this decision also involved an unreasonable

determination of the facts because the prosecutors struck Gooden on obviously racial

grounds, involving Gooden's and petitioner's shared racial identity. *Ford v. Lockhart*,

861 F.Supp. 1447, 1463 (E.D. Ark. 1994) (it was "obvious information" that

prosecutor struck prospective jurors who had same skin color as defendant), *aff'd,*

*Ford v. Norris,* 67 F.3d 162 (8th Cir. 1995).[15]

To meet the second part of the *Batson* test, the prosecutor's purportedly

"neutral" explanation cannot be based upon the race of the juror. *Hernandez v. New*

*York*, 500 U.S. 352, 360 (1991). The prosecutor's explanation here, that Gooden

resembled the African-American defendant on trial, is undoubtedly "a proxy for race."

*See United States v. Wynn*, 20 F.Supp.2d 7, 15 (D.D.C. 1997). Petitioner has been

---

such was "troubling" to court); *J.E.B. v. Alabama ex rel. T. B.,* 511 U.S. 127, 129 (1994) ("gender, like race, is an unconstitutional proxy for juror competence and impartiality"); *United States v. Omoruyi,* 7 F.3d 880, 881-882 (9th Cir. 1993) (prosecutor's explanation of peremptory strikes of unmarried female prospective jurors on the basis that they would be physically attracted to defendant constituted admission of purposeful gender-based discrimination).

[15]Like petitioner, Ford was an African-American man facing capital murder charges in the high-profile killing of a Caucasian. *Ford, supra,* 67 F.3d at 164; *Ford v. Lockhart,* 861 F.Supp. 1447, 1450 (E.D. Ark. 1994). He was found guilty of shooting a state trooper and sentenced to death by an all-Caucasian jury. *Ford, supra,* 67 F.3d at 164.

49

unable to locate any published decision where a reviewing court considered a neutral explanation for a *Batson* challenge involving the similarity between the appearance of the juror and a black defendant. This lack of authority is undoubtedly due to the fact that prosecutors are usually far too clever to use a criteria tied to racial identity.

The most analogous situation that repeatedly appears in *Batson* jurisprudence involves the situation where the prosecutor attempts to justify a strike by noting that the juror lives in a predominantly African-American inner-city neighborhood. *See e.g. United States v. Mitchell*, 877 F.2d 294, 303 (4th Cir. 1989); *United States v. Briscoe*, 896 F.2d 1476 (7th Cir. 1990). In such situations, where a prosecutor's explanation is so closely tied to race, reviewing courts must determine when such criteria "cease being race-neutral and become a surrogate for impermissible racial bias." *United States v. Bishop*, 959 F.2d 820, 823 (9th Cir. 1992). In *Bishop*, the court found that the government could not meet the second part of the *Batson* test because its explanation that the prospective juror lived in a predominantly African-American area, was not race-neutral because there was no nexus between the juror's residence and any issue in the trial. *Id*. at 825. In the case at hand, the evidence of racial discrimination is significantly stronger for the obvious reason that no Caucasian juror could possibly resemble the defendant.

Therefore, it is inescapable that the St. Louis County prosecutors' strike of Gooden was *not* race-neutral. *See United States v. Wilson,* 884 F.2d 1121, 1123-1124 (8th Cir. en banc 1989) (prosecutor's explanation for his striking African-American prospective juror was not race neutral where it was based on his "belief that [African-American criminal defendants' African-American] friends were more likely to contact [African-American prospective juror] than [a white prospective juror]").  The Missouri Supreme Court's finding to the contrary was objectively unreasonable.

**E.      The state's remaining purported reasons for striking prospective Juror 64, Henry Gooden, an African-American man, were pretexts for purposeful racial discrimination.**

As noted above, this court must review *de novo* the issue of whether the state's reasons offered to justify its strike of Gooden were pretexts for purposeful racial discrimination. The focus of *Batson's* third element is the plausibility, persuasiveness, and credibility of the prosecutors' explanations. The credibility of a prosecutor's explanation "can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy." *Miller-El I, supra,* 537 U.S. at 338.

The prosecutors' additional explanation that they struck Gooden because he "was weak" on the death penalty, (Tr. 1586), is implausible, unpersuasive, and lacks

51

credibility.  This explanation is directly contradicted by Gooden's statements on the record; the prosecutors' strike of another African-American prospective juror who was "stronger" than Gooden on the death penalty; and the prosecutors' failure to strike non-African-American prospective jurors who were "weaker" than Gooden on the death penalty.  *See Ford v. Norris,* 67 F.3d 162, 168-170 (8th Cir. 1995) (granting habeas relief under *Swain* because prosecutor's explanation that African-American prospective juror "was not strong" on death penalty was contradicted by record and applied to other non-African-American prospective jurors not stricken).

Regarding his view on the death penalty, the entire exchange between the prosecutors and Gooden consisted of:

MR. LARNER:     All right.
                Juror Number 64.  In the proper case, under the law and the evidence, could you seriously and legitimately consider imposing the death penalty?

VENIREMAN
GOODEN:         I believe I could.

                        ****

MR. LARNER:     If you were the foreman of the jury, could you sign the verdict of death?

VENIREMAN
GOODEN:         Yes, I could..

MR. LARNER:     You could? Okay. Have you thought about this issue before?

VENIREMAN

GOODEN:          No, not really.

MR. LARNER:      Okay. Have you been in favor of the death penalty in the past, in certain cases?

VENIREMAN
GOODEN:          In certain cases.

MR. LARNER:      Do you think in some cases it might be appropriate, in others it might not?

VENIREMAN
GOODEN:          Yes.

MR. LARNER:      Okay...

(Tr. 762-763).

This record undeniably shows that Gooden could seriously consider imposing the death penalty, could sign the verdict of death, and had previously favored the death penalty in appropriate cases. These facts directly contradict the prosecutors' assertion that Gooden was "weak" on the death penalty. As the Eighth Circuit has held, where an African-American prospective juror answers"yes" to whether she "could and would impose the death penalty in a proper case," a prosecutor's subsequently-asserted explanation for striking her on the basis that "she was not strong on the issue of the death penalty" constitutes a pretext for purposeful racial discrimination. *Ford, supra,* 67 F.3d at 167, 168-169. As the court stated:

> [we cannot] understand how the prosecutor, from this record, could conclude that [this prospective juror] was not strong on the death

penalty.... the record is entirely devoid of evidence to support the prosecutor's proffered reason.

*Id.*

At the same time that the prosecutors justified their strike of Gooden on the alleged basis that he was "weak on" the death penalty, they struck another African-American prospective juror, Linda Jones, who was "strong on" the death penalty, because she stated it must be imposed upon a person who is guilty of killing another; that if a person "take[s] a life, then [his] life should not be spared"; and that "[i]f the death penalty is the penalty, then [she] would have no problems with it." (Tr. 226-227, 228; 1569-1571). This strike of a African-American juror who strongly believed in the death penalty provides powerful evidence that the prosecutors' explanation for striking Gooden as "weak on" the death penalty was, in fact, a pretext for purposeful racial discrimination.

