**IN THE UNITED STATES DISTRICT**
**FOR THE EASTERN DISTRICT OF MISSOURI**

| | | |
|---|---|---|
| MARCELLUS WILLIAMS, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Case No. 4:05-CV-1474-RWS |
| | ) | |
| DONALD ROPER, | ) | DEATH PENALTY CASE |
| | ) | EXECUTION SCHEDULED |
| Respondent. | ) | 8/22/17 at 6:00 P.M. |

**PETITIONER'S MOTION FOR RELIEF FROM A JUDGMENT OR ORDER**
**PURSUANT TO FED. R. CIV. P. 60(b)**

COMES NOW Marcellus Williams, Petitioner, by and through counsel, and hereby moves the Court, pursuant to Fed. R. Civ. P. 60(b), for relief from its Judgment entered March 26, 2010. (R. 58). That Judgment granted in part and denied in part Petitioner's Petition for Writ of Habeas Corpus filed pursuant to 28 U.S.C. § 2254.

**MEMORANDUM IN SUPPORT**

**I.   INTRODUCTION.**

Petitioner's case comes to this Court in a unique posture. This Court granted penalty phase relief on Petitioner's Sixth Habeas Claim. However, the Eighth Circuit reversed, by a vote of 2-1. *Williams v. Roper*, 695 F.3d 825 (8th Cir. 2012) *cert. denied,* 1345 S.Ct. 85 (2013).

**II. RELEVANT PROCEDURAL HISTORY.**

On August 26, 2006, Petitioner filed a Petition for Writ of Habeas Corpus. R. 9. Relevant to the instant motion, Petitioner claimed as his Fourth Habeas Ground that the state presented perjured testimony and that Petitioner was actually innocent. R. 9. p. 39-45.

1

In support thereof, Petitioner moved this Court for discovery related specifically for additional DNA testing (R. 10), and discovery (R. 11) and an evidentiary hearing (R. 16) as it related to the Fourth Habeas Claim.   Petitioner specifically requested further DNA testing. R. 10 p. 2 ("In Claim 4 of his petition, petitioner alleges that his conviction and sentence of death were secured in violation of his Eighth and Fourteenth Amendment rights because he was convicted on the basis of the perjured testimony of Henry Cole and Laura Asaro, and because he is actually innocent of the Gayle murder.   *See Herrera v. Collins*, 506 U.S. 390 (1993); *House v. Bell*, 126 S.Ct. 2064 (2006)."  This Court denied the above requests.  R. 34 p. 16 ("Williams' motions to conduct further DNA testing [10], to authorize discovery [11], and to hold an evidentiary hearing [16] are **DENIED**.")

This Court noted that the state did not respond to the motion regarding DNA testing. *Id.*  p. 13.  In denying the evidentiary hearing request, this Court did make a finding that "Petitioner was diligent in raising the issues and seeking to develop the facts in the state courts." *Id.*  p. 16.  In denying discovery, this Court held that because the biological trace evidence had been tested that "[t]his is not a case in which the biological trace evidence has not been tested and, if tested, could exculpate petitioner. The record showed that the biological trace evidence did not match the DNA of petitioner, the victim or the victim's husband. This fact was presented to the jury at petitioner's trial." *Id.* p. 14.

Petitioner filed reconsideration motion with this Court regarding the DNA testing. R. 35.  This Court denied that request on the basis that good cause has not been shown for discovery or a hearing.  R. 42 p. 3.

While this Court granted habeas relief on Petitioner's Sixth Claim for Habeas Relief, this Court denied relief on Petitioner's Fourth Claim.  This Court noted that there was not

2

"new" evidence that existed as required by the applicable Supreme Court standard. R. 58 p. 19.

Petitioner filed a notice of cross-appeal and sought a certificate of appealability on that denial.  On December 15, 2010, the Eighth Circuit denied Petitioner's COA request. Petitioner sought rehearing on that denial, in part, based on *Harbison v. Bell*, 566 U.S. 180 (2009), where the Supreme Court held that a COA is unnecessary to appeal on issues that do not dispose of the merits, like the discovery/DNA issue here.  On February 23, 2011, after ordering a response, the rehearing petition was denied *en banc* and the original panel. Thereafter, the United States Supreme Court, on November 7, 2011, denied Petitioner's Writ for Certiorari.

After the Eighth Circuit reversed, by a vote of 2-1, this Court's Order granting penalty phase relief, *Williams*, 695 F.3d 825, the state requested an execution date.  On December 17, 2014, the Missouri Supreme Court set Petitioner's execution date for January 28, 2015. On January 9, 2015, Petitioner filed a habeas petition in the Missouri Supreme Court related to actual innocence tied specifically to access to DNA testing.  *State ex rel. Williams v. Steele*, Case No. SC94720.

