**JENNIFER FIENUP   11/29/2016**

Page 1

                    IN THE CIRCUIT COURT

                 OF BOONE COUNTY, MISSOURI


-----------------------------x

MARCELLUS WILLIAMS,              :

                                 :

               Petitioner,       :

                                 :          Case No.

       vs.                       :

                                 :      15BA-CV01828

TROY STEELE, Superintendent, :

Potosi Correctional Center,  :

                                 :

               Respondent.       :

-----------------------------x



                    Washington, D.C.



                    Tuesday, November 29, 2016


Deposition of:

               JENNIFER FIENUP,

the witness, was called for examination by counsel

for the Petitioner, pursuant to notice, commencing

at 9:30 a.m., at the offices of Henderson Legal

Services, 1560 Wilson Boulevard, Suite 750,

Arlington, Virginia 22209, before Dawn A. Jaques,

CSR, CLR, and Notary Public in and for the

District of Columbia.

Page 2

APPEARANCES:

On behalf of the Petitioner:

LAURENCE E. KOMP, ESQ.      (via video)

P.O. Box 1785

Manchester, Missouri   63011

PHONE:    (636) 207-7330

FAX:      (636) 207-7351

EMAIL:   lekomp@swbell.net

        -   AND   -

KENT E. GIPSON, ESQ.        (via video)

Law Office of Kent Gipson, LLC

121 East Gregory Boulevard

Kansas City, Missouri   64114

PHONE:    (816) 363-4400

FAX:      (816) 363-4300

EMAIL:   kent.gipson@kentgipsonlaw.com

Page 3

APPEARANCES (Continued):

On behalf of the Respondent:

        MICHAEL J. SPILLANE, ESQ.    (via video)

        State of Missouri

        Office of the Attorney General

        Supreme Court Building

        207 West High Street

        P.O. Box 899

        Jefferson City, Missouri   65102

        PHONE:     (573) 751-1307

        FAX:       (573) 751-0774

        EMAIL:    mike.spillane@ago.gov

JENNIFER FIENUP  11/29/2016

Page 4

I-N-D-E-X

WITNESS:                                              PAGE:

JENNIFER FIENUP

        Examination by Mr. Komp   ........ 5, 54

        Examination by Mr. Gipson  ....... 51, 55

        Examination by Mr. Spillane  .......   60


E-X-H-I-B-I-T-S

PETITIONER'S EXHIBIT:                                PAGE:

Exhibit 1   Curriculum Vitae of Jennifer

            Fienup  .....................   6

Exhibit 2   Case report and case file   ...   24

Exhibit 3   Supplemental case report   ....   36


            (NOTE:  Electronic copies of

             exhibits provided to all counsel

             and the court reporter.)

JENNIFER FIENUP  11/29/2016

Page 5

P R O C E E D I N G S

Whereupon,

JENNIFER FIENUP,

was called as a witness, after having been

first duly sworn by the Notary Public, was

examined and testified as follows:

EXAMINATION BY COUNSEL FOR THE PETITIONER

BY MR. KOMP:

**Q     Could you please state your name and spell it for the record?**

A     My name is Jennifer Fienup, J-E-N-N-I-F-E-R, F-I-E-N-U-P.

**Q     Have you ever been deposed before?**

A     I have, yes.

**Q     Okay, so you know the drill?**

A     For the most part.

**Q     You know I'm going to ask questions. We have to have a vocalized response, no nods, no "uh-hmms," so the court reporter can clearly say it's yes or a no.**

**If you don't hear a question -- this is my first time doing a videoconference like this.  If you don't hear a question, please let me know.**

**And if there's a problem, Mike, on**

Page 6

your end, please let us know as well, and also with the court reporter, because this is my first time doing something like this.  So if for some reason the technology doesn't work, please let me know and I will repeat the question.

A    Okay.

Q    Hopefully, we won't have to go back five questions where it started.

If you don't understand a question, just let me know.  It's not as formal as if there's a jury here.  If you want me to rephrase a question or restate it, I'm more than happy to, because accuracy is what's most important at depositions.

For the record, Mr. Spillane and I spoke yesterday, but we're going to refer to Petitioner's Exhibit 1 as your CV, and hopefully you brought it with you.

A    Uh-hmm, yes.

Q    Petitioner's Exhibit 2 is going to be your initial case report and case file, which is approximately 245 pages; and then Petitioner's Exhibit 3 is going to be the supplemental case report, which is approximately 86 pages.

Mike, are we okay with that?

JENNIFER FIENUP  11/29/2016

Page 7

MR. SPILLANE:  Well, that's right.  I think Exhibit 2, does that include the April report, and then Exhibit 3 includes the August?  Is that accurate?

MR. KOMP:  Yes, yes.

MR. SPILLANE:  Okay, yes.

BY MR. KOMP:

**Q   Okay.  Well, let's get going.**

**Mrs. Fienup, how are you currently employed?**

A    I am the Quality Assurance Manager at Bode Cellmark Forensics.

**Q   And how long have you been in that position with Bode?**

A    In this position, for a little over a year.

**Q   Okay.  And what does that entail?**

A    As the Quality Assurance Manager, I oversee the quality assurance program.  I'm also the safety officer, so I oversee the safety program.

Pretty much what that means is I am doing all the paperwork and making sure that we remain accredited and follow the standards per our accreditation bodies.

JENNIFER FIENUP  11/29/2016

Page 8

Q    Okay.  And do you still, in that capacity, conduct STR analysis?

A    Yes.  On occasion, I still report DNA cases.

Q    Okay.  And prior to that, did you have other positions with Bode?

A    Prior to that, I was a DNA analyst.  I was a senior DNA analyst most recently; and then before that, various levels of DNA analyst.

Q    And approximately how long have you been at Bode?

A    About ten years.

Q    Ten years?  And in that time, how often or how many times, as a guesstimate, have you conducted an STR analysis?

A    Thousands.

Q    Thousands?

A    Yeah.

Q    Prior to Bode, were you employed anywhere else?

A    No, not in this field.

Q    Tell me a little bit about your education.

A    I have my Bachelor's of Science from Colorado State University in biology, and my

JENNIFER FIENUP   11/29/2016

Page 9

Master's of Forensic Science in Forensic Molecular

Biology from George Washington University.

  **Q** **Do you do any teaching or training on STR, or have you in the past done STR training?**

  A I've done internal training.  I haven't done any formal external training, but I have been involved in training other analysts at Bode.

  **Q** **Okay.  Have you testified before?**

  A Yes.

  **Q** **Okay.  How many times?**

  A About 26 or 27 times.

  **Q** **Okay.  And in state or federal court, or just state court?**

  A Both.

  **Q** **Both, okay.  And you were found qualified to testify?**

  A Yes.

  **Q** **In all those cases?**

  A Yes.

  **Q** **And have you testified for the defense and the prosecution?**

  A Yes.

  **Q** **Do you know the ratio of that?**

  A I usually testify for the prosecution.

Page 10

I think I've testified for the defense once, maybe twice.

Q    Okay.  And do you have your CV in front of you?

A    I do, yes.

Q    And just so I know we're sort of looking at the same document, it's three pages long?

A    Yes.

Q    And on the last page, there's three cases listed.

A    Yes.

Q    And just for the record, that's depo Exhibit 1.  We're going to move that Ms. Fienup be qualified as an expert in STR forensic analysis.

Mike, we okay?

MR. SPILLANE:  Yeah, I don't have any objection.

BY MR. KOMP:

Q    Okay.  All right.

I want to just -- I'm probably the least sharpest tool in this telephone conference right now, so I want you to talk to me about DNA at the most simplest level you can.  It will help me, and I think it will help the court when it

Page 11

reviews this transcript.  So treat me like I know nothing, which is probably pretty close to the mark.

I want to start by talking about this case.  In this case, what were you asked to do in Mr. Williams' case?

A    I was asked to test some items for DNA.  Would you like me to give you an explanation of what DNA is?

Q    Yes.  Before we get to the results and all that, just very simply and briefly describe what DNA is, and then we'll move to the testing.

A    Sure.  So DNA is a chemical substance in our bodies.  It is what determines our unique traits.  We get half of our DNA from our mom and half from our dad, so 99 percent of our DNA between all people are the same, that's why we all look very similar -- two arms, two legs -- but there's about one percent that is very individual for each person, and that is the area of DNA that we are looking at when we're doing the testing.

For this case, we did what's called YSTR testing.  So STR stands for Short Tandem Repeat, and that's the sections of the DNA that we're looking at when we're doing the testing.

JENNIFER FIENUP  11/29/2016

Page 12

YSTR means that those sections are specifically on the Y chromosome.  So a male is XY, so it's a specific male DNA area that we're looking at for YSTR testing.

**Q    So does YSTR testing ignore female DNA?**

A    Yes, because females would be XX, males would be XY, so only males would have that Y chromosome.

**Q    How long has YSTR testing been out there?**

A    I don't know exactly.  It's been around for a while, but I couldn't tell you exactly when it started.

**Q    Does it matter, as far as STR and YSTR, if there's a small quantity of DNA?**

A    No.  The process is very similar. It's just a matter of targeting.  We process the samples the same as if we were doing STR or YSTR, and with technology, we only need a very small amount of DNA to be able to detect something.

**Q    Okay.  And when we say "very small amount," what would you consider a very small amount?  One cell?  Two cells?  Just so we're --**

A    I don't know exactly how to quantify

Page 13

it because it's dependent, but really like we could detect DNA, depending on what we do, with only a handful of cells.

**Q    Okay.  What tests, when you're doing -- you referred to YSTR, so let's focus on that because that's what was done in this case.**

**So what tests do you generally use for YSTR?**

A    So what we used was a test, a kit called PowerPlex® Y23.  That's just a manufactured kit.

So to start from the beginning, we take a sample of the evidence, we add chemicals to that sample to break up the cells and release any potential DNA, and we remove that DNA from the rest of the sample so that we can just isolate that DNA, and then we quantify how much we obtained.  And we can quantify it using a method that can quantify both male DNA and human DNA, so that estimates about how much DNA we were able to obtain.

And then after that, I processed it using what's called PowerPlex® Y23.  So what that is, it's a kit that targets those specific areas in the DNA that I want to see.

Page 14

Q    Okay.  And in this PowerPlex, how many, I guess -- what's a locus or a loci?

A    A locus is one area of the STR that we are looking at.  So for PowerPlex® Y23, we're looking at 23 loci.

Q    Okay, 23.  And you sort of answered my question because I was going to ask how does the PowerPlex® work.

If I use the term "wash out" or "overwhelm effect" or "female overwhelm effect," do you understand what I'm saying, or am I using the wrong terms?

A    I think what you're meaning is when there's a lot of female DNA in the sample?

Q    Yes.

A    So potentially if there was a lot of female DNA, it could affect the YSTR testing and could cause potentially some inhibition or artifacts that are visible in the YSTR profile.  I believe that's what you're referring to.

Q    Okay.  So what's an artifact, since you brought that term up?

A    An artifact is -- it's generally a known event during amplification, which is the step that we're using the PowerPlex® Y23 kit.  And

**JENNIFER FIENUP   11/29/2016**

Page 15

since it's known, it's not a real -- a true allele, which is what we're looking at in our results.  We're looking at peaks that are called alleles.

It's not real, and so, through testing, we can know certain artifacts that occur on a regular basis and be able to account for those when we're doing our data analysis.

**Q    Okay.  Now, when you're, I guess, let's say -- and this is not this case, so I'm asking a general question.**

**If testing reveals a DNA profile from, let's say, a single source sample, when you're doing like your forensic analysis, what do you then do with this profile that's been developed?**

A    So if it's a single-source profile, during the analysis, we are going to check for artifacts, or known events, to make sure that everything that has been designated a number by the software, an allele, is actually an allele.

And then if it's a single source from a piece of evidence, then I would process the reference or analyze the reference data and do the same thing, and then I can make comparisons between the two to see if they match.

Page 16

Q    Okay.  And you used the term, the nomenclature, "reference sample."

A    Yes.

Q    Can you explain what that is just so it's clear for the record?

A    Sure.  A reference sample is a sample that is from a known person.  So if I took a swab from you, that would be your reference sample.

Q    Okay.  And then what would you determine -- like in this case you processed the murder weapon, the knife.  What would the designation, the nomenclature be for that, the swabbing from that item?

A    That would be evidence.  That would be an evidence sample.

Q    Okay.  All right.

When you're making a comparison with -- let's say you develop this single-source sample, and let's just say generally, what guidelines and procedures are in place when you start making a comparison between your reference sample and your evidence sample?

A    So first two people have to analyze the data, and those analyses have to match before you can go forward with the comparison.

Page 17

And then once you're comparing it -- so pretty much I'm looking at the evidence sample and comparing each allele to the reference sample. If they're identical, then that's a match.  If there's a discrepancy, then that could potentially be an exclusion.

**Q     Is there a required number of alleles needed to make a comparison?**

A    It depends on the nature of the profile.  For a single source, we don't make an inclusion with less than three loci, complete loci.  However, we could exclude -- depending on what those loci look like, we could potentially exclude off of less.

**Q     I'm sorry, exclude off of less than three loci?**

A    Yes.  Potentially, yes.

**Q     Why does it make a difference between inclusion version exclusion?**

A    So it only takes one.  When you're looking at an evidence in a reference, you're looking for a direct correlation, so it only takes one discrepancy to say that it's an exclusion.

But for an inclusion, you have to match at every location.  So when we only have one

or two locations out of the whole profile, that's not a very good profile, that's not a lot of information, and so we don't include off of such little information.

**Q   Okay.  Can you use -- I'm going to use -- we've been talking about alleles that are quota from the testing.**

**When I use a term like "threshold," the peak has to be above a threshold, can you explain what that means?**

A   Sure.  So we actually have three different thresholds.  The first is the peak detection threshold, and that's at 35 relative fluorescence units, or RFU.  That's just how high the peak is.  That is the threshold in which the peak that I'm seeing could potentially be an allele.  It's differentiated from the baseline of the data; however, it can't definitively be called a true allele until it meets the analytical threshold.

So the analytical threshold is 75 RFU, and once the peak reaches that height or above, then it can be designated as a true allele, unless, based on analysis, we determined it was an artifact.

Page 19

Q    Okay.

A    And then the third threshold is what's called a stochastic threshold, and that threshold depends on the kit, the testing kit that we're using, but that threshold is needed to reach to ensure that there's no other data that's missing from that location, from that locus.

