# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI
# EASTERN DIVISION

---

## MARCELLUS S. WILLIAMS,

### Petitioner,

### v.

## DONALD L. ROPER,

### Respondent.

## Case No. 4:05CV01474-RWS

## CAPITAL HABEAS PROCEEDING

---

## PETITION FOR A WRIT OF HABEAS CORPUS

---

**KENT E. GIPSON**
**WILLIAM C. ODLE**
**305 E. 63RD STREET**
Kansas City, MO 64113
Telephone (816) 373-2795
Facsimile (816) 363-2799

*Counsel for Petitioner*

000015

# TABLE OF CONTENTS

PAGE

**LIST OF EXHIBITS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vi

**I.  Introduction** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

**II.  Procedural History and Factual Background** . . . . . . . . . . . . . . . . . . . . . 7

**III.  Petition For A Writ of Habeas Corpus** . . . . . . . . . . . . . . . . . . . . . . 15

## Claim No. 1

The prosecution violated petitioner's Sixth, Eighth and Fourteenth Amendment rights in failing to disclose material evidence that could have been utilized to impeach the credibility of Henry Cole and Laura Asaro.
.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

A.      Failure to disclose the mental health records and related impeachment information regarding Henry Cole and Laura Asaro . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

B.      The state's deliberate concealment of Cole's and Asaro's whereabouts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

C.      The prosecution's attempt to manufacture additional jailhouse informantion evidence against petitioner. . . . . . . . . . . . . . . . . . . . 25

## Claim No. 2

Trial counsel was ineffective in failing to investigate and present available evidence to impeach the credibility of Henry Cole . . . . . . . . . . . . . . . . 28

000017

**Claim No. 3**

Trial counsel was ineffective in failing to investigate and present evidence to impeach the credibility of Laura Asaro. . . . . . . . . . . . . . . . . . . . . . . . . 35

**Claim No. 4**

Petitioner's conviction and sentence of death were secured in violation of his Eighth and Fourteenth Amendment rights because he was convicted on the basis of the perjured testimony of Henry Cole and Laura Asaro and because he is actually innocent of the murder of Felicia Gayle. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

**Claim No. 5**

Mr. Williams and black veniremembers Henry Gooden, William Singleton and Marvin Fortson were denied equal protection of the law when the prosecution struck them from the jury on the basis of their race in violation of *Batson v. Kentucky,* 476 U.S. 79 (1986). . . . . . . . . . . . . . . 46

A.    Venireperson 64: Henry Gooden . . . . . . . . . . . . . . . . . . . . 48

   1. Steps one and two of the *Batson* framework . . . . . . . . . . . . . 48

   2. Step three of the *Batson* framework . . . . . . . . . . . . . . . . . . 49

B.    Venireperson 65: William Singleton . . . . . . . . . . . . . . . . . . . 58

   1. Steps one and two of the *Batson* framework . . . . . . . . . . . . . 58

   2. Step three of the *Batson* framework . . . . . . . . . . . . . . . . . . 58

C.    Venireperson 72: Marvin Fortson. . . . . . . . . . . . . . . . . . . . . 62

D.    The recent *McFadden* decision and other evidence establishes that St.

000018

Louis County prosecutors have a long-standing practice of excluding black citizens from jury service. . . . . . . . . . . . . . . . . . . . . . . . 65

### Claim No. 6

Mr. Williams was denied his Sixth and Fourteenth Amendment rights to effective assistance of counsel because his attorneys failed to conduct an adequate investigation and present available evidence regarding his background and social and medical history, which would have provided compelling mitigating evidence at the sentencing phase of trial. Had this evidence been discovered and presented, there is a reasonable probability that the outcome would have been different in the penalty phase.. . . . . . . 68

### Claim No. 7

Petitioner's counsel on direct appeal was ineffective in failing to brief a meritorious due process claim arising from the trial court's denial of petitioner's continuance requests. . . . . . . . . . . . . . . . . . . . . . . . . . 84

### Claim No. 8

Mr. Williams' Sixth and Fourteenth Amendment rights were violated because his trial counsel labored under a conflict of interest and the trial court failed to address the issue. . . . . . . . . . . . . . . . . . . . . . . . . . . 92

### Claim No. 9

Petitioner's Sixth and Fourteenth Amendment rights were violated by the trial court's restriction of petitioner's cross-examination of prosecution witness Glenn Roberts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

### Claim No. 10

Petitioner's appellate counsel was constitutionally ineffective for failing to brief the issue of the trial court's improper exclusion of the mitigating evidence from Dr. Mark Cunningham regarding the adverse impact that petitioner's execution would have upon his family and children.. . . . . . . 101

000019

**Claim No. 11**

Petitioner's Eighth and Fourteenth Amendment rights were violated by the prosecutor's improper closing arguments during the penalty phase of trial. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 104

**Claim No. 12**

Trial counsel was ineffective in failing to request a limiting instruction regarding petitioner's escape attempt.. . . . . . . . . . . . . . . . . . . . . . . . 107

**Claim No. 13**

Petitioner's death sentence was imposed in violation of the Eighth and Fourteenth Amendments because three of the ten aggravating circumstances submitted by the state were unconstitutionally duplicative. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 111

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 115

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . 116

000020

# LIST OF EXHIBITS

Exhibit 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Dr. Cross Report

Exhibit 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . John Duncan Affidavit

Exhibit 3 . . . . . . . . . . . . . . . . . . . . . . . . . . . Kimber Edwards Affidavit

Exhibit 4 . . . . . . . . . . . . . . . . . . . . . . . . . Johnifer Cole Griffin Affidavit

Exhibit 5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Durwin Cole Affidavit

Exhibit 6 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Ronnie Cole Affidavit

Exhibit 7 . . . . . . . . . . . . . . . . . . . . . . . . . . . Edward Hopson Affidavit

Exhibit 8 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Walter Hill Affidavit

Exhibit 9 . . . . . . . . . . . . . . . . . . . . . . . . . . . . Latonya Hill Affidavit

Exhibit 10 . . . . . . . . . . . . . . . . . . . . . . . . . . . Joseph Green Affidavit

Exhibit 11 . . . . . . . . . . . . . . . . . . . . St. Louis County Attorney Affidavits

Exhibit 12 . . . . . . . . . . . . . . . . . . . . . . Excerpts from Collar Transcript

Exhibit 13 . . . . . . . . . . . . . . . . . . . . Excerpts from Henry Cole Deposition

Exhibit 14 . . . . . . . . . . . . . . . . . . . Excerpts from Laura Asaro Deposition

000021

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| MARCELLUS S. WILLIAMS, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Case No. 4:05CV01474-RWS |
| | ) | |
| DONALD L. ROPER, | ) | |
| | ) | |
| Respondent. | ) | |

**PETITION FOR A WRIT OF HABEAS CORPUS
BY A PRISONER IN STATE CUSTODY
<u>UNDER A SENTENCE OF DEATH</u>**

COMES NOW petitioner, Marcellus S. Williams, by and through his counsel, Kent E. Gipson and William C. Odle, and pursuant to 28 U.S.C. § 2254, submits the following Petition for a Writ of Habeas Corpus by a petitioner in State Custody Under a Sentence of Death.

Petitioner, Marcellus S. Williams, (hereinafter "petitioner" or "Mr. Williams"), is confined at Potosi Correctional Center, Missouri Division of Adult Institutions, Route 2, Box 2222, Mineral Point, Washington County, Missouri, 63660, by Superintendent Donald L. Roper, and is being denied his liberty pursuant to an unconstitutional conviction and sentence of death.

The allegations contained in this petition are in substantial compliance with the

000022

Case 4:05-cv-01474-RWS    Document 9    Filed 08/29/2006    Page 8 of 122

model form for use and application for habeas corpus cases under § 2254.

## I. INTRODUCTION

Marcellus Williams was convicted of the 1998 murder of Felicia Gayle, who was stabbed to death in her University City home, on the word of two paid informants whose testimony was unworthy of belief. Despite the violent and bloody nature of the crime scene, police failed to uncover any forensic evidence connecting petitioner to the murder. In fact, physical evidence collected from the crime scene, including hair and footprints, could not be linked to petitioner, the victim or her husband, suggesting that the actual killer may still be at large. Because the murder went unsolved for quite some time, the authorities resorted to the "snitch" testimony of Henry Cole and Laura Asaro to make an arrest. As history has taught us, the government's reliance upon paid snitch testimony, in lieu of solid police work, is a recipe for a wrongful conviction. *See e.g., The Snitch System: How Snitch Testimony Sent Randy Steidl and Other Innocent Americans to Death Row*, a Center on Wrongful Convictions Survey, Winter 2004-2005, Northwestern School of Law, www.law.northwestern.edu/wrongfulconvictions. This is exactly what happened here.

Because the victim was a former reporter with the St. Louis *Post-Dispatch* and the wife of a prominent St. Louis area physician, the case generated enormous

2

000023

publicity. (Tr. 1730, 2820-28).[1] After the murder went unsolved for several months, like rats emerging from the sewer during a summer drought, Henry Cole and Laura Asaro came forward and claimed that petitioner had confessed to committing the murder in order to lay claim to a $10,000 reward that was offered for information about the homicide.

Henry Cole is a career criminal with convictions dating back thirty years. Mr. Cole also has a long history mental illness, evidence that the jury did not hear. The state's other star witness, Laura Asaro, also has a checkered background. She is an admitted crack addict and prostitute, who was supposedly petitioner's girlfriend for a two-month period around the time of the Gayle murder. Both of these witnesses testified at trial that petitioner admitted to them that he had murdered Ms. Gayle. Mr. Williams' alleged jailhouse confession to Mr. Cole gave a much different account of the crime than his alleged "pillow talk" confession to his prostitute girlfriend. As a result, it is abundantly clear that at least one of these witnesses, if not both of them, committed perjury at trial in exchange for the reward money. (Tr. 1818, 1882). Although trial counsel tried to expose Cole's and Asaro's credibility problems before

---

[1] This petition will refer to the trial transcript as (Tr.), the direct appeal legal file as (L.F.), the limited post-conviction hearing on the issue of whether Mr. Williams was properly advised of his right to testify in the penalty phase of his trial as (H. Tr.), and the Rule 29.15 legal file as (29.15 L.F.).

3

000024

the jury, they were denied access to impeaching information and failed to uncover Cole's and Asaro's histories of mental illness.

Trial counsel, Joseph Green and Christopher McGraugh, were hired by the Public Defender System to represent petitioner at his trial. Both Green and McGraugh were admittedly unprepared for trial. In fact, Green sought a continuance because he was involved in another highly publicized St. Louis County capital murder trial involving Kenneth Baumruk, which started just a month before Mr. Williams' trial commenced. *See State v. Baumruk,* 85 S.W.3d 644 (Mo. banc 2002).

In denying virtually all of defense counsel's discovery requests, requests for forensic testing and two requests for a continuance based upon the state's failure to produce impeaching information on Cole and Asaro, the trial court pushed the case to trial beginning June 4, 2001. (Tr. 136; L.F. 269, 295, 394, 457). In a racially charged case (Ms. Gayle was white and petitioner is black), the prosecutor struck six of seven blacks from the venire panel, leaving just one black juror to serve on the petit jury. (Tr. 1569-70).

Due to trial counsel's lack of preparation, coupled with several trial court rulings, the jury did not receive a complete picture of the case during the guilt phase of trial. Because the prosecution failed to disclose impeaching information and because trial counsel did not conduct a reasonable investigation, trial counsel's cross-

4

000025

examination of Cole and Asaro barely scratched the surface in establishing their utter lack of credibility. New information came to light during state post-conviction proceedings, including information regarding both of these witnesses' long histories of mental illness, which would have further undermined their credibility in the eyes of the jury. Because the jury did not hear this evidence, it was no surprise when the jury found petitioner guilty as charged.

The penalty phase of petitioner's trial was also a travesty. Defense counsel conducted little investigation to uncover mitigating evidence involving petitioner's family, social, medical and psychological history. *See Wiggins v. Smith*, 539 U.S. 510 (2003). Instead, trial counsel relied solely upon "residual doubt" arguments and an abbreviated plea for mercy from petitioner's family that he was a good father and role model in a feeble attempt to convince the jury to spare petitioner's life. (Tr. 3312-3140). In contrast, the state presented thirteen witnesses to testify regarding petitioner's prior convictions and other aggravating evidence (of these witnesses, five were subjected to an abbreviated cross-examination and eight were not cross-examined by the defense at all).

Had trial counsel adequately investigated the case, powerful mitigating evidence could have been presented to convince the jury to spare petitioner's life. During state post-conviction proceedings, it was revealed that Mr. Williams' school records

5

000026

Case 4:05-cv-01474-RWS   Document 9   Filed 08/29/2006   Page 12 of 122

reflected that he had an IQ of 80 and that he suffered from a litany of mental and emotional problems that impaired his ability to conform his conduct to the requirements of the law. (See Exh. 1). Mr. Williams' childhood was marked by the absence of parental love and affection from his mother. Petitioner only saw his natural father three times in his entire life and, the first time he met his father, he was physically abused by him. (*Id.*). Petitioner was also sexually abused at the age of 8 or 9 by his uncle, an aunt, and a church deacon. (*Id.* 13-14). He grew up in a very violent household where his mother and step-father repeatedly physically abused Mr. Williams and his brothers. (*Id.*) Mr. Williams was stripped naked and beaten with tree branches and belts and suffered from recurrent nightmares. In light of his turbulent home life, petitioner became suicidal and turned to drugs and crime at an early age to cope with his problems. (*Id.*)

Petitioner also grew up in extreme poverty in a high crime neighborhood. Mr. Williams, from an early age, saw his uncles use drugs and commit numerous crimes. (*Id.*) None of this evidence was heard by the jury that sentenced petitioner to death.

In light of the lack of solid evidence, coupled with the inherent credibility problems of Cole and Asaro, there is a significant likelihood that an innocent man is sitting on death row for a murder he did not commit. Had the jury heard all of the evidence that has now been uncovered, there is more than a reasonable likelihood that

6

000027

the outcomes at both the guilt and penalty phases of trial would have been different.

## II. PROCEDURAL HISTORY AND FACTUAL BACKGROUND

On August 11, 1998, Felicia Gayle was stabbed to death in her home in University City, Missouri. (Tr. 1712, 2163). Because Ms. Gayle had worked for the St. Louis *Post-Dispatch* years earlier and her husband was a prominent St. Louis area physician, the crime received an extraordinary amount of pretrial publicity. (Tr. 1730, 2820-28). Months went by without any charges being filed. On November 29, 1999, the state charged petitioner with first degree murder and armed criminal action. (L.F. 14). Subsequently, on January 6, 2000, petitioner was indicted on these offenses and the additional charges of burglary in the first degree, robbery in the first degree and an additional count of armed criminal action. (L.F. 18).

Attorneys Joseph Green and Christopher McGraugh were retained by the Missouri Public Defender System on April 10, 2000, to represent petitioner at trial. (L.F. 53). The case was set for trial on June 4, 2001, in St. Louis County Circuit Court before Judge Emmett M. O'Brien.

One month before trial, defense counsel requested a continuance. (L.F. 394-98). The continuance was based, in part, upon the state's non-disclosure of any background information on Cole or Asaro. Counsel also had not received petitioner's Department of Corrections records, such records either having been "lost" by the state

7

000028

Case 4:05-cv-01474-RWS   Document 9   Filed 08/29/2006   Page 14 of 122

or checked-out and not returned by the prosecutor's office. (L.F. 395). Counsel also needed more opportunity to investigate Cole, who had *twelve* prior convictions as well as a long history of mental illness and drug addiction. (*Id.*) Cole refused to sign releases for this information at the instruction of the prosecutor. (See Exh. 10) The state also had not disclosed Cole's or Asaro's correspondence with police, remuneration by the police, or the writings and drawings Cole made for police. (*Id.* 396).

Counsel also sought a continuance based upon the need to conduct further genetic testing on materials provided just two weeks earlier, including bloody fingerprints, shoeprints, hair, fiber and serological evidence obtained from the scene. (*Id.*) The continuance request was also based upon the fact that Mr. Green was involved in the capital trial of Kenneth Baumruk, that commenced in May, 2001. (See Exh. 10). The trial court denied the continuance request without explanation. (L.F. 400).

On May 25, 2001, counsel filed a supplemental motion for continuance. (*Id.* 457-61). This request was based upon the late disclosure of a statement allegedly made by petitioner to another inmate concerning a prior unadjudicated burglary in Kansas City, reports showing the crime scene fingerprints had been destroyed, and a written reward agreement between University City and the victim's family. (*Id.* 458).

8

000029

The Department of Corrections also still could not locate petitioner's records. (*Id.* 458-59). Trial counsel again requested additional time to conduct forensic testing on the physical evidence to reveal potential exculpatory evidence. (*Id.* 459; Tr. 127-28). The trial court also denied this continuance request without explanation. (L.F. 462).

Trial began on Monday, June 4, 2001. (Tr. 136). During voir dire, the state used its peremptory challenges to strike six of the seven qualified black venirepersons, leaving only one African-American to serve on the jury. (Tr. 1569-70). During trial, the state presented evidence that on the morning of August 11, 1998, Dr. Daniel Picus left his house in University City. (Tr. 1705). When Picus arrived home that evening, he found Ms. Gayle's lifeless body on the floor between the stairs and the front door, with a knife protruding from her neck. (Tr. 1710-12, 2198). He immediately called 911. (Tr. 1712, 1717). Three fingerprints were lifted from within the house. (Tr. 2221-22). In the front hall there were two shoe impressions in blood, as well as a third footprint. (Tr. 2224-27, 2245). Hairs were taken from the rug and from Ms. Gayle's shirt. (Tr. 2871-72, 2920).

Picus believed that several items were missing from the house, including Gayle's purse and his laptop computer. (Tr. 1718-19). In her purse, Gayle typically carried a calculator, wallet, and an identification card. (Tr. 1776-79). A pane of glass had

9

000030

Case 4:05-cv-01474-RWS   Document 9   Filed 08/29/2006   Page 16 of 122

been broken from the front door, which police assumed was the method of entry. (Tr. 1735).

The autopsy revealed that Gayle died from a total of sixteen stab wounds to her head, neck, chest and abdomen, seven of which could have been fatal. (Tr. 2163). There were forty-three stab wounds on her entire body. (*Id.*) The police collected blood and skin samples from under Gayle's fingernails. (Tr. 2268, 2962-63). Frustrated by the lack of progress in solving the crime, Dr. Picus offered a $10,000 reward for information. (Tr. 1783, 1814). The police still had no leads in the case until June 4, 1999, when twelve-time convicted criminal Henry Cole, came forward. (Tr. 2379-82).

Between April and June of 1999, Cole testified he was in the city jail with petitioner. (Tr. 2382). After a few weeks, he and petitioner realized they were distantly related and, according to Cole, became friends. (Tr. 2385-87). Cole stated that in early or mid-May, he was watching television with petitioner, when a story came on about Felicia Gayle's death, reporting that there were still no suspects and that a reward for $10,000 had been offered. (Tr. 2388-89). According to Cole, who had known petitioner only for a few weeks, petitioner admitted to him that he had committed the crime. (Tr. 2390).

Cole also claimed petitioner had indicated to him that the only other witness he

10

000031

had told about the crime was Laura Asaro. (Tr. 2414). In November 1999, officers went to Ms. Asaro's mother's house to speak with her. (Tr. 1910). Ms. Asaro believed that the officers were there to arrest her on outstanding warrants. (Tr. 1923). The police offered to help Asaro with her warrants if she would provide information about the murder. (Tr. 1980). Asaro agreed to cooperate, becoming the second material witness against petitioner. (Tr. 1910).

Asaro testified that at the time of the crime she had been dating petitioner for two or three months, living at times in his car. (Tr. 1840-41). Asaro claimed that, on the day of the murder, petitioner drove her to her mother's house around 9:00 a.m. and returned in the car later that afternoon at about 3:00 p.m. (Tr. 1841-43). Asaro claimed petitioner was wearing a jacket zipped to the top, despite the August heat and the car having no operable air-conditioner. (Tr. 1841-42).

After removing the jacket, Asaro claimed she saw blood on his shirt and fingernail scratches on his neck. (Tr. 1843, 1855). Petitioner allegedly explained he had been in a fight. (Tr. 1843). Later that day, Asaro claimed that petitioner took off his clothing, placed it in his backpack, and threw it down a sewer. (Tr. 1845).

Asaro also testified that when petitioner picked her up, he had a computer in the car. (Tr. 1859-60). She stated that he took it to a house down the street and, upon

11

000032

returning, the computer was gone. (Tr. 1844, 1860-61).[2] The next morning when she wanted to retrieve her clothes from the trunk of petitioner's car, Asaro says she gained access to the trunk and saw a woman's purse. (Tr. 1846).[3] Snatching the purse away from petitioner, Asaro claimed she opened it and saw the victim's identification and coin bag. (Tr. 1846). She became angry, believing that petitioner had another girlfriend. (Tr. 1847).

