UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| MARCELLUS WILLIAMS, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| vs. | ) | Case No. 4:05CV1474 RWS |
| | ) | |
| DONALD ROPER, | ) | |
| | ) | |
| Respondent. | ) | |

**MEMORANDUM AND ORDER**

Petitioner Marcellus Williams is a state prisoner who has been sentenced to death for the

first degree murder of Felicia Gayle. Williams has filed a petition for a writ of habeas corpus

under 28 U.S.C. § 2254. I find that Williams is not entitled to habeas relief as to his underlying

conviction. However, I find that Williams was prejudiced when he received ineffective

assistance of counsel at the penalty phase of his trial. As a result I will grant Williams relief from

his sentence of death and remand the case to the Circuit Court of the County of St. Louis to hold

a new penalty phase hearing.

**I       Factual Background**

The Missouri Supreme Court accepts as true all evidence favorable to a verdict, including

all favorable inferences from the evidence. State v. Wolfe, 97 S.W.3d 248, 252 (Mo. 2000).

Based on this premise, the Missouri Supreme Court, in Williams' direct appeal, made the

following statement of the background facts viewed in the light most favorable to the verdict:

> On August 11, 1998, Williams drove his grandfather's Buick LeSabre to a bus
> stop and caught a bus to University City. Once there, he began looking for a
> house to break into. Williams came across the home of Felicia Gayle. He
> knocked on the front door but no one answered. Williams then knocked out a

window pane near the door, reached in, unlocked the door, and entered Gayle's home.  He went to the second floor and heard water running in the shower.  Williams went back downstairs, rummaged through the kitchen, found a large butcher knife, and waited.

Gayle left the shower and called out, asking if anyone was there.  She came down the stairs.  Williams attacked, stabbing and cutting Gayle forty-three times, inflicting seven fatal wounds.  Afterwards, Williams went to an upstairs bathroom and washed off.  He took a jacket and put it on to conceal the blood on his shirt.  Before leaving, Williams placed Gayle's purse and her husband's laptop computer and black carrying case in his backpack.  The purse contained, among other things, a St. Louis Post-Dispatch [the local newspaper] ruler and calculator.  Williams left out the front door and caught a bus back to the Buick.

After returning to the car, Williams picked up his girlfriend, Laura Asaro.  Asaro noticed that, despite the summer heat, Williams was wearing a jacket.  When he removed the jacket, Asaro noticed that Williams' shirt was bloody and that he had scratches on his neck.  Williams claimed he had been in a fight.  Later in the day, Williams put his bloody clothes in his backpack and threw them into a sewer drain, claiming he no longer wanted them.

Asaro also saw a laptop computer in the car.  A day or two after the murder, Williams sold the laptop to Glenn Roberts.

The next day, Asaro went to retrieve some clothes from the trunk of the car.  Williams did not want her to look in the trunk and tried to push her away.  Before he could, Asaro snatched a purse from the trunk.  She looked inside and found Gayle's Missouri state identification card and a black coin purse.  Asaro demanded that Williams explain why he had Gayle's purse.  Williams then confessed that the purse belonged to a woman he had killed.  He explained in detail how he went into the kitchen, found a butcher knife, and waited for the woman to get out of the shower.  He further explained that when the woman came downstairs from the shower, he stabbed her in the arm and then put his hand over her mouth and stabbed her in the neck, twisting the knife as he went.  After relaying the details of the murder, Williams grabbed Asaro by the throat and threatened to kill her, her children and her mother if she told anyone.

On August 31, 1998, Williams was arrested on unrelated charges and incarcerated at the St. Louis City workhouse.  From April until June 1999, Williams shared a room with Henry Cole.  One evening in May, Cole and Williams were watching television and saw a news report about Gayle's murder.  Shortly after the news report, Williams told Cole that he had committed the crime.  Over the next few weeks, Cole and Williams had several conversations about the murder.  As he had

done with Laura Asaro, Williams went into considerable detail about how he broke into the house and killed Gayle.

After Cole was released from jail in June 1999, he went to the University City police and told them about Williams' involvement in Gayle's murder. He reported details of the crime that had never been publicly reported.

In November of 1999, University City police approached Asaro to speak with her about the murder. Asaro told police that Williams admitted to her that he had killed Gayle. The next day, the police searched the Buick LeSabre and found the Post-Dispatch ruler and calculator belonging to Gayle. The police also recovered the laptop computer from Glenn Roberts. The laptop was identified as the one stolen from Gayle's residence.

State v. Williams, 97 S.W.2d 462, 466- 467 (Mo. 2003). On direct appeal Williams did not challenge the sufficiency of the evidence. Id. at 467. As a result, the Missouri Supreme Court's determination of the facts is presumed to be correct and Williams has the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1)[1].

## II    Procedural History

On January 6, 2000, Williams was indicted on the felonies of first degree burglary, first degree murder, first degree robbery, and two counts of armed criminal action.

On January 18, 2000, John Krehmeyer, an Assistant Public Defender, entered his appearance on Williams' behalf. On June 5, 2000, Joseph L. Green and Christopher McGraugh entered their appearance on behalf of Williams. Throughout the trial and sentencing Williams was represented by Green and McGraugh.

---

[1] "a determination of a factual issue by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

-3-

On February 4, 2000, March 7, 2001, March 21, 2001, and April 5, 2001, the State of Missouri filed notices of aggravating circumstances it intended to prove at the penalty stage of the trial.  On June 4, 2001, Williams was found to be a persistent offender under § 558.016 RSMo. and § 558.021 RSMo.

Williams' trial began in the Circuit Court of St. Louis County on June 4, 2001 and ended on June 19, 2001.  Williams was found guilty on all counts.  The jury assessed the punishment of death on the first degree murder conviction.  The jury found ten statutory aggravating circumstances in reaching its decision to recommend the death sentence.

On August 27, 2001, after denying Williams' motion for judgment of acquittal not withstanding the jury verdict or in the alternative for a new trial, the trial court sentenced Williams to consecutive terms of 30 years imprisonment for first degree burglary and 30 years imprisonment for each of the two armed criminal action convictions, a consecutive term of life imprisonment for first degree robbery, and a sentence of death for first degree murder.

Williams appealed his conviction to the Missouri Supreme Court which affirmed the conviction and sentences.  See State v. Williams, 97 S.W.2d 462 (Mo. 2003).  A petition for certiorari was denied by the United States Supreme Court.  Williams v. Missouri, 539 U.S. 944 (2003).

On May 30, 2003, Williams filed a pro se motion for post-conviction relief in the Circuit Court of St. Louis County, Missouri, pursuant to Missouri Supreme Court Rule 29.15.  Appointed counsel filed an amended motion to vacate the judgment and sentence, and a request for an evidentiary hearing.  A hearing was held on March 12, 2004.  The Circuit Court of St. Louis County denied Williams' motion to vacate the judgment and sentence.

Williams appealed the decision of the circuit court to the Missouri Supreme Court which affirmed the lowers court's denial of relief See Williams v. State, 168 S.W.3d 433 (Mo. 2005).

Williams filed a pro se motion for appointment of counsel in a habeas corpus petition action in a death penalty case with this Court on September 12, 2005. Counsel was appointed and the federal habeas corpus petition was filed on August 29, 2006.

**III    Grounds for Federal Habeas Relief**

Williams raises the following claims in his habeas petition:

(1)    the prosecution failed to disclose material impeachment evidence in violation of Brady v. Maryland, 373 U.S. 83 (1963);

(2)    trial counsel was ineffective for failing to investigate and present evidence to impeach prosecution witness Henry Cole;

(3)    trial counsel was ineffective for failing to investigate and present evidence to impeach prosecution witness Laura Asaro;

(4)    his conviction and sentence were unconstitutional because they were based on perjured testimony and because he is actually innocent;

(5)    the prosecution violated Batson v. Kentucky, 476 U.S. 79 (1986) by using peremptory strikes against several venirepersons and the state supreme court erred in analyzing the issue;

(6)    trial counsel failed to investigate and present social and medical history evidence during the penalty phase;

(7)    appellate counsel failed to raise the denial of a continuance on direct appeal;

(8)    the trial court failed to investigate trial counsel's conflict of interest and the

motion court failed to hold an evidentiary hearing on the issue;

(9)     the trial court acted unconstitutionally in restricting cross-examination of prosecution witness Glenn Roberts;

(10)    appellate counsel failed to raise the exclusion of mitigating evidence on direct appeal;

(11)    the prosecutor's closing argument during the penalty phase was unconstitutional;

(12)    trial counsel was ineffective for failing to request a limiting instruction about evidence of petitioner's attempted escape from jail; and

(13)    three of the ten aggravating circumstances submitted by the state were unconstitutionally duplicative.

