SC94720

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

# IN THE
## SUPREME COURT OF MISSOURI

| | | |
|---|---|---|
| In Re: MARCELLUS WILLIAMS, | ) | |
| | ) | **CAPITAL CASE** |
| Petitioner, | ) | **Execution Set for** |
| | ) | **January 28, 2015** |
| v. | ) | **At 12:01 a.m.** |
| | ) | |
| TROY STEELE, Superintendent, | ) | Case No. _____ |
| Potosi Correctional Center | ) | |
| | ) | |
| Respondent. | ) | |

## PETITION FOR A WRIT OF HABEAS CORPUS

COMES NOW petitioner, Marcellus Williams, a Missouri prisoner under a sentence of death in respondent's custody, and petitions this Court, pursuant to Rule 91 and Article I, Section 12 of the Missouri Constitution, for a writ of habeas corpus vacating his convictions for first degree murder and other offenses and his sentence of death. Petitioner further moves this Court to stay his execution, currently scheduled for January 28, 2015 and appoint a Special Master pursuant to Rule 68.03 to address petitioner's requests for additional DNA testing and for any DNA profiles to be run through national and state DNA databases and conduct any necessary follow-up hearings thereafter. In support of this petition, Mr. Williams states as follows:

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

**SUGGESTIONS IN SUPPORT**

**I.**

**INTRODUCTION**

This capital habeas corpus case presents this Court with an extraordinary situation that mirrors two recent capital cases litigated before the United States Supreme Court and the Florida Supreme Court where state officials or state law denied condemned prisoners access to untested DNA evidence that could prove their innocence. *See Hildwin v. Florida*, 141 So.3d 1178 (Fla. 2014); *Skinner v. Switzer*, 131 S. Ct. 1289 (2011). As in *Skinner*, Missouri's post-conviction DNA testing statute does not permit petitioner to obtain further DNA testing of the untested hairs, murder weapon, and other genetic materials collected from the crime scene in order to prove his innocence. See § 547.035.1 R.S.Mo. (2010). Petitioner has also been denied access to exculpatory evidence from the similar unsolved 1998 murder of Debra McClain in the adjoining St. Louis suburb of Pagedale under Missouri's Sunshine Law. See § 610.100 R.S.Mo. (2010). As a result, as in *Skinner*, this governing Missouri law, which arbitrarily limits petitioner's ability to prove his innocence, denies him a life and liberty interest protected by the procedural due process guarantees embodied in the Fourteenth Amendment. 131 S. Ct. at 1293.

2

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

Like Paul Hildwin, Marcellus Williams was convicted and sentenced to death for the 1998 home invasion murder of Felicia Gayle based in large part upon questionable evidence involving an uncorroborated jailhouse confession to a cellmate and circumstantial evidence linking him to some of the property stolen from the victim's home at the time she was killed. *See Hildwin v. State*, 531 So.2d 124, 125-126 (Fla. 1988). (*Hildwin I*). As in the *Hildwin* case, there was genetic material left at the crime scene in this case that was not tested for DNA. In contrast to the *Hildwin* case, however, the evidence presented at petitioner's trial was significantly weaker than the evidence submitted by the State of Florida to convict and condemn Mr. Hildwin to death because the unmatched and untested hairs at the crime scene were found to be microscopically inconsistent with petitioner's known hairs. (Tr. 2867-2877, 2920). This now archaic forensic technology of microscopic hair comparison utilized at petitioner's trial was completely exculpatory and strongly suggested that petitioner is innocent.

After Paul Hildwin had languished many years on Florida's death row, he finally secured DNA testing on the challenged genetic material from the crime scene which provided compelling evidence excluding him as the murderer because the genetic DNA profile matched another unknown person. Based upon this evidence alone, the Florida Supreme Court, by a closely divided four-three vote, denied Mr. Hildwin a new trial under existing Florida law permitting new trials to

3

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

be granted based upon newly discovered evidence of innocence. *Hildwin v. State*, 951 So.2d 784, 789 (Fla. 2006). (*Hildwin II*).

Thereafter, the Florida Supreme Court, under its All Writs Act, addressed Mr. Hildwin's request to have the unidentified DNA profile compared to the profiles in CODIS (the FBI maintained DNA combined databank) and the Florida statewide DNA databank for purposes of identifying the source of the DNA in order to prove his innocence. *Hildwin v. State*, 73 So.3d 33 (Fla. 2010). (*Hildwin III*). The Florida Supreme Court relinquished jurisdiction and remanded the case to the Circuit Court for an evidentiary hearing on Mr. Hildwin's request for federal and state DNA database searches.[1]

After these database searches were conducted, the Florida database search in *Hildwin* revealed a match to the victim's boyfriend. As a result, the Supreme Court of Florida recently reversed Mr. Hildwin's murder conviction and death sentence and ordered a new trial. *Hildwin v. State*, 141 So.3d at 1183. (*Hildwin IV*). As in *Hildwin*, this Court's intervention is necessary to ensure that Marcellus Williams receives the same procedural safeguards afforded to Paul Hildwin to

---

[1] Although Missouri apparently does not have an All Writs Act similar to Florida's or 28 U.S.C. § 1651, Rules 68.03(d) and 91.01(a) provide this Court with the discretion and authority to grant petitioner's requests for further DNA analysis.

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

provide him with the necessary tools and court processes to prove his innocence through available DNA technology.

Throughout the post-conviction proceedings in this case, prosecutors and the Missouri Attorney General have opposed petitioner's repeated requests for DNA testing and to compare any developed DNA profiles against federal and national databases.   In petitioner's federal habeas corpus action, due to the state's opposition, the district court denied petitioner's repeated requests for court ordered discovery to obtain further DNA testing and obtain exculpatory evidence regarding the McClain murder.   That court and the Eighth Circuit also refused to grant petitioner a certificate of appealability on these discovery issues in his cross-appeal to the Eighth Circuit after the district court reversed petitioner's death sentence on his claim that petitioner received ineffective assistance of counsel at the penalty phase of his trial.

It is also important to note that trial counsel requested a continuance of the trial date to give the defense time to conduct further DNA testing but that request was denied.  (Tr. 127-128; L.F. 394-396).  Undersigned counsel for petitioner have also formally requested that St. Louis County Circuit Attorney Robert McCulloch, who has custody of the untested genetic material, assent to further DNA testing. (See Exh. 11).  As of the date of the filing of this petition, he has refused to do so. Due to the foregoing facts, there is no procedural bar to this Court's consideration

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

of the merits of this petition due to interference by state officials. *See, e.g., Amadeo v. Zant*, 486 U.S. 214, 222 (1988). In addition, based upon existing evidence and the likelihood that further DNA testing and the evidence from the McClain murder will be exculpatory, this Court is free to review the merits of any of the claims of relief raised in this petition under the gateway innocence test. *See, e.g., State ex rel. Verweire v. Moore*, 211 S.W.3d 89, 92-93 (Mo. banc 2006).

