No. _____

## CAPITAL CASE

## EXECUTION SCHEDULED FOR AUGUST 22, 2017 AT 6:00 P.M.

---

IN THE
SUPREME COURT OF THE UNITED STATES

---

MARCELLUS WILLIAMS,

*Petitioner,*

*v.*

TROY STEELE, Superintendent,
Potosi Correctional Center

*Respondent.*

---

On Petition For A Writ Of Certiorari
To The Supreme Court Of Missouri

---

PETITION FOR A WRIT OF CERTIORARI

---

KENT E. GIPSON, Mo. #34524*
Law Office of Kent Gipson, LLC
121 East Gregory Boulevard
Kansas City, Missouri 64114
816-363-4400 / 816-363-4300 (Fax)
kent.gipson@kentgipsonlaw.com
*Counsel of Record*

LAURENCE E. KOMP, Mo. #84430
E.D. Mo. No. 5212907
P.O. BOX 1785
Manchester, MO 63011
636-207-7330 / fax 636-207-7351
lekomp@swbell.net

COUNSEL FOR PETITIONER

## QUESTION PRESENTED

Whether the Eighth and Fourteenth Amendments preclude the execution of a condemned prisoner who presents a compelling freestanding claim of actual innocence in a state or federal post-conviction proceeding.

## TABLE OF CONTENTS

Page

QUESTIONS PRESENTED

TABLE OF CONTENTS ........................................................................... i

TABLE OF AUTHORITIES ..................................................................... ii

PETITION FOR A WRIT OF CERTIORARI ............................................ 1

OPINIONS BELOW ................................................................................. 2

JURISDICTIONAL STATEMENT .......................................................... 2

CONSTITUTIONAL PROVISIONS INVOLVED .................................... 2

STATEMENT OF THE CASE .................................................................. 3

    A.    PROCEDURAL HISTORY ............................................... 3

    B.    STATEMENT OF FACTS.................................................. 6

REASONS FOR GRANTING THE WRIT................................................. 17

    I.    CERTIORARI SHOULD BE GRANTED TO PERMIT THE COURT TO RESOLVE THE UNANSWERED QUESTION OF WHETHER THE EIGHTH AND FOURTEENTH AMENDMENTS PROHIBIT THE EXECUTION OF A PRISONER WHO PRESENTS A COLORABLE POST-CONVICTION CLAIM OF ACTUAL INNOCENCE........................ 17

CONCLUSION ........................................................................................ 24

APPENDIX ......................................................................................... A-1

# TABLE OF AUTHORITIES

**Cases**

*Atkins v. Virginia*, 536 U.S. 304 (2002).................................................................. 22

*Burton v. Dormire*, 295 F.3d 839 (8th Cir. 2002).................................................. 18

*Gardner v. Florida*, 430 U.S. 349 (1977)................................................................ 22

*Gregg v. Georgia*, 428 U.S. 153 (1976).................................................................. 22

*Herrera v. Collins*, 506 U.S. 390 (1993) ................................................................ 18

*House v. Bell*, 547 U.S. 518 (2006) ........................................................................ 20

*McQuiggin v. Perkins*, 133 S. Ct. 1924 (2013)...................................................... 20

*Monge v. California*, 524 U.S. 721 (1998) ............................................................. 21

*Montgomery v. Louisiana*, 136 S. Ct. 718 (2016).................................................. 23

*Montoya v. Ulibarri*, 142 N.M. 89 (2007) ............................................................. 19

*People v. Hamilton*, 115 A.D.3d 12 (N.Y. 2014) ................................................... 19

*People v. Washington*, 665 N.E.2d 1330 (Ill. 1996).............................................. 19

*Roper v. Simmons*, 543 U.S. 551 (2005)........................................................... 21, 22

*State v. Baumruk,* 85 S.W.3d 644 (Mo. banc 2002) ................................................. 8

*State v. El-Tabech*, 610 N.W.2d 737 (Neb. 2000)................................................... 19

*State v. Williams*, 97 S.W.3d 462 (Mo. banc 2003).................................................. 3

*Williams v. Missouri*, 539 U.S. 944 (2003)........................................................... 3, 4

*Williams v. Roper*, 2010 U.S. Dist. LEXIS 144919 (E.D.Mo., 3-26-10) ................. 4

