No. 16-8963

THIS IS A CAPITAL CASE

EXECUTION SHEDULED 6:00 P.M. AUGUST 22, 2017

IN THE SUPREME COURT OF THE UNITED STATES

MARCELLUS WILLIAMS

Petitioner,

v.

TROY STEELE, Warden,

Respondent.

Brief in Opposition to Petition for a
Write of Certiorari to the Supreme Court of Missouri

JOSHUA D. HAWLEY
Attorney General

D. JOHN SAUER
State Solicitor

MICHAEL J. SPILLANE
 *Counsel of Record*
Assistant Attorney General
Missouri Bar No. 40704
P.O. Box 899
Jefferson City, MO 65102
Telephone: (573)751-3321
Facsimile: (573)751-2096
Mike.Spillane@ago.mo.gov
Attorneys for Respondent

**QUESTION PRESENTED**

Marcellus Williams unsuccessfully sought DNA testing in his federal habeas corpus action, the Court of Appeals denied a certificate of appealability in that case, and this Court denied review. Williams also filed a civil rights action seeking additional DNA testing, but the United States District Court for the Eastern District of Missouri found his claim to be frivolous. Then Williams filed a state court habeas action alleging actual innocence solely under *Missouri* law. The Missouri Supreme Court stayed Williams' scheduled January 2015 execution and appointed a special master to facilitate the additional DNA testing that Williams requested. DNA testing of crime scene evidence was conducted by experts under Williams' control, and that testing consumed the evidence without providing any support for Williams' claim of actual innocence. After reviewing the testing results, the Missouri Supreme Court denied the petition alleging actual innocence under Missouri law. Accordingly, the question presented is:

Should this Court grant review to consider whether there is a federal constitutional right to make a freestanding claim of actual innocence in a case in which a state court denied an actual innocence claim made solely under state law?

1

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................... 3

STATEMENT OF THE CASE ........................................................................... 5

REASONS FOR DENYING THE WRIT ........................................................ 14

   1.  The petition does not identify any federal question raised, addressed, or decided by the Missouri Supreme Court that this Court can review. .. 14

   2.  Williams does not allege a conflict of authority warranting this Court's review, and this Court has often declined to review the question Williams presents for review............................................................... 16

   3.  Williams' case provides a poor vehicle to consider whether there is a freestanding actual innocence claim under the federal Constitution, because Williams cannot satisfy any plausible standard that this Court might adopt for actual innocence claims. ............................................. 18

CONCLUSION................................................................................................ 23

# TABLE OF AUTHORITIES

## <u>Cases</u>

*Burton v. Dormire*, 295 F.3d 839 (8th Cir. 2002) .............................................. 16

*Campbell v. United States* (No. 02-394), 2002 WL 32134508, *cert. denied*, 537 U.S. 950 (2002) ...................................................................................... 18

*Daniels v. Uchtman* (No. 05-654), 2005 WL 3150492, *cert. denied*, 546 U.S. 1095 (2006) ...................................................................................... 18

*Estelle v. McGuire,* 502 U.S. 62 (1991) ............................................................ 15

*Ex parte Elizondo*, 947 S.W.2d 202 (Tex. Crim. App. 1996) ............................ 17

*Ex Parte Fournier*, 473 S.W.3d 789 (Tex. Crim. App. 2015) ............................ 17

*Ex parte Thompson*, 153 S.W.3d 416 (Tex. Crim. App. 2015) ................... 17, 22

*Gardner v. Stephens* (No. 13-546), 2013 WL 583768, *cert. denied*, 134 S. Ct. 928 (2014) ...................................................................................... 18

*Herrera v. Collins*, 506 U.S. 390 (1993) .......................................................... 22

*McAuliffe v. United States* (No. 12-1186), 2013 WL 1309082, *cert. denied*, 133 S. Ct. 2044 (2013) ................................................................................... 18

*Missouri v. Williams*, 97 S.W.3d 462 (Mo.) *cert. denied sub nom Williams v. Missouri*, 539 U.S. 944 (2003)............................................................. 6, 7, 19

*Montoya v. Ulibarri*, 142 N.M. 89 (2007)....................................................... 16

