**IN THE UNITED STATES DISTRICT**
**FOR THE EASTERN DISTRICT OF MISSOURI**

| | | |
|---|---|---|
| MARCELLUS WILLIAMS, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Case No. 4:05-CV-1474-RWS |
| | ) | |
| DAVID VANDERGRIFF, | ) | DEATH PENALTY CASE |
| | ) | EXECUTION SCHEDULED |
| Respondent. | ) | 9/24/24 at 6:00 P.M. |

**PETITIONER'S MOTION FOR RELIEF FROM A**
**JUDGMENT AND ORDER PURSUANT TO FED. R. CIV. P. 60(b)**

COMES NOW Marcellus Williams, Petitioner, by and through counsel, and hereby moves the Court, pursuant to FED. R. CIV. P. 60(b), for relief from its Judgment entered March 26, 2010. (R. 58).[1] That Judgment granted in part and denied in part Petitioner's Petition for Writ of Habeas Corpus filed pursuant to 28 U.S.C. § 2254. Petitioner Williams's request for relief is based on the recent disclosure by the State of Missouri of evidence demonstrating the Missouri Supreme Court unreasonably denied his *Batson* claim and the recent testimony of the trial prosecutor clearly and convincingly rebuts the state court's fact-finding. The evidence withheld by the State clearly demonstrates the trial prosecutor engaged in intentional racial discrimination in his peremptory strikes against otherwise qualified Black jurors in violation of Williams's constitutional rights.

---

[1] "R" refers to the CM/ECF docket before this Court. "HT1" and "HT2" refer to the evidentiary hearing which took place August 28, 2024. "8/21/24 Hrg. Tr." refers to transcript of proceedings before the state circuit court on that date. "Tr." refers to the original trial transcript.

1

"Discrimination on the basis of race, odious in all aspects, is especially pernicious in the administration of criminal justice." *Rose v. Mitchell*, 443 U.S. 545, 555 (1979). The United States Supreme Court has emphasized that, when it comes to jurors, racial bias must be especially guarded against. "Racial bias [is] a familiar and recurring evil that, if left unaddressed, would risk systemic injury to the administration of justice." *Pena-Rodriguez v. Colorado,* 580 U.S. 206, 224 (2017) (internal quotation marks omitted). "Permitting racial prejudice in the jury system damages both the fact and the perception of the jury's role as a vital check against the wrongful exercise of power by the State." *Id.*

Fed. R. Civ. P. 60(b) provides this Court the procedural mechanism to consider the newly disclosed evidence and to grant appropriate relief to Williams. The Supreme Court issued its decision in *Buck v. Davis*, 580 U.S. 100 (2017), granting Texas death row inmate Duane Buck penalty phase relief under Rule 60(b)(6). The facts surrounding Mr. Buck's Rule 60(b)(6) litigation are similar to the circumstances of Petitioner's case. As in *Buck*, there were intervening legal developments that undermined the correctness of the prior judgment in the habeas proceeding. The Court in *Buck* also stressed that Mr. Buck's underlying claim, involving the injection of racial discrimination into the case, was an extraordinary circumstance that warranted relief, as was the concession of error. *See id.* at 113-14. The Court in *Buck* noted that claims of racial discrimination are particularly "pernicious in the administration of justice" and "poison[] public confidence in the judicial process." *Id.* at 124.

2

**MEMORANDUM IN SUPPORT**

## I.      Introduction.

Petitioner's case comes to this Court in a posture where evidence uniquely in possession of the State of Missouri and relevant to this Court's consideration of Petitioner's *Batson* claim only came to light a few weeks ago – the trial prosecutor, finally and for the first time subjected to adversarial testing, testified under oath in a manner that demonstrates the Supreme Court of Missouri in 2003 unreasonably denied a *Batson* claim and that new evidence clearly and convincingly rebuts the state court's fact-finding. Specifically, the trial prosecutor admitted that "part of the reason" he struck a juror was that he was a young Black man with glasses. (HT2. 212).

Q. So you struck them because they were both young black men with glasses?

A. Wrong. **That's part of the reason**.

*Id*. (emphasis added).

This admission occurred immediately after the following exchange:

A. . . . I thought they looked like they were brothers.

Q. They looked like brothers?

A. Familial brothers.

Q. Okay.

3

> A. I don't mean black people. I mean, like, you know, you got the same mother, you got the same father. You know, you're brothers, you're both men, you're brothers.

*Id.* Perhaps realizing his mistake, the trial prosecutor later backtracked and claimed that race was not part of the reason for striking the jurors, *id.* p. 213 ("Q. And part of the reason is that they were both black? A. No. Absolutely not. Absolutely not."); however, this was after he once again repeated that the juror and Mr. Williams, both Black men, "looked like they were brothers." *Id.*  Further, Larner admitted that "[t]hey were both young black men…[a]nd that's not necessarily the full reason that I thought they were so similar." *Id.* p. 211.

In addition to admitting race was a factor in striking jurors, the trial prosecutor admitted he took notes during voir dire and that he saved them in the file. *Id.* p. 217. Incredibly (and suspiciously), those notes are now missing from the State's file. *Id.* p. 265-66.

Mr. Williams's circumstances are worse than that found troubling in *Amadeo v. Zant*, 486 U.S. 214 (1988). In *Amadeo*, the Supreme Court faulted Georgia for suppressing a memo related to the manipulation of the voir dire in a racially discriminatory manner. *Id.*  Here, Missouri has seemingly destroyed the evidence, the notes, that would have supported a finding of racial discrimination in the jury selection process.

The trial prosecutor's admission he considered the juror's race not only establishes the unreasonable nature of the Supreme Court of Missouri's decision and

demonstrates that new evidence clearly and convincingly rebuts the state court's fact-finding—but also undermines this Court's earlier affirmance of the state court decision. The destruction of the prosecutor's voir dire notes—evidence that would underpin a *Batson* claim—raises a negative inference that such notes would support Petitioner's claim. The State maintained sole possession of their case file including the prosecutor's trial notes and they failed to disclose them to the defense, to the Missouri Supreme Court, or to this Court during consideration of Williams' *Batson* claim.

All of this takes place in a case where this Court previously granted penalty phase relief on Petitioner's Sixth Habeas Claim. However, the Eighth Circuit reversed, by a vote of 2-1. *Williams v. Roper*, 695 F.3d 825 (8th Cir. 2012) *cert. denied,* 1345 S.Ct. 85 (U.S. 2013).

## II.    RELEVANT PROCEDURAL HISTORY.

On August 26, 2006, Petitioner filed a Petition for Writ of Habeas Corpus. R. 9. Relevant to the instant motion, Petitioner claimed as his Fifth Habeas Ground that the state violated the Supreme Court's decision in *Batson*. R. 9. p. 45-68. This Court denied the claim on the basis that Petitioner could not overcome AEDPA.

While this Court granted habeas relief on Petitioner's Sixth Claim for Habeas Relief, this Court denied relief on Petitioner's Fifth Claim. The Missouri Supreme Court, in *State v. Williams*, 97 S.W.3d 462, 472 (Mo. banc 2003), denied relief, holding: "Unlike *Johnson*, this case does not involve an *overt*, racially motivated reason for the strike. Instead, the prosecutor stated that the venireperson resembled Williams, had the same glasses, and had a similar demeanor. These reasons are not *inherently* race

5

based." (emphasis added). Applying AEDPA, this Court credited the now-rebutted factual basis. *See* R. 58 p. 25 ("This decision is supported by the record and Williams has failed to overcome the presumption that this determination was correct by clear and convincing evidence.")

Petitioner filed a notice of cross-appeal and sought a certificate of appealability on the *Batson* denial. On December 15, 2010, the Eighth Circuit denied Petitioner's request. Petitioner sought rehearing on that denial. On February 23, 2011, after ordering a response, the rehearing petition was denied *en banc* and before the original panel. Thereafter, the United States Supreme Court, on November 7, 2011, denied Petitioner a Writ of Certiorari.