Additionally, the prosecutors failed to strike the following Caucasian prospective jurors who, unlike Gooden, made statements showing that they were "weak on" the death penalty:

First, Prospective Juror 57/McCarthy, who sat as a juror on petitioner's case, said that:

54

> Hypothetically speaking, as we are here today, I would have to say that if you guys decided and proved beyond a reasonable doubt that someone had done the crime, that I would feel comfortable with life in prison. If the mitigating circumstances were outweighed by the aggravating circumstances, I don't necessarily have a clear answer on that . . .

(Tr. 663-664); and

> I would have to say that my belief is as I've already outlined, you know. We're speaking hypothetically here. When it comes down to the brass tacks of actually listening to it, and sitting there, and hearing things, looking across the aisle at the person for three weeks, and hearing what their life is all about, as the events unfolded, you just don't know.
> My belief is that yes, I could say death penalty. But I'm just not a hundred percent.

(Tr. 666).

Second, Prospective Juror 42/Taylor, who sat as a juror on petitioner's case, said that the death penalty was "not something [he] would rush towards" and that while he "absolutely could consider the death penalty," that did not mean that he would. (Tr. 564-565). Third, Prospective Juror 92/Riedy, who was eligible to sit as an alternate juror on petitioner's case, did not raise his hand when asked to do so if he could seriously consider imposing the death penalty. Also, he said that he did not know if he wanted to "[i]mpose the death penalty on somebody"; he would require the State to prove more than the beyond a reasonable doubt standard (that is, being firmly convinced of guilt); and he was "wavering on" the death penalty. (Tr. 1010-1017).

55

In a remarkably similar situation, the Supreme Court of Mississippi found a *Batson* violation, rejecting a similar justification where the juror who was struck answered "yes" to a voir dire question of whether she could consider a death sentence. *Flowers v. State*, 947 So.2d 910, 924-925 (Miss. 2007).

In sum, the St. Louis County prosecutors' alleged explanation for striking Gooden for being "weak on" the death penalty was a pretext for purposeful racial discrimination. This explanation is implausible because it is, at least, equally applicable to Caucasian prospective jurors who were not stricken. *Miller-El II, supra,* 545 U.S. at 246, 252, 258 n. 17; *Purkett, supra,* 514 U.S. at 768; *United States v. Pospisil*, 186 F.3d 1023, 1028 (8th Cir. 1999); *United States v. Brooks,* 175 F.3d 605, 607 (8th Cir. 1999); *Ford v. Norris,* 67 F.3d 162, 169 (8th Cir. 1995) (under *Swain*); *Davidson v. Harris,* 30 F.3d 963, 965-966 (8th Cir. 1994); *Walton v. Caspari,* 916 F.2d 1352, 1361-1362 (8th Cir. 1990) (under *Swain*); *Garrett v. Morris,* 815 F.2d 509, 513-514 (8th Cir. 1987) (under *Swain*). This reason is also unpersuasive because the prosecutors could have, but failed to, inquire further of Gooden regarding his views on the death penalty. *Miller-El v. Dretke, supra,* 545 U.S. at 250 n. 8; *Davidson, supra,* 30 F.3d at 965-966 (because civil rights defendants failed to ask prospective juror about their alleged explanation for striking her, the strike was pretext for purposeful racial discrimination).

56

The prosecution's additional explanation for striking Gooden, because of his clothing and job, was also pretextual.  This criticism of Gooden's clothes (worn on just one of the four days of *voir dire* before strikes were made) was that: his shirt, which had an orange dragon and either "Chinese or Arabic lettering," was "wild;" his religious cross was a "large gold cross very prominent outside his shirt, which [they] thought was ostentatious looking;" and his pants were gray and shiny.  (Tr. 1586.)

In response, defense counsel argued that the prosecutors' criticism, if real, obligated them to make a record on the day that Gooden actually wore these clothes, so that, if necessary, defense counsel could have a fair opportunity to refute it, as well as call to the court's attention the dress of other prospective jurors.  (Tr. 1587-1589). This objection by defense counsel - although rejected by the trial court - was particularly insightful, almost as if he had a crystal ball predicting the Missouri Supreme Court's later *McFadden II* decision. McFadden's counsel "refuted the [St. Louis County prosecutors'] conclusion that [the prospective juror's] hair color was crazy and [also] noted that [the juror] was neatly dressed." *McFadden II, supra,* 216 S.W.3d at 676.  *See People v. White*, 669 N.Y.S.2d 503, 505 (N.Y. App. 1998) (neither the dress of nor the unemployment of African-American prospective jurors were sufficient reasons to justify striking them);  *Rector v. State*, 444 S.E.2d 862, 865 (Ga. App. 1994) (explanation of strike of African-American prospective juror due to

her gold tooth was not race-neutral where prosecutor could not explain tooth's relevance to the case).

Finally, regarding Gooden's employment as a U.S. Postal Service mail processing supervisor, the prosecutors asserted, without inquiring of Gooden, that his job was both "a patronage job" involving a political appointment and that Gooden handled mail and was a clerk. (Tr. 1494, 1586).[16]  They also asserted, again without inquiry, that mail handlers and clerks were politically liberal. (Tr. 1586). Prosecutor Larner said that "postal service workers are very liberal. And I'm talking about mail handlers and clerks. People that work at the post office in that capacity, especially, are that way, it's been my experience when I go into the post office, seeing the people that work there." (Tr. 1586-1587). Petitioner's defense counsel specifically disputed that postal workers were liberal. (Tr. 1588-1589).

The prosecutors' occupation based justification is inherently incredible. The prosecutors *never* asked Gooden any question about his job or political views. And their characterizations of his job – both a patronage position *and* a lower-level mail handler position – appear to contradict each other. *See Moran v. Clarke*, 443 F.3d 646, 650, 652-653 (8th Cir. 2006) (trial court rejected civil plaintiff's contradictory and

---

[16]No facts in the record support these assertions.

58

"difficult to reconcile" explanations for striking four African-American prospective jurors). Additionally, Larner's explanation that his experience in observing mail handlers and clerks when he visited the post office revealed to him that postal clerks are liberal is subjective, improbable, and incredible. In our numerous trips to the post office over the years, neither undersigned co-counsel has ever heard a postal clerk "talk politics" with a customer. Larner's "political" justification also lacks credibility because postal workers are specifically prohibited by the Hatch Act from engaging in political activity on the job. 5 U.S.C. §§7321-7326; (*See also* Exh. 17, pp. 3-4 attached hereto.).

Respondent cites *Williams v. Groose*, 77 F.3d 259 (8th Cir. 1996) for the proposition that the Eighth Circuit has explicitly approved the "postal worker justification" against a *Batson* challenge. (Resp. at 28). That case's entire discussion regarding the prosecutor's peremptory strikes of postal workers was:

> After the prosecutor used peremptory challenges to remove prospective black jurors from the venire panel, Williams objected to their removal. The prosecutor explained that he removed jurors Lacy and Tillman because they are postal workers. This reason is race neutral. [. . . .] Williams did not argue the prosecutor's race-neutral reason was pretextual. Thus, the record supports the district court's finding of no discrimination in the removal of Lacy and Tillman.