While his state habeas was pending, on January 12, 2015, Petitioner filed a 42 U.S.C. § 1983 action before this Court.  *See Williams v. McCulloch*, Case No. 4:15-cv-00070.  On January 14, 2015, this Court denied this 1983 action. R. 7 from *Williams v. McCulloch*, Case No. 4:15-cv-00070.  Petitioner did not appeal that ruling.

On January 22, 2015, the Missouri Supreme Court stayed Petitioner's scheduled execution date.  Thereafter, on May 26, 2015, the Missouri Supreme Court issued an Order referring the matter to a Special Master to supervise DNA testing.  On January 5, 2017, after

3

supervising the DNA testing but without conducting a hearing or making any findings, the Special Master sent Petitioner's case back the Missouri Supreme Court.

On January 31, 2017, the Missouri Supreme Court summarily denied Petitioner's habeas petition without briefing or oral argument.  Petitioner filed certiorari petition to the United States Supreme Court from that denial.  The United States Supreme Court denied certiorari on June 26, 2017.

On April 26, 2017, the Missouri Supreme Court set Petitioner's execution for August 22, 2017.

## III.   LEGAL STANDARD.

Under Article III of the United States Constitution federal courts have inherent "power over [their] own judgments."  *United States v. Ohio Power Co.*, 353 U.S. 98, 99 (1957) (*per curiam*).  A vehicle for exercise of this power is Fed.R.Civ.P. 60(b), which "[i]n simple English … vests power in courts adequate to enable them to vacate judgments whenever such action is appropriate to accomplish justice." *Klaprott v. United States*, 335 U.S. 601, 615 (1949).

Rule 60(b) "does not provide a new remedy at all," but rather is "simply the recitation of pre-existing judicial power." *Plaut v. Spendthrift Farm Inc.*, 514 U.S. 211, 234-235 (1995).  That judicial power includes the inherent power to set aside judgments that are unfair: "Rule 60(b) … reflects and confirms the court's own inherent and discretionary power, firmly established in English practice long before the foundation of our Republic, to set aside a judgment whose enforcement would work inequity." *Plaut*, 514 U.S. at 233-234 (quoting *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 244 (1944)). *See also United States v. Ohio Power Co.*, 353 U.S. 98, 104 (1957) (Harlan, J., dissenting)

(acknowledging the authority of the *per curium* majority to grant *certiorari* even though the decision had previously become final following the denial of two separate rehearing petitions, based on "the Court's inherent (1) through (3) power over its judgments"). "The decision to grant Rule 60(b)(6) relief is a case-by-case inquiry that requires the trial court to intensively balance numerous factors, including the competing policies of the finality of judgments and the incessant command of the court's conscience that justice be done in light of all the facts." *Thompson v. Bell,* 580 F.3d 423, 442 (6th Cir.2009) (Internal quote omitted).

Rule 60(b) applies to habeas proceedings, just as it applies to all federal judicial proceedings when there is a claim that the judgment should be reconsidered in the interest of justice. *See Rodriguez v. Mitchell*, 252 F.3d 191 (2d Cir. 2001) (Rule 60(b) motions exist in habeas to remedy error in federal judgment).

As described further, *infra*, a district court may grant a 60(b) motion as long as the motion does not present a "claim" that would contravene AEDPA strictures on successive petitions. *Gonzalez v. Crosby*, 545 U.S. 524, 529, 531 (2005). A claim is *not* presented by a motion which "merely asserts that a previous ruling which precluded a merits determination was in error -- for example, a denial for such reasons as failure to exhaust, procedural default, or statute-of-limitations bar." For this reason, such a motion – like the instant one challenging the Court's failure to consider evidence not fairly presented in state court due to no fault of the Petitioner – is a proper subject of a 60(b) application in a habeas proceeding. *Id*. at 532 n.4. Indeed, "Rule 60(b) allows a court to grant relief from a final judgment or order." *Cornell v. Nix*, 119 F.3d 1329, 1332 (8th Cir. 1997); *See also Mohammed v. Sullivan*, 866 F.2d 258, 260 (8th Cir. 1989) (habeas corpus proceeding).

"[Rule 60(b)] is properly invoked where there are extraordinary circumstances, or where the judgment may work an extreme and undue hardship, and should be liberally construed when substantial justice will thus be served." *Id.* (quotation omitted).