**Q    Okay.  Can you explain that again, just stochastic?**

A    Sure.  So stochastic threshold is the threshold needed to ensure that, at that locus, that data isn't missing.

So for a single-source profile -- so earlier I mentioned DNA comes half from our mom, half from our dad.  That means, at each location, there's a potential to have two peaks.  You can either have one peak or two peaks, one peak meaning you obtained the same allele from both your mom and dad, so you're only seeing one allele because they're combined, two peaks meaning you received one of those alleles from your mom and one from your dad, so you could be a 12/13.  That's what I'm seeing, a number.

So if you only have one allele, it has to reach the stochastic threshold in order to be

Page 20

confident that the second allele isn't just dropping out.  So it's strong enough to say that, yes, you are truly an 11/11.  You obtained an 11 from your mom, 11 from your dad, there's only one peak at this location.

Q    Okay.  So the stochastic threshold, that's really only applicable in STR testing, not necessarily YSTR testing?

A    So we do have a YSTR stochastic threshold.  It is a little different because, in YSTRs, a single-source profile will only have one peak because you don't get anything from your mom, you're only getting it from your dad, so it's one peak.  However, we do have a stochastic threshold because there's one location in YSTRs that has two peaks.

Q    Okay.

A    Just the nature of how they built the kit, it's actually two separate locations, but they're so close together that, when we look at it, it's actually one location.  So there's two peaks there.

So using that, and during the validation and the testing of this kit, it was determined that the stochastic threshold is at

Page 21

300, and if the peaks are above 300, you can be confident that things aren't dropping out or missing.

Q    All right.  Now, when you're doing --
and I'll get to drop-out and drop-in later.

When you're doing just a -- stay on sort of when you're doing your analysis for exclusion or inclusion purposes.  Can you use below-threshold alleles for exclusion purposes?

A    If it's a clear single-source profile, then yes.

Q    So why the differentiation with potential multiple source profiles?

A    So comparisons are not quite as clear when you have multiple contributors.

So with low-level profiles, you can get what is called preferential amplification, which means if you have two people in one sample, and there's very little DNA, each location could potentially either be like seeing the information from contributor A, and at another location, it might be that's the allele from contributor B, but they look similar.  They're the same.  They look like they're equal, they look like they could match.

JENNIFER FIENUP  11/29/2016

Page 22

When you get to low-level stuff like that, it gets harder to be able to be confident that everything is coming from the same person.

So when you have a mixture and peaks below threshold, you can't use that to exclude anyone because you don't know who those alleles are coming from.

Q   Okay.  All right.

Does Bode have like a stated policy on that, the use of below-threshold alleles for exclusion purposes?

A   Yes.  It's in our SOP that we can use alleles below analytical to help further our conclusion of exclusion.

Q   And just speaking generally, I mean, is it as simple as just looking at -- what is it, an electropherogram -- and looking at your data, and just comparing it to the electropherogram of the reference sample --

A   Yeah.

Q   -- and that's the analysis?

A   Yes.

Q   So what is a partial profile?

A   A partial profile is when we don't obtain information at every location.

Page 23

So for YSTRs, it's exactly that.  If we don't have information at every single location, then we consider it a partial profile.

Q    Okay.  Now, can you still make a comparison or exclusion with a partial?

A    Yes, depending on the kind of -- if it's a single-source partial, yes.  If it's a mixture, less likely.

Q    We sort of mentioned this.

What are stochastic effects?

A    Stochastic effects are things that we see when the profile -- when those peaks are below stochastic threshold, there are effects that we see with that data.

So, again, preferential amplification, as I explained before, that's a stochastic effect, where it just so happens that that piece of DNA was amplified first, and since it was amplified first, it's going to continue to be amplified more than the other piece of DNA, so we see imbalanced alleles, or drop-out, meaning that a piece of DNA wasn't even amplified to the point that we can say there's an allele.

They're prevalent in samples that there's not much DNA, so the alleles aren't

Page 24

reaching that stochastic threshold.

Q    Okay.  All right.

Well, let's look at -- we're going to look at what's -- just turn to Exhibit 2, which is the April 8th, 2016 report.  And your case notes, they start -- they're 245 pages -- or a case file, I guess.  Is it case notes or case file?

A    This is a case file.  The entire thing is case file.

Q    And how does Bode prepare its case file in a case just generally?

A    So we print off all of the worksheets -- the case notes, essentially, from processing.  Every step that we processed the sample at results in a worksheet with all the information, and so we start by putting those in.

And then we have the electropherograms for all of our data, and then we include all of the correspondence and direction and testing, the submission paperwork, the chain of custody, and then finally the report.

Q    Have you had the opportunity to review this, the case file, the original case file?

A    Yes.

Q    And did you bring it with you, just so

JENNIFER FIENUP   11/29/2016

Page 25

I know we're looking at the --

A      Yep.

Q      For the record, Mike, she held it up to the camera to show us.

I'd ask you to look at pages 242 through 245.  What is that?

A      Page 242 through 245 are four out of the five pages of the report.

Q      Okay.  And just so we're clear, the fifth page refers to mitochondrial DNA that was done?

A      Yes.

Q      Okay.  So when I ask you questions about this report, I'd like you just to focus on the YSTR that was done and ignore the mitochondrial.

A      Okay.

Q      In referencing the report, can you just walk us through what testing was done?

A      Sure.  In terms of the YSTR, so we received three items for YSTR testing.  The first item was designated -- so this case, Bode gives it a case number, so the case number is CCB1536-0303, and then each item gets an individual number.

So the first item we received is

Page 26

CCB1536-0303-E01, and that was labeled as

fingernail clippings right.

The second item is CCB1536-0303-E02,

and that was labeled as fingernail clippings left.

And the third item was

CCB1536-0303-E03, and that was labeled as knife

and package with sheath.

So we tested those three items for

YSTR using that PowerPlex® Y23 kit.  The sample

E03, we took two different samplings from it.  We

sampled the junction between the knife blade and

the handle, and we sampled the knife handle

separately, so that is E03-A and E03-B.

**Q    Okay.**

A    So those four samples were all tested

for YSTRs.

I obtained no YSTR profiles from

samples E01, E02 and E03-A, so that would be the

fingernail clippings right, fingernail clippings

left, and the junction between the knife blade and

handle.

And from sample E03-B, the knife

handle, I obtained a partial YSTR profile that was

consistent with a mixture of at least two

individuals, and due to the possibility of allelic

Page 27

dropout, no conclusions could be made.

Q    Okay.  So you did find male DNA on the knife handle?

A    Yes.

Q    Can you tell from the case file how much DNA was found?  Is there a quantity to it?

A    Sure.  Hold on one moment.

Okay, found it.  So the estimated quantity of DNA was 0.27 nanograms of human DNA, and 0.0031 nanograms of male DNA.

Q    Can you say that again?  I'm sorry.

A    So 0.27 nanograms of human DNA, and 0.0031 nanograms of male DNA.

Q    And just so we know, you got that out of the case file?

A    Yes, page 17.

Q    Page 17?

A    Yes.

Q    Okay.  Were you able to -- I guess let me -- you made a reference to this earlier.

What's an electropherogram?

A    An electropherogram is the final graph of our data.  Essentially it's a page that looks like a graph with peaks on it, and those peaks are what are designated as alleles.

Page 28

Q    In reviewing your case notes, it appears that the electropherogram for sample E03-B is found at page 118?

A    Yes.

Q    Okay.  Can you just, so we can look at -- or so the court can -- you know, the court is not here, but the court may have questions, and I don't know if the court has ever had an electropherogram in front of him before, so looking at page 118, can you just sort of explain how that's laid out?

Like I see a box, and there's like a DYS designation with a number.  What does that refer to?

A    So all of those boxes refer to the specific locations in the DNA that we targeted for amplification, for testing.

Q    Okay.

A    So there are 23 because there are 23 areas of the DNA that we tested.

Q    Okay.  And then I can see -- what are the -- there's sort of like a little, I don't know, graph that has like AD162, 80, 160, 240, 320, 400, 480.

A    So that is the size of the DNA.  So

Page 29

that's in base pairs, and that's how these pieces of DNA, in order to be able to separate out these peaks on this graph, are arranged so that they have different sizes.

Q    Okay.  So earlier you referenced RFU. Is the number running vertically on that RFU number --

A    Yes.

Q    -- like 80 on one, and then at 290 on another?

A    Yes.

Q    Okay.  So I'm looking at this sort of -- shoot, I can't -- DYS576.  So there's sort of a peak there.  Do you see that?

A    Yes.

Q    Okay.  And that peak, does that mean that there's an allele there at that location?

A    Yes.  You're looking at the peak that has the number 20 on it?

Q    Yes.

A    Yes.

Q    Okay.  Now, what does that 20 number mean, that first number in that box?

A    That just means that's how many repeats were at this location.

Page 30

So what this testing is doing is that each of these locations, there's a pattern of molecules that repeat over and over and over again, and so what that's doing is it's just counting how many number of repeats. That's how an allele is designated.

So at this particular location, there were 20 repeats, so this allele is a 20.

Q   Okay.  All right.

And then what's the second number that's below the 20?  And it's a 135.

A   That is the RFU.  That's the height of the peak.

Q   Okay.  And then the third number, the 124.27, what's that number?

A   That's the base pair.  That's the size of the peak on the graph.

Q   All right.  So the next number is allele -- if I say that's allele 13, am I right, or is that --

A   Yes, that's how you say it.

Q   So allele 13 has an RFU of 150, and its height is 159.24?

A   Its height is 150, its size is 159.24.

So the base pair size just allows the

Page 31

software to be able to know which location that allele belongs to.

Q    Okay.

A    So it's sorting them.

Q    **In this circumstance, looking at this electropherogram, what kind of profile did you develop?**

A    So this is a partial YSTR profile that's consistent with a mixture of at least two individuals.

Q    **Let me go to -- when we talk about -- and that's what you said on page 245 of your report, it's consistent with a mixture of at least two individuals, and I was quoting that.**

     **Does that mean there's more than two?**

A    It means I can't tell.  I can tell that there are at least two.  It might only be two, it could be more than two, but I can't tell how many people are contributing.

Q    **Okay.  And you talk about the allele drop-out.  How do you determine that there has been drop-out?**

A    So it could be a couple ways.

     First, I could see a peak that isn't being designated a number because it didn't reach

Page 32

the analytical threshold, so that would be considered drop-out because it wasn't strong enough to reach that 75 RFU threshed, and so it's not designated as an allele.  I'm missing that information.

Or if the peak did not reach the stochastic threshold, there's a potential for drop-out.  There might not be drop-out, but there could be drop-out that I'm not even seeing.

Sometimes when there's drop-out, there's no peak, nothing amplified, and so I don't see anything, which is why, once it reaches that stochastic threshold, based on when we validated this kit, we would at least see another peak to know, and the other peak, on average, would have reached the analytical threshold.  It might not be as tall, but we would know it was there.  Because sometimes with drop-out, it's a flat line, you don't see any sort of peak, so you don't know if there's drop-out or not.

Q   Okay.  And I guess that's sort of my question.  I mean, how do you know that there's been drop-out?

A   For sure I know there's drop-out when I see a peak that's underneath the analytical

Page 33

threshold.  So it's not being designated as an allele, but I can see that there is data there, it's just not strong enough to be able to designate it as a specific allele.

Q    Okay.  And what is drop-in?

A    Drop-in is when potentially there's extraneous DNA in the environment that sometimes can get into your sample.  It's not contamination necessarily, but there's just a random peak that shows up.

I don't know that I've actually ever seen drop-in in my samples, but potentially, if you do see it, it would be a lot lower than your true allele because there would be a lot less of it.

Q    And what is stutter?

A    Stutter is an effect -- it's an artifact like we talked about before that happens at amplification.

What it is, it's a known effect that -- sometimes during amplification, the chemicals -- the elements of the kit.  So it's looking at a specific sequence of molecules, and so sometimes when it's amplifying it, it's making millions of copies so that we can visualize it on

Page 34

our electropherogram, it slips, and so it creates a peak that is one base pair less or one base pair more than the true allele.

So it's a known artifact, so we can account for that. Based on our studies, we know what the maximum, like, percentage would be. So when we do our data analysis, we set it up so that it filters out those known artifacts.

Q   Okay. All right. And you anticipated my next question, which is how do we know that it's drop-out versus drop-in or stutter?

A   So stutter will always pair with a true allele, and usually it's stronger alleles that will have the stutter. Weaker or lower alleles generally won't have as much stutter. So that's how you can always know that there's stutter, if it's -- you won't just have a stutter peak without a true allele peak.

And then drop-in, I'm not really sure. I mean, like I said, I've never really seen drop-in. So there are times where I've seen artifacts, and so you can reprocess. Because it's not in the sample, it's somewhere in the environment, so you can reprocess the sample to confirm whether that's really an allele that

Page 35

should be there, or if it was just an artifact that popped in.

And then drop-out, like I said, you can see peaks below threshold that indicate that you're not -- that the information is not strong enough to be able to get all the information.

Q    Okay.  I'd ask you to look at page 242 of Petitioner's Exhibit 2, which is your case file.

A    Yes.

Q    What's that chart called?  I mean, is that something you prepare normally, or is there a technical term for that chart?

A    Yes.  So this is an allele table, and so we do these for every case.

What it is, it's a summary of what we tested and what our results are in numerical fashion.

Q    And what does that allele table tell us about the male DNA that was found on the murder weapon in this case?

A    So for E03-B, it lists all of the allele numbers that I obtained on the electropherogram, and the dash-dash-dash is indicating that the allele did not reach

Page 36

stochastic threshold and, therefore, there's possible additional alleles that aren't being designated as a number.

Q   Okay, you anticipated my next question, which was going to be what do the dashes mean.

So it appears that you received the result, I think on approximately 14 of the loci?

A   Yes, 14.

Q   So those 14 results would be above the threshold allele requirement?

A   The analytical threshold, yes.

Q   Analytical threshold, which is what, 75 RFU?

A   Yes.

Q   Okay.  Now, I'd like you to look at -- I'm sorry, I'm jumping ahead of ourselves.

The supplemental report, which is Petitioner's Exhibit 3, if you look at the allele table found on page 85.

A   Okay.

Q   And I'm going to sort of -- the next couple questions are going to sort of draw on the two different allele tables.

Just for purposes of this deposition,

Page 37

EO3-B1, I'm just going to refer to it as the knife handle just so it's -- you know.