Asaro claimed that petitioner's response was to tell her that the purse belonged to a woman he just killed. (Tr. 1848). In contrast to Cole's account (and in direct conflict with the crime scene evidence), Asaro claimed petitioner told her that he broke into the woman's house through the *back* door. (Tr. 1848, 1851). Asaro then gave a general account of a surprise encounter with the victim, a struggle and an account of the stabbing. (*Id.*) Unlike Cole, Asaro testified that petitioner drove to the scene (and did not take a bus). (Tr. 1841-42). Like Cole, Asaro admitted that she too

---

[2] Asaro told the police that petitioner had sold the computer to a man named "Larry," and she showed them where the man lived. (Tr. 2080-81). The man turned out to be Glenn Roberts. (Tr. 2084). Roberts testified that petitioner had pawned the computer to him for $150 or $250, but Roberts was not allowed to explain that petitioner was acting on Asaro's behalf. (Tr. 2000)

[3] The police later searched petitioner's car with the consent of petitioner's grandfather, without a warrant. (Tr. 66-67, 70-72). From the glovebox, they seized a *Post-Dispatch* ruler and a calculator. (Tr. 2275, 2277). From the trunk, they seized a pad of paper on which was written Glenn Roberts' name and phone number. (Tr. 2280).

12

000033

was interested in the reward money. (Tr. 1953).

Because the state's case hinged on two highly unbelievable witnesses, defense counsel focused on the lack of forensic evidence linking petitioner to this extremely bloody murder scene, and suggested that police could easily have fed information to Cole and Asaro to resolve this long-unsolved, high-profile crime. For example, numerous hairs were discovered on the victim's shirt and on the rug where her body was found. (Tr. 2871-72, 2920). The rug had been vacuumed eleven days before the crime. (Tr. 2754-55). While some of the hairs matched Gayle or Picus, others did not match either of them or petitioner. (Tr. 2871-72, 2920). Similarly, two pubic hairs found on the rug did not match Gayle, Picus, or petitioner. (Tr. 2876-77). Head hairs also found on the rug also did not match any of these three individuals. (Tr. 2877).

In addition, fingernail clippings taken from Gayle that contained blood and skin could not be matched to petitioner. (Tr. 2961, 2964). Bloody footprints at the scene appeared to belong to a single assailant. However, another footprint was present which bore a different sole pattern, indicating that another unknown person was present at the crime scene. (Tr. 2230-31, 2881-82, 2886). This second shoeprint did not match any paramedics' shoes, nor did it match the shoes seized from petitioner upon his arrest. (Tr. 2882, 3140).

13

000034

The jury deliberated more than five hours and convicted Mr. Williams on all five counts as charged. (Tr. 3069, 3072-74). At the penalty phase, the state presented evidence of Mr. Williams' prior criminal conduct, including prior convictions and unadjudicated prior bad acts. (Tr. 3107-3117, 3122-29, 3130, 3132-36, 3143-59, 3167, 3168-71, 3184-87, 3188-92, 3193-97). The state also presented victim impact evidence, concerning both the impact of the Gayle murder on her family and the impact on the families of victims of *other* unrelated crimes committed by petitioner. (Tr. 3201-3284). The defense called Mr. Williams' family to briefly testify that he was a loving and caring father to his children. (Tr. 3301, 3444-45). The defense also called an expert, Dr. Mark Cunningham, to testify about the psychological impact Mr. Williams' execution would have on his children. (Tr. 3385-93, 3447-52). However, the trial court ruled that this evidence was inadmissible. (Tr. 3395, 3453). The jury deliberated less than two hours and sentenced petitioner to death. (Tr. 3517-18).

Petitioner timely appealed his convictions and sentences to the Missouri Supreme Court. The Missouri Supreme Court affirmed petitioner's convictions and sentence on January 13, 2003. *State v. Williams*, 97 S.W.3d 462 (Mo. banc 2003). The United States Supreme Court subsequently denied certiorari on June 23, 2003. *Williams v. Missouri*, 539 U.S. 944 (2003).

Petitioner filed a timely *pro se* motion for post-conviction relief under Mo. R.

14

000035

Case 4:05-cv-01474-RWS   Document 9   Filed 08/29/2006   Page 21 of 122

Sup. Ct. 29.15 on May 30, 2003. (29.15 L.F. 6). Appointed counsel filed an amended Rule 29.15 Motion on September 8, 2003. (29.15 L.F. 69). The circuit court denied petitioner an evidentiary hearing on all of his claims except for the allegation that trial counsel was ineffective for failing to allow petitioner to testify in the penalty phase. (29.15 L.F. 483) On May 14, 2004, the circuit court entered an order denying the Rule 29.15 motion. (29.15 L.F. 800). The Missouri Supreme Court subsequently affirmed the denial of post-conviction relief on June 21, 2005. *Williams v. State,* 168 S.W.3d 433 (Mo. banc 2005). Rehearing was denied on August 30, 2005. Petitioner is currently incarcerated under a sentence of death at the Potosi Correctional Center, Route 2, Box 2222, Mineral Point, Missouri 63660.

## III.  PETITION FOR A WRIT OF HABEAS CORPUS

Petitioner's conviction and sentence of death were obtained in violation of his rights secured and guaranteed under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution in the following respects:

### CLAIM 1

**THE PROSECUTION VIOLATED PETITIONER'S SIXTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS IN FAILING TO DISCLOSE MATERIAL EVIDENCE THAT COULD HAVE BEEN UTILIZED TO IMPEACH THE CREDIBILITY OF HENRY COLE AND LAURA ASARO.**

In *Brady v. Maryland,* 373 U.S. 83, 87 (1963), the Supreme Court found that

15

000036

"the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment irrespective of the good faith or bad faith of the prosecution." It is also well settled that impeachment evidence must also be disclosed to the defense pursuant to *Brady*. *United States v. Bagley*, 473 U.S. 667, 676 (1985); *Giglio v. United States*, 405 U.S. 150, 154 (1972). It is also well settled that a *Brady* violation may occur in cases of a prosecutor's inadvertent failure to disclose. *Strickler v. Greene*, 527 U.S. 263, 282 (1999); *see also United States v. Agurs*, 427 U.S. 97, 110 (1976) (the constitutional obligation to disclose under *Brady* is not measured by the moral culpability or willfulness of the prosecutor). Accordingly, it is of no consequence to petitioner's federal claim whether or not the state acted in bad faith in failing to disclose impeachment evidence. It is also well settled that a *Brady* violation occurs when the prosecutor fails to disclose impeachment materials in the possession of others acting on the government's behalf, including the police. *Strickler v. Greene,* 527 U.S. 263, 275-276 (1999); *Kyles v. Whitley,* 514 U.S. 419, 437 (1995).

> **A.   Failure to Disclose the Mental Health Records and Related Impeachment Information Regarding Henry Cole and Laura Asaro.**

Prior to trial, defense counsel sought through discovery drug treatment records, mental health records, and prison and jail records for Cole and Asaro. (L.F. 188-192).

16

000037

The state not only failed to disclose these records, but also persistently hindered counsel's efforts to obtain them by instructing Cole not to sign a release for this material at his deposition. (29.15 L.F. 114). The state also filed a motion in limine to preclude defense counsel from impeaching these witnesses with evidence of their drug addiction or Cole's extensive history of mental illness. (*Id.*)

The very day he was deposed, Cole had just been released from the psychiatric unit at the Bronx-Lebanon Hospital in New York City. (*Id.* 115; Deposition of Henry Cole, April 2, 2001, Exhibit 13). Cole also admitted he had been prescribed psychiatric medication, but that he did not always take it. (29.15 L.F. 116).

Cole was also a drug addict and an alcoholic. During the 1990s, Cole received drug treatment at numerous institutions, including: St. Luke's Hospital, CMC on Delmar, Department of Corrections at Farmington, Missouri, St. Louis City Workhouse, Roosevelt Hospital in New York and Interfaith Hospital in Brooklyn, New York. (*Id.*) Cole admitted to regularly using drugs, including crack cocaine, marijuana, and heroin. (*Id.*) Cole had also suffered from hallucinations and memory loss because of his drug use. (*Id.* 117). Cole was also prone to binge drinking, resulting in further memory loss. (*Id.* 117).

Like Henry Cole, Laura Asaro received treatment at mental facilities, including stays at St. Louis Empowerment Center, New Beginnings, Queen of Peace and

17

000038

Case 4:05-cv-01474-RWS   Document 9   Filed 08/29/2006   Page 24 of 122

Booneville Treatment Center for Women. (*Id*. 117-18; Deposition of Laura Asaro, April 11, 2001, Exhibit 14). However, she gave inconsistent and varying accounts of her treatment and minimized her addiction. (29.15 L.F. 117). She admitted being treated by a psychiatrist, but would not reveal his name or when she had seen him. (*Id*. 117-18). She applied for disability benefits due to her mental problems. (*Id*. 118). A judge had ordered her into drug treatment at New Beginnings shortly before trial when she was deposed. (*Id*.)

The state disclosed none of these records to the defense, and sought to preclude any impeachment of these witnesses regarding their mental problems. (L.F. 120-21). As a result, the jury was deprived of important evidence that would have further discredited Cole and Asaro. *Id*. The Missouri Supreme Court denied relief on this claim stating that "the prosecution has no obligation to disclose evidence of which the defense is already aware and which the defense can acquire [from other entities]." 168 S.W.2d at 440. That court also based its decision upon the fact that the prosecution turned over everything in their possession to defense counsel. *Id*. This decision is clearly contrary to and/or is an unreasonable application of well established United States Supreme Court precedent. 28 U.S.C. § 2254(d)(1); *Williams v. Taylor*, 529 U.S. 362, 404 (2000).

The state's obligation to produce exculpatory evidence is not, as the state court

18

found, limited to the evidence in the prosecutor's possession. *Strickler v. Greene*, 527 U.S. at 275-276. For example, in *Kyles v. Whitley*, 514 U.S. 419 (1995), the Supreme Court held that the prosecutor has a duty to learn of any favorable evidence known to others acting on the government's behalf, such as the police. In this case, much of the impeaching information regarding Cole and Asaro was in the possession of other government entities, such as the City Workhouse, the Missouri Department of Corrections, the government-run mental institutions. Under *Strickler* and *Kyles*, the prosecution is required to disclose any impeaching information in the possession of these other governmental entities. There is no loophole to this constitutional duty to disclose resulting from the prosecution's "open file" policy. As a result, the Missouri decision is both contrary to and involves an unreasonable application of *Strickler* and *Kyles*.

In addition, the state's attempt to excuse or minimize its failure to disclose by noting its "open file" policy is disingenuous in light of the uncontradicted evidence in the record that the prosecution did everything in their power to deny defense counsel access to Asaro and Cole prior to trial. Assistant prosecutor Keith Larner concealed the whereabouts of Henry Cole and Laura Asaro by pretending that the witnesses were hard to find, even though he and the police were in regular contact with both of them. (29.15 L.F. 95-97, 99, 102). In fact, defense counsel noted on the record before the

19

000040

trial court that he could not locate or investigate these witnesses. In response, the state did not reveal their whereabouts and did everything in its power to hide them from the defense. (*Id.* 98-99, Tr. 30-31). Most importantly, the prosecution deliberately obstructed defense counsel's access to impeaching information on Henry Cole by explicitly advising him not to sign a release form for his records. (See Exh. 10).

It cannot be disputed that the state's non-disclosure of a key witness' history of mental illness violates due process under *Brady*. *See East v. Johnson*, 123 F.3d 235, 238 (5th Cir. 1997). Like Cole and Asaro, Barbara Hardaway was a "key witness" during the penalty phase prosecution of East, because she "was the only witness who provided the jury with evidence of the other murders East allegedly committed." *Id.* at 238. The state withheld evidence that Hardaway, like Cole, suffered from hallucinations. *Id.* For this reason, the Fifth Circuit ordered a remand to allow East to obtain discovery of Hardaway's mental health records:

> Given the importance of Hardaway's testimony to the prosecution's case... her mental records are likely material as impeachment evidence.... Under these circumstances, we disagree with the state's assertion that East's ability to effectively impeach Hardaway is immaterial because it would not undermine the remainder of the state's case....

*Id. See also United States v. Golyansky*, 291 F.3d 1245, 1248 (10th Cir. 2002); *United States v. Lindstrom*, 698 F.2d 1154, 1163-64 (11th Cir. 1983); *United States v. Jimenez*, 256 F.3d 330, 343-44 (5th Cir. 2001).

20

000041

Similarly, in *Chavis v. North Carolina*, 637 F.2d 213, 224-25 (4th Cir. 1980), the Fourth Circuit found the prosecution's failure to turn over a key witness' psychiatric records violated due process under *Brady*. "We do not doubt that Hall's psychiatric report if it had been made available to defense counsel might have had a substantial impact on the outcome of the case. If the jury had known that Hall was a borderline defective, it might well have concluded that [he] lacked the ability to recall events accurately, about which he testified in exquisite detail, that had occurred at least one and one-half years prior to the time he was testifying." *Id.*

Like the situation confronted by the Fourth Circuit in *Chavis*, Mr. Williams has been denied access to impeaching information on the key witnesses against him at every turn in this case. This action deprived petitioner of his Sixth and Fourteenth Amendment right to confront and cross-examine his accusers. As a result, as in the *Chavis* case, petitioner is entitled to full discovery and an evidentiary hearing to prove his claims under *Brady* because he was not given an opportunity to do so during state post-conviction proceedings.

**B.    The State's Deliberate Concealment of Cole's and Asaro's Whereabouts.**

For over a year prior to trial, the state failed to disclose the actual addresses of Henry Cole and Laura Asaro. The prosecutor regularly contacted both Cole and

21

000042

Asaro, but actively concealed their whereabouts. (29.15 L.F. 95-97, 99). Assistant Prosecuting Attorney, Keith Larner, told the court that Cole had AIDS, when he knew he did not, to justify his absences and flight to New York. (*Id.* 97, 99; L.F. 224). Police were in regular contact with Cole and bought him a bus ticket to New York, making him unavailable to be contacted by the defense. (L.F. 99, 102; Exh. 13 at 44). As noted earlier, the prosecution also obstructed petitioner's access to impeaching information by advising Mr. Cole not to sign a release form for his records. (See Exh. 10).

Similarly, Larner had personally interviewed Asaro three times, but told the court he was unable to locate her. (29.15 L.F. 99-102). Larner was in regular contact with Asaro because he was prosecuting a robbery case against Mr. Williams just before petitioner's murder trial was set to begin and Asaro was a prosecution witness in that case. (*Id.*)

Shortly before the commencement of the robbery trial, the prosecution contacted Asaro in the City Jail, and served her with a subpoena. (*Id.*) When Mr. Williams' counsel in the robbery case, Elizabeth Haines, learned of the subpoena, she tried to contact Asaro at the jail, but found that Asaro had been released. (*Id.* 103-04). Larner then refused to produce Asaro for a deposition. (*Id.* 104). On March 29, 2001, just days before the robbery trial was due to commence, Haines saw a small

000043

woman, who had the appearance of a drug addict, standing with Larner in front of the St. Louis County Justice Center. (*Id.*) Haines approached the two and asked the woman her name. (*Id.*) Laura Asaro revealed her identity and disclosed that two prosecutors, Larner and Bishop, had interviewed her that afternoon. (*Id.*) Larner tried to prevent Haines and her investigator from serving Asaro with a subpoena. (*Id.*)[4]

Haines finally deposed Asaro the next day and discovered that Larner had interviewed her three times and had taken notes, but he never disclosed these statements to the defense. (*Id.*) Larner also failed to disclose a videotaped statement, an audio taped statement, and a written statement taken from Asaro before trial. (*Id.*)

At the same time, Larner also engaged in similar conduct to hide Asaro in petitioner's death penalty case. Larner stood silently by as trial counsel complained in open court about difficulties the defense had in locating and interviewing Cole and Asaro. (*Id.* 98-99; Tr. 30-31).

It is axiomatic that a prosecutor's duty in a criminal proceeding is to seek justice. *Berger v. United States,* 295 U.S. 78, 88 (1935). Although the prosecutor should "prosecute with earnestness and vigor," he may not use "improper methods

---

[4] Had petitioner been granted an evidentiary hearing, Richard Herndon, an investigator with the Public Defender, would have testified that he had never before or since experienced so much interference from the state in serving a subpoena. (29.15 L.F. 104).

23

000044

calculated to produce a wrongful conviction." *Id.* One clearly improper method is ongoing intentional "gamesmanship" which obstructs the ability of the defense to render effective assistance.

For example, the Sixth Circuit granted habeas relief in part on this basis in *Demjanjuk v. Petrovsky*, 10 F.3d 338, 339-40 (6th Cir. 1993). Demjanjuk was convicted of war crimes in Israel and sentenced to death. After seven years in an Israeli jail, the Supreme Court of Israel overturned his conviction on the basis of new evidence that became available after the breakup of the Soviet Union, which showed that Demjanjuk was not a concentration camp guard known as "Ivan the Terrible." *Id.* at 342. After Demjanjuk's return to the United States, he was charged with war crimes and convicted once again. However, OSI investigators withheld information, delayed disclosure and failed to disclose exculpatory evidence. The Sixth Circuit reopened the case in which it had denied habeas relief to Demjanjuk and vacated Demjanjuk's conviction "on the ground that the judgments were wrongly procured as a result of prosecutorial misconduct that constituted fraud on the court." *Id.* at 356. The Sixth Circuit noted that "the attitude of the government trial attorneys ... 'at times bordered on gamesmanship.'" *Id.* at 341.

In similar situations, reviewing courts have granted habeas relief where the prosecutor pays transportation costs to allow the prosecution witnesses to leave the

24

000045

jurisdiction to hinder defense counsel's access to them. *See Banks v. Dretke*, 54 U.S. 668, 699 (2004) ("[s]tate persisted in hiding [prosecution witness'] informant status and misleadingly represented that it had complied with its full *Brady* disclosure obligations . . ."); *see also Lockett v. Blackburn*, 571 F.2d 309 (5th Cir.), *cert. denied*, 439 U.S. 873 (1978); *Freeman v. Georgia*, 599 F.2d 65 (5th Cir. 1979), *cert. denied*, 444 U.S. 1013 (1980) (authorities knowingly concealed whereabouts of state witness and visited her frequently before and near the time of trial); *Hernandez v. Estelle*, 674 F.2d 313 (5th Cir. 1981).

The prosecutor's obstructive tactics clearly inhibited trial counsel's ability to prepare to cross-examine the prosecution's two key witnesses. Viewed in conjunction with the fact that the trial court denied the defense a continuance to more adequately prepare, it is clear that petitioner was prejudiced by these tactics. After full discovery and a full and fair hearing, habeas relief is warranted.

### C.   The Prosecution's Attempt to Manufacture Additional Jailhouse Informant Evidence Against Petitioner.

Prior to trial, agents for the state approached two inmates at the St. Louis County Jail, John Duncan and Kimber Edwards,[5] and provided them with incriminating

---

[5] The affidavits of Duncan and Edwards are attached hereto as Exhibits 2 and 3.

25

000046

information about the murder of Felicia Gayle and then offered them inducements if they would testify against petitioner. (29.15 L.F. 73-74, 108-114). Prosecution investigator Ed Magee interviewed Duncan and provided him details about the crime. (*Id.* 109). Magee stated to Duncan that he could receive a reduction in his sentence if he would testify that Mr. Williams had discussed committing the crime in his presence. (*Id.* 109-110). Mr. Duncan also stated in his affidavit that while he and petitioner were in the Workhouse he saw petitioner every day. "[Petitioner] never discussed his case with anyone. He never talked about anything personal... Marcellus is not the type of person to discuss his personal matters or his case... He is not the kind of guy to confess to others he committed a crime." (See Exh. 2). A University City police officer also interviewed another prisoner, Kimber Edwards and provided him facts about the Gayle murder and then asked him if he would be willing to testify that Mr. Williams had confessed in exchange for favorable treatment. (See Exh. 3). During state post-conviction proceedings, relief was denied to petitioner on this aspect of his prosecutorial misconduct claim without a hearing. On appeal, the Missouri Supreme Court affirmed the denial of relief, rejecting petitioner's argument that the state's effort to manufacture other jailhouse snitches negatively impacted the credibility of Cole and Asaro. *Williams v. State,* 168 S.W.3d at 440.

The Missouri decisions on this claim involve unreasonable applications of both

26

000047

Case 4:05-cv-01474-RWS   Document 9   Filed 08/29/2006   Page 33 of 122

the underlying facts and applicable law. The state court rulings ignore the inescapable fact that the prosecution made a powerful argument to the jury that both Cole and Asaro's "snitch" testimony was reliable because Mr. Williams' confessions to them contained details of the crime that were not reported in press accounts and could have only been provided to them by Mr. Williams himself. (Tr. 3010, 3053). If the jury had heard that police and prosecutors had provided evidence regarding the circumstances of the murder to other potential jailhouse snitches, this information could have effectively rebutted this argument and further diminished the credibility of Cole and Asaro.