## IV     Standard of Revue

A state prisoner may petition for a writ of habeas corpus "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).  "'[I]t is not the province of a federal habeas court to re-examine state-court determinations [of] state-law questions.'" Gee v. Groose, 110 F.3d 1346, 1349 (8th Cir.1997)(quoting Estelle v. McGuire, 502 U.S. 62, 67-68 (1991)).  Rather, a federal court is limited "'to deciding whether a conviction violated the Constitution, laws, or treaties of the United States.'" Id.

A federal court's power to grant a writ of habeas corpus is governed by 28 U.S.C. § 2254(d), which provides:

(d) An application for a writ of habeas corpus on behalf of a person in custody

in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The Supreme Court construed § 2254(d) in Williams v. Taylor, 529 U.S. 362 (2000). With respect to the "contrary to" language, a majority of the Court held that a state court decision is contrary to clearly established Federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law" or if "the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Id. at 413. "Avoiding these pitfalls does not require citation of our cases-indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." Early v. Packer, 537 U.S. 3, 8 (2002).

Under the "unreasonable application" prong of § 2254(d)(1), a writ may issue if "the state court identifies the correct governing legal rule from [the Supreme Court's] cases but unreasonably applies [the principle] to the facts of the particular state prisoner's case." Williams, 529 U.S. at 413. Thus, "a federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." Id. at 409. Although the Court failed to specifically define "objectively unreasonable," it observed that "an unreasonable application of federal law is different from an incorrect application of federal law." Id. at 410.

- 7 -

Even if the state court's decision was contrary to, or an unreasonable application of, clearly established federal law, "habeas relief may still be denied absent a showing of prejudice. See Early v. Packer, 537 U.S. 3, 10-11 (2002) (per curiam)." Medina v. Hornung, 386 F.3d 872, 877 (9th Cir. 2004).

> There are two forms of prejudice. Only a small group of 'structural errors' are deemed so harmful that they warrant per se relief. Dyer v. Calderon, 151 F.3d 970, 973 n. 2 (9th Cir.1998) (citing to Arizona v. Fulminante, 499 U.S. 279, 307-10 (1991)).  The overwhelming majority of trial errors are non-structural and do not trigger habeas relief unless the error resulted in 'substantial and injurious effect or influence in determining the jury's verdict[,]' Brecht v. Abrahamson, 507 U.S. 619, 637 (1993) (citation omitted), or unless the judge "is in grave doubt" about the harmlessness of the error. O'Neal v. McAninch, 513 U.S. 432, 436, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995).

Medina v. Hornung, 386 F.3d at 877.

Finally, claims in a habeas petition "that have not been presented to the state courts, and for which there are no remaining state remedies, are procedurally defaulted." Skillicorn v. Luebbers, 475 F.3d 965, 976 (8th Cir. 2007).  "Unless a habeas petitioner shows cause and prejudice or that he is actually innocent of the charges, a court may not reach the merits of procedurally defaulted claims in which the petitioner failed to follow applicable state procedural rules in raising the claims." Id.

V       Discussion

*Claim 1 - Brady Violation*

Williams asserts that the state failed to disclose material evidence that could have impeached the credibility of prosecution witnesses Henry Cole and Laura Asaro in violation of Brady v. Maryland, 373 U.S. 83 (1963).  Trial counsel sought discovery of Cole's and Asaro's

- 8 -

drug treatment records, mental health records, and corrections records. Williams argues the state failed to disclose these records and "persistently hindered [trial] counsel's efforts to obtain them by instructing Cole not to sign a release. . . . [and by filing] a motion in limine to preclude [trial] counsel from impeaching these witnesses with evidence of their drug addiction or Cole's extensive history of mental illness." (Pet. at 17.) Williams also argues that, although much of this evidence was in the possession of other entities, the prosecution has a duty to learn of and disclose such evidence and that such duty is not satisfied by reference to the prosecution's "open file" policy. (Id. at 19.)

In addition, Williams argues the prosecutor and the police concealed the location of Cole and Asaro from trial counsel (Id. at 22) and the prosecutor failed to disclose witness interview notes, audiotapes, videotapes, and written statements. (Id. at 23.)

As a final grounds for relief under this claim, Williams asserts that the police attempted to manufacture evidence against Williams by providing two jail inmates with incriminating information and offering them "inducements" or "favorable treatment" if they would testify against Williams. (Id. at 25-26.)

A state must disclose exculpatory evidence, including evidence that may be used to impeach a government witness. Brady, 373 U.S. at 87. "To establish a Brady violation, [the defendant] must first prove the state withheld evidence tending to exculpate him. Second, [the defendant] must demonstrate that the evidence withheld was "material"-that if the evidence had been disclosed, the outcome of the trial would (to a reasonable probability) have been different." Burton v. Dormire, 295 F.3d 839, 846 (8th Cir. 2002).

Although Williams did not assert this Brady claim of prosecutorial misconduct on direct

- 9 -

appeal, the post-conviction court and the Missouri Supreme Court addressed the claim. Williams v. State, 168 S.W.3d 433, 439 (Mo. 2005).

The Missouri Supreme Court noted that Williams trial began on June 4, 2001 and that in March 2000 the state applied to preserve the testimony of Cole and Asaro because they allegedly feared retaliation by Williams and they had not been in regular contact with police or prosecutors. Id. at 440. The state notified Williams' lawyers in May 2000 that these witnesses had made videotaped statements and that those statements were available for viewing. The court recognized that Williams' counsel was on notice for more than a year before trial that Cole and Asaro were potential witnesses at trial and that counsel had access to their statements during that time period. Id. at 440-441.

Nearly three months before the trial, the state provided Williams' counsel with Cole's New York address and Asaro's St. Louis address. The state also provided counsel with Cole and Asaro's videotaped statements and police reports concerning both these witnesses. Id. The court concluded that the state did not conceal the whereabouts or statements of these two witnesses. This conclusion is not an unreasonable determination of the facts in light of the evidence presented to the state courts.

The court also found that the state did not fail to disclose impeachment evidence regarding these two witnesses. The court reaffirmed its position that the state has no duty to disclose evidence of which the defense is already aware and which defense can acquire. Id. (citing State v. Brooks, 960 S.W.2d 479, 494 (Mo. 1997)). The court noted that Williams, in his post-conviction proceeding sought discovery from the state which included Cole and Asaro's medical and psychiatric records from different federal, state, and private institutions. The state

- 10 -

responded by allowing Williams' counsel to inspect everything in the state's file. Id. The post-conviction court addressed this claim and rejected it because Williams did not allege "any specific information that is contained within such psychological or prison records, nor how such information would have been admissible at trial, nor how such information would have effected the credibility" of the two witnesses. (Resp't Ex. 32 at 781.)

Based on the foregoing, the Missouri Supreme Court concluded that a Brady violation did not occur. If Williams wanted Cole and Asaro's records his discovery requests should have been directed at the entities holding those records not at the state. Williams, 168 S.W.3d at 440. The rulings of the post-conviction court and the Missouri Supreme Court on this issue are not contrary to or an unreasonable application of clearly established federal law.

Williams also claims that agents of the state, prior to trial, approached two inmates, John Duncan and Kimber Edwards, at the St. Louis County jail and offered them leniency if they testified against Williams with incriminating information provided by the state. Williams asserts that he was prejudiced by the state's effort to manufacture evidence against him, even though neither of these witnesses testified at trial, because this evidence would have tainted the credibility of Cole and Asaro's trial testimony. The Missouri Supreme Court found as speculative and conclusory the allegation that the prosecution's "offer of assistance to two men who did not testify at trial is tantamount to the 'manufacture' of evidence that negatively impacts the credibility of witnesses who testified and were subject to cross-examination." Id. The court's ruling on this issue not contrary to or an unreasonable application of clearly established federal law.

*Claims 2 and 3 - Ineffective Assistance of Counsel Re Impeachment of Cole and Asaro*

Williams asserts that he was denied effective assistance of counsel because trial counsel failed to investigate and present available evidence to impeach Cole and Asaro.