Because no procedural impediment exists to this Court's discretionary intervention, the present petition presents two grounds for relief: 1) a procedural due process claim under *Skinner*; and 2) a freestanding claim of actual innocence under *State ex rel. Amrine v. Roper*, 102 S.W.3d 541 (Mo. banc 2003) and the Florida Supreme Court's recent decision in *Hildwin IV*. After a full and fair review of the following facts and applicable law, petitioner Marcellus Williams respectfully requests that his currently scheduled execution be stayed, that this Court appoint a Special Master to hear this case and, after all further and necessary DNA testing and database searches are completed, grant him a writ of habeas corpus vacating his unconstitutional convictions and sentence of death.

## II.

## PROCEDURAL HISTORY

A St. Louis County, Missouri jury convicted Marcellus Williams in 2001 of one count of first degree murder, first degree burglary, first degree robbery, and

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

two counts of armed criminal action involving the 1998 stabbing death of Felicia Gayle.  The trial court, upon the recommendation of the jury, sentenced petitioner to death on the murder conviction.  (See Exh. 12).  On direct appeal, this Court affirmed petitioner's convictions and sentences in *State v. Williams*, 97 S.W.3d 462 (Mo. banc 2003), *cert denied*, *Williams v. Missouri*, 539 U.S. 944 (2003).

Petitioner subsequently sought post-conviction relief pursuant to Missouri Supreme Court Rule 29.15.  The state trial court denied this motion on May 14, 2004, after denying petitioner's request for a hearing on all but one of his claims for relief.  (29.15 L.F. 800).  This Court affirmed the denial of post-conviction relief in *Williams v. State*, 168 S.W.3d 433 (Mo. banc 2005).

Petitioner, thereafter, commenced a federal habeas corpus proceeding by filing a timely habeas petition in the United States District Court for the Eastern District of Missouri.  *Williams v. Roper*, No. 4:05-CV-01474-RWS.  The case was assigned to District Judge Rodney W. Sippel.  After the district court denied petitioner's requests for discovery, further DNA testing, and an evidentiary hearing, Judge Sippel granted petitioner habeas relief on his claim of ineffective assistance of counsel at the penalty phase of trial and denied habeas relief on all other claims.  *Williams v. Roper*, 2010 U.S. Dist. LEXIS 144919 (E.D.Mo., 3-26-10).

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

Respondent filed a timely notice of appeal and petitioner thereafter filed a timely cross-appeal and moved for a certificate of appealability ("COA") in the district court.  This COA, among other things, sought leave to cross-appeal the district court's refusal to order further DNA testing to permit petitioner to prove his innocence.  The district court denied petitioner's COA motion.  The Warden's appeal and petitioner's cross-appeal were docketed in the Eighth Circuit as Case Nos. 10-2579 and 10-2682.  Petitioner, thereafter, filed an application for a COA before the Eighth Circuit requesting to brief additional issues, including the DNA issue, on the cross-appeal.  The Eighth Circuit denied the COA application and dismissed Williams' cross-appeal.  The United States Supreme Court subsequently denied certiorari in *Williams v. Roper*, 539 U.S. 944 (2011).

After briefing and argument, the Eighth Circuit Court of Appeals, by a two to one vote, reversed the district court and remanded the case with directions that the petition be denied.  *Williams v. Roper*, 695 F.3d 825 (8th Cir. 2012).  The Court of Appeals, thereafter, denied rehearing and rehearing *en banc* on December 6, 2012.  The United States Supreme Court denied Mr. Williams' petition for a writ of certiorari in *Williams v. Steele*, 134 S.Ct. 85 (2013).

On December 17, 2014, this Court issued a warrant of execution, scheduling petitioner's execution for 12:01 a.m. on Wednesday January 28, 2015.  This Court took this action despite the fact that it did not issue a show cause order pursuant to

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

its recently amended Rule 30.30, which had been its regular practice in all other scheduled executions within the past year.  Petitioner's motion to vacate this warrant is still pending.

Jurisdiction and venue of this petition lies with this Court pursuant to Rule 91.02(a).  Pursuant to Rule 91.04(a)(4), petitioner also states that no petition for relief raising the issues brought herein has been sought in any higher court.

## III.

## STATEMENT OF THE CASE AND SUMMARY OF ARGUMENT

Marcellus Williams was convicted in 2001 for the 1998 murder of Felicia Gayle, who was stabbed to death in her University City home, on the word of two paid informants whose testimony was unworthy of belief.  Despite the violent and bloody nature of the crime scene, police failed to uncover any forensic evidence connecting petitioner to the murder.  In fact, physical evidence collected from the crime scene, including hair and footprints, could not be linked to petitioner, the victim or her husband, suggesting that the actual killer may still be at large.  Because the murder went unsolved for nearly a year, the authorities resorted to the "snitch" testimony of Henry Cole and Laura Asaro to make an arrest.  As history has taught us, the government's reliance upon paid snitch testimony, in lieu of solid police work, is a recipe for a wrongful conviction.  *See e.g., The Snitch System:  How Snitch Testimony Sent Randy Steidl and Other Innocent Americans*

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

*to Death Row*, a Center on Wrongful Convictions Survey, Winter 2004-2005, Northwestern School of Law, www.law.northwestern.edu/wrongfulconvictions. This is exactly what happened here.

Because the victim was a former reporter with the *St. Louis Post-Dispatch* and the wife of a prominent St. Louis area physician, the case generated enormous publicity. (Tr. 1730, 2820-28).[2] After the murder went unsolved for several months, like rats emerging from the sewer during a summer drought, Henry Cole and Laura Asaro came forward in June of 1999 and claimed that petitioner had confessed to committing the murder in order to lay claim to a $10,000 reward that was offered for information about the homicide by the victim's husband.

Henry Cole is a career criminal with convictions dating back thirty years. Mr. Cole also has a long history of mental illness, evidence that the jury did not hear. The state's other star witness, Laura Asaro, also has a checkered background. She is an admitted crack addict and prostitute, who was supposedly petitioner's girlfriend for a two-month period around the time of the Gayle murder. (See Exh. 14). Both of these witnesses testified at trial that petitioner admitted to them that he had murdered Ms. Gayle. Mr. Williams' alleged jailhouse confession to Mr. Cole gave a much different account of the crime than his alleged "pillow

---

[2] Petitioner respectfully requests this Court to take judicial notice of the records on appeal in SC83934 and SC86095.

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

talk" confession to his prostitute girlfriend. As a result, it is abundantly clear that at least one of these witnesses, if not both of them, committed perjury at trial in exchange for the reward money. (Tr. 1818, 1882). Although trial counsel tried to expose Cole's and Asaro's credibility problems before the jury, they were denied access to impeaching information and failed to uncover Cole's and Asaro's histories of mental illness before trial.