*Williams v. Roper*, 695 F.3d 825 (8th Cir. 2012)......................................................... 5

*Williams v. Roper*, No. 4:05-CV-01474-RWS........................................................... 4

*Williams v. State*, 168 S.W.3d 433 (Mo. banc 2005).................................................. 3

*Williams v. Steele*, 134 S. Ct. 85 (2013) ................................................................. 5

*Youngberg v. Romeo*, 457 U.S. 307, 316 (1982) ...................................................... 20

**Other Authorities**

§ 28 U.S.C. § 1257(a) .......................................................................................... 16

§ 610.100 R.S.Mo. (2010)...................................................................................... 16

28 U.S.C. § 2254 .................................................................................................. 18

No. _____

## CAPITAL CASE

## EXECUTION SCHEDULED FOR AUGUST 22, 2017 AT 6:00 P.M.

---

## IN THE
## SUPREME COURT OF THE UNITED STATES

---

## MARCELLUS WILLIAMS,

*Petitioner,*

*v.*

## TROY STEELE, Superintendent,
## Potosi Correctional Center

*Respondent.*

---

## On Petition For A Writ Of Certiorari
## To The Supreme Court Of Missouri

---

## PETITION FOR A WRIT OF CERTIORARI

---

Petitioner, Marcellus Williams, respectfully requests that a writ of certiorari issue to review the judgment and decision of the Supreme Court of Missouri that denied his original petition for a writ of habeas corpus challenging his Missouri convictions and sentence of death.

1

## OPINIONS BELOW

The order and judgment of the Missouri Supreme Court denying petitioner's petition for a writ of habeas corpus pursuant to Mo. S. Ct. Rule 91 is unpublished and is published in the Appendix at A-1.

## JURISDICTIONAL STATEMENT

The judgment of the Missouri Supreme Court was issued on January 31, 2017. The present petition for a writ of certiorari was required to be filed by petitioner within ninety (90) days. *See* Rule 13.1. The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1257(a).

## CONSTITUTIONAL PROVISIONS INVOLVED

This case involves provisions of the Eighth and Fourteenth Amendments to the United States Constitution:

The Eighth Amendment provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."

The Fourteenth Amendment to the United States Constitution provides in part: "No state shall make or enforce any law which will abridge the privileges or immunities of the citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process

2

of law; nor deny to any person within its jurisdiction the equal protection of the law."

## STATEMENT OF THE CASE

## A. PROCEDURAL HISTORY

A St. Louis County, Missouri jury convicted Marcellus Williams in 2001 of one count of first degree murder, first degree burglary, first degree robbery, and two counts of armed criminal action involving the 1998 stabbing death of Felicia Gayle. The trial court, upon the recommendation of the jury, sentenced petitioner to death on the murder conviction. (A-122-123). On direct appeal, the Missouri Supreme Court affirmed petitioner's convictions and sentences in *State v. Williams*, 97 S.W.3d 462 (Mo. banc 2003), *cert denied, Williams v. Missouri*, 539 U.S. 944 (2003).

Petitioner subsequently sought post-conviction relief pursuant to Missouri Supreme Court Rule 29.15. The state trial court denied this motion on May 14, 2004, after denying petitioner's request for a hearing on all but one of his claims for relief. (29.15 L.F. 800). The Missouri Supreme Court affirmed the denial of post-conviction relief in *Williams v. State*, 168 S.W.3d 433 (Mo. banc 2005).

Petitioner, thereafter, commenced a federal habeas corpus proceeding by filing a timely habeas petition in the United States District Court for the Eastern

3

District of Missouri. *Williams v. Roper*, No. 4:05-CV-01474-RWS. The case was assigned to District Judge Rodney W. Sippel. After the district court denied petitioner's requests for discovery, further DNA testing, and an evidentiary hearing, Judge Sippel granted petitioner habeas relief on his claim of ineffective assistance of counsel at the penalty phase of trial and denied habeas relief on all other claims. *Williams v. Roper*, 2010 U.S. Dist. LEXIS 144919 (E.D.Mo., 3-26-10).