*Paige v. City of University City,* 780 S.W.2d 93 (Mo. App. E.D. 1989) ........... 15

*People v. Hamilton*, 115 A.D.3d 12 (N.Y. 2014) ............................................. 16

3

*People v. Washington*, 665 N.E.2d 1330 (Ill. 1996) ........................................... 16

*Skinner v. Switzer*, 131 S. Ct. 1289 (2011) ........................................................ 9

*State ex rel. Amrine v. Roper*, 102 S.W.3d 541 (Mo. 2003) ..................... 9, 13, 14

*State v. El-Tabech*, 610 N.W.2d 737 (Neb. 2000) ............................................. 16

*Williams v. McCulloch*, 2015 WL 222170 (E.D. Mo. Jan. 14, 2015) ........... 9, 13

*Williams v. Missouri*, 168 S.W.3d 433 (Mo. 2007) ............................................ 7

*Williams v. Roper*, 2007 WL 1018638 (E.D. Mo. 2007) ..................................... 8

*Williams v. Roper*, 565 U.S. 1015 (2011) .......................................................... 8

*Williams v. Roper*, 695 F.3d 825 (8th Cir. 2012) *cert. denied* 134 S. Ct. 85

   (2013) ........................................................................................................ 5, 6, 7

## Statutes

28 U.S.C. § 1257 ................................................................................................ 16

28 U.S.C. § 2254 ................................................................................................ 17

Mo. Rev. Stat. §547.035 .................................................................................... 10

Mo. Rev. Stat. §565.035 .................................................................................... 15

4

## STATEMENT OF THE CASE

On August 11, 1998, Marcellus Williams parked his grandfather's car at a bus stop and took a bus to University City, Missouri, a suburb of St. Louis. Once there, he looked for a house to burglarize. *Williams v. Roper*, 695 F.3d 825, 827 (8th Cir. 2012), *cert. denied*, 134 S. Ct. 85 (2013). Williams came upon Felicia Gayle's home, knocked out a window pane near the door, reached in, unlocked the door, and let himself in. *Id*. Williams heard the shower running upstairs where Ms. Gayle was taking a shower. *Id*. He went to the kitchen, found a butcher knife, and waited. *Id*.

Ms. Gayle finished her shower and went downstairs. *Id*. Williams murdered Ms. Gayle by stabbing and cutting her forty-three times with the butcher knife, including at least seven potentially fatal wounds. *Id*. Williams then washed the victim's blood from his body and concealed his bloody shirt under a jacket. *Id*. Williams stole a laptop computer and the victim's purse, which contained a *St. Louis Post-Dispatch* ruler and a calculator. *Id*.

Williams returned to the bus stop, retrieved his grandfather's car, and picked up his girlfriend, Laura Asaro. *Id*. Asaro noticed Williams was wearing a jacket despite the summer heat. *Id*. When Williams took off his jacket, Asaro saw blood on his shirt and scratches on his neck. *Id*. Williams explained the scratches by saying he had been in a fight. *Id*. Asaro saw a

5

laptop computer in the car. *Id.* Later in the day, Williams put his bloody clothes in a backpack and threw them into a sewer drain. *Id.*

The day after the murder, Asaro found the victim's purse, containing the victim's identification, in the trunk of the car Williams was driving. *Id.* Williams confessed the details of the murder to Asaro, then grabbed Asaro by the throat and told her that he would kill her, her children, and her mother if she told anyone. *Id.*

Williams was arrested on unrelated charges and incarcerated in the St. Louis City workhouse, where he shared a room with Henry Cole. *Id.* Williams told Cole he had committed the Gayle murder and discussed details of the crime with Cole over a period of a few weeks. *Id.* After Cole's release from the St. Louis City workhouse in June 1999, Cole went to University City Police and told them about Williams' confession. *Id.* To the University City Police, Cole "reported details of the crime that had never been publicly reported." *Missouri v. Williams*, 97 S.W.3d 462, 467 (Mo. banc 2003).