After the Eighth Circuit reversed, by a vote of 2-1, this Court's order granting penalty phase relief, *Williams v. Roper*, 695 F.3d 825 (8th Cir. 2012) *cert. denied,* 571 U.S. 839 (2013), the state requested an execution date. On December 17, 2014, the Missouri Supreme Court set Petitioner's execution date for January 28, 2015. On January 9, 2015, Petitioner filed a habeas petition in the Missouri Supreme Court related to actual innocence tied specifically to access to DNA testing. *State ex rel. Williams v. Steele*, Case No. SC94720.

While his state habeas was pending, on January 12, 2015, Petitioner filed a 42 U.S.C. § 1983 action before this Court. *See Williams v. McCulloch*, Case No. 4:15-cv-00070. On January 14, 2015, this Court denied this § 1983 action. R. 7 from *Williams v. McCulloch*, Case No. 4:15-cv-00070. Petitioner did not appeal that ruling.

6

On January 22, 2015, the Missouri Supreme Court stayed Petitioner's scheduled execution date. Thereafter, on May 26, 2015, the Missouri Supreme Court issued an Order referring the matter to a Special Master to supervise DNA testing. On January 5, 2017, after supervising the DNA testing but without conducting a hearing or making any findings, the Special Master sent Petitioner's case back the Missouri Supreme Court.

On January 31, 2017, the Missouri Supreme Court summarily denied Petitioner's habeas petition without briefing or oral argument. Petitioner filed a certiorari petition to the United States Supreme Court from that denial. The United States Supreme Court denied certiorari on June 26, 2017. *Williams v. Steele*, 582 U.S. 937 (2017).

On April 26, 2017, the Missouri Supreme Court set Petitioner's execution for August 22, 2017. On August 22, 2017, then-Governor of Missouri Eric Greitens stayed Williams's execution and convened a Board of Inquiry ("BOI") to investigate Williams's claims, but the BOI was dissolved by Governor Mike Parson on June 29, 2023. It is unknown whether the BOI reached a conclusion or issued a report or recommendation prior to Governor Parson's interference.

Pursuant to Section 547.031 RSMo (2021), the Prosecuting Attorney for St. Louis County initiated proceedings by filing a Motion to Vacate or Set Aside Petitioner's judgment on January 26, 2024. On February 5, 2024, the Attorney General filed a Notice of Intent to Oppose the motion.

On June 4, 2024, the Missouri Supreme Court set Petitioner's execution date for September 24, 2024. On June 5, 2024, the Attorney General filed a Motion to Dismiss the Motion to Vacate or Set Aside in the circuit court, 121 days after filing the notice of

intent to oppose the Motion to Vacate. On July 2, 2024, the circuit court set an evidentiary hearing on the Prosecutor's petition for August 21, 2024.

On July 18, 2024, the Attorney General filed a petition for a Writ of Prohibition disputing the circuit court's setting of a hearing date under § 547.031 and its failure to grant the Attorney General's motion to dismiss. The Supreme Court of Missouri denied the writ on July 26, 2024.

On August 21, 2024, the prosecuting attorney and Petitioner presented a resolution to this civil matter in the form of a consent agreement. Petitioner agreed to enter a plea of guilty to the charged offense of murder in the first degree pursuant to *North Carolina v. Alford*, 400 U.S. 25 (1970) with a sentence of life without the possibility of parole. The consent order contained concessions from the prosecuting attorney that constitutional errors committed by the St. Louis County Prosecuting Attorney's Office occurred during Petitioner's trial.

As the Court described in open court without any objection:

> THE COURT: The Court also finds, following discussions between representatives of the victim's family both with the Prosecuting Attorney's Office and the Attorney General's Office regarding this consent judgment, the Court held a telephonic conference in chambers with that representative on August 21, 2024, wherein the representation expressed to the Court the family's desire that the death penalty not be carried out in this case, as well as the family's desire for finality.

8/21/24 Tr. p. 23 (Attachment B). The Consent Order and Judgment from the August 21, 2024 proceedings reflected respect for Dr. Picus, the victim's husband, noting: "The Court finds that, following discussions between a representative of the victim's family and both the Prosecuting Attorney's Office and the Attorney General's Office . . . the

8

representative expressed to the Court the family's desire that the death penalty not be carried out in this case, as well as the family's desire for finality." (Attachment A). The St. Louis County Prosecutor's Office also relied on the family's opposition to the death penalty in seeking the consent judgment: "We have discussed with the victim's husband, Dr. Daniel Picus, who has indicated he does not support the application of the death penalty to Mr. Williams. As the Court is aware, Dr. Picus expressed this sentiment to the Court and all counsel in chambers during a telephone call earlier today." 8/21/24 Tr. pp. 8-9 (Attachment B).

Contrary to the wishes of Ms. Gayle's family, the Attorney General filed a Petition for Writ of Prohibition, or in the Alternative, Mandamus, to prevent the consent judgment from taking effect. The Supreme Court of Missouri granted a preliminary writ on August 21, 2024. On August 22, 2024, in accordance with the Missouri Supreme Court's writ, the circuit court vacated the consent judgment and set an evidentiary hearing for August 28, 2024.

As a result of the Missouri Supreme Court's order, a hearing on the Motion to Vacate was held on August 28, 2024. The evidence relied on below is the only time in the course of this case that the trial prosecutor was put under oath and provided context for his statements regarding the exercise of peremptory challenges.

### III.    LEGAL STANDARD.

Under Article III of the United States Constitution, federal courts have inherent "power over [their] own judgments." *United States v. Ohio Power Co.*, 353 U.S. 98, 99 (1957) (*per curiam*). A vehicle for exercise of this power is Fed. R. Civ. P. 60(b), which

9

"[i]n simple English ... vests power in courts adequate to enable them to vacate judgments whenever such action is appropriate to accomplish justice." *Klaprott v. United States*, 335 U.S. 601, 615 (1949). Under the rule, federal courts have "broad authority to relieve a party from a final judgment upon such terms as are just, provided that the motion is made within a reasonable time and is not premised on one of the grounds for relief enumerated in clauses (b)(1) through (b)(5)." *Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847, 863 (1988) (internal quotations omitted).

Rule 60(b) "does not provide a new remedy at all," but rather is "simply the recitation of pre-existing judicial power." *Plaut v. Spendthrift Farm Inc.*, 514 U.S. 211, 234-235 (1995). That judicial power includes the inherent power to set aside judgments that are unfair: "Rule 60(b) ... reflects and confirms the court's own inherent and discretionary power, firmly established in English practice long before the foundation of our Republic, to set aside a judgment whose enforcement would work inequity." *Plaut*, 514 U.S. at 233-234 (quoting *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 244 (1944)). "The decision to grant Rule 60(b)(6) relief is a case-by-case inquiry that requires the trial court to intensively balance numerous factors, including the competing policies of the finality of judgments and the incessant command of the court's conscience that justice be done in light of all the facts." *Thompson v. Bell,* 580 F.3d 423, 442 (6th Cir. 2009) (internal quote omitted).

While the factors a court may consider in assessing whether relief under Rule 60(b)(6) is necessary to accomplish justice are manifold and unparticularized, *Liljeberg*, 485 U.S. at 863–64, the Supreme Court has cautioned that the relief it affords is

10

warranted only in "extraordinary circumstances." *Ackerman v. United States*, 340 U.S. 193, 199–202 (1950). "In determining whether extraordinary circumstances are present, a court may consider a wide range of factors. These may include, in an appropriate case, the risk of injustice to the parties and the risk of undermining the public's confidence in the judicial process." *Buck v. Davis*, 580 U.S. 100, 123 (2017) (internal quotations omitted). The extraordinary circumstances present in Petitioner's case more than meet this standard.