77 F.3d at 261. *Groose* is distinguishable because pretext was not an issue in that case.

All of the prosecutor's explanations here, viewed in their totality, demonstrate that they struck Gooden because of his race. Apart from being inherently race based, the "appearance" justification can also be considered as persuasive evidence indicating that the other facially neutral explanations are pretextual. In such situations, reviewing courts have held that explanations that disproportionately exclude jurors on the basis of their race constitute  evidence of pretext if they have no connection to the facts of a particular case. *United States v. Wynn*, 20 F.Supp.2d at 15.

The remaining criteria articulated by the prosecutor, Gooden's dress and occupation, are subjective and implausible. The following passage from a recent *Batson* decision aptly describes these justifications. As Judge Bybee stated: "[The prosecution's] ostensibly 'race-neutral' reasons show themselves to be only a veneer, a pleasing moss having no depth." *Kessler v. Cambra*, 465 F.3d 351, 362 (9th Cir. en banc 2006).  The appearance and employment excuses had nothing to do with the case to be tried. Coupled with the St. Louis County prosecutor's habit of striking black jurors in criminal cases for decades, petitioner has shown by clear and convincing evidence that these justifications were a pretext to strike Gooden because of his race.

**F.**   **<u>The explanations for striking Prospective Juror 65, William Singleton, an African-American man -- that he "was not definite enough" regarding whether he could consider the death penalty and that he had been court-martialed for stealing \$160 -- were pretexts for purposeful racial discrimination.</u>**

60

As set forth earlier, the Missouri Supreme Court's failure to address pretext requires this court to review this issue *de novo*. The St. Louis County prosecutors' explanations for their strike of Prospective Juror 65, William Singleton, an African-American man -- that he was " not 'definite enough' on whether he could consider the death penalty....even though even though he had "stated that he could consider the death penalty," and that he had been "court-martialed...for stealing money,"*Williams, supra,* 97 S.W.3d at 472 -- were implausible and pretexts for purposeful racial discrimination

The explanation that Singleton was "not definite enough" on the death penalty is contradicted by the record, which shows that Singleton said that he could vote for the death penalty, keep an open mind throughout the process, make a decision based on the evidence and the law, and follow the State's burden of proof beyond-a-reasonable-doubt.  (Tr. 763, 768, 775-776, 778).  He did not think that either of the two sentencing options (the death penalty or life imprisonment) was more lenient than the other: "[e]ither way, [the defendant]'s gone for the rest of his life."  (Tr. 766). Significantly, the prosecutors chose not to strike a similarly situated Caucasian prospective jurors, Prospective Juror 70/Brueggerman, sat on petitioner's jury despite his statement at voir dire that life without the possibility of parole is "as bad as or

worse than the death penalty." (Tr. 789; 1611). *Miller-El II, supra,* 545 U.S. at 246, 252, 258 n. 17; *Purkett, supra,* 514 U.S. at 768; *United States v. Pospisil*, 186 F.3d 1023, 1028 (8th Cir. 1999); *United States v. Brooks,* 175 F.3d 605, 607 (8th Cir. 1999); *Ford v. Norris,* 67 F.3d 162, 169 (8th Cir. 1995) (under *Swain*); *Davidson v. Harris,* 30 F.3d 963, 965-966 (8th Cir. 1994); *Walton v. Caspari,* 916 F.2d 1352, 1361-1362 (8th Cir. 1990) (under *Swain*); *Garrett v. Morris,* 815 F.2d 509, 513-514 (8th Cir. 1987) (under *Swain*).

The State's other alleged explanation for striking Singleton -- his court-martial and subsequent guilty plea in 1988, to the misdemeanor of wrongful appropriation of $160 in government funds -- was also a pretextual explanation. (Tr. 1420-1421). Singleton served forty-eight days of confinement, paid restitution, and had his rank reduced. At the time of petitioner's trial in 2001, he had been honorably discharged and was currently serving in the Reserves. *Id.* In comparison, the prosecutors chose not to strike similarly situated Caucasian prospective jurors: Prospective Juror 32/Vinyard, who sat on petitioner's jury, and Prospective Juror 67/McDermott. (Tr. 1413-1414; 1594; 1611). McDermott had been convicted of indecent exposure fifteen years earlier (Tr. 1425, 1427), and Vinyard had been convicted of receiving stolen property twenty-four years earlier. (Tr. 1413-1414; 1420-1421; 1611).

The balance of the issues implicating *Batson v. Kentucky*, 476 U.S. 79 (1986) were adequately addressed in petitioner's habeas petition.

## CLAIM 6 - THE *WIGGINS* CLAIM

According to defense counsel Joseph Green, who was responsible for preparing and presenting mitigating evidence at the penalty phase, his primary argument to the jury to convince them to spare petitioner's life was "residual doubt." Green also intended to present evidence of petitioner's positive adjustment to incarceration and lack of future dangerousness if he was given a sentence of life. (Hab. Pet. Exh. 10, at ¶¶ 6, 25, 32; Exh. 27 to Respondent's Response, at 43, 45-46, 62-63, 87, 91, 93-95, 100, 131).[17] *However, Mr. Green did not present any evidence or argument regarding any of these issues at the sentencing phase.*[18]  Mr. Green also failed to uncover and present evidence of petitioner's history, character, and background, including his social and medical history, for example, growing up in poverty; chaotic family and school life; exposure to illegal drug use by family members; blood relatives' abuse of and addiction to illegal drugs; suffering of sexual and physical abuse at the

---

[17]Co-counsel Chris McGraugh also agreed that the defense's main mitigation theory was residual doubt.  (Exh. 27 to Respondent's Response, at 46).

[18]In fact, in his opening statement, Mr. Green twice told the jurors that he would not challenge their verdict "in any way," and also told them that the defense "accept[ed] [the] verdict." (Tr. 3103-3104).

63

hands of family members; contemplation of suicide as an adolescent; and his mental health disorders.  (Hab. Pet. Exhs. 1, 10; 29.15 L.F. at 330-347).[19]

In addressing this claim, respondent cites the Missouri Supreme Court opinion verbatim, notes a couple of passages from the 29.15 testimony of Joseph Green on an entirely unrelated issue and also cites a couple of passages from the 29.15 motion court's ruling expressing the view that presenting an extensive case in mitigation of punishment would be inconsistent with Green's purported strategy of residual doubt. (Resp. 30-31;  *c.f.* n.19,  *supra*).  Thereafter, respondent argues that the Missouri Supreme Court decision was reasonable under 2254(d). (*Id.* at 32).

There are significant, glaring, and convenient omissions from respondent's arguments. Respondent says nary a word about the ABA Guidelines governing the performance of counsel in death penalty cases, which reviewing courts *must* utilize in assessing trial counsel's performance in a capital case. *Wiggins v. Smith*, 539 U.S. 510, 524 (2003).  Nor does he address – or contest – the extensive findings of Dr.

---

[19]*None* of this evidence would have undermined defense counsel's "viable defense" at trial that petitioner did not commit the crimes at issue. *Cf.* Resp. at 32. Instead, according to counsel Green, it "would have provided explanations for [Williams'] prior criminal history" (which the State used as aggravators to persuade the jury to return a death sentence), and also "would have given the jury a more sympathetic picture of [Williams] than the facts surrounding the crime[s]" at issue. (Hab. Pet. Exh 10 at ¶¶ 31, 32.)