Consistent with the Eighth Circuit, other courts have repeatedly noted that a reviewing court should apply "Rule 60(b) 'most liberally to judgments in default … [because] … [t]runcated proceedings of this sort are not favored…. *Thus, unless it appears that no injustice was done by the judgment, the equities in such cases will militate strongly in favor of relief.'" Harrell v. DCS Equipment Leasing Corp.*, 951 F.2d 1453, 1459 (5th Cir. 1992) (quoting *Seven Elves, Inc. v. Eskenazi*, 635 F.2d 396, 403 (5th Cir. 1981)) (emphasis supplied); *see also Halicki v. La. Casino Cruises, Inc.*, 151 F.3d 465, 471 (5th Cir. 1998); *Bridoux v. Eastern Air Lines, Inc.,* 214 F.2d 207, 210 (D.C. Cir. 1954) (where denial of relief precludes examination of the full merits of the cause, even a slight abuse may justify reversal).

A Rule 60(b) motion is appropriate here because the judgment entered on Petitioner's § 2254 Petition makes clear that the denial of factual development precluded a proper consideration of the merits of Petitioner's Fourth Claim. Such an allegation is a "true" 60(b), as envisioned by *Gonzalez,* 545 U.S. 524, and cannot be construed as a successive petition pursuant to § 2244(b)(2).

### A. New DNA Results – Petitioner excluded as source of male DNA found on murder weapon.

The new DNA testing on evidence from Petitioner's case, that had been previously denied, provides additional compelling evidence that Petitioner is innocent and that another unknown male with a different DNA profile murdered Felicia Gayle.  The new Y-

6

STR DNA test results indicated that several alleles at nine different loci on the murder weapon do not match the corresponding alleles from the known DNA sample of Petitioner.

Dr. Norah Rudin reviewed testing, case notes and data files generated by Bode Laboratory.  In her opinion, "Marcellus Williams could not have contributed the detected profile" on the murder weapon.  Attached as Exhibit A, at p.1.  Dr. Rudin noted "it is clear that he could not have contributed the profile reported by Ms. Fienup" due to an allele difference at 11 of the 15 loci.  *Id.* p. 2; *Id.* Appx A.  Dr. Rudin went further and reviewed the data files generated by Bode.

In comparing the Allele table from a known sample with the below Bode's threshold, Dr. Rudin described how even the non-called peaks did not comport with Mr. Williams' reference profile.  *Id.* p. 2-3.  According to Dr. Rudin, allelic drop is not valid in these circumstances because "the alleles present in his profile would have to be assumed present but not detected (dropped out) in at least 13 of the 21 detected loci.  Additionally, alleles from a second contributor would have to replace his missing alleles at each of those loci.  A better explanation is that Marcellus Williams is not a contributor to the profile(s) found on the knife." *Id.* p. 3.  Thus, Dr. Rudin concluded that "the profile detected on the knife is that Marcellus Williams is not a contributor." *Id.* p. 4.

The following chart from the Bode Laboratory reports (Exh.'s B, C). indicate that the above threshold alleles found at several of the loci do not match Petitioner that were submitted for comparison purposes.

| Locus | Unknown Sample (First Round) Attached as Exhibit B | Petitioner's Sample (Second Round) Attached as Exhibit C |
|---|---|---|
| DYS576 | 20, --- | 16 |
| DYS389 I | 13, --- | 13 |
| DYS 448 | No results | 20 |
| DYS389 II | No results | 29 |
| DYS19 | No results | 14 |
| DYS391 | 10 | 10 |
| DYS481 | 23, --- | 26 |
| DYS549 | No results | 11 |
| DYS533 | 13, --- | 12 |
| DYS438 | No results | 11 |
| DYS437 | 15, --- | 14 |
| DYS570 | 16, --- | 19 |
| DYS635 | 23 | 23 |
| DYS390 | 24, --- | 21 |
| DYS439 | 12, --- | 12 |
| DYS392 | 13, --- | 11 |
| DYS643 | No results | 13 |
| DYS393 | 13, --- | 14 |
| DYS458 | 17, --- | 18 |
| DYS385 a/b | 11, 14 | 15, 16 |

| | | |
|---|---|---|
| DYS456 | No results | 15 |
| Y-GATA-H4 | No results | 11 |

Significantly, the results from the unknown sample derived from the murder weapon in the second round of Bode's testing correspond with the first round of Bode's testing.

| Locus | Unknown Sample (First Round) | Unknown Sample (Second Round) |
|---|---|---|
| DYS391 | 10 | 10, ___ |
| DYS390 | 24, ___ | 24, ___ |
| DYS393 | 13, ___ | 13, ___ |
| DYS458 | 17, ___ | 17, ___ |

Such reproducibility or repeatability indicates a reliability of results.