So in the knife handle analysis, on the first YSTR testing, there was an above-threshold of 20 at locus 576?

A    I'm sorry, can you say that again?

Q    In the knife handle sample, the YSTR testing revealed an above-threshold allele of 20 at locus DYS576?

A    Yes.

Q    And in the sample taken from Mr. Williams, what was the allele at locus DYS576?

A    He has an allele 16.

Q    Okay.  So on the knife sample, the DNA testing revealed an above-threshold allele of 23 at locus 481.

In the sample taken from Mr. Williams, what was the allele at locus DYS481?

A    Mr. Williams has a 26.

Q    Okay.  From the knife handle, the YSTR testing revealed an above-threshold allele of 13 at DYS533, and in the sample taken from Mr. Williams, what was the allele at locus DYS533?

A    Mr. Williams has an allele 12.

Q    In the knife handle, the YSTR testing

Page 38

revealed an above-threshold allele of 15 at locus DYS437.

In the sample taken from Mr. Williams, what was the threshold allele at locus DYS437?

A    Mr. Williams has an allele 14.

Q    And in the knife handle, the YSTR testing revealed an above-threshold allele of 16 at DYS570.

In the sample taken from Mr. Williams, what was the allele at locus DYS570?

A    19.

Q    In the knife handle, the YSTR testing revealed an above-threshold allele of 24 at DYS390.

In the sample taken from Mr. Williams, what was the locus at DYS390?

A    21.

Q    In the knife handle, the YSTR testing revealed an above-threshold allele of 13 at DYS392.

In the sample from Mr. Williams, what was the allele at locus DYS392?

A    11.

Q    In the knife handle sample, the YSTR testing revealed an above-threshold allele of 17

Page 39

at locus DYS458.

In the known sample taken from Mr. Williams, what was the allele at locus DYS458?

A    18.

Q    In the knife handle, the YSTR revealed an above-threshold allele of 11, 14 at DYS385a/b.

In the sample taken from Mr. Williams, what was the above-threshold allele at DYS385a/b?

A    15, 16.

Q    And is that the allele you were talking about earlier where it's unusual on the YSTR that you're actually finding two alleles?

A    Yeah.  I mean, it's not unusual, but, yeah, that 385, it's actually two locations, 385a and 385b.

Q    Okay.  All right.

So in both those cases, there's different alleles from your initial testing and the known sample from Mr. Williams?

A    Yes, they're different.

Q    Okay.  On just the initial analysis, you know, not looking at the second testing that was done, how close a call was this as far as making your conclusions?

A    Well, I mean, there's a lot of data in

Page 40

this sample.  However, under threshold I was seeing additional peaks, which is what indicates that there is at least one other contributor.

If these alleles had been stronger, then I could have had confidence that they were all coming from the same person and been able to make exclusions off of it, but since it's so low, and our studies have shown that when the samples are so low, the potential for preferential amplification increases, so I can't be sure that this combination of alleles all come from the same person.

If they had been higher RFU, if they had been stronger, then I could be more confident, but since they weren't, I couldn't make conclusions.

**Q   Well, for the record, I'm laying a pen down on my pad, right?  So if I pick it up and just move it over to here, that has the potential of leaving DNA, does it not?**

A    On the pen?  Yes.

**Q    On the pen, okay.  But is it fair to say not a lot?**

A    It kind of depends on the person. Some people shed more cells by touching something

JENNIFER FIENUP   11/29/2016

Page 41

than others; or if you had just recently washed

your hands, you would have less just loose cells

on your hand than if you hadn't.

So it's not going to be a lot of DNA,

but depending on the person will determine the

likelihood of how much DNA they would be able to

leave.

Q    So there are variables that are

involved, you know, even if I just pick up this

pen and move it six inches over to the side?

A    Yes.

Q    So let's say this pen is not a pen,

but it's a knife handle, and I pick it up and I

violently and viciously stab somebody a number of

times, and the last wound is I take the knife and

I embed it in them, and then I walk away.

Is it fair to say more DNA would be

left on that?

A    Potentially, if you're holding it for

a longer time, if the person is sweating, if the

person cuts himself on the knife.  There are

variables, but, yeah, the longer you hold

something, the longer you have to leave DNA on an

item, so it could potentially leave more DNA.

Q    Okay.  It just seems that the second

**JENNIFER FIENUP   11/29/2016**

Page 42

example, if you're holding a knife for longer and you're doing something -- or you're holding this pen for longer periods of time and you're doing actions, that it would just leave more DNA, or the possibility of more DNA?

A    Yeah, because you're holding it longer, you're in contact with it longer, so there is the potential to leave more DNA.

Q    And this isn't like -- we're not talking about like this is a rape case where you're working with -- you're doing STR, YSTR, from bodily fluids.

If there's a strong profile, and you got a result on I think 14 of the 23 locus, is that less likely from incidental contact?

MR. SPILLANE:  I'm going to object to the form of the question because I have no idea what he asked.

BY MR. KOMP:

Q    Do you understand the question?

A    No, not really.  Could you rephrase it?

Q    Okay.  In the example of where you just pick it up and you put the pen down, or you use it to like stab somebody, which is more likely

Page 43

to leave DNA from that contact?

A    Like I said, I would expect the person who holds it longer to potentially leave more DNA than someone who just briefly touches something.

Q    Okay, let's look at the second analysis, the supplemental report, which is Petitioner's Exhibit 3.

A    This is the report from August?

Q    Yes.

A    Okay.

Q    So when you're doing a second round of testing, or supplemental testing, how does Bode prepare a case file on that?

A    The same way.  All of the worksheets from the processing are in there, the electropherograms of the data, any correspondence or submission paperwork or instructions, and then the report.

The difference is that this is a supplemental case report, so in the case report, we refer to the original case report so that you know that there's another report for this case.

Q    Okay.  And you brought that with you?

A    Yes.

Q    Okay.  And I'd like you to look at

JENNIFER FIENUP   11/29/2016

Page 44

pages 85 and 86.

A    Okay.

Q    What is that?

A    Those are the pages of the supplemental report.

Q    And what type of testing was conducted the second time around?

A    Again, I did YSTR testing.

Q    Similar to what you described earlier?

A    Yes.  So we took another sampling of the knife handle and tried testing it again, and we also tested a reference sample from Marcellus Williams.

Q    Okay.  And did you find male DNA on this second swabbing of the knife handle?

A    Yes.  So sample E03-C -- would you like the quantity of DNA again?

Q    Yes, please.

A    Okay.  So for our second sampling, obtained an estimate of 0.00199 nanograms of human DNA, and then less than 0.001 nanograms of male DNA.

Q    And what page is that?

A    That's page 11.

Q    Page 11?  Okay.

JENNIFER FIENUP  11/29/2016

Page 45

It's pretty obvious -- I mean, this is obviously less DNA than the first time, and why is that?

A    Because we're just -- so what we do is we wet our cotton swab and rub it on the handle, and so we're just doing it a second time.

So, theoretically, when we swabbed it the first time, we picked up at least half, if not more, of the DNA that was present on the knife handle.  So when we went back and swabbed it again, there was potential to be less DNA than the first time.

Q    And what kind of profile was obtained?

A    I obtained a partial YSTR profile that was consistent with a mixture of at least two individuals, and, again, I could make no conclusions.

Q    So now I'd ask you to look at pages 63 and 64 of your supplemental case notes, and that would be 63 and 64 of Petitioner's Exhibit 3.

A    Yes.

Q    And what are those?

A    These are the electropherograms, the resulting data from that sampling.

Q    On the initial testing, the

JENNIFER FIENUP   11/29/2016

Page 46

electropherogram was only one page.  This is two pages.  Why the difference?

A   So when we were testing this, at the last step, we just ran it through the machine twice just to make sure, because sometimes something can happen during the run that could cause us to have to reprocess, so we just did it up front.

So it's the exact same sample, it's just run through the machine twice.

Q   Okay, and that's what I'm curious about.  I'm just using this as an example.  Is there any significance in the change in numbers?

For instance, if you look at the DYS391 loci on page 63, it has inside that box allele 10, 174, then 100.76.  Then on page 64, that same locus -- loci -- locus or loci?  I'm messing this up.

A   Locus and loci.  So locus is the singular.

Q   Okay.  You've seen why I failed Latin back in high school.

So locus DYS391 has in the box 10, 174, 178.  Why a change in numbers?

A   That's just the variation of running

Page 47

it through the machine.

So what's happening is it's being run through a tube, and then a laser hits it and excites the molecules that are on that allele, and then the camera catches that excitement, the fluorescence. So it's just a variation of how the sample ran through the machine.

So it's the same allele. So each sample that we run through runs with its own internal control, which is what sizes it. So that's why the sizing, the base pair number, is slightly different, because it just ran through with a different amount of time just slightly, so that's why we run a control with each individual sample as it goes through the machine.

So, yeah, it's just a slight variation from the machine.

**Q   Okay.  And were these run back to back, or was there some time difference in between?**

A   No, they were run at the same time. So it's in a plate with 96 wells in it, and so they were in two of the wells, and so they were run through at the same time.

**Q   Okay.  And I'm going to ask you to**

JENNIFER FIENUP   11/29/2016

Page 48

look at page 85 of Exhibit 3, which is your supplemental Bode case file, and that is -- what's that?

A    85 is the last page of the report that contains my signature, as well as the allele table for these samples that I processed.

Q    Okay.  And what does that allele table tell you about the partial profile of the DNA found on the knife?

A    So I obtained results at four of the locations, and, again, because I could see evidence of it being a mixture, the dash-dash-dash again indicates that there's possible additional alleles that aren't being detected; and then it also reflects the YSTR profile for Marcellus Williams.

Q    Okay.  In the knife handle sample, the DNA testing revealed an above-threshold allele of 24 at locus DYS390.

In the sample taken from Mr. Williams, what was the above-threshold allele at locus DYS390?

A    21.

Q    Okay.  The YSTR testing revealed an above-threshold allele of 13 at DYS393 from the

Page 49

knife handle.

And what is the allele at locus DYS393 for Mr. Williams?

A    14.

Q    And in the knife handle, the YSTR testing revealed an above-threshold allele of 17 at DYS458.

In the sample taken from Mr. Williams, what was the allele at locus DYS458?

A    18.

Q    If I use the term "redundancy," what does that mean to you?

A    Not sure.

Q    Okay.  Well, if you look at -- I'd ask you to sort of look at the allele table from the supplemental, which is on page 85, and then the allele table on page 242.

It appears to me that you got the same results at DYS391, DYS390, DYS393 and DYS458.

A    Yes.

Q    Do these sort of -- I call it redundancy.  Does this redundancy in results indicate anything to you?

A    It's not unexpected.  I mean, they're samplings of the same item, and so I would expect

Page 50

consistency between the alleles that were detected.

Q   Does that tend to, in your mind -- we talked earlier about, you know, just casual leaving DNA versus the possibility that if you're yielding a murder weapon and stabbing somebody numerous times.

Does the redundancy in these results tell you anything about the possibility that this could be a major profile versus a minor profile?

A   No, because I have to look at each profile individually.  It tells me that there was a person who had those alleles, or a combination of people who had those alleles, that touched the -- or left DNA on the handle.

But in terms of being able to say that those alleles came from the same person, I can't say that because there's so little DNA and the peaks are so low.  Because they're separate samplings, I can't combine them to be able to make it into more information.

Q   Okay.  Mike and Jennifer, can we just have a second so I can consult with my co-counsel real quick?  Is that okay?

A   Okay.

Page 51

MR. SPILLANE:  Okay.

MR. KOMP:  I'll step out.

(A break was taken at 10:38 a.m.)

(Resume at 10:40 a.m.)

EXAMINATION BY CO-COUNSEL FOR THE RESPONDENT

BY MR. GIPSON:

Q    Ms. Fienup, this is Kent Gipson.  I'm the other lawyer on the case.

I think Mr. Komp went through a lot of these numbers on the two different charts, and correct me if I'm wrong, but putting aside the threshold limits, there are several alleles we found from Mr. Williams' known DNA that did not match the alleles from the knife in, I don't know, six or seven, or maybe eight different areas?

A    Yeah.  When you're just looking at the allele table, then, yeah, there are inconsistencies between the two sets of numbers.

Q    And looking down, if you compare the two charts from April and the one from August, the DYS385a and b, I think you testified earlier that when you find two different results, one of them would be from your mother and one from the father; is that right?  Or I maybe I missed that.

A    That's for STR testing.

Page 52

Q   Okay.  So that doesn't have any -- what's the significance of finding two different ones as opposed -- is there any difference in the way you compare those as if you only found one?

A   No.  So the reason there are two numbers here is just because it's two locations.  They're just very close to each other.

And so in the graph, like they weren't really -- they're not capable of separating them out.  And so the 11 and the 14, one will come from DYS385a, and the other allele comes from DYS385b.

Q   But neither one matched Marcellus Williams from the knife?

A   Right, they're inconsistent.

Q   So I guess the real question is you developed these thresholds for making exclusions or matches.  I assume that's based on a reasonable degree of scientific certainty?  It's a term we lawyers use sometimes, but is that basically how you develop those protocols?

A   It's based on the validation studies.  They do testing on these kits and test different types of profiles to determine what those thresholds should be.

Q   I was just looking at a case that came

Page 53

out of Missouri just last week where DNA experts

had testified that even though it doesn't meet the

threshold, if you don't have matches to a known

sample, it still has evidentiary value on the

question of exclusion.

Would you agree with that?

A    I would agree if it was a

single-source profile.

Q    But on YSTR, if you find six, seven,

eight or nine alleles that do not match a

suspect's DNA, does that have any evidentiary

value in showing that he was not the contributor?

A    If it was a single-source profile,

yes.  If it's a mixture, not necessarily.

Q    But it does cast -- it certainly does

cast doubt on it, does it not, on the identity?

A    Potentially.  I can't tell with this

type of profile because it's a mixture and it's so

low.  I just can't tell with any confidence that

this combination of alleles comes from one person.

It could come from multiple people.

Q    Let's talk about that.

Just for purposes of this case, you

don't know this, but the evidence, at least from

the prosecution's point of view, was there was a

Page 54

single perpetrator of this murder, okay?

A    Okay.

Q    So given that, would that heighten the evidentiary value of it as far as there not being a second contributor?

A    No.

Q    Why's that?

A    Because when I look at my electropherogram, when I look at my results, I see evidence of at least one other contributor.

Q    But you're talking about another male contributor?