The police activity here is similar to the government misconduct that this Court confronted in *Reasonover v. Washington,* 60 F. Supp.2d 937, 965 (E.D. Mo. 1990). In *Reasonover,* the prosecution's key witness was a jailhouse informant named Rose Jolliff. *Id.* at 964. Jolliff testified at Reasonover's trial that Reasonover confessed to committing the murder to her in a jail cell that was also occupied by a woman named Maquita Hinton. After Hinton was released from jail, she was contacted by police regarding Reasonover's purported jailhouse confession. The police offered Hinton money if she would back up Jolliff's testimony that Reasonover confessed to murder. *Id.* at 965. The police also gave Hinton details regarding the murder, including the names of other persons purportedly involved. *Id.* A tape of this police conversation

27

000048

with Hinton corroborated her testimony at Ms. Reasonover's 2254 hearing. In granting Ms. Reasonover habeas relief, Judge Hamilton noted the Hinton's testimony provided strong evidence that police provided Jolliff incriminating details to use in her trial testimony against Reasonover. *Id.*

Based upon the undeniable similarity between the facts surrounding the police misconduct here and the facts in *Reasonover*, this Court should grant an evidentiary hearing on this issue. Thereafter, this Court should grant habeas relief.

## CLAIM 2

## TRIAL COUNSEL WAS INEFFECTIVE IN FAILING TO INVESTIGATE AND PRESENT AVAILABLE EVIDENCE TO IMPEACH THE CREDIBILITY OF HENRY COLE.

To establish ineffective assistance of counsel, petitioner must show: (1) that counsel's performance was deficient (i.e., falling "below an objective standard of reasonableness"); and (2) that counsel's deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). One barometer of deficient performance in capital cases is whether counsel's actions comported with the standards set forth by the American Bar Association (ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases "ABA Guidelines"), which were expressly adopted by the United States Supreme Court in *Wiggins v. Smith*, 539 U.S. 510, 524 (2003) ("[W]e long have referred [to these ABA Standards]

28

000049

as guides to determining what is reasonable."); *see also Marshall v. Cathel,* 428 F.3d 452, 467 (3rd Cir. 2005) (noting the ABA Guidelines set the standard for reasonableness in capital cases).

The ABA Guidelines require capital counsel to thoroughly investigate, prepare and present all avenues of factual inquiry relevant to the defense. Guideline 10.7 imposes clear obligations on defense counsel in this regard:

> A. Counsel at every stage have an obligation to conduct thorough and independent investigations relating to the issues of both guilt and penalty.

> 1. The investigation regarding guilt should be conducted regardless of any admission or statement by the client concerning the facts of the alleged crime, or overwhelming evidence of guilt, or any statement by the client that evidence bearing upon guilt is not to be collected or presented.

The commentary to this guideline elaborates on the critical importance the function of investigation plays in a capital case: "At every stage of the proceedings, counsel has a duty to investigate the case thoroughly. This duty is intensified (as are many duties) by the unique nature of the death penalty." *See also Powell v. Alabama,* 287 U.S. 45, 57 (1932) (describing "thorough-going investigation" as "vitally important.").

In the present case, counsel's investigation of Henry Cole's background and

29

000050

credibility was clearly deficient.[6] *See Towns v. Smith*, 395 F.3d 251, 259-60 (6th Cir. 2005) (finding ineffective assistance of counsel for failing to investigate critical prosecution witnesses). Reasonable investigation by post-conviction and present counsel has revealed significant impeaching evidence from Henry Cole's own family that would have utterly destroyed his credibility in the eyes of the jury.

Mr. Williams' alleged in state court that trial counsel was ineffective in failing to investigate and interview members of Henry Cole's family. (29.15 L.F. 75-76, 121-39). The claim was specific, listing the witnesses that should have been interviewed and outlining in great detail each witness' testimony: Johnifer Cole Griffin, Bridget Griffin, Ronnie Cole, Durwin Cole, Twana "Coco" Cole.[7] (*Id.* 121,123-38). Mr. Williams had asked his attorneys to talk to these witnesses and provided counsel their names. (*Id.* 122-23). These witnesses were available and willing to testify at trial. (*Id.* 123).

Had counsel contacted these witnesses, they would have discovered that Cole

---

[6] Trial counsel, despite being provided with the names of Cole's family members, did not interview any of them. (See Exh. 10 at 3-4). Nor did they provide the names to their investigator and request that he contact them. If granted an evidentiary hearing, trial counsel would testify that they had no strategic reason for failing to interview the Cole family. They "simply ran out of time." (*Id.* 4).

[7] The affidavits of Johnifer Cole Griffin, Durwin Cole, and Ronnie Cole were submitted in state court along with petitioner's Amended 29.15 Motion and are attached hereto as Exhibits 4, 5, and 6, respectively.

30

000051

was lying about Mr. Williams and could not be believed. Cole wrote to his son, Johnifer, while he was in jail with Mr. Williams. (See Exh. 4). Henry Cole bragged that he had a "caper" going on and something "big" was coming. (*Id.*) Johnifer knew that his father had made false allegations against others in the past, beginning in the 1980s and continuing throughout his life. (*Id.*) Indeed, Henry Cole even served as an informant against Johnifer, his own son, in order to get a deal from the authorities. (*Id.*)

Similarly, Cole's daughter, Bridget Griffin, knew that Cole could not be trusted. (*Id.* 129-30). She knew of his well known reputation of providing false information to the police in exchange for leniency. (*Id.* 130). She also had personal knowledge of prior false allegations Cole had made. (*Id.* 130). Ronnie and Durwin Cole, Henry's nephews, could have further confirmed that Cole had made false allegations in the past and was extremely unreliable. (See Exh's 4, 5). Cole concocted scams, lied about others, and then left town. (*Id.*) He would do or say anything for money. (*Id.*)

Cole's niece, Twanna, confirmed these family accounts. (29.15 L.F. 136-37). She had witnessed her uncle's crazy and bizarre behavior. (*Id.* 136). She knew Henry needed money for drugs and would provide false information to get it. (*Id.* 137). As with the rest of her family, she did not trust her uncle, based on his history of making false allegations. (L.F. 137).

000052

Missouri courts routinely allow impeachment of witnesses through the testimony of acquaintances concerning the witness' reputation in the community for truthfulness. *See Wolfe v. State*, 96 S.W.3d 90, 92 (Mo. banc 2003) ("Wolfe's counsel also presented four impeachment witnesses who testified against Cox's reputation in the community for truthfulness"); *Kuehne v. State,* 107 S.W.3d 285, 295 (Mo. 2003) (finding ineffective assistance of counsel for failing to call impeachment witnesses where the jury's decision rested solely on the credibility of the state's witnesses). *Strickland*, 466 U.S. at 687.

In numerous respects, this case is indistinguishable from *Cargle v. Mullin*, 317 F.3d 1196 (10th Cir. 2003).    In *Cargle*, the court held that defense counsel's performance in the guilt phase of Cargle's capital trial was constitutionally deficient. In *Cargle*, as here, the petitioner was convicted on the testimony of two snitches. *Id.* at 1211, 1212-13.    The Tenth Circuit granted habeas relief because Cargle's trial counsel failed to investigate and interview a number of witnesses who could have been called to impeach the credibility of the "snitch" witnesses. *Id.* at 1213-14. As the court found:

> Over and above the incremental benefit each of these six witnesses would have added to the defense in impeaching the government's two central witnesses. . ., there is the larger point that they could have, collectively, provided an effective overall defense strategy (*particularly in a case resting almost entirely on the credibility of these two inherently*

32

000053

*vulnerable prosecution witnesses*) that counsel utterly failed to see, much less effectively employ: showing the case involved such a tangle of inter- and-intra witness inconsistence that the jury could not be confident enough in any person's word to justify holding petitioner responsible for first degree murder beyond a reasonable doubt.

*Id.* (emphasis supplied). *See also Benn v. Lambert*, 283 F.3d 1040, 1054 (9th Cir.), *cert. denied*, 537 U.S. 942 (2002).

As noted earlier, trial counsel knew that Henry Cole had a long history of mental illness. Although trial counsel certainly cannot be blamed for the prosecution's failure to disclose mental health records regarding Henry Cole as outlined above, had counsel bothered to interview members of Cole's family, much of the evidence regarding his mental illness could have been brought forth in front of the jury to attack Cole's credibility. For example, Durwin Cole reported that Henry Cole often hallucinated, recounting one incident where Henry saw non-existent bugs in his hair and drinking glass. (See Exh. 5). Other members of his family also recounted that Cole often had auditory hallucinations and sometimes failed to take his psychiatric medications. (29.15 L.F. 133). His family also confirmed that he had been diagnosed as mentally ill and received disability benefits because of his mental illnesses. Members of the family also recalled other incidents of bizarre behavior by Mr. Cole brought on by his mental illness. (*Id.* 136).

In addressing this claim, the Missouri Supreme Court limited its analysis of this

33

000054

issue to testimony that Cole's family could provide regarding his prior bad acts. There is no mention of Cole's history of making false allegations in its opinion. *Williams v. State,* 168 S.W.3d at 441. In addressing the mental health issue, the Missouri Supreme Court does not even mention the specific instances in which members of Cole's family observed him suffering from visual and auditory hallucinations. *Id.* Because the Missouri Supreme Court's decision did not address the prior false allegations or the specific anecdotes regarding Cole's mental illness and hallucinations, the state court decision is based upon an unreasonable and incomplete assessment of the relevant facts, even if this claim were viewed under the lens of 2254(d). The failure of the Missouri Supreme Court to grasp the factual basis for the claim permits this Court to review this claim *de novo* under 2254(d)(2).

Applying the *Strickland* test, it is not a close question that both deficient performance and prejudice can be shown, if the allegations raised by petitioner before this Court and in his state post-conviction motion are proven after an evidentiary hearing. Undoubtedly, Cole's credibility in the eyes of the jury would have been damaged further if they had known of his auditory and visual hallucinations and his prior false allegations and his history as a "professional snitch." Habeas relief is warranted.

## CLAIM 3

34

000055

## TRIAL COUNSEL WAS INEFFECTIVE IN FAILING TO INVESTIGATE AND PRESENT EVIDENCE TO IMPEACH THE CREDIBILITY OF LAURA ASARO.

As was the case with Henry Cole, trial counsel failed to conduct a thorough investigation to uncover all reasonably available information that could have undermined the credibility of Laura Asaro. Under the *Strickland* test and the aforementioned ABA Guidelines for Capital Cases, it is clear that a reasonably competent attorney would have conducted a more thorough investigation of Laura Asaro's background to uncover impeaching information. Had this been done, as the following discussion reveals, there is a reasonable likelihood that the jury would have not believed her testimony at trial. 466 U.S. at 694.

Had trial counsel bothered to interview Ms. Asaro's friends, neighbors and relatives, these efforts would have revealed fertile grounds for impeaching her credibility. Two witnesses, Edward Hopson and Colleen Bailey[8] could have testified that Ms. Asaro admitted to them that she had "set up" Mr. Williams to get the $10,000 reward, that Asaro desperately needed this money to feed her crack cocaine addiction, and she had made prior false allegations against others. (29.15 L.F. 78-79, 151-157).

---

[8] Mr. Hopson was the live-in boyfriend of Laura Asaro's mother. Ms. Bailey was Ms. Asaro's neighbor. Hopson's affidavit is attached to this petition as Exhibit 7.

35

000056

Mr. Hopson has stated that he has known Laura Asaro since her childhood. (See Exh. 7). Both Mr. Hopson and Ms. Asaro's neighbor Colleen Bailey also could have testified that she was a known police informant and had engaged in a pattern of lying to police to get herself out of trouble. (*Id.*)

Trial counsel also inexplicably failed to contact and interview Ms. Asaro's mother, Cynthia Asaro. Cynthia Asaro's testimony, coupled with other affidavits from Walter and Latonya Hill, (See Exh's 8, 9), would have established that Laura Asaro lied when she testified at trial that petitioner drove his car on the date of the murder. All of these witnesses could have testified at trial that Mr. Williams' car was not running on that day. Ms. Asaro's mother's testimony and the testimony of these other witnesses would have also revealed that Ms. Asaro lied when she stated that she did not have access to the trunk of petitioner's car. (*Id.*) These witnesses could have testified that Ms. Asaro had a set of keys to the car and that she could have gotten into the trunk and planted incriminating evidence linking him to the murder of Ms. Gayle. (29.15 L.F. 162-166). Cynthia Asaro could have also testified that her daughter gave her coupons similar to those found in the victim's purse. Ms. Asaro's mother also could have testified that she never saw any letters mailed from the jail from petitioner to Laura Asaro, which would have contradicted Laura's trial testimony that she gave these letters to her mother to throw away. (Tr. 1888; 29.15 L.F. 165-166).

36

000057

Finally, a reasonably competent attorney would have sought testing of Asaro's blood and hair against evidence collected from the crime scene that could not be matched to the victim, her husband, or petitioner. Petitioner had nothing to lose by seeking the testing of Asaro's DNA and had a lot to gain. If testing had revealed that none of the crime scene evidence could be scientifically linked to Asaro, no damage would be done to the defense. In contrast, had any of this evidence been linked to Asaro, it would have totally destroyed her credibility by establishing that she was present at the scene when the victim was killed. *See Wolfe v. State,* 96 S.W.3d 90 (Mo. banc 2003).

Such testing could have been easily accomplished by the defense in this case. The defense had already employed a DNA expert named Jami Harmon. Ms. Asaro also testified that she would willingly submit samples of her hair and blood for testing to anyone who wanted it. (Tr. 1985). Defense counsel also clearly grasped the possible significance of such evidence by noting in his opening statement that the police failed to take testable samples of hair and fibers from Laura Asaro. (Tr. 1699). However, because the defense did not bother to request the testing of Asaro's known samples, the issue did not resurface at trial. Mr. Green has also stated that he recognized the importance of attempting to match crime scene DNA to known suspects, but did not have time to do it. (29.15 L.F. 830-831; Exh. 10).

37

000058

In addressing this ineffectiveness claim regarding the impeachment of Ms. Asaro, the Missouri Supreme Court held that the evidence provided by Ms. Asaro's mother and acquaintances regarding the reward money and the operability of petitioner's car did not entitle petitioner to relief because it was cumulative to other evidence that the jury heard at trial. *Williams v. State,* 168 S.W.3d at 441-442. This decision rests upon an unreasonable interpretation of the factual record. *See* 2254(d)(2). Although the jury heard that Ms. Asaro was a prostitute and a drug addict and had expectations of receiving some reward money for testifying at petitioner's trial, they heard absolutely no evidence such as was provided by Ms. Bailey and Mr. Hopson that Asaro had admitted "framing" petitioner for the reward money. Such specific evidence indicating that Ms. Asaro perjured herself for money is a far cry from general impeachment evidence presented regarding her lifestyle and her expectation of receiving reward money. Regarding the operability of petitioner's car, the Missouri Supreme Court held that this testimony would have been cumulative to the testimony of Mr. Williams' brother and cousin. This conclusion by the Missouri Supreme Court is also flatly contradicted by the record. Mr. Williams' brother, Jimmy Williams, was never asked if the car was inoperable. (Tr. 2769-2775).

If granted an evidentiary hearing by this Court, petitioner can meet both prongs of the *Strickland* test. Under either the standard of review provisions of 2254(d) or

38

000059

a *de novo* review, petitioner's allegations, if found credible after an evidentiary hearing, will entitle him to habeas relief.

## CLAIM 4

**PETITIONER'S CONVICTION AND SENTENCE OF DEATH WERE SECURED IN VIOLATION OF HIS EIGHTH AND FOURTEENTH AMENDMENT RIGHTS BECAUSE HE WAS CONVICTED ON THE BASIS OF THE PERJURED TESTIMONY OF HENRY COLE AND LAURA ASARO AND BECAUSE HE IS ACTUALLY INNOCENT OF THE MURDER OF FELICIA GAYLE.**

It is well settled that a conviction secured through the prosecution's use of perjured testimony violates the due process clause of the Fourteenth Amendment. *See e.g., United States v. Agurs*, 427 U.S. 97, 112 (1976); *Napue v. Illinois*, 360 U.S. 264 (1959); *United States v. Foster*, 874 F.2d 491, 494-495 (8th Cir. 1988). It is also well settled that a sentence, including a sentence of death, obtained through the use of materially false or misleading evidence violates the due process clause and the Eighth Amendment. *Johnson v. Mississippi*, 486 U.S. 587 (1988); *United States v. Tucker*, 404 U.S. 443 (1972); *Townsend v. Burke*, 334 U.S. 736 (1948).

Apart from the governmental misconduct and ineffective assistance of counsel issues regarding Asaro and Cole noted in the previous claims, it is also quite clear that at least one, and probably both of these witnesses, committed perjury at petitioner's trial. As noted earlier, Asaro and Cole gave significantly different accounts of

39

000060

petitioner's perpetration of the murder of Felicia Gayle. For instance, Ms. Asaro's account of petitioner's confession indicates that he drove an inoperable car on the day of the crime and broke into the victim's home through the back door. (Tr. 1848, 1851). Asaro's account conflicted with the account given by Henry Cole and the physical evidence. Cole claimed that after the murder, petitioner left the scene wearing the victim's sweater. (Tr. 2400). In contrast, Asaro testified petitioner was wearing a zipped up jacket on the date of the homicide. (*Id.* 1842). Ms. Asaro's credibility is also called into serious question in light of the numerous discrepancies in her story. For instance, she told the police that Marcellus threw away the victim's purse along with the clothing he was wearing on the day the crime was committed. (Tr. 1927, 1952). Later at trial, however, she testified that the purse was not thrown away until the next morning. (*Id.* 1846-1847).

There is also strong circumstantial evidence that both Ms. Asaro and Mr. Cole lied in exchange for the reward money. Apart from the reward money issue which undermined both witnesses' credibility, if their account of the crime was true, there should have been some sort of forensic evidence linking petitioner to the crime. In fact, there was none. There is evidence that Ms. Asaro and Mr. Cole "put their heads together" and spoke about their testimony in advance before they contacted the police. In this regard, Ms. Asaro admitted during her trial testimony that she received calls

40

000061

from Henry Cole in June or July of 1999. (Tr. 1896, 1906). Finally, there is evidence to suggest that the police fed these witnesses information about the crime, which gave the prosecutor ammunition to argue that their credibility was enhanced because they knew details of the crime that were never reported in the paper. As noted earlier, government agents approached two other prisoners, John Duncan and Kimber Edwards, and offered them inducements if they would testify that Marcellus Williams admitted committing the murder to them while incarcerated. (See Exh's 2, 3).

Trial counsel was also repeatedly denied access to impeaching information regarding both witnesses' history of mental illness. If granted full discovery and an evidentiary hearing, petitioner is confident that he can establish that both of these witnesses committed perjury at his trial. To establish the materiality of the perjured testimony, petitioner must show that there is a reasonable probability that the result of the trial would have been different, but for the prosecution's use of the perjured testimony. *Strickler v. Greene*, 527 U.S. 263, 289-290 (1999); *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). There can be little dispute that, without the testimony of Cole and Asaro, that there is more than a reasonable probability that Mr. Williams would have been acquitted.

Although many of the perjured testimony cases refer to the state's "knowing" use of perjured testimony, it is clear that prevailing jurisprudence in this area does not

000062

require that the prosecutor himself actually knew that he was presenting perjured testimony at the time these witnesses testified. Due process requires that a conviction be overturned based on perjured testimony even if the perjured testimony was known only to police investigators and not the prosecutor. *Kyles*, 514 U.S. at 437-438.

Petitioner has presented strong circumstantial evidence that the trial prosecutor knew or should have known that he presented perjured testimony. First, the prosecutor must have known that at least one of his key witnesses was committing perjury given the widely divergent stories they told regarding how the crime was committed. Second, the police misconduct involving government efforts to solicit other jailhouse informant testimony against petitioner suggests that the prosecution was attempting to manufacture a case against petitioner. Finally, given the fact that Mr. Cole and Ms. Asaro were mentally ill, had long criminal records, and clearly gave their testimony in exchange for the reward money, the prosecution knew or should have known that their testimony was false. *See e.g. Killian v. Poole*, 282 F.3d 1204, 1208 (9th Cir. 2002)

The utter lack of credibility of Mr. Cole and Ms. Asaro, coupled with other issues that need to be factually developed in this case, will also establish that petitioner is actually innocent of the murder of Felicia Gayle. It is now well settled that it is unconstitutional to permit an execution to go forward where a death row inmate has

42

000063

presented convincing evidence he is actually innocent of the crime for which he was condemned to die. *Herrera v. Collins*, 506 U.S. 390 (1993); *House v. Bell*, 126 S.Ct. 2064 (2006). An innocent prisoner can also overcome any procedural impediment to merits review of any of his other underlying constitutional claims for relief. *Schlup v. Delo*, 513 U.S. 298, 327 (1995).