To prevail on this claim Williams must satisfy a two-pronged requirement. First, he must show that counsel's performance was deficient. Strickland v. Washington, 466 U.S. 668 (1984). This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id. at 687. In considering whether this requirement has been established, "judicial scrutiny of counsel's performance must be highly deferential." Id. at 689. The courts seek to "eliminate the distorting effects of hindsight" by examining counsel's performance from counsel's perspective at the time of the alleged error. Id.

Second, Williams "must show that the deficient performance prejudiced the defense." Id. at 687. This requires him to demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. Counsel is not ineffective for failing to make a meritless argument. See Rodriguez v. United States, 17 F.3d 225, 226 (8th Cir. 1994).

*Henry Cole*

Williams asserts that trial counsel failed to interview Cole's relatives, who would have testified that Cole had made false allegations in the past, had a reputation for providing false information to the police in exchange for leniency, and provided false information to obtain money for illegal drugs.

The post-conviction court found that the Cole's family members' potential testimony

would have been inadmissible at trial because it consisted of specific prior bad acts of Cole which is not allowed to impeach witnesses. (Resp. Ex. 32 at 784.)  The post-conviction court also concluded that Cole was thoroughly impeached at trial through the use of his extensive criminal record. (Id. at 785.)  Williams' trial counsel argued that Cole was not to be trusted, he was a con man, and a violent diabolical criminal. (Id.)  The post-conviction court concluded that trial counsel did an effective job of attacking Cole's credibility and that Williams was not prejudiced by counsel's failure to offer inadmissible testimony of Cole's family members.

The Supreme Court of Missouri also made the determination that, under Missouri law, this type of testimony would have been inadmissible.  The court relied upon the rule that extrinsic evidence of prior witness misconduct is generally inadmissible. Id. at 441 (citing State v. Long, 140 S.W.3d 27, 31 (Mo. 2004)).  The court noted that an exception in Long to allow extrinsic evidence in "some cases" where the "prosecuting witness" has made prior false allegations does not apply to Cole who was neither a victim or a prosecuting witness at Williams' trial. Id.

The Missouri Supreme Court's ruling is the highest authority on Missouri evidentiary law.  The court's ruling on the admissibility of evidence in Missouri state court is barred from federal review in a federal habeas proceeding. See Schleeper v. Groose, 36 F.3d 735, 737 (8th Cir. 1994)( "A federal court may not re-examine a state court's interpretation and application of state law.").

In his habeas petition Williams' asserts that Cole's relatives would also have testified about Cole's history of mental illness, auditory hallucinations and bizarre behavior.  In his post-conviction proceeding Williams additionally asserted that a court-ordered psychiatric evaluation

would prove that Cole was incompetent to testify. The post-conviction court rejected these grounds for relief. It noted that Williams' provided no basis for the conclusory allegation that had trial counsel obtained a psychiatric evaluation the trial court would have found Cole to be an incompetent witness.

The Missouri Supreme Court also concluded that Williams failed to specify in his post-conviction motion any information in Cole's records that would have established that Cole was incompetent to testify. The court stated that Williams' allegations about Cole's competence were "speculative conclusions, not facts," which the post-conviction court properly dismissed. Williams, 168 S.W.2d at 441.

*Laura Asaro*

Williams claims that he was denied effective assistance of counsel because trial counsel failed to investigate and present available evidence to impeach Asaro. He states that counsel failed to interview Asaro's friends, neighbors and relatives, who would have testified that Asaro admitted "set[ting] up" petitioner for the reward, that she needed the money for illegal drugs, that she had made false allegations against others, and that she was a known police informant who lied to get herself out of trouble. (Pet. at 35.)

Williams also argues that trial counsel failed to interview Asaro's mother who would have been able to impeach Asaro's testimony on several points (whether petitioner's car was operable on the day of the crime, whether Asaro had access to the trunk of the car, whether Asaro gave her mother coupons similar to those found in the victim's purse, whether Asaro received any letters mailed from jail by petitioner). (Pet. at 36.)

In addition, Williams argues that trial counsel failed to test Asaro's DNA against

- 14 -

biological evidence from the crime scene which did not match the victim, the victim's husband or Williams. Williams asserts that if the biological evidence from the crime scene *had been connected* to Asaro, it "would have totally destroyed her credibility by establishing that she was present at the scene when the victim was killed." (Pet. at 37.)   In an affidavit submitted to the post-conviction court, trial counsel recognized the importance of attempting to match crime scene DNA to known suspects, but did not have time to do it. (Id.)

Williams' asserts he is entitled to habeas relief on these claims because the Missouri Supreme Court's conclusion that the non-disclosed impeachment evidence was cumulative is an unreasonable interpretation of the record and that, if granted an evidentiary hearing, petitioner can establish both deficient performance and actual prejudice. (Pet. at 38.)

The Missouri Supreme Court affirmed the post-conviction court's finding that counsel was not ineffective for failing to call witnesses to testify that Asaro was a drug addict and prostitute who was framing Williams to collect a reward offered in the case. The court found this evidence to be "cumulative to the evidence at trial because the record contained evidence of Arsaro's drug addiction, prostitution, and that she might receive reward money for testifying at trial." Williams, 168 S.W.3d at 441.

The court also ruled that information which may have been elicited from Asaro's mother, regarding whether Williams' car was operable in August 1998 was conclusory because it was based only on her mother's observation that Williams' and Asaro had used public transit several times in that month. It was also cumulative because Williams' brother testified at the trial that the car was inoperable. Id. at 442.

Williams' asserts that Asaro's mother would also have testified that Asaro gave her

- 15 -

coupons that were similar to coupons found in the Ms. Gayle's purse in an effort to impeach Asaro. But absent a factual allegations that the coupons were obtained from the purse the court found this allegation to be conclusory. Id.

At trial Asaro testified that she has received two letters from Williams while he was in jail which stated that he hoped she was not thinking about saying anything about the "U City incident." She also testified that when she spoke to police on November 17, 1999, she no longer had the letters because her mother threw them away. (Resp't Ex 10 at 1887-1888.) In his habeas petition Williams asserts that at his Rule 29.15 motion states that Asaro's mother would testify that she "never *saw* any letters mailed from the jail from petitioner" (emphasis added) citing the Rule 29.15 L.F. at 165-166 (Resp't Ex 29). (Pet. at 36.) Williams argues that Asaro's mother's testimony would have refuted Asaro's testimony that she received incriminating received letters from Williams which would impeach her credibility. A review of the record, however, shows that Williams misstates the evidence of what Asaro's mother would have said. The record shows that Asaro's mother would have testified that "she never *read* any letters from [Williams] to Asaro where he talked about the University City incident." (Resp't Ex. 29 at 165-166.) It does not say that Asaro's mother never *saw* any letters from Williams, nor does this evidence refute Asaro's testimony that her mother threw letters away.

The post-conviction motion court and the Missouri Supreme Court concluded that Asaro's mother's proposed statement that she had not read any letters from Williams would not have impeached Asaro's testimony that Asaro received the letters. Williams, 168 S.W.3d at 442. This conclusion is fully supported by the record.

Williams allegations that counsel was ineffective for failing to question Williams' family

members who would have testified that Asaro had access to keys to the car Williams' drove and to the trunk is also without merit. Williams asserts that this information would show that Asaro was involved in the murder and was setting Williams up by planting evidence in the car. The Missouri Supreme Court properly concluded from the record that this evidence would have been cumulative of Asaro's and other witness testimony that Asaro had access to the interior of the car. Id.

Finally, Williams alleges that trial counsel was ineffective for failing to test Asaro's blood and hair against evidence at the crime scene that could not be matched to Ms. Gayle, her husband, or Williams in order to connect Asaro to the crime scene. The Missouri Supreme Court found that this allegation of ineffective assistance did not rely on any specific facts and was merely speculative conclusions that "if such testing was performed, it would show that Asaro was present at the crime scene." Id. The court's conclusion is supported by the record.

Based on the foregoing, I find that the post-conviction court's and the Missouri Supreme Court's rulings that Williams did not receive ineffective assistance of counsel based on trial counsel's failure to investigate and present available evidence to impeach Cole and Asaro is not based on an unreasonable determination of facts, an unreasonable interpretation of the record or an unreasonable application of established Supreme Court precedent.


### Claim 4 - Perjured Testimony - Actual Innocence

*Perjured Testimony*

Williams asserts that his conviction and sentence violate due process because Cole and Asaro committed perjury at his trial. Williams argues that Cole's and Asaro's testimony about

petitioner's conduct are inconsistent and contain many discrepancies. He claims that they were notoriously unreliable "jailhouse informants" who were motivated by the reward money. He argues that Cole and Asaro were key prosecution witnesses and that, but for the prosecution's use of their perjured testimony, there is a reasonable probability that he would have been acquitted. (Pet. at 41.)