Trial counsel, Joseph Green and Christopher McGraugh, were hired by the Missouri Public Defender System to represent petitioner at his trial. Both Green and McGraugh were admittedly unprepared for trial. (See Exh. 10). In fact, Green sought a continuance because he was involved in another highly publicized St. Louis County capital murder trial involving Kenneth Baumruk, which started just a month before Mr. Williams' trial commenced. *See State v. Baumruk,* 85 S.W.3d 644 (Mo. banc 2002).

In denying virtually all of defense counsel's discovery requests, requests for forensic testing and two requests for a continuance based upon the state's failure to produce impeaching information on Cole and Asaro, the trial court pushed the case to trial beginning June 4, 2001. (Tr. 136; L.F. 269, 295, 394, 457). In a racially charged case (Ms. Gayle was white and petitioner is black), the prosecutor struck six of seven blacks from the venire panel, leaving just one black juror to serve on the petit jury. (Tr. 1569-70).

11

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

Due to trial counsel's lack of preparation, coupled with several trial court rulings, the jury did not receive a complete picture of the case during the guilt phase of trial.  Because the prosecution failed to disclose impeaching information and because trial counsel did not conduct a reasonable investigation, trial counsel's cross-examination of Cole and Asaro barely scratched the surface of establishing their utter lack of credibility.  As will be discussed in greater detail below, new information came to light during state post-conviction proceedings, including information regarding both of these witnesses' long histories of drug abuse and mental illness which would have further undermined their credibility in the eyes of the jury.  Because the jury did not hear this evidence, it was no surprise when the jury found petitioner guilty as charged.

On August 11, 1998, Felicia Gayle was stabbed to death in her home in University City, Missouri.  (Tr. 1712, 2163).  Months went by without any charges being filed.  On November 29, 1999, the state charged petitioner with first degree murder and armed criminal action after Cole and Asaro came forward.  (L.F. 14). Subsequently, on January 6, 2000, petitioner was indicted on these offenses and the additional charges of burglary in the first degree, robbery in the first degree and an additional count of armed criminal action.  (L.F. 18).

The autopsy revealed that Ms. Gayle died from a total of sixteen stab wounds to her head, neck, chest and abdomen, seven of which could have been

12

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

fatal. (Tr. 2163). There were forty-three stab wounds on her entire body. (*Id.*) A kitchen knife was left in her body. The police collected blood and skin samples from under Gayle's fingernails. (Tr. 2268, 2962-63). Frustrated by the lack of progress in solving the crime, Ms. Gayle's husband Dr. Daniel Picus offered a $10,000 reward for information. (Tr. 1783, 1814). The police still had no leads in the case until June 4, 1999, when twelve-time convicted criminal Henry Cole came forward. (Tr. 2379-82).

Between April and June of 1999, Cole testified he was in the city jail with petitioner. (Tr. 2382). After a few weeks, he and petitioner realized they were distantly related and, according to Cole, became friends. (Tr. 2385-87). Cole stated that in early or mid-May, he was watching television with petitioner, when a story came on about Felicia Gayle's death, reporting that there were still no suspects and that a reward for $10,000 had been offered. (Tr. 2388-89). According to Cole, who had known petitioner only for a few weeks, petitioner admitted to him that he had committed the crime. (Tr. 2390).

Cole also claimed petitioner had indicated to him that the only other witness he had told about the crime was Laura Asaro. (Tr. 2414). In November 1999, officers went to Ms. Asaro's mother's house to speak with her. (Tr. 1910). Ms. Asaro believed that the officers were there to arrest her on outstanding warrants. (Tr. 1923). The police offered to help Asaro with her warrants if she would

13

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

provide information about the murder.  (Tr. 1980).   Asaro agreed to cooperate, becoming the second material witness against petitioner.  (Tr. 1910).

Asaro testified that at the time of the crime she had been dating petitioner for two or three months, living at times in his car.  (Tr. 1840-41).  Asaro claimed that, on the day of the murder, petitioner drove her to her mother's house around 9:00 a.m. and returned in the car later that afternoon at about 3:00 p.m.  (Tr. 1841-43). Asaro claimed petitioner was wearing a jacket zipped to the top, despite the August heat and the car having no operable air-conditioner.  (Tr. 1841-42).

After removing the jacket, Asaro claimed she saw blood on his shirt and fingernail scratches on his neck.  (Tr. 1843, 1855).  Petitioner allegedly explained he had been in a fight.  (Tr. 1843).  Later that day, Asaro claimed that petitioner took off his clothing, placed it in his backpack, and threw it down a sewer.  (Tr. 1845).

Asaro also testified that when petitioner picked her up, he had a computer in the car.  (Tr. 1859-60).  She stated that he took it to a house down the street and, upon returning, the computer was gone.  (Tr. 1844, 1860-61). The next morning when she wanted to retrieve her clothes from the trunk of petitioner's car, Asaro says she gained access to the trunk and saw a woman's purse.  (Tr. 1846). Snatching the purse away from petitioner, Asaro claimed she opened it and saw the

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

victim's identification and coin bag. (Tr. 1846). She became angry, believing that petitioner had another girlfriend. (Tr. 1847).

Asaro claimed that petitioner's response was to tell her that the purse belonged to a woman he just killed. (Tr. 1848). In contrast to Cole's account (and in direct conflict with the crime scene evidence), Asaro claimed petitioner told her that he broke into the woman's house through the *back* door. (Tr. 1848, 1851). Asaro then gave a general account of a surprise encounter with the victim, a struggle and an account of the stabbing. (*Id.*) Unlike Cole, Asaro testified that petitioner drove to the scene (and did not take a bus). (Tr. 1841-42). Like Cole, Asaro admitted that she was also interested in the reward money. (Tr. 1953).

Because the state's case hinged on two highly unbelievable witnesses, defense counsel focused on the lack of forensic evidence linking petitioner to this extremely bloody murder scene, and suggested that police could easily have fed information to Cole and Asaro to resolve this long-unsolved, high-profile crime. For example, numerous hairs were discovered on the victim's shirt and on the rug where her body was found. (Tr. 2871-72, 2920). The rug had been vacuumed eleven days before the crime. (Tr. 2754-55). While some of the hairs matched Gayle or Picus, others did not match either of them or petitioner. (Tr. 2871-72, 2920). Similarly, two pubic hairs found on the rug did not match Gayle, Picus, or petitioner. (Tr. 2876-77). Head hairs also found on the rug also did not match any

15

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

of these three individuals.  (Tr. 2877).   None of these unmatched hairs, nor the knife were ever tested for DNA by either the prosecution or the defense.  (Tr. 2867).