Respondent filed a timely notice of appeal and petitioner thereafter filed a timely cross-appeal and moved for a certificate of appealability ("COA") in the district court. This COA, among other things, sought leave to cross-appeal the district court's refusal to order further DNA testing to permit petitioner to prove his innocence. The district court denied petitioner's COA motion. The Warden's appeal and petitioner's cross-appeal were docketed in the Eighth Circuit as Case Nos. 10-2579 and 10-2682. Petitioner, thereafter, filed an application for a COA before the Eighth Circuit requesting to brief additional issues, including the DNA issue, on the cross-appeal. The Eighth Circuit denied the COA application and dismissed Williams' cross-appeal. This Court subsequently denied certiorari in *Williams v. Missouri*, 539 U.S. 944 (2003).

4

After briefing and argument, the Eighth Circuit Court of Appeals, by a two to one vote, reversed the district court and remanded the case with directions that the petition be denied. *Williams v. Roper*, 695 F.3d 825 (8th Cir. 2012). The Court of Appeals, thereafter, denied rehearing and rehearing *en banc* on December 6, 2012. This Court denied Mr. Williams' petition for a writ of certiorari in *Williams v. Steele*, 134 S. Ct. 85 (2013).

On December 17, 2014, the Missouri Supreme Court set petitioner's execution for January 28, 2015. On January 9, 2015, petitioner filed an original petition for a writ of habeas corpus before the Missouri Supreme Court, accompanied by a motion for a stay of execution. (A-13-59). This petition was also accompanied by fourteen exhibits. (A-60-144).

Petitioner's state habeas petition raised a procedural due process claim alleging that he had been denied his due process right to seek DNA testing to prove his innocence. (A-43-46). The petition also raised a freestanding claim of actual innocence. (A-47-58). Petitioner also sought a stay of execution and requested that a Special Master be appointed to hear his claims after further DNA testing is completed. On January 22, 2015, the Missouri Supreme Court stayed petitioner's execution pending the disposition of his habeas petition. (A-16).

5

On May 26, 2015, the Missouri Supreme Court appointed Boone County, Missouri Circuit Judge Gary Oxenhandler as a special master to oversee further DNA testing in conjunction with the underlying habeas petition. (A-5). After DNA testing was completed by Bode Labs, the parties filed post-testing briefs accompanied by the deposition of a Bode Lab technician and the affidavit of the DNA expert retained by petitioner. (A-11-12; 145-167). On January 31, 2017, the Missouri Supreme Court summarily denied the habeas corpus petition, without explanation, in a one page order. (A-1).

## B.   STATEMENT OF FACTS

Marcellus Williams was convicted in 2001 for the 1998 murder of Felicia Gayle, who was stabbed to death in her University City home, on the word of two paid informants whose testimony was inherently unreliable. Despite the violent and bloody nature of the crime scene, police failed to uncover any forensic evidence connecting petitioner to the murder. In fact, physical evidence collected from the crime scene, including hair and footprints, could not be linked to petitioner, the victim or her husband, suggesting that the actual killer may still be at large. Because the murder went unsolved for nearly a year, the authorities resorted to the "snitch" testimony of Henry Cole and Laura Asaro to make an arrest.

6

Because the victim was a former reporter with the *St. Louis Post-Dispatch* and the wife of a prominent St. Louis area physician, the case generated enormous publicity. (Tr. 1730, 2820-28). After the murder went unsolved for several months, Henry Cole and Laura Asaro came forward in June of 1999 and claimed that petitioner had confessed to committing the murder in order to lay claim to a $10,000 reward that was offered for information about the homicide by the victim's husband.

Henry Cole is a career criminal with convictions dating back thirty years. Mr. Cole also has a long history of mental illness, evidence that the jury did not hear. The state's other star witness, Laura Asaro, also has a checkered background. She is an admitted crack addict and prostitute, who was supposedly petitioner's girlfriend for a two-month period around the time of the Gayle murder. (A-136-144). Both of these witnesses testified at trial that petitioner admitted to them that he had murdered Ms. Gayle. Mr. Williams' alleged jailhouse confession to Mr. Cole gave a much different account of the crime than his alleged "pillow talk" confession to his prostitute girlfriend. As a result, it is abundantly clear that at least one of these witnesses, if not both of them, committed perjury at trial in exchange for the reward money. (Tr. 1818, 1882). Although trial counsel tried to expose Cole's and Asaro's credibility problems before the jury, they were denied

7

access to impeaching information and failed to uncover Cole's and Asaro's histories of mental illness before trial.