The University City police approached Asaro, who also told them that Williams had confessed to the murder. *Id.* The University City police searched the car Williams had driven on the day of the murder and found the *St. Louis Post-Dispatch* ruler and the calculator that had belonged to the victim and had been in her purse. *Id.* Police also recovered the laptop computer, which Williams had stolen from Ms. Gayle's residence, from a man

6

named Glenn Roberts, who stated that Williams had sold it to him a day or two after the murder. *Id.*

Following a jury trial, the Circuit Court of St. Louis County, Missouri convicted Williams of first-degree murder, first-degree burglary, first-degree robbery, and two counts of armed criminal action. *Williams v. Roper*, 695 F.3d at 828. The jury sentenced Williams to death, finding ten aggravating circumstances. *Id.* The aggravating circumstances included five circumstances that arose from the facts of the murder itself, and included five consisting of Williams' prior convictions as separate aggravating circumstances, including two armed robberies, two armed criminal actions, and one assault. *Id.* The Missouri Supreme Court affirmed the conviction and sentence on direct appeal. *Missouri v. Williams*, 97 S.W.3d 462 (Mo.), *cert. denied sub nom Williams v. Missouri*, 539 U.S. 944 (2003). Williams pursued state post-conviction relief unsuccessfully in the trial court, contending that his trial counsel had been ineffective in not conducting sufficient testing of the physical evidence, and the Missouri Supreme Court affirmed the denial of post-conviction relief. *Williams v. Missouri*, 168 S.W.3d 433 (Mo. 2007). The Missouri Supreme Court affirmed the finding of the post-conviction review court that counsel was not ineffective for not doing additional testing of physical evidence. *Id.* at 442.

During his federal habeas corpus litigation, Williams asked the United States District Court for the Eastern District of Missouri to order additional DNA testing. *Williams v. Roper*, No. 4:05CV1474 RWS, 2007 WL 1018638 (E.D. Mo. 2007). The district court declined, finding that the crime scene evidence had been tested; that there was trace DNA on the knife handle that did not match Williams, the victim, or the victim's husband; that the jury was aware of this fact; and there was no good reason for discovery. *Id*. at *8. The district court held that "[t]his is not a case in which the biological trace evidence has not been tested and, if tested, could exculpate petitioner. The record showed that the biological trace evidence did not match the DNA of petitioner, the victim or the victim's husband. This fact was presented to the jury at petitioner's trial." *Id*. The United States Court of Appeals did not overturn that decision, and this Court denied certiorari. *Williams v. Roper*, 565 U.S. 1015 (2011).

After the Missouri Supreme Court scheduled Williams' execution for January 28, 2015, Williams filed a suit in the United States District Court for the Eastern District of Missouri under 42 U.S.C. §1983 claiming a right to additional DNA testing. He asserted claims based on due process under the Fourteenth Amendment; the First Amendment right to access to courts; the right to be free from cruel and unusual punishment; the Compulsory Process and Confrontation Clauses of the Sixth Amendment; and due process in

8

clemency proceedings. *Williams v. McCulloch*, No. 4:15CV00070 RWS, 2015 WL 222170 (E.D. Mo. Jan. 14, 2015).  On January 14, 2015 the district court dismissed the complaint as frivolous and certified that an appeal would not be taken in good faith. *Id.*

On January 9, 2015, Williams had filed a motion for a stay of execution in the Missouri Supreme Court, asking the court to stay his execution pending litigation of a state habeas corpus petition. Appendix A12–13. On the same date, Williams filed a petition for habeas corpus in the Missouri Supreme Court. Appendix A17–58. Williams admitted in the petition that he did not qualify for additional DNA testing under the Missouri statute that permits post-conviction testing of DNA evidence, Mo. Rev. Stat. §547.035. Appendix A18.

In his habeas petition to the Missouri Supreme Court, Williams made two claims. First, he alleged he had a federal due process right to additional DNA testing under the reasoning of *Skinner v. Switzer*, 131 S. Ct. 1289 (2011), even though he did not qualify for testing under the applicable Missouri statute. Appendix A22. Second, he alleged a claim of actual innocence under *Missouri* law, relying on the state-law precedent *State ex rel. Amrine v. Roper*, 102 S.W.3d 541 (Mo. 2003). Appendix A22. Though the heading of Williams' actual innocence claim recited that he was seeking relief under the "Eighth and Fourteenth Amendments," the argument in his habeas

9

petition relied exclusively on state law, not federal law, to advance his freestanding actual innocence claim. Appendix A49–58. On January 22, 2015, the Missouri Supreme Court stayed Williams' execution pending resolution of the state habeas corpus petition. Appendix A16.