As described further, *infra*, a district court may grant a 60(b) motion as long as the motion does not present a "claim" that would contravene AEDPA strictures on successive petitions. *Gonzalez v. Crosby*, 545 U.S. 524, 529, 531 (2005). A claim is *not* presented by a motion which "merely asserts that a previous ruling which precluded a merits determination was in error -- for example, a denial for such reasons as failure to exhaust, procedural default, or statute-of-limitations bar."

That limitation poses no barrier here. This Court never addressed the constitutional question. Rather, this Court addressed whether AEDPA imposed a bar to relief. R. 58 p. 25 ("This decision is supported by the record and Williams has failed to overcome the presumption that this determination was correct by clear and convincing evidence."). By definition, it is a denial that *precluded* a merits determination. Section 2254(d) prohibits a federal court from granting relief on any habeas corpus claim "that was adjudicated on the merits in state court proceedings" unless the state court's adjudication of the claim "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law,

11

as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." § 2254(d). "By its terms § 2254(d) bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions in §§ 2254(d)(1) and (d)(2)." *Harrington v. Richter*, 562 U.S. 86, 98 (2011). Section 2254(d) thus restricts a federal court's ability to conduct de novo review of federal claims adjudicated on the merits by state courts unless the provisions of subsections (1) and (2) are overcome.

On the *Batson* claim, this Court never went past the initial 2254(d) question. Because the application of § 2254(d)'s standard is non-merits-based, *see Medellin v. Dretke*, 544 U.S. 660, 664–65 (2005) (per curiam) (including § 2254(d) among "several threshold issues that could independently preclude habeas relief"), this Court never considered the merits of the *Batson* claim. Rather, this Court merely conducted an inquiry into its own power to grant relief irrespective of whether Petitioner is in custody in violation of the United States Constitution under § 2254(a). The new evidence developed at the August 28, 2024 hearing clearly and convincingly rebuts the state court's fact-finding--and this Court indicated the precise basis of affirmance was the previous lack of such evidence. *See* R. 58 p. 25 ("This decision is supported by the record and Williams has failed to overcome the presumption that this determination was correct by clear and convincing evidence.").

That Petitioner is here challenging a procedural—rather than substantive—basis for the Court's denial of habeas relief is confirmed by the Supreme Court's reminders

12

that a finding that § 2254(d) precludes the federal habeas remedy does not mean that, as a matter of substantive law, a person's custody is constitutional. *See, e.g.*, *Glebe v. Frost*, 574 U.S. 21, 23–24 (2014) (per curiam) (finding that § 2254(d) may preclude relief even "[a]ssuming for argument's sake that the trial court violated the Constitution"); *Lopez v. Smith*, 574 U.S. 1, 5–7 (2014) (per curiam) (assuming *arguendo* that a constitutional violation occurred while concluding that § 2254(d) precluded de novo merits review).

For this reason, a motion such as the instant one, challenging a Court's assessment under AEDPA of a now-changed record, is a proper subject of a 60(b) application in a habeas proceeding. *Id*. at 532 n.4. Indeed, "Rule 60(b) allows a court to grant relief from a final judgment or order." *Cornell v. Nix*, 119 F.3d 1329, 1332 (8th Cir. 1997); *see also Mohammed v. Sullivan*, 866 F.2d 258, 260 (8th Cir. 1989) (habeas corpus proceeding). "[Rule 60(b)] is properly invoked where there are extraordinary circumstances, or where the judgment may work an extreme and undue hardship, and should be liberally construed when substantial justice will thus be served." *Cornell*, 119 F.3d at 1332 (quotation omitted).

A Rule 60(b) motion is appropriate here because the judgment entered on Petitioner's § 2254 Petition makes clear that the denial of the *Batson* claim is premised on a fact that is no longer supported by the full record, and indeed the record clearly and convincingly rebuts it. Further, the suspicious destruction of voir dire notes supporting the *Batson* claim precluded a genuine consideration of the merits of Petitioner's Fifth Claim. Such an allegation is a "true" 60(b), as envisioned by *Gonzalez,* 545 U.S. 524, and cannot be construed as a successive petition pursuant to § 2244(b)(2).

13

IV.    **New testimony from the trial prosecutor expressly admitting to racially-based peremptory strikes warrants 60(b) relief.**

A. **Part of the reason a juror was struck is because he looked like a "brother" to Petitioner, and because the juror and Petitioner were both young Black men with glasses.**

During jury selection in Petitioner's trial, the State utilized six of its nine peremptory strikes (67% of the available strikes) against six of the seven (86%) Black venirepersons. (Tr. 1568-69). Petitioner's jury was comprised of eleven white jurors and only one Black juror.

The trial prosecutor inaccurately admitted to using three of his nine peremptory strikes to strike Black jurors and six strikes to strike white jurors. (HT2 at 201-02). The hearing transcript demonstrates that the trial prosecutor sought to minimize his use of the peremptory against the qualified Black jurors ("No. I think you have them reversed, actually" HT2 at 201 (Attachment D)); in reality, he used six of his nine peremptory strikes to strike qualified Black jurors and three strikes to strike white jurors. He admitted that part of the reason he struck Juror 64, a Black juror, was because he looked very similar to the defendant, a Black man, that he reminded him of the defendant, and had the same "piercing eyes" as Petitioner. (*Id*. at 208). The trial prosecutor testified that when he said he looked very similar to the defendant, he meant they were both young Black men. (*Id*. at 210-11). The trial prosecutor further testified that he thought they looked like they were "brothers." (*Id*. at 212). He testified that "part of the reason" he struck Juror No. 64 was because he was a young Black man with glasses. (*Id*. at 213; *see also id*. at 211 ("Q. And by that, they were both young black men, right? A. They were

14

both young black men. Q. Okay. A. And that's not necessarily the full reason that I thought they were so similar.")).

The venireperson at issue, Henry Gooden, stated that he could he impose the death penalty, favored the death penalty in some cases, and he could also sign a death verdict. (Tr. 762-63). The State nevertheless struck Gooden, claiming that he was "weak" on the death penalty. (Tr. 1586). The State also reasoned that Gooden also "looked very similar to the defendant" and "reminded [the State] of the defendant." (*Id.*). In the original trial transcript, the trial prosecutor does not specifically call out Gooden's race as the basis of that similarity.

During the evidentiary hearing on August 28, 2024, the trial prosecutor admitted that "part of the reason" he struck Gooden was that he was a young Black man with glasses. (HT2 212-13). The trial prosecutor, in a very troubling manner, foundered at the hearing after using the term "brother" to describe both men, and then offered an unsolicited plaintive race neutral explanation to explain his comments at the hearing. (*See* HT2. 212).

Venireperson William Singleton, another qualified Black man, was also struck because the State claimed he was "weak" on the death penalty, even though he stated he could vote for a death sentence, keep an open mind throughout the trial and deliberation process, make a decision based on the evidence and the law, and could abide by the State's burden of proof beyond-a-reasonable-doubt. (Tr. 762-63, 768, 775-76, 778). Singleton elaborated that he did not believe a sentence of life imprisonment to be more lenient than the death penalty, because "[e]ither way, [the defendant]'s gone for

15

the rest of his life." (Tr. 766). Three white jurors who gave similar answers regarding their belief that a life sentence was of equivalent magnitude to the death penalty were not struck. (Tr. 564-65, 663-64, 666-67, 789, 1611). The State also argued for Singleton to be struck because he had been court martialed in 1988. (Tr. 1420-21). But Singleton had been honorably discharged and in 2001, at the time of voir dire, was still serving in the reserves. White venirepersons who had been convicted of various other crimes, including receiving stolen property and indecent exposure, were not struck. (Tr. 1413-14, 1425, 1427, 1611).