Donald Cross, who conducted a detailed background investigation of petitioner during post-conviction proceedings and concluded, among other things, that mitigating evidence could have been submitted that petitioner  suffered from Post-Traumatic Stress Disorder, endured an abusive and turbulent childhood in broken home in a violent, crime-ridden neighborhood, and was subjected to serious sexual and physical abuse as a child. (Pet. 72-78; Hab Pet. Exh.1). And he conveniently neglects to distinguish the *Wiggins* case, where the Supreme Court explicitly *rejected* respondent's primary argument against granting habeas relief: that failing to investigate and present evidence of a capital defendant's disadvantaged background, mental illness, and physical and sexual abuse is a reasonable tactic where trial counsel relies upon residual doubt as a defense.  (Pet. 80-83).  Respondent's omissions speak volumes regarding the lack of merit of his position.

Contrary to respondent's bald assertion that the state decision is reasonable, the standard of review provisions of §2254(d) present absolutely no impediment to granting relief on this claim.  As noted earlier, the motion court did not hold an evidentiary hearing on this claim so this court must review this claim *de novo* because the decision's factual findings are inherently unreasonable under §2254(d)(2): *See e.g. Bryan v. Mullin*, 335 F.3d 1207, 1215-1216 (10th Cir. 2003); *Taylor v. Maddox,* 366 F.3d 992, 1001 (9th Cir. 2004); *Nunes v. Mueller*, 350 F.3d 1045, 1055 (9th Cir.

2003).  Relief is also available to petitioner for a second reason under §2254(d)(2): the Missouri Supreme Court's finding that counsel pursued a penalty phase strategy based upon residual or lingering doubt is clearly refuted by the record.

Although Green indicated that residual doubt was purportedly his primary strategy in avoiding the death penalty, the penalty phase record reveals otherwise. Green never mentioned the concept of residual doubt.  He never argued to the jury that it should spare petitioner's life due to lingering doubt of guilt.  In his opening statement, Green indicated that the defense accepted the jury's verdict. *See* n. 18, *infra*.  During his closing argument, Green never argued that the jury should return a life, rather than a death, sentence because the evidence of guilt was sufficiently weak to leave a lingering doubt of guilt. In fact, at one point in his argument, Green told the jury: "I'm not trying to make you go back and revisit your verdict." (Tr. 3498). Although he did briefly mention inconsistencies between Cole's and Asaro's accounts of the crime, Green did so only to attack the evidence supporting the statutory aggravating circumstance of avoiding arrest. (*Id*. at 3497-3498).

Undoubtedly, a constitutionally effective advocate pursuing a residual doubt theory would have argued to the jury that it should spare the defendant's life because the evidence of guilt was insufficient to remove all doubt that he was the perpetrator. The absence of any such argument leads to the inescapable conclusion that the  factual

66

finding that counsel for petitioner presented a residual doubt defense during the penalty phase is unreasonable under §2254(d)(2): the state court here clearly "misstate[d] the record in making their findings..." regarding "a material factual issue that is central to petitioner's claim . . ." *Taylor v. Maddox*, 366 F.3d 992, 1001 (9th Cir. 2004).

This  factual flaw is indistinguishable from the state decision's factual error that the Eighth Circuit invoked in granting relief under §2254(d)(2) to Missouri death row inmate Willie Simmons on his very similar claim of penalty phase ineffectiveness. *See Simmons v. Luebbers*, 299 F.3d 929, 937-38 (8th Cir. 2002).  In *Simmons*, the Missouri Supreme Court based its decision denying relief on a significant factual error regarding mitigating evidence it  mistakenly believed had been presented at a previous trial.  In light of this error, the Eighth Circuit granted Simmons penalty phase relief under §2254(d)(2) because the Missouri decision rested upon an unreasonable determination of material fact.  *Id*. In the case at hand, the Missouri Supreme Court made an equally significant factual error when it erroneously found that Green pursued a residual doubt penalty phase strategy.

Another material misrepresentation of fact here involves the false suggestions by the Missouri Supreme Court and respondent that petitioner received an evidentiary hearing on this claim. (Resp. 30-32). In fact, the 29.15 motion court *did not hold -- and, in fact, denied -- an evidentiary hearing* on the issue of defense counsel's

67

ineffectiveness in failing to investigate and present mitigating evidence. (29.15 L.F. 483, 780). On appeal, the Missouri Supreme Court's single paragraph devoted to this issue stated that trial counsel testified "at the evidentiary hearing regarding Williams' claim ″ and that "[t]he motion court did not clearly err in denying this claim without an evidentiary hearing." *Williams v. State*, 168 S.W.3d at 443. Only the latter finding – that a hearing was denied – is accurate.

Respondent supports his false suggestion that petitioner received an evidentiary hearing on this claim by citing portions of Green's testimony at the limited 29.15 hearing, which the motion court conducted on the single and distinct issue of counsel's ineffectiveness regarding petitioner's failure to testify at trial. (29.15 L.F. 483) (Resp. 31). Respondent then leaps to his next argument that the post-conviction motion court properly refrained from crediting Green's affidavit regarding this claim because he allegedly failed to come forward with its information during his 29.15 testimony. (Resp. 31-32). Respondent's argument is utterly disingenuous because the Missouri courts never addressed the credibility of Green's affidavit. *See Norton v. Spencer*, 351 F.3d 1, 6 (1st Cir. 2003)(granting relief under §2254(d)(2) after rejecting argument that state court implicitly made an adverse credibility determination). Respondent's misstatements further underscore the merit of petitioner's position: that because he did not receive a hearing and that the Missouri Supreme Court's findings

68

are significantly flawed, this Court must review this claim *de novo* and grant habeas relief under §2254(d)(2).

Relief is also available to petitioner under the "contrary to" clause of §2254(d)(1) because the Missouri Supreme Court failed to cite and follow the governing law of *Strickland v. Washington,* 466 U.S. 668 (1984), *Williams v. Taylor,* 529 U.S. 362 (2000), and *Wiggins v. Smith,* 539 U.S. 510 (2003).  The fifth and sixth sentences of the Missouri Supreme Court post-conviction decision – "[t]he selection of witnesses and evidence are matters of trial strategy, virtually unchallengeable in an ineffective assistance claim," and "an abusive childhood defense would have been inconsistent with the penalty phase strategy and would not have changed the jury's sentence," *Williams v. State, supra,* 168 S.W.3d at 443 -- are contrary to clearly established Supreme Court law.  See 28 U.S.C. §2254(d)(1); *Williams v. Taylor,* 529 U.S. at 405.  That is, the decision "arrive[d] at a conclusion opposite to that reached by the [Supreme] Court [of the United States] on a question of law," as well as "confront[ed] facts...materially indistinguishable from a relevant Supreme Court precedent and arrive[d] at a result opposite."  *Id.*  It also "applie[d] a rule that contradicts the governing law set forth in [the Supreme Court of the United States']  cases."  *Id.*

69

The Missouri Supreme Court decision in essence, applied its *own* rules -- that defense counsel's choice of witnesses and evidence constituted a "virtually unchallengeable" trial strategy, and that an "abusive childhood defense" would have had to have changed the jury's sentence, *Williams v. State, supra,* 168 S.W.3d at 439, *rather than the actual governing law as set forth in Strickland, supra,,* 466 U.S. at 694; *Williams v. Taylor, supra,* 529 U.S. at 394-397; and *Wiggins, supra,,* 539 U.S. at 527-528.