In reviewing these repeated alleles, the Y-STR completed by Bode notes that at three loci there is not a match to Petitioner's known sample. Specifically, as noted at Page 2 of the Bode Supplemental Report:

| Locus | Unknown Sample (Repeated Alleles from First and Second Round) | Petitioner's Sample (Second Round) |
|---|---|---|
| DYS391 | 10 | 10 |
| DYS390 | 24, ___ | 21 |
| DYS393 | 13, ___ | 14 |
| DYS458 | 17, ___ | 18 |

Ms. Fienup indicated in her deposition that each of the nine non-matching alleles found in the unknown sample were over the threshold of RFU 75 but were not above the RFU of 300[1] that is necessary for the laboratory, under its existing protocols, to conclude with absolute certainty that petitioner could be excluded as the killer. Attached as Exhibit D, Depo at 18-21. However, Ms. Fienup did indicate that these results do have exculpatory value. *Id*. 53. Had only one of the nine alleles from the knife reached the 300 RFU threshold, petitioner would have been excluded as the unknown DNA contributor on the murder weapon. *Id*. 58-59. In this regard, it is important to note that Ms. Fienup indicated that it was a "close call" regarding whether there was sufficient data to exclude petitioner as the contributor of the DNA on the knife. *Id*. 59.

The new DNA testing on evidence from Petitioner's case, that had been previously denied, provides additional compelling evidence that Petitioner is innocent and that another unknown male with a different DNA profile murdered Felicia Gayle. This Court previously denied discovery which prevented the development of this evidence (*see* R. 34 & 42), and then denied the merits based on a lack of "new" evidence. R. 58 p. 19. Petitioner challenges the discovery denial that precluded a proper consideration of the merits of Petitioner's Fourth Habeas Claim.

**B. PETITIONER'S 60(b) MOTION ONLY ATTACKS A "DEFECT IN THE INTEGRITY OF THE FEDERAL HABEAS PROCEEDINGS" AND THUS THIS COURT IS NOT PREVENTED FROM GRANTING THE RELIEF HE SEEKS.**

AEDPA's restrictions on successive petitions apply only to "applications" for habeas corpus. *See Gonzalez*, 545 U.S. at 530. An "application" is "a filing that contains one or

---

[1] "RFU" is an acronym for relative florescent units.

more *claims*." *Id.* (internal quotation marks omitted and emphasis added). A motion brings a claim when it: (1) seeks to add a new ground for relief that was previously omitted due to "excusable neglect," "newly discovered evidence," or a "subsequent change in substantive law" or (2) attacks the federal court's previous resolution of the same claim on the merits. *See id.* at 530-32.

A motion should not be treated as a successive habeas petition when a Rule 60(b) motion challenges not the substance of the federal court's resolution of a claim on the merits, but "some defect in the integrity of the federal habeas proceedings." *Id.* at 532. Thus, "[a] motion that ... challenges only the District Court's failure to reach the merits ... can therefore be ruled upon by the District Court without precertification by the Court of Appeals ...." *Id.* at 538.

Petitioner's Rule 60(b) motion meets the *Gonzalez* criteria. The subject of this Rule 60(b) motion relates to the denial of access to DNA evidence that he sought to develop previously in these habeas proceedings,[2] but was denied the opportunity to do so. The Rule 60(b) motion does not present a new claim. Rather, it seeks to overcome a defect in the § 2254 proceeding, i.e., the denial of access to evidence which led to denial of a full merits review of Petitioner's claim. Because of this, no court has ever reviewed the full merits of Petitioner's claim.

Petitioner's case is similar to the circumstances found to be a 60(b) in *United States v. Marizcales-Delgadillo*, 243 Fed. Appx. 435 (10th Cir. 2007). In *Marizcales-Delgadillo*, the Tenth Circuit held:

---

[2] Significantly, there is no question that Petitioner has been diligent in pursuing access to the evidence; this Court previously found that Petitioner had been diligent. R. 34 p. 16.

In his Rule 60(b)(6) motion, Mr. Marizcales-Delgadillo primarily argued that the court had erred by denying his § 2255 motion without giving him an adequate opportunity to access record documents and amend the motion to present his claims properly, thus calling into question the integrity of the proceedings from the point of view of procedural due process.

Although Mr. Marizcales-Delgadillo also discussed the merits of his § 2255 motion in his Rule 60(b)(6) motion, he did so on the theory that to prevail on the 60(b) motion, he had to show that there was some merit in the underlying claims in the § 2255 motion. In the particular circumstances of this case, we do not construe this effort as reasserting a federal basis for relief from his sentence that would render the 60(b)(6) motion a second or successive § 2255 motion. *See Gonzalez*, 545 U.S. at 538*; Spitznas*, 464 F.3d at 1215. Rather, the relief sought--an opportunity to obtain the relevant documents and file an amended § 2255 motion for the court's consideration--makes evident that his Rule 60(b) motion challenged the process the court used in deciding to deny the § 2255 motion, not the substance of that decision.