A    Yes.

Q    Mr. Komp just has a couple of questions to follow up, and then I think maybe we'll leave you alone for the rest of the day.

A    Okay.

FURTHER EXAMINATION BY COUNSEL FOR THE PETITIONER

BY MR. KOMP:

Q    I'm looking at the allele table on page 242 of the case file.

A    Yes.

Q    And earlier you said dot-dot-dot.  You know, for example, let's just look at the locus DYS576, the 20 comma dot-dot-dot.

Page 55

**So that dot-dot-dot, is that where you're saying there's an allele present, but drop-out prevents me from identifying it?**

A   Yes.

**Q   So looking at that DYS385a/b, there's 11, 14?**

A   Yes.

**Q   And there's no dot-dot-dot, so is there no drop-out that occurred at DYS385a/b?**

A   So that's a product of how we summarize the results, but as I was saying before, when we make comparisons, we use the electropherogram, not the summary table.

When I look at the electropherogram, I do actually see a peak under threshold that could potentially be another allele, but due to how our SOPs are set up on how we summarize the allele table, there is no dash.

MR. KOMP:  I think that's all we have.

Do you have anything, Kent?

FURTHER EXAMINATION BY

CO-COUNSEL FOR THE PETITIONER

BY MR. GIPSON:

**Q   This is Mr. Gipson again.**

**The absence of dash-dash-dash on the**

**JENNIFER FIENUP   11/29/2016**

Page 56

385a/b, we're talking about the same thing, does that mean that there is no unknown alleles found, or less of a likelihood than if there was a dash-dash-dash?

A    No.  It's just how we summarize.

When I'm looking at the raw electropherogram, the raw data, I do see a third peak below threshold.  It's just that, based on our SOP, we don't include that dash.  And so since I'm following the SOP, that's the way the summary allele table is.

But when I look at the electropherogram, I see a peak that could potentially be an allele.  It's not above the threshold, so it's not being designated as an allele, but it could potentially be an allele.

Q    On any --

A    So that's --

Q    I'm sorry, I didn't mean to interrupt you.

On any of the 23 loci from the knife, two knife samples, were any of them above the threshold?  And I think it's what, 75?  Is that what you said earlier?

A    Yeah.  So all of these numbers that

Page 57

you see in the allele table are above the 75 threshold.

Q    And I thought that was the floor by which you can make a comparison or an exclusion, or is that not right?

A    So there's the analytical threshold, which is the 75, in which it can be designated as a peak for an allele.

And then there's the stochastic threshold, which is 300, that once it reaches that point, you can be more confident that you're not missing data, that another allele is not dropping out.

Q    So any time there's a number from the knife sample, that means it's at least 75?

A    Yes.

Q    Were any of them over 300?

A    Yes.

Q    Which ones?

A    At DYS391, the allele 10; and DYS635, allele 23.  That's why they don't have dashes.

Q    Okay.  And then the others were more than 75?

A    Yes.

Q    Okay, I think that clears that up.

Page 58

**But as far as -- I think I don't want to beat a dead horse here, but as a question of whether something has some evidentiary value one way or the other -- and you're a scientist, you're not a lawyer, so you probably can't answer this question -- but you just can't determine, to a reasonable degree of scientific certainty, anything about whether you can exclude Marcellus Williams as a person that contributed DNA on this knife; is that right?**

A   Right.  Yeah, I can't make any conclusions.

**Q   But there is evidence, you would agree, about the non-matches that could possibly exclude him but for the fact that the threshold didn't reach 300; is that correct?**

A   Right, right.  If those alleles were stronger, I potentially could have made conclusions on this profile.

**Q   And all you would have needed to do would be three or more -- if we would have reached 300, you could have excluded him?**

A   Yes.  If they were -- yeah.  Depending on the profile, if they were stronger, it only takes one allele to exclude for a single-source

JENNIFER FIENUP   11/29/2016

Page 59

profile, or for a major component profile, but, unfortunately, I don't have that here.

Q    But you use a three on mixed profiles, right?

A    No.  So it's three locations, three loci, for STR analysis to be able to include somebody.

Q    Okay.

A    It only takes one locus, one allele, to exclude.

Q    Okay.  So if any one of those would have reached 300, you could have excluded him?

A    If more of them had reached 300.  I do have a couple that are above 300, but because of the nature of the profile, I still couldn't exclude off of those.

If more of the data had reached above 300, then I could have potentially made conclusions off of it.

Q    I seem to recall, and maybe Mr. Komp can clarify, maybe in some conversations you had with him, that this was either a close call or right on the cusp of being able to make an exclusion, is that true?

A    It was.  It was just a little too low.

Page 60

If it had been stronger, I could have made conclusions, but it was a close call.

MR. GIPSON:  I think that's all I have.  Thank you.

EXAMINATION BY COUNSEL FOR THE RESPONDENT

BY MR. SPILLANE:

**Q    This is Mike Spillane.  I had a few questions.**

A    Okay.

**Q    Good afternoon -- or good morning I guess, ma'am.**

A    Morning.

**Q    The first thing, on DYS385a/b, I wanted to clarify that a little bit.**

**What you're looking at, I guess, are amino acids A, C, G and T, and the number you have is how many times those repeat in a particular location, is that accurate?**

A    Right.  So I'm looking -- so, yeah, A, C, T, G are the nucleotides, and I'm looking at --

**Q    Right.**

A    There's a pattern, and how many times that pattern repeats is the number.

**Q    Right.  And the reason you have two results for DYS385a/b is that pattern exists in**

Page 61

two places on the chromosome, and you just list them there in one box.  Is that fair?

A   Yes.

Q   So it's two different numbers, but because it's the same amino acids, you put them in the same box --

A   It's just --

Q   -- even though it's two different -- yeah, go ahead.

A   I'm sorry.  It's just that the locations -- the way this kit is set up, those two locations are close to each other just spatially.  When you're looking at the graph, the peaks are all spread out because the locations are able to be spread out.  Those two locations, they're right next to each other, and so rather than them being reported as two separate locations, they're just combined.

Q   Okay.  And it's just an artifact of the graph that you don't have a line there indicating that there's another possible allele result because that's just an artifact of the graph.  There's still a possibility if you look back at the data, is that accurate?

A   Yes.

Page 62

Q    Okay, let me ask you about some of the ones you weren't asked about.

DYS389.1, the number of repeats on the knife handle matches exactly the number of repeats on Marcellus Williams' profile, isn't that accurate, 13?

A    Yes, they're consistent.  They're the same number.

Q    What about DYS391, that matches exactly as well, 10 repeats, does it not?

A    I believe that's the one you just asked about, yes.

Q    389.1.

A    Oh, I'm sorry.

Yes, 391, yes, they're the same number.

Q    And DYS635, they're the same number as well, 23, isn't that accurate?

A    Yes, they're the same number.

Q    And DYS439, they're the same number, 12, isn't that accurate?

A    Yes, they're the same number.

Q    And the two of them that had results over 300, DYS391 and DYS635, those are both identical between the knife handle and Marcellus

Page 63

**Williams, aren't they?**

A    Yes, they're the same number.

**Q    Is that significant?**

A    Not necessarily because I have to look at the overall profile, and since I can't make any conclusions -- like they are the same number, but I can't necessarily say that those numbers came from Marcellus Williams or that they didn't.  It's inconclusive.

**Q    Well, let me ask you a hypothetical.**

**If the opposing counsel was correct, one would expect a stronger result from the person that held the knife during the murder -- and I'm not saying that is or is not true, that's just the hypothetical I'm giving you -- then one would expect a stronger result than the two I just read you, 391 and 635, is that accurate?**

A    Yeah.  So if you expect a stronger result, then in a mixture you can have what's called a major contributor and a minor contributor.

And so if the profile meets certain parameters, meaning that the peaks are above the stochastic, so above 300, and are also 75 percent of the profile compared to the minor alleles that

Page 64

are visible, then you could potentially pull out a major contributor, which would be a single-source profile, which you would make conclusions to.

Q     And the only two that were above 300 were those two that matched Marcellus Williams?

A     Yes, those both were above 300.

Q     Let me jump back and ask you about the testing for mitochondrial DNA on the April 8 report.  Do you have that in front of you?

A     I do.

Q     You compared that to the DNA sample for Felicia Gayle and for Mr. Pinkus, but you did not compare it to Marcellus Williams.  I was wondering why.

A     I am not trained in mitochondrial DNA. I can't testify to that.

Q     Are you saying you don't know why it wasn't compared to Marcellus Williams?

A     I didn't do that testing.  I only did the YSTR testing.  I'm not trained in mitochondrial DNA.

Q     Let me ask you this.  Why did you do YSTR testing on the knife handle as opposed to standard PCR testing that could be submitted to CODIS and put into the system to try and find

Page 65

someone to match it?

A   Based on the quantification results that I had read earlier, there was a lot more human DNA than male DNA.

So based on conversations with the client, since the male DNA was the profile of interest, we did YSTR testing because it was expected that, based on our quantification results, that any male DNA would be overshadowed by the total human DNA.

Q   Let me see if I can get a finer point on that question.

Was it your opinion that if you did standard PCR testing, you wouldn't get a result that could be submitted to CODIS anyway?

A   Potentially, yes.

Q   Was that your reasoning, or I'm not understanding why you --

A   So my reasoning was, since the profile of interest was the male DNA, in my experience, with those type of quant results, the STR results would result mostly in the human DNA, which I would expect to be female DNA, and the male DNA that is present wouldn't have been detected as well.

Case: 4:05-cv-01474-RWS   Doc. #: 101-5   Filed: 07/31/17   Page: 66 of 83 PageID #: 1059

Page 66

Q    So am I correct that you have to hit 8 out of 13 points to submit it to CODIS for PCR testing?

A    I don't know.  Actually, I don't know what the rules are for submitting profiles to CODIS.  We're not allowed to do that as a private lab.

Q    Perhaps I misunderstood.  I thought you had authority through the Kansas City Police Department lab to do that.

A    So what we do is we have to get it approved by a lab that does have CODIS rights, and then we send them the resulting data, and they decide whether it's CODIS eligible.  We just have to get permission before starting to be able to send them that data.

Q    Right.  And you didn't get permission in this case because you did YSTR as opposed to standard PCR?

A    We did get permission, but since I know YSTR results aren't CODIS eligible, we didn't submit them the data for CODIS.

Q    Let me ask you a question about Table 1 in the April testing.

     It looks like you got 14 results in

Page 67

April, and then you only got four results when you did it again in August.

Is it a reasonable inference that there'd be no value in doing further testing on the knife handle?

A    I would say yes, because I clearly got a lot less DNA the second time we tested it, so I would expect that any DNA on the handle by this point has been consumed.

Q    Counting the possible result at DYS385a/b, in your original test, you had possible, but unconfirmable alleles at 12 sites, is that accurate, in the April test?

A    I'm sorry, I don't understand your question.

Q    All right.  You have dashed lines at 11 positions on that chart, which indicate a possible allele, but you couldn't confirm whether it was an allele or not, is that accurate?

A    Yes.  Where I have possible -- yeah, possible drop-out.  So possible additional alleles, yes.

Q    Right.  And then at the position of DYS385a/b, you also have a possible drop-out, but you just can't tell?  Because of the way the chart

JENNIFER FIENUP  11/29/2016

Page 68

is designed, that's not marked there.  So it's 12 out of the total, is that accurate?

A    Yes.

Q    Is it a fair characterization of your results that your results are consistent with Marcellus Williams' DNA being on the knife handle and one or more other male persons also having left DNA on the knife handle?

A    I can't say that.  I can't make any conclusions on this DNA profile.

Q    You can't exclude and you can't include?

A    Correct.

Q    Let me ask you this.  I noticed you have four hits that match Marcellus Williams exactly on different alleles, and two of those are the two that are over 300.

Can you make any conclusion of whether that's greater than random chance to hit that many and the two with such high numbers?

A    I can't, no.

Q    So you can't exclude and you can't include because you simply have insufficient data?

A    Correct.

Q    And there'd be no point in doing any

Page 69

further testing on the handle because it's pretty much been consumed, is that accurate?

A    In my opinion, I believe so, based on the technology we have today.

Q    What kind of a knife is this?

A    I'm really not sure.  It's just described as a knife.

Q    You never saw the knife?  I won't ask you questions about it if you never saw it.

A    I did not sample the knife myself, so I have the notes, but it's just described as a knife.  I don't know what kind of knife it is.

Q    You don't know if it's a kitchen knife or a pocket knife or anything like that?

A    I don't know.  I just know it's a knife with a wooden handle.

Q    All right.  Have you ever tested anything you knew to be a kitchen knife?

A    I don't think so.

Q    Well, then, I won't ask you any questions about your results on those because I guess you don't know what kind of a knife you're testing when you do it?

A    Right.

Q    All right, that's all the questions I

Page 70

**have.  Thank you.**

A    You're welcome.

MR. KOMP:  We don't have anything.

MR. SPILLANE:  Could I ask one thing while I've got everybody on the line?

If somebody could send me Exhibits 1, 2 and 3, because the disk I have, I think it doesn't have a full set of the April 8th stuff, so if that's no trouble, I'd appreciate it.

MR. KOMP:  Okay.

THE REPORTER:  Do you want to ask her about signature?

MR. KOMP:  I think we would agree to waive it, if that's okay.

MR. GIPSON:  It's up to her.  It's up to the deponent.

MR. KOMP:  You have the right, if you want, to review this and make correction, but it can only be sort of typos.  You can't change the substance of your testimony, or you can waive that right and the court reporter can just prepare the deposition.

THE WITNESS:  I'll waive that right.

(The deposition concluded at 11:05.

Reading and signature were waived.)

**JENNIFER FIENUP   11/29/2016**

Page 71

CERTIFICATE OF NOTARY PUBLIC

I, DAWN A. JAQUES, a Notary Public in and for the District of Columbia, before whom the foregoing deposition was taken, do hereby certify that witness whose testimony appears in the foregoing pages was duly sworn by me; that the testimony of said witness was taken by me in shorthand at the time and place mentioned in the caption hereof and thereafter reduced to typewriting under my supervision; that said deposition is a true record of the testimony given by said witness; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition is taken; and, further, that I am not a relative or employee of any attorney or counsel employed by the parties thereto, nor financially or otherwise interested in the outcome of the actions.