There are five unresolved issues in this case which, if fully developed through discovery and an evidentiary hearing, will establish that Mr. Williams is actually innocent of the murder of Felicia Gayle. First, as noted earlier, if a thorough inquiry is conducted, petitioner is confident that the court will conclude that both Cole and Asaro committed perjury at petitioner's trial and that both of these witnesses are unworthy of belief. Second, as noted earlier, the police efforts to solicit other jailhouse snitches strongly suggests that the government manufactured a case of guilt against petitioner. *See Reasonover v. Washington, supra*.

Third, there was trace evidence collected at the scene that did not match petitioner, the victim, or her husband. In particular, there were both head and pubic hairs found at the crime scene that did not match the victim, her husband, or petitioner. (Tr. 2871-72, 2876-77, 2920). Fingernail clippings taken from the victim revealed testable blood and skin samples. Although these samples contained some of the victim's DNA, there was no DNA match to petitioner. In light of Ms. Asaro's account

43

000064

of the crime, indicating that petitioner had scratches on his body, if her account was true, Mr. Williams' DNA should have been found in the victim's fingernail scrapings.

In light of ongoing advances in DNA testing and DNA database laws, petitioner believes that additional DNA testing of the hairs and fingernail clippings could reasonably reveal the identity of actual killer. Under Missouri law, every convicted felon and prison inmate must submit a DNA sample. See § 650.05 et. seq. R.S.Mo. (2000). Based upon the aforementioned facts and the seriousness of this case, petitioner is entitled to seek discovery by order of this court to require additional DNA testing of the unknown hairs and fingernail scrapings collected from the crime scene. *See Toney v. Gammon*, 79 F.3d 693, 700 (8th Cir. 1996).

The fourth issue that should be further explored to exonerate petitioner is the unsolved murder of Debra McClain, which occurred in Pagedale, Missouri, the same summer that Ms. Gayle was murdered. The Debra McClain murder occurred approximately a month before Ms. Gayle was murdered. Apart from the temporal and geographical proximity of the murders, there were other remarkable similarities in the two cases. St. Louis County Medical Examiner Dr. Mary Case thought that these murders could be connected. (H. Tr. 33). Both of the murders occurred during home invasions. In each case, the attacker had stabbed the victim over twenty times with a knife obtained from the kitchen of the home, and then left the knife in the body. (*Id.*

44

000065

27-28). In fact, one investigator thought the killings were the work of a serial killer. (*Id.*) If granted discovery and a hearing on this issue, petitioner is confident that links between these two crimes will provide further evidence to establish his actual innocence.

Finally, petitioner presented a viable issue in his 29.15 involving police misconduct in connection with the searches of his car at his grandfather's house. (29.15 L.F. 27-29). Petitioner was not given access in state court to all of the relevant police reports surrounding the searches of his car. (*Id.* 44). If granted discovery and a hearing on this issue, petitioner believes this will provide further evidence supporting his claim of innocence.

All of the foregoing facts should raise serious doubts as to whether the state of Missouri put the right man on death row for this murder. If afforded a full and fair hearing on this issue, which petitioner clearly did not receive in state court, he is confident that he can establish that his conviction was secured in violation of his Eighth and Fourteenth Amendment rights because he is innocent and was convicted on the basis of testimony that was unworthy of belief. Habeas relief is warranted.

## CLAIM 5

**MR. WILLIAMS AND BLACK VENIREMEMBERS HENRY GOODEN, WILLIAM SINGLETON AND MARVIN FORTSON WERE DENIED EQUAL PROTECTION OF THE LAW  WHEN THE PROSECUTION**

000066

**STRUCK THEM FROM THE JURY ON THE BASIS OF THEIR RACE IN VIOLATION OF *BATSON V. KENTUCKY*, 476 U.S. 79 (1986).**

"It is well known that prejudices often exist against particular classes in the community, which sway the judgment of jurors, and which, therefore, operate in some cases to deny to a person of those classes the full enjoyment of that protection which others enjoy." *Miller-El v. Dretke*, 125 S.Ct. 2317, 2323 (2005) (quoting *Strauder v. West Virginia*, 100 U.S. 303, 309 (1880)) (hereinafter *Miller-El II*). Racial discrimination in jury selection compromises the defendant's right to a trial by an impartial jury, *Miller-El*, 125 S.Ct. at 2323 (citing *Strauder*, 100 U.S. at 308), and essentially creates "state-sponsored group stereotypes rooted in, and reflective of, historical prejudice." *Miller-El v. Dretke*, 125 S.Ct. 2317, 2323 (2005) (citing *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 128 (1994)). This discriminatory practice "invites cynicism respecting the jury's neutrality," *Powers v. Ohio*, 499 U.S. 400, 412 (1991), undermines public confidence, *Georgia v. McCollum*, 505 U.S. 42, 49 (1992), and jeopardizes the integrity of the judicial system. *Miller-El II*, 125 S.Ct. at 2324.

Here, the fate of Marcellus Williams, a black man accused of killing the white wife of a prominent St. Louis physician, lay in the hands of eleven white jurors and a single black petit juror. Black persons comprise almost twenty percent of St. Louis County's population, but of the seven qualified African-Americans on the venire panel,

46

000067

the state struck six, including Henry Gooden, William Singleton and Marvin Fortson. (Tr. 1586, 1591, 1603-05). The state even struck one black person who was eligible to serve as an alternate juror. (Tr. 1607-1608).

The Equal Protection Clause prevents the state and trial court from utilizing peremptory challenges to exclude jurors on the basis of race. *Batson v. Kentucky*, 476 U.S. 79, 88-89 (1986). *Batson* claims are reviewed under a familiar three-stage process. First, a defendant must make a *prima facie* case "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." *Id.* at 93-94. Second, once the *prima facie* case is made, the burden shifts to the state to tender a race-neutral explanation for the challenged strike(s). *Purkett v. Elem*, 514 U.S. 765, 767 (1995). Third, after the state has articulated its purportedly race-neutral explanation for the strike, the court must determine whether the defense has carried its burden of proving purposeful discrimination, often by demonstrating that the state's explanation is a pretext for discrimination. *Id.*; *Batson*, 514 U.S. at 98. If this three-part test is met, the defendant is entitled to a new trial because a *Batson* violation is a structural error requiring no additional showing of actual prejudice. *Ford v. Norris*, 67 F.3d 162, 171 (8th Cir. 1995); *Rosa v. Peters*, 36 F.3d 625, 634, n. 17 (7th Cir.1994).

### A. Venireperson 64: Henry Gooden.

47

000068

Case 4:05-cv-01474-RWS    Document 9    Filed 08/29/2006    Page 54 of 122

### 1. Steps One and Two of the *Batson* Framework.

There is no question that Mr. Williams has established a *prima facie* case of intentional discrimination under *Batson* with regard to Henry Gooden. The prosecution excluded six of seven eligible black veniremembers with its peremptory strikes, including Henry Gooden. Similar patterns of strikes have satisfied the first element of *Batson*'s test in other cases. *See e.g.*, *Devose v. Norris*, 53 F.3d 201, 204-05 (8th Cir. 1995) (state struck two black prospective jurors, leaving only one African-American on the jury). Indeed, a *Batson* claim can succeed if it appears the state has excluded even a single juror because of race. *Walker v. Girdich*, 410 F.3d 120, 124 (2nd Cir. 2005); *United States v. Vasquez-Lopez*, 22 F.3d 900, 902 (9th Cir. 1994); *Jones v. Ryan*, 987 F.2d 960, 972 (3rd Cir. 1993).[9]

Regarding the second part of the *Batson* test, the state articulated three facially permissible reasons for striking Mr. Gooden: (1) his appearance and clothing resembled Mr. Williams; (2) his job as a postal worker; and (3) his views on the death penalty. (Tr. 1586).

---

[9] If there was any doubt on the adequacy of Mr. Williams' *prima facie* case, the state's articulation of race-neutral reasons moots the issue and requires a reviewing court to address the ultimate question of intentional discrimination. *Hernandez v. New York*, 500 U.S. 352, 359 (1991); *Holloway v. Horn*, 355 F.3d 707, 723-24 (3rd Cir. 2004).

48

000069

## 2. Step Three of the *Batson* Framework.

*Batson*'s third step requires a court to determine whether the opponent of a strike has proved "purposeful racial discrimination." *Purkett,* 514 U.S. at 767.  The critical question at step three is "the persuasiveness of the prosecutor's justification for his peremptory strike." *Miller-El v. Cockrell,* 537 U.S. 322, 338-39 (2003) (hereafter "*Miller-El I*").  A number of considerations may cast doubt upon a given explanation.  These include a prosecutor's failure to ask follow-up questions about issues claimed to be influential in making strikes, the existence of comparable white panelists who were not stricken, a prosecutor's mis-stating or mis-remembering the responses of jurors, and disparate types of inquiries for black and white veniremembers.  *See Miller-El II,* 125 S. Ct. at 2325-28. The state's race-neutral excuses for striking Mr. Gooden do not fare well under this framework.

Because the state's proffered reasons for striking Mr. Gooden are facially neutral, the ultimate issue is whether these reasons are "a pretext for racial discrimination." *Hernandez v. New York,* 500 U.S. 352, 363 (1991).  But the trial court itself must make this determination:  "If a race-neutral explanation is tendered, *the trial court* must then decide ... whether the opponent of the strike has proved purposeful racial discrimination." *Johnson v. California,* 646 U.S. 162  (2005); *Hernandez,* 500 U.S. at 363; *Purkett,* 514 U.S. at 767 (emphasis added).  It is, after

49

000070

all, the trial court which has the unique opportunity to observe the demeanor of the prosecutor as well as the potential jurors, and thereby to assess the prosecutor's state of mind. *Hernandez*, 500 U.S. at 365.

The trial court in Mr. Williams' case made no such assessment. Defense counsel challenged the state's proffered reasons for the strike, explaining, among other things, that the juror bore no resemblance to petitioner, that there was no record made of his appearance, and that other jurors wore unusual clothing, that another postal worker was not struck, and that Mr. Gooden was unequivocal in stating that he could render a death verdict. (Tr. 1587-89). Rather than determine whether the state's reasons were pretextual, the trial court, without any critical inquiry, simply stated that the reasons were themselves race-neutral: "It's my understanding . . . [the prosecution] is entitled to determine and use peremptory strikes based upon their hunches . . . and the Court finds the reasons given to be race neutral and not of a pretextual nature." (Tr. 1591). The trial court did not articulate whether the prosecutor's explanations were *plausible*.

The state justified its strike on the ground that Mr. Gooden too closely resembled Mr. Williams, had similar "bookish" glasses, two earrings and a goatee, and wore ostentatious clothing. This "appearance" justification is inherently suspect because a white venireman could not possibly have a similar appearance to petitioner,

50

000071

with the possible exception of clothing and eyeglasses. This explanation is too broad and race-based to withstand constitutional scrutiny.

Furthermore, the fact that Mr. Gooden wore two earrings in his left ear, a large gold cross, brightly colored, or unusual clothing and had a goatee is not a valid race-neutral reason for striking him for at least three reasons. First, apart from asking just six questions regarding Mr. Gooden's views about the death penalty, the prosecutor asked no questions in any way related to any one of the purported reasons for striking him. (Tr. 762-63). "The state's failure to engage in any meaningful voir dire examination on a subject the state alleges it is concerned about is evidence suggesting that the explanation is a sham and a pretext for discrimination." *Ex Parte Travis*, 776 So.2d 874, 881 (Ala. 2000), *quoted in Miller-El II*, 125 S. Ct. at 2328. The prosecutor simply asked Mr. Gooden whether he could impose the death penalty and moved on. The state's failure to inquire about any bias arising from Mr. Gooden's appearance, job, or liberal beliefs "undermines the persuasiveness of the claimed concern." *Miller-El II*, 125 S. Ct. 2328, 2330, n.8.

Second, the prosecutor should have made a record of his concerns about Mr. Gooden's appearance via a bench conference. By not mentioning this concern, and then using it as a post-hoc justification to strike Gooden, the state left the defense ill-equipped to rebut this excuse. If the defense had advance notice, they could have

51

000072

shown that other jurors wore similar glasses, earrings and were clad in unusual clothing.[10]

Third, striking a juror for having certain jewelry or clothing is not race-neutral, when the state cannot explain how this justification relates to the case. *Rector v. State*, 444 S.E.2d 862, 865 (Ga. App. 1994) (strike of black venireperson because she had a gold tooth was not race-neutral when the state could not explain how the tooth was relevant to the case); *see also People v. White*, 669 N.Y.S.2d 503, 505 (N.Y. App. 1998) (finding neither dress nor unemployment of two black jurors was sufficient to justify strikes).

For all of these reasons, the prosecutor's "primary" explanation as to Mr. Gooden's appearance is inherently pretextual. This fact alone entitles Mr. Williams to relief, regardless of the viability of the state's other justifications. *See Miller-El I*, 537 U.S. at 339("[T]he issue comes down to whether the trial court finds the prosecutor's race-neutral *explanations* to be credible") (emphasis added). No explanation proffered by the state is believable when its "primary" race-neutral reason is demonstrably invalid. In the related context of employment discrimination, a trier of fact who rejects *some* of an employer's stated reasons for an adverse action as false

---

[10] Nevertheless, the defense did inform the court that several male jurors, including venireperson 32, wore earrings. (Tr. 1589).

52

000073

or mendacious, may reasonably reject the others, believing "that the person is non-credible and should not be believed as to other issues." *Tyler v. RE/MAX Mountain States*, 232 F.3d 808, 814 (10th Cir. 2000); *accord Ragland v. Rock-Tenn Co.*, 955 F. Supp. 1009, 1016 (N.D. Ill. 1997) (discrimination may be inferred from the pretextuality of one among several non-discriminatory explanations if the "multiple grounds offered by the defendant for the adverse action are so intertwined, or the pretextual character of one of them so fishy and suspicious" as to survive summary judgment).

The state also justified its strike on the ground that Mr. Gooden was a postal worker. (Tr.1586-87). This justification, as with all the other proffered reasons, was again not supported by anything Mr. Gooden said on the record because the prosecution made no inquiry about his job or other experiences. *Miller-El II*, at 2328.

More importantly, the Missouri Supreme Court recently reaffirmed that a person's occupation alone is rarely, if ever, a valid basis for striking a juror. *State v. McFadden,* 191 S.W.3d 648, 653 (2006) (striking a black juror employed by St. Louis School District was pretextual). In *State v. Edwards*, 116 S.W.3d 511, 525-28 (Mo. banc 2003), the Missouri Supreme Court rejected out-of-hand the notion that a juror's employment as a postal worker was sufficient reason to justify a peremptory strike: "If the mere incantation of the phrase 'he is a postal worker' were sufficient to

53

000074

overcome any showing of pretext, the third step of the *Batson* test would be illusory." *Id.* Unless there is some nexus between the juror's occupation and the case at hand (i.e., the defendant also had experience working at the same or similar job), *Edwards* holds an "occupation-based" strike is pretextual. *Edwards*, 116 S.W.3d at 550 (Teitelman, J., concurring) ("in the vast majority of cases, a prospective juror's employment has nothing to do with his or her ability to fairly weigh the evidence and arrive at a just decision").

In *State v. Smith*, 791 S.W.2d 744, 749 (Mo. App. 1990), the prosecutor removed two black veniremen because they worked for the government. The prosecution stated that he struck the government employees "because he had had bad experiences and results with them." *Id.* The Court of Appeals rejected this explanation, because it "does not depend on any observation or assessment of the prospective juror," but rather was merely a "rote neutral explanation," which, although facially legitimate, concealed a discriminatory motive. *Id.* In *State v. Davis*, 894 S.W.2d 703,710 (Mo. App. 1995), the court held that striking a black venireperson because he was "retired military" was not a legitimate race-neutral reason. The prosecutor failed to show why it would be legitimate to strike retired military venirepersons and failed to explain how this juror's background was relevant to the case. *Id.*

54

000075

In this case, the prosecutor offered the following reason for his strike:

> I find that postal service workers are very liberal. And I'm talking about mail handlers and clerks. People that work at the post office in that capacity, especially, are that way, it's been my experience when I go into the post office, seeing the people that work there. And on other juries, I tend to strike postal service employees.

(Tr. 1596-87). As in *Smith*, the prosecutor's purported "personal experience" with certain occupations is also a rote explanation, devoid of any objective assessment of Mr. Gooden's ability to serve on the jury. The inadequacy of this explanation is obvious. How could the prosecutor reasonably ascertain, from his stamp-buying trips to the post office, that postal clerks held liberal views?

If the state truly had any concerns about postal workers, it would have struck the other postal worker on the venire, venireperson 12, Clarence Jones. The state claimed that it did not strike Jones, even though he was a postal worker, because he worked as a mechanic, not a mail sorter. (Tr. 1587). The failure to strike a' similarly situated juror demonstrates that this reason was pretextual. *McFadden*, 191 S.W.3d at 654-655.

Perhaps the most easily demonstrated pretextual basis for the strike of Mr. Gooden was the prosecutor's assertion that he was not certain that Mr. Gooden could impose a death sentence. This "concern" was based on his answers to six standard "death qualification" questions and is plainly refuted by the substance of this colloquy:

55

000076

MR. LARNER: Juror Number 64. In the proper case, under the law and the evidence, could you seriously and legitimately consider imposing the death penalty?

VENIREMAN GOODEN: I believe I could.

MR. LARNER: Okay. Could you also give serious legitimate consideration to the punishment of life without the possibility of probation or parole?

VENIREMAN GOODEN: Yes.

MR. LARNER: If you were the foreman of the jury, could you sign the verdict of death?

VENIREMAN GOODEN: Yes, I could.

\*\*\*

MR. LARNER: Okay. Have you been in favor of the death penalty in the past, in certain cases?

VENIREMAN GOODEN: In certain cases.

MR. LARNER: Do you think in some cases it might be appropriate, in others, it might not?

VENIREMAN GOODEN: Yes.

(Tr.762-63).

Mr. Gooden's answers were unambiguous and indicated an ability to follow the

law and consider the full range of punishment. This colloquy establishes no objective

basis to believe that Mr. Gooden was opposed to the death penalty. As the Supreme

000077

Case 4:05-cv-01474-RWS    Document 9    Filed 08/29/2006    Page 63 of 122

Court has made clear in *Miller-El II*, one important factor in determining pretext is a prosecutor's failure to ask follow-up questions about issues claimed to be influential in making strikes. (*Id.* 2325-28). Here, the prosecutor's failure to make further inquiry into Mr. Gooden's death penalty views establishes this strike was pretextual.

Pretext is also established by the fact that the prosecution did not strike two similarly-situated white venirepersons who gave equivocal answers to the question of whether they could impose the death penalty. For instance, Venireman 57, Michael McCarthy, gave a rambling answer to this question indicating, among other things, that: "I don't necessarily have a clear answer on that." (Tr. 663-670). Mr. McCarthy later served on the jury. (Supp. L.F. 1). Venireperson 81, Fern Bush-Ferguson, stated: "I doubt seriously, though, I would vote for the death penalty." (Tr. 886). Although the record is a bit unclear, it appears that Juror 81 was qualified to sit as an alternate juror. (Supp. L.F. 1). Instead of striking her, the state exercised an alternate peremptory challenge to excuse another Africa-American, Juror 87, Gregory Gardner. (Tr. 1607-1608).

The demonstrated implausibility of all three reasons given by the state creates a powerful inference that Mr. Gooden was struck solely because of his race. Habeas relief is warranted.

**B. Venireperson 65: William Singleton.**

000073

### 1. Steps One and Two of the *Batson* Framework..

As with Mr. Gooden, there is no question that Mr. Williams has established a *prima facie* case of intentional discrimination under *Batson*. Under part two of the *Batson* test, the state offered two reasons for striking Mr. Singleton: (1) he gave ambiguous answers regarding the death penalty; and (2) he had a misdemeanor conviction (Tr. 1591, 1593-94).

### 2. Step Three of *Batson*.

Once again, the third step of the inquiry under *Batson* is to examine the "persuasiveness of the prosecutor's justification for his peremptory strike." *Miller-El I*, at 338-339. Virtually all the considerations calling into question the state's race-related explanations for striking Mr. Singleton are present here, including the prosecution's failure to ask follow-up questions, the existence of several similarly situated white veniremen who were not struck, and the disparate inquiries of white and black jurors. *Miller-El II*, at 2325-28.

The state's first purported justification for striking Mr. Singleton was his alleged hesitancy to impose the death penalty, a notion that is conclusively refuted by the record. When the prosecutor asked Singleton if he could seriously and legitimately vote for the death penalty in the proper case, Singleton responded, "I think I could." (Tr. 763). When asked again, "Could you see yourself in that position actually voting,

000079

if the evidence and the law was there, for the death penalty?", Singleton said without qualification, "yes." (Tr. 763). The prosecutor and the court asked if Singleton could follow the law regarding reasonable doubt that had been read to him. (Tr. 775). Singleton responded affirmatively. (Tr. 775-76). A few moments later, despite Singleton's answers, the prosecutor again asked him if he would hold the state to a higher burden of proof. (Tr. 777). Singleton responded that if the jury found guilt beyond a reasonable doubt, he would be able to follow the steps of the sentencing process as described by the prosecutor and consider both punishments. (Tr. 777-78).