The state counters that this claim has been procedurally defaulted because this claim was not presented to the state courts. Williams asserts that this claim is related to his Brady claims and therefore, not defaulted. I find that this claim is very distinct from the Brady claims which attempted to undermine the credibility of Cole and Asaro's testimony but did not accuse them of perjury. Because Williams has failed to show cause why he did not raise this claim in his state court proceedings this claim is procedurally defaulted. Skillicorn, 475 F.3d at 976.

I also agree with the state's position that the record demonstrates that Williams' counsel effectively cross-examined Cole and Asaro and that contradictions in their testimony do not prove perjury, much less the prosecutor's knowing reliance on perjury. (Resp. at 24.)

*Actual Innocence*

Williams argues that there are "five unresolved issues which, if fully developed through discovery and an evidentiary hearing, will establish that [he] is actually innocent of the murder." (Pet. at 43.) Those issue are: (1) Cole and Asaro committed perjury at trial and are unworthy of belief (that jailhouse informants are notoriously unreliable); (2) the state manufactured evidence against Williams (this refers to the attempt to persuade two jail inmates to testify against Williams); (3) evidence from the crime scene did not match Williams, the victim or her husband, and biological evidence taken from the victim did not match Williams; (4) another murder was

- 18 -

similar to this murder and the two might be connected (suggesting a serial killer); and (5) police misconduct in connection with the search of his car.

The state argues that there is no "free standing" claim of actual innocence in habeas cases citing Burton v. Dormire, 295 F.3d 839, 842 (8th Cir. 2002)("Claims of actual innocence based on newly discovered evidence have never been held to state a ground for habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding."). The state argues that petitioner does not assert a "gateway" actual innocence claim or any newly discovered evidence, but instead argues the weakness of the evidence presented at trial, for example, the lack of credibility of Cole and Asaro and the lack of forensic evidence. (Resp. at 23.)

Williams' concedes that "freestanding claims" of actual innocence are not cognizable on habeas review, but argues that, if DNA testing were to exonerate Williams, this case would provide the Eighth Circuit (and eventually the Supreme Court) with the opportunity to reconsider that holding. (Traverse at 36-37.)

None of Williams' "five unresolved issues" constitute newly discovered evidence in the actual innocence context because all of these points could have been discovered earlier through the exercise of due diligence. Meadows v. Delo, 99 F.3d 280, 282 (8th Cir. 1996)("The test for newly discovered evidence is whether the evidence could have been discovered earlier in the exercise of due diligence.")(internal quotation omitted). In addition, Williams freestanding claim of innocence is not cognizable ground for habeas relief in the absence of an independent constitutional violation occurring in the underlying state criminal proceeding. Burton, 295 F.3d at 842.

*Claim 5 - State's Peremptory Strikes Violated <u>Batson</u>*

Williams challenges the prosecutor's use of peremptory strikes against three African American venirepersons: Henry Gooden, William Singleton, and Marvin Fortson. He alleges that these strikes violated the holding in <u>Batson v. Kentucky</u>, 476 U.S. 79 (1986). A party may not use peremptory strikes to exclude prospective jurors deliberately on account of their race. <u>Id.</u> at 96-98.

"<u>Batson</u> enumerated a three-step process to guide a trial court's review: First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race; second, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question; and third, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination." <u>Taylor v. Roper</u>, 577 F.3d 848, 854 (8th Cir. 2009)(internal quotation and citation omitted). The defendant bears the burden of persuasion to establish a <u>Batson</u> violation. <u>Id.</u> The determination of whether a peremptory strike was motivated by race "is ultimately a question of fact." <u>Id.</u> "[A] determination of a factual issue made by a State court shall be presumed to be correct" in a federal habeas proceeding." <u>Id.</u> (quoting 28 U.S.C. § 2254(e)(1)). A state court's determination regarding the prosecution's intent may be set aside only by rebutting the presumption of correctness by clear and convincing evidence. <u>Id.</u> at 855.

Moreover, in a habeas case, if <u>Batson</u> claims were adjudicated on the merits in state court proceedings then a defendant must show that the adjudication either 'resulted in a decision that

- 20 -

was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding,' 28 U.S.C. § 2254(d)(2), or 'resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.' Id. § 2254(d)(1)." Id.

Williams asserts that he established a prima facie Batson claim based on the prosecutor striking six of seven African-American venirepersons, leaving one African-American juror on the petit jury. (Pet. at 48.) He alleges that the prosecutor's articulated facially race-neutral explanations for the three strikes at issue are neither supported by the record nor plausible  He also argues that the trial court improperly failed to decide whether or not these reasons were pretextual and improperly concluded that Williams failed to establish purposeful discrimination. (Id. at 50-64.)

Williams argues that the prosecutor's articulated explanations for the strikes at issue were simply not persuasive.  The state articulated three "facially permissible" explanations for the strike of venireperson Gooden:  his appearance and clothing "too closely" resembled Williams', his job as a postal worker, and his views on the death penalty.

Williams asserts that the trial court failed to consider whether the explanations articulated were plausible and failed to determine whether those explanations were pretextual.  With respect to appearance, the prosecutor referred to Gooden's "bookish" glasses, jewelry (earrings and necklace), goatee, and "loud" clothing.  Williams notes that the prosecutor asked no questions on voir dire related to Gooden's appearance or job; the prosecutor's questions were instead related to the Gooden's ability to impose the death penalty.  Williams argues that the state's failure to engage in any meaningful voir dire examination on a subject the state alleges it is concerned

- 21 -

Case 4:05-cv-01474-RWS   Docu#ne1283   Filed 03/26/10   Page 22 of 46

about is evidence suggesting that the explanation is a sham and a pretext for discrimination. In addition, Williams argues that the prosecutor failed to explain how Gooden's appearance was relevant to the case.

The Missouri Supreme Court determined that striking "a prospective juror based upon clothing and attire does not reflect and inherent racial bias motivating the strike." Williams, 97 S.W.3d at 471.

Williams also argues that the prosecutor did not ask Gooden any questions about his job as a postal worker. Williams asserts that Missouri cases have held that occupation is rarely a valid reason for a peremptory strike. Missouri cases do not unequivocally support this proposition. See Id. at 472 ("the prosecutor stated that he struck the venireperson because of he was a postal employee. Employment is a valid race-neutral basis for striking a prospective juror.")(citing State v. Smulls, 935 S.W.2d 9, 16 (Mo. 1996)("Even assuming the prosecutor's reasons for challenging mail sorters and postal workers are non-sensical, this does not establish the reasons are inherently pretextual.")). However, the Missouri Supreme Court has also stated that "the state goes too far in arguing that a strike automatically survives a charge of pretext if the prosecutor states the strike was based on the prospective juror's occupation as a postal worker, without more." State v. Edwards, 116 S.W.3d 511, 526 (Mo. 2003).

At Williams' trial the prosecutor explained that he wanted to strike Gooden because he was a clerk, a mail processing supervisor, and the prosecutor's experience found mail handlers and clerks very liberal. (Tr. at 1586.) The prosecutor noted to the trial court that he was not moving to strike another African American postal worker because he was not a clerk, he was a mechanic who is "not your typical postal worker" who tend to be liberal. (Tr. at 1587.) The

- 22 -

prosecutor, therefore, offered "something more" than the mere fact Gooden was a postal worker as a basis of this strike.

Williams further argues that the record does not support the prosecutor's explanation that the prosecutor was uncertain whether Gooden could impose the death penalty. He asserts that Gooden's answers to death qualification questions showed that he could impose a death sentence. (Pet. at 56)(citing voir dire exchange). Williams argues the prosecutor failed to ask further death qualification questions and failed to strike two white venirepersons who gave similarly equivocal answers to death qualification questions. (Id. at 57.)(citing venirepersons 57 and 81).

Williams makes similar arguments about the prosecutor's peremptory strikes against the two other African-American venirepersons--Singleton and Fortson. That is, that the prosecutor failed to ask follow-up questions, similarly situated white venirepersons were not struck, and the record does not support the prosecutor's articulated explanations. Williams asserts that the record shows that Singleton stated that he could vote for the death penalty and that he would follow the law. (Id. at 60.)