In addition, fingernail clippings taken from Gayle that contained blood and skin could not be matched to petitioner.  (Tr. 2961, 2964).  Bloody footprints at the scene appeared to belong to a single assailant.  None of the bloody shoeprints matched any paramedics' shoes, nor did they match the shoes seized from petitioner upon his arrest.  (Tr. 2882, 3140).

Throughout the state and federal post-conviction process, petitioner was never afforded a hearing on any of his constitutional claims involving the credibility of Mr. Cole or Asaro.  Petitioner was denied a hearing on the DNA testing issue during his 29.15 litigation.  Furthermore, the federal district court denied all of petitioner's discovery requests regarding the McClain murder and all other attempts to obtain further DNA testing of the untested and unmatched materials in this case.  (Dist. Ct. ecf docs 34, 42).

In his federal habeas petition, petitioner advanced a freestanding claim of actual innocence, coupled with a claim that he was convicted on the basis of the perjured testimony of Cole and Asaro.  In the litigation of his federal habeas petition before the district court, petitioner filed numerous motions and requests for discovery seeking access to impeaching information regarding Cole and Asaro, the

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

police investigation of the McClain murder, and for further DNA testing of the untested items and genetic materials. (See Dist. Ct. ecf docs 9, 10, 11, 35, 37).

As noted earlier, there was trace evidence collected at the scene that did not microscopically match petitioner, the victim, or her husband. In particular, there were both head and pubic hairs found at the crime scene that did not match the victim, her husband, or petitioner. (Tr. 2871-72, 2876-77, 2920). Fingernail clippings taken from the victim revealed testable blood and skin samples. Although these samples contained some of the victim's DNA, there was no DNA match to petitioner. In light of Ms. Asaro's account of the crime, indicating that petitioner had scratches on his body, if her account was true, Mr. Williams' DNA should have been found in the victim's fingernail scrapings.

In light of ongoing advances in DNA testing and DNA database laws, petitioner believes that additional DNA testing of the hairs, the murder weapon and fingernail clippings would likely reveal the identity of actual killer. Under Missouri law, every convicted felon and prison inmate must submit a DNA sample. See § 650.050 et. seq. R.S.Mo. (2000). Based upon the aforementioned facts and the gravity of this case, due process requires this Court to order additional DNA testing and database searches to give petitioner the opportunity to prove his innocence.

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

Petitioner also sought access, through discovery motions filed in his 2254 action, to police reports, lab reports, and any DNA profiles developed in the unsolved murder of Debra McClain, which occurred in Pagedale, Missouri, on July 18, 1998.  (See Exh. 1); (See also Dist. Ct. ecf doc's 11, 35, 37).  Apart from the temporal and geographical proximity of the murders, there were other remarkable similarities between the two cases.  St. Louis County Medical Examiner Dr. Mary Case thought that these murders were connected.  (H. Tr. 33).

At a meeting with the chief detectives investigating the Gayle homicide, Dr. Case articulated the following similarities between the murders of Ms. Gayle and Ms. McClain:

1.    The age of the victims (McClain was 40, Gayle was 42);

2.    Both women were of similar build and had long brown hair;

3.    The injuries were similar in that both were stabbed on the right side of the neck and had numerous stab wounds on the front and back upper trunk area;

4.    Crime scenes were similar in that very little was disturbed, each victim was stabbed with a knife from her own kitchen drawer and the victims' purses were missing in both cases; and

5.    Both victims had defensive wounds.

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

(See Exh. 1).  Most importantly, Dr. Case noted the unusual factor that the victim in each case still had the knife in her body, which, according to Dr. Case "is extremely rare." (*Id*.).  In fact, one investigator thought the killings were the work of a serial killer.  (H. Tr. 29-30).

The murder of Debra McClain remained unsolved at the time of petitioner's 2001 trial and apparently remains unsolved to this day.  As a result, any and all police records, crime laboratory testing and any other reports generated in the case are closed records under Missouri's Sunshine Law.  See § 610.100 R.S.Mo. (2010).  In light of advances in DNA technology and the creation of both the state and CODIS databases, petitioner also unsuccessfully sought access to any available items of evidence in the McClain case, such as the knife and any trace evidence for DNA testing and, if any profiles have been or are developed, to have such profiles run through these databases.  (See Dist. Ct. ecf docs 34, 42).   If granted discovery and a hearing on the connection between these two murders, petitioner is confident that links between these two crimes will provide further evidence to establish his actual innocence.

In recent years, forensic DNA testing has revolutionized the nation's criminal justice system.  DNA has been aptly characterized by the nation's former top prosecutor as "nothing less than the 'truth machine' of law enforcement,

19

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

ensuring justice by identifying the guilty and exonerating the innocent."[3]   And this embrace by the justice system has been as rapid as it has been widespread.   Indeed, it took less than a decade for DNA typing to evolve from a novel scientific test, requiring twelve weeks of *Frye* hearings to determine its admissibility, *see, e.g.*, *People v. Castro*, 545 N.Y.S.2d 985 (Sup. Ct. 1989), into "the foremost forensic technique for identifying perpetrators, and eliminating suspects, when biological material such as saliva, skin, blood, hair or semen are left at a crime scene."  U.S. Dept. of Justice, *Postconviction DNA Testing: Recommendations for Handling Requests 1* (1999).

No application of forensic DNA evidence has received greater attention – or wrought greater changes to the legal system – than its ability to conclusively establish the innocence of convicted persons in prison and on death row.  While individual cases of wrongful conviction were documented long before the advent of DNA analysis, *see, e.g.*, Edwin Borchard, *Convicting the Innocent* (1932), never before has our nation witnessed so many convicted prisoners freed, in such a short time, with so little debate as to their actual innocence.  Since 1989, when the first convicted felon in the United States was cleared by DNA, such testing has

_____

[3] Statement of (former) Attorney General John Ashcroft, President's DNA Initiative, March 2, 2001 (available at www.usdoj.gov).

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

exonerated at least 254 wrongfully convicted men and women, 17 of whom had been sentenced to death.[4]

Technological advances within the field of DNA analysis have played a critical role in accelerating the pace of these exonerations. As the U.S. Supreme Court has recognized, today's advanced DNA analysis is simply "unparalleled" in its "ability to exonerate the wrongly convicted and to identify the guilty." *District Atty's Ofc. for the Third Jud. Dist. v. Osborne*, 129 S. Ct. 2308, 2312 (2009); *see also Id.* at 2315 (discussing evolution of DNA testing methods). The nation's investment in DNA testing has reflected its outsize importance in furthering these goals: by 2006, for example, the federal government's annual appropriations to the states for DNA testing amounted to nearly ten times what was allocated for all other forensic disciplines combined. *See* Nathan James, Congressional Research

---

[4] See the Innocence Project, Know the Cases, available at www.innocenceproject.org/know; the Innocence Project, Exonerations by State, www.innocenceproject.org/news/StateView.php. The use of the term "exoneration" here is limited to those cases in which a conviction is vacated by a court based upon the exculpatory results of post-conviction DNA testing, and the defendant (a) is granted a full pardon based on actual innocence, (b) secures dismissal of the indictment, and/or (c) is acquitted at retrial.