Trial counsel, Joseph Green and Christopher McGraugh, were hired by the Missouri Public Defender System to represent petitioner at his trial. Both Green and McGraugh were admittedly unprepared for trial. (A110-118). In fact, Green sought a continuance because he was involved in another highly publicized St. Louis County capital murder trial involving Kenneth Baumruk, which started just a month before Mr. Williams' trial commenced. *See State v. Baumruk,* 85 S.W.3d 644 (Mo. banc 2002).

In denying virtually all of defense counsel's discovery requests, requests for forensic testing and two requests for a continuance based upon the state's failure to produce impeaching information on Cole and Asaro, the trial court pushed the case to trial beginning June 4, 2001. (Tr. 136; L.F. 269, 295, 394, 457). In a racially charged case (Ms. Gayle was white and petitioner is black), the prosecutor struck six of seven blacks from the venire panel, leaving just one black juror to serve on the petit jury. (Tr. 1569-70).

Due to trial counsel's lack of preparation, coupled with several trial court rulings, the jury did not receive a complete picture of the case during the guilt phase of trial. Because the prosecution failed to disclose impeaching information

8

and because trial counsel did not conduct a reasonable investigation, trial counsel's cross-examination of Cole and Asaro barely scratched the surface of establishing their utter lack of credibility. As will be discussed in greater detail below, new information came to light during state post-conviction proceedings, including information regarding both of these witnesses' long histories of drug abuse and mental illness which would have further undermined their credibility in the eyes of the jury. Because the jury did not hear this evidence, it was no surprise when the jury found petitioner guilty as charged.

On August 11, 1998, Felicia Gayle was stabbed to death in her home in University City, Missouri. (Tr. 1712, 2163). Months went by without any charges being filed. On November 29, 1999, the state charged petitioner with first degree murder and armed criminal action after Cole and Asaro came forward. (L.F. 14). Subsequently, on January 6, 2000, petitioner was indicted on these offenses and the additional charges of burglary in the first degree, robbery in the first degree and an additional count of armed criminal action. (L.F. 18).

The autopsy revealed that Ms. Gayle died from a total of sixteen stab wounds to her head, neck, chest and abdomen, seven of which could have been fatal. (Tr. 2163). There were forty-three stab wounds on her entire body. (*Id.*) A kitchen knife was left in her body. The police collected blood and skin samples

9

from under Gayle's fingernails. (Tr. 2268, 2962-63). Frustrated by the lack of progress in solving the crime, Ms. Gayle's husband Dr. Daniel Picus offered a $10,000 reward for information. (Tr. 1783, 1814). The police still had no leads in the case until June 4, 1999, when twelve-time convicted criminal Henry Cole came forward. (Tr. 2379-82).

Between April and June of 1999, Cole testified he was in the city jail with petitioner. (Tr. 2382). After a few weeks, he and petitioner realized they were distantly related and, according to Cole, became friends. (Tr. 2385-87). Cole stated that in early or mid-May, he was watching television with petitioner, when a story came on about Felicia Gayle's death, reporting that there were still no suspects and that a reward for $10,000 had been offered. (Tr. 2388-89). According to Cole, who had known petitioner only for a few weeks, petitioner admitted to him that he had committed the crime. (Tr. 2390).

Cole also claimed petitioner had indicated to him that the only other witness he had told about the crime was Laura Asaro. (Tr. 2414). In November 1999, officers went to Ms. Asaro's mother's house to speak with her. (Tr. 1910). Ms. Asaro believed that the officers were there to arrest her on outstanding warrants. (Tr. 1923). The police offered to help Asaro with her warrants if she would

10

provide information about the murder. (Tr. 1980). Asaro agreed to cooperate, becoming the second material witness against petitioner. (Tr. 1910).

Asaro testified that at the time of the crime she had been dating petitioner for two or three months, living at times in his car. (Tr. 1840-41). Asaro claimed that, on the day of the murder, petitioner drove her to her mother's house around 9:00 a.m. and returned in the car later that afternoon at about 3:00 p.m. (Tr. 1841-43). Asaro claimed petitioner was wearing a jacket zipped to the top, despite the August heat and the car having no operable air-conditioner. (Tr. 1841-42).