The Missouri Supreme Court appointed a special master who eventually ordered two rounds of DNA testing of crime scene evidence. Appendix A7–12. The testing was arranged for and controlled by Williams. To conduct the testing, Williams retained two different experts in succession. The testing addressed two types of crime scene evidence—hair samples from the crime scene, and biological traces from the handle of the murder weapon.

First, DNA test results for hair samples found at the crime scene showed that the samples are consistent with the victim, and not consistent with her husband. Forensic Case Report of April 2016 Submitted to the Missouri Supreme Court. The hair samples were tested against the victim and her husband, but *not* against Marcellus Williams. Williams' initial expert in the habeas case had no explanation for why the hair samples were not tested against Williams. Supplemental Appendix, Fienup Deposition A64.

Testing the handle on the murder weapon, the kitchen knife, indicated that most of the DNA on the knife handle is from a female source. Supplemental Appendix, Fienup Deposition A27, A44. Williams' expert did only Y-STR testing on the DNA from the knife handle. Supplemental

10

Appendix, Fienup Deposition A12, A25–27. Such testing *cannot be run through CODIS* and is meant to identify male DNA. Supplemental Appendix, Fienup Deposition A64–66. The testing, according to Williams' initial expert, indicates more than one male's DNA is on the knife handle, and that it is impossible to include or exclude Marcellus Williams as one of the persons who left DNA on the knife handle. Supplemental Appendix, Fienup Deposition A26–27, A31, A45, A48, A58–59, A61–A64, A68. The knife handle DNA repeat patterns match Williams at four loci but do not match him at others. Supplemental Appendix, Fienup Deposition, A48, A62–64.

Williams' initial expert witness agreed it was a reasonable inference that further DNA testing of the knife handle would have no value because she "clearly got a lot less DNA the second time we tested it."  Supplemental Appendix, Fienup Deposition A67. The expert witness further explained that she "would expect that any DNA on the handle by this point has been consumed." *Id*. The DNA tester acting at Williams' direction made the decision to do Y-STR testing, which cannot be run through the CODIS data base, based on consultation with the "client," presumably counsel for Williams. Supplemental Appendix, Fienup Deposition A65. The tester repeated the test a second time, consuming the remainder of the DNA on the knife handle. Supplemental Appendix, Fienup Deposition A67.

11

Williams' initial testing expert testified in her deposition that, despite the match to Williams at four loci, she could not draw any conclusions that would either include or exclude Williams as a contributor to the DNA on the knife handle, because multiple persons' male DNA was on the kitchen knife handle. Supplemental Appendix, Fienup Deposition A63–64, A68. No effort appears to have been made to compare the DNA on the knife handle to the DNA of the victim's husband or any other person whose DNA could reasonably be expected to be on the knife handle.

Unsatisfied with the testimony from his own initial testing expert, Williams retained a new expert after the hearing, and attached her report to his post-hearing brief. Appendix A164–67. The new report appears to agree with Williams' first expert that there was more than one male person's DNA on the knife handle, and that four loci in the profile on the knife handle have the same repeat number as Williams' profile. *Id*. Nevertheless, the new report, in the opening summary, concluded that Williams could not have contributed to the DNA on the knife handle. *Id*. A164. The conclusion of the new report states "the simplest and most reasonable explanation for the profile detected on the knife is that Williams is not a contributor." *Id*. A166.

As noted above, Williams' habeas petition to the Missouri Supreme Court raised two claims. First, Williams alleged a federal due process right to additional DNA testing, because he did not meet the standard for additional

12

DNA testing under the Missouri post-conviction DNA testing statute. The United States District Court for the Eastern District of Missouri had already dismissed a variation of that claim as frivolous in *Williams v. McCulloch*, No. 4:15CV00070 RWS, 2015 WL 222170 (E.D. Mo. Jan. 14, 2015). But the Missouri Supreme Court stayed Williams' January 2015 execution date and permitted Williams to do testing anyway. Second, Williams raised an actual innocence claim under *state* law, alleging that DNA testing would prove he is actually innocent. But the Missouri Supreme Court concluded that it did not. In fact, Williams consumed the DNA without ever doing the type of testing that could be run through the CODIS database, which his habeas petition had portrayed as a central purpose of testing. Appendix A17–59.