In a disparate line of questioning as compared to white jurors, the trial prosecutor did not reassure a single Black juror that all 12 people had to agree on the verdict when he questioned them individually and instead reassured white jurors 11, 18, 21, 22, 26, 27, 29, 30, 32, 34, 35, 41, 43, 50, 63, 67, 70, 71, 106, and 126, that 12 people needed to agree. The trial prosecutor had no response when confronted with this disparate treatment at the August 28, 2024, hearing. This failure to respond when faced with disparate and a lack of comparative treatment of jurors based on their race clearly and convincingly demonstrates this Court's barrier to merits review should be lifted.

St. Louis County's practice of striking Black venirepersons based on their race continued after Petitioner's trial. In 2006 and 2007, the Missouri Supreme Court reversed two death sentences imposed in St. Louis County for *Batson* violations. *State v. McFadden*, 216 S.W.3d 673, 674-77 (Mo. banc 2007); *State v. McFadden*, 191 S.W.3d 648, 656, 657 (Mo. banc 2006). The Missouri Supreme Court and other state appellate courts have also reversed a number of convictions on *Batson* grounds. *See State v.*

*Hampton*, 163 S.W.3d 903, 904-05 (Mo. banc 2005); *State v. Hopkins*, 140 S.W.3d 143, 157 (Mo. Ct. App. 2004).

At first, the trial prosecutor sought to minimize that history. When asked, "Have you ever been found to have violated *Batson v. Kentucky* in another case?" he retorted, "Now let me say this perfectly clear. Never." HT2 at 218. However, when asked, "So no judge has ever found that you have failed to provide a race neutral reason for using a peremptory strike on a black juror?" he backpedaled, claiming, "I thought you said have I ever been reversed." *Id.* He then conceded that in the "McFadden case," the trial judge found him to have failed to provide race neutral reasons for excluding three Black jurors. *Id.* at 218-19. The trial prosecutor insisted:

> I disagreed with him, but he's the judge. And we put those jurors back on the jury. And they were on that case, and they voted death. They were put back on that jury. But yes, I was wrong on that. But it was not by a -- I've never been reversed on Batson. And that's what I thought you were asking. I tried all those cases. Most of them I won, almost all. And they were all appealed on Batson. If any black was struck, they appealed on Batson.
>
> In all those cases, and I'd say there's probably 25 to 50 that were appealed on Batson, none of those by any court, appellate court, reversed me on Batson. On that one case Judge Ross, he thought I didn't have sufficient reasons. He actually, he told me that, he says, before I even struck them he said, if you strike them, I'm going to put them back on. And I struck them anyway because I thought I was right. And you know what? He put them back on, and they stayed on, and they voted for death.

*Id.* at 219-20. Larner again sought to minimize his previous misconduct; he failed to mention that regarding the one juror in *McFadden* where a *Batson* challenge was overruled, the trial court found Larner's first reason to be pretextual for race.

17

"Racial discrimination in jury selection compromises the defendant's right to a trial by an impartial jury." *State v. McFadden*, 191 S.W.3d 648, 651 n.2 (Mo. banc 2006). "The right to sit before a jury of one's peers, chosen not because of race, but because of their standing as citizens doing their civic duty, is essential to a fair trial." *Id.* at 657 (*quoting Miller-El v. Dretke*, 545 U.S. 231 (2005)).

Furthermore, "[s]election procedures that purposefully exclude black persons from juries undermine public confidence in the fairness of our system of justice." *Batson v. Kentucky,* 476 U.S. 79, 87 (1986). "The very idea of a jury is a body ... composed of the peers or equals of the person whose rights it is selected or summoned to determine; that is, of his neighbors, fellows, associates, persons having the same legal status in society as that which he holds." *Id.* at 86 (*quoting Strauder v. West Virginia*, 100 U.S. 303, 308 (1880)). "In view of the heterogeneous population of our Nation, public respect for our criminal justice system and the rule of law [is] strengthened if we ensure that no citizen is disqualified from jury service because of his race." *Id.* at 99.

As a result, "[t]he State's privilege to strike individual jurors through peremptory challenges[] is subject to the commands of the Equal Protection Clause." *Id.* at 89. "In the eyes of the Constitution, one racially discriminatory peremptory strike is one too many." *Flowers v. Mississippi*, 588 U.S. 284, 298 (2019).

*Batson* provides a three-step process for determining when a strike is discriminatory:

> First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race; second, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in

18

> question; and third, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination.

*Foster v. Chatman*, 578 U.S. 488, 499-500 (2016) (*quoting Snyder v. Louisiana*, 552 U.S. 572, 476-77 (2008)).

"The ultimate inquiry is whether the State was 'motivated in substantial part by discriminatory intent.'" *Flowers*, 588 U.S. at 303 (*quoting Foster*, 578 U.S. at 303). Once purposeful discrimination is shown, the prosecution cannot rely on other non-discriminatory reasons to justify the strike. *See McFadden*, 191 S.W.3d at 657 ("To excuse such obvious prejudice because the challenged party can also articulate nondiscriminatory reasons for the peremptory strike would erode what little protection *Batson* provides against discrimination in jury selection.").

While the Missouri Supreme Court addressed a *Batson* claim on direct appeal in 2003 in favor of the State, neither that court nor this Court had available the express admission of racial animus on the part of the trial prosecutor. No testimonial evidence was before the Supreme Court of Missouri in 2003, only a self-serving colloquy with the trial court, which is clearly and convincingly rebutted by the sworn testimony from 2024.

During the trial prosecutor's testimony on August 28, 2024, he volunteered that race ***was*** a consideration in exercising a peremptory strike of Juror No. 64, and that he struck that juror in part because he was Black. (HT2 at 212) ("Q. So you struck them because they were both young black men with glasses? A. Wrong. ***That's part of the reason***. And not just glasses. I said the same type glasses. And I said they had the same

19

piercing eyes.") (emphasis added). Further, Larner admitted that "[t]hey were both young black men...[a]nd that's not necessarily the *full reason* that I thought they were so similar." *Id.* p. 211 (emphasis added).

At the original trial and before the Missouri Supreme Court, the State had taken the position that Juror 64 and Petitioner looked similar and had a similar demeanor without specifying that the juror's *race* was a part of this similarity, meaning those courts had a limited record. (*See* Tr. 1585-1587 (no mention of race by State in describing resemblance); *Williams*, 97 S.W.3d at 472 ("Unlike *Johnson*, this case does not involve an *overt*, racially motivated reason for the strike. Instead, the prosecutor stated that the venireperson resembled Williams, had the same glasses, and had a similar demeanor. These reasons are not *inherently* race based.") (emphasis added). Applying AEDPA, this Court credited those now clearly and convincingly rebutted findings. *See* R. 58 p. 25 ("This decision is supported by the record and Williams has failed to overcome the presumption that this determination was correct by clear and convincing evidence.").

The new testimony reveals that there was in fact an "overt" race-based reason for the strikes. During his testimony, the trial prosecutor clarified that the juror's race *was* part of his considerations. (HT2 at 210) ("Q. Okay. And so these were both young black men, right? ... A. So he did look very similar to the defendant, yes. Q. (By Mr. Potts) And by that, they were both young black men; right? A. They were both young black men. Q. Okay. A. But that's not necessarily the *full* reason that I thought they were so similar.")

20

(emphasis added). K.L. continued to make it clear that, in fact, he believed they "looked like brothers." (HT2. 212).

The evidentiary record recently developed demonstrates that the alleged resemblance between Petitioner and Juror No. 64 can no longer be treated as a "race-neutral basis" for the strike. *Foster*, 578 U.S. at 499-500 (emphasis added); *see Williams*, 97 S.W.3d at 471 ("The state's reasons for strike need only be facially race-neutral unless discriminatory intent is inherent within the explanation."). The trial prosecutor's testimony shows that race ***was*** a factor, which is impermissible. "A person's race simply 'is unrelated to his fitness as a juror.'" *Batson*, 476 U.S. at 87 (*quoting Thiel v. Southern Pacific Co.*, 328 U.S. 217, 227 (1946) (Frankfurter, J., dissenting)). Larner now admits it was "part of" but not the "full" reason.