Clearly established Supreme Court law requires a claim of defense counsel's ineffectiveness to be analyzed according to the following basic principles: (1) whether "counsel's representation fell below an objective standard of reasonableness," *Williams v. Taylor, supra,* 529 U.S. at 390-391, citing *Strickland,* 466 U.S. at 688; and (2) whether *"there is a reasonable probability that at least one juror would have struck a different balance,"* *Williams v. Taylor, supra,* 529 U.S. at 393-395 (emphasis added). *See, Wiggins, supra,* 539 U.S. at 521-524, 528, 534 (same). Additionally, this settled law mandates that "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigations," *Strickland, supra,* 466 U.S. at 690-691, cited in *Wiggins, supra,* 539 U.S. at 521, and defense counsel

70

representing a death penalty defendant has an "obligation to conduct a thorough investigation of the defendant's background." *Williams v. Taylor,* 529 U.S. at 396.

In addition, the opinion of the state court that this omitted evidence would not have changed the jury's sentence is contrary to the *Strickland* prejudice test. In a death penalty case, prejudice is established if "there is a reasonable probability that at least one juror would have struck a different balance,"*Wiggins,* 539 U.S. at 537, *citing Williams v. Taylor,* 529 U.S. at 398. In other words, prejudice is established if "the available mitigating evidence, taken as a whole, 'might well have influenced the jury's appraisal' of [the petitioner's] moral culpability." *Id.* Because the state court applied a test that is contrary to *Strickland* and its progeny, habeas relief is warranted under the "contrary to" clause of 2254(d)(1).

There is another significant flaw in the Missouri Supreme Court's assessment of prejudice that permits *de novo* review of this ineffectiveness claim under both §2254(d)(1) and (2). In assessing the question of prejudice, albeit in a very cursory manner, the Missouri Supreme Court only explicitly addressed and supposedly considered evidence of petitioner's "abusive childhood." *Williams,* 168 S.W.3d at 443. The court ignored, among other things, evidence of childhood sexual abuse, and post-traumatic stress disorder. (*See* Hab. Pet. Exh. 1).

71

Relief is available to petitioner here under §2254(d)(2) because the state court ignored significant evidence that supports his claim for relief. *Taylor v. Maddox*, 366 F.3d at 1006-1008.  A similar factual flaw permitted the Supreme Court to grant relief to the petitioner in *Miller-El v. Cockrell*, 537 U.S. 322 (2003).  In *Miller-El*, the Court granted relief on a *Batson* claim under §2254(d)(2) because the state court ignored testimony that the prosecuting attorney's office had "manipulate[d] the racial composition of the jury in the past." *Id.* at 346.

The Missouri Supreme Court's failure to address mental health issues and evidence of sexual abuse in petitioner's case is a serious oversight as well as "contrary to" and "unreasonable application" of the command of *Strickland v. Washington*, 466 U.S. 668 (1984), that reviewing courts assess the impact of all of the excluded evidence resulting from a deficient investigation by trial counsel.  *Id.* at 694.  Habeas relief is appropriate under the unreasonable application clause of §2254(d)(1) where the state decision "reveals an obvious failure to consider the totality of the omitted mitigation evidence." *Williams v. Taylor*, 529 U.S. 362, 416 (2002).

The state courts' suggestion that testimony by Dr. Cross and the psychiatric evidence would not have had value as mitigating evidence is also contrary to clearly established Supreme Court precedent. The Missouri Supreme Court's summary "rubber-stamp" of the 29.15 motion court's finding that this evidence lacked mitigating

72

value because it "would have cast movant as a violent, aggressive, and angry person," (29.15 L.F. at 801), is clearly contrary to *Tennard v. Dretke*, 542 U.S. 274 (2004); *Wiggins v. Smith*, 539 U.S. 510, 535 (2003); and *Burger v. Kemp*, 483 U.S. 776, 779, 789, n.7 (1987). For example, in *Tennard*, the Supreme Court held that evidence of impaired intellectual functioning is inherently mitigating. 542 U.S. at 288.

Further convincing evidence that the Missouri Supreme Court unreasonably applied Supreme Court precedent in denying relief on this claim is the spate of recent decisions from several circuits granting penalty phase relief in similar situations. As noted earlier in this traverse, decisions from the circuits in similar situations are particularly instructive to reviewing courts in determining whether a state court decision is unreasonable under 2254(d)(1). *Atley v. Ault*, 191 F.3d 865, 871 (8th Cir. 1999).

In the aftermath of *Wiggins*, there have been numerous decisions from other circuits granting death row inmates penalty phase relief on ineffectiveness claims that involve very similar facts to those presented here. *See e.g. Lambright v. Schriro*, __ F.3d __, 2007 WL 1880985 (9th Cir. July 2, 2007); *Haliym v. Mitchell*, __ F.3d __, 2007 WL 2011268 (6th Cir. July 13, 2007); *Dickerson v. Bagley*, 453 F.3d 690 (6th Cir. 2006); *Williams v. Anderson*, 460 F.3d 789 (6th Cir. 2006); *Frazier v. Huffman*, 343 F.3d 780 (6th Cir. 2003); *Boyde v. Brown*, 404 F.3d 1159 (9th Cir. 2005); *Lewis v. Dretke*, 355 F.3d 364 (5th Cir. 2003); *Outten v. Kearney*, 464 F.3d 401 (3rd Cir.

73

2006). In particular, the recent decisions in *Outten* and *Haliym* contain remarkably similar facts to those presented here.

In *Outten*, the Third Circuit found trial counsel's investigation deficient and held the Delaware Supreme Court's decision was contrary to and involved an unreasonable application of *Wiggins*, despite the fact that some mitigating evidence regarding Outten's abusive childhood had been presented at trial. *Id.* at 421. The omitted mitigating evidence in *Outten* is similar to petitioner's evidence because neither jury heard relevant evidence of the petitioners' sexual abuse and mental health. *Id.*

Last month, the Sixth Circuit granted an Ohio prisoner penalty phase relief on a *Wiggins* claim involving similar issues regarding deficient performance and prejudice. *Haliym v. Mitchell*, *supra*. In that case, trial counsel did present some mitigating evidence from an expert and a relative regarding the defendant's mental illness and disadvantaged upbringing. 2007 WL 2011268 at *21-22. However, the post-conviction investigation revealed that Haliym was seriously abused as a child and had brain damage. When confronted with this factual scenario, the Sixth Circuit had little difficulty in finding that trial counsel's investigation was unreasonable and had prejudiced Haliym. *Id.* at *25-32.