*Id*. at 438 (footnotes omitted); *see also Mitchell v. Rees*, 261 F. App'x 825, 829 (6th Cir. 2008) (court's failure to provide an evidentiary hearing is a defect in the integrity of the habeas procedure).[3]

Likewise, Petitioner challenges the process used in denying his § 2254 motion, denying access to DNA testing, not the substance of that decision.  Thus, *Gonzalez* authorizes the instant motion, as it "merely asserts that a previous ruling which precluded a merits determination was in error… ." *Gonzalez*, 545 U.S. at 532 n.4.

---

[3] The Court in *Mitchell*, 261 F. App'x. at 289, noted: "Here, Mitchell's Rule 60(b) motion argues that *Mitchell I* erroneously denied him an evidentiary hearing and requests that the district court reopen the case and grant the hearing. This is not a 'claim' because it does not assert an error in the state conviction and would not constitute a federal basis for relief. Respondent argues that this case is distinguishable from cases in which a limitations bar applies because here the court actually decided Mitchell's original claim on the merits. While this may be true, the focus of the inquiry is not on whether the court reached the merits of the original petition but on whether the Rule 60(b) motion contains a claim. If it does not contain a claim, it is not a habeas petition, successive or otherwise. *See Gonzalez,* 545 U.S. at 530. Because Mitchell's Rule 60(b) motion challenges only the judgment on the evidentiary hearing, it does not make a claim but rather asserts an error in the federal habeas proceeding."

**D.    EXTRAORDINARY CIRCUMSTANCES JUSTIFY REOPENING THE JUDGMENT PURSUANT TO RULE 60(b)(6).**

Rule 60(b)(6) is properly invoked in extraordinary circumstances much like we have in this case.  "Clause (6) is a residual clause used to cover unforeseen contingencies; that is, it is a means for accomplishing justice in exceptional circumstances, [not covered by the other five provisions of Rule 60]." *Stipelcovich v. Sand Dollar Marine, Inc.,* 805 F.2d 599, 604–05 (5th Cir.1986) (citing 7 J. Lucas & J. Moore, Moore's Federal Practice ¶ 60.27[2] at 274 (2d ed.1985)).  A motion under subsection (b)(6) must be brought "within a reasonable time," Fed. R. Civ. P. 60(c)(1), and requires a showing of "extraordinary circumstances" to justify the reopening of a final judgment.  A consideration of extraordinary circumstances under Rule 60(b)(6) relies on a variety of factors, all of which this case meets.

**1.    The New DNA Results Present An Extraordinary Circumstance Sufficient For Rule 60(b)(6) Relief.**

The Hon. E. Richard Webber of the Eastern District of Missouri in *Barnett v. Roper*, 941 F.Supp.2d 1099 (E.D. Mo. 2013), found 60(b)(6) to be satisfied in a capital 2254.  Critical to his conclusion was an examination of a number of equitable factors that led to a conclusion that: "This Court finds the equitable consideration of factors to be appropriate in light of the capital nature of this case, and the competing interests of finality and justice." *Id*. at 1118.  As in *Barnett,* a number of extraordinary circumstances exist in Petitioner's case.

**A.    Petitioner's evidence is new.**

Petitioner's evidence is "new" in the literal sense and as a term of legal art.  First, Petitioner only obtained the DNA results through the end of last year and exhausted them

13

through available state remedies as well as the United States Supreme Court.  It is thus "new."

This Court previously noted that in the actual innocence context that Petitioner had no "new" evidence.  Under Eighth Circuit authority, a habeas petitioner must first come forward with "new" evidence, *Amrine v. Bowersox*, 238 F.3d 1023, 1029 (8th Cir.), *cert. denied*, 534 U.S. 963 (2001). Evidence is only "new" if it was "not available at trial and could not have been discovered earlier through the exercise of due diligence." *Amrine*, 238 F.3d at 1029.  This Court previously found Petitioner to have been diligent. Thus, the impetus of this Court's earlier diligence finding dictates Petitioner satisfied *Amrine*.

**B.     Petitioner Has Acted With Diligence And Has Acted Within A Reasonable Time.**

This Court previously found that Petitioner acted with diligence. R. 34. Specifically, this Court ruled: "Petitioner was diligent in raising the issues and seeking to develop the facts in the state courts." *Id.*  p. 16.

Petitioner continued his pursuit of review of the DNA throughout federal court. *See supra.*  The Missouri Supreme Court ultimately granted access.  The results were not finalized until late December 2016. Exhaustion of available remedies occurred on June 26, 2017.  Petitioner has filed the instant motion within a month of cert denial.  Thus, as in *Barnett*, where filing within three months of an intervening change in law, was found to have "expeditiously filed" his 60 (b) motion (*Barnett*, 941 F.Supp.2d at 1119),[4] Petitioner has at all times acted with diligence.