_____

Dawn A. Jaques, CSR, CLR

Notary Public in and for

District of Columbia

My commission expires:

January 14, 2020

Page 72

IN THE CIRCUIT COURT OF BOONE COUNTY, MISSOURI

MARCELLUS WILLIAMS                )
                                  )
                                  )
  v.                              )No. 15BA-CV01828
TROY STEELE, Superintendent, )
Potosi Correctional Center   )

                    CERTIFICATE OF DEPOSITION

Comes now Dawn A. Jaques (reporter) and pursuant to Rule 57.03(g)(2)(a) states as follows:

The deposition of JENNIFER FIENUP, was taken on November 29, 2016.  The name and address of the person or firm having custody of the original transcript is:

LAURENCE E. KOMP

Laurence E Komp Attorney at Law

P.O. Box 1785

Manchester, Missouri  63011

At the time of delivery of the transcript, the deposition charges had not been paid.  Payment status will be updated at the request of the Court pursuant to Section 492.590(2) RSMo.

                    By:_____

Midwest Litigation Services

(800) 280-3376

www.midwestlitigation.com

JENNIFER FIENUP   11/29/2016

Page 73

**A**

**a.m** 1:17 51:3,4
**able** 12:21 13:20
15:7 22:2 27:19
29:2 31:1 33:3
35:6 40:6 41:6
50:16,20 59:6
59:23 61:14
66:15
**above-threshold**
37:5,8,15,21
38:1,7,13,19,25
39:6,8 48:18,21
48:25 49:6
**absence** 55:25
**account** 15:7
34:5
**accreditation**
7:25
**accredited** 7:24
**accuracy** 6:13
**accurate** 7:4
60:18 61:24
62:6,18,21
63:17 67:13,19
68:2 69:2
**acids** 60:16 61:5
**action** 71:13
**actions** 42:4
71:17
**AD162** 28:23
**add** 13:13
**additional** 36:2
40:2 48:13
67:21
**address** 72:12
**affect** 14:17
**afternoon** 60:10
**agree** 53:6,7
58:14 70:13
**ahead** 36:17 61:9
**allele** 15:2,20,20
17:3 18:17,19
18:23 19:18,19
19:24 20:1
21:22 23:23

29:17 30:6,8,19
30:19,22 31:2
31:20 32:4 33:2
33:4,14 34:3,13
34:18,25 35:14
35:19,23,25
36:11,19,24
37:8,12,13,15
37:18,21,23,24
38:1,4,5,7,10
38:13,19,22,25
39:3,6,8,10
46:16 47:4,8
48:5,7,18,21,25
49:2,6,9,15,17
51:17 52:11
54:20 55:2,16
55:17 56:11,14
56:16,16 57:1,8
57:12,20,21
58:25 59:9
61:21 67:18,19
**alleles** 15:4 17:7
18:6 19:21 21:9
22:6,10,13
23:21,25 27:25
34:13,15 36:2
39:12,18 40:4
40:11 48:14
50:1,13,14,17
51:12,14 53:10
53:20 56:2
58:17 63:25
67:12,22 68:16
**allelic** 26:25
**allowed** 66:6
**allows** 30:25
**amino** 60:16 61:5
**amount** 12:21,23
12:24 47:13
**amplification**
14:24 21:17
23:15 28:17
33:19,21 40:10
**amplified** 23:18
23:18,19,22

32:11
**amplifying** 33:24
**analyses** 16:24
**analysis** 8:2,15
10:15 15:8,14
15:17 18:24
21:7 22:21 34:7
37:3 39:21 43:6
59:6
**analyst** 8:7,8,9
**analysts** 9:7
**analytical** 18:19
18:21 22:13
32:1,16,25
36:12,13 57:6
**analyze** 15:23
16:23
**answer** 58:5
**answered** 14:6
**anticipated** 34:9
36:4
**anyway** 65:15
**APPEARANC...**
2:1 3:1
**appears** 28:2
36:7 49:18 71:5
**applicable** 20:7
**appreciate** 70:9
**approved** 66:12
**approximately**
6:22,24 8:10
36:8
**April** 7:2 24:5
51:20 64:8
66:24 67:1,13
70:8
**area** 11:20 12:3
14:3
**areas** 13:24
28:20 51:15
**Arlington** 1:19
**arms** 11:18
**arranged** 29:3
**artifact** 14:21,23
18:25 33:18
34:4 35:1 61:19

61:22
**artifacts** 14:19
15:6,18 34:8,22
**aside** 51:11
**asked** 11:5,7
42:18 62:2,12
**asking** 15:11
**assume** 52:17
**assurance** 7:11
7:18,19
**attorney** 3:5
71:15 72:14
**August** 7:3 43:8
51:20 67:2
**authority** 66:9
**average** 32:15

**B**

**b** 21:22 51:21
**Bachelor's** 8:24
**back** 6:7 45:10
46:22 47:18,19
61:24 64:7
**base** 29:1 30:16
30:25 34:2,2
47:11
**based** 18:24
32:13 34:5
52:17,21 56:8
65:2,5,8 69:3
**baseline** 18:17
**basically** 52:19
**basis** 15:7
**beat** 58:2
**beginning** 13:12
**behalf** 2:2 3:2
**believe** 14:20
62:11 69:3
**belongs** 31:2
**below-threshold**
21:9 22:10
**biology** 8:25 9:2
**bit** 8:22 60:14
**blade** 26:11,20
**Bode** 7:12,14 8:6
8:11,19 9:8

22:9 24:10
25:22 43:12
48:2
**bodies** 7:25
11:14
**bodily** 42:12
**BOONE** 1:2 72:1
**Boulevard** 1:18
2:14
**box** 2:4 3:8 28:12
29:23 46:15,23
61:2,6 72:14
**boxes** 28:15
**break** 13:14 51:3
**briefly** 11:11
43:4
**bring** 24:25
**brought** 6:18
14:22 43:23
**Building** 3:6
**built** 20:18

**C**

**C** 5:1 60:16,20
**call** 39:23 49:21
59:22 60:2
**called** 1:15 5:4
11:22 13:10,23
15:3 18:18 19:3
21:17 35:11
63:20
**camera** 25:4 47:5
**capable** 52:9
**capacity** 8:2
**caption** 71:8
**case** 1:5 4:13,13
4:14 6:21,21,23
11:5,5,6,22
13:6 15:10
16:10 24:5,6,7
24:7,8,9,10,11
24:13,23,23
25:22,23,23
27:5,15 28:1
35:8,15,21
42:10 43:13,20

43:20,21,22 45:19 48:2 51:8 52:25 53:23 54:21 66:18
**cases** 8:4 9:19 10:11 39:17
**cast** 53:15,16
**casual** 50:4
**catches** 47:5
**cause** 14:18 46:7
**CCB1536-0303** 25:23
**CCB1536-0303...** 26:1
**CCB1536-0303...** 26:3
**CCB1536-0303...** 26:6
**cell** 12:24
**Cellmark** 7:12
**cells** 12:24 13:3 13:14 40:25 41:2
**Center** 1:7 72:8
**certain** 15:6 63:22
**certainly** 53:15
**certainty** 52:18 58:7
**CERTIFICATE** 71:1 72:9
**certify** 71:4
**chain** 24:20
**chance** 68:19
**change** 46:13,24 70:19
**characterization** 68:4
**charges** 72:17
**chart** 35:11,13 67:17,25
**charts** 51:10,20
**check** 15:17
**chemical** 11:13
**chemicals** 13:13 33:22

**chromosome** 12:2,9 61:1
**CIRCUIT** 1:1 72:1
**circumstance** 31:5
**City** 2:15 3:9 66:9
**clarify** 59:21 60:14
**clear** 16:5 21:10 21:14 25:9
**clearly** 5:19 67:6
**clears** 57:25
**client** 65:6
**clippings** 26:2,4 26:19,19
**close** 11:2 20:20 39:23 52:7 59:22 60:2 61:12
**CLR** 1:20 71:21
**co-counsel** 50:23 51:5 55:22
**CODIS** 64:25 65:15 66:2,6,12 66:14,21,22
**Colorado** 8:25
**Columbia** 1:21 71:3,22
**combination** 40:11 50:13 53:20
**combine** 50:20
**combined** 19:20 61:18
**come** 40:11 52:10 53:21
**comes** 19:14 52:11 53:20 72:10
**coming** 22:3,7 40:6
**comma** 54:25
**commencing** 1:16

**commission** 71:24
**compare** 51:19 52:4 64:13
**compared** 63:25 64:11,18
**comparing** 17:1 17:3 22:18
**comparison** 16:17,21,25 17:8 23:5 57:4
**comparisons** 15:24 21:14 55:12
**complete** 17:11
**component** 59:1
**concluded** 70:24
**conclusion** 22:14 68:18
**conclusions** 27:1 39:24 40:16 45:17 58:12,19 59:19 60:2 63:6 64:3 68:10
**conduct** 8:2
**conducted** 8:15 44:6
**conference** 10:22
**confidence** 40:5 53:19
**confident** 20:1 21:2 22:2 40:14 57:11
**confirm** 34:25 67:18
**consider** 12:23 23:3
**considered** 32:2
**consistency** 50:1
**consistent** 26:24 31:9,13 45:15 62:7 68:5
**consult** 50:23
**consumed** 67:9 69:2
**contact** 42:7,15

43:1
**contains** 48:5
**contamination** 33:8
**continue** 23:19
**Continued** 3:1
**contributed** 58:9
**contributing** 31:19
**contributor** 21:21,22 40:3 53:12 54:5,10 54:12 63:20,21 64:2
**contributors** 21:15
**control** 47:10,14
**conversations** 59:21 65:5
**copies** 4:16 33:25
**correct** 51:11 58:16 63:11 66:1 68:13,24
**correction** 70:18
**Correctional** 1:7 72:8
**correlation** 17:22
**correspondence** 24:19 43:16
**cotton** 45:5
**counsel** 1:15 4:17 5:7 54:18 60:5 63:11 71:11,15
**counting** 30:5 67:10
**COUNTY** 1:2 72:1
**couple** 31:23 36:23 54:14 59:14
**court** 1:1 3:6 4:18 5:19 6:2 9:13,14 10:25 28:6,6,7,8 70:21 72:1,18
**creates** 34:1

**CSR** 1:20 71:21
**curious** 46:11
**currently** 7:9
**Curriculum** 4:11
**cusp** 59:23
**custody** 24:20 72:12
**cuts** 41:21
**CV** 6:17 10:3

_____
**D**

**D** 5:1
**D.C** 1:10
**dad** 11:16 19:15 19:19,22 20:4 20:13
**dash** 55:18 56:9
**dash-dash-dash** 35:24 48:12 55:25 56:4
**dashed** 67:16
**dashes** 36:5 57:21
**data** 15:8,23 16:24 18:18 19:6,12 22:17 23:14 24:18 27:23 33:2 34:7 39:25 43:16 45:24 56:7 57:12 59:17 61:24 66:13,16 66:22 68:23
**Dawn** 1:19 71:2 71:21 72:10
**day** 54:16
**dead** 58:2
**decide** 66:14
**defense** 9:21 10:1
**definitively** 18:18
**degree** 52:18 58:7
**delivery** 72:16
**Department** 66:10

JENNIFER FIENUP   11/29/2016

Page 75

dependent 13:1
depending 13:2
    17:12 23:6 41:5
    58:23
depends 17:9
    19:4 40:24
depo 10:13
deponent 70:16
deposed 5:13
deposition 1:13
    36:25 70:22,24
    71:4,10,13 72:9
    72:11,17
depositions 6:14
describe 11:11
described 44:9
    69:7,11
designate 33:4
designated 15:19
    18:23 25:22
    27:25 30:6
    31:25 32:4 33:1
    36:3 56:15 57:7
designation
    16:12 28:13
designed 68:1
detect 12:21 13:2
detected 48:14
    50:2 65:24
detection 18:13
determine 16:10
    31:21 41:5
    52:23 58:6
determined
    18:24 20:25
determines 11:14
develop 16:18
    31:7 52:20
developed 15:15
    52:16
difference 17:18
    43:19 46:2
    47:19 52:3
different 18:12
    20:10 26:10
    29:4 36:24

39:18,20 47:12
47:13 51:10,15
51:22 52:2,22
61:4,8 68:16
differentiated
    18:17
differentiation
    21:12
direct 17:22
direction 24:19
discrepancy 17:5
    17:23
disk 70:7
District 1:21 71:3
    71:22
DNA 8:3,7,8,9
    10:23 11:8,9,12
    11:13,15,16,20
    11:24 12:3,6,16
    12:21 13:2,15
    13:15,17,19,19
    13:20,25 14:14
    14:17 15:12
    19:14 21:19
    23:17,20,21,25
    25:10 27:2,6,9
    27:9,10,12,13
    28:16,20,25
    29:2 33:7 35:20
    37:14 40:20
    41:4,6,17,23,24
    42:4,5,8 43:1,3
    44:14,17,21,22
    45:2,9,11 48:8
    48:18 50:5,15
    50:18 51:13
    53:1,11 58:9
    64:8,11,15,21
    65:4,4,6,9,10
    65:20,22,23,23
    67:7,8 68:6,8
    68:10
document 10:7
doing 5:22 6:3
    7:23 11:21,25
    12:19 13:5 15:8

15:14 21:4,6,7
30:1,4 42:2,3
42:11 43:11
45:6 67:4 68:25
dot-dot-dot
    54:23,25 55:1,8
doubt 53:16
draw 36:23
drill 5:15
drop-in 21:5
    33:5,6,12 34:11
    34:19,21
drop-out 21:5
    23:21 31:21,22
    32:2,8,8,9,10
    32:18,20,23,24
    34:11 35:3 55:3
    55:9 67:21,24
dropout 27:1
dropping 20:2
    21:2 57:12
due 26:25 55:16
duly 5:5 71:6
DYS 28:13
DYS385a 51:21
    52:11
DYS385a/b 39:6
    39:8 55:5,9
    60:13,25 67:11
    67:24
DYS385b 52:11
DYS389.1 62:3
DYS390 38:14,16
    48:19,22 49:19
DYS391 46:15,23
    49:19 57:20
    62:9,24
DYS392 38:20,22
DYS393 48:25
    49:2,19
DYS437 38:2,4
DYS439 62:20
DYS458 39:1,3
    49:7,9,19
DYS481 37:18
DYS533 37:22,23