Singleton's response that life and death sentences are equally harsh because both options involve dying in prison was irrelevant to his qualifications as a juror. (Tr.764-66). Singleton's unequivocal statement that he could vote for death rebuts any inference that he would be reluctant to impose death. Indeed, defense counsel objected to the relevance of this inquiry and the trial court was clearly troubled by it. (Tr. 766-67). In response, the prosecutor even offered to withdraw his question. (Tr. 767). To base a strike on a line of inquiry that is irrelevant to the juror's ability to follow the law is pretextual in light of Singleton's clear indication he could consider and impose the death penalty. (Tr. 768).[11]

---

[11] Notably, the prosecutor failed to question any other jurors on whether they believed either punishment option was harsher than the other. If this had truly been an area of concern for the state, they would have questioned Caucasian jurors

000080

Singleton disclosed that in 1988 he pled guilty in a court martial to a misdemeanor charge of wrongful appropriation of government funds, based upon a missing $160 from a military nightclub's receipts. (Tr. 1420-24, 1594). Singleton stated that, although he pled guilty, he was innocent of the charge. *Id.* This formed the basis of the state's second reason for striking Singleton, he had a misdemeanor conviction and appeared to perceive himself as wrongfully convicted of that crime. (Tr. 1592-93).

As with every purported reason for a strike, the prosecution failed to ask Mr. Singleton any questions regarding the guilty plea, the nature of the offense, and whether it might affect his partiality in the case at hand. (Tr. 763-768). "The state's failure to engage in any meaningful voir dire examination on a subject the state alleges it is concerned about is evidence suggesting that the explanation is a sham and a pretext for discrimination." *Ex Parte Travis*, 776 So.2d 874, 881 (Ala. 2000), *quoted in Miller-El II*, 125 S. Ct. at 2328. If the state was really concerned about Mr. Singleton's military infraction, it could have and should have asked him more about it.

In addition, another apparent indica of pretext was the prosecution's failure to

_____

on this point. *See Miller-El II*, at 2325-28.

60

000081

strike other similarly situated white jurors. Two other jurors had misdemeanor convictions but were not struck by the state; juror 32, Vinyard, and juror 67, McDermott . (Tr. 1413-14, 1594). *Miller El-II*, at 2325-28.

Mr. Vinyard had been convicted of the misdemeanor of receiving stolen property twenty-four years earlier. (Tr. 1413-14). Mr. McDermott revealed that fifteen years earlier, he had been convicted of indecent exposure after he urinated in public in Florida. (Tr. 1425-26). His sentence was two days time served and a $50 fine. (Tr. 1427).

The prosecutor asserted that the other venirepersons with misdemeanor convictions were not struck because their punishments were not severe and that their cases were remote in time. (Tr. 1594-95). This reason is pretextual because Singleton's conviction was also remote in time, having occurred thirteen years earlier. (Tr. 1420-21). The state also had no idea regarding the sentence Mr. Vinyard served on his conviction for receiving stolen property, since the prosecutor did not ask him any follow-up questions. Because both justifications for striking Singleton were pretextual, habeas relief is warranted.

### C. Venireperson Number 72: Marvin Fortson.

As with venirepersons Mr. Gooden and Mr. Singleton, petitioner has met steps one and two of the *Batson* inquiry with venireperson Marvin Foster. Mr. Fortson

61

000082

stated that he was sure he could seriously and legitimately consider imposing the death penalty all the way through the process and would follow the law. (Tr. 783-85). He further stated that he would keep an open mind, listen to all the evidence, examine the instructions and then determine which punishment is appropriate. (Tr. 786).

The prosecution justified its strike of this juror by noting that Mr. Fortson was fired from a job for fighting with another worker. (Tr. 1497). The other employee provoked Mr. Fortson verbally, and several times, Mr. Fortson walked away. (Tr. 1497-98). Finally, Mr. Fortson reacted by "putting my hands on him"--punching him three times in the face. (Tr. 1497-98).

Defense counsel objected to the lengthy and detailed questioning (i.e., fishing-expedition) of this venireperson. (Tr. 1498). The court admonished the prosecutor, because he had previously ordered that there would be no individual voir dire, only questioning of venirepersons who were unemployed or retired. (Tr. 1499). The court asked the prosecutor what difference it made how hard Mr. Fortson hit the other man. (Tr. 1500). The prosecutor responded, "I'm concerned if I were to strike this juror that there would be a *Batson* challenge. And I wanted to make that record." (Tr. 1500).

The prosecution rationalized its strike of Fortson's based on his termination for fighting and downplaying his blame in the incident. (Tr. 1603-1605). The state also

62

000083

commented that Mr. Fortson may have been offended when other venirepersons laughed when Mr. Fortson explained why he was fired. (Tr. 1605). The prosecutor also stated that Mr. Fortson had his arms crossed during the state's death qualification but unfolded them during the defense's questioning. (Tr. 1604-1605).

Defense counsel responded that not all the venirepersons were questioned as to why they were fired, showing that the state was targeting black venirepersons for extended inquiries. (Tr. 1606). Defense counsel also argued that he could not respond to the prosecutor's hunches or things that were not made part of the record. (Tr. 1606). The trial court, without explanation, stated that the state had presented race-neutral reasons for its strike. (Tr. 1606).

The state's reason for striking Mr. Fortson - that he was fired from his job for fighting - was pretextual, since the state failed to conduct any meaningful inquiry of other venirepersons to determine why they left prior jobs or if they had ever been in a fight. The court allowed individual voir dire to enable the state to question the venirepersons who were unemployed or retired, regarding their prior employment. (Tr. 1466, 1499). Despite the limitation, the state questioned nineteen of the remaining venirepersons about their current jobs, and only six others who were retired or unemployed. (Tr. 1475-1503). Of the nineteen venirepersons questioned about their jobs, only five were asked why they left prior jobs. (Tr. 1481, 1486, 1492, 1494,

000084

1497).  The state was fishing for reasons to strike black venirepersons.  This was made abundantly clear when state responded to the court's question of why it was relevant to elicit the details of Mr. Fortson's fight with another employee, by saying "I'm concerned if I were to strike this juror that there would be a *Batson* challenge. And I wanted to make that record.  If that were the reason." (Tr. 1500).

There is also no objective evidence in the record to justify striking Mr. Fortson based upon his demeanor.  The state purportedly struck Mr. Fortson because he had his arms crossed during the state's death qualification but unfolded them during the defense's questioning.  (Tr. 1604-1605).  The state also commented that Mr. Fortson may have been offended when other venirepersons laughed when he explained why he was fired.  (Tr. 1605).  The state never bothered to make a record beforehand of Mr. Fortson's alleged demeanor.  If the state had been so keenly concerned about it, it should have made a record of it at the time it became apparent. *See McFadden,* 191 S.W.3d at 655 ("strikes based upon... demeanor 'are largely irrelevant to one's ability to serve as a juror and expose venirepersons to peremptory strikes for no real reason except for their race'").  By not mentioning this concern during voir dire, and then using it as a post-hoc basis for a strike, the state left the defense unable to counter this justification.

**D.     The Recent *McFadden* Decision and Other Evidence Establishes**

64

000085

**That St. Louis County Prosecutors Have a Long-Standing Practice of Excluding Black Citizens from Jury Service.**

*Miller-El II* relied upon historical evidence of the Dallas County prosecutor's policy of excluding African-American veniremembers, including a manual containing an article explaining why prosecutors should do so. 125 S. Ct. at 2338-40. The evidence "confirm[ed]" the court's conclusion that disparate questioning of white and minority panelists was attributable to race. *Id.* at 2338; *see also id.* at 2340 ("*If anything more is needed for an undeniable explanation of what was going on, history supplies it.*") (emphasis added).

Evidence of systematic racial bias in St. Louis County exists already, even in the absence of a prosecutors' manual or other similarly embarrassing proof. Petitioner's research reveals no fewer than six successful *Batson* claims arising out of St. Louis County: *State v. McFadden*, 191 S.W.3d 648 (Mo. banc 2006); *State v. Hampton*, 163 S.W.3d 903 (Mo. banc 2005); *State v. Hopkins*, 140 S.W.3d 143 (Mo. App. 2004); *State v. Holman*, 759 S.W.2d 902 (Mo. App. 1988); *State v. Robinson*, 753 S.W.2d 36 (Mo. App. 1988); and *State v. Williams*, 746 S.W.2d 148 (Mo. App. 1988). These cases reveal six separate incidents in which reviewing courts held, as a matter of law, that prosecuting attorneys in St. Louis County excluded African-American jurors because of their race.

000086

St. Louis County's pattern or practice of excluding African-American jurors both predates and follows *Batson*. In 1990, attorneys representing Missouri death row inmate Maurice Byrd submitted nine affidavits from criminal defense lawyers who regularly practiced in St. Louis County: Michael Young, Joseph Downey, Mary Dames Fox, Frank Anzalone, Stormy White, Bernard Edelman, Richard Sindel, Brad Kessler and Sarah Pleban. All nine stated that African-Americans were systematically excluded from service in St. Louis County by the prosecution's use of peremptory strikes. *See* Exh. 11, attached (affidavits filed with Eighth Circuit in Case No. 90-1491). The Eighth Circuit panel in *Byrd* did not consider the affidavits on procedural grounds, but Judges Lay and Wollman believed they established "a *prima facie* equal protection violation under *Swain v. Alabama*, 380 U.S. 202, 222-24 (1965)." *Byrd v. Delo*, 942 F.2d 1226, 1233 (8th Cir. 1991) (statement of Lay, C.J., joined by Wollman, J).[12]

The St. Louis County prosecutors' history of excluding African-American veniremembers is also no secret to the public or in the legal community. When former assistant prosecutor Rick Barry ran against current prosecutor Robert McCulloch in the 1990 Democratic primary, he campaigned on ending the St. Louis County

---

[12] Byrd's claim was governed by *Swain*, since his conviction was final before *Batson*. *See Byrd v. State*, 723 S.W.2d 37, 42 (Mo. App. E.D. 1987).

66

000087

Prosecutor's policy of peremptorily striking African-Americans from criminal cases. *See* Tim Poor, "Barry Stresses Minority Hiring," *St. Louis Post Dispatch*, Jun. 29, 1990, at 8A. Mr. Barry stated in this article that his more experienced colleagues in the prosecutor's office urged him to strike African-Americans from juries. *Id.*

In a 1971 hearing conducted on a motion for new trial in the case of *State v. Collor*, two former St. Louis County prosecutors acknowledged their jurisdiction's practice of excluding African-American jurors. *See* Exh. 12, attached (excerpt of *Collor* transcript). Donald Wolff testified, "[W]hen I prosecuted a black defendant I systematically excluded black members of the panel because I felt that they would be more sympathetic to the defendant than perhaps white upper class or white middle class members of the panel would[,] particularly if I had no other reason for exercising my right to a peremptory challenge." (*Id.* 615). Wolff added that such stereotyped beliefs were "utilized by most Prosecutors with whom I was associated." (*Id.* 614). William Shaw likewise acknowledged his participation in "systemtic[ally]" striking African-American panelists, and believed his colleagues did so because of the "general prejudice" against African-Americans in St. Louis County. (*Id.* 579, 588-89). *Cf. Miller-El II*, 125 S. Ct. at 2338 ("We know that for decades leading up to the time this case was tried prosecutors in the Dallas County office had followed a specific policy of systematically excluding blacks from juries.").

67

000088

Whether or not St. Louis County had a "specific policy" of excluding African-Americans, the available evidence suggests an extensive and ongoing history of doing so. The recent *McFadden* decision also underscores the fact that St. Louis County prosecutors have engaged in a pattern and practice of disenfranchising black jurors by repeatedly utilizing vague, irrelevant, and pretextual justifications for striking them, such as demeanor and employment. 191 S.W.3d at 654-656. This history, together with the particular evidence of discrimination indicated here, show that the prosecutor's stated reasons for striking Henry Gooden, William Singleton and Marvin Fortson are unworthy of belief, and that Mr. Williams should receive a new trial before a lawfully selected jury.

## CLAIM 6

**MR. WILLIAMS WAS DENIED HIS SIXTH AND FOURTEENTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL BECAUSE HIS ATTORNEYS FAILED TO CONDUCT AN ADEQUATE INVESTIGATION AND PRESENT AVAILABLE EVIDENCE REGARDING HIS BACKGROUND AND SOCIAL AND MEDICAL HISTORY, WHICH WOULD HAVE PROVIDED COMPELLING MITIGATING EVIDENCE AT THE SENTENCING PHASE OF TRIAL. HAD THIS EVIDENCE BEEN DISCOVERED AND PRESENTED, THERE IS A REASONABLE PROBABILITY THAT THE OUTCOME WOULD HAVE BEEN DIFFERENT IN THE PENALTY PHASE.**

At the penalty phase, the state presented thirteen witnesses who testified concerning Mr. Williams' prior criminal history. These witnesses testified about a

68

000089

doughnut shop robbery (Tr. 3107-3120, 3122-30, 3132-40), a Burger King robbery (Tr. 3143-67), and a residential burglary in Kansas City. (Tr. 3184-87, 3188-92). A correctional officer recounted Mr . Williams' alleged verbal threat to him while he was in jail. (Tr. 3168-72). The state also introduced certified copies of Mr. Williams' convictions. (Tr. 3167, 3193-3200; Trial Exs.174, 174(a), 228-232).

In mitigation of punishment, trial counsel relied upon "residual doubt," (Tr. 3103-06, 3489-3506), and also presented the brief testimony of a few family members, including petitioner's mother and brother, who testified that Mr. Williams was a good father to his children. (Tr. 3312-13, 3340-41, 3344, 3353, 3359, 3367, 3375, 3380-81, 3382-84, 3401-09, 3418-25, 3426-33). The jury heard no evidence regarding Mr. Williams' troubled background, social, familial or psychological history. Not surprisingly, the jury deliberated less than two hours and sentenced Mr. Williams to death because they knew virtually nothing about him except his prior criminal history. (Tr. 3517-18).

In reviewing this issue, this court must be guided by the familiar test of *Strickland v. Washington*, 366 U.S. 668, 694 (1984). Under the two-part *Strickland* test, the court must consider whether counsel's performance was objectively unreasonable and whether the defendant was prejudiced thereby. *Id.* In assessing counsel's performance pertaining to the penalty phase of capital trials, the Supreme

000090

Court has recognized that counsel's performance must be assessed in the context of the ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases. *Wiggins v. Smith*, 539 U.S. 510, 524 (2003). As the Sixth Circuit has indicated:

> The *Wiggins* case now stands for the proposition that the ABA Standards for counsel in death penalty cases provide the guiding rules and standards to be used in defining the "prevailing professional norms" in effective assistance cases. This principle adds clarity, detail and content to the more generalized and indefinite twenty year old language of *Strickland*.

*Hamblin v. Mitchell*, 354 F.3d 482, 486 (6th Cir. 2004). Viewing trial counsel's performance at the penalty phase of petitioner's capital trial under the ABA Guidelines, it is not a close question that Mr. Green's performance was objectively deficient. As the ABA Guidelines state in pertinent part:

> Counsel's duty to investigate and present mitigating evidence is now well established. The duty to investigate exists regardless of the expressed desire of a client. Nor may counsel sit idly by, thinking that investigation would be futile. Counsel cannot responsibly advise a client about the merits different courses of action, the client cannot make informed decisions and counsel cannot be sure of the client's competency to make such decisions unless he has first conducted a thorough investigation with respect to both phases of the case. . . .

> Counsel needs to explore: [1] medical history, (including hospitalizations, mental and physical illness or injury, alcohol and drug use, prenatal and birth trauma, malnutrition, developmental delays and neurological damage).

70

000091

[2] Family and social history, (including physical, sexual or emotional abuse, family history of mental illness, cognitive impairments, substance abuse or domestic violence; poverty, familial instability, neighborhood environment and peer influence; other traumatic events such as exposure to criminal violence, the loss of a loved one or a natural disaster; experiences of racism or other social or ethnic bias cultural or religious influences. . . . ).

[3] Educational history (including achievement, performance, behavior and activities), special educational needs (including cognitive and limitations and learning disabilities and the opportunity or lack thereof and activities. . . .

ABA Guidelines for Appointment and Performance of Defense Counsel in Death Penalty Cases, ¶ 10.7 (2003) pp. 80-83 (quotation marks and footnotes omitted).

The following facts establish that trial counsel's investigation and presentation of petitioner's defense in the penalty phase of the trial was objectively deficient. In fact, the factual scenario presented in this case is virtually identical to the situation the Supreme Court recently confronted in *Wiggins*. Had the compelling mitigating evidence now available been presented at trial, it would have significantly altered the balance of aggravating and mitigating evidence in the eyes of the jury, creating a reasonable probability that the outcome of the sentencing phase would have been different. *Antwine v. Delo,* 54 F.3d 1357, 1365 (8th Cir. 1995); *Wiggins v. Smith,* 539 U.S. at 538.

In his Rule 29.15 proceeding, petitioner claimed that counsel was ineffective in

71

000092

failing to investigate, consult, and present psychological testimony to explain Mr. Williams' prior criminal history (29.15 L.F.88-89, 210-29); and in failing to adequately investigate petitioner's background and social history.  (29.15 L.F. 88-91, 229-50). State post-conviction counsel retained psychologist Dr. Donald Cross, who did a thorough post-investigation into petitioner's social, familial, educational and psychological history. (29.15 L.F. 213-27).  Dr. Cross is a clinical psychologist from St. Louis University, who specializes in child psychology and the treatment of victims of sexual assault and abuse.  Dr. Cross conducted extensive interviews with petitioner and his family and reviewed extensive records from petitioner's childhood as well as records involving petitioner's criminal history.  Dr. Cross' twenty-eight page affidavit is attached to this petition as Exhibit 1.

An expert such as Dr. Cross, if called by trial counsel, would have explained to the jury that petitioner grew up in an extremely violent household.  (*Id.*)  His family moved often, so he was shuffled to various schools.  (*Id.*)  School records reflected petitioner's borderline intelligence.  His IQ in the ninth grade was 80.  (*Id.*)  School was very difficult and petitioner struggled, failing nine classes in seventh grade, and was frequently absent.  (*Id.*)  By the tenth grade, his last year of school, he received all F's, had 35 absences, a cumulative GPA of 1.1 and, his ending class ranking was 339 out of 390.  (*Id.*)

72

Mr. Williams also suffered emotional and behavior problems. (*Id.*) He acted out as early as kindergarten, having been suspended for fighting. (*Id.*) Because of the severe discord in his home environment, petitioner developed mental impairments which remained untreated and which resulted from nine separate risk factors Dr. Cross discovered in his evaluation of Mr. Williams. First, petitioner had a poor relationship with his parents. (*Id.*) His mother viewed her pregnancy of Mr. Williams as a mistake, the result of a one-night stand. (*Id.*) She never showed her son affection, concern or care. (*Id.*) Mr. Williams' father completely abandoned him. (*Id.*) He saw his father only three times in his entire life. At their first meeting, his father actually beat him. (*Id.*)

Petitioner and his brother Jimmy were sexually abused by their Uncle James Hill when petitioner was only seven or eight years old. (*Id.* 13-14). Petitioner was also sexually abused by a maternal aunt and, when he turned to the church for help, he was sexually abused by an older church deacon. (*Id.*) Dr. Cross could have explained to the jury that victims of child sexual abuse frequently develop feelings of anger and confusion in conjunction with a desire to re-establish the control in their lives that was taken away by the abuser. This anger is easily channeled into violence because Mr. Williams was abused in early stages of childhood development and was very vulnerable, confused, and emotionally fragile because family members violated his trust

73

000094

by abusing him. (*Id.*)

Dr. Cross could have explained to the jury how Mr. Williams was affected emotionally by intense family conflict. Mr. Williams grew up in a violent household, where his grandfather beat his grandmother in front of the children. (*Id.*) His mother and stepfather frequently beat Mr. Williams and his brothers. (*Id.*) They stripped him naked and beat him with tree branches and belts. As a result, he could not sleep and had terrifying nightmares. (29.15 L.F. 218). With no safe haven, he thought of suicide and turned to drugs to cope with his turbulent home life. (*Id.*)

Mr. Williams also grew up in extreme poverty. (*Id.* 219). At times, 15-17 family members lived in a cramped, squalid apartment. *Id.* Petitioner's inner-city neighborhood was plagued by high unemployment, crime and drugs. (See Exh. 10). Mr. Williams, from an early age, often witnessed his uncles use drugs and commit crimes. (*Id.*)

Mr. Williams also possessed a fifth psychological risk factor -- alienation and rebelliousness. (*Id.*) Dr. Cross could have explained that all of Mr. Williams' acting out in school and attempts to gain his mother's attention were essentially cries for help that were, in turn, met with beatings. (*Id.*) To make matters worse, his family actively encouraged promoted petitioner's delinquent and violent behavior, encouraging him to steal, fight and commit violent acts. (*Id.*)

74

000095

Petitioner's descent into a life of crime also resulted from his academic failures and his addiction to drugs. Unable to succeed in school, like many inner-city youths, he became a criminal. His addiction to drugs compelled him to steal to support his habit. Because of his turbulent background, petitioner was mentally and emotionally unstable and was suicidal. (*Id.*) Dr. Cross diagnosed petitioner as suffering from significant mental illness including depression, drug dependence, and Post-Traumatic Stress Disorder ("PTSD"). (29.15 L.F. 226). PTSD is a serious anxiety disorder "following exposure to an extreme traumatic stressor involving direct personal experience of an event that involves actual or threatened death or serious injury, or a threat to the physical integrity of another person." Diagnostic and Statistical Manual of Mental Disorders, Fourth Addition, 1996, 309.81, p. 424 ("DSM IV"). Child sexual abuse is well recognized as a cause of post-traumatic stress disorder by both the Diagnostic and Statistical Manual of Mental Disorders, 4th. Edition [DSM-IV] as well as the psychiatric community. *See* DSM-IV at 424. A person suffering from PTSD experiences "impaired affect modulation; self-destructive and impulsive behavior; dissociative symptoms; somatic complaints; feelings of ineffectiveness, shame, despair, or hopelessness; feeling permanently damaged. . . hostility; social withdrawal; feeling constantly threatened . . . ." *Id.* at 425. Petitioner's background and impairments would have provided powerful evidence to explain to the jury his descent

75

000096

into a life of crime.