In 1988 Singleton pleaded guilty in a court martial to a misdemeanor charge of wrongful appropriation of government funds, but he maintained that he was innocent. The prosecutor explained that he was concerned that Singleton perceived himself as having been wrongfully convicted. (Tr. at 1592 - 93.) Williams argues the prosecutor failed to ask Singleton questions about the guilty plea or whether it might affect his partiality in the case. Williams also notes that the prosecutor did not strike two white jurors with misdemeanor convictions. (Pet. at 61)(juror 32 and juror 67).

Similarly, Fortson stated during voir dire that he could consider imposing the death

- 23 -

penalty and would follow the law.  The prosecutor explained the peremptory strike because Fortson had been fired from his job for fighting with another employee.  Id. at 62.  The prosecutor asked Fortson several questions about the fight.  Williams argues that other venirepersons were not questioned about why they had been fired (why they were unemployed).  The prosecutor also explained that Fortson may have been offended because other venirepersons laughed at his explanation for the fight and that he had crossed his arms during the state's death qualification questioning but did not do so during the defense's questioning.  Id. at 63.  Williams asserts that the prosecutor did not make a record of this behavior at the time.  Williams argues that this kind of behavior (arm gestures) is "largely irrelevant to one's ability to serve as a juror" and is merely a post-hoc rationalization.  Id. at 64 (citing State v. McFadden, 191 S.W.3d 648, 655 (2006)).

Finally, Williams states that several recent state court decisions have found racial bias in peremptory strikes by prosecutors in the same jurisdiction where the trial in the present case occurred.  Id. at 65-68 (state decisions involving trials conducted before and after the trial in the present case, in particular McFadden, 191 S.W.3d 648 ).

The state argues that once the defendant makes a prima facie case (stage one), the prosecutor has the burden to provide a race-neutral explanation (stage two).  However, the state argues that the explanation should not be rejected at stage two as silly or superstitious. (Resp. at 27, citing Purkett v. Elem, 514 U.S. 765, 767-768 (1995).)  The state emphasizes that it is not until the third stage (pretext) that the trial judge decides, as a matter of fact, usually on the basis of the demeanor and credibility of the prosecutor, whether the explanation is pretextual. (Resp. at 28, citing Hernandez v. New York, 500 U.S. 352, 365 (1991)( "As with the state of mind of a

- 24 -

juror, evaluation of the prosecutor's state of mind based on demeanor and credibility lies peculiarly within a trial judge's province.))

The trial court found that the prosecutor's explanations for each challenged peremptory strike were race-neutral and not pretextual. (Resp. at 28-29.) Whether the prosecutor's explanation is pretextual is a finding of fact that is presumed to be correct under 28 U.S.C. § 2254(e) and may only be rebutted by clear and convincing evidence.

The Missouri Supreme Court found that the prosecutor's explanations for the three challenged peremptory strikes were facially race-neutral and were not inherently discriminatory. Williams, 97 S.W.3d at 471- 472. This decision is supported by the record and Williams has failed to overcome the presumption that this determination was correct by clear and convincing evidence. I find that Williams has not established that the Missouri Supreme Court's decision was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding, or resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.

### Claim 6 - Ineffective Assistance Concerning Williams' Social and Medical History

Williams asserts that he received ineffective assistance of trial counsel because counsel failed to conduct an adequate investigation and present evidence about Williams' social history and medical history as mitigating factors during the penalty phase of the trial.

During the penalty phase, the state presented the testimony of thirteen witnesses who testified about Williams' criminal history. It also presented his criminal record. In mitigation of

- 25 -

punishment, Williams' counsel relied upon "residual doubt" as a theory of defense and presented brief testimony from a few family members, including Williams' mother and brother, that Williams was a good father. Williams' trial counsel did not present any evidence about Williams' troubled background, family, social, and psychological history. The jury deliberated less than two hours before sentencing Williams to death. Williams argues that had trial counsel investigated and presented social and medical history evidence during the penalty phase, the jury would have been presented with a much different balance of aggravating and mitigating evidence and that there is a reasonable probability that the outcome of the penalty phase would have been different.

Williams asserted this claim in his post-conviction motion. He argued that his trial counsel failed to properly investigate Williams social and medical history in preparation for trial. (Resp't Ex. 29 at 88.) In support of this claim Williams stated that his trial counsel would testify that they intended to present expert testimony to explain Williams' social history and prior criminal conduct. (Id. at 89.) Counsel hired Mark Cunningham, Ph.D. to investigate Williams' social history, but hired him too late to establish a rapport with Williams and never got a complete social history. (Id.) As a consequence counsel failed to offer the testimony of a qualified psychologist or psychiatrist to explain the statutory and non-statutory aggravating circumstances to the jury. (Id.)

In addition, Williams claimed that counsel failed to interview Williams' family members to obtain evidence of mitigating factors for the jury to consider. (Id. at 90.) The information that would have been uncovered include the facts that Williams was subjected to brutally violent physical abuse by family members, he was a victim of sexual abuse, his family condoned and

- 26 -

encouraged criminal behavior, he came from an impoverished household, and he was exposed to guns, drugs and alcohol at a young age. (Id.) Counsel's mitigation specialist, Jeff Eno, began such an inquiry but did not conduct a thorough investigation because he had not been asked to do so. (Id.) Although some family members testified at the penalty phase they were not asked about Williams' dysfunctional background because counsel had never interviewed them to obtain this information.

Williams' post-conviction motion counsel retained a clinical psychologist, Dr. Donald Cross, to conduct a social and psychological history of Williams. Dr. Cross  (Dr. Cross's affidavit is attached to the habeas petition as Ex. 1.) Cross found that Williams grew up in an extremely violent and dysfunctional household in a neighborhood characterized by crime, drugs and poverty; he was of borderline intelligence; he experienced academic failure (he dropped out of school after the tenth grade); he had a poor relationship with his mother; his father abandoned him; he was repeatedly sexually abused as a child; he had severe nightmares as a child; during childhood he developed severe mental illnesses that were not treated (depression, post-traumatic stress syndrome); as a youth he became addicted to drugs and was mentally and emotionally unstable and suicidal; he suffered a serious head injury as a child. (Pet. at 74-78.)

The post conviction court did not hold an evidentiary hearing on this claim. It found that Williams' counsel's failure to present this mitigating evidence was a strategic decision. (Resp't Ex. 33 at 802.) The court found that counsel opted to present Williams as a loving father and son and advance a theory of residual doubt about Williams' guilt in order to argue against the imposition of the death penalty. (Id.) The court determined that if testimony of Williams' social and medical history was offered it would have cast Williams as a "violent, aggressive, and angry

person" and would have undermined counsel's residual doubt argument. (Id. at 801.)

Trial counsel filed his affidavit in support of Williams' motion to reconsider the post-conviction court's ruling. (Resp't Ex. 33 at 826.) Counsel stated in the affidavit that had the court held an evidentiary hearing on this claim he would have stated that he knew that investigating social and medical history was important mitigating evidence in a capital case. (Id. at 831.) He stated that he was unable to obtain this information in Williams' case because he was involved in another capital trial immediately before Williams' trial. (Id.) He sought a continuance which was denied and consequently did not have sufficient time to prepare for Williams' trial. (Id.) If counsel had done the investigation and discovered Williams' background (which was subsequently done by post-conviction counsel) he would have submitted that evidence at the trial. (Id. at 832-833.)

In addition, counsel filed affidavits of several witnesses stating that if the post-conviction court had held an evidentiary hearing they would have testified to Williams' dysfunctional background. (Id. at 834-930.)

In reaching its decision to deny this claim the post-conviction court never addressed counsel's duty to thoroughly investigate Williams' background. The Missouri Supreme Court affirmed on the basis that the decision to not put on an abusive childhood defense was a matter of trial strategy that was "virtually unchallengeable in an ineffective assistance claim." Williams, 168 S.W.3d at 443. The court did not address Williams' *failure to investigate* aspect of his claim.

In his habeas petition, Williams asserts that trial counsel's failure to obtain a complete report from an expert regarding the aggravating circumstances and the failure to interview family

members regarding Williams' background completely undermined the state courts' determination that counsel's failure to put on mitigating evidence was simply an appropriate trial strategy. He argues that the lack of investigation and presentation of mitigating evidence was a violation of his constitutional right to effective counsel. He asserts that the state courts' determination of this claim was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States. (Pet. at 82.)