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

Service, *An Overview and Funding History of Select Department of Justice Grant Programs 11, 15* (2006).

In particular, the capabilities of DNA analysis increased exponentially with the rapid development of (and government investment in) the FBI's Combined DNA Index System ("CODIS"), beginning in the late 1990s.  CODIS is a vast, computerized database that allows participating law enforcement agencies from all fifty states and the federal government to instantaneously compare what are known as "STR" (Short Tandem Repeat) DNA profiles from crime scenes against DNA samples collected from nearly eight million convicted felony offenders nationwide. To date, these rapid, computerized CODIS searches have generated over 107,000 "hits" in both active and "cold case" investigations.  *See* Federal Bureau of Investigation, *CODIS-NDIS Statistics*, available at http://www.fbi.gov/hg/lab/codis/clickmap.htm.

The development and expansion of CODIS and parallel state databanks over the last decade has also given criminal defendants a powerful new tool to prove the truth of their longstanding claims of actual innocence.  Several courts upholding the constitutionality of the database have relied on this core function in holding that any threat to citizens' privacy is outweighed by the public interests served. *See, e.g.*, *United States v. Amerson*, 483 F.3d 73, 87 (2nd Cir. 2007) ("The greater accuracy and speed with which CODIS allows the government to apprehend and

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

convict those guilty of crimes has, as we have seen, an equally important corollary – its use in exonerating innocent people criminally suspected, convicted, or charged").

The critical role that access to CODIS plays in an innocent prisoner's bid for post-conviction relief cannot be overstated.  For where a CODIS search of an unidentified DNA profile from a case is performed, and "hits" to another convicted serial offender in the system with no connection to the defendant (particularly if the offender has a history of similar crimes, or confesses to the crime at issue when confronted with the results), it may erase all doubts about the exculpatory value of the earlier forensic tests or DNA results – for example by refuting an argument by the state that unidentified DNA was "stray" evidence unconnected to the crime, or may have come from a prior consensual partner of the victim.  That such outcomes are neither surprising nor infrequent is grounded in common sense and experience. *See, e.g.*, United States Dept. of Justice, *DNA Initiative: Forensic DNA Databases* ("Given the recidivistic nature of many crimes a likelihood exists that the individual who committed the crime…was convicted of a similar crime and already has his or her DNA profile in a DNA database that can be searched by the [CODIS] software"), *available at* http://www.dna.gov/dna-databases/; Brandon L. Garrett, *DNA and Due Process*, 78 Fordham L. Rev. 2919 (2010) at 2932, *available at* http://law.fordham.edu/assets/LawReview/Garrett_Vol_78_May.pdf

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

(noting that the pace of post-conviction DNA exonerations accelerated 'from a trickle…to a flood' with the advent of STR testing and CODIS in the late 1990s).

Indeed, fully sixty-five or 26%, of the first 250 post-conviction DNA exonerations in the United States included a "cold hit" to the actual perpetrator of the crime in a state or federal DNA database. *See Id.*, n.2931. Notably, many cases in this group involved defendants who had appeared unquestionably guilty in light of the evidence offered against them at trial (including multiple eyewitness identifications, detailed confessions to the crime, and various non-DNA forensics). *See, e.g.*, Brandon L. Garrett, *Judging Innocence*, 108 Colum. L. Rev. 55, 107 tbl. 8, 109 (2008) (surveying decisions issued in the first 200 post-conviction DNA exoneration cases, and finding that in nearly 50% of these cases, a court had commented on the innocent defendant's likely guilt, and in 10% of cases, had characterized the evidence of guilt as "overwhelming").

Based on the foregoing facts and the technological advances in DNA testing and the expansion of state and federal databases, petitioner certainly believes it is a reasonable request that all untested items and genetic material in this case be submitted to thorough DNA testing with available technology and, if a DNA profile is obtained, these results should be run through both the CODIS and Missouri DNA databases. As a result, petitioner requests that either this Court order or delegate this decision to a Special Master to conduct further DNA testing

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

on all of the hairs that were found at the scene of the murder, the fingernail clippings collected from the victim's fingernails, and the knife that was found in the victim's body.

With regard to the knife, the state never attempted to conduct any DNA testing on the knife. Since it had a wooden handle, a thorough forensic analysis would have involved dismantling the knife to see if there is any blood or DNA material under the handle as well as the blade. In addition, in light of advances in DNA technology in the last fifteen years, it is now possible to obtain "touch DNA" from objects such as the knife in this case. "Touch DNA" refers to genetic information recovered from epithelial (skin) cells left behind when a person makes contact with an object. Testing for touch DNA involves more sophisticated and amplified methods of the same STR and PCR technology utilized to test blood and other traditional sources of DNA. *See* Victoria Kawecki, *Can't Touch This? Making a Place for Touch DNA in Post-Conviction DNA Testing Statutes*, 62 Catholic Univ. L. Rev. 821, 828-829 (2013).

This action is the only forum in which petitioner can vindicate his due process and Eighth Amendment rights to obtain a full and fair procedure to prove his innocence. Missouri's post-conviction DNA statute clearly does not cover this situation because DNA technology was available at the time of petitioner's trial and the hairs and other evidence from the scene could have been tested had trial

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

counsel obtained a continuance to do so.  See § 547.035.1 R.S.Mo. (2010).  Like Paul Hildwin, petitioner deserves the chance to establish his innocence with available forensic science before he faces the executioner.

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

## IV.

## REASONS FOR GRANTING THE WRIT

## <u>CLAIM I</u>

**PETITIONER IS BEING DEPRIVED OF HIS SIXTH AND FOURTEENTH AMENDMENT RIGHTS TO COMPULSORY PROCESS AND DUE PROCESS OF LAW BECAUSE EXISTING MISSOURI LAW, INCLUDING THE POST-CONVICTION DNA STATUTE, PRECLUDE HIM FROM OBTAINING ACCESS TO EXCULPATORY EVIDENCE AND FURTHER DNA ANALYSIS NECESSARY TO ALLOW HIM A FAIR OPPORTUNITY TO PROVE HIS INNOCENCE OF THE MURDER OF FELICIA GAYLE.**

As noted earlier, Missouri's post-conviction DNA statute, by its express terms, does not permit the DNA testing and database searches that are being sought in this petition.  See § 547.035.1 R.S.Mo. (2010).  This statute does not permit a trial court to order DNA testing where trial counsel is aware of the existence of the biological evidence and if DNA testing was available at the time of the defendant's trial.  This statute also does not require or permit any developed DNA profiles to be compared with CODIS or state DNA databases.[5]  In this case, it is undisputed that DNA technology was available at the time of petitioner's trial and that trial counsel was aware of the untested crime scene evidence in this case.  In fact, trial

---

[5]  Several other states' post-conviction DNA testing laws specifically authorize state database and CODIS searches.  *See, e.g.,* Md. Code Ann. § 8-201 (2008).