After removing the jacket, Asaro claimed she saw blood on his shirt and fingernail scratches on his neck. (Tr. 1843, 1855). Petitioner allegedly explained he had been in a fight. (Tr. 1843). Later that day, Asaro claimed that petitioner took off his clothing, placed it in his backpack, and threw it down a sewer. (Tr. 1845).

Asaro also testified that when petitioner picked her up, he had a computer in the car. (Tr. 1859-60). She stated that he took it to a house down the street and, upon returning, the computer was gone. (Tr. 1844, 1860-61). The next morning when she wanted to retrieve her clothes from the trunk of petitioner's car, Asaro says she gained access to the trunk and saw a woman's purse. (Tr. 1846). Snatching the purse away from petitioner, Asaro claimed she opened it and saw the

11

victim's identification and coin bag. (Tr. 1846). She became angry, believing that petitioner had another girlfriend. (Tr. 1847).

Asaro claimed that petitioner's response was to tell her that the purse belonged to a woman he just killed. (Tr. 1848). In contrast to Cole's account (and in direct conflict with the crime scene evidence), Asaro claimed petitioner told her that he broke into the woman's house through the *back* door. (Tr. 1848, 1851). Asaro then gave a general account of a surprise encounter with the victim, a struggle and an account of the stabbing. (*Id.*) Unlike Cole, Asaro testified that petitioner drove to the scene (and did not take a bus). (Tr. 1841-42). Like Cole, Asaro admitted that she was also interested in the reward money. (Tr. 1953).

Because the state's case hinged on two highly unbelievable witnesses, defense counsel focused on the lack of forensic evidence linking petitioner to this extremely bloody murder scene, and suggested that police could easily have fed information to Cole and Asaro to resolve this long-unsolved, high-profile crime. For example, numerous hairs were discovered on the victim's shirt and on the rug where her body was found. (Tr. 2871-72, 2920). The rug had been vacuumed eleven days before the crime. (Tr. 2754-55). While some of the hairs matched Gayle or Picus, others did not match either of them or petitioner. (Tr. 2871-72, 2920). Similarly, two pubic hairs found on the rug did not match Gayle, Picus, or

12

petitioner. (Tr. 2876-77). Head hairs also found on the rug also did not match any of these three individuals. (Tr. 2877). None of these unmatched hairs, nor the knife were ever tested for DNA by either the prosecution or the defense. (Tr. 2867).

In addition, fingernail clippings taken from Gayle that contained blood and skin could not be matched to petitioner. (Tr. 2961, 2964). Bloody footprints at the scene appeared to belong to a single assailant. None of the bloody shoeprints matched any paramedics' shoes, nor did they match the shoes seized from petitioner upon his arrest. (Tr. 2882, 3140).

Throughout the state and federal post-conviction process, petitioner was never afforded a hearing on any of his constitutional claims involving the credibility of Mr. Cole or Asaro. Petitioner was denied a hearing on the DNA testing issue during his 29.15 litigation. Furthermore, the federal district court denied all of petitioner's discovery requests regarding the similar murder of Debra McClain and all other attempts to obtain further DNA testing of the untested and unmatched materials in this case. (A-63-65); (Dist. Ct. Doc.'s 34, 42).

In his federal habeas petition, petitioner advanced a freestanding claim of actual innocence, coupled with a claim that he was convicted on the basis of the perjured testimony of Cole and Asaro. In the litigation of his federal habeas

13

petition before the district court, petitioner filed numerous motions and requests for discovery seeking access to impeaching information regarding Cole and Asaro, the police investigation of the McClain murder, and for further DNA testing of the untested items and genetic materials. (See Dist. Ct. Doc.'s 9, 10, 11, 35, 37).

As noted earlier, there was trace evidence collected at the scene that did not microscopically match petitioner, the victim, or her husband. In particular, there were both head and pubic hairs found at the crime scene that did not match the victim, her husband, or petitioner. (Tr. 2871-2872, 2876-2877, 2920). Fingernail clippings taken from the victim revealed testable blood and skin samples. Although these samples contained some of the victim's DNA, there was no DNA match to petitioner. In light of Ms. Asaro's account of the crime, indicating that petitioner had scratches on his body, if her account was true, Mr. Williams' DNA should have been found in the victim's fingernail scrapings.