The Missouri Supreme Court authorized Williams to perform the DNA testing he requested on crime scene evidence, and Williams consumed the available crime scene DNA in the process. The results did not make out a claim of actual innocence under *State ex rel. Amrine v. Roper*, 102 S.W.3d 541 (Mo. 2003). Therefore, the Missouri Supreme Court denied the petition for habeas corpus. The Missouri Supreme Court then set Williams' execution date for August 22, 2017.

13

## REASONS FOR DENYING THE WRIT

**1. The petition does not identify any federal question raised, addressed, or decided by the Missouri Supreme Court that this Court can review.**

Williams' habeas corpus petition in the Missouri Supreme Court raised a freestanding claim of actual innocence. Appendix A47–58. But this claim was asserted solely under *state* law. *Id.* In the heading introducing this claim, Williams recited that he was relying on the Eighth and Fourteenth Amendments of the U.S. Constitution. Appendix A47. But this formulaic recital was the sole reference to federal law in this claim. *Id.* His analysis and argument concerning the actual innocence claim relied only on Missouri cases concerning actual innocence that are based, in turn, on a Missouri statute that authorizes continuing review of death sentences. Appendix A49–58 (citing *State ex rel. Amrine v. Roper*, 102 S.W.3d 541 (Mo. 2003), and Mo. Rev. Stat. § 565.035.3). There is no reason to believe the Missouri Supreme Court in this case considered the question whether the federal Constitution creates a cause of action for freestanding claims of actual innocence, because Williams never presented any analysis or argument on that point. He simply placed a formulaic reference to the federal Constitution in a heading, without more.

Under Missouri procedural law, Williams' formulaic reference to the federal Constitution in the heading of his actual innocence claim, without any

14

argument or citation of federal law to support the claim, was plainly insufficient to preserve and present the supposed federal claim to the state court. *See, e.g., Paige v. City of University City*, 780 S.W.2d 93, 94 (Mo. App. E.D. 1989) (holding that an appellate brief that did not "show wherein and why appellants are entitled to relief" and cited no authorities to support the issues identified in the headings did not preserve those claims for appellate review). There is no reason to suppose that the Missouri Supreme Court ever considered or decided the question of federal law of which Williams now seeks this Court's review, since that question was never validly presented to the Missouri court. And this Court lacks jurisdiction to review state-court decisions on questions of state law. 28 U.S.C. § 1257(a); *see also Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991) ("We have stated many times that federal habeas corpus relief does not lie for errors of state law. . . . [I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.").

Accordingly, the petition identifies no adverse decision on a question of federal law by a lower court. It fails to identify any question warranting this Court's certiorari review.

**2. Williams does not allege a conflict of authority warranting this Court's review, and this Court has often declined to review the question Williams presents for review.**

Even if Williams had properly presented his federal claim to the Missouri Supreme Court and received a decision of it on the merits, the proposed question presented would not warrant this Court's review. Williams fails to identify any split in authority warranting this Court's review under this Court's Rule 10.

Williams does not identify any conflict of authority that warrants this Court's review under Rule 10. On the contrary, Williams concedes that "most federal circuit courts of appeals have interpreted *Herrera* to categorically preclude federal habeas petitioners from obtaining habeas corpus relief under 28 U.S.C. § 2254 based on freedstanding claims of actual innocence." Pet., at 18 (citing *Burton v. Dormire*, 295 F.3d 839, 848 (8th Cir. 2002)). Instead, Williams cites three decisions by state courts of last resort that have relied on *state law*, not federal law, to recognize freestanding actual innocence claims. *See* Pet., at 18–19 (citing *People v. Washington*, 665 N.E.2d 1330, 1335 (Ill. 1996); *People v. Hamilton*, 115 A.D.3d 12 (N.Y. 2014); and *Montoya v. Ulibarri*, 142 N.M. 89, 97 (2007)). He cites one decision refusing to recognize a freestanding claim of actual innocence under state law, *see* Pet., at 19 (citing *State v. El-Tabech*, 610 N.W.2d 737 (Neb. 2000)). But this Court does not review state court decisions on questions of state law, so the allegation

16

that state courts have come to different results under the laws of their respective states does not provide any reason for this Court to grant review.