Because the prosecution exercised a peremptory strike based even partially on race, the prosecutor's other supposedly race-neutral reasons have become irrelevant. *McFadden*, 191 S.W.3d at 657 ("To excuse such obvious prejudice because the challenged party can also articulate nondiscriminatory reasons for the peremptory strike would erode what little protection Batson provides against discrimination in jury selection."). At minimum, it clearly and convincingly rebuts Larner's self-serving colloquy relied upon by the Missouri Supreme Court.

Although the trial prosecutor's admission is sufficient, this Court "must examine the whole picture." *Flowers*, 588 U.S. at 314. "[A] court must undertake 'a sensitive inquiry into such circumstantial and direct evidence of intent as may be available.'" *Batson*, 476 U.S. at 93 (*quoting Arlington Heights v. Metropolitan Housing Dev. Corp.*,

21

429 U.S. 252 266 (1977)). The more fully developed record demonstrates that AEDPA is satisfied and the impediment to addressing the merits has been removed.

The testimony on August 28, 2024 showed that the juror who "resembled" Petitioner was, unlike Petitioner, wearing a shirt with an orange dragon and "Chinese or Arabic letters," a large gold cross, two gold earrings in his left ear, and shiny gray pants. (HT2 at 213-215). Beyond their race and age, the only similarities were the type of glasses, and, according to the trial prosecutor, "piercing eyes." It seems only one person among the over 130 venirepersons had piercing eyes like Petitioner—and that person just happened to be Black.

The trial prosecutor's testimony made clear that he was aware of the risk of reversal if he had openly told the trial court that race was a reason, which explains why he did not previously volunteer this information during his original self-serving colloquy with the trial court. (HT2 at 211 ("I mean, if the juror, potential juror was black and the defendant was black and I struck him, that would have been kicked out by the Supreme Court in a second. That would have come back for a complete retrial."); *id.* at 219 ("If any black was struck, they appealed on Batson.")).

"'[T]he prosecutor's questions and statements during voir dire examination and in exercising his challenges may support or refute an inference of discriminatory purpose.'" *Flowers*, 588 U.S. at 308 (*quoting Batson*, 476 U.S. at 97). In this respect, Juror No. 64 only gave favorable answers to the prosecution's questions:

> Juror Number 64. In the proper case, under the law and the evidence, could you seriously and legitimately consider imposing the death penalty?

22

VENIREMAN GOODEN: I believe I could.

MR. LARNER: Okay. Could you also give serious legitimate consideration to the punishment of life without the possibility of probation or parole?

VENIREMAN GOODEN: Yes.

MR. LARNER: If you were the foreman of the jury, could you sign the verdict of death?

VENIREMAN GOODEN: Yes, I could.

MR. LARNER: You could? Okay. Have you thought about this issue before?

VENIREMAN GOODEN: No, not really.

MR. LARNER: Okay. Have you been in favor of the death penalty in the past, in certain cases?

VENIREMAN GOODEN: In certain cases.

MR. LARNER: Do you think in some cases it might be appropriate, in others, it might not?

VENIREMAN GOODEN: Yes.

MR. LARNER: Okay.

(Tr. 762-763).

The above represents the full extent of the prosecution's questioning of Juror No. 64 about his willingness to impose the death penalty. Juror No. 64 "should have been an ideal juror in the eyes of a prosecutor seeking a death sentence, and the prosecutor's explanation for the strike cannot reasonably be accepted." *Miller-El,* 545 U.S. at 247.

Despite his pro-death-penalty answers, to survive the *Batson* challenge, the prosecution stated that he was potentially "liberal" based on his earrings. But any

23

"liberal" leaning is something that the prosecution should have explored during voir dire, not assumed based on earrings. (Tr. 1585). "[T]he State's failure to engage in any meaningful voir dire examination on a subject the State alleges it is concerned about is evidence suggesting that the explanation is a sham and a pretext for discrimination." *McFadden*, 191 S.W.3d at 653-54 (*quoting Miller-El,* 125 S. Ct. at 2328). This is further evidence of discriminatory intent.

A Court also looks at the sheer number of peremptory challenges used against the few black members of the venire. *See Flowers*, 588 U.S. at 288 (it was a "critical fact" was that "the State exercised peremptory strikes against five of the six black prospective jurors"); *see also McFadden*, 191 S.W.3d at 650 ("At trial, the State exercised five of its nine peremptory challenge to remove African-American venirepersons, leaving only one African-American to serve on the jury."). "Simple math shows ... the number of peremptory strikes available to the prosecutor exceeded the number of black prospective jurors." *Flowers*, 588 U.S. at 296. Here, the prosecution had nine peremptory strikes, which it exercised on six of seven black prospective jurors. (Tr. 1568, 1569-70). Even the trial prosecutor had trouble believing that he had exercised peremptory strikes on this many black jurors, minimizing the reality and insisting that he only struck three instead of six. (HT2 at 201-02).

The sheer number of Black prospective jurors stricken by the prosecution via peremptory strikes—six of seven, or 86%—speaks for itself. *See Miller-El*, 545 U.S. at 241 ("The prosecutors used their peremptory strikes to exclude 91% of the eligible African-American venire members.... Happenstance is unlikely to produce this

disparity."); *McFadden*, 191 S.W.3d at 657 n.27 ("Happenstance also fails the prosecutor in this instance, where 83% of the eligible African-American venire members were stricken using pretextual reasons."). There were 30 eligible members of the venire at that point, consisting of seven Black members and 23 non-black members. This means that the prosecution eliminated 86% (6/7) of Black prospective jurors with peremptory strikes, and only 13% (3/23) of non-Black prospective jurors with peremptory strikes. *Cf. Miller-El*, 545 U.S. at 266 ("By the time a jury was chosen, the State had peremptorily challenged 12% of the qualified nonblack panel members, but eliminated 91% of the black ones."). It is insufficient to point to the fact that one Black member of the venire was seated on the jury. The Supreme Court "skeptically view[s] the State's decision to accept one black juror," because "a prosecutor might do so in an attempt 'to obscure the otherwise consistent pattern of opposition to' seating black jurors." *Flowers*, 588 U.S. at 307 (*quoting Miller-El*, 545 U.S. at 250).

Furthermore, "[t]he lopsidedness of the prosecutor's questioning and inquiry can itself be evidence of the prosecutor's objective as much as it is of the actual qualifications of the black and white prospective jurors who are struck or seated." *Flowers*, 588 U.S. at 310. Specifically, "disparate questioning can be probative of discriminatory intent." *Id.* at 308. As the Supreme Court has explained:

> [T]his Court's cases explain that disparate questioning and investigation of prospective jurors on the basis of race can arm a prosecutor with seemingly race-neutral reasons to strike the prospective jurors of a particular race. In other words, by asking a lot of questions of the black prospective jurors or conducting additional inquiry into their backgrounds, a prosecutor can try to find some pretextual reason—any reason—that the prosecutor can later articulate

> to justify what is in reality a racially motivated strike. And by not doing the same for white prospective jurors, by not asking white prospective jurors those same questions, the prosecutor can try to distort the record so as to thereby avoid being accused of treating black and white jurors differently.... Prosecutors can decline to seek what they do not want to find about white prospective jurors.

*Id.* at 310 (internal citation omitted).

The record demonstrates several ways in which the prosecution engaged in disparate questioning for Black and non-Black jurors. First, the prosecution tended to ask Black jurors open-ended questions that could have led to Black jurors providing answers that disqualified themselves, while asking non-Black jurors closed-ended, leading questions. For example, the prosecution questioned a non-Black prospective juror (who was later seated on the jury) as follows:

> MR. LARNER: All right Juror Number 30. In a proper case, under the evidence and the law, can you legitimately and seriously consider imposing the death sentence?
>
> VENIREMAN STORMS: Yes.
>
> MR. LARNER: You can?
>
> VENIREMAN STORMS: Yes.
>
> MR. LARNER: Are you sure?
>
> VENIREMAN STORMS: Yes.
>
> MR. LARNER: You would not automatically -- can you also consider life without parole, without the possibility of probation and parole?
>
> VENIREMAN STORMS: Yes.
>
> ...[Brief questioning of another juror]...