The facts surrounding petitioner's ineffectiveness claim are virtually indistinguishable from those confronted by the Eighth Circuit in *Simmons v. Luebbers*,

74

299 F.3d 929 (8th Cir. 2002). Simmons received two death sentences, in separate trials involving the murders of two different women. *Id*. at 931. Simmons' trial counsel, like Green in petitioner's case, presented only very brief testimony at the penalty phase from Simmons' mother regarding her relationship with her son. *Id*. at 937-938. During post-conviction proceedings, Simmons' attorneys uncovered significant mitigating evidence that closely mirrors the findings of Dr. Cross in this case. (*See* Hab. Pet. Exh. 1) The Eighth Circuit characterized the excluded evidence in *Simmons* as follows:

> (1) He was raised in a very strict home environment; (2) His father had a drinking problem and would beat Simmons' mother in front of him; (3) Until he was 17 years of age, he was beaten by his mother so severely that he was left with welts and bruises; (4) He was so scared of being beaten that he would urinate on himself prior to the beatings; (5) He ran away from home at age 12 or 13 and was assaulted, and possibly raped, in Chicago; (6) He grew up in an impoverished neighborhood frequented by street violence; and (7) His IQ was 83.

*(Id.* at 936).

*Simmons* is also similar to the case at hand because the Missouri Supreme Court's denial of relief was based on the finding that Simmons' trial attorneys had tactical reasons for not presenting this evidence (for example, to avoid comparisons to Simmons' successful brother and because it might have done more harm than good). *(Id*. at 938 & n.6). In addition to noting, as mentioned earlier, that the Missouri courts' erroneous factual findings were reviewable under §2254(d)(2), the Eighth

75

Circuit noted that the alleged tactical reasons invoked by the Missouri Supreme Court were indefensible:

> By the time the state was finished with its case, the jury's perception of Simmons could not have been more unpleasant. Mitigating evidence was essential to provide some sort of explanation for Simmons' abhorrent behavior. Despite the availability of such evidence, however, none was presented. Simmons' attorneys' representation was ineffective.

(*Id*. at 938-939).

On the issue of *Strickland* prejudice, the Circuit had little difficulty in finding that Simmons had been prejudiced because of the powerful mitigating impact of the aforementioned evidence. *Id*. at 939. In this regard, it is important to note that *Simmons* is a far more aggravated case than that presented here: Simmons was convicted of murdering two different women by strangulation on two separate occasions. *Id*. at 731. A side-by-side comparison of these two cases, involving almost identical §2254(d)(2) and deficient performance and prejudice issues, requires that the outcomes must also be the same.

At a minimum, if this court determines that the state court record is not sufficient to grant relief, it should hold an evidentiary hearing. As the Supreme Court has properly held, "[w]here the facts are in dispute, the federal court in habeas corpus must hold an evidentiary hearing if the habeas applicant did not receive a full and fair evidentiary hearing in a state court." *Townsend v. Sain,* 372 U.S. 293, 312 (1963),

*overruled on other grounds, Keeney v. Tamayo-Reyes,* 504 U.S. 1, 5-6 (1992).  Here,

the facts are in dispute, and petitioner did not receive *any* evidentiary hearing in the

state post-conviction court on this Claim 6.[20]

## CLAIM 7 - INEFFECTIVENESS OF APPELLATE COUNSEL REGARDING THE CONTINUANCE DENIAL

In addressing this claim, respondent argues that petitioner cannot prevail under

§2254(d) because the Missouri Supreme Court decision is reasonable. (Resp. 32-33).

As noted earlier, however, §2254(d) does not apply to this claim and this court must

review this issue *de novo* because petitioner did not receive an evidentiary hearing on

this issue during his 29.15 proceeding. Thus, any state factual findings addressing

*Strickland* performance and prejudice are unreasonable under §2254(d)(2). *See e.g.*

*Taylor v. Maddox*, 366 F.3d 992, 1001 (9th Cir. 2004).

Even assuming for the sake of argument that the standard of review provisions

of §2254(d) do apply to this claim, petitioner can still prevail. On the issue of

*Strickland* performance, the Missouri Supreme Court did not address this issue in any

manner whatsoever. As a result, this aspect of this claim may be reviewed *de novo*. On

---

[20]Respondent fails to identify the alleged "disputed facts not refuted by the record" he asserts were not presented in state post-conviction.  (Resp.  44). *See* 28 U.S.C. §2254(e)(2) (precluding a federal habeas hearing *only* where petitioner is at fault for lack of development of facts in state courts).

the issue of *Strickland* prejudice, the Missouri Supreme Court's decision involves an unreasonable determination of fact under 2254(d)(2) because the opinion ignored much of the substance of Joseph Green's affidavit. (See Hab. Exh. 10).

In his affidavit, Mr. Green indicates that his motion for continuance resulted in prejudice to petitioner for numerous reasons far beyond the issues involving DNA testing and the possible testimony of Matthieu Hose that were explicitly addressed by the Missouri Supreme Court's opinion. *Williams v. State, supra,* 168 S.W.3d at 444-445. In this regard, Mr. Green indicates that the denial of a continuance hindered trial counsel's ability to investigate issues relating to the credibility and impeachment of Henry Cole and Laura Asaro and also hindered his penalty phase investigation. (*See* Pet. Exh. 10). The Missouri Supreme Court also failed to take into account the critical and material fact that Mr. Green had just completed another death penalty trial in the *Baumruk* case just before petitioner's trial commenced. (*Id.*)

The continuance applications explicitly note the *Baumruk* trial and the need to obtain impeachment information regarding Cole. (D.A.L.F. 394-398). The supplemental continuance motion also notes that the defense needed more time to obtain petitioner's prison "mental and psychological evaluations" that were "necessary for defense expert Dr. Cunningham to evaluate and offer opinions as to the character and mental makeup of the defendant." (*Id*. 457-461) Thus, petitioner can meet the

78

standard for relief under §2254(d)(2) because the state court ignored significant evidence supporting petitioner's claim. *See Miller-El v. Cockrell*, 537 U.S. 322, 346 (2003).

In addressing the issue of *Strickland* performance, respondent repeatedly notes that it is appropriate for appellate counsel to "winnow" out weaker claims in favor of asserting stronger ones. (Resp. 32-33). While this is true as a general proposition, there is no evidence that appellate counsel here made a tactical decision to abandon the continuance claim in favor of raising stronger issues on direct appeal. As the petition indicates, there is objective evidence from the appellate court record that no such tactical decision was made.  Appellate counsel raised at least three other claims, a challenge to the attempted escape, an issue regarding failure to given an instruction on juror note taking, and a challenge to victim impact evidence, that had absolutely no chance of success. Petitioner is not aware of any Missouri case that has reversed a conviction based upon the introduction of evidence of escape or defects in the juror note taking process. Similarly, it is virtually impossible for a death row inmate to prevail on a challenge to victim impact evidence in the aftermath of the Supreme Court decision in *Payne v. Tennessee*, 501 U.S. 808 (1991).

The cases cited by respondent in support of this winnowing argument are clearly distinguishable. In *Horne v. Trickey*, 895 F.2d 497, 499 (8th Cir. 1990) and

*Smith v. Murray*, 477 U.S. 527, 534 (1986), appellate counsel gave testimony that they made tactical decisions to abandon claims because, under existing law, they believed the claims had little chance for success. In both of these cases, new developments in the law that post-dated the appeal were not relevant because the *Strickland* performance test requires reviewing courts to review counsel's decisions at the time they were made. *Id*. at 536; 895 F.2d at 500. Similarly, *Jones v. Barnes*, 463 U.S. 745 (1983), which takes note of the winnowing strategy in *dicta*, actually holds that a prisoner has no constitutional right to have his appellate attorney brief every non-frivolous issue at his request. *Id*. 752-754.