---

[4] For reasons not apparent from the face of the opinion, the Court in *Barnett* weighed diligence as a neutral factor.

14

### C. The Nature of The New Facts Demonstrates That The Discovery Denial Precluded A Full And Fair Merits Review.

While finding Petitioner diligent, this Court denied petitioner access to DNA evidence he has now obtained through state court litigation. Thereafter, this Court denied Petitioner's Fourth Habeas Claim on the basis that there was not "new evidence." Thus, the discovery ruling represents a significant connection to the subsequent merits ruling. It is this type of connectivity that "merits relief" as in *Barnett*, 941 F.Supp.2d at 1119.

### D. Finality Is Neutral.

Finality of the judgment is not a factor that weighs significantly in Missouri's favor in the context of a Rule 60(b) Motion. Indeed, the Supreme Court explicitly discounted finality as a basis for denying Rule 60(b) relief in *Gonzalez* precisely because the very purpose of Rule 60(b) is to make exceptions to finality. *See Gonzalez*, 545 U.S. at 529 ("[The Court gives] little weight to the respondent's appeal to the virtues of finality" as "[t]hat policy consideration, standing alone, is unpersuasive in the interpretation of a provision [Rule 60(b)] whose sole purpose is to make an exception to finality."). Here, there is no prejudice to Missouri beyond the lack of finality.

Setting this aside, any such potential prejudice, however, must be weighed against the more irreversible finality of Petitioner's execution, as well as the serious concern that Petitioner's death sentence is imposed upon one whom is actually innocent – a claim that has never been fully heard on the merits due to, in part, the State's continued opposition to the development of DNA evidence. Thus, Petitioner posits that this factor leans in Petitioner's favor. At a minimum, in light of the fact that "death is different," *Ford v. Wainwright*, 477 U.S. 399, 411 (1986), and that capital cases require a greater need for

15

reliability, consistency and fairness, this factor is neutral. *See Barnett*, 941 F. Supp. 2d 1099 at 1120.

### E.      Significant Actual Innocence Issue As To Guilt And/Or Penalty.

The State's theory rested upon a single assailant.  The State cemented their theory of guilt on the testimony of two snitches, Henry Cole and Laura Asaro.  Thus, the DNA testing results on their face, where loci do not match Petitioner, further undermines the snitch testimony of Cole and Asaro, and suggests another unknown male assailant committed the murder.

Petitioner was convicted in 2001 for the 1998 murder of Felicia Gayle, who was stabbed to death in her University City home, on the word of two paid informants whose testimony was unworthy of belief.  Despite the violent and bloody nature of the crime scene, police failed to uncover any forensic evidence connecting Petitioner to the murder.  In fact, physical evidence collected from the crime scene, including hair and footprints, could not be linked to Petitioner, suggesting that the actual killer may still be at large.  Because the murder went unsolved for nearly a year, the authorities resorted to the "snitch" testimony of Cole and Asaro to make an arrest.  A government's reliance upon paid snitch testimony, in lieu of solid police work, is a recipe for a wrongful conviction.  *See e.g., The Snitch System: How Snitch Testimony Sent Randy Steidl and Other Innocent Americans to Death Row*, a Center on Wrongful Convictions Survey, Winter 2004-2005, Northwestern School of Law, www.law.northwestern.edu/wrongfulconvictions.  This is exactly what happened here.

After the murder went unsolved for several months, Cole and Asaro came forward in June of 1999 and claimed that petitioner had confessed to committing the murder in order to lay claim to a $10,000 reward that was offered for information about the homicide by the

16

victim's husband. Cole is a career criminal with convictions dating back thirty years. Cole also has a long history of mental illness, evidence that the jury did not hear. The state's other star witness, Asaro, also has a checkered background. She is an admitted crack addict and prostitute, who was supposedly petitioner's girlfriend for a two-month period around the time of the Gayle murder.

Both of these witnesses alleged that petitioner admitted to them that he had murdered Ms. Gayle. Petitioner's alleged jailhouse confession to Cole gave a much different account of the crime than his alleged "pillow talk" confession to his prostitute girlfriend. Given the inconsistencies, it is abundantly clear that at least one of these witnesses, if not both of them, committed perjury at trial in exchange for the reward money. (Tr. 1818, 1882). Although trial counsel tried to expose Cole's and Asaro's credibility problems before the jury, they were denied access to impeaching information and failed to uncover Cole's and Asaro's histories of mental illness before trial.

During state post-conviction proceedings, petitioner presented substantial evidence undermining the conviction which the state based solely on the testimony of Cole and Asaro. This evidence establishes that Cole and Asaro simply were unworthy of belief.