DYS570 38:8,10
DYS576 29:13
    37:9,12 54:25
DYS635 57:20
    62:17,24

—————————
E
—————————

E 2:3,12 5:1,1
    72:13,14
E-X-H-I-B-I-T-S
    4:9
E01 26:18
E02 26:18
E03 26:10
E03-A 26:13,18
E03-B 26:13,22
    28:2 35:22
E03-C 44:16
earlier 19:14
    27:20 29:5
    39:11 44:9 50:4
    51:21 54:23
    56:24 65:3
East 2:14
education 8:23
effect 14:10,10
    23:16 33:17,20
effects 23:10,11
    23:13
eight 51:15 53:10
either 19:17
    21:20 59:22
Electronic 4:16
electropherogr...
    22:17,18 27:21
    27:22 28:2,9
    31:6 34:1 35:24
    46:1 54:9 55:13
    55:14 56:7,13
electropherogr...
    24:17 43:16
    45:23
elements 33:22
eligible 66:14,21
EMAIL 2:8,18
    3:12

embed 41:16
employed 7:10
    8:19 71:12,15
employee 71:14
ensure 19:6,11
entail 7:17
entire 24:8
environment
    33:7 34:24
EO3-B1 37:1
equal 21:24
ESQ 2:3,12 3:3
essentially 24:13
    27:23
estimate 44:20
estimated 27:8
estimates 13:20
event 14:24
events 15:18
everybody 70:5
evidence 13:13
    15:22 16:14,15
    16:22 17:2,21
    48:12 53:24
    54:10 58:13
evidentiary 53:4
    53:11 54:4 58:3
exact 46:9
exactly 12:12,14
    12:25 23:1 62:4
    62:10 68:16
examination
    1:15 4:4,5,6 5:7
    51:5 54:18
    55:21 60:5
examined 5:6
example 42:1,23
    46:12 54:24
excitement 47:5
excites 47:4
exclude 17:12,14
    17:15 22:5 58:8
    58:15,25 59:10
    59:16 68:11,22
excluded 58:22
    59:12

JENNIFER FIENUP   11/29/2016

Page 76

exclusion 17:6,19
  17:23 21:8,9
  22:11,14 23:5
  53:5 57:4 59:24
exclusions 40:7
  52:16
Exhibit 4:10,11
  4:13,14 6:17,20
  6:23 7:2,3
  10:14 24:4 35:8
  36:19 43:7
  45:20 48:1
exhibits 4:17
  70:6
exists 60:25
expect 43:2 49:25
  63:12,16,18
  65:23 67:8
expected 65:8
experience 65:20
expert 10:15
experts 53:1
expires 71:24
explain 16:4
  18:10 19:8
  28:10
explained 23:16
explanation 11:8
external 9:6
extraneous 33:7

**F**

F-I-E-N-U-P
  5:12
fact 58:15
failed 46:21
fair 40:22 41:17
  61:2 68:4
far 12:15 39:23
  54:4 58:1
fashion 35:18
father 51:23
FAX 2:7,17 3:11
federal 9:13
Felicia 64:12
female 12:5

14:10,14,17
  65:23
females 12:7
field 8:21
Fienup 1:14 4:3
  4:12 5:3,11 7:9
  10:14 51:7
  72:11
fifth 25:10
file 4:13 6:21
  24:6,7,8,9,11
  24:23,23 27:5
  27:15 35:9
  43:13 48:2
  54:21
filters 34:8
final 27:22
finally 24:21
financially 71:16
find 27:2 44:14
  51:22 53:9
  64:25
finding 39:12
  52:2
finer 65:11
fingernail 26:2,4
  26:19,19
firm 72:12
first 5:5,22 6:2
  16:23 18:12
  23:18,19 25:21
  25:25 29:23
  31:24 37:4 45:2
  45:8,12 60:13
five 6:8 25:8
flat 32:18
floor 57:3
fluids 42:12
fluorescence
  18:14 47:6
focus 13:5 25:14
follow 7:24 54:15
following 56:10
follows 5:6 72:10
foregoing 71:3,5
forensic 9:1,1

10:15 15:14
Forensics 7:12
form 42:17
formal 6:10 9:6
forward 16:25
found 9:16 27:6
  27:8 28:3 35:20
  36:20 48:9
  51:13 52:4 56:2
four 25:7 26:15
  48:10 67:1
  68:15
front 10:4 28:9
  46:8 64:9
full 70:8
further 22:13
  54:18 55:21
  67:4 69:1 71:14

**G**

G 5:1 60:16,20
Gayle 64:12
general 3:5 15:11
generally 13:7
  14:23 16:19
  22:15 24:11
  34:15
George 9:2
getting 20:13
Gipson 2:12,13
  4:5 51:6,7
  55:23,24 60:3
  70:15
give 11:8
given 54:3 71:11
gives 25:22
giving 63:15
go 6:7 16:25
  31:11 61:9
goes 47:15
going 5:17 6:16
  6:20,23 7:8
  10:14 14:7
  15:17 18:5
  23:19 24:3 36:5
  36:22,23 37:1

41:4 42:16
  47:25
good 18:2 60:10
  60:10
graph 27:22,24
  28:23 29:3
  30:17 52:8
  61:13,20,23
greater 68:19
Gregory 2:14
guess 14:2 15:9
  24:7 27:19
  32:21 52:15
  60:11,15 69:22
guesstimate 8:14
guidelines 16:20

**H**

half 11:15,16
  19:14,15 45:8
hand 41:3
handful 13:3
handle 26:12,12
  26:21,23 27:3
  37:2,3,7,20,25
  38:6,12,18,24
  39:5 41:13
  44:11,15 45:5
  45:10 48:17
  49:1,5 50:15
  62:4,25 64:23
  67:5,8 68:6,8
  69:1,16
hands 41:2
happen 46:6
happening 47:2
happens 23:17
  33:18
happy 6:12
harder 22:2
hear 5:21,23
height 18:22
  30:12,23,24
heighten 54:3
held 25:3 63:13
help 10:24,25

22:13
Henderson 1:17
hereof 71:8
high 3:7 18:14
  46:22 68:20
higher 40:13
hit 66:1 68:19
hits 47:3 68:15
hold 27:7 41:22
holding 41:19
  42:1,2,6
holds 43:3
hopefully 6:7,17
horse 58:2
human 13:19
  27:9,12 44:20
  65:4,10,22
hypothetical
  63:10,15

**I**

I-N-D-E-X 4:1
idea 42:17
identical 17:4
  62:25
identifying 55:3
identity 53:16
ignore 12:5 25:15
imbalanced
  23:20
important 6:13
inches 41:10
incidental 42:15
include 7:2 18:3
  24:18 56:9 59:6
  68:12,23
includes 7:3
inclusion 17:11
  17:19,24 21:8
inconclusive 63:9
inconsistencies
  51:18
inconsistent
  52:14
increases 40:10
indicate 35:4

JENNIFER FIENUP   11/29/2016

Page 77

49:23 67:17
**indicates** 40:2
   48:13
**indicating** 35:25
   61:21
**individual** 11:19
   25:24 47:14
**individually**
   50:12
**individuals** 26:25
   31:10,14 45:16
**inference** 67:3
**information** 18:3
   18:4 21:20
   22:25 23:2
   24:16 32:5 35:5
   35:6 50:21
**inhibition** 14:18
**initial** 6:21 39:18
   39:21 45:25
**inside** 46:15
**instance** 46:14
**instructions**
   43:17
**insufficient**
   68:23
**interest** 65:7,20
**interested** 71:16
**internal** 9:5
   47:10
**interrupt** 56:19
**involved** 9:7 41:9
**isolate** 13:16
**item** 16:13 25:22
   25:24,25 26:3,5
   41:24 49:25
**items** 11:7 25:21
   26:8

**J**

**J** 3:3
**J-E-N-N-I-F-E...**
   5:12
**January** 71:25
**Jaques** 1:19 71:2
   71:21 72:10

**Jefferson** 3:9
**Jennifer** 1:14 4:3
   4:11 5:3,11
   50:22 72:11
**jump** 64:7
**jumping** 36:17
**junction** 26:11
   26:20
**jury** 6:11

**K**

**Kansas** 2:15 66:9
**Kent** 2:12,13
   51:7 55:20
**kent.gipson@k...**
   2:18
**kind** 23:6 31:6
   40:24 45:13
   69:5,12,22
**kit** 13:9,11,24
   14:25 19:4,4
   20:19,24 26:9
   32:14 33:22
   61:11
**kitchen** 69:13,18
**kits** 52:22
**knew** 69:18
**knife** 16:11 26:6
   26:11,12,20,22
   27:3 37:1,3,7
   37:14,20,25
   38:6,12,18,24
   39:5 41:13,15
   41:21 42:1
   44:11,15 45:9
   48:9,17 49:1,5
   51:14 52:13
   56:21,22 57:15
   58:10 62:4,25
   63:13 64:23
   67:5 68:6,8
   69:5,7,8,10,12
   69:12,13,14,16
   69:18,22
**know** 5:15,17,24
   6:1,5,10 9:24

10:6 11:1 12:12
   12:25 15:6 22:6
   25:1 27:14 28:6
   28:8,23 31:1
   32:15,17,19,22
   32:24 33:11
   34:5,10,16 37:2
   39:22 41:9
   43:22 50:4
   51:14 53:24
   54:24 64:17
   66:4,4,21 69:12
   69:13,15,15,22
**known** 14:24
   15:1,18 16:7
   33:20 34:4,8
   39:2,19 51:13
   53:3
**Komp** 2:3 4:4 5:8
   7:5,7 10:19
   42:19 51:2,9
   54:14,19 55:19
   59:20 70:3,10
   70:13,17 72:13
   72:14

**L**

**lab** 66:7,10,12
**labeled** 26:1,4,6
**laid** 28:11
**laser** 47:3
**Latin** 46:21
**Laurence** 2:3
   72:13,14
**Law** 2:13 72:14
**lawyer** 51:8 58:5
**lawyers** 52:19
**laying** 40:17
**leave** 41:7,23,24
   42:4,8 43:1,3
   54:16
**leaving** 40:20
   50:5
**left** 26:4,20 41:18
   50:15 68:8
**Legal** 1:17

**legs** 11:18
**lekomp@swbe...**
   2:8
**let's** 7:8 13:5
   15:10,13 16:18
   16:19 24:3
   41:12 43:5
   53:22 54:24
**level** 10:24
**levels** 8:9
**likelihood** 41:6
   56:3
**limits** 51:12
**line** 32:18 61:20
   70:5
**lines** 67:16
**list** 61:1
**listed** 10:11
**lists** 35:22
**Litigation** 72:20
**little** 7:15 8:22
   18:4 20:10
   21:19 28:22
   50:18 59:25
   60:14
**LLC** 2:13
**location** 17:25
   19:7,15 20:5,15
   20:21 21:19,21
   22:25 23:3
   29:17,25 30:7
   31:1 60:18
**locations** 18:1
   20:19 28:16
   30:2 39:14
   48:11 52:6 59:5
   61:11,12,14,15
   61:17
**loci** 14:2,5 17:11
   17:12,13,16
   36:8 46:15,17
   46:17,19 56:21
   59:6
**locus** 14:2,3 19:7
   19:11 37:5,9,12
   37:16,18,23

38:1,4,10,16,22
   39:1,3 42:14
   46:17,17,19,19
   46:23 48:19,21
   49:2,9 54:24
   59:9
**long** 7:13 8:10
   10:8 12:10
**longer** 41:20,22
   41:23 42:1,3,7
   42:7 43:3
**look** 11:18 17:13
   20:20 21:23,23
   21:24 24:3,4
   25:5 28:5 35:7
   36:16,19 43:5
   43:25 45:18
   46:14 48:1
   49:14,15 50:11
   54:8,9,24 55:14
   56:12 61:23
   63:4
**looking** 10:7
   11:21,25 12:4
   14:4,5 15:2,3
   17:2,21,22
   22:16,17 25:1
   28:10 29:12,18
   31:5 33:23
   39:22 51:16,19
   52:25 54:20
   55:5 56:6 60:15
   60:19,20 61:13
**looks** 27:23
   66:25
**loose** 41:2
**lot** 14:14,16 18:2
   33:13,14 39:25
   40:23 41:4 51:9
   65:3 67:7
**low** 40:7,9 50:19
   53:19 59:25
**low-level** 21:16
   22:1
**lower** 33:13
   34:14

**M**

**ma'am** 60:11
**machine** 46:4,10 47:1,7,15,17
**major** 50:10 59:1 63:20 64:2
**making** 7:23 16:17,21 33:24 39:24 52:16
**male** 12:2,3 13:19 27:2,10 27:13 35:20 44:14,21 54:11 65:4,6,9,20,23 68:7
**males** 12:8,8
**Manager** 7:11,18
**Manchester** 2:5 72:15
**manufactured** 13:10
**Marcellus** 1:4 44:12 48:15 52:12 58:8 62:5 62:25 63:8 64:5 64:13,18 68:6 68:15 72:3
**mark** 11:3
**marked** 68:1
**Master's** 9:1
**match** 15:25 16:24 17:4,25 21:25 51:14 53:10 65:1 68:15
**matched** 52:12 64:5
**matches** 52:17 53:3 62:4,9
**matter** 12:15,18
**maximum** 34:6
**mean** 22:15 29:16,23 31:15 32:22 34:20 35:11 36:6 39:13,25 45:1

49:12,24 56:2 56:19
**meaning** 14:13 19:18,20 23:21 63:23
**means** 7:22 12:1 18:10 19:15 21:18 29:24 31:16 57:15
**meet** 53:2
**meets** 18:19 63:22
**mentioned** 19:14 23:9 71:8
**messing** 46:18
**method** 13:18
**MICHAEL** 3:3
**Midwest** 72:20
**Mike** 5:25 6:25 10:16 25:3 50:22 60:7
**mike.spillane...** 3:12
**millions** 33:25
**mind** 50:3
**minor** 50:10 63:20,25
**missed** 51:24
**missing** 19:6,12 21:3 32:4 57:12
**Missouri** 1:2 2:5 2:15 3:4,9 53:1 72:1,15
**misunderstood** 66:8
**mitochondrial** 25:10,16 64:8 64:15,21
**mixed** 59:3
**mixture** 22:4 23:8 26:24 31:9 31:13 45:15 48:12 53:14,18 63:19
**Molecular** 9:1
**molecules** 30:3

33:23 47:4
**mom** 11:15 19:14 19:19,21 20:4 20:12
**moment** 27:7
**morning** 60:10 60:12
**mother** 51:23
**move** 10:14 11:12 40:19 41:10
**multiple** 21:13 21:15 53:21
**murder** 16:11 35:20 50:6 54:1 63:13