Dr. Cross, in his affidavit, summarized his findings and conclusions from his evaluation of petitioner and interviews with friends and family and a review of his records as follows:

> In summary, Mr. Williams was at risk for violent delinquent behavior at conception. He was helpless to manifest anything but dysfunctional behavior with nine clearly delineated risk factors and no buffers available. His drug dependency clearly reduced his social inhibitions to a level that increased the probability that some form of violence would manifest.... Resources for social bonding to positive role models was non-existent, no teacher reached out to him, he had no opportunity to be coached by a caring and supportive male figure nor were youth leaders made available to this young male during his developmental years. When he attempted to reach out to the church he was once again sexually assaulted by the church deacon. He simply did not have a chance to live a healthier and more functional life. His violent drug infested neighborhood, his dysfunctional family, family housing instability, absence of a father or an appropriately supportive father figure and the childhood trauma made it impossible for him to develop effective strategies to resolve his emotional, interpersonal conflicts and to realize a definitive resolution of his adolescent identity crisis.... Mr. Williams learned that violence is the only solution available to him. It got the attention of others, the attention he longed for from his mother, however negative, when he was a child.... This vicious cycle is not easily broken. Early intervention is essential to deter this process that was so well established in Mr. Williams' behavior by the time he reached kindergarten.... But the [mental health] referral did not occur until the third grade. Apparently no significant follow-up was made to this referral probably due to his school change or transfer.... Inadequate resources and no hope for a better life is what he was left with as he decided to drop out of high school. Again, he

000097

reached out for help landing in a psych ward at Christian Hospital following two fainting episodes.... His report of suicide ideation at the age of fourteen and again at the age of fifteen is symptomatic of... adolescent depression.... Thus, the mental health problem was never uncovered and addressed even though the symptoms were ever-present and people were reacting to them regularly. The final mental disorder diagnosis considering a more complete symptom picture is Post-Traumatic Stress Disorder. The defiance, ignoring of rules, anger and subsequent violence, current intrusive thoughts, self doubt and self effacing thoughts, adolescent depression, physical and sexual abuse experience were all ignored and left unabated and untreated. Mr. Williams currently and has for many years suffered from this mental disorder.... These disorders constitute a significant mental illness or defect, impairing Mr. Williams' ability to conform his conduct to the requirements of the law. But for Mr. Williams' mental illnesses and defects intensified by multiple risk factors, Mr. Williams would not have been involved in any of the criminal activities that were used as aggravating circumstances in this case.... [T]he culmination of each of these disorders and risk factors contributed to his inability to cope with stressful situations and contributed to Mr. Williams' behavior during his prior criminal history. Based on the mental illnesses, their combined symptoms and the above identified risk factors; Mr. Williams was under the influence of extreme mental or emotional disturbance and circumstantial conditions that his ability to appreciate the wrongfulness of his actions and conform his behavior to the law were substantially impaired.

(Exh. 1 at 21-24).

Trial counsel also neglected to uncover mitigating evidence by obtaining life history information from petitioner's immediate family. Compelling mitigation evidence could have been discovered and presented if trial counsel had bothered to

000098

interview petitioner's family members, petitioner's brother Jimmy, his cousin, Latonia, his grandfather, his mother, and his aunt. These witnesses could have corroborated life history information that Dr. Cross later discovered, and were ready and willing to testify regarding petitioner's upbringing and the trauma and abuse he suffered at an early age. (29.15 L.F. 233-247). Petitioner's family could have recounted the physical and sexual abuse he suffered, his attack by a vicious dog, and the serious head-injury he suffered when he fell from a second floor balcony. (*Id.* 235-36, 241, 246). These witnesses also chronicled a family environment permeated with drugs, violence and instability. (*Id.* 237, 239, 244-45, 247). Petitioner's brother corroborated the fact that he and petitioner were sexually abused by their Uncle James. (*Id.* 237). Because of his traumatic home life, school officials referred Mr. Williams to a psychiatrist in the third grade. (See Exh. 1). Teachers called his mother, but she simply ignored their requests to seek help for her son. (29.15 L.F. 246).

Trial counsel Joseph Green provided a sworn affidavit that is attached to this petition as Exhibit 10. Mr. Green was hired by the public defender's office to handle petitioner's trial along with Chris McGraugh. Mr. Green assumed primary responsibility for the penalty phase of petitioner's trial. (*Id.*) Mr. Green stated that, because of his training in handling capital cases, he knew of the importance of conducting a thorough social history investigation of petitioner. However, he was

78

000099

Case 4:05-cv-01474-RWS   Document 9   Filed 08/29/2006   Page 85 of 122

unable to do so because he was penalty phase counsel in the capital trial involving Kenneth Baumruk, which commenced on May 7, 2001, less than a month before petitioner's trial was set to commence. (*Id.* at 6). Because of his obligations in the Baumruk case and the fact that the trial court denied a continuance, Mr. Green stated that he did not have sufficient time to prepare for petitioner's trial. (*Id.*)

Mr. Green reviewed petitioner's social history and reports prepared by Dr. Cross. Mr. Green indicated that "had I obtained the diagnosis that Dr. Cross came up with during the post-conviction case, I would have put this evidence on at trial. This evidence would have been important to Marcellus' penalty phase defense in that it would have provided explanations for his prior criminal history." (*Id.* 7). Mr. Green also indicated that this evidence would have given the jury a more sympathetic picture of petitioner and would have bolstered the testimony of petitioner's family. (*Id.*) Mr. Green explained that he did not conduct a social history simply because "we ran out of time because of problems we had in getting discovery from the state and, my inability to work on Marcellus' case because of my obligations in *State of Missouri v. Kenneth Baumruk.* I believe testimony like Dr. Cross' would have been very mitigating and could have saved Marcellus' life." (*Id.* 7-8).

The 29.15 motion court denied this ineffectiveness claim without holding an evidentiary hearing. (29.15 L.F. 801). The Missouri Supreme Court upheld this ruling

79

000100

by finding that counsel's failure to investigate was shielded by their strategy to rely upon "residual doubt" to avoid the death penalty. *Williams v. State,* 168 S.W.3d at 433. It is curious that the state courts shielded counsel's ineffectiveness by invoking the mantra of trial strategy without holding an evidentiary hearing to hear whether or not trial counsel could offer any strategic reason for their inaction. *See Harris v. Reed,* 894 F.2d 871, 878 (7th Cir. 1990) ("[Just] as a reviewing court should not second guess the strategic decisions of counsel with the benefit of hindsight, it should also not construct strategic defenses that counsel does not offer"). The Missouri decisions, therefore, are contrary to *Strickland* and *Wiggins.*[13]

In *Wiggins v. Smith,* 539 U.S. at 534, the court found trial counsel's failure to conduct a thorough investigation that would have uncovered evidence that the defendant had suffered physical and sexual abuse as a child resulted in only a "partial" mitigation case being heard. *Id.* Citing the ABA Guidelines, the court in *Wiggins* held that a thorough penalty phase investigation should "comprise efforts to discover all reasonably available mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor." *Id.* at 524.

As in this case, both the Maryland state courts and the Fourth Circuit in

---

[13] Mr. Green's affidavit did not offer any strategic justification in failing to present mitigating evidence regarding petitioner's life history. (See Exh. 10).

80

000101

*Wiggins* had found counsel was not ineffective because they made a tactical decision to concentrate their penalty phase efforts on residual doubt of Mr. Wiggins' guilt. *Id.* at 518-519. *See also Wiggins v. Corcoran,* 288 F.3d 629, 639-640 (4th Cir. 2002). The Missouri Supreme Court's reasoning in this case is virtually indistinguishable from the deficient state and lower federal court decisions in *Wiggins. Williams v. State,* 168 S.W.3d at 443. The Supreme Court in *Wiggins* had little difficulty in finding that the state court decision in *Wiggins* involved an unreasonable application of *Strickland* under 2254 (d)(1). *Id.* at 521-524. *See also Williams v. Taylor,* 529 U.S. 362, 396 (2000). As in *Wiggins* and *Williams,* the Missouri Supreme Court wrongly assumed that trial strategy would shield counsel's failure to investigate petitioner's background because they elected to focus on arguing residual doubt of guilt to convince the jury to spare their client's life. 168 S.W.3d at 443. Although an evidentiary hearing is necessary to fully develop the record on counsel's performance and the resulting prejudice, it is clear that the Missouri courts' opinions suffer from the same flaws found by the Supreme Court in *Williams* and *Wiggins.*

The substance of the mitigating evidence in this case is also substantially similar to the excluded evidence in *Wiggins* and *Williams.* In *Williams,* the mitigating evidence consisted of extensive evidence of abusive and neglect in Williams' childhood, coupled with the fact that he suffered from mental impairments and was

81

000102

Case 4:05-cv-01474-RWS   Document 9   Filed 08/29/2006   Page 88 of 122

borderline mentally retarded. 529 U.S. at 370, 395-398. In *Wiggins*, the excluded mitigating evidence consisted "severe privation and abuse in the first six years of his life while in the custody of his alcoholic, absentee mother. He suffered physical torment, sexual molestation and repeated rape during his subsequent years in foster care. The time Wiggins spent homeless, along with his diminished mental capacities, further augment his mitigation case." *Wiggins*, 539 U.S. at 535.

The substance of the mitigating evidence in this case is also similar to the evidence the Supreme Court recently confronted in *Rompilla v. Beard*, 125 S. Ct. 2456 (2005). As in petitioner's case, Rompilla was "reared in a slum environment," quit school at an early age, was abused as a child and suffered from mental problems. *Id.* at 2468-2469. The Supreme Court concluded that Rompilla had received ineffective assistance of counsel, finding "this evidence adds up to a mitigation case that bears no relation to the few naked pleas for mercy actually put before the jury, and although we suppose it is possible that the jury could have heard it all and still decided on the death penalty, that is not the test. It goes without saying that the undiscovered 'mitigating evidence, taken as a whole', might well have influenced the jury's appraisal of [Rompilla's] culpability." *Id.* at 2469. In sum, it is clear that the state courts' finding of trial strategy, without conducting a hearing, is both contrary to and involves an unreasonable application of *Strickland, Williams, Wiggins* and *Rompilla*. In light

82

000103

of the substance of Mr. Green's affidavit, the state decisions also rest upon "an unreasonable determination of fact." *See* 28 U.S.C. 2254(d)(2); *Simmons v. Luebbers,* 299 F.3d 929, 937-938 (8th Cir. 2002).

*Strickland* prejudice is also established in light of the similarity of petitioner's mitigating evidence to that presented by the petitioners who obtained habeas relief in *Williams, Wiggins, Rompilla,* and *Simmons.*[14]  Had this evidence been presented, it would have significantly altered the sentencing calculus by providing evidence to support the statutory mitigating factor of extreme mental or emotional disturbance. *See* § 565.032.3(2) (2003).  Coupled with the lingering doubt of petitioner's guilt, there is more than a reasonable probability that at least one juror would have rejected the death penalty. *Antwine v. Delo,* 54 F.3d 1357, 1365, 1368 (8th Cir. 1995).

To fully develop the factual record on this claim, it is necessary for this Court to conduct an evidentiary hearing.  A hearing is clearly not precluded by the provisions of 28 U.S.C. 2254(e) because petitioner fully developed his claim for relief in state court. *See Williams (Michael) v. Taylor,* 529 U.S. 420, 442-444 (2000).  Petitioner, therefore, cannot be faulted for his failure to receive a full and fair 29.15 hearing.  After

---

[14]  In *Simmons,* trial counsel was deemed ineffective in failing to present mitigating evidence that Mr. Simmons was raised in an abusive household, was beaten by his mother, was assaulted and probably homosexually raped at the age of 12 or 13, grew up in an impoverished neighborhood frequented by street violence and, had an IQ of 83.  299 F.3d at 935-936.

83

000104

a full and fair hearing, petitioner is confident that the court will conclude that he received ineffective assistance of counsel and that a new penalty phase proceeding should be ordered.

## CLAIM 7

**PETITIONER'S COUNSEL ON DIRECT APPEAL WAS INEFFECTIVE IN FAILING TO BRIEF A MERITORIOUS DUE PROCESS CLAIM ARISING FROM THE TRIAL COURT'S DENIAL OF PETITIONER'S CONTINUANCE REQUESTS.**

On May 7, 2001, approximately one month before trial, counsel requested a continuance on the ground that they needed adequate time to prepare for both the guilt and penalty phases. (L.F. 394-98). The state gave late notice of non-statutory aggravating circumstances and the witnesses it intended to call. (*Id.* 395). On April, 5, 2001, the state gave untimely notice of its intent to rely on, as an additional non-statutory aggravating factor, a jail assault alleged to have occurred more than a year earlier. (*Id.*) Prosecutors waited nearly one more month before disclosing an alleged witness to the assault, Matthieu Hose. (*Id.*) The state waited until May 1, 2001, a month before trial, to disclose its intention to introduce evidence of other bad acts - a burglary with which Mr. Williams had never been charged or convicted. (*Id.*) This offense had occurred *four* years earlier, in 1997. (*Id.*) Shortly before trial, the state

84

000105

disclosed four new witnesses from that incident that counsel needed to interview and investigate. (*Id.*)

Despite repeated requests, defense counsel could not obtain Mr. Williams' records from the Department of Corrections (L.F. 395), even though the prosecuting attorney had possession of the file months before trial. (H. Tr. 97). Similarly, counsel had been unable to get Henry Cole's prison records from Missouri, Pennsylvania, Michigan and the Federal Bureau of Prisons. (L.F. 395). Rather than assisting counsel in obtaining the impeaching material, the state openly discouraged Cole from signing releases at his deposition. *Id.* (Exhibit 10). The state also failed to provide correspondence between Mr. Williams and Cole, a map of the crime scene prepared by Cole for the police, telephone records of calls Cole supposedly made, and payment records for the money police paid Cole for his cooperation. (L.F. 395-396).

Defense counsel also needed time to complete forensic testing of shoe prints, hair, fiber and serological evidence obtained at the scene. (*Id.*) The state had not provided raw data of its testing, necessary for an independent review. (*Id.*) The state did not provide supplemental reports of fingerprint testing. (*Id.*) Trial counsel also had insufficient time to investigate petitioner's life history in order to prepare for the penalty phase of trial. (See Exh. 10).

85

000106

Accordingly, counsel informed the court that, under the circumstances, one month was not sufficient to prepare for trial. In addition to the state's dilatory disclosures and non-disclosures, Mr. Green was representing Kenneth Baumruk in another death penalty case. (L.F. 397). That trial began on May 7, 2001, leaving Mr. Green with literally no time to devote to Mr. Williams' case. Counsel told the court they could not be effective and prepared without a continuance. (*Id.*) The court summarily denied the motion, indicating that the parties could make a record on May 25, 2001. (L.F. 400).

On May 25, 2001, trial counsel filed a supplemental verified motion for continuance. (L.F. 457-61). Again, counsel identified the state's conduct that made it impossible for counsel to be prepared. Surprises and late disclosures continued. On May 11, 2001, defense counsel finally received fingerprint reports and discovered that the state had destroyed fingerprints taken from the scene. (*Id.* 458). Many of the prosecution's witnesses were uncooperative. The state instructed victim impact witness Veronica Gayle not to speak with the defense, resulting in counsel having to lose precious preparation time by deposing her. (*Id.*) The victim of an alleged burglary in Kansas City could not appear for his deposition scheduled for May 24, 2001. (*Id.*) On May 18, 2001, trial counsel learned that police and the victim's family

86

000107

had a formal, written reward agreement which they had not seen. (*Id.*) Counsel's forensic testing of the crime scene was also incomplete. (L.F. 459).

The trial court again denied the request for a continuance, without articulating *any* reason for doing so. (L.F. 462). Defense counsel preserved this claim for appeal by asserting the denial of the continuance as a claim of trial error in their motion for a new trial. (L.F. 543). However, appellate counsel Rosemary Percival inexplicably did not brief this issue on direct appeal.

The Missouri Supreme Court denied relief on this claim of ineffectiveness on appeal. 168 S.W.2d at 444. Without the benefit of any record from an evidentiary hearing, the court found that Mr. Williams was not prejudiced by the denial of a continuance because the "state did not introduce at trial any evidence regarding Hose's statements," and because defense expert Jami Harmon testified she had found no DNA evidence which would place petitioner at the scene. *Id.* This reasoning ignores the fact that Hose testified for the prosecution at the penalty phase, (Tr. 2615-2638), and the defense was denied relevant information in order to adequately investigate him and cross-examine him. In addition, the delay in turning over forensic evidence to Dr. Harmon severely hampered trial counsel's ability to adequately prepare a defense for

87

000108

Harmon's testimony, because of time constraints.[15] The Missouri Supreme Court also ignored all of the other meritorious circumstances cited in trial counsel's continuance motions.

Petitioner is entitled to effective assistance of counsel on direct appeal. *Evitts v. Lucey*, 469 U.S. 387(1985); *Roe v. Delo*, 160 F.3d 416 (8th Cir. 1998). To establish ineffective assistance of counsel on appeal, a petitioner must show that counsel's performance was deficient and the performance prejudiced his case. *Strickland v. Washington*, 466 U.S. 668 (1984). *See Smith v. Robbins*, 528 U.S. 259, 285 (2000). The Court must determine whether counsel ignored issues clearly stronger than those presented. *Id*. at 288, citing, *Gray v. Greer*, 800 F.2d. 644, 646 (7th Cir. 1986). *Strickland* does not require the issue be a "dead-bang winner." *Neill v. Gibson*, 278 F.3d 1044, 1057 (10th Cir. 2001). That requirement would be more onerous than *Strickland's* reasonable probability standard. *Id.*

The "failure to raise a claim that has significant merit raises an inference that counsel performed beneath professional standards." *State v. Sumlin,* 828 S.W.2d 487, 490 (1991). Any presumption of reasonableness afforded an appellate attorney's

---

[15] Jami Harmon's trial testimony was limited to testing she conducted on fingernail clippings from the victim. (Tr. 2949-50). If granted an evidentiary hearing, Ms. Harmon will testify that as late as May 1, 2001 she was requesting additional materials from defense counsel and that the "notebook" she had been provided was missing numerous forensic samples.

88

000109

performance can be overcome if she neglected to raise a significant and obvious issue while pursuing substantially weaker ones. *Bloomer v. United States*, 162 F.3d. 187, 193 (2nd Cir.1998). In petitioner's direct appeal, it is clear that a claim of error based upon the continuance denial was much stronger than other issues briefed by Ms. Percival, such as the challenge to evidence of petitioner's attempted escape from jail and the plain error challenge to the trial court's failure to give the "juror note taking" instruction. *See State v. Williams,* 97 S.W.3d 462, 469, 472 (Mo. banc 2003).