He also asserts that the decision was an unreasonable determination of the facts in light of the evidence presented in the state court proceeding because the post-conviction motion court never held a hearing on this claim to fully develop the record. If it had, the record would show the residual doubt theory became a defense strategy by default because trial counsel failed to prepare mitigating evidence which would allow him to make an competent strategy decision. In addition, the residual doubt strategy was hollow because trial counsel never argued to the jury that it should spare Williams' life due to a lingering doubt of guilt. (Pet. at 80, Traverse at 66.) To the contrary, trial counsel told the jury "I'm not trying to make you go back and revisit your verdict." (Resp't Ex. 18 at 3498.)

The United States Supreme Court has held that trial counsel has a duty to conduct a thorough investigation of defendant's background in preparing for a death penalty case. Wiggens v. Smith, 539 U.S. 510, 522 (2003)(citing Williams v. Taylor, 529 U.S. 362, 396 (2003)). A limited investigation into potential mitigating evidence cannot be justified as a tactical decision which results in counsel's failure to present mitigating evidence at sentencing in order to pursue an alternative strategy instead. Id. at 521. (A failure of counsel to "uncover and present voluminous mitigating evidence at sentencing cannot be justified as a tactical decision to" focus

instead on another ground to avoid the death penalty.)  Deference to a strategic choice of trial counsel is virtually unchallengeable but only if the choice is made *after* a thorough investigation of the law and facts relevant to the plausible options.  Id. at 521 (citing Strickland v. Washington, 466 U.S. 668, 690-691 (1984).

The Court noted that the ABA's guidelines state that investigations into mitigating evidence "'should comprise efforts to discover all reasonably available mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor.'" Id. at 524 (citing ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(C), p. 93 (1989)).  "'Among the topics counsel should consider presenting are medical history, educational history, employment and training history, family and social history, prior adult and juvenile correctional experience, and religious and cultural influences.'" Id. (citing ABA Guideline 11.8.6, p.133).

If counsel abandons the investigation of a defendant's background "after having acquired only rudimentary knowledge of his history from a narrow set of sources" his representation is constitutionally ineffective.  Id. at 525-530.  The unreasonableness of counsel's conduct is further highlighted if the failure to thoroughly investigate mitigating evidence resulted from counsel's inattention to the issue.  Id. at 526.

In Wiggins, the Supreme Court has clearly stated the requirement that counsel has the duty to thoroughly investigate a defendant's background in preparing a death penalty case.  A failure to do so establishes an ineffective assistance of counsel claim.  A trial strategy is not entitled to deference if it is not the product of a thorough investigation of law and facts relevant to plausible options.

I find that Williams has established the claim that his trial counsel was constitutionally ineffective for failing to thoroughly investigate Williams' background in search of mitigation evidence. The record is replete with evidence of Williams' family and social history and mental history which, if presented at trial, would establish a reasonable probability that the outcome of the penalty phase would have been different.[2]

Moreover, his counsel stated that the decision to not thoroughly investigate and put on this mitigating evidence at trail was not a strategic decision, it was the result of counsel not preparing this evidence. The reason he failed to prepare this evidence, because he ran out of time or through inadvertence, does not matter. His failure to competently provide representation, for whatever reason, establishes Williams' claim of ineffective assistance of counsel.

I find the state courts' reliance on trial counsel's residual doubt strategy is contrary to the Supreme Court's decision in Wiggins. Trial strategy cannot excuse defense counsel's failure to perform a thorough investigation of a defendant's background in a death penalty case. The state courts' decision rested solely on trial counsel's failure to put on mitigating evidence of Williams' background at the penalty phase because counsel was relying on residual doubt instead. The state courts never addressed trial counsel's failure to conduct a thorough background investigation in their decisions.

The state courts also determined that if Williams offered an abusive childhood defense it would have been inconsistent with his residual doubt strategy. Williams, 168 S.W.3d at 444.

_____

[2] Williams offered substantial amounts of mitigating evidence to the post-conviction court, unlike the defendant in Williams v. Norris, 576 F.3d 850, 859 (8th Cir. 2009)(defendant failed to prooffer the substance of any specific testimony to show what evidence he would have presented and whether it would change the mind of the jury).

This is an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Even if Williams' background evidence was considered by trial counsel and strategically not offered as evidence, Williams would still be entitled to relief. In light of the overwhelming amount of aggravating evidence that was proffered by the state, the jury would not think worse of Williams based on evidence of his dysfunctional youth and mental issues. Mitigating evidence was essential to attempt to provide some sort of explanation for Williams' murder of Ms. Gayle. See Simmons v. Luebbers, 299 F.3d 929, 938 (8th Cir. 2002).

I also find that the state court's decision was an unreasonable determination of the facts in light of the evidence presented in the state court proceeding because the post-conviction motion court never held a hearing on this claim to fully develop the record. If it had, the record would show the residual doubt theory became a defense strategy by default because trial counsel failed to properly prepare mitigating evidence which would have allowed him to make an competent penalty phase strategy decision.

As a result, I will grant Williams' habeas petition on this ground and remand this case to state court for a new penalty phase hearing.

***Claims 7 and 10 - Ineffective Assistance of Appellate Counsel***

*Claim 7*

In Claim 7 of his petition, Williams asserts that he received ineffective assistance of appellate counsel because counsel failed to appeal the trial court's denial of Williams' requests for a continuance. Trial counsel preserved the denial of a continuance as a claim of trial error in the post-trial motion for new trial. However, appellate counsel did not raise the denial of a

- 32 -

continuance as an issue on direct appeal.

About a month before trial, trial counsel requested a continuance in order to further prepare for trial. Williams asserts that, shortly before trial, the state disclosed the intent to rely on a jail assault as an additional non-statutory aggravating factor, the intent to introduce evidence of an uncharged burglary, and four new witnesses. In addition, Williams claims that trial counsel had not been able to obtain Williams' records from the department of corrections or Cole's prison records from several jurisdictions, correspondence and other records, forensic test results, and Williams' social and medical history. Trial counsel raised these matters in the initial motion for a continuance on May 7, 2001. The trial court denied the motion on May 9, 2001 off the record by an order which allowed Williams to make a record at a hearing set on May 25, 2001.

Williams filed a supplemental motion for a continuance, citing the receipt of forensic test results, the need to interview prosecution witnesses, and the need to conduct additional forensic tests as the basis for a continuance. After a hearing the trial court also denied the supplemental motion for a continuance.

A decision of whether to grant an continuance or not lies with in the sound discretion of the trial court. Williams, 168 S.W.3d 433, 444 (citing State v. Brown, 902 S.W.2d 278 (Mo. 1995). See also State v. Chambers, 891 S.W.2d 93, 100 -101 (Mo. 1994)("A very strong showing is required to prove abuse of that discretion; the party requesting the continuance must show prejudice.") "Inadequate preparation does not justify a continuance where counsel had ample opportunity to prepare." Chambers, 891 S.W.2d at 101.

At a hearing on May 25, 2001, Williams argued his supplemental request for a continuance. He asserted that he needed more time to interview three prison inmates, one of

- 33 -

whom had recently revealed to the prosecution that Williams had stated that "he had stabbed a woman about forty times with a knife, or that he was charged with that." (Tr. at 99.)   The prosecutor told the trial judge that one of the witnesses had since died and that he would not use the other two witnesses at trial or during the penalty phase.  He stated that he might call one of these witnesses (Mathieu Hose) for impeachment purposes if Williams' testified at trial and denied that he made such a statement.  (Id. at 100.)  The prosecutor also stated that other witnesses whom Williams sought to interview were endorsed in the file more than a month earlier.

The prosecutor also reviewed a list of the items that Williams' counsel wanted (which formed the basis of the request for a continuance) that had been available to counsel for months. (Tr. at 109- 122.)  Addressing Williams' request to do further DNA testing the prosecutor told the trial court that no forensic evidence was found at the crime seen that matched Williams.  (At trial two forensic experts testified that none of Williams' hairs were found at the crime scene and none of his DNA was found under Ms. Gayle's fingernails.  Williams, 168 S.W.3d at 445.)  The prosecutor stated that there was no need for a continuance to do further DNA because it had already been determined that no DNA at the crime scene matched Williams.

The trial court denied Williams' supplemental motion for a continuance.  The post-conviction court found that Williams' counsel had ample time to prepare the case (Williams' trial counsel entered their appearance in the case a year before Williams' trial) and that appellate counsel was not ineffective for failing to raise the denial of a continuance on direct appeal. (Resp't Ex. 33 at 811.)  The Missouri Supreme Court concluded that Williams' allegations in this claim "do not support a finding of a reasonable probability that appellate counsel could have

successfully argued that the trial court erred by not granting a continuance." Williams, 168 S.W.3d at 445.