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

counsel attempted to obtain a continuance to pursue further DNA testing but was unable to convince the trial judge to grant this request. (Tr. 127-128; L.F. 394-396).

Based on the foregoing facts, this petition presents a compelling claim under *Skinner* that petitioner is being denied his due process rights, as well as his right to compulsory process, to obtain material scientific evidence necessary to prove that he is innocent of the murder of Felicia Gayle. Petitioner has also been unable to obtain any police reports, lab reports, or any genetic profiles that may have been developed from the investigation into the unsolved murder of Debra McLain that occurred approximately three weeks before the murder of Ms. Gayle. Because the McClain murder is still an ongoing investigation and no charges or convictions have resulted, any of the previously requested information regarding this case cannot be obtained by petitioner without a court order pursuant to Missouri's Sunshine Law. See § 610.100 R.S.Mo. (2010).

Both the St. Louis Circuit Attorney and the Missouri Attorney General, in prior and present proceedings, have refused to consent to further DNA testing of the unmatched hairs, the fingernail clippings, and the knife. The state has also opposed petitioner's motions for court orders to give petitioner access to the records and evidence uncovered during the police investigation into the Debra McClain murder. As a result, there is no question that these facts present a

28

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

substantial Constitutional claim for relief under *Skinner v. Switzer*, 131 S. Ct. 1289, 1293 (2011).

This petition presents a reasonable and urgent request that petitioner be afforded the same tools to prove his innocence that the Florida Supreme Court provided to Paul Hildwin, a similarly situated prisoner sentenced to death. Based on the undisputed evidence in this case coupled with the advances in DNA technology, there is more than a reasonable probability that DNA profiles can be developed from the untested items of physical evidence seized from the crime scene that can be matched to a known individual through either Missouri's DNA database or CODIS.

This evidence could also provide a compelling justification for Governor Nixon, in the exercise of his constitutional power to commute death sentences, to elect to spare petitioner's life based upon significant doubts regarding his guilt. The Supreme Court has held that procedural due process protections extend to clemency proceedings in capital cases. *See Ohio Adult Parole Authority v. Woodard*, 523 U.S. 272, 288-289 (1988) (O'Connor, J., concurring in part and concurring in the judgment); *Id*. at 290, (Stevens, J., concurring in part and dissenting in part). In a similar situation, the Eighth Circuit held that another Missouri death row inmate presented a viable due process violation based upon a prosecutor's interference with the condemned man's ability to present evidence in

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

support of clemency to the Governor. *Young v. Hayes*, 218 F.3d 850, 852-853 (8th Cir. 2000). Like the St. Louis City Circuit Attorney's actions in *Young*, Mr. McCulloch's refusal to allow petitioner access to available evidence to prove his innocence denies petitioner a life and liberty interest protected by the Fourteenth Amendment.

A similar situation also arose in Ohio where Governor Ted Strickland granted a reprieve to John Spirko to permit DNA testing and thereafter commuted his death sentence due to residual doubt regarding whether he was guilty of the murder for which he was condemned to die. *See* Jane Kahoun, *Governor Saves Spirko from Execution*, Cleveland Plain Dealer, January 9, 2008. Therefore, this Court should stay petitioner's execution and issue orders directing the appropriate state actors in this case to conduct the requested DNA testing and, if a DNA profile is developed, run any such profiles through the Missouri and CODIS databases. This Court, should also stay petitioner's execution and, in its discretion, appoint a Special Master to rule on petitioner's DNA and discovery requests and conduct necessary hearings on petitioner's claim of innocence before this Court conducts its final review of this petition. See Rule 68.03. Such a process would give petitioner subpoena power, as well as the ability to obtain court orders to obtain the necessary evidence to prove his innocence.

30

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

## CLAIM II

**PETITIONER'S CONTINUED INCARCERATION AND UPCOMING EXECUTION FOR THE OFFENSE OF FIRST DEGREE MURDER VIOLATES THE EIGHTH AND FOURTEENTH AMENDMENTS AND ARTICLE I, SECTION 10 OF THE MISSOURI CONSTITUTION BECAUSE THE EXISTING EVIDENCE, COUPLED WITH OTHER EXCULPATORY EVIDENCE LIKELY TO EMERGE IF FURTHER DISCOVERY IS ORDERED AND FUTURE DNA TESTS ARE CONDUCTED, ESTABLISHES HE IS INNOCENT OF THE MURDER OF FELICIA GAYLE.**

The known evidence in this case already establishes a reasonable likelihood that petitioner Marcellus Williams did not murder Felicia Gayle. As noted earlier, there was no physical evidence from the bloody crime scene to link petitioner to the murder. Instead, he was convicted entirely upon the inherently unreliable and incredible testimony of Henry Cole and Laura Asaro. Evidence developed during prior state and federal post-conviction proceedings demonstrate that their testimony is unworthy of belief and that there is a substantial probability they perjured themselves in exchange for the substantial reward money they received from the victim's husband. Coupled with the significant likelihood that the DNA testing of the fingernail clippings, hair, and murder weapon and evidence regarding the McClain murder will provide further evidence of his innocence, petitioner's convictions and death sentence must be set aside.

It is well settled under Missouri law that claims of innocence are cognizable in a Rule 91 petition for a writ of habeas corpus. *Wilson v. State*, 813 S.W.2d 833

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

(Mo. banc 1991). Under Missouri law, a petitioner's showing of innocence has both procedural and substantive implications. A prisoner who is probably innocent is entitled to habeas corpus review of the fairness of his trial, regardless of any procedural bar. *Clay v. Dormire*, 37 S.W.3d 214, 217 (Mo. banc 2000). A prisoner who can demonstrate innocence by clear and convincing evidence is entitled to habeas corpus relief, even if he had a fair trial. *State ex rel. Amrine v. Roper*, 102 S.W.3d 541, 543 (Mo. banc 2003). Mr. Williams' petition invokes both avenues of relief, so petitioner will discuss both standards below.

A.    **Gateway Innocence.**

A showing of actual innocence overcomes rules of procedural default that would otherwise bar consideration of claims and evidence. *Clay v. Dormire*, 37 S.W.3d 214, 217 (Mo. 2000), citing *Schlup v. Delo*, 513 U.S. 298, 316 (1995). Habeas corpus is available in Missouri to correct a fundamental miscarriage of justice, and "[t]he quintessential miscarriage of justice is the execution of a person who is entirely innocent." *Id*. at 325.