Petitioner also sought access, through discovery motions filed in his 2254 action, to police reports, lab reports, and any DNA profiles developed in the unsolved murder of Debra McClain, which occurred in Pagedale, Missouri, on July 18, 1998. (A-63-65); (See also Dist. Ct. Doc.'s 11, 35, 37). Apart from the temporal and geographical proximity of the murders, there were other remarkable

14

similarities between the two cases. St. Louis County Medical Examiner Dr. Mary Case thought that these murders were connected. (H. Tr. 33).

At a meeting with the chief detectives investigating the Gayle homicide, Dr. Case articulated the following similarities between the murders of Ms. Gayle and Ms. McClain:

1.   The age of the victims (McClain was 40, Gayle was 42);

2.   Both women were of similar build and had long brown hair;

3.   The injuries were similar in that both were stabbed on the right side of the neck and had numerous stab wounds on the front and back upper trunk area;

4.   Crime scenes were similar in that very little was disturbed, each victim was stabbed with a knife from her own kitchen drawer and the victims' purses were missing in both cases; and

5.   Both victims had defensive wounds.

(A-62-65). Most importantly, Dr. Case noted the unusual factor that the victim in each case still had the knife in her body, which, according to Dr. Case "is extremely rare." (*Id.*). In fact, one investigator thought the killings were the work of a serial killer. (H. Tr. 29-30).

The murder of Debra McClain remained unsolved at the time of petitioner's 2001 trial and apparently remains unsolved to this day. As a result, any and all

15

police records, crime laboratory testing and any other reports generated in the case are closed records under Missouri's Sunshine Law. See § 610.100 R.S.Mo. (2010). In light of advances in DNA technology and the creation of both the state and CODIS databases, petitioner also unsuccessfully sought access to any available items of evidence in the McClain case, such as the knife and any trace evidence for DNA testing and, if any profiles have been or are developed, to have such profiles run through these databases. (See Dist. Ct. Doc.'s 34, 42).

As noted earlier, the Missouri Supreme Court stayed petitioner's execution and appointed Judge Oxenhandler as a special master to oversee DNA testing of trace evidence from the crime scene of the Gayle murder. However, the Missouri Supreme Court did not authorize the master to conduct any hearings on petitioner's broader claim of actual innocence, nor did the Supreme Court order that Judge Oxenhandler address petitioner's request for evidence regarding the McClain murder. (A-3-12). As a result, the proceedings before the master merely involved the parties' making arrangements to have the trace evidence from the scene of the Gayle murder tested by Bode Laboratories. (*Id.*).

After the Bode Laboratories completed testing, they issued a report finding, that despite the fact that several alleles at eleven different loci from the Y-STR DNA testing of the knife did not match the known DNA of petitioner, that the

16

threshold levels were too low to make a conclusive exclusion. (A-145-152). After the testing was completed, the parties took the deposition of a Bode Laboratory technician and submitted post-DNA testing briefs. (A-10-12). Before petitioner's post-DNA testing brief was filed, he secured the assistance of DNA expert Norah Rudin, Ph.D. (A-145-167). After reviewing all of the DNA reports from Bode Lab and the lab notes and electronic raw data, Dr. Rudin concluded that Marcellus Williams could not have contributed to the detected DNA profile found on the knife that murdered Felicia Gayle. (A-164-166).

On January 1, 2017, Judge Oxenhandler submitted all of the DNA data and briefs of the parties to the Missouri Supreme Court. (A-11-12). Less than a month later, the Missouri Supreme Court summarily denied the habeas petition without any further briefing or argument, in a one line order. (A-1). The present petition for a writ of certiorari is now before this Court for its consideration.

## REASONS FOR GRANTING THE WRIT

### I.

**CERTIORARI SHOULD BE GRANTED TO PERMIT THE COURT TO RESOLVE THE UNANSWERED QUESTION OF WHETHER THE EIGHTH AND FOURTEENTH AMENDMENTS PROHIBIT THE EXECUTION OF A PRISONER WHO PRESENTS A COLORABLE POST-CONVICTION CLAIM OF ACTUAL INNOCENCE.**

17

The facts of this case present this Court with an ideal opportunity to resolve the unanswered questions and confusion spawned by this Court's decision in *Herrera v. Collins*, 506 U.S. 390 (1993) regarding whether due process and the cruel and unusual punishment clauses of the Eighth and Fourteenth Amendments prohibit the execution of a prisoner who raises a substantial claim of actual innocence. The fractured opinion in *Herrera* has created a great deal of confusion and conflicts between the various state and federal courts that have addressed whether innocent prisoners have a due process right to post-conviction relief where freestanding claims of innocence are advanced.