The only case that Williams identifies purporting to recognize a freestanding actual innocence claim under *federal* law is *Ex parte Thompson*, 153 S.W.3d 416 (Tex. Crim. App. 2015). *Thompson* relied entirely on a previous Texas precedent, *Ex parte Elizondo*, 947 S.W.2d 202 (Tex. Crim. App. 1996), as authority for considering actual innocence claims under federal law. *Thompson*, 153 S.W. 3d at 417. As the concurrence in *Thompson* pointed out, however, Texas courts have gone beyond the holdings of federal courts in ruling that the federal Constitution authorizes freestanding actual innocence claims. *Thompson*, 153 S.W.3d at 423–24 (Cochran, J., concurring). The Texas Court of Criminal Appeals further expounded on this point in *Ex Parte Fournier*, 473 S.W.3d 789, 790–96 (Tex. Crim. App. 2015), holding that although Texas actual innocence jurisprudence borrows heavily from federal precedents, it has been "substantially modified" by Texas. *Id.* at 790 ("Texas's actual innocence jurisprudence is heavily borrowed from federal law, but its application has been substantially modified."). In short, though ostensibly rooted in the federal Constitution, Texas's treatment of freestanding actual innocence claims bears the unique hallmarks of Texas.

Thus, the split in authority that Williams purports to identify is, at most, a shallow split involving a single State with its own unique approach to

17

actual innocence claims. This split of authority does not warrant this Court's review. Perhaps for this reason, since *Herrera*, this Court has often denied petitions seeking review of the question whether there is a freestanding claim for actual innocence under federal law. *See, e.g.,* Petition for Writ of Certiorari in *Gardner v. Stephens* (No. 13-546), at 23–31, 2013 WL 583768, *cert. denied*, 134 S. Ct. 928 (2014) (petitioning for writ of certiorari on grounds that constitutional safeguards require recognition of freestanding claim of actual innocence); Petition for Writ of Certiorari in *McAuliffe v. United States* (No. 12-1186), at 14–20, 2013 WL 1309082, *cert. denied*, 133 S. Ct. 2044 (2013) (same); Petition for Writ of Certiorari in *Daniels v. Uchtman* (No. 05-654), at 13–16, 2005 WL 3150492, *cert. denied*, 546 U.S. 1095 (2006) (same); Petition for Writ of Certiorari in *Campbell v. United States* (No. 02-394), at 23–29, 2002 WL 32134508, *cert. denied*, 537 U.S. 950 (2002) (same).

3.   **Williams' case provides a poor vehicle to consider whether there is a freestanding actual innocence claim under the federal Constitution, because Williams cannot satisfy any plausible standard that this Court might adopt for actual innocence claims.**

Further, even if the federal question had been presented to the state court for decision, and even if the question warranted this Court's review, Williams' case would be a very poor vehicle for this Court to consider the question because Williams' claim that he is actually innocent of the murder of Felicia Gayle is plainly unconvincing.

18

Williams contends that the jury verdict against him was unreliable because the State's case "hinged on two highly unbelievable witnesses," Cole and Asaro, to whom Williams confessed that he had murdered Ms. Gayle. Pet. at 12. But Williams overlooks the extensive objective evidence that corroborated the testimony of those two witnesses. This evidence included: (1) when Cole came forward to police to report Williams' confession, Cole "reported details of the crime that had never been publicly reported," *Williams*, 97 S.W.3d at 467; (2) the day after Asaro spoke with police, the police discovered property stolen from Ms. Gayle's home, including the distinctive *St. Louis Post-Dispatch* ruler and calculator, in the car that Williams had been driving on the day of the murder, *id.*; (3) Asaro stated that she saw a laptop computer in Williams' car on the day of the murder, and a laptop computer was among the property stolen from Ms. Gayle's home, *id.*; (4) the laptop computer stolen from Ms. Gayle's home on the day of the murder was recovered from Glenn Roberts, who testified that Williams had sold it to him "a day or two after the murder," *id.*; and (5) Williams made separate, detailed confessions to both Cole and Asaro, and the two confessions both mutually corroborated each other on the details of the murder and matched the crime-scene evidence. *Id.* In short, Williams was in possession of the stolen property from the victim's home immediately after

19

the murder and made detailed confessions to two different confidants, recounting non-public details of the crime to at least one of them.