26

MR. LARNER: I didn't mean to forget to do that with you. I like to do that with everyone. And I assume that I have on the first row. Okay. Now, the judge has already asked you if you could consider both. I'm going into it a little deeper. Now, Number 30, you understand that the burden of proof is on the State?

VENIREMAN STORMS: Yes.

MR. LARNER: And you won't automatically go from guilt to the death penalty, will you?

VENIREMAN STORMS: No.

MR. LARNER: You'll wait to hear the aggravating circumstances, or circumstance, and see if it exists, right?

VENIREMAN STORMS: Yes.

MR. LARNER: I have to prove it exists?

VENIREMAN STORMS: Right.

MR. LARNER: Beyond a reasonable doubt?

VENIREMAN STORMS: Absolutely.

MR. LARNER: And if it exists, all twelve have to agree it exists. Okay?

VENIREMAN STORMS: Right.

MR. LARNER: To get through that second door. Okay?

VENIREMAN STORMS: Yes.

MR. LARNER: Any question about any of this?

VENIREMAN STORMS: Absolutely not.

MR. LARNER: Okay. And then when you start weighing it, it's a matter of quality, not quantity. Okay? Otherwise, it would just be getting out your calculator. And then, even then, you still don't have to do the death penalty. You don't

27

have to. Do you have a problem with that, or question about that?
VENIREMAN STORMS: No.

MR. LARNER: Now, but you will be able to legitimately consider it, and if it's appropriate, vote for it. Is that right?

VENIREMAN STORMS: Yes.

(Tr. 401-03)

In stark contrast, here is the prosecution's questioning of Juror No. 65 (a Black juror who was not seated):

MR. LARNER: Juror Number 65, in the proper case under the evidence and the law, could you seriously and legitimately vote for the death penalty?

VENIREMAN SINGLETON: I think I could.

MR. LARNER: Could you *see yourself in that position actually voting*, if the evidence and the law was there, for the death penalty?

VENIREMAN SINGLETON: Yes.

MR. LARNER: You've *considered this in the past*, this issue?

VENIREMAN SINGLETON: I've never really thought about it.

MR. LARNER: Do you think that some crimes are *deserving* of that and others are not?

MR. GREEN: Judge, I'm going to object to the relevance of whether other crimes are deserving of that or not.

MR. LARNER: Well, I'll rephrase that. Do you think that you could also consider life in prison without the possibility of probation or parole?

VENIREMAN SINGLETON: Yes, I could.

28

MR. LARNER: Would that be *easier* for you?

VENIREMAN SINGLETON: I can't say. Both, either way, you know, when you think about it, life in prison without parole, or death. You know, you put a person away for the rest of their life. So I can't see any differences in it. Therefore, I can't see any difference in how you judge or weigh those. In other C.W.s, what I'm saying is, I could, you know, -- if I could vote for death, I could vote for life in prison without parole.

MR. LARNER: Do you think that *one is more harsh than the other*?

MR. GREEN: Judge, I'm going to object. You're implying that they lean one way or the other, to one punishment over the other.

THE COURT: The objection is sustained. Please rephrase your question.

MR. LARNER: Do you think that *one punishment is a worse punishment* than the other? I'm not asking you which one you favor, whether you lean towards this one or lean towards that one. I just would like to know, since you said that both of them are -- you didn't see any difference, I think you said. You didn't see any –

VENIREMAN SINGLETON: What I –

MR. GREEN: Judge, I have to object to it, that there's no question before the juror.

THE COURT: Well, the question was, you didn't see any difference. Is that correct?

MR. LARNER: Yes.

MR. GREEN: Okay.

VENIREMAN SINGLETON: I don't think one is any more lenient than the other.

MR. LARNER: Okay. Do you think they are equal?

29

MR. GREEN: Judge, I would object. That implies a leniency of one over the other.

THE COURT: The objection will be sustained.

MR. LARNER: What do you mean by, *you don't think one is any more lenient than the other*?

MR. GREEN: Judge, that's another form of the same question.

THE COURT: The objection is overruled.

MR. LARNER: Okay.

THE COURT: It's a followup to what the venireperson stated.

MR. LARNER: Yes.

VENIREMAN SINGLETON: Well, basically once the person is convicted, then they are put away for the rest of their life. If there's life without parole, or probation, that means until the day he dies. The death penalty means he's put away until the State puts him to death. Either way, he's gone for the rest of his life.

MR. LARNER: Okay. But do you see that -- well, what you've said is not, I'm not arguing with what you said at all. I'm just trying to see if you *feel* that one punishment is as bad as the other, or is as harsh is the other.

(Tr. 763-66) (emphasis added).

By comparison, the prosecution used a different script for non-black jurors, as shown below:

MR. LARNER: All right Juror Number 67, in the proper case, could you seriously and legitimately, under the law and the evidence, consider the death penalty?

VENIREPERSON NO. 67: Yes.

MR. LARNER: All right. Can you also seriously and

30

legitimately consider life without parole?

VENIREPERSON NO. 67: Yes.

MR. LARNER: You would make the State prove that special aggravating circumstance?

VENIREPERSON NO. 67: Yes.

MR. LARNER: You wouldn't go from door one, which is the guilt, right, to door three, would you?

VENIREPERSON NO. 67: No.

MR. LARNER: You would make us prove that special, that aggravating circumstance?

VENIREPERSON NO. 67: Yes.

MR. LARNER: Beyond a reasonable doubt? To the twelve people?

VENIREPERSON NO. 67: Yes.

MR. LARNER: And then you would weigh the one or more aggravating circumstances against the one or more mitigating?

VENIREPERSON NO. 67: Yes.

MR. LARNER: And then at that point, you could still consider both punishments?

VENIREPERSON NO. 67: Yes.

MR. LARNER: And if, in this hypothetical case, if there was no mitigation evidence in favor of the defendant in this hypothetical case, there was only aggravating circumstances and no mitigating, so that, of course, the aggravating would outweigh the mitigating, if there wasn't any mitigation, you could still consider both, seriously consider both punishments at that point?

VENIREPERSON NO. 67: Yes.

MR. LARNER: If that's what the law says?

31

VENIREPERSON NO. 67: Yes.

(Tr. 769-71) (emphasis added).

The prosecution in this case also engaged in differential types of questioning regarding the verdict process for Black and non-Black jurors, systematically isolating Black jurors. (Tr. 206) ("MR. LARNER: And you could stand up in open court and announce your verdict, if it was the death penalty? VENIREMAN LINDA JONES: Yes."); *id.* at 762 ("MR. LARNER: If you were the foreman of the jury, could you sign the verdict of death? VENIREMAN GOODEN: Yes, I could."); *id.* at 878-79 ("MR. LARNER: I noticed you were sort of like Number 76, in that you had your hand up at first and then when I said about signing the verdict as the foreperson and announcing that in court, that kind of hit home a little bit? VENIREMAN RANDLE: That would be difficult."). The prosecution, by contrast, sought to reassure non-Black jurors that twelve votes were required, so they would not have to be alone:

- Tr. 249 ("And all twelve jurors would have to agree on that aggravating circumstance beyond a reasonable doubt before the second door is opened. Does that help? VENIREMAN HEIDBRINK: I think so.");

- Tr. 342 ("MR. LARNER: Okay. If you were the foreman of the jury, could you sign the death verdict? VENIREMAN TERRILL: If I felt that was the correct decision. MR. LARNER: Okay. If all twelve agreed? VENIREMAN TERRILL: Yeah. MR. LARNER: And you would be one of those twelve? VENIREMAN TERRILL: Yeah.");