Unlike those cases, this claim does not involve a case of appellate counsel making a tactical decision to abandon a weak issue that has no chance of success. To the contrary, the relative strength of this issue establishes deficient performance under *Strickland*. *See Mason v. Hanks*, 97 F.3d 887, 893 (7th Cir. 1996)("When appellate counsel omits without legitimate strategic purpose 'a significant and obvious issue,' we will deem his performance deficient.")

On the issue of *Strickland* prejudice, apart from ignoring material facts involving the *Baumruk* trial and the impact of the continuance denial in investigating other issues in the case, the Missouri Supreme Court's decision is unreasonable under §2254(d)(1) because the court failed to take into account any federal constitutional issues in

80

deciding the claim. Instead, the Missouri Supreme Court only addressed the state law component of the claim. *Williams v. State*, 168 S.W.3d 433, 444-445 (Mo. banc. 2005). Settled United States Supreme Court caselaw establishes that a due process violation occurs where the denial of the continuance amounted to an "unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay.'" *Morris v. Slappy*, 461 U.S. 1, 11-12 (1983); quoting *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964). The trial court's action here falls into this category.

The Missouri Supreme Court's *Strickland* prejudice analysis is also deficient and unreasonable under §2254(d)(1) because it failed to take into account, in light of the federal constitutional component of the claim, that there is a reasonable probability that a federal court, in later collateral proceedings, would have granted relief to petitioner on the omitted claim. *See Freeman v. Lane*, 962 F.2d 1252, 1258-1259 (7th Cir. 1992). Evidence emerged during state post-conviction proceedings in relation to other claims for relief showing that, had counsel had the opportunity to more fully investigate the case, they could have presented a much stronger case in both the guilt and penalty phases of trial. During the guilt phase, they could have impeached and attacked the credibility of Cole and Asaro with additional evidence indicating that their lack of credibility. (See Hab. Pet. Exhs. 3-9). In addition, a thorough investigation has revealed compelling mitigating evidence that could have reasonably affected the

81

outcome at the penalty phase. (See claim 6, *infra*.).  There is a reasonable probability that a reviewing court, taking this evidence into account, would have found the trial court's denial of a continuance was arbitrary and inconsistent with due process. Habeas relief is warranted.

### CLAIM 8 - THE CONFLICT OF INTEREST ISSUE

Once again, in opposing relief on petitioner's conflict of interest claim, respondent urges the court to review this claim through the lens of §2254(d). (Resp. 33-35). As noted earlier, §2254(d) does not apply here because the fact finding process was defective because no hearing was ever granted on this claim in state court. *Taylor v. Maddox*, 366 F.3d at 1001. §2254(d) is also inapplicable because the Missouri Supreme Court did not address the federal constitutional aspect of the claim in any manner whatsoever. *Williams v. State*, 168 S.W.3d at 446. §2254(d) does not apply where a prisoner raises a federal claim in state court and the court thereafter ignores the federal claim and rests its decision  upon state law grounds. *See Skillicorn v. Luebbers*, 475 F.3d 965, 972 (8th Cir. 2007).

In addressing the merits of the underlying claim, respondent advances two basic arguments. First, respondent argues that relief is precluded under *Mickens v. Taylor*, 535 U.S. 162 (2002). Second, respondent argues that petitioner's pro se motion did not advance a conflict of interest issue at all. Instead, according to respondent,

82

petitioner's motion merely complained regarding counsel's failure to investigate. (Resp. at 34-35). Neither argument has merit.

Petitioner's pro se motion raises more than a failure to investigate. (*See* D.A.L.F. 444-445). In this motion, petitioner, citing *Cuyler v. Sullivan*, 446 U.S. 335 (1980), and other Missouri conflict of interest caselaw, contended that the "attorney-client relationship had been dissolved" and there was a lack of trust and confidence between attorney and client. (*Id.*) The failure to investigate aspect of the motion, emphasized by respondent, establishes that counsel's performance was adversely affected by this conflict because counsel failed to communicate with petitioner regarding witnesses who could have aided his defense. (*Id.*) In fact, petitioner's concerns were later vindicated during post-conviction proceedings in which evidence emerged through investigation that could have been utilized to more effectively impeach Henry Cole and Laura Asaro. (See Hab. Pet. Exh. 3-9).

Likewise, respondent's reliance on *Mickens* is misplaced. The *Mickens* decision merely clarifies existing law that requires some adverse effect upon counsel's performance, far short of *Strickland* prejudice, to establish a Sixth Amendment violation based upon a conflict of interest. 535 U.S. at 174-175. In fact, Justice Scalia, in his opinion, stressed the fact that *Mickens* did not significantly alter prior conflict of interest jurisprudence. *Id.* at 174. Under the facts presented here, petitioner has

83

amply demonstrated a Sixth Amendment violation because his counsel's performance was adversely affected by the breakdown in communications between attorney and client and the trial court failed to hold a hearing to address the issue.

## CLAIM 9 - THE GLENN ROBERTS TESTIMONY ISSUE

This issue is also not subject to the standard of review provisions of §2254(d) because the Missouri Supreme Court did not address the due process component of the claim on direct appeal. Instead, the Court based its ruling completely on state evidentiary rules. *State v. Williams*, 97 S.W.3d at 467-469 As a result, this court is free to review the issue *de novo*. *Skillicorn*, *supra*, 475 F.3d at 972.

In addressing the merits of the due process claim, respondent does not directly respond to the argument that the state courts mechanistically applied state hearsay rules to exclude exculpatory evidence central to the petitioner's defense. *See e.g. Chambers v. Mississippi*, 410 U.S. 284, 300 (1973). Likewise, respondent asserts no countervailing state interest in excluding this evidence. *See Crane v. Kentucky*, 476 U.S. 683, 690-691 (1986).

Petitioner's statement to Roberts that he was selling the computer on behalf of Laura Asaro was a spontaneous statement to a close acquaintance, a factor emphasized by the court in *Chambers* in finding the hearsay statement in that case possessed sufficient indicia of reliability. 410 U.S. at 300. In addition, respondent's

84

characterization of this statement as self serving is disingenuous. This statement was made before petitioner was arrested or was even a suspect in the Gayle murder. Because this hearsay statement possessed sufficient indicia of reliability and was central to the success of petitioner's defense at trial, a due process violation under *Chambers* occurred.

## CLAIM 11 - THE PENALTY PHASE CLOSING ARGUMENT

As a threshold matter, respondent argues that there is a procedural bar to this claim because petitioner is advancing different challenges to the penalty phase closing argument than he did during his state court direct appeal. (Resp. 37-38). This argument is meritless and distorts the legal limitations of the procedural default rule.