Cole wrote to his son, Johnifer Cole Griffin, while he was in jail with Mr. Williams. (*See* R. 9-7 PageID 246-256). Henry Cole bragged that he had a "caper" going on and something "big" was coming. (*Id.* p. 9-10 PageID 254-255). Johnifer knew that his father had made false allegations against others in the past, beginning in the 1980s and continuing throughout his life. (*Id.* p. 6-9 PageID 251-254). Indeed, Henry Cole even served as an informant against Johnifer, his own son, in order to get a deal from the authorities. (*Id.* p. 6 PageID 251).

17

Similarly, Cole's daughter, Bridget Griffin, knew that Cole could not be trusted. (29.15 L.F. 129-30).[5] She knew of his well-known reputation of providing false information to the police in exchange for leniency. (*Id.* 130). She also had personal knowledge of prior false allegations Cole had made. (*Id.*).

Ronnie and Durwin Cole, Henry's nephews, confirmed that Cole had made false allegations in the past and was extremely unreliable. (*See* R. 9-8 PageID 181-187; R. 9-9 PageID 266-270). Cole was described as someone who has "always been a liar and not a reliable person." (R. 9-9 p. 4 PageID 269). Cole concocted scams, lied about others, and then left town. (*Id.*). He would do or say anything for money. (R. 9-8 p. 3-4 PageID 183-184). Cole's niece, Twanna, could confirm these family accounts. (29.15 L.F. 136-37). She had witnessed her uncle's crazy and bizarre behavior. (*Id.* 136). She knew Henry needed money for drugs and would provide false information to get it. (*Id.* 137). As with the rest of her family, she did not trust her uncle, based on his history of making false allegations. (*Id.*).

Durwin Cole reported that Henry Cole often hallucinated, recounting one incident where Henry saw non-existent bugs in his hair and drinking glass. (R. 9-8 p. 3 PageID 183). Other members of his family also recounted that Cole often had auditory hallucinations and sometimes failed to take his psychiatric medications. (29.15 L.F. 133). His family also confirmed that he had been diagnosed as mentally ill and received disability benefits because of his mental illnesses. Members of the family also recalled other incidents of bizarre behavior by Mr. Cole brought on by his mental illness. (*Id.* 136).

---

[5] Respondent previously filed the state court record with the Court.

18

Asaro's testimony is equally undermined.  Edward Hopson and Colleen Bailey could have testified that Asaro admitted to them that she had "set up" Mr. Williams to get the $10,000 reward, that Asaro desperately needed this money to feed her crack cocaine addiction, and she had made prior false allegations against others. (29.15 L.F. 78-79, 151-157).  Mr. Hopson describes Asaro as "a deceitful, mean destructive liar" and on one occasion had her son perjure an alibi for her.  (R. 9-10 p. 3 PageID 203).  Both Mr. Hopson Ms. Bailey indicated that she was a known police informant and had engaged in a pattern of lying to police to get herself out of trouble. Hopson indicated that Asaro had "cultivated a tight relationship" in order to act as an often used informant.  (*Id.*)  Hopson noted that "[Colleen Bailey] advised me that Laura talked to her about her upcoming testimony. She was looking forward to testifying in the case because she was anticipating receiving a substantial amount of money for her testimony."  R. 9-10 p. 5 PageID 205.

Asaro's mother, Cynthia Asaro (29.15 L.F. 165-166), Walter Hill, and Latonya Hill, (*See* R. 9-11 PageID 165-168; R. 9-12 PageID 228-230), established that Asaro lied when she testified at trial that petitioner drove his car on the date of the murder.  Each witness indicated that Mr. Williams' car was not running at that time. (R. 9-11 p. 3 PageID 167; R. 9-12 p. 3 PageID 230).  Additionally, these witnesses revealed that Asaro lied when she stated that she did not have access to the trunk of petitioner's car. Rather, Asaro had a set of keys to the car and that she could have gotten into the trunk and planted incriminating evidence linking him to the murder of Ms. Gayle.  (R. 9-11 p. 3 PageID 167 "Laura Asaro was the only individual who had keys to Marcellus' car.")  Asaro still had the keys when the police searched Petitioner's car, and had to punch the lock out to search it.  (*Id.*)  Cynthia Asaro

19

reported that her daughter gave her coupons similar to those found in the victim's purse. (29.15 L.F. 165-166).