**N**

**N** 5:1
**name** 5:9,11 72:12
**nanograms** 27:9 27:10,12,13 44:20,21
**nature** 17:9 20:18 59:15
**necessarily** 20:8 33:9 53:14 63:4 63:7
**need** 12:20
**needed** 17:8 19:5 19:11 58:20
**neither** 52:12 71:11
**never** 34:20 69:8 69:9
**nine** 53:10
**nods** 5:18
**nomenclature** 16:2,12
**non-matches** 58:14
**normally** 35:12
**Notary** 1:20 5:5 71:1,2,22
**NOTE** 4:16

**notes** 24:5,7,13 28:1 45:19 69:11
**notice** 1:16
**noticed** 68:14
**November** 1:11 72:12
**nucleotides** 60:20
**number** 15:19 17:7 19:23 25:23,23,24 28:13 29:6,7,19 29:22,23 30:5 30:10,14,15,18 31:25 36:3 41:14 47:11 57:14 60:16,23 62:3,4,8,16,17 62:19,20,22 63:2,6
**numbers** 35:23 46:13,24 51:10 51:18 52:6 56:25 61:4 63:7 68:20
**numerical** 35:17
**numerous** 50:7

**O**

**O** 5:1
**object** 42:16
**objection** 10:18
**obtain** 13:21 22:25
**obtained** 13:18 19:18 20:3 26:17,23 35:23 44:20 45:13,14 48:10
**obvious** 45:1
**obviously** 45:2
**occasion** 8:3
**occur** 15:6
**occurred** 55:9
**Office** 2:13 3:5

**officer** 7:20
**offices** 1:17
**Oh** 62:14
**okay** 5:15 6:6,25 7:6,8,17 8:1,5 9:9,11,13,16 10:3,16,20 12:22 13:4 14:1 14:6,21 15:9 16:1,9,16 18:5 19:1,8 20:6,17 22:8 23:4 24:2 25:9,13,17 26:14 27:2,8,19 28:5,18,21 29:5 29:12,16,22 30:9,14 31:3,20 32:21 33:5 34:9 35:7 36:4,16,21 37:14,20 39:16 39:21 40:22 41:25 42:23 43:5,10,23,25 44:2,14,19,25 46:11,21 47:18 47:25 48:7,17 48:24 49:14 50:22,24,25 51:1 52:1 54:1 54:2,17 57:22 57:25 59:8,11 60:9 61:19 62:1 70:10,14
**once** 10:1 17:1 18:22 32:12 57:10
**ones** 52:3 57:19 62:2
**opinion** 65:13 69:3
**opportunity** 24:22
**opposed** 52:3 64:23 66:18
**opposing** 63:11
**order** 19:25 29:2

JENNIFER FIENUP   11/29/2016

original 24:23
  43:21 67:11
  72:12
outcome 71:17
overall 63:5
oversee 7:19,20
overshadowed
  65:9
overwhelm 14:10
  14:10

**P**

P 5:1
P.O 2:4 3:8 72:14
package 26:7
pad 40:18
page 4:2,10
  10:10 25:7,10
  27:16,17,23
  28:3,10 31:12
  35:7 36:20
  44:23,24,25
  46:1,15,16 48:1
  48:4 49:16,17
  54:21
pages 6:22,24
  10:7 24:6 25:5
  25:8 44:1,4
  45:18 46:2 71:5
paid 72:17
pair 30:16,25
  34:2,2,12 47:11
pairs 29:1
paperwork 7:23
  24:20 43:17
parameters
  63:23
part 5:16
partial 22:23,24
  23:3,5,7 26:23
  31:8 45:14 48:8
particular 30:7
  60:17
parties 71:12,15
pattern 30:2
  60:22,23,25

Payment 72:17
PCR 64:24 65:14
  66:2,19
peak 18:9,12,15
  18:16,22 19:17
  19:17 20:5,12
  20:14 29:14,16
  29:18 30:13,17
  31:24 32:6,11
  32:14,15,19,25
  33:9 34:2,18,18
  55:15 56:8,13
  57:8
peaks 15:3 19:16
  19:17,20 20:16
  20:22 21:1 22:4
  23:12 27:24,24
  29:3 35:4 40:2
  50:19 61:13
  63:23
pen 40:17,21,22
  41:10,12,12
  42:3,24
people 11:17
  16:23 21:18
  31:19 40:25
  50:14 53:21
percent 11:16,19
  63:24
percentage 34:6
periods 42:3
permission 66:15
  66:17,20
perpetrator 54:1
person 11:20
  16:7 22:3 40:6
  40:12,24 41:5
  41:20,21 43:2
  50:13,17 53:20
  58:9 63:12
  72:12
persons 68:7
Petitioner 1:5,16
  2:2 5:7 54:18
  55:22
Petitioner's 4:10

6:17,20,22 35:8
  36:19 43:7
  45:20
PHONE 2:6,16
  3:10
pick 40:18 41:9
  41:13 42:24
picked 45:8
piece 15:22 23:17
  23:20,21
pieces 29:1
Pinkus 64:12
place 16:20 71:7
places 61:1
plate 47:22
please 5:9,23 6:1
  6:4 44:18
pocket 69:14
point 23:22
  53:25 57:11
  65:11 67:9
  68:25
points 66:2
Police 66:9
policy 22:9
popped 35:2
position 7:14,15
  67:23
positions 8:6
  67:17
possibility 26:25
  42:5 50:5,9
  61:23
possible 36:2
  48:13 61:21
  67:10,12,18,20
  67:21,21,24
possibly 58:14
potential 13:15
  19:16 21:13
  32:7 40:9,19
  42:8 45:11
potentially 14:16
  14:18 17:5,13
  17:17 18:16
  21:20 33:6,12

41:19,24 43:3
  53:17 55:16
  56:14,16 58:18
  59:18 64:1
  65:16
Potosi 1:7 72:8
PowerPlex 13:10
  13:23 14:1,4,8
  14:25 26:9
preferential
  21:17 23:15
  40:9
prepare 24:10
  35:12 43:13
  70:21
present 45:9 55:2
  65:24
pretty 7:22 11:2
  17:2 45:1 69:1
prevalent 23:24
prevents 55:3
print 24:12
prior 8:5,7,19
private 66:6
probably 10:21
  11:2 58:5
problem 5:25
procedures
  16:20
process 12:17,18
  15:22
processed 13:22
  16:10 24:14
  48:6
processing 24:14
  43:15
product 55:10
profile 14:19
  15:12,15,16
  17:10 18:1,2
  19:13 20:11
  21:10 22:23,24
  23:3,12 26:23
  31:6,8 42:13
  45:13,14 48:8
  48:15 50:10,10

50:12 53:8,13
  53:18 58:19,24
  59:1,1,15 62:5
  63:5,22,25 64:3
  65:6,19 68:10
profiles 21:13,16
  26:17 52:23
  59:3 66:5
program 7:19,21
prosecution 9:22
  9:25
prosecution's
  53:25
protocols 52:20
provided 4:17
Public 1:20 5:5
  71:1,2,22
pull 64:1
purposes 21:8,9
  22:11 36:25
  53:23
pursuant 1:16
  72:10,18
put 42:24 61:5
  64:25
putting 24:16
  51:11

**Q**

qualified 9:17
  10:15
quality 7:11,18
  7:19
quant 65:21
quantification
  65:2,8
quantify 12:25
  13:17,18,19
quantity 12:16
  27:6,9 44:17
question 5:21,23
  6:5,9,12 14:7
  15:11 32:22
  34:10 36:5
  42:17,20 52:15
  53:5 58:2,6

JENNIFER FIENUP   11/29/2016

65:12 66:23 67:15
**questions** 5:17 6:8 25:13 28:7 36:23 54:15 60:8 69:9,21,25
**quick** 50:24
**quite** 21:14
**quota** 18:7
**quoting** 31:14

——————
**R**
——————

**R** 5:1
**ran** 46:4 47:7,12
**random** 33:9 68:19
**rape** 42:10
**ratio** 9:24
**raw** 56:6,7
**reach** 19:5,25 31:25 32:3,6 35:25 58:16
**reached** 32:16 58:21 59:12,13 59:17
**reaches** 18:22 32:12 57:10
**reaching** 24:1
**read** 63:16 65:3
**Reading** 70:25
**real** 15:1,5 50:24 52:15
**really** 13:1 20:7 34:19,20,25 42:21 52:9 69:6
**reason** 6:4 52:5 60:24
**reasonable** 52:17 58:7 67:3
**reasoning** 65:17 65:19
**recall** 59:20
**received** 19:21 25:21,25 36:7
**record** 5:10 6:15 10:13 16:5 25:3

40:17 71:10
**reduced** 71:9
**redundancy** 49:11,22,22 50:8
**refer** 6:16 28:14 28:15 37:1 43:21
**reference** 15:23 15:23 16:2,6,8 16:21 17:3,21 22:19 27:20 44:12
**referenced** 29:5
**referencing** 25:18
**referred** 13:5
**referring** 14:20
**refers** 25:10
**reflects** 48:15
**regular** 15:7
**related** 71:12
**relative** 18:13 71:14
**release** 13:14
**remain** 7:24
**remove** 13:15
**repeat** 6:5 11:24 30:3 60:17
**repeats** 29:25 30:5,8 60:23 62:3,4,10
**rephrase** 6:11 42:21
**report** 4:13,14 6:21,24 7:3 8:3 24:5,21 25:8,14 25:18 31:13 36:18 43:6,8,18 43:20,20,21,22 44:5 48:4 64:9
**reported** 61:17
**reporter** 4:18 5:19 6:2 70:11 70:21 72:10
**reprocess** 34:22

34:24 46:7
**request** 72:18
**required** 17:7
**requirement** 36:11
**Respondent** 1:8 3:2 51:5 60:5
**response** 5:18
**rest** 13:16 54:16
**restate** 6:12
**result** 36:8 42:14 61:22 63:12,16 63:19 65:14,22 67:10
**resulting** 45:24 66:13
**results** 11:10 15:3 24:15 35:17 36:10 48:10 49:19,22 50:8 51:22 54:9 55:11 60:25 62:23 65:2,9,21 65:21 66:21,25 67:1 68:5,5 69:21
**Resume** 51:4
**revealed** 37:8,15 37:21 38:1,7,13 38:19,25 39:5 48:18,24 49:6
**reveals** 15:12
**review** 24:22 70:18
**reviewing** 28:1
**reviews** 11:1
**RFU** 18:14,21 29:5,6 30:12,22 32:3 36:14 40:13
**right** 7:1 10:20 10:23 16:16 21:4 22:8 24:2 26:2,19 30:9,18 30:19 34:9 39:16 40:18

51:24 52:14
57:5 58:10,11
58:17,17 59:4
59:23 60:19,21
60:24 61:15
66:17 67:16,23
69:17,24,25
70:17,21,23
**rights** 66:12
**round** 43:11
**RSMo** 72:18
**rub** 45:5
**Rule** 72:10
**rules** 66:5
**run** 46:6,10 47:2 47:9,14,18,21 47:24
**running** 29:6 46:25
**runs** 47:9

——————
**S**
——————

**S** 5:1
**safety** 7:20,20
**sample** 13:13,14 13:16 14:14 15:13 16:2,6,6 16:8,15,19,22 16:22 17:2,3 21:18 22:19 24:15 26:9,22 28:2 33:8 34:23 34:24 37:7,11 37:14,17,22 38:3,9,15,21,24 39:2,7,19 40:1 44:12,16 46:9 47:7,9,15 48:17 48:20 49:8 53:4 57:15 64:11 69:10
**sampled** 26:11 26:12
**samples** 12:19 23:24 26:15,18 33:12 40:8 48:6

56:22
**sampling** 44:10 44:19 45:24
**samplings** 26:10 49:25 50:20
**saw** 69:8,9
**saying** 14:11 55:2,11 63:14 64:17
**school** 46:22
**Science** 8:24 9:1
**scientific** 52:18 58:7
**scientist** 58:4
**second** 20:1 26:3 30:10 39:22 41:25 43:5,11 44:7,15,19 45:6 50:23 54:5 67:7
**Section** 72:18
**sections** 11:24 12:1
**see** 13:25 15:25 23:12,14,20 28:12,21 29:14 31:24 32:12,14 32:19,25 33:2 33:13 35:4 48:11 54:9 55:15 56:7,13 57:1 65:11
**seeing** 18:16 19:19,23 21:20 32:9 40:2
**seen** 33:12 34:20 34:21 46:21
**send** 66:13,16 70:6
**senior** 8:8
**separate** 20:19 29:2 50:19 61:17
**separately** 26:13
**separating** 52:9
**sequence** 33:23
**Services** 1:18