In death penalty cases, counsel should not "winnow out" claims that have arguable merit. In this respect, death penalty appeals are far different than non-capital appeals. "Although not every imperfection in the deliberative process is sufficient, even in a capital case, to set aside a state court judgment, the severity of the sentence mandates careful scrutiny in the review of *every* colorable claim of error." *Zant v. Stephens*, 462 U.S. 862, 885 (1983) (emphasis added). "Our duty to search for constitutional error with painstaking care is never more exacting than it is in a capital case." *Burger v. Kemp*, 483 U.S. 776, 785 (1987). The clearly established norm for capital counsel's performance is set forth in the ABA Guidelines. *See Wiggins v. Smith*, 539 U.S. 510, 524 (2003). Guideline 10.8 specifically imposes on counsel the duty to raise *all* meritorious issues at every stage of a capital prosecution. "Winnowing" issues in a capital appeal can have fatal consequences. Issues

89

000110

abandoned by counsel in one case, pursued by different counsel in another case which is ultimately successful, cannot necessarily be reclaimed later. When a client will be killed if the case is lost, counsel should not let any winnable ground for relief go unexplored or unexploited. As the Commentary to Guideline 10.8 states: "[b]ecause of the possibility that the client will be sentenced to death, counsel must be significantly more vigilant about litigating all potential issues at all levels in a capital case than any other case."

In the present case, appellate counsel was ineffective. The continuance claim had significant merit because the record clearly establishes that trial counsel did not have adequate time to prepare due to the state's late disclosures and due to Mr. Green's responsibilities in another contemporaneous death penalty trial. By their own admission, therefore, trial counsel's performance was adversely affected. (L.F. 397; Exh. 10).

The denial of a necessary request for a continuance, particularly when there is no legitimate interest of justice to deny it, can render a trial fundamentally unfair and violate due process. *Lee v. Kemna*, 2004 WL 1575555 (W.D. Mo. July 8, 2004). In *Lee*, the trial court denied Lee's request for a continuance based upon the unexpected absence of one defense witness. Noting the importance of the witness and the fact

90

000111

that the reason for the continuance request was not any fault of Lee, the court found

that the summary denial of the request violated Lee's due process rights:

> [A] myopic insistence upon expeditiousness in the face of a justifiable
> request for delay can render the right to defend . . . an empty formality
> . . . .There are no mechanical tests for deciding when a denial of a
> continuance is so arbitrary as to violate due process.  The answer must
> be found in the circumstances present in every case.

*Id.* at 2 (quoting *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964)).[16]

If anything, petitioner's need for a continuance was more compelling than the

reason for delay in *Lee*.  In this case, the prosecutor was clearly dilatory in providing

discovery in a timely fashion.  In addition to this sand-bagging by the prosecution,

defense counsel Joseph Green was burdened by having to prepare for and try another

death penalty case involving Kenneth Baumruk during the month prior to petitioner's

trial.  (See Exh. 10).  The trial court summarily denied petitioner's continuance

requests without explanation, presenting a classic example of "a myopic insistence

---

[16] Appellate counsel should have been aware that Missouri law supported
granting a continuance under similar circumstances.  In *State v. Whitfield*, 837
S.W.2d 503, 507(Mo. banc 1992), the court found an abuse of discretion in failing
to grant a continuance as a result of the state's discovery violation.  Similarly, in
*State v. McIntosh*, 673 S.W.2d 53, 54-55 (Mo. App. 1984), the trial court abused
its discretion when it failed to grant a continuance necessary for the defense to
prepare for trial.  *See also State v. Perkins*, 710 S.W.2d 889, 893 (Mo. App. 1986)
(court's failing to grant a continuance was an abuse of discretion).

91

000112

upon expeditiousness." (*Id.*) The denial of a continuance unquestionably rendered petitioner's trial fundamentally unfair. (*Id.* 3-4).

In light of the merits of the underlying claim and the fact that it was properly preserved by trial counsel, appellate counsel was ineffective in failing to raise this issue on direct appeal. *Strickland* prejudice is established in light of the substantive merit of the underlying claim that was not reviewed on direct appeal. The Missouri Supreme Court's denial of this claim is clearly contrary to and/or constitutes an unreasonable application of *Strickland* and *Unger*. *See* 28 U.S.C. § 2254(d)(1); *Williams v. Taylor*, 529 U.S. 362, 404 (2000). Habeas relief is warranted.

### CLAIM 8

### MR. WILLIAMS' SIXTH AND FOURTEENTH AMENDMENT RIGHTS WERE VIOLATED BECAUSE HIS TRIAL COUNSEL LABORED UNDER A CONFLICT OF INTEREST AND THE TRIAL COURT FAILED TO ADDRESS THE ISSUE.

Mr. Williams was denied effective assistance of counsel and due process because his trial counsel had a conflict of interest. Mr. Williams diligently attempted to present this claim to the trial court by filing a *pro se* motion alleging that his counsel had a conflict because they failed to interview witnesses to impeach Henry Cole's credibility. The court failed to conduct any inquiry into the factual allegations supporting his claim. (L.F. 444; 29.15 L.F. 86-87, 196-201). The 29.15 motion court

92

000113

also denied relief on this claim without a hearing, never addressing the trial court's error in failing to conduct a hearing on the actual conflict of interest. (29.15 L.F. 796-99). The Missouri Supreme Court upheld the motion court's ruling because, in their view, Mr. Williams' conflict of interest motion pled only conclusions. 168 F.3d at 446. The state courts' decisions are "contrary to" and involve an "unreasonable application" of settled Sixth Amendment caselaw under 2254(d).

It is well established that the Sixth Amendment requires effective and conflict-free counsel. *Mickens v. Taylor*, 535 U.S. 162, 166 (2002); *Strickland v. Washington*, 466 U.S. 668, 685-686 (1984). If counsel labored under an actual conflict of interest that adversely affects counsel's performance, then prejudice is presumed. *Mickens,* 535 U.S. at 172; *Cuyler v. Sullivan*, 446 U.S. 335 (1980). A "conflict of interest" can mean a division of loyalties, a breakdown in the attorney-client relationship or other circumstances that affect counsel's performance. *Mickens,* at 172; *Glasser v. United States*, 315 U.S. 60 (1942). In order to ensure the right to a conflict free counsel, the courts have a clear duty to make careful inquiries into such allegations:

> When a defendant raises a seemingly substantial complaint before trial regarding the defense attorney's conflict of interest or divided loyalty, the Supreme Court has been absolutely clear that the court must make a thorough inquiry into the factual basis for the defendant's complaint. *Holloway v. Arkansas*, 435 U.S. 475, 488- 91 (1978), *see Smith [v.*

93

000114

Case: 4:05-cv-01474-RWS    Doc. #: 104-2    Filed: 08/02/17    Page: 100 of 122
PageID #: 1211
Case 4:05-cv-01474-RWS    Document 9    Filed 08/29/2006    Page 100 of 122

*Lockhart,]* 923 F.2d at 1320. That inquiry should be on the record and must be of the kind to ease the defendant's satisfaction, distrust or concern. *Smith*, 923 F.2d at 1320. If the trial court fails to make a sufficient inquiry, prejudice is presumed and "reversal is automatic." *Holloway,* 435 U.S. at 488-89.

*Atley v. Ault*, 21 F. Supp. 2d 949, 955-56 (S.D. Iowa 1998), *aff'd,* 191 F.3d 865 (8th Cir. 1999).

Here, there was *no* inquiry by the trial court, let alone a "thorough" one as required by *Holloway*. Mr. Williams raised more than a "seemingly substantial complaint" regarding his legitimate concerns that his counsel was not following his wishes in locating and interviewing material witnesses. Mr. Williams' *pro se* motion identified specific witnesses trial counsel had failed to contact and interview, that counsel failed to obtain discovery regarding the state's witnesses, and bluntly alleging that "the attorney-client relationship has dissolved" and that he had a "total lack of trust and confidence" in his counsel because of their pursuit of their own personal interests. (L.F. 444-445).[17] These allegations were sufficiently substantial under *Holloway* to

---

[17] Mr. Williams' legitimate concerns were bolstered by other facts in the record, including counsels' own concession that they did not have sufficient time to investigate and prepare the case in their requests for a continuance, (L.F. 394, 457), and their subsequent admission of ineffectiveness in their motion for a new trial. (L.F. 543). Mr. Green's affidavit also indicates that petitioner's *pro se* conflict of interest motion had merit and should have been addressed by the trial court. (See Exh. 10).

94

000115

CASE: 4:05-cv-01474-RWS    Doc. #: 104-2    Filed: 08/02/17    Page: 101 of 122
PageID #: 1212
Case 4:05-cv-01474-RWS    Document 9    Filed 08/29/2006    Page 101 of 122

trigger the trial court's duty to make a meaningful inquiry into the allegations. *See also Wood v. Georgia*, 450 U.S. 261, 272 (1981) (the mere possibility of a conflict requires inquiry).

Petitioner's case is remarkably similar to the factual scenario confronted by the Eighth Circuit in *Atley*. Atley was charged with a drug offense and went through a series of attorneys prior to trial. His first attorney moved to withdraw because he claimed Atley insisted on acting as co-counsel. 191 F.3d at 867. Atley requested his second attorney be removed because of a "break down" in communications. *Id.* His third attorney, upon learning that he would be hired by the County Attorney's office, moved to withdraw citing ethical concerns. *Id.* at 867-68. After Atley learned of this fact, he too raised his concerns that a conflict existed. *Id.* The Court denied the motion after hearing argument from both the defense and prosecution, but without any evidentiary hearing or any input from Mr. Atley. *Id.*

The Iowa Supreme Court affirmed, holding that while *Holloway* requires the court to inquire into any conflicts, the trial court had satisfied that requirement by hearing argument from counsel. *Id.*; *State v. Atley*, 564 N.W.2d 817 (Iowa), *cert. denied*, 522 U.S. 1004 (1997). On habeas review, the district court found that the state court's conclusion that the colloquy with counsel was "sufficient" was an unreasonable application of *Holloway*. 21 F. Supp.2d at 956. The court found the record showed

95

000116

Case: 4:05-cv-01474-RWS    Doc. #: 104-2    Filed: 08/02/17    Page: 102 of 122
PageID #: 1213
Case 4:05-cv-01474-RWS    Document 9    Filed 08/29/2006    Page 102 of 122

that the trial court "failed to ask a single substantive question of anyone," and observed that "[i]n lieu of the probing and specific questions necessary to any real inquiry, the Iowa Supreme Court chose to accept the untesting [sic] general observations of the trial court." *Id.*

The Eighth Circuit affirmed, finding that "the *Holloway* court held that when a court fails to discharge its constitutional duty to determine whether the defendant is receiving assistance of counsel unburdened by a conflict of interest, prejudice is presumed and reversal of the conviction is automatic." *Id.* at 870. The court noted the absence of any inquiry is itself unconstitutional, regardless whether an actual conflict is later demonstrated. *Id.* Finally, the court found the limited, non-probing questions asked of the defense counsel and prosecutor did not satisfy the kind of inquiry required by *Holloway*, and that the Iowa Supreme Court's decision otherwise was an "unreasonable application of clearly established federal law." *Id.* at 873. Finding that the right to conflict free counsel is fundamental, the court concluded that the harmless error standard of *Brecht v. Abrahamson*, 507 U.S. 619 (1993) did not apply, but that the denial of a *Holloway* inquiry presumes prejudice and mandates habeas relief. *Id.* at 874.

Because petitioner received *no* inquiry regarding his allegations of conflict of interest, the Missouri Supreme Court's summary denial of this claim represents a

96

000117

starkly more unreasonable application of *Holloway* than was presented in *Atley*.

Habeas relief is warranted.

**CLAIM 9**

**PETITIONER'S SIXTH AND FOURTEENTH AMENDMENT RIGHTS WERE VIOLATED BY THE TRIAL COURT'S RESTRICTION OF PETITIONER'S CROSS-EXAMINATION OF PROSECUTION WITNESS GLENN ROBERTS.**

It is well settled that both the Sixth Amendment and the Due Process clause of the Fourteenth Amendment preclude state courts from excluding relevant and reliable evidence central to a criminal defendant's defense by mechanistically applying state evidentiary rules. *Washington v. Texas*, 388 U.S. 14, 19 (1967); *Michigan v. Lucas*, 500 U.S. 145, 151 (1991); *Green v. Georgia*, 442 U.S. 95, 97 (1979). This constitutional principle precludes the state from excluding competent, reliable evidence central to a defendant's claim of innocence in the absence of any valid justification. *Crane v. Kentucky*, 476 U.S. 683, 690-691 (1986).

In the present case, the most damaging item of physical evidence linking petitioner to the crime was the victim's husband's notebook computer which Mr. Williams purportedly "pawned" to a family friend, Glenn Roberts. (Tr. 1999-2012). The prosecution presented testimony from Roberts that petitioner sold him a computer later linked to the victim's husband. (*Id.*) However, the defense was precluded from

97

000118

Case 4:05-cv-01474-RWS Document 9 Filed 08/29/2006 Page 104 of 122

eliciting from Roberts the exculpatory evidence that petitioner was acting on behalf of Laura Asaro and that Roberts understood that the computer belonged to Asaro. (Tr. 1997, 2027-30). The defense argued that this latter evidence should be admitted under the "rule of completeness," contending that the jury should hear all of the circumstances of this transaction. (*Id.*)[18] The trial court ruled that any effort to elicit further information from Roberts would necessarily require the introduction of petitioner's own "self-serving" statements, which were inadmissible hearsay. (Tr. 2036).

The Missouri Supreme Court denied relief on this claim, finding that the rule of completeness did not apply, because the state "did not introduce into evidence any statements or confessions Mr. Williams made to Roberts during the sale of the laptop . . ." 97 S.W.3d at 468. Indeed, the prosecutor was careful to keep Roberts' testimony fixed on petitioner's actions and not what was said:

Q: Why did you want the laptop?

A: Basically he was saying he was having financial –

---

[18] *See State v. Quinn*, 461 S.W.2d 812, 816 (Mo. 1970); *State v. Collier*, 892 S.W.2d 686, 695 (Mo. App. 1994); *State v. Easley*, 662 S.W.2d 248, 252 (Mo. 1983). It would be incongruous for a defendant's incriminating statement to be considered in isolation from any ameliorating circumstances therein described. *State v. Beatty*, 849 S.W.2d 56, 59 (Mo. App. 1993). After all, the state has no right to introduce selected portions of a defendant's confession and exclude those which tend to mitigate, justify, or excuse the offense charged. *Id.*

000119

Case: 4:05-cv-01474-RWS    Doc. #: 104-2    Filed: 08/02/17    Page: 105 of 122
PageID #: 1216
Case 4:05-cv-01474-RWS    Document 9    Filed 08/29/2006    Page 105 of 122

Q: I didn't ask you what he was saying, I asked you –

(Tr. 2003-04).

The Missouri Supreme Court seized on the prosecution's careful method of questioning to conclude that, because there was no statement, confession or admission, only evidence of a "transaction," the state had not "opened the door" to trigger application of the rule. *Williams,* 97 S.W.3d at 468. This reasoning runs afoul of the well settled rule that a defendant's admission may consist of a statement *or conduct.* *State v. Isa,* 850 S.W.2d 876, 894 (Mo. banc 1993). Accordingly, by eliciting testimony from Roberts that petitioner alone brought the computer over to his house, this evidence of inculpatory conduct was tantamount to a statement or confession. Fundamental fairness, due process, and the rule of completeness, therefore required that petitioner be allowed to present the exculpatory aspects of the transaction, through either conduct or statements.

For example, in *Henderson v. United States,* 632 A.2d 419, 421 (D.C. 1993), the defendant was convicted of murdering his ex-wife. Since there were no witnesses and the physical evidence was inconclusive, Henderson was convicted on circumstantial evidence centering upon the defendant's suspicious conduct after the murder. *Id.* The state presented parts of incriminating aspects of the defendant's

99

000120

Case: 4:05-cv-01474-RWS    Doc. #:  104-2    Filed: 08/02/17    Page: 106 of 122
PageID #: 1217
Case 4:05-cv-01474-RWS    Document 9    Filed 08/29/2006    Page 106 of 122

statement to the police, and the trial court excluded other parts that were exculpatory. *Id*. at 423.

The Court of Appeals for the District of Columbia applied the rule of completeness, holding that when the state relies on the defendant's conduct to show consciousness of guilt, all of what was said at the time, on the subject, is admissible. *Id*. at 427. Otherwise, the defendant may improperly be forced to choose between allowing his or her statement to stand distorted as a result of selective introduction and abandoning his or her Fifth Amendment right not to testify in order to clarify that statement. *Id*. at 426.

Since the Missouri Supreme Court did not address the due process aspect of this claim, this Court is free to review this issue *de novo*. *See e.g., Taylor v. Bowersox*, 229 F.3d 963, 967-968 (8th Cir. 2003). Undoubtedly, petitioner's statements to Mr. Roberts indicating that he was selling the computer on behalf of Laura Asaro was central to his claim of defense. It, therefore, violates due process to exclude reliable evidence central to the defense by mechanistically applying state hearsay rules, absent any compelling state justification. *Chambers v. Mississippi*, 410 U.S. 284, 300 (1973); *Crane v. Kentucky*, 476 U.S. 683, 690-691(1986). The state of Missouri has never advanced any compelling reason for invoking the hearsay rule to preclude petitioner from presenting this exculpatory evidence. As a result, the exclusion of this relevant

100

000121

Case: 4:05-cv-01474-RWS    Doc. #: 104-2    Filed: 08/02/17    Page: 107 of 122
PageID #: 1218
Case 4:05-cv-01474-RWS    Document 9    Filed 08/29/2006    Page 107 of 122

evidence violates due process under the *Chambers* line of cases. Habeas relief is warranted.

## CLAIM 10

## PETITIONER'S APPELLATE COUNSEL WAS CONSTITUTIONALLY INEFFECTIVE FOR FAILING TO BRIEF THE ISSUE OF THE TRIAL COURT'S IMPROPER EXCLUSION OF THE MITIGATING EVIDENCE FROM DR. MARK CUNNINGHAM REGARDING THE ADVERSE IMPACT THAT PETITIONER'S EXECUTION WOULD HAVE UPON HIS FAMILY AND CHILDREN.

Defense counsel wished to present the testimony of psychologist Dr. Mark Cunningham at the penalty phase to inform the jury of the adverse psychological impact that Mr. Williams' execution would have on his children. (Tr. 3385-95). The trial court ruled that this evidence was inadmissible without articulating any reason or citing any authority for doing so. (Tr. 3395). On direct appeal, Mr. Williams' counsel did not brief a claim of error regarding the improper exclusion of this evidence. *See State v. Williams, supra.*

Mr. Williams' 29.15 motion claimed appellate counsel was ineffective for failing to raise this claim. (29.15 L.F. 93, 267-76). The motion court denied this claim without a hearing, ruling that the court did not err in excluding this evidence at trial because it did not relate to petitioner's "character, record or circumstances of his case." (*Id.* at 812-13). The Missouri Supreme Court affirmed, based on prior state court precedent.

101

000122

*Williams v. State*, 168 S.W.3d at 445. These state decisions are "contrary to" and involve an unreasonable application of settled Eighth Amendment jurisprudence forbidding trial courts from excluding relevant mitigating evidence. *See Lockett v. Ohio*, 438 U.S. 586, 604 (1978); *Eddings v. Oklahoma*, 455 U.S. 104 (1982).

The impact of an execution on the defendant's family is relevant and important mitigating evidence. *See Marshall v. Hendricks*, 307 F.3d 36, 113 (3rd Cir. 2002) (impact on defendant's family recognized as proper mitigation evidence and district court's denial of relief regarding this claim reversed for an evidentiary hearing). Other states have routinely admitted execution impact evidence. In an Oregon case, the trial court excluded the defendant's wife's testimony about the anticipated negative effect his execution would have on his daughter. *State v. Stevens*, 879 P.2d 162, 167-68 (Or. 1994). On appeal, the court found that the exclusion of this evidence was reversible error because the evidence was relevant to the defendant's character. *Id*. at 168. The Oregon Supreme Court reasoned that a rational juror could infer from the wife's testimony that she believed that her daughter would be affected adversely by the defendant's execution because of something positive about his relationship with his daughter and because of something positive about the defendant's character or background. *Id.* Similarly, California allows evidence, argument and instructions

000123

Case: 4:05-cv-01474-RWS　Doc. #: 104-2　Filed: 08/02/17　Page: 109 of 122
PageID #: 1220
Case 4:05-cv-01474-RWS　Document 9　Filed 08/29/2006　Page 109 of 122

pertaining to the impact of the execution upon the defendant's family. *People v. Fierro*, 821 P.2d 1302, 1337-38 (Cal. 1991).

Execution impact evidence is admissible for two additional reasons. First, juries routinely hear "victim impact" evidence. *Payne v. Tennessee*, 501 U.S. 808 (1991). Thus, it is only fair that they should hear the evidence of the impact of the execution upon the defendant's family as well. *See* King, R. and Norgard, K., *What About Our Families? Using the Impact on Death Row Defendants' Family Members as a Mitigating Factor in Death Penalty Sentencing Hearings,* 26 Fla. St. U.L. Rev. 1119, 1161-65 (Summer, 1999).