*Claim 10*

In Claim 10 of his petition, Williams asserts that he was denied effective assistance of appellate counsel because counsel failed to appeal the trial court's exclusion of mitigating evidence from Dr. Mark Cunningham about the adverse impact that Williams' execution would have on Williams' family.

Williams argues that the impact of an execution on a defendant's family is relevant to the defendant's character and proper mitigation evidence. (Pet. at 102.) He asserts that, had appellate counsel briefed this issue, there is a reasonable probability that the outcome of the appeal would have been different.

This claim was raised in the motion for post-conviction relief and was denied without an evidentiary hearing because the motion court decided that the evidence did not relate to Williams' character, record or circumstances of his case. (Resp't Ex. 33 at 812.) The Missouri Supreme Court affirmed that ruling noting that it had previously held that "testimony from a murder victim's family as to the appropriate punishment is inadmissible in a capital case." Williams, 168 S.W.3d at 445 (citing State v. Smith, 32 S.W.3d 532, 555 (Mo. 2000)). The court concluded that this holding extends "to exclude testimony form a defendant's family regarding the appropriate punishment." Id. The court noted that all but one state court who considered this issue concluded that testimony from a defendant's family or friends regarding the impact of a death sentence was inadmissible. Id. The court concluded that the motion court did not err in denying this claim of ineffective assistance of appellate counsel. Id.

- 35 -

I find that Williams is not entitled to relief on Claim 7 or Claim 10 because the state court's rulings on these claims were not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding, or result in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.

### Claim 8 - Failure to Inquire About a Conflict of Interest

Williams alleges that he was denied effective assistance of counsel because trial counsel had a conflict of interest and the trial court failed to inquire and resolve this issue. This claim arises from a pro se motion Williams filed with the trial court alleging trial counsel had a conflict of interest because they failed to interview specific witnesses in order to impeach Cole. (Pet. at 92.) Williams asserted in his pro se motion that "the attorney-client relationship has dissolved" and that he lacked "trust and confidence" in trial counsel because of their pursuit of "their own personal interests." (Pet. at 94 (citing Resp't Ex. 21 at 444) (the motion did not state what those personal interests were). The trial court denied the motion without a hearing on that issue (although trial counsel was seeking evidence to impeach Cole as evidenced in the motion for a continuance (Resp't Ex. 21 at 395-396)).

In cases involving a trial court's failure to inquire into defendant's alleged conflict with counsel, a defendant must show that a conflict of interest actually affected the adequacy of counsel's performance, rather than the Strickland prejudice test of "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Ausler v. U.S., 545 F.3d 1101, 1104 (8th Cir. 2008)(citing Mickens v. Taylor, 535 U.S. 162, 168

(2002).[3]

Williams habeas petition states that Williams' conflict of interest claim concerned his counsel's failure to interview witnesses regarding Cole. The post-conviction court ruled that this motion was intertwined with counsel's request for a continuance in which counsel sought, among other things, to interview witnesses regarding Cole's credibility. (Resp't Ex. 32 at 796-797.)

The post-conviction court found ample proof in the trial transcript that Williams' trial counsel, through effective cross-examination of Cole, attacked his credibility "in practically every way possible." (Id. at 798.) The court found that Williams' allegation that he was prejudiced by trial counselor's alleged failure to investigate was merely a conclusion unsupported by "any specifics." (Id. at 799.) The court found that Williams' claims that there was an irreconcilable conflict of interest with his counsel and that there was a communication breakdown with his counsel were merely legal conclusions asserted by Williams. (Id.)

The Missouri Supreme Court affirmed the post-conviction court's decision noting that Williams' motion "contains no allegations as to how or why counsel was ineffective for failing to obtain a hearing on the conflict of issue claim. Williams, 168 S.W.3d at 446.

I find that Williams failed to establish in the post-conviction proceedings that a conflict of interest actually affected the adequacy of counsel's performance. Ausler, 545 F.3d at 1104. Based on the record before the state courts, I find that their rulings were not an unreasonable

---

[3] Williams argues that the trial court's failure to have a hearing on his motion comes within the automatic reversal rule of the United States Supreme Court's holding in Holloway v. Arkansas, 435 U.S. 475 (1978). However, the subsequent decisions of the Supreme Court have limited the automatic reversal rule of Holloway to cases "where defense counsel is forced to represent codefendants over his timely objection, unless the trial court has determined that there is no conflict." See Mickens v. Taylor, 535 U.S. 162, 168 (2002).

determination of the facts in light of the evidence presented in the state court proceeding, or resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.

### *Claim 9 - Exclusion of Exculpatory Hearsay*

The undisputed evidence at trial shows that Williams sold Glenn Roberts a laptop computer belonging to Ms. Gayle's husband a day or two after the murder. At trial Roberts testified that Williams sold him the computer. Roberts' testimony was limited to the "mechanics" of the transaction and he did not testify what was said during the transaction. Williams asserts that the trial court erred in excluding cross-examination of Roberts, as to what was said during the computer transaction. Specifically Williams wanted to ask Roberts if Williams told Roberts that he was selling the computer on behalf of Asaro. Trial counsel argued that this cross-examination was admissible under the "rule of completeness." The trial court excluded this cross-examination because it would introduce hearsay (Williams' out of court statements about the laptop). At trial Williams did not testify, and Roberts did not testify about what Williams told him during the sale of the laptop.

When the state "introduces part of a confession or admission into evidence, the defendant is authorized to introduce the remaining portion, although it may be self-serving." Williams, 97 S.W.3d at 468. The court found that through Roberts' testimony the state established that Williams had the computer and sold it to Roberts. Because the state did not ask Roberts about any statements Williams made to him, the rule of completeness did not apply because there was no statement or admission to complete. Id.

- 38 -

Williams argues that an "admission" can consist of conduct as well as statements (citing State v. Isa, 850 S.W.2d 876, 894 (Mo. 1993)), and that Roberts's testimony about Williams' inculpatory conduct (that Williams sold the laptop computer to Roberts) was "tantamount" to an admission which required that Williams be allowed to present the exculpatory aspects as well (that Williams was acting on behalf of Asaro). (Pet. at 99.) Williams argues that exclusion of his exculpatory statements, through a "mechanistic" application of the rule of completeness, while admitting inculpatory conduct, excluded evidence central to the theory of defense in violation of due process.

The state counters that Roberts' testimony about what Williams told him would have been hearsay and that there was no statement to "complete" because no statement of Williams to Roberts had been admitted.

Williams argues his hearsay statement to Roberts' testimony is admissible under the holding in Chambers v. Mississippi, 410 U.S. 284 (1973). In Chambers, the Court held that hearsay may be admitted in "circumstances that provide considerable assurance of their reliability." Id. at 300. In that case three separate witness would have testified at a murder trial that a third-party confessed to the murder. The trial court ruled these statements were inadmissible hearsay. The Court found that the confessions were made spontaneously to close acquaintances shortly after the murder and the third-party later signed a written confession which he later recanted. In addition, these confessions were corroborated by several other pieces of evidence in the case. Based on these multiple facts the Court held that the hearsay evidence of the witnesses was improperly excluded from trial. Id.

Williams asserts that his alleged statement to Roberts that he was selling the computer for

Asaro was a "spontaneous event to a close acquaintance" before he was a suspect in the murder which would be admissible hearsay under Chambers. (Traverse at 84-85.) I find that this fact alone does not "provide considerable assurance of [its] reliability" found in and required by Chambers to allow the admission of this hearsay evidence.

I also find the Missouri Supreme Court's ruling that Williams' statement could not come into evidence under the "rule of completeness" doctrine is not an unreasonable determination of the facts in light of the evidence presented in the state court proceeding, or resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.

### Claim 11 - Closing Argument During Penalty Phase

Williams argues that the prosecutor's closing argument during the penalty phase denied Williams due process of law. He asserts the prosecutor improperly commented on Williams' right to a jury trial, improperly compared Williams' life with that of the victim, expressed the prosecutor's personal opinion, referred to matters not in evidence, injected racial prejudice (petitioner is African-American, the victim white), and "inflamed" the jury. (Pet. at 105-06.)

In support of this claim, Williams points to excerpts of the state's closing argument at pages 3510 - 3515 of the trial transcript. (Resp't Ex. 18 at 3510 - 3515.)