If petitioner can show "a constitutional violation has probably resulted in the conviction of one who is actually innocent," this Court is free to reach the merits of his constitutional claims, even if he has procedurally defaulted his claims by failing to assert them properly in prior proceedings. A prisoner is "actually innocent" within the meaning of this standard if "it is more likely than not that no reasonable

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

juror would have found petitioner guilty beyond a reasonable doubt." *Schlup*, 513 at 327.

## B.    Freestanding Actual Innocence.

Innocence is also a viable substantive claim for habeas relief under Missouri law.  If there is clear and convincing evidence that petitioner is innocent, then Missouri courts must issue the writ of habeas corpus even if petitioner's trial is otherwise free of constitutional error.

> Because the continued imprisonment and eventual execution of an innocent person is a manifest injustice, a habeas petitioner under a sentence of death may obtain relief from a judgment of conviction and sentence of death upon a showing of actual innocence that undermines confidence in the correctness of the judgment.

*State ex rel. Amrine v. Roper*, 102 S.W.3d 541, 543 (Mo. banc 2003).

In analyzing claims of actual innocence based on newly discovered evidence, evidence is "new" if the jury did not hear it.  *Schlup* itself made clear that a limited concept of "new" evidence defeats the purpose of the actual innocence inquiry:

> "To be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence - whether it be exculpatory scientific evidence, trustworthy eyewitness

33

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

accounts, or critical physical evidence - that was not presented at trial."

513 U.S. at 324.

This formulation serves the fundamental purpose of habeas corpus to correct unjust incarcerations by focusing on the reliability of the verdict of the jury. Therefore, "[t]he habeas court must make its determination concerning the prisoner's innocence 'in light of all the evidence, including that alleged to have been illegally admitted (but with due regard to any reliability of it) and evidence tenably claimed to have been wrongly excluded or to have become available only after the trial.'"

*Id*. at 328 (emphasis added).

This Court in *Amrine* requires reviewing courts to conduct a thorough analysis of the evidence, including in cases, such as petitioner's, in which evidence has grown with the passage of time, while evidence at trial utilized to convict him has proven false:

> Amrine petitions this Court for a writ of habeas corpus, arguing that
>
> he is actually innocent of the Barber murder. Because the recantations
>
> were made over the course of years and between rounds of federal
>
> court proceedings, no court has addressed, at once, all of the evidence

34

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

of Amrine's innocence. This Court is the first forum in which all of the existing evidence will be considered.

102 S.W.3d at 545.

Just as in *Amrine*, the present Rule 91 litigation is the first forum in which all of petitioner's evidence of innocence will be considered.  This Court in *Amrine* also made it clear that the doors of Missouri courthouses are always open to claims of innocence: "Habeas corpus is the last judicial inquiry into the validity of a criminal conviction and serves as a 'bulwark against convictions that violate fundamental fairness.'"  (*Id.*) (quoting *Engle v. Isaac*, 456 U.S. 107, 126 (1982)). Therefore, this Court's analysis of petitioner's innocence must be based upon a thorough review of all the evidence presented to this Court by petitioner in support of his petition for writ of habeas corpus.

## C.   **Evidence Developed in State Post-Conviction Undermines State's Case.**

During state post-conviction proceedings, petitioner presented substantial evidence undermining the conviction which the state obtained solely on the testimony of Cole and Asaro.[6]  This evidence establishes that Cole and Asaro simply were unworthy of belief.

---

[6] For over a year prior to trial, the state failed to disclose the actual addresses of Cole and Asaro. The prosecutor regularly contacted both Cole and Asaro, but actively concealed their whereabouts. (29.15 L.F. 95-97, 99).  Police were in

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

Cole wrote to his son, Johnifer Cole Griffin, while he was in jail with Mr. Williams. (See Exh. 4). Henry Cole bragged that he had a "caper" going on and something "big" was coming. (*Id.*) Johnifer knew that his father had made false allegations against others in the past, beginning in the 1980s and continuing throughout his life. (*Id.*) Indeed, Henry Cole even served as an informant against Johnifer, his own son, in order to get a deal from the authorities. (*Id.*)

Similarly, Cole's daughter, Bridget Griffin, knew that Cole could not be trusted. (29.15 L.F. 129-30). She knew of his well-known reputation of providing false information to the police in exchange for leniency. (*Id.* 130). She also had personal knowledge of prior false allegations Cole had made. (*Id.* 130).

Ronnie and Durwin Cole, Henry's nephews, confirmed that Cole had made false allegations in the past and was extremely unreliable. (See Exh's 5 and 6). Cole concocted scams, lied about others, and then left town. (*Id.*) He would do or say anything for money. (*Id.*) Cole's niece, Twanna, could confirm these family accounts. (29.15 L.F. 136-37). She had witnessed her uncle's crazy and bizarre

---

regular contact with Cole and bought him a bus ticket to New York, making him unavailable to be contacted by the defense. (L.F. 99, 102; Exh. 13 at 44). The trial prosecutor had personally interviewed Asaro three times, but told the court he was unable to locate her. (29.15 L.F. 99-102). (See also Exh's 13, 14).

36

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

behavior. (*Id.* 136). She knew Henry needed money for drugs and would provide false information to get it. (*Id.* 137). As with the rest of her family, she did not trust her uncle, based on his history of making false allegations. (*Id.*).

Durwin Cole reported that Henry Cole often hallucinated, recounting one incident where Henry saw non-existent bugs in his hair and drinking glass. (See Exh. 5). Other members of his family also recounted that Cole often had auditory hallucinations and sometimes failed to take his psychiatric medications. (29.15 L.F. 133). His family also confirmed that he had been diagnosed as mentally ill and received disability benefits because of his mental illnesses. Members of the family also recalled other incidents of bizarre behavior by Mr. Cole brought on by his mental illness. (*Id.* 136).

Asaro's testimony is equally undermined. Edward Hopson and Colleen Bailey could have testified that Asaro admitted to them that she had "set up" Mr. Williams to get the $10,000 reward, that Asaro desperately needed this money to feed her crack cocaine addiction, and she had made prior false allegations against others. (29.15 L.F. 78-79, 151-157); (See also Exh. 7). Both Mr. Hopson and Ms. Bailey indicated that she was a known police informant and had engaged in a pattern of lying to police to get herself out of trouble. (*Id.*)

Asaro's mother, Cynthia Asaro (29.15 L.F. 165-166), Walter Hill, and Latonya Hill, (See Exh's 8 and 9), established that Asaro lied when she testified at

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

trial that petitioner drove his car on the date of the murder.  Each witness indicated that Mr. Williams' car was not running on that day.  Additionally, these witnesses revealed that Asaro lied when she stated that she did not have access to the trunk of petitioner's car. (*Id.*)  These witnesses could have testified that Asaro had a set of keys to the car and that she could have gotten into the trunk and planted incriminating evidence linking him to the murder of Ms. Gayle. (29.15 L.F. 165-166).  Cynthia Asaro reported that her daughter gave her coupons similar to those found in the victim's purse.  (*Id.*).