In the aftermath of *Herrera*, most federal circuit courts of appeals have interpreted *Herrera* to categorically preclude federal habeas petitioners from obtaining habeas corpus relief under 28 U.S.C. § 2254 based on freestanding claims of actual innocence. *See, e.g., Burton v. Dormire*, 295 F.3d 839, 848 (8th Cir. 2002). The question of whether the federal constitution precludes the incarceration and execution of an innocent prisoner has also divided many of the state courts who have addressed the issue. The Illinois Supreme Court determined that this Court's "conflicted" decision in *Herrera* barred a federal due process claim grounded upon actual innocence and instead relied upon the Illinois Constitution to grant the prisoner a new trial. *People v. Washington*, 665 N.E.2d

18

1330, 1335 (Ill. 1996). Several other state courts have taken a similar path to grant innocent prisoners relief under state constitutions. *See, e.g., People v. Hamilton*, 115 A.D.3d 12 (N.Y. 2014); *Montoya v. Ulibarri*, 142 N.M. 89, 97 (2007).

However, in states where neither legislation nor the state constitution has been interpreted to permit innocent prisoners to obtain post-conviction relief, innocent prisoners have no legal recourse to obtain any meaningful judicial review despite compelling evidence that they are imprisoned or even condemned to die for a crime that they did not commit. *See State v. El-Tabech*, 610 N.W.2d 737 (Neb. 2000). In that case, the Supreme Court of Nebraska held that, in light of *Herrera* and the language of the state's post-conviction act, that an innocent prisoner had no legal recourse in Nebraska courts unless the legislature intervened to expand the scope of the state's post-conviction review act. *Id.* at 748. On the other hand, some states have found that post-conviction relief is available to innocent prisoners because the failure to provide post-conviction relief under these circumstances would violate the due process clause of the United States Constitution. *Ex parte Thompson*, 153 S.W.3d 416 (Tex. Crim. App. 2015).

It is also important to note that these restrictive interpretations of the *Herrera* decision to categorically preclude constitutional claims advanced by inmates with freestanding claims of innocence are demonstrably wrong. In the last

19

decade, this Court has made it clear that *Hererra*, in which the petitioner had only made a weak showing of innocence, did not actually resolve the issue of whether the constitution precludes the execution of an innocent prisoner. *See McQuiggin v. Perkins*, 133 S. Ct. 1924, 1931 (2013); *House v. Bell*, 547 U.S. 518, 554-555 (2006).

*Herrera* recognized that the central purpose of any system of criminal justice is to convict the guilty and free the innocent. *Herrera*, 506 U.S. at 398. In addition, the concept of "liberty from bodily restraint has been recognized as the core of the liberty protected by the Due Process Clause from arbitrary governmental action." *Youngberg v. Romeo*, 457 U.S. 307, 316 (1982). Because an innocent person "has a liberty interest in remaining free from punishment," the execution or continued incarceration of an innocent person violates elementary fairness and "runs afoul" of that person's due process rights. *Hamilton*, 115 A.D.3d at 26.

Both the *Herrera* decision itself and subsequent decisions clearly indicate that strong procedural and substantive due process arguments can be made that the continued incarceration and execution of an innocent prisoner would violate both procedural and substantive due process under the Fourteenth Amendment. *Hererra*, 506 U.S. at 436, 437 (Blackmun, J., dissenting). Although the majority

20

of the court in *Herrera* declined to find that substantive due process would be violated by the execution of an innocent prisoner, at least six members of the court did agree that a truly persuasive case of actual innocence would render a conviction unconstitutional. *Id.* at 417. The Illinois Supreme Court in *Washington* found that the continued imprisonment of an innocent person would violate both substantive and procedural due process. The court in *Washington* held that procedural due process required post-conviction relief because "to ignore such a claim would be fundamentally unfair." *Washington*, 665 N.E.2d at 1336. The court in *Washington* also held that "imprisonment of the innocent would also be so conscience shocking as to trigger operation of substantive due process." *Id.*