Williams argues that Cole and Asaro contradicted each other in their accounts of his confessions, but he identifies only two putative inconsistencies in their accounts—*i.e.*, whether Williams took a car or a bus to the crime scene (in fact, he took both), and whether he entered Ms. Gayle's house through the front door or the back door. Pet. at 12. These minor inconsistencies do nothing to undermine the powerful evidence corroborating Williams' confessions to Cole and Asaro.

In light of this evidence of his guilt, Williams' arguments that he is actually innocent are unconvincing. First, Williams suggests that the recent DNA testing conducted in the state habeas proceeding indicates that he is innocent. Pet. at 16–17. Notably, even if one were to accept at face value the conclusion of Williams' second expert that the DNA on the knife handle is not from Williams, that conclusion would not establish that Williams is innocent. The fact that another male may have handled the knife at some point prior to Williams simply does not show that Williams himself never handled the knife. Given Williams' two confessions and the extensive corroborating evidence, the DNA testing plainly fails to undermine Williams' evident guilt for the murder, even when viewed in the light most favorable to Williams.

20

Second, Williams contends that the murder of another woman, Debra McClain, remains unsolved, and he argues that circumstantial similarities between the two crimes suggest that the same person committed both. Pet. at 15. Williams' argument about the identity of Ms. McClain's murderer is inherently speculative and does not undermine the direct evidence of his guilt for Ms. Gayle's murder. Moreover, even if one assumes that the two murders were committed by the same person, that fact would not exculpate Williams for Ms. Gayle's murder. Rather, given the strong evidence of Williams' guilt for Ms. Gayle's murder, the assumption would merely indicate that Williams had committed *both* murders, not that he had committed *neither* murder. Williams' petition fails to refer to any evidence or argument that he could not have committed the murder of Ms. McClain as well.

Williams argues that, if he were to access evidence from the second investigation, he might rely on "CODIS databases" to exonerate himself of both murders. Pet. at 16. On the contrary, when given the opportunity, Williams declined to conduct the sort of testing on the DNA evidence that could be run through the CODIS databases, and he consumed the evidence through his testing.

Thus, Williams' petition presents a particularly poor vehicle to decide whether federal law creates a freestanding actual innocence claim, because Williams could not satisfy any plausible standard for actual innocence. Even

21

if such a claim exists, it would impose an extremely high burden on the petitioner. For example, in *Herrera*, this Court assumed without deciding that only a "*truly persuasive demonstration* of 'actual innocence' made after trial would render the execution of a defendant unconstitutional." *Herrera v. Collins*, 506 U.S. 390, 416 (1993) (emphasis added). Similarly, the Texas case law on which Williams relies requires an actual-innocence claimant to demonstrate that "the newly discovered evidence *unquestionably* establishes his or her innocence." *Thompson*, 153 S.W.3d at 417 (emphasis added).

Williams plainly cannot satisfy any such standard. Rather, there has been a truly persuasive demonstration that he committed the murder of Felicia Gayle, and he is unquestionably guilty of that crime. This Court should decline to review Williams' petition for this reason as well.

22

## CONCLUSION

This Court should deny the petition for writ of certiorari.

Respectfully submitted,

**Joshua D. Hawley**
Attorney General

**D. John Sauer**
State Solicitor

**Michael Spillane**
 *Counsel of Record*
Assistant Attorney General
Missouri Bar No. 40704
P.O. Box 899
Jefferson City, MO 65102
Telephone: (573)751-7406
Facsimile: (573)751-2096
Mike.Spillane@ago.mo.gov

*Attorneys for Respondent*

23