- Tr. 344 ("MR. LARNER: And all twelve have to agree that I proved an aggravating circumstance beyond a reasonable doubt. Okay? VENIREMAN RABACK: Yes. MR. LARNER: Are you with me?");

- Tr. 355 ("MR. LARNER: And if all twelve don't agree to that aggravating circumstance, all twelve, then you have to go with life

32

without parole? VENIREMAN KAMMER: Yes. MR. LARNER: It's only if all twelve agree that that aggravating circumstance exists, that you then weigh the mitigating. And if all twelve agree that the aggravating is heavier than the mitigating, you're at door three. Okay? VENIREMAN KAMMER: Yes.");

- Tr. 393 ("MR. LARNER: And just because you find aggravating circumstances, or the twelve people find an aggravating circumstance beyond a reasonable doubt, you wouldn't then automatically vote for the death penalty, would you? If the instructions tell you there's more to be done? 7 VENIREMAN CASBY: No, I wouldn't.");

- Tr. 397 ("MR. LARNER: Aggravating circumstances, all twelve have to agree. If there's nothing in mitigation, you'll still consider life without parole? VENIREMAN BALDES: (Nods).");

- Tr. 399-400 ("MR. LARNER: And if the defense -- if there's more aggravating than mitigating, you understand all twelve have to agree that there's more aggravating than mitigating? VENIREMAN VORST: Yes. MR. LARNER: And all twelve, even before that, have to agree that we have aggravating circumstances, okay? VENIREMAN VORST: Correct.");

- Tr. 402-03 ("MR. LARNER: And if it exists, all twelve have to agree it exists. Okay? VENIREMAN STORMS: Right.");

- Tr. 404-05 ("MR. LARNER: And if I don't prove that aggravating circumstance to your satisfaction beyond a reasonable doubt, to the twelve jurors, what's the punishment? If I don't prove that aggravating circumstance, what's the punishment? VENIREMAN VINYARD: Life imprisonment." ... MR. LARNER: That's the law. And if I do, then you start -- then the twelve, if they agree, then you start looking at mitigating. And if that mitigating outweighs that aggravating, if twelve people don't think that that aggravating -- twelve people have to agree the aggravating is heavier. If they don't, you stop there. You don't get -- you're not quite at that third door. You are not at that third door until aggravating is heavier than mitigating, and all twelve agree to that. Okay? Any question about that, Juror Number 32? VENIREMAN VINYARD: No, sir."[2]

---

[2] Similar questioning was also provided for prospective jurors 34, 35, 41, 43, 50, 63, 67, 70, 71, 106, and 126. (Tr. 533, 535, 538, 542-43, 653, 761, 770, 779, 781, 1239-40, and 1245-246).

33

The prosecution did not engage in this type of reassurance with a single Black prospective juror. *Cf. Miller-El*, 545 U.S. at 255 ("If the graphic script is given to a higher proportion of blacks than whites, this is evidence that prosecutors more often wanted blacks off the jury, absent some neutral and extenuating explanation."); *id.* at 256 ("Only 6% of the white venire panelists, but 53% of those who were black, heard a different description of the death penalty before being asked their feelings about it.").

In fact, the only time the topic of twelve jurors came up with a Black prospective juror, the prosecution returned to the theme of placing pressure on the juror of having to stand up and announce the verdict in open court. (Tr. 879-80) ("VENIREMAN RANDLE: I would do it under the law and the evidence. But it would really be difficult for me to be a foreperson, and to sign, and stand up and say it. MR. LARNER: Well, I think all twelve jurors will probably have to stand up and say that that's their verdict. Not just the foreperson. The foreperson would sign the verdict. But all twelve would have to get up and announce their verdict in open court. So there's no getting around that, in that type of case."). "A court confronting that kind of pattern cannot ignore it." *Flowers*, 588 U.S. at 310. The prosecution engaged in disparate questioning of jurors based on their race.

A court properly "consider[s] historical evidence of the State's discriminatory peremptory strikes from past trials in the jurisdiction." *Flowers*, 588 U.S. at 304. The trial prosecutor admitted that, in a prior case (in fact, the *McFadden* case), the Honorable John Ross had found that he had exercised peremptory strikes on Black jurors in violation of *Batson*. (HT2 at 218-20). But the trial prosecutor was devious in

34

this regard, first indicating that he had never violated *Batson* before admitting that Hon. Ross found he did. *Id.* This is further evidence that the trial prosecutor violated *Batson* in this case.

The new *Batson* evidence from Petitioner's case, relevant to a claim that was previously denied on procedural grounds, provides additional compelling evidence that Petitioner's *Batson* claim survives 2254(d) because the new evidence clearly and convincingly rebuts the factual basis for the denial. Therefore, the impediment to considering the merits of the claim can be satisfied and *de novo* review may occur in a case where the county prosecutor has conceded error on a claim related to improper racial considerations.

**B. Petitioner's 60(b) motion only attacks a "defect in the integrity of the federal habeas proceedings" and thus this Court is not prevented from granting the relief he seeks.**

AEDPA's restrictions on successive petitions apply only to "applications" for habeas corpus. *See Gonzalez*, 545 U.S. at 530. An "application" is "a filing that contains one or more *claims*." *Id.* (internal quotation marks omitted and emphasis added). A motion brings a claim when it: (1) seeks to add a new ground for relief that was previously omitted due to "excusable neglect," "newly discovered evidence," or a "subsequent change in substantive law," or (2) attacks the federal court's previous resolution of the same claim on the merits. *See id.* at 530-32. A motion should not be treated as a successive habeas petition when a Rule 60(b) motion challenges not the substance of the federal court's resolution of a claim on the merits, but "some defect in the integrity of the federal habeas proceedings." *Id.* at 532.

35

Petitioner's Rule 60(b) motion meets the *Gonzalez* criteria. The subject of this Rule 60(b) motion relates to the denial of a claim under the auspices of AEDPA – which was not a merits review. *See supra.* Petitioner was denied the opportunity to have his claim reviewed on the merits, but the new evidence and concession of error reopen the threshold AEDPA question. The Rule 60(b) motion does not present a new claim. Rather, it seeks to overcome a defect in the § 2254 proceeding, the denial of a full merits review of Petitioner's claim. Because of this, no court has ever reviewed the full merits of Petitioner's claim including the concession of error and the admitted-to racial animus by the prosecution.

Mr. Williams's case reflects the same perniciousness the Supreme Court considered in *Buck*. Racial discrimination, and what obviously occurred here now that Larner was finally tested under oath, undermines the public confidence in the judicial process. Further, Larner's testimony establishes that there is a substantial risk of racial injustice in Mr. Williams's case. *See Buck*, 580 U.S. at 123.

Petitioner challenges the process used in denying his § 2254 motion via an application of 2254(d). Thus, *Gonzalez* authorizes the instant motion, as it "merely asserts that a previous ruling which precluded a merits determination was in error… ." *Gonzalez*, 545 U.S. at 532 n.4.

## C. Extraordinary circumstances justify reopening the judgment pursuant to rule 60(b)(6).

Rule 60(b)(6) is properly invoked in extraordinary circumstances much like we have in this case. "Clause (6) is a residual clause used to cover unforeseen contingencies; that is, it is a means for accomplishing justice in exceptional circumstances, [not

36

covered by the other five provisions of Rule 60]." *Stipelcovich v. Sand Dollar Marine, Inc.,* 805 F.2d 599, 604–05 (5th Cir.1986) (citing 7 J. Lucas & J. Moore, Moore's Federal Practice ¶ 60.27[2] at 274 (2d ed.1985)). A motion under subsection (b)(6) must be brought "within a reasonable time," Fed. R. Civ. P. 60(c)(1), and requires a showing of "extraordinary circumstances" to justify the reopening of a final judgment. A consideration of extraordinary circumstances under Rule 60(b)(6) relies on a variety of factors, all of which this case meets. Applying *Buck*, there can be no question regarding extraordinary circumstances here.