Principles of exhaustion and procedural default require a petitioner to have "fairly presented" his claims in state court. *Picard v. Connor*, 404 U.S. 270, 275 (1971). A state court brief need only present the "substance" of the claim and need not cite "book and verse" of the federal constitution or the entire set of legal arguments later asserted in federal court. *Id*. at 278. A federal habeas claim need only be "closely related" to the one advanced in state court, and the case law requires only an "arguable factual commonality" between the two. *Kenley v. Armontrout*, 937 F.2d 1298, 1302-1303 (8th Cir. 1991). A petitioner may amplify a state court claim with additional facts

and legal arguments so long as the "substance" of the claim is presented. *Odem v. Hopkins*, 192 F.3d 772, 776 (8th Cir. 1999).

Applying these principles to this claim, it is clear that petitioner fairly raised a constitutional challenge to several aspects of the prosecution's penalty phase closing argument during his state court direct appeal. The fact that neither the state court brief nor his petition quoted verbatim every improper argument does not mean that the same substantive challenges to the same improper arguments were not presented. In fact, both the state court briefs and the petition cite to the same transcript references, noting several improper arguments that, among other things, compared the worth of the victim to the defendant and were designed to denigrate petitioner's exercise of his constitutional rights to trial and to remain silent. (See App. Br. 141-146; Pet. 104-107). Although this claim could have been more artfully raised in both this action and in the state court forum, it is clear that petitioner fairly presented the same substantive challenges to the closing argument that he advanced before the Missouri Supreme Court. *See Clemmons v. Delo*, 124 F.3d 944, 952 (8th Cir. 1997). There is no exhaustion or procedural bar issue precluding merits review of this claim.

During argument, Prosecutor Larner improperly commented on petitioner's exercise of his Sixth Amendment right to trial, compared the worth of the victim's life

86

to that of petitioner's and inflamed the jury. (Tr. 3471, 3473-3474). He argued, in his

rebuttal argument, that:

> Had he [defense counsel] been in that home asking for
> mercy for Lisha Gayle, it would have fallen on deaf ears. Because
> that man [defendant] was hellbent on brutalizing that woman [Ms.
> Gayle], and destroying that woman. He was hellbent, and there
> was no stopping him. He had made up his mind. . . . In that house
> that night, that afternoon, there was one juror.

* * *

> There was one juror in that house. He didn't give Lisha a
> fair trial. He was the judge, the jury, and executioner.

* * *

> There was one juror [the defendant] in that home that
> afternoon. And that juror was the foreman, foreperson. And he
> [the defendant] decided without a trial, without hearing evidence,
> and without instructions of law, he decided Lisha Gayle must die.
> And that man is right there (indicating). And if there's one person
> in this courtroom that believes in the death penalty, it's that man
> right there.

* * *

> This is not a church. There are no stained glass windows.
> We don't give forgiveness here. That's for him and his maker to
> decide. We give justice here. We are here for justice.

* * *

> You all represent society. You represent more than just
> yourselves. This isn't a personal decision. It's a societal
> decision. It's as if each one of you has a little piece of a mirror.
> And you'll put that mirror together to form a complete mirror.

87

And in that mirror you'll shine it on the defendant.  And then we will see what this society thinks of this defendant.

Society has to defend itself. . . . Society has to defend itself. You're the last line of defense.  The police can't do it.  I can't do it.  It's only the jury that can protect us. . . .We have to protect ourselves.

We have to be safe in our homes.  We cannot go to work and let our women be at home at risk. . . . We cannot live in fear. We must fight that.

\* \* \*

And if this ain't the case, ladies and gentlemen, then there ain't such a thing.  This man, these facts, that criminal background. It's this case.

What were Lisha's last words?  For her mother.  She cried out for her mother.  The horror, the terror that she went through. Don't forget that.  The terror, coming down the steps, thinking someone is in her home, and here is that man twice her size, with this sharp knife that was strained. . . .

Think of the terror of her last five minutes of life.  Think of the horror, the sheer God awful horror that that woman went through.  Being stabbed and stabbed and stabbed, and she's got her arms up, and she is screaming and crying. . . .

And what did she do to deserve that? What did Lisha Gayle do to deserve that, except in her life help people and love people?

What did Dr. Picus [her husband] do to deserve this (playing tape)?

\* \* \*

But that man, Harry Truman, said, The buck stops here. Now, ladies and gentleman, I leave you with Lisha Gayle (indicating).  Hold her.  Hug her.  Tell her you love her.  But most of all, ladies and gentlemen, don't let her down.  Don't let her down.  Stand firm.  Stand firm.

(Tr. 3510-3516).

88

As pointed out in the petition, this argument improperly compared the constitutional rights of petitioner with the victim and amounted to a thinly veiled, prejudicial comment on petitioner's exercise of his right to a jury trial. *Griffin v. California,* 380 U.S. 609, 615 (1965). The prosecutor improperly expressed his personal opinion, argued facts outside the evidence, and injected racial prejudice into the case, when he implored the jury to "protect society." The argument that the jury should impose the death penalty to "protect society" is a personal opinion that is inherently inflammatory and improper because it is based upon on facts not in evidence. *See Shurn v. Delo*, 177 F.3d 662 (8th Cir. 1999); *Miller v. Lockhart*, 65 F.3d 676 (8th Cir. 1995). The prosecutor's penalty stage argument which "referred to facts not in evidence" and evoked the jury's natural fear of crime "was the sort of argument that would result in 'mob justice' rather than result in a reasoned deliberation." *Copeland v. Washington*, 232 F.3d 969, 975-976 (8th Cir. 2000)

The likelihood of prejudice is even greater here because this was a racially charged case. The prosecutor's closing argument improperly injected racial prejudice into the case, asking the jury to protect "our women" from "someone like him." It appears that St. Louis County prosecutors have a pattern and practice of crossing the line during penalty phase argument as the recent decision in *Weaver v. Bowersox*, 438 F.3d 832 (8th Cir. 2006) demonstrates.

89

## CLAIMS 10, 12, 13

The balance of the issues regarding these claims were adequately addressed in the petition. With regard to claim 13, this claim was advanced to preserve this issue for possible discretionary review by either the Eighth Circuit *en banc* or the United States Supreme Court in light of the circuit split regarding the duplicative aggravating circumstance issue involved. (Hab. Pet. 111-115). It would serve no useful purpose to rehash those arguments here.

## CONCLUSION

Wherefore, for all the foregoing reasons, as well as those reasons advanced in his habeas corpus petition and motions addressing discovery and an evidentiary hearing, petitioner respectfully requests that this court grant him reasonable discovery and, after a full and fair hearing, grant a writ of habeas corpus discharging him from his unconstitutional convictions and sentence of death and, grant such other and further relief that seem just, equitable and proper under the circumstances.

Respectfully submitted,

/s/Kent E. Gipson
Kent E. Gipson, #34524

90

and

/s/ Lori Leon

Lori Leon, Ohio #0065584
Public Interest Litigation Clinic
305 East 63rd Street
Kansas City, Missouri 64113
(816) 363-2795 • (816) 363-2799 (fax)

## CERTIFICATE OF SERVICE

I hereby certify that on the 31st day of August, 2007, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to Michael J. Spillane, Assistant Attorney General, P.O. Box 899, Jefferson City, Missouri 65102.

/s/Kent E. Gipson

91