Cole's and Asaro's testimony, like the inmate testimony in *Amrine*, has been demonstrably discredited during prior post-conviction proceedings. Many persons who were close with Mr. Cole, including his own relatives, have provided affidavits demonstrating that his trial testimony, or anything he says for that matter, is unworthy of belief. In fact, Cole's son indicated that Mr. Cole told him that he had a "caper" going on to implicate petitioner in this murder for the reward money. (R. 9-7 p. 9-10 PageID 254-255). Ironically, this affidavit provides evidence of the same category as petitioner's alleged jailhouse confession to Cole, which the jury relied upon to convict petitioner and sentence him to death. In addition, two other jail inmates have provided sworn affidavits that the police and prosecutors fed them information and tried to induce them to become jailhouse snitches against petitioner, but they refused to do so. (*See* R. 9-5 PageID 241-245; R. 9-6 PageID 188-191). St. Louis County authorities have previously solicited and pressured other inmates to fabricate jailhouse confessions in order to obtain an arrest and conviction in other high profile murder cases. *See Reasonover v. Washington*, 60 F.Supp.2d 937, 964-965 (E.D. Mo. 1990).

With regard to Asaro's testimony, her testimony is not only inconsistent with Henry Cole's testimony, it is also inconsistent with the physical evidence in the case. Had petitioner actually told Asaro the details of the crime as she recounted at trial, there would have been biological evidence at the scene of the crime connecting petitioner to the murder. Specifically, Asaro's testimony that she observed scratches on petitioner's neck, if true, would have led to a finding of petitioner's blood and skin in the victim's fingernail clippings.

This fact alone provides objective evidence that Ms. Asaro was lying in exchange for the reward money.

**F.      Greater Need For Reliability and Fairness.**

Petitioner has been sentenced to death. Death is different. As in *Barnett*, where the court undertook a more equitable consideration in that case given its capital nature which required a greater need for reliability, consistency and fairness (941 F. Supp. 2d 1099 at 1120), this Court should likewise find this similar need as a factor demonstrating an extraordinary circumstance herein. As in *Barnett*, the claim has never been fully and fairly considered and directly impacts both the conviction and sentence.

Earlier this year, the United States Supreme Court issued its decision in *Buck v. Davis*, 137 S. Ct. 759 (2017), granting Texas death row inmate Duane Buck penalty phase relief under Rule 60(b)(6). The facts surrounding Mr. Buck's Rule 60(b)(6) litigation are similar to the circumstances of this case. As in *Buck*, there were intervening legal developments that undermined the correctness of the prior judgment in the habeas proceeding. The court in *Buck* also stressed that Mr. Buck's underlying claim, involving the injection of racial discrimination into the case, was an extraordinary circumstance that warranted relief.

The court in *Buck* noted that claims of racial discrimination are particularly "pernicious in the administration of justice" and "poisons public confidence in the judicial process." *Id*. Even more so than claims of racial discrimination in capital cases, the execution of an innocent man is offensive to basic notions of fairness and justice and erodes public confidence in the American judicial system. As a result, based upon the importance of the substantive claim for relief, coupled with the intervening events that occurred in

21

petitioner's state court litigation, sufficient extraordinary circumstances exist to establish petitioner's right to 60(b)(6) relief.

### G.     State's Interests Are Not Harmed.

The State is not harmed by ensuring the public that the right person is executed.  The granting of a 60(b) does not represent a substantial harm to the State.  Particularly in this case, where there is no physical evidence, the testing conducted excludes Mr. Williams, there is no confession and the State relies upon two unworthy snitches. Because there are so many questions raising concerns of Mr. Williams' actual innocence, the State is certainly not harmed by allowing the merits to be considered before it carries out an irrevocable execution.

Meanwhile, there is a similar unsolved crime where there may be comparable DNA results to review.  As previously argued to this Court, an unsolved Pagedale crime bears similarities to the facts of Petitioner's case.  Indeed the medical examiner was struck by the similarities of the case. *See* R. 37.  The State's interests are served by solving all crimes and eliminating any connection between the two – a connection raised by the State's medical examiner.

### CONCLUSION

WHEREFORE, for the above stated reasons, this Court should GRANT Petitioner's request, reopen proceedings, ORDER Respondent to file necessary parts of the state court record, schedule an immediate conference for purposes of scheduling, order release of any testing done in the Pagedale crime and grant otherwise appropriate relief.

Respectfully submitted,

/s/ *Kent E. Gipson*
KENT E. GIPSON, Mo. Bar #34524
121 East Gregory Boulevard
Kansas City, Missouri 64114
816-363-4400 / fax 816-363-4300
kent.gipson@kentgipsonlaw.com

/s/ *Laurence E. Komp*
LAURENCE E. KOMP
E.D. Mo. No. 5212907
Capital Habeas Unit, Chief
Federal Public Defender
Western District of Missouri
818 Grand Avenue, Suite 300
Kansas City, MO 64106
(816) 471-8282

ATTORNEYS FOR PETITIONER

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was filed and sent to the following counsel of record for Respondent, via the ECF system on this 31st day of July, 2017.

Mike Spillane
Assistant Attorney General
P.O. Box 899
Jefferson City, Missouri 65102

/s/*Kent E. Gipson*
Attorney for Petitioner