JENNIFER FIENUP  11/29/2016

72:20

**set** 34:7 55:17 61:11 70:8

**sets** 51:18

**seven** 51:15 53:9

**sharpest** 10:22

**sheath** 26:7

**shed** 40:25

**shoot** 29:13

**Short** 11:23

**shorthand** 71:7

**show** 25:4

**showing** 53:12

**shown** 40:8

**shows** 33:10

**side** 41:10

**signature** 48:5 70:12,25

**significance** 46:13 52:2

**significant** 63:3

**similar** 11:18 12:17 21:23 44:9

**simple** 22:16

**simplest** 10:24

**simply** 11:11 68:23

**single** 15:13,21 17:10 23:2 54:1

**single-source** 15:16 16:18 19:13 20:11 21:10 23:7 53:8 53:13 58:25 64:2

**singular** 46:20

**sites** 67:12

**six** 41:10 51:15 53:9

**size** 28:25 30:16 30:24,25

**sizes** 29:4 47:10

**sizing** 47:11

**slight** 47:16

**slightly** 47:12,13

**slips** 34:1

**small** 12:16,20 12:22,23

**software** 15:20 31:1

**somebody** 41:14 42:25 50:6 59:7 70:6

**SOP** 22:12 56:9 56:10

**SOPs** 55:17

**sorry** 17:15 27:11 36:17 37:6 56:19 61:10 62:14 67:14

**sort** 10:6 14:6 21:7 23:9 28:10 28:22 29:12,13 32:19,21 36:22 36:23 49:15,21 70:19

**sorting** 31:4

**source** 15:13,21 17:10 21:13

**spatially** 61:12

**speaking** 22:15

**specific** 12:3 13:24 28:16 33:4,23

**specifically** 12:2

**spell** 5:10

**Spillane** 3:3 4:6 6:15 7:1,6 10:17 42:16 51:1 60:6,7 70:4

**spoke** 6:16

**spread** 61:14,15

**stab** 41:14 42:25

**stabbing** 50:6

**standard** 64:24 65:14 66:19

**standards** 7:24

**stands** 11:23

**start** 11:4 13:12

16:21 24:6,16

**started** 6:8 12:14

**starting** 66:15

**state** 3:4 5:9 8:25 9:13,14

**stated** 22:9

**states** 72:10

**status** 72:17

**stay** 21:6

**STEELE** 1:7 72:7

**step** 14:25 24:14 46:4 51:2

**stochastic** 19:3,9 19:10,25 20:6,9 20:14,25 23:10 23:11,13,16 24:1 32:7,13 36:1 57:9 63:24

**STR** 8:2,15 9:4,4 10:15 11:23 12:15,19 14:3 20:7 42:11 51:25 59:6 65:21

**Street** 3:7

**strong** 20:2 32:2 33:3 35:5 42:13

**stronger** 34:13 40:4,14 58:18 58:24 60:1 63:12,16,18

**studies** 34:5 40:8 52:21

**stuff** 22:1 70:8

**stutter** 33:16,17 34:11,12,14,15 34:17,17

**submission** 24:20 43:17

**submit** 66:2,22

**submitted** 64:24 65:15

**submitting** 66:5

**substance** 11:13 70:20

**Suite** 1:18

**summarize** 55:11 55:17 56:5

**summary** 35:16 55:13 56:10

**Superintendent** 1:7 72:7

**supervision** 71:9

**supplemental** 4:14 6:23 36:18 43:6,12,20 44:5 45:19 48:2 49:16

**Supreme** 3:6

**sure** 7:23 11:13 15:18 16:6 18:11 19:10 25:20 27:7 32:24 34:19 40:10 46:5 49:13 69:6

**suspect's** 53:11

**swab** 16:7 45:5

**swabbed** 45:7,10

**swabbing** 16:13 44:15

**sweating** 41:20

**sworn** 5:5 71:6

**system** 64:25

—— **T** ——

**T** 60:16,20

**table** 35:14,19 36:20 48:5,7 49:15,17 51:17 54:20 55:13,18 56:11 57:1 66:24

**tables** 36:24

**take** 13:13 41:15

**taken** 37:11,17 37:22 38:3,9,15 39:2,7 48:20 49:8 51:3 71:4 71:7,13 72:11

**takes** 17:20,22

58:25 59:9

**talk** 10:23 31:11 31:20 53:22

**talked** 33:18 50:4

**talking** 11:4 18:6 39:11 42:10 54:11 56:1

**tall** 32:17

**Tandem** 11:23

**targeted** 28:16

**targeting** 12:18

**targets** 13:24

**teaching** 9:3

**technical** 35:13

**technology** 6:4 12:20 69:4

**telephone** 10:22

**tell** 8:22 12:13 27:5 31:16,16 31:18 35:19 48:8 50:9 53:17 53:19 67:25

**tells** 50:12

**ten** 8:12,13

**tend** 50:3

**term** 14:9,22 16:1 18:8 35:13 49:11 52:18

**terms** 14:12 25:20 50:16

**test** 11:7 13:9 52:22 67:11,13

**tested** 26:8,15 28:20 35:17 44:12 67:7 69:17

**testified** 5:6 9:9 9:21 10:1 51:21 53:2

**testify** 9:17,25 64:16

**testimony** 70:20 71:5,6,10

**testing** 11:12,21 11:23,25 12:4,5 12:10 14:17

15:6,12 18:7 19:4 20:7,8,24 24:19 25:19,21 28:17 30:1 37:4 37:8,15,21,25 38:7,12,18,25 39:18,22 43:12 43:12 44:6,8,11 45:25 46:3 48:18,24 49:6 51:25 52:22 64:8,19,20,23 64:24 65:7,14 66:3,24 67:4 69:1,23
**tests** 13:4,7
**Thank** 60:4 70:1
**theoretically** 45:7
**thereto** 71:16
**thing** 15:24 24:8 56:1 60:13 70:4
**things** 21:2 23:11
**think** 7:2 10:1,25 14:13 36:8 42:14 51:9,21 54:15 55:19 56:23 57:25 58:1 60:3 69:19 70:7,13
**third** 19:2 26:5 30:14 56:7
**thought** 57:3 66:8
**Thousands** 8:16 8:17
**three** 10:7,10 17:11,16 18:11 25:21 26:8 58:21 59:3,5,5
**threshed** 32:3
**threshold** 18:8,9 18:13,15,20,21 19:2,3,3,5,10 19:11,25 20:6 20:10,14,25

22:5 23:13 24:1 32:1,7,13,16 33:1 35:4 36:1 36:11,12,13 38:4 40:1 51:12 53:3 55:15 56:8 56:15,23 57:2,6 57:10 58:15
**thresholds** 18:12 52:16,24
**time** 5:22 6:3 8:13 41:20 42:3 44:7 45:2,6,8 45:12 47:13,19 47:21,24 57:14 67:7 71:7 72:16
**times** 8:14 9:11 9:12 34:21 41:15 50:7 60:17,22
**today** 69:4
**tool** 10:22
**total** 65:10 68:2
**touched** 50:14
**touches** 43:4
**touching** 40:25
**trained** 64:15,20
**training** 9:3,4,5,6 9:7
**traits** 11:15
**transcript** 11:1 72:12,16
**treat** 11:1
**tried** 44:11
**trouble** 70:9
**TROY** 1:7 72:7
**true** 15:1 18:19 18:23 33:14 34:3,13,18 59:24 63:14 71:10
**truly** 20:3
**try** 64:25
**tube** 47:3
**Tuesday** 1:11
**turn** 24:4

**twice** 10:2 46:5 46:10
**two** 11:18,18 12:24 15:25 16:23 18:1 19:16,17,20 20:15,19,21 21:18 26:10,24 31:9,14,15,17 31:18,18 36:24 39:12,14 45:15 46:1 47:23 51:10,18,20,22 52:2,5,6 56:22 60:24 61:1,4,8 61:11,15,17 62:23 63:16 64:4,5 68:16,17 68:20
**type** 44:6 53:18 65:21
**types** 52:23
**typewriting** 71:9
**typos** 70:19

**U**

**Uh-hmm** 6:19
**uh-hmms** 5:19
**unconfirmable** 67:12
**underneath** 32:25
**understand** 6:9 14:11 42:20 67:14
**understanding** 65:18
**unexpected** 49:24
**unfortunately** 59:2
**unique** 11:14
**units** 18:14
**University** 8:25 9:2
**unknown** 56:2

**unusual** 39:11,13
**updated** 72:18
**use** 13:7 14:9 18:5,6,8 21:8 22:5,10,12 42:25 49:11 52:19 55:12 59:3
**usually** 9:25 34:13

**V**

**v** 72:6
**validated** 32:13
**validation** 20:24 52:21
**value** 53:4,12 54:4 58:3 67:4
**variables** 41:8,22
**variation** 46:25 47:6,16
**various** 8:9
**version** 17:19
**versus** 34:11 50:5 50:10
**vertically** 29:6
**viciously** 41:14
**video** 2:3,12 3:3
**videoconference** 5:22
**view** 53:25
**violently** 41:14
**Virginia** 1:19
**visible** 14:19 64:1
**visualize** 33:25
**Vitae** 4:11
**vocalized** 5:18
**vs** 1:6

**W**

**waive** 70:14,20 70:23
**waived** 70:25
**walk** 25:19 41:16
**want** 6:11 10:21

10:23 11:4 13:25 58:1 70:11,18
**wanted** 60:14
**wash** 14:9
**washed** 41:1
**Washington** 1:10 9:2
**wasn't** 23:22 32:2 64:18
**way** 43:14 52:4 56:10 58:4 61:11 67:25
**ways** 31:23
**we'll** 11:12 54:16
**we're** 6:16 10:6 10:14 11:21,25 11:25 12:3,24 14:4,25 15:2,3 15:8 19:4 24:3 25:1,9 42:9 45:4,6 56:1 66:6
**we've** 18:6
**Weaker** 34:14
**weapon** 16:11 35:21 50:6
**week** 53:1
**welcome** 70:2
**wells** 47:22,23
**went** 45:10 51:9
**weren't** 40:15 52:8 62:2
**West** 3:7
**wet** 45:5
**Why's** 54:7
**Williams** 1:4 37:12,17,19,23 37:24 38:3,5,9 38:15,21 39:3,7 39:19 44:13 48:16,20 49:3,8 52:13 58:9 63:1 63:8 64:5,13,18 68:15 72:3
**Williams'** 11:6

JENNIFER FIENUP   11/29/2016

Page 83

| | | | | |
|---|---|---|---|---|
| 51:13 62:5 68:6 | 26:23 31:8 37:4 | 66:25 71:25 | **29** 1:11 72:12 | **636** 2:6,7 |
| **Wilson** 1:18 | 37:7,20,25 38:6 | **15** 38:1 39:9 | **290** 29:9 | **64** 45:19,20 |
| **witness** 1:15 4:2 | 38:12,18,24 | **150** 30:22,24 | | 46:16 |
| 5:4 70:23 71:4 | 39:5,12 42:11 | **1560** 1:18 | **3** | **64114** 2:15 |
| 71:6,11 | 44:8 45:14 | **159.24** 30:23,24 | | **65102** 3:9 |
| **wondering** 64:14 | 48:15,24 49:5 | **15BA-CV01828** | **3** 4:14 6:23 7:3 | |
| **wooden** 69:16 | 53:9 64:20,23 | 1:6 72:6 | 36:19 43:7 | **7** |
| **work** 6:4 14:8 | 65:7 66:18,21 | **16** 37:13 38:7 | 45:20 48:1 70:7 | **75** 18:21 32:3 |
| **working** 42:11 | **YSTRs** 20:11,15 | 39:9 | **300** 21:1,1 57:10 | 36:14 56:23 |
| **worksheet** 24:15 | 23:1 26:16 | **160** 28:23 | 57:17 58:16,22 | 57:1,7,15,23 |
| **worksheets** | | **17** 27:16,17 | 59:12,13,14,18 | 63:24 |
| 24:13 43:14 | **Z** | 38:25 49:6 | 62:24 63:24 | **750** 1:18 |
| **wouldn't** 65:14 | | **174** 46:16,24 | 64:4,6 68:17 | **751-0774** 3:11 |
| 65:24 | **0** | **178** 46:24 | **320** 28:24 | **751-1307** 3:10 |
| **wound** 41:15 | **0.001** 44:21 | **1785** 2:4 72:14 | **35** 18:13 | |
| **wrong** 14:12 | **0.00199** 44:20 | **18** 39:4 49:10 | **36** 4:14 | **8** |
| 51:11 | **0.0031** 27:10,13 | **19** 38:11 | **363-4300** 2:17 | **8** 64:8 66:1 |
| **www.midwestl...** | **0.27** 27:9,12 | | **363-4400** 2:16 | **80** 28:23 29:9 |
| 72:21 | | **2** | **385** 39:14 | **800** 72:21 |
| | **1** | **2** 4:13 6:20 7:2 | **385a** 39:14 | **816** 2:16,17 |
| **X** | **1** 4:11 6:17 10:14 | 24:4 35:8 70:7 | **385a/b** 56:1 | **85** 36:20 44:1 |
| **x** 1:3,9 | 66:24 70:6 | **20** 29:19,22 30:8 | **385b** 39:15 | 48:1,4 49:16 |
| **XX** 12:7 | **10** 46:16,23 | 30:8,11 37:5,8 | **389.1** 62:13 | **86** 6:24 44:1 |
| **XY** 12:3,8 | 57:20 62:10 | 54:25 | **391** 62:15 63:17 | **899** 3:8 |
| | **10:38** 51:3 | **2016** 1:11 24:5 | | **8th** 24:5 70:8 |
| **Y** | **10:40** 51:4 | 72:12 | **4** | |
| **Y** 12:2,8 | **100.76** 46:16 | **2020** 71:25 | **400** 28:24 | **9** |
| **Y23** 13:10,23 | **11** 20:3,4 38:23 | **207** 3:7 | **480** 28:24 | **9:30** 1:17 |
| 14:4,25 26:9 | 39:6 44:24,25 | **207-7330** 2:6 | **481** 37:16 | **96** 47:22 |
| **yeah** 8:18 10:17 | 52:10 55:6 | **207-7351** 2:7 | **492.590(2)** 72:18 | **99** 11:16 |
| 22:20 39:13,14 | 67:17 | **21** 38:17 48:23 | | |
| 41:22 42:6 | **11/11** 20:3 | **22209** 1:19 | **5** | |
| 47:16 51:16,17 | **11:05** 70:24 | **23** 14:5,6 28:19 | **5** 4:4 | |
| 56:25 58:11,23 | **118** 28:3,10 | 28:19 37:15 | **51** 4:5 | |
| 60:19 61:9 | **12** 37:24 62:21 | 42:14 56:21 | **54** 4:4 | |
| 63:18 67:20 | 67:12 68:1 | 57:21 62:18 | **55** 4:5 | |
| **year** 7:16 | **12/13** 19:22 | **24** 4:13 38:13 | **57.03(g)(2)(a)** | |
| **years** 8:12,13 | **121** 2:14 | 48:19 | 72:10 | |
| **Yep** 25:2 | **124.27** 30:15 | **240** 28:23 | **573** 3:10,11 | |
| **yesterday** 6:16 | **13** 30:19,22 | **242** 25:5,7 35:7 | **576** 37:5 | |
| **yielding** 50:6 | 37:21 38:19 | 49:17 54:21 | | |
| **YSTR** 11:23 12:1 | 48:25 62:6 66:2 | **245** 6:22 24:6 | **6** | |
| 12:4,5,10,16,19 | **135** 30:11 | 25:6,7 31:12 | **6** 4:12 | |
| 13:5,8 14:17,19 | **14** 36:8,9,10 38:5 | **26** 9:12 37:19 | **60** 4:6 | |
| 20:8,9 25:15,20 | 39:6 42:14 49:4 | **27** 9:12 | **63** 45:18,20 | |
| 25:21 26:9,17 | 52:10 55:6 | **280-3376** 72:21 | 46:15 | |
| | | | **63011** 2:5 72:15 | |
| | | | **635** 63:17 | |