Second, this type of evidence is routinely admissible in non-capital felony sentencing hearings. *Id*. at 1152-54.[19] Missouri law allows for consideration of "the history and character of the defendant" in considering probation eligibility. § 559.012 R.S. Mo. (2000). Evidence regarding the impact imprisonment would have on a defendant's family is admissible under this broad language. Accordingly, execution

---

[19] *See, e.g., People v. Young*, 619 N.E.2d 851, 855 (Ill. App. Ct. 1993) (Illinois statute allows consideration of whether imprisonment would entail excessive hardship to dependents); *Battles v. State*, 688 N.E.2d 1230, 1237 (Ind. 1997) (dependents are a mitigating factor under Indiana law allowing courts to consider whether imprisonment would result in undue hardship to dependents); *State v. Johnson*, 570 A.2d 395, 400 (N.J. 1990) (courts allowed to consider imprisonment would entail excessive hardship to dependents); *State v. Teague*, 300 S.E.2d 7 (N.C. App. 1983) (whether defendant has a supportive and stable family is mitigating factor).

000124

Case 4:05-cv-01474-RWS    Document 9    Filed 08/29/2006    Page 110 of 122

impact evidence should be admissible in capital sentencing proceedings because of the constitutional requirement of heightened reliability in capital cases. *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976).

Since this claim was properly preserved, counsel's failure to raise it on direct appeal was objectively unreasonable, especially since, as noted earlier, appellate counsel pursued much weaker, unpreserved claims. Further, Counsel's failure prejudiced Mr. Williams. Had this issue been briefed, there is a reasonable probability that petitioner would have obtained relief from his death sentence at some stage of the post-conviction process. *See Freeman v. Lane*, 962 F.2d 1252, 1258-1260 (7th Cir. 1992).

## CLAIM 11

## PETITIONER'S EIGHTH AND FOURTEENTH AMENDMENT RIGHTS WERE VIOLATED BY THE PROSECUTOR'S IMPROPER CLOSING ARGUMENTS DURING THE PENALTY PHASE OF TRIAL.

A prosecutors' duty in a criminal proceeding is to seek justice. *Berger v. United States,* 295 U.S. 78, 88 (1935). Although the prosecutor should "prosecute with earnestness and vigor," he may not use "improper methods calculated to produce a wrongful conviction." *Id.* Indeed, it is also well established that a prosecutor must not argue to a jury by appealing to its passion or prejudice. *See* ABA Standards for Criminal Justice §3-5.8(c) (2d ed. 1982). Ordinarily, the use of such methods is grounds for reversal of a conviction or sentence if it results in an unfair trial violating

000125

Case: 4:05-cv-01474-RWS    Doc. #: 104-2    Filed: 08/02/17    Page: 111 of 122
PageID #: 1222
Case 4:05-cv-01474-RWS    Document 9    Filed 08/29/2006    Page 111 of 122

the Due Process Clause. Reversal is required where, as here, a prosecutor's comments have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Berger*, 295 U.S. at 88.

In this case, the prosecutor ignored the trial court's admonition not to comment explicitly or implicitly about petitioner's exercise of his right to trial, compare the worth of his life with that of the victim, or to inflame the jury. (Tr. 3471, 3473-74). To the contrary, the prosecutor's closing argument was sprinkled with this type of improper and prejudicial argument:

> Mr. Larner: Defense counsel makes an eloquent plea for mercy and forgiveness of his client.
> 
> * * *
> 
> Mr. Larner: Had he been in that home asking for mercy for Lisha Gayle, it would have fallen on deaf ears. Because that man was hellbent on brutalizing that woman, and destroying that woman. He was hellbent, and there was no stopping him. He had made up his mind . . . .In that house that night, that afternoon, there was one juror.
> 
> * * *
> 
> Mr. Larner: There was one juror in that house. He didn't give Lisha a fair trial. He was the judge, the jury, and executioner...
> 
> * * *
> 
> Mr. Larner: There was one juror in that home that afternoon. And that juror was the foreman, foreperson. And he decided without a trial, without hearing evidence and without instructions of law, he decided Lisha Gayle must die. And that man is right there (indicating). And if there's one person in this courtroom that believes in the death penalty, it's that man right there.
> 
> * * *
> 
> Mr. Larner: And what did she do to deserve that? What did Lisha Gayle do to deserve that, except in her life help people and love people?

105

000126

Case: 4:05-cv-01474-RWS    Doc. #: 104-2    Filed: 08/02/17    Page: 112 of 122
PageID #: 1223
Case 4:05-cv-01474-RWS    Document 9    Filed 08/29/2006    Page 112 of 122

(Tr. 3510-3512, 3515).

This argument improperly juxtaposed the constitutional rights of petitioner with the victim and amounted to a thinly veiled, prejudicial comment on petitioner's exercise of his right to a jury trial. *Griffin v. California,* 380 U.S. 609, 615 (1965). Moreover, this argument is also a blatantly improper appeal to the jurors' emotions. "It is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion." *Gardner v. Florida,* 430 U.S. 349, 357 (1977).

Likewise, the prosecutor improperly expressed his personal opinion, argued facts outside the evidence, and injected racial prejudice into the case, when he implored the jury to "protect" society:

> Mr. Larner: Society has to defend itself. He talks about self defense. Society has to defend itself. You're the last line of defense. The police can't do it. It's only the jury that can protect us. We have to put up a defense. We have to protect ourselves. We have to be safe in our homes. We cannot go to work and *let our women* be at home at risk. A woman has to have a right to be able to take a shower without fear that someone like him will come in there and kill her in her own home. We cannot live in fear. We must fight that.

(Tr. 3514) (Emphasis added). The argument that the jury should impose the death penalty to "protect society" is a personal opinion, that is inherently inflammatory and improper because it is based upon on facts not in evidence. *See Shurn v. Delo,* 177

106

000127

Case: 4:05-cv-01474-RWS   Doc. #: 104-2   Filed: 08/02/17   Page: 113 of 122
PageID #: 1224
Case 4:05-cv-01474-RWS   Document 9   Filed 08/29/2006   Page 113 of 122

F.3d 662 (8th Cir. 1999); *Miller v. Lockhart*, 65 F.3d 676 (8th Cir. 1995). The Eighth

Circuit has recognized that the prosecutor's penalty stage argument which "referred

to facts not in evidence" and evoked the jury's fear of crime "was the sort of argument

that would result in 'mob justice' rather than result in a reasoned deliberation."

*Copeland v. Washington*, 232 F.3d 969, 975-76 (8th Cir. 2000) *See also United*

*States v. Weatherspoon*, 410 F.3d 1142, 1149-50 (9th Cir. 2005); *United States v.*

*Leon-Reyes*, 177 F.3d 816, 823 (9th Cir. 1999). The likelihood of prejudice is even

greater here because this was a racially charged case, where the victim, prosecutor,

and eleven jurors were white and the defendant is black. The prosecutor's closing

argument improperly played the "race card," asking the jury to protect "our women"

from "someone like him." This argument was a calculated appeal to the jury's

emotions and racial prejudices. Habeas corpus relief is warranted.

## CLAIM 12
## TRIAL COUNSEL WAS INEFFECTIVE IN FAILING TO REQUEST A LIMITING INSTRUCTION REGARDING PETITIONER'S ESCAPE ATTEMPT.

At the guilt phase of trial, the state presented evidence that petitioner attempted

to escape from jail. Trial counsel unsuccessfully objected to the admission of this

evidence. (Tr. 1679-84). When the case was submitted, however, trial counsel

inexplicably failed to request that the trial court give a mandatory instruction to the jury

000128

limiting the purposes for which they could consider this evidence. *See* MAI-CR3d 310.12. This limiting instruction would have given the jury some guidance as to how to properly consider this evidence and would have precluded them from considering it as evidence of criminal propensity or bad character.

To establish an ineffective assistance of counsel claim, petitioner must establish counsel's representation "fell below an objective standard of reasonableness" and show the "deficient performance prejudiced" him. *See Strickland v. Washington,* 466 U.S. 668, 687-88 (1984). To demonstrate prejudice, petitioner must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

The Missouri Supreme Court rejected petitioner's ineffective assistance claim, stating that the failure to request a limiting instruction "was a matter of trial strategy because a limiting instruction may have served only to highlight the state's evidence." 168 S.W. 3d at 443. However, the court's reasoning is contradicted by the record. Trial counsel admitted that their failure was not strategy. In their motion for a new trial, trial counsel argued that the court erroneously failed to give a limiting instruction *sua sponte* and that they were constitutionally ineffective for failing to request one. (L.F. 548-549). Thus, the decision by the Missouri Supreme Court was not supported by the record. *See* 28 U.S.C. § 2254(d)(2).

108

000129

Case: 4:05-cv-01474-RWS    Doc. #: 104-2    Filed: 08/02/17    Page: 115 of 122
PageID #: 1226
Case 4:05-cv-01474-RWS    Document 9    Filed 08/29/2006    Page 115 of 122

This Court is bound by the state courts' findings of fact only if they are supported by the record. *Wiggins,* 539 U.S. at 524, 527; *Marshall v. Hendricks,* 307 F.3d 36, 115 (3rd Cir. 2002) ("The reviewing court's reasoning under the first prong needs to be made with an understanding of counsel's thought process ... so that a conclusion ... can be made based on facts of record, rather than on assumptions"). It is also well settled law under Missouri law that motion courts cannot speculate that a decision was based on trial strategy without first holding a hearing. *See, e.g. State v. Blue,* 811 S.W.2d 405, 410 (Mo. App. E.D. 1991) (no basis for determining counsel's failure to call a witness, absent a hearing); *State v. Talbert,* 800 S.W.2d 748, 749(Mo. App. E.D. 1990) (failure to call endorsed witness could not be considered "strategic" absent a hearing); *Fingers v. State,* 680 S.W.2d 377, 378 (Mo. App. S.D. 1984) (finding that failure to impeach witness was strategic improper without a hearing); and *Chambers v. State,* 781 S.W.2d 116, 117(Mo. App. E.D. 1989) (questioning of witness could not be considered trial strategy without a hearing).

MAI-CR3d: 310.12 provides:

If you find and believe from the evidence that the defendant (was involved in) (was convicted of) (was found guilty of) (pled guilty to) (pled nolo contendere to) (an offense) (offenses) other than the one for which he is now on trial (and other than the offense mentioned in Instruction No. ___), you may consider that evidence on the issue of (identification) (motive) (intent) (absence of mistake or accident) (presence of a common scheme or plan) ([*Specify other purpose for*

109

Case: 4:05-cv-01474-RWS   Doc. #: 104-2   Filed: 08/02/17   Page: 116 of 122
PageID #: 1227
Case 4:05-cv-01474-RWS   Document 9   Filed 08/29/2006   Page 116 of 122

*which the evidence was received as substantive evidence of guilt.*]) of the defendant (and you may also consider such evidence for the purpose of deciding the believability of the defendant and the weight to be given to his testimony). (You may not consider such evidence for any other purpose.)

This instruction *must* be given upon the request of either party. *See* Notes on Use 2. Trial counsel, given the damaging nature of this evidence, acknowledged their ineffectiveness in failing to request this limiting instruction. (L.F. 548-549). Thus, the first prong of *Strickland* is easily satisfied.

It is also clear that petitioner was prejudiced by counsel's failures. As noted earlier, the evidence of petitioner's guilt was questionable. No physical evidence linked him to this murder. Without this cautionary instruction, it was likely that the jury considered evidence of the attempted escape as reflecting a propensity for violence and criminal behavior. Thus, the second prong of *Strickland* is also satisfied.

Under similar circumstances, the Eighth Circuit granted habeas relief in *Freeman v. Class*, 95 F.3d 639 (8th Cir. 1996). In *Freeman*, as here, "[t]here were no eyewitnesses . . .[and] no fingerprints," but only snitch testimony to connect Freeman to the crime. The court found counsel's failure to request a limiting instruction on accomplice testimony to be "highly prejudicial," because the state's case rested mainly on such testimony. *Id.* at 642. The court in *Freeman* concluded that counsel's ineffectiveness rendered the trial "fundamentally unfair." *Id.* at 643. In both *Freeman*

110

000131

Case: 4:05-cv-01474-RWS    Doc. #: 104-2    Filed: 08/02/17    Page: 117 of 122
PageID #: 1228
Case 4:05-cv-01474-RWS    Document 9    Filed 08/29/2006    Page 117 of 122

and in this case, the degree of prejudice resulting from the failure to obtain a cautionary

instruction must be measured in light of the strength of the state's case. Given the

obvious similarity between this case and *Freeman*, the result should be the same.

CLAIM 13

**PETITIONER'S DEATH SENTENCE WAS IMPOSED IN VIOLATION OF THE EIGHTH AND FOURTEENTH AMENDMENTS BECAUSE THREE OF THE TEN AGGRAVATING CIRCUMSTANCES SUBMITTED BY THE STATE WERE UNCONSTITUTIONALLY DUPLICATIVE.**

At the close of Mr. William's penalty phase, at the state's request and over the

objection of trial counsel (Tr. 3464-65), the court submitted Jury Instruction 22, which

listed ten aggravating factors alleged by the state, three of which were as follows:

2. Whether the murder of Felicia Gayle was committed while the defendant engaged in perpetration of burglary. A person commits the crime of burglary when he knowingly enters unlawfully in an inhabitable structure for the purpose of committing stealing therein.
   A person commits the crime of stealing if he appropriates property of another with the purpose to deprive her or him thereof, either without her or his consent or by means of deceit or coercion.
3. Whether the murder of Felicia Gayle was committed while the defendant was engaged in the perpetration of robbery. A person commits the crime of robbery when he forcibly steals property.
4. Whether the defendant murdered Felicia Gayle for the purpose of the defendant receiving money or any other thing of monetary value from Felicia Gayle.

(L.F. 528-29).

Aggravators Two and Three penalized petitioner for the precisely the same

conduct as that alleged in Aggravator Four. These three aggravators were duplicative,

111

000132

Case 4:05-cv-01474-RWS   Document 9   Filed 08/29/2006   Page 118 of 122

because they relied on the same set of facts--that petitioner killed the victim so that he could take things from her house.

In *Jones v. United States*, 527 U.S. 373 (1999), a plurality of court noted that it was an open question whether "aggravating factors could be duplicative so as to render them constitutionally invalid." *Id.* at 399 (plurality opinion). Three dissenting Justices concluded that duplicating aggravating factors unconstitutionally "creates the risk of an arbitrary death sentence," citing decisions from the Fifth and Tenth Circuits. *Id.* at 421 (Ginsburg, J., dissenting).

There is currently a circuit split regarding this question, involving at least five federal courts of appeals and thirteen divided state supreme courts. While the Eighth Circuit held that the constitution permits instructing a capital jury on duplicative aggravating factors under the FDPA, the court admitted that its decision conflicted with the decisions of other courts of appeals. *United States v. Purkey*, 428 F.3d 738, 762 (8th Cir. 2005). The Tenth Circuit, for example, held that duplicative aggravating factors unconstitutionally bias the jury in favor of death. *United States v. McCullah*, 76 F.3d 1087 (10th Cir. 1996). It held that allowing the "double counting of aggravating factors, especially under a weighing scheme, has a tendency to skew the weighing process and creates the risk that the death sentence will be imposed arbitrarily and thus, unconstitutionally." *Id.* at 1111 (citing *Stringer v. Black*, 503 U.S.

000133

Case: 4:05-cv-01474-RWS   Doc. #: 104-2   Filed: 08/02/17   Page: 119 of 122
PageID #: 1230
Case 4:05-cv-01474-RWS   Document 9   Filed 08/29/2006   Page 119 of 122

222, 232 (1992)).  The Fourth, Fifth, and Ninth Circuits have all adopted this same

standard.  See *United States v. Jones*, 132 F.3d 232, 251 (5th Cir. 1998) ("Such

double-counting of aggravating factors creates the risk of an arbitrary death

sentence."), *aff'd on other grounds*, 525 U.S. 980 (1998); *United States v. Tipton*, 90

F.3d 861, 899 (4th Cir. 1996).  There is also a 10-3 split among state supreme courts

on the question presented, with the majority finding duplication impermissible.[20]

There is also strong empirical evidence that duplication of aggravating factors

skews sentencing in favor of death.  *See e.g.*, Theodore Eisenberg, et al., *Jury*

*Responsibility in Capital Sentencing: An Empirical Study*, 44 Buff. L. Rev. 339, 366

(1996) (reporting the result of a South Carolina death penalty survey that found,

despite the absence of an instruction to "weigh" aggravating and mitigating factors,

---

[20] For a cases from the ten states prohibiting duplication, see: *Parsons v. Barnes*, 871 P.2d 516, 529 (Utah 1994), *cert. denied*, 513 U.S. 966 (1994); *Engberg v. Meyer*, 820 P.2d 70, 87-90 (Wyo. 1991), *cert. denied*, 535 U.S. 1001 (2002); *Smith v. State*, 1991 OK CR 100 (Okla. Crim. App. 1991), *cert. denied*, 504 U.S. 959 (1992); *Willie v. State*, 585 So. 2d 660, 680-81 (Miss. 1991); *People v. Melton*, 44 Cal. 3d 713, 768 (Cal. 1988), *cert. denied*, 488 U.S. 934 (1988); *State v. Jenkins*, 15 Ohio St. 3d 164, 194-200 (Ohio 1984), *cert. denied*, 472 U.S. 1032 (1985); *State v. Goodman*, 298 N.C. 1, 28-29 (N.C. 1979); *Cook v. State*, 369 So. 2d 1251, 1256 (Ala. 1978); *Provence v. State*, 337 So. 2d 783, 786 (Fla. 1976), *cert. denied*, 431 U.S. 969 (1977).  For cases from the three states allowing duplicative aggravators, see *Ferguson v. State*, 642 A.2d 772, 782 (Del. 1994), *cert. denied*, 519 U.S. 1014 (1996); State v. Moore, 122 N.J. 420, 473-474 (N.J. 1991); *People v. Davis*, 794 P.2d 159, 189 (Colo. 1990), cert denied, 498 U.S. 1018 (1991).

000134

Case: 4:05-cv-01474-RWS    Doc. #: 104-2    Filed: 08/02/17    Page: 120 of 122
PageID #: 1231
Case 4:05-cv-01474-RWS    Document 9    Filed 08/29/2006    Page 120 of 122

"most jurors did employ some mechanical reasoning processes to arrive at a sentencing decision" by "adding up and weighing factors"). Commentators have noted that the process of weighing gives jurors a psychological defense against grappling with the difficult moral decision of whether to recommend a defendant be sentenced to death. "The explicit or implicit direction to weigh aggravating and mitigating factors . . . suggests strongly that the ultimate death penalty decision involves mechanical application of rules rather than the exercise of genuine judgment." Jordan M. Steiker, *The Limits of Legal Language: Decisionmaking in Capital Cases*, 94 Mich. L. Rev. 2590, 2618 (1996). Robert Weisberg, *Deregulating Death*, 1983 Sup. Ct. Rev. 305, 393 ("People escape the dilemma [of painful choices] when the law offers them the 'choice to be choiceless' through a mechanical formula of decision cloaked in the rhetoric of professional authority."). Thus, duplicative aggravators weigh more heavily than they should in the jury's mind.

Because the aggravating factors were unconstitutionally duplicative, petitioner's death sentence is tainted and unreliable. Habeas relief is warranted.

## CONCLUSION

WHEREFORE, for all the foregoing reasons, petitioner, Marcellus S. Williams, prays:

1.    That a writ of habeas corpus be directed to respondent;

114

Case 4:05-cv-01474-RWS    Document 9    Filed 08/29/2006    Page 121 of 122

2.    That the state of Missouri be required to appear and answer the allegations in this petition;

3.    That Mr. Williams be afforded reasonable discovery and a full and fair evidentiary hearing on the allegations of this petition;

4.    That Mr. Williams be discharged from his unconstitutional convictions and sentence of death; and

5.    That petitioner be allowed such other and further relief as may seem just, equitable and proper under the circumstances.

Respectfully submitted,


/s/   Kent E. Gipson

Kent E. Gipson,   # 34524
William C. Odle, # 38571
Public Interest Litigation Clinic
305 E. 63rd St.
Kansas City, MO 64113
816-363-2795 • Fax 816-363-2799

*Counsel for Petitioner*

## CERTIFICATE OF SERVICE

000136

Case: 4:05-cv-01474-RWS    Doc. #:  104-2    Filed: 08/02/17    Page: 122 of 122
                                    PageID #: 1233
Case 4:05-cv-01474-RWS    Document 9    Filed 08/29/2006    Page 122 of 122

I hereby certify that on August 29, 2006, the foregoing was filed

electronically with the Clerk of Court to be served by operation of the Court's

electronic filing system upon the following:

Mr. Michael Spillane
Office of the Attorney General
P.O. Box 899
Jefferson City, MO 65102

*Counsel for Respondent*


/s/ William C. Odle
William C. Odle
Public Interest Litigation Clinic
305 E. 63rd St.
Kansas City, MO 64113
816/363-2795 ● Fax 816/363-2799


*Counsel for Petitioner*

116

000137