The state argues that this claim is defaulted because it is not same claim presented to the state courts.

On direct appeal Williams challenged the trial court's inaction and rulings during the state's closing arguments in the guilt and penalty phase of the trial. His habeas petition does not

reassert his claim that the trial judge erred, it asserts that the prosecutor's improper closing argument in the penalty phase violated Williams' Eighth and Fourteenth Amendment rights.

Specifically, Williams' direct appeal was limited to two claims regarding the prosecutor's remarks. First, Williams alleged that the trial court erred by failing to *sua sponte* intervene in the guilt phase to prevent the state form personalizing testimony about Williams' choking Asaro. (Resp't Ex. 32 at 141.) Second, Williams asserted that the trial court abused its discretion in overruling Williams' objections in the penalty phase to the state's "comments comparing the rights of the victims to [Williams'] rights, that (1) if defense counsel had been in the victim's house asking [Williams] to be merciful, his pleas would have fallen on deaf ears; and (2) Williams was the victim's judge jury and executioner." (Id.)

The Missouri Supreme Court rejected both of these claims of error. Williams, 97 S.W.3d at 474-475. The court found that the prosecutor's argument concerning the choking of Asaro by Williams did not improperly suggest "personal danger to the jurors or use the kind of graphic detail that would prejudice Williams." Id. at 474. The court held that prosecutor's argument was a reasonable attempt to explain the fear Asaro had of Williams and why she did not come forward with her story sooner. Id.

The court also determined that the prosecutor's argument in the penalty phase regarding mercy and Williams acting as judge, jury and executioner were permissible rebuttal to Williams' argument for mercy from the jury. Id. at 475. The court rejected Williams' contention that this argument was an improper commentary on Williams right to remain silent. The court noted that a trial court has broad discretion to control the scope of closing argument and will only be reversed upon a showing of abuse of discretion that resulted in prejudice to the defendant. Id. at

- 41 -

Case 4:05-cv-01474-RWS   Document 58   Filed 03/26/10   Page 42 of 46

474. (citing State v. Deck, 994 S.W.2w 527, 543 (Mo. 1999).  The court found that Williams did not demonstrate prejudice based on the prosecutor's comments.  Id. at 475.

The claim raised in Williams' habeas petition did not assert that the trial judge erred, the claim Williams' asserted on direct appeal.  Rather, Williams' asserts a new claim that the prosecutor's argument in the penalty phase violated Williams' constitutional rights.  In support of this claim, Williams presents new parts of the prosecutor's argument to support new claims that the prosecutor "improperly expressed his personal opinion, argued facts outside the evidence, and injected racial prejudice into the case." (Pet. at 105-106.)

"Although a habeas claim need not present an 'exact duplicate' of one raised in the state proceedings, it must present the same factual and legal bases in state court in order for the claim to be preserved."  Winfield v. Roper, 460 F.3d at 1036 (citations omitted).

I find that the claims raised in Williams' habeas petition are not based on the same factual and legal basis Williams raised in the state court.  His theory of relief changed from a claim of judicial error on direct appeal to a claim prosecutorial misconduct in his habeas petition.  He also offers new parts of the prosecutor's argument that were not presented to the state court and offers new theories of prejudice (improper expression of personal opinion, argued facts outside the evidence, and injected racial prejudice into the case).  As a result I find that, the claims in the habeas petition are procedurally barred from review because they were not raised in state court.  Skillicorn, 475 F.3d at 976.

To the extent that Williams' claims could be construed to have been raised on direct appeal in state court, I find that the Missouri Supreme Court's decision as to these claims is not an unreasonable determination of the facts in light of the evidence presented in the state court

Case: 4:05-cv-01474-RWS   Doc. #: 104-6   Filed: 08/02/17   Page: 43 of 46 PageID
#: 1303
Case 4:05-cv-01474-RWS   Document 68   Filed 03/26/10   Page 43 of 46

proceeding, or resulted in a decision that was contrary to, or involved an unreasonable

application of, clearly established Federal law, as determined by the Supreme Court of the United

States.

### Claim 12 - Failure of Trial Counsel to Request a Limiting Instruction

On direct appeal Williams made the claim that the trial court abused its discretion by

denying his objection to evidence that Williams attempted to escape from the St. Louis City

workhouse approximately three weeks after he had been indicted on multiple charges, including

the first degree murder of Gayle, and on the day he had been sentenced to twenty years

imprisonment on separate charges. Williams, 97 S.W.3d at 469. The evidence showed that

Williams assaulted a guard with a metal bar during the escape attempt. Id. The Missouri

Supreme Court found that the escape evidence was properly admitted. Id.

In his post-conviction motion, Williams asserted that he received ineffective assistance of

trial counsel because counsel failed to request a limiting instruction (MAI-CR 3d § 310.12)

regarding the escape attempt. Williams asserts that the limiting instruction would have told the

jury that the evidence of an escape attempt "could only be used for consciousness of guilt

purposes, [and] the jury could not have used the evidence improperly as propensity or character

evidence. (Resp't Ex. 29.)

The post-conviction court denied this ground for relief finding that Williams pleaded

conclusions and "speculates that the jury used Movant's attempted escape as propensity evidence

- 43 -

or character evidence." (Resp't Ex. 33 at 800.)[4] The court noted that neither party argued to the jury that the escape evidence could be used for propensity or character evidence. (Id.)

The Missouri Supreme Court affirmed the motion court's ruling. I find the state courts' decisions are not an unreasonable determination of the facts in light of the evidence presented in the state court proceeding, or resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.

### Claim 13 - Duplicative Aggravating Circumstances

At the penalty phase of the trial, the court submitted ten statutory aggravating circumstances for the jury to consider in reaching its decision on whether Williams was eligible for a sentence of death. The jury found the existence of all ten circumstances and assessed a punishment of death.

Williams argues that three of the ten aggravating circumstances were unconstitutionally duplicative. Specifically, Williams asserts that aggravating circumstances 2, 3 and 4 described the same conduct and relied on the same facts (burglary, robbery, receiving money or any other thing of value) and that duplicative aggravating factors "skew" the penalty phase and create the risk of an arbitrary death sentence. (Pet. at 112.)

The Missouri Supreme Court rejected Williams' claim that the aggravating circumstances

---

[4] As an additional ground for denying relief on this claim the post-conviction court stated that the decision of whether to request the limiting instruction or not is a matter of trial strategy. (Resp't Ex. 32 at 799.) Trial counsel contends that its failure to request the instruction was not a trial strategy. Nevertheless, I find that the state courts' decision based on the conclusory and speculative nature of this claim precludes habeas relief.

- 44 -

were impermissibly duplicative. Williams, 97 S.W.3d at 474. (citing State v. Anderson, 79

S.W.3d 420(Mo. 2002)(no prejudice where aggravating factors are duplicative)).

The United States Court of Appeals has also held that instructing a jury on duplicative

aggravating factors under the Federal Death Penalty Act does not violate the constitution. United

States v. Purkey, 428 F.3d 738, 762 (8th Cir. 2005)(noting the Supreme Court has never "'held

that aggravating factors could be duplicative so as to render them constitutionally invalid.'")

(quoting Jones v. United States, 527 U.S. 373, 398 (1999)).

Based on the decisions in Purkey and Jones I find that the Missouri Supreme Court's

decision on this issue is not an unreasonable determination of the facts in light of the evidence

presented in the state court proceeding, or resulted in a decision that was contrary to, or involved

an unreasonable application of, clearly established Federal law, as determined by the Supreme

Court of the United States.


Accordingly,


**IT IS HEREBY ORDERED** that Petitioner Marcellus Williams' Petition for Writ of

Habeas Corpus [#s 2 and 9] is **GRANTED IN PART AND DENIED IN PART**. Williams'

claim for relief as to his underlying condition is **DENIED**. Williams' claim for relief from the

penalty phase of his trial is **GRANTED** based on trial counsel's constitutionally ineffective

assistance for failing to investigate and present mitigating evidence of Williams' social and

family history.

- 45 -

**IT IS FURTHER ORDERED** that this case is remanded to the Circuit Court of the County of St. Louis, State of Missouri, for a new hearing of the penalty phase of Williams' trial.

A separate Judgment in accordance with this Memorandum and Order is entered this same date.

_____
RODNEY W. SIPPEL
UNITED STATES DISTRICT JUDGE

Dated this 26th day of March, 2010.