Cole's and Asaro's testimony, like the inmate testimony in *Amrine,* has been demonstrably discredited during prior post-conviction proceedings.  Many persons who were close with Mr. Cole, including his own relatives, have provided affidavits demonstrating that his trial testimony, or anything he says for that matter, is unworthy of belief.  In fact, Cole's son indicated that Mr. Cole told him that he had a "caper" going on to implicate petitioner in this murder for the reward money.  (See Exh. 4).  Ironically, this affidavit provides evidence of the same category as petitioner's alleged jailhouse confession to Cole, which the jury relied upon to convict petitioner and sentence him to death.  In addition, two other jail inmates have provided sworn affidavits that the police and prosecutors fed them information and tried to induce them to become jailhouse snitches against petitioner, but they refused to do so.  (See Exh's 2, 3).  Sadly, this is not an

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

uncommon occurrence in St. Louis County prosecutions because history tells us that St. Louis County authorities have previously solicited and pressured other inmates to fabricate jailhouse confessions in order to obtain an arrest and conviction in other high profile murder cases. *See Reasonover v. Washington*, 60 F.Supp.2d 937, 964-965 (E.D. Mo. 1990).

With regard to Asaro's testimony, her testimony is not only inconsistent with Henry Cole's testimony, it is also inconsistent with the physical evidence in the case. Had petitioner actually told Asaro the details of the crime as she recounted at trial, there would have been biological evidence at the scene of the crime connecting petitioner to the murder. Specifically, Asaro's trial testimony that she observed scratches on petitioner's neck, if true, would have led to a finding of petitioner's blood and skin in the victim's fingernail clippings. This fact alone provides objective evidence that Ms. Asaro was lying in exchange for the reward money.

**D.    There Is Sufficient Evidence Of Petitioner's Innocence To Require That His Death Sentence Be Commuted To Life Imprisonment Under Amrine And Missouri's Proportionality Review Statute.**

Missouri's mandatory proportionality review statute requires the court to consider "whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime, the strength of the evidence, and the defendant." § 565.035.3 R.S.Mo. (2010). In light of the

39

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

evidence presented at trial coupled with the further evidence of innocence developed in the state post-conviction proceedings, this Court should reexamine its previously conducted proportionality review and vacate petitioner's death sentence because the evidence of petitioner's guilt is clearly not established with sufficient certainty to justify the ultimate punishment.

In addressing the strength of the evidence in its original proportionality review of petitioner's sentence on direct appeal, this Court stated: "Williams confessed to the murder." *State v. Williams*, 97 S.W.3d 462, 475 (Mo. banc 2003). This passage from the court's previous opinion is, at best, misleading because petitioner did not confess to the police. By any objective measure, the evidence that petitioner allegedly "confessed" to the murder to two paid informants, who were convicted felons, does not come anywhere close to having equal weight to a voluntary confession to the police.

As a result, this Court should reexamine the proportionality of petitioner's death sentence in light of the strength of all of the evidence that has come to light. Like the case of Timothy Chaney, there is no eyewitness, confession, or physical evidence establishing Marcellus Williams' guilt. *See State v. Chaney*, 967 S.W.2d 47, 60 (1998). This Court noted, in commuting Mr. Chaney's death sentence to life imprisonment, that the evidence of his guilt was sufficient to support the

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

conviction, but is not of "the compelling nature usually found in cases where the sentence is death." (*Id*.).

In *Amrine*, a substantial majority of the members of this Court indicated that Missouri's proportionality review scheme requires the court to conduct an ongoing review of the propriety of a condemned prisoner's death sentence when new evidence of innocence emerges. *See Amrine*, 102 S.W.3d at 547 (majority opinion); *Id*. at 549-550 (concurring opinion of Wolff, J.); *Id*. at 552 (dissenting opinion of Price, J.). Petitioner respectfully suggests that the aforementioned opinions in *Amrine* suggest that the middle ground might be reached in habeas corpus cases where a condemned man presents significant post-conviction evidence raising grave doubts about his guilt that might not meet the higher standard for reversal of the underlying conviction under *Amrine*, but would nevertheless be sufficient to require that a prisoner's death sentence be overturned and his sentence reduced to life without parole. Even where all of the evidence is legally sufficient to establish guilt and does not provide clear and convincing evidence of innocence, the death penalty should be off the table where substantial doubts regarding guilt exist. As Judge Price's dissent in *Amrine* advocates, where evidence of possible innocence substantially undercuts confidence in the verdict, a death sentence should be set aside. 102 S.W.3d at 552 (Price, J. dissenting).

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

Based upon the existing evidence, there is sufficient doubt of petitioner's guilt to require the reversal of petitioner's death sentence even without further discovery or DNA testing.  In this regard, the evidence here is similar in nature to the evidence that led three members of the Florida Supreme Court to find that a new trial was warranted for Florida death row inmate Paul Hildwin in light of the fact that genetic evidence from the crime scene could not be linked to petitioner and pointed toward another possible killer.  *See Hildwin II*, 951 So.2d at 793-797 (Pariente, J. dissenting).  Should further exculpatory DNA evidence come to light, which is extremely likely, this would provide the clinching factor that should lead this Court, as the Florida Supreme Court did recently in *Hildwin IV*, to conclude that petitioner is entitled to a new trial under *Amrine* because there is clear and convincing evidence that he is innocent based upon unassailable scientific evidence.

## CONCLUSION

For all the foregoing reasons, petitioner respectfully requests that this Court stay his scheduled execution, order the previously requested DNA testing and analysis and other disclosures requested herein and/or appoint a Special Master to hear both the procedural and substantive issues contained in this petition or, grant such other and further relief as the Court deems fair and just under the circumstances.

Electronically Filed - SUPREME COURT OF MISSOURI - January 09, 2015 - 01:37 PM

Respectfully submitted,

/s/ *Kent E. Gipson*
KENT E. GIPSON, Mo. Bar #34524
LAW OFFICE OF KENT GIPSON, LLC
121 East Gregory Boulevard
Kansas City, Missouri 64114
816-363-4400 / fax 816-363-4300
kent.gipson@kentgipsonlaw.com

*/s/ Laurence E. Komp*
LAURENCE E. KOMP, Mo. Bar #84430
E.D. Mo. No. 5212907
P.O. BOX 1785
Manchester, MO 63011
636-207-7330 / fax 636-207-7351
lekomp@swbell.net

COUNSEL FOR PETITIONER

## CERTIFICATE OF SERVICE

I hereby certify that on the 9th day of January, 2015, this petition was filed via the CM/ECF system.  A copy was mailed to the Office of the Attorney General, 207 West High Street, P.O. Box 899, Jefferson City, MO 65102, attorneys for respondent.

/s/ *Kent E. Gipson*
Counsel for Petitioner