A strong argument can also be made that the continued incarceration and execution of an innocent prisoner violates the Eighth Amendment. Due to the heightened reliability requirement in capital sentencing proceedings, the requirements of the cruel and unusual punishment clause of the Eighth Amendment apply to death penalty cases with special force. *See Monge v. California*, 524 U.S. 721, 732 (1998); *See also Roper v. Simmons*, 543 U.S. 551 (2005). The Eighth Amendment's heightened reliability requirement applies with equal force regarding eligibility for the death penalty and to the attendant procedural safeguards that states must provide to prevent the imposition of unjust or

21

unconstitutional death sentences. *See, e.g., Gardner v. Florida*, 430 U.S. 349, 357 (1977) ("This Court has acknowledged its obligation to re-examine capital sentencing procedures against evolving standards of procedural fairness in a civilized society.")

A sentencing process that does not comport with "evolving standards of decency that mark the progress of a maturing society" also violates the Eighth Amendment. *Simmons*, 542 U.S. at 561; *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). In determining whether an Eighth Amendment violation occurs under the evolving standards of decency test, the best indicator of contemporary values is legislation enacted by the states. *See Atkins v. Virginia*, 536 U.S. 304, 313 (2002).

In the more than two decades since the *Herrera* decision, the vast majority of the states either through legislation, court rule, or by the interpretation of its constitution, have created a post-conviction review system that allows wrongly convicted prisoners to obtain post-conviction relief if they can present a compelling case of actual innocence. *See* Brooks, Simpson, and Kaneb, *If Hindsight Is 20/20, Our Justice System Should Not Be Blind To New Evidence Of Innocence: A Survey Of Post-Conviction New Evidence Statutes And A Proposed Model*; 79 Alb. L. Rev. 1045 (2015/2016). This expansion of the rights of innocent prisoners to seek legal redress has also undoubtedly been accelerated as a

22

result of the spate of DNA exonerations resulting from scientific advances in that technology. However, as noted earlier, for those innocent prisoners in the federal system and the handful of states that do not provide adequate legal remedies for innocent prisoners,[1] this Court under *Simmons* and *Atkins* should grant review in this case in order to recognize that the United States Constitution requires that innocent prisoners have a right to be heard and obtain new trials on freestanding claims of actual innocence under the evolving standards of decency test.

Another central concern of the Eighth Amendment is its protection against disproportionate punishment. *See Montgomery v. Louisiana*, 136 S. Ct. 718, 732 (2016). This Court has identified four "penological justifications" for imposing a life without parole sentence in *Montgomery*: (1) retribution; (2) deterrence; (3) incapacitation; and (4) rehabilitation. *Id.* at 733. None of these purposes are served and are, in fact, undermined when the convicted individual is actually innocent. Therefore, because punishment of an actually innocent person is inherently disproportionate to the acts committed by that person, such punishment violates the constitutional prohibition on cruel and unusual punishment. *Hamilton*, 115 A.D.3d at 26.

---

[1] As the Brooks article points out, many states impose strict time limits and/or restrict innocence claims to those based upon DNA evidence. 79 Alb. L. Rev. at 1054-1057, 1070-1075.

23

These state legislative and legal developments involving innocence jurisprudence in the aftermath of *Herrera* dictate that its holding should be abandoned, reexamined, and clarified. Evolving standards of decency clearly indicate that it is constitutionally impermissible to allow condemned prisoners to remain incarcerated or forfeit their lives if they have a substantial claim of innocence. This Court's discretionary review is necessary to ensure that innocent prisoners such as petitioner have adequate judicial process to litigate their claims.

## CONCLUSION

The petition for a writ of certiorari should be granted.

Respectfully submitted,

Kent E. Gipson, #34524
Law Offices of Kent Gipson, LLC
301 East 63rd Street
Kansas City, Missouri 64113
(816) 363-4400 • Fax 816.363.4300
kent.gipson@kentgipsonlaw.com

LAURENCE E. KOMP, Mo. Bar #84430
E.D. Mo. No. 5212907
P.O. BOX 1785
Manchester, MO 63011
636-207-7330 / fax 636-207-7351
lekomp@swbell.net

*COUNSEL FOR PETITIONER*

24