> 1. **The new evidence of racial discrimination in the exercise of a peremptory strike presents an extraordinary circumstance sufficient for Rule 60(b)(6) relief.**

The Hon. E. Richard Webber of the Eastern District of Missouri in *Barnett v. Roper*, 941 F.Supp.2d 1099 (E.D. Mo. 2013), found 60(b)(6) to be satisfied in a capital § 2254 proceeding. Critical to his analysis was an examination of a number of equitable factors that led to a conclusion that: "This Court finds the equitable consideration of factors to be appropriate in light of the capital nature of this case, and the competing interests of finality and justice." *Id.* at 1118. As in *Barnett,* a number of extraordinary circumstances exist in Petitioner's case.

> a. **Petitioner's evidence was only recently available.**

Petitioner's evidence is "new" in the literal sense and as a legal term of art. It is less than 21 days old. It is thus "new."

While Petitioner has at all times been diligent, he only gained access to the trial prosecutor's testimony in the last few weeks. Similarly, he only learned of the

destruction of evidence that would have supported a *Batson* claim in a similar time period. Finally, the confession of error by the county prosecutor also occurred less than 30 days ago.

Under Eighth Circuit authority, a habeas petitioner must first come forward with "new" evidence. *Amrine v. Bowersox*, 238 F.3d 1023, 1029 (8th Cir. 2001), *cert. denied*, 534 U.S. 963 (2001). Evidence is only "new" if it was "not available at trial and could not have been discovered earlier through the exercise of due diligence." *Amrine*, 238 F.3d at 1029. The trial prosecutor was finally forced to answer questions under oath just weeks ago – it could not have occurred anytime earlier. Thus, the confession that race was a factor in exercising peremptory strikes, which rebuts the self-serving trial colloquy, did not exist at the time of trial. Indeed, the trial prosecutor seemingly was trying to throw the trial court off the scent of what was really going on when he responded to the *Batson* challenge during trial. It is unknown when the prosecutor's office purged the voir dire notes, but it was clearly subsequent to the trial proceedings. Thus, Petitioner has satisfied *Amrine*.

### b. Petitioner has acted with diligence and has acted within a reasonable time.

Without the county prosecuting attorney's 2024 filing, the evidence and expression of racial animus would never have been uncovered. Nor would the destruction of the voir dire notes—the cover-up—have been known.

Petitioner has been diligent. The St. Louis County Circuit Court denied the county prosecutor's petition on September 12, 2024. Yesterday evening, on September 16, 2024, a notice of appeal was filed. Petitioner has filed the instant motion within four

days of the circuit court denial. Applying *Barnett*, where a petitioner filing within three months of an intervening change in law was found to have "expeditiously filed" his 60(b) motion, *Barnett*, 941 F.Supp.2d at 1119, Petitioner has expeditiously pursued this remedy in 4 days from the denial and within 21 days of the testimony.

### c. The nature of the new facts demonstrates that the discovery denial precluded a full and fair merits review.

As noted above, racism is anathema to justice. It has reared its ugly head here. Additionally, the prosecutor's confession of error supports reopening Petitioner's claim. Mr. Williams's case reflects the same perniciousness the Supreme Court considered in *Buck*, 580 U.S. at 123.

### d. Ms. Gayle's family's finality interest supports Petitioner.

Finality of the judgment, which the State of Missouri always asserts, is not a factor to be given great weight in the context of a Rule 60(b) Motion. Indeed, the Supreme Court explicitly discounted finality as a basis for denying Rule 60(b) relief in *Gonzalez* precisely because the very purpose of Rule 60(b) is to make exceptions to finality. *See Gonzalez*, 545 U.S. at 529 ("[The Court gives] little weight to the respondent's appeal to the virtues of finality" as "[t]hat policy consideration, standing alone, is unpersuasive in the interpretation of a provision [Rule 60(b)] whose sole purpose is to make an exception to finality."). Here, there is no prejudice to Missouri beyond the lack of finality. Rather, Missouri pursues finality at the cost of harm to its judicial system due to the perniciousness of racial prejudice.

Setting this aside, any such potential prejudice, however, must be weighed against the more irreversible finality of Petitioner's execution, as well as the serious

39

concern that Petitioner's death sentence is imposed unconstitutionally—a claim that has never been fully heard on the merits due to AEDPA. In light of the fact that "death is different," *Ford v. Wainwright*, 477 U.S. 399, 411 (1986), and that capital cases require a greater need for reliability, consistency and fairness, this factor is supportive of Petitioner.

If finality is to be considered, Petitioner respectfully points this Court to the manner in which Ms. Gayle's family defines finality, as described by the Circuit Court: In initially granting the consent judgment, the court considered "the family's desire that the death penalty not be carried out in this case, as well as the family's desire for finality." 8/21/24 Tr. p. 23. (Attachment B).

**e.  Significant *Batson* Error.**

As noted above, the trial prosecutor now admits that race was "part of" but not the "full reason" for a peremptory used against a Black man, who could have been Mr. Williams's "brother." The new, clear and convincing evidence of racial discrimination establishes a violation of *Batson* herein, and provides a basis to reopen the procedural barrier previously imposed to deny a merits ruling.

**f.  Greater Need for Reliability and Fairness.**

Petitioner has been sentenced to death. Death is different. As in *Barnett*, where the court undertook a more equitable consideration in that case given its capital nature which required a greater need for reliability, consistency, and fairness,941 F. Supp. 2d 1099 at 1120, this Court should likewise find those requirements to be factors

40

demonstrating an extraordinary circumstance herein. As in *Barnett*, the claim has never been fully and fairly considered and directly impacts both the conviction and sentence.

The court in *Buck* noted that claims of racial discrimination are particularly "pernicious in the administration of justice" and "poisons public confidence in the judicial process." *Id.* at 124. As in *Buck*, this case presents a conceded claim of racial discrimination in a capital case. As a result, based upon the importance of the substantive claim for relief, coupled with the intervening events that occurred in Petitioner's state court litigation, sufficient extraordinary circumstances exist to establish petitioner's right to 60(b)(6) relief.

### g. State's Interests Are Not Harmed.

The State is not harmed by ensuring that race did not play a factor in jury selection. The State is sworn to uphold the constitution, not to subvert it. The granting of a 60(b) motion does not represent a substantial harm to the State. This is particularly true in this case, where there is an admission that race was a factor (and thus, the state court decision is unreasonably based on a self-serving, untrue colloquy); evidence supporting the *Batson* claim was destroyed; the county prosecutor conceded error; and the victim's family wanted the case closed based on the confession of error, rather than an execution. Thus, the State cannot credibly claim it would be harmed by allowing the merits of the *Batson* claim to be considered before it carries out an irrevocable execution.

41

## CONCLUSION

For the above stated reasons, this Court should GRANT Petitioner's request, reopen proceedings, ORDER an immediate conference for purposes of scheduling, and grant otherwise appropriate relief.

Respectfully submitted,

/s/ Laurence E. Komp
LAURENCE E. KOMP, #40446
FAITH J. TAN, IL Bar #6342729
Federal Public Defender
Western District of Missouri
1000 Walnut Street, Suite 600
Kansas City, MO 64106
816-675-0923
laurence_komp@fd.org
faith_tan@fd.org

/s/ Kent E. Gipson
KENT E. GIPSON, #34524
Law Office of Kent Gipson, LLC
121 E. Gregory Blvd.
Kansas City, MO 64114
816-363-4400 • Fax 816-363-4300
kent.gipson@kentgipsonlaw.com

ATTORNEYS FOR PETITIONER

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was filed and sent to the following counsel of record for Respondent, Mr. Mike Spillane, Assistant Attorney General, P.O. Box 899, Jefferson City, Missouri 65102, via the ECF system on this 17th day of September 2024.

/s/Laurence E. Komp
Attorney for Petitioner

42