**Capital Case – Execution September 24, 2024, at 6:00 p.m. Central.**

---

**IN THE UNITED STATES DISTRICT
FOR THE EASTERN DISTRICT OF MISSOURI**

**Case No. 4:05-CV-1474-RWS**

---

**PETITIONER'S MOTION FOR RELIEF FROM A
JUDGMENT AND ORDER PURSUANT TO FED. R. CIV. P. 60(b)**

---

**Appendix**

---

## TABLE OF CONTENTS

**Consent Order and Judgment** ……………………………………...Attachment A

**August 21 Hearing Transcript**...........................................................Attachment B

**August 28 Volume 1 Transcript** ……………………………………Attachment C

**August 28 Volume 2 Transcript** ……………………………………Attachment D

# Attachment A

**IN THE CIRCUIT COURT OF ST. LOUIS COUNTY**
**STATE OF MISSOURI**

In Re:  Prosecuting Attorney, 21st Judicial)
Circuit, ex rel. Marcellus Williams,          )
                                                              )
          Movant/Petitioner,                      )
                                                              )
v.                                                             )          Case No. 24SL-CC00422
                                                              )
State of Missouri,                                   )          Division 13
                                                              )
          Respondent.                               )

**FILED**

**AUG 2 1 2024**

**JOAN M. GILMER**
COURT CLERK. ST LOUIS COUN~

## CONSENT ORDER AND JUDGMENT

Marcellus Williams was charged and convicted in St. Louis County Cause No. 99CR-5297 with one count of murder in the first degree (Count II), one count of first-degree burglary (Count I), one count of first-degree robbery (Count IV), and two counts of armed criminal action (Counts III and V), and was subsequently sentenced to death on Count II on August 27, 2001 along with consecutive terms of 30 years (Count I), 30 years (Count III), Life (Count IV), and 30 years (Count V).

On January 26, 2024, the State of Missouri filed a Motion to Vacate or Set Aside Judgment and Suggestions in Support pursuant to Section 547.031, RSMo.

This Court set a hearing on this motion for August 21, 2024.

The Court has been informed the State of Missouri, through the St. Louis County Prosecuting Attorney, and Williams, have agreed to settle this matter as follows: that the conviction and sentence as to Count II only shall be vacated, conditional upon Williams pleading to the charged offense of murder in the first degree pursuant to *North Carolina v. Alford*, 400 U.S. 25 (1970), with a negotiated sentence of **life without the possibility of**

1

**parole** for the charge of murder in the first degree, with the other counts, upon which Williams was found guilty after a trial and subsequently sentenced, remaining unchanged.

The Court finds that the State of Missouri, through the St. Louis County Prosecuting Attorney, concedes that constitutional errors did occur in the original trial that undermine confidence in the original judgment.

The Court finds that, following discussions between a representative of the victim's family and both the Prosecuting Attorney's Office and the Attorney General's Office regarding this Consent Judgment, the Court held a telephonic conference in chambers with that representative on August 21, 2024, wherein the representative expressed to the Court the family's desire that the death penalty not be carried out in this case, as well as the family's desire for finality.

The Court has been informed that Williams acknowledges, understands, and agrees that by being resentenced pursuant to this Judgment, he waives his right to appeal or collaterally attack the judgment resentencing him following the entry of this Judgment, except on grounds of newly discovered evidence or changes in the law made retroactive to cases on collateral review.

The Court finds that the State of Missouri, through the St. Louis County Prosecuting Attorney, and Williams are the proper parties to this negotiated settlement of this matter pursuant to Section 547.031.

The Court finds a consent judgment is a proper remedy in this case.

The Court further finds, in accordance with RSMo. § 547.031(2) the Attorney General has been given notice of the Motion to Vacate previously filed, has entered its

appearance and has participated in all proceedings to date, including providing its objections to the instant Consent Order and Judgment.

The Court, after taking judicial notice of the Motion to Vacate, the evidence presented at the original trial, direct appeal, and post-conviction proceedings, including all state or federal habeas actions, finds this Consent Order and Judgment is supported by the record.

The Court further finds that all other pending matters or motions before the Court in this proceeding are hereby denied.

WHEREFORE, the Court vacates the conviction of Marcellus Williams for murder in the first degree (Count II) on the condition that Marcellus Williams accepts a plea of murder in the first degree and a sentence of life without the possibility of parole be imposed.

IT IS SO ORDERED.

8/21/2024
_____
Date

Div. 13
_____
Bruce Hilton, Circuit Judge

_____
Marcellus Williams, Relator

3

# Attachment B

```
        IN THE CIRCUIT COURT OF THE COUNTY OF ST. LOUIS
              TWENTY-FIRST JUDICIAL CIRCUIT
                    Division No. 13
          The Honorable Bruce F. Hilton, Presiding
IN RE:                         )
PROSECUTING ATTORNEY,          )
21ST JUDICIAL CIRCUIT,         )
ex rel. MARCELLUS WILLIAMS,    )
                               )
        MOVANT/PETITIONER,     )
                               )
           vs.                 )CAUSE NO. 24SL-CC00422
                               )
STATE OF MISSOURI,             )
                               )
        RESPONDENT.            )
```

ON BEHALF OF STATE OF MISSOURI:
MISSOURI ATTORNEY GENERAL'S OFFICE
MR. ANDREW J. CLARKE
Assistant Attorney General
PO Box 899
Jefferson City MO  65102


SPECIAL COUNSEL FOR INNOCENCE OF ST. LOUIS COUNTY
PROSECUTING ATTORNEY'S OFFICE:
LATHROP GPM
MR. MATTHEW JACOBER
190 Carondelet Plaza
Clayton MO 63105

MS. JESSICA HATHAWAY
Assistant Prosecuting Attorney
100 S. Central Avenue
St. Louis MO 63105

ON BEHALF OF MARCELLUS WILLIAMS:
MS. ALANA MCMULLIN
4731 Wyoming Street
Kansas City, MO 64112

                TRANSCRIPT OF HEARING

                  AUGUST 21, 2024

                    Reported By:
          Rhonda J. Laurentius, CCR, RPR
              Official Court Reporter
            Twenty-First Judicial Circuit

THE COURT:  We're on the record in Cause Number 24SL-CC00422, in re:  The Prosecuting Attorney for the Twenty-First Judicial Circuit, ex rel. Marcellus Williams vs State of Missouri.

Let the record reflect this matter was set for an evidentiary hearing this date, August 21, 2024.

On or about January 26, 2024, the Prosecuting Attorney's Office filed a motion to vacate or set aside judgment and suggestions in support pursuant to Section 547.031 RSMo.

Let the record further reflect that the Court's interpretation of the statute is that there must be a hearing on this matter, and the Court scheduled this for a hearing this date.

Is there an announcement?

MR. JACOBER:  Good afternoon, Your Honor.  Matthew Jacober.  I, along with my colleagues, Alana McMullin and Teresa Hurla, are special counsel for Innocence for St. Louis County's Prosecuting Attorney's Office.  In addition, Jessica Hathaway from the St. Louis County Prosecuting Attorney's Office is with us.

There is an announcement, Your Honor. There has been a resolution of the case.  The Court

has been presented with a consent order and judgment signed by Mr. Williams. And I would like to make a record at this time, after all counsel have entered their appearance for the record, regarding the circumstances of this consent order and judgment.

THE COURT: Thank you. And that's an oversight on my part.

Let the record further reflect that the Attorney General is here and represented by Michael Spillane. And if there are any other attorneys that want to be acknowledged on the record I'll so note that.

MR. CLARK: Your Honor, I will be arguing today. Andrew Clark, assistant attorney general on behalf of the State of Missouri.

THE COURT: Thank you.

The Court has been presented with a consent order and judgment purportedly signed by Mr. Williams as relator to resolve all issues pertaining to this motion, which the Court actually has very little direction due to the fact that it's only been in existence since 2021. And this consent order and judgment has been furnished to the Court by the Prosecuting Attorney's Office and

by Mr. Williams.  It's my understanding that the Attorney General believes that I don't have jurisdiction to enter this consent order and judgment and appropriate remedies will be pursued in obviously a different proceeding.

Let the record further reflect that in anticipation of this hearing today the following facts are not disputed.  Following a jury trial the Circuit Court sentenced Mr. Williams to death for first degree murder.  The Court affirmed Mr. Williams' conviction and affirmed the judgment, denying any post-conviction relief.

In December of 2014 the Court issued a warrant of execution setting a January 28, 2015, execution date.  Mr. Williams then filed a petition for writ of habeas corpus in the Court alleging that he was entitled to initial DNA testing to demonstrate actual innocence.  The Court vacated Mr. Williams' execution date and appointed a Special Master to ensure complete DNA testing and report the results of the additional DNA testing. The Special Master provided the Supreme Court with the results of additional DNA testing conducted on hair and fingernail samples from the crime scene and the knife used in the murder.

4

The parties fully briefed their arguments to the Special Master. After reviewing the Master's files, the Court denied Mr. Williams' habeas petition because the additional DNA testing did not demonstrate Mr. Williams' actual innocence.

In 2017 Mr. Williams filed another petition for writ of habeas corpus again alleging DNA testing demonstrated his actual innocence by excluding him as a contributor of DNA found on the knife used in the murder. The Court denied said relief.

In 2023 Mr. Williams filed a petition for declaratory judgment alleging that the governor lacked authority to rescind an execution order appointing a board of inquiry pursuant to Section 552.070 and staying Mr. Williams' execution until a final clemency determination.

On June 4, 2024, the Supreme Court issued a permanent writ of prohibition barring the Circuit Court from taking further action other than granting the governor's motion for judgment on the pleadings and denying Mr. Williams' petition for declaratory judgment.

Prior to the Court's order and warrant, the Prosecuting Attorney for the Twenty-First

Judicial Circuit filed a motion to vacate Mr. Williams' first degree murder conviction and death sentence pursuant to Section 547.031 authorizing the Prosecuting Attorney or Circuit Attorney to file a motion to vacate or set aside the judgment at any time upon information the convicted person may be innocent or may have been erroneously convicted.

This Court has reviewed probably close to 8,000 pages, which I am guided to do so under the statute, including the original trial transcript which lasted some 14 days, the post-conviction relief proceedings, and all the cases that have been decided previously by courts that are higher than this.

The Court finds that this statute is civil in nature. It is not post-conviction relief. The Court has been provided no authority to suggest that I cannot enter this consent order and judgment. And the Court is going to enter this consent order and judgment.

And further, Mr. Jacober, you may make a record with respect to this consent order and judgment.

MR. JACOBER: Thank you, Your Honor.

6

Is it okay if I stand here?

THE COURT:  You can stand, sit, whatever is your preference.

MR. JACOBER:  I'll stand.

Your Honor, just by way of record, again Matthew Jacober on behalf of the St. Louis County Prosecuting Attorney's Office.

The DNA evidence developed did not fully support our initial conclusions.  Additional investigation and testing demonstrated the evidence was not handled in accordance with proper procedures at the time of Mr. Williams' charge and conviction.  As a result, the additional testing was inconclusive and did not allow the St. Louis County Prosecuting Attorney's Office to rely on its theory Mr. Williams' exclusion as a contributor to the DNA on the murder weapon as a significant factor supporting his innocence.

It is clear, based on testing, Mr. Williams' DNA is not on the murder weapon which was tested in 2016, long after the crime occurred, and long after the trial was concluded.  The murder weapon was handled without proper procedures then in place.  As a result DNA was likely removed and added during the investigation and prosecution of

7

Mr. Williams during the time span of 1998 through 2001. The St. Louis County Prosecuting Attorney's Office regrets its failure to maintain proper protocols surrounding the key physical evidence in this heinous crime, the murder weapon.

The majority of the additional investigation was conducted in the last 60 days and promptly provided to Mr. Williams and the Attorney General's Office. As a result of this evidence and concerns regarding the investigation and trial of Mr. Williams impacting his rights as a charged individual, St. Louis County Prosecuting Attorney determined there were constitutional errors undermining our confidence in the judgment.

St. Louis County Prosecuting Attorney's Office engaged in settlement discussions with Mr. Williams and his counsel. These discussions began on August 20, 2024, and culminated on August 21, 2024, in which Mr. Williams is agreeing to plead pursuant to North Carolina vs. Alford in exchange for a sentence of life without the possibility of parole.

We have discussed with the victim's husband, Dr. Daniel Picus, who has indicated he does not support the application of the death

penalty to Mr. Williams.  As the Court is aware, Dr. Picus expressed this sentiment to the Court and all counsel in chambers during a telephone call earlier today.  Mr. Williams is further waiving all appellate and post-conviction remedies except those afforded via newly discovered evidence or a retroactively adopted and applied law.  This brings much needed and deserved finality to this case and Mrs. Gayle's family.

Despite the above, it's our understanding the Attorney General's Office objects to this resolution.  Taking the above record and everything that the Court has reviewed to date, which includes all of the documents in this matter and all of Mr. Williams' direct and indirect appeals to his conviction, the St. Louis County Prosecuting Attorney's Office requests the Court accept the consent order and judgment, accept Mr. Williams' plea pursuant to North Carolina vs Alford, and resentence Mr. Williams on Count II of the underlying indictment to life without the possibility of parole.

Ms. Hathaway will proceed forward with the allocution and the plea proceedings.

THE COURT:  Thank you.

9

MR. JACOBER:  Thank you, Your Honor.

THE COURT:  Mr. Williams.

MARCELLUS WILLIAMS:  Yes, sir.

THE COURT:  Can you rise and raise your right hand.

MARCELLUS WILLIAMS,

having been sworn, testified as follows:

THE COURT:  You may.

MS. HATHAWAY:  Your Honor, as a preliminary matter, I prepared a memorandum that would withdraw the State of Missouri's previously filed notice of intent to seek the death penalty.

THE COURT:  Thank you.

Mr. Williams, I have before me, which I guess we can mark as Circuit Attorney's Exhibit 1, a consent order and judgment.  Circuit Attorney's Exhibit 1 references a signature signed by Marcellus Williams, relator.  Did you sign this document?

MARCELLUS WILLIAMS:  I did.

THE COURT:  I'm going to ask you a series of questions.  If at any time you don't understand any of my questions please get my attention and I'll rephrase.

MARCELLUS WILLIAMS: (Nods head.)

10

THE COURT:  Can you please state your full legal name for the record?

MARCELLUS WILLIAMS:  Marcellus Scott Williams.

THE COURT:  Thank you.  And how young a man are you?

MARCELLUS WILLIAMS:  Fifty-five.

THE COURT:  Highest level of education you've achieved?

MARCELLUS WILLIAMS:  GED.

THE COURT:  With that GED you're capable of reading, writing, and understanding the English language?

MARCELLUS WILLIAMS:  I am.

THE COURT:  You just heard the Circuit Attorney announce that you would like to enter an Alford plea with respect to the agreement that has been reached between you and the Circuit Attorney, is that accurate?

MARCELLUS WILLIAMS:  Yes.

THE COURT:  Any problems with your hearing today?

MARCELLUS WILLIAMS:  None.

THE COURT:  You are a U.S. citizen?

MARCELLUS WILLIAMS:  Yes.

11

THE COURT:  Are you under the influence of any drugs or alcohol today?

MARCELLUS WILLIAMS:  No.

THE COURT:  You understand that pursuant to this consent order and judgment you are agreeing to plead guilty to the charge of first degree murder pursuant to North Carolina vs Alford with the negotiated sentence of life without the possibility of parole?

MARCELLUS WILLIAMS:  I understand.

THE COURT:  Did you have enough time to review this consent order and judgment before you signed it?

MARCELLUS WILLIAMS:  Yes.

THE COURT:  Have any threats or promises been made to you to get you to go ahead and sign this?

MARCELLUS WILLIAMS:  No.

THE COURT:  Have any threats or promises been made to your family to entice you or intimidate you into signing this agreement?

MARCELLUS WILLIAMS:  No.

THE COURT:  You understand, Mr. Williams, that your agreement with the Prosecuting Attorney's Office will become the

sentence and judgment of the Court if I accept this consent order and judgment?

MARCELLUS WILLIAMS: I do.

THE COURT: You heard the prosecutor's statement regarding the issue of the sentence ordering the death penalty is being withdrawn by the Prosecuting Attorney --

MARCELLUS WILLIAMS: Yes.

THE COURT: -- in exchange for your agreement to plead under North Carolina vs. Alford to life without parole?

MARCELLUS WILLIAMS: Yes.

THE COURT: The additional counts remain unchanged.

MARCELLUS WILLIAMS: Yes.

THE COURT: Based upon the prosecutor's statement, do you believe that you will be found guilty by a jury or the trial court if you went to trial since you've already been found guilty?

MARCELLUS WILLIAMS: State that again, Your Honor.

THE COURT: You've already been found guilty, correct?

MARCELLUS WILLIAMS: Right.

THE COURT: And this was back in

13

2000 --

MARCELLUS WILLIAMS:  -- 1.

THE COURT:  2001.  And you've exhausted all of your remedies available under the law --

MARCELLUS WILLIAMS:  Yes.

THE COURT:  -- correct?

MARCELLUS WILLIAMS:  (Nods head.)

THE COURT:  Do you believe that it's in your best interest, given the evidence, to enter a plea of guilty pursuant to the case of North Carolina vs Alford?

MARCELLUS WILLIAMS:  Yes, I do.

THE COURT:  Have your attorneys explained to you the effect of your plea of guilty pursuant to the case of North Carolina vs. Alford?

MARCELLUS WILLIAMS:  Yes.

THE COURT:  What is your understanding of that case?

MARCELLUS WILLIAMS:  My understanding of the case is that it's a no contest, I plead to no contest to the charge.

THE COURT:  You understand that it has the same legal effect as a guilty plea?

MARCELLUS WILLIAMS:  Yes.

THE COURT:  Is the consent order and

14

judgment part of your reason for the Alford plea?

MARCELLUS WILLIAMS:  Yes.

THE COURT:  Do you have any questions about your Alford plea before we proceed?

MARCELLUS WILLIAMS:  I don't.

THE COURT:  Is it your desire under the effect of the Alford plea to continue this proceeding and accept the agreement -- the consent order and the agreement contained within the consent order and judgment?

MARCELLUS WILLIAMS:  Yes.

THE COURT:  You heard the Prosecuting Attorney through Mr. Jacober, that you understand that there is no DNA evidence that affects your claim of innocence?

MARCELLUS WILLIAMS:  Yes.

THE COURT:  Knowing all that do you wish to continue?

MARCELLUS WILLIAMS:  Yes.

THE COURT:  Mr. Williams, how do you plead to Count II, the charge of first degree murder?

MR. CLARK:  Your Honor, sorry.  At this point we would object that this Court has no authority in its civil case, in the 547 case to

15

take this plea.  And in the criminal case it has no authority or jurisdiction to unsettle the previous conviction.  These are the same arguments we raised in chambers.

Just for the record, Your Honor, as to the civil case, State ex rel. Bailey vs. Sengheiser, 2024, Westlaw 358 8726, indicates this Court has no authority in this case to resentence anyone.  That in the criminal case, State ex rel. Zahnd vs. Van Amburg, 533 S.W.3d 227 Mo. 2017, State ex rel. Fike vs. Johnson, 530 S.W.3d 508, and State ex rel. Poucher vs. Vincent, 258 S.W.3d 62.  Those are all Missouri Supreme Court cases that indicate that when a criminal court sentences someone like Mr. Williams for the first time in 2001 it's exhausted of its jurisdiction and authority to act over the criminal judgment.

Here that jurisdictional authority has not been reinvigorated.  This Court does not have the authority to first - These are wrapped together - to first to enter the consent judgment in this case and then to use that consent judgment to unravel the sentencing of the first case, of the criminal case.

As for whether the civil case, the

16

post-conviction remedy, State ex rel. Bailey vs. Fulton, 659 S.W.3d 909, says that 547 actions are civil remedies in the nature of post-conviction and that this Court has the obligation and responsibility to enforce the post-conviction rules, the mandatory post-conviction rules to enforce the finality and the orderly administration of justice.

Now I have a record about the consent judgment. I don't know if you want me to make it now or make it later.

THE COURT: You can.

MR. CLARK: All right, Your Honor.

THE COURT: This goes to your issue that I raised earlier as to whether or not you even have standing to object, correct?

MR. CLARK: Well both. I think, Your Honor, we'd like to make a record about the DNA evidence and to make a record about who the parties are, which I think is the standing question. So with the Court's indulgence...

THE COURT: You may proceed.

MR. CLARK: As to the party question, civil cases are litigated by the parties in interest. No matter how they're captioned, no

17

matter how they're titled, no matter what the parties think they are, they are governed by the parties in interest, who has an interest in the case.  And here it's clear who has an interest in the case; Marcellus Williams and the State of Missouri.

Now in enacting 547.031 the legislature gave the Prosecuting Attorney the authority to the representational capacity of Marcellus Williams to raise claims as he saw fit.  It does not give him the authority to raise that claim and then concede it on the other side.  547 does not allow that. And in fact in the case of State vs. Planned Parenthood of Kansas, 66 S.W.3d 16, it says for one attorney to give instruction to both sides of litigation as to the claims and the remedies in the case may ensure a predictable outcome but it will not ensure a just outcome.  And the Supreme Court said, to put it bluntly, the Attorney General there but here the Prosecuting Attorney, must choose a side regarding the legality of the contracts there – Here Marcellus Williams' conviction – and act consistently with that position in the Courts.

So here the Prosecuting Attorney cannot raise a claim on behalf of Marcellus Williams and

then put its prosecutor hat on and concede the claim. He's on both sides of the V at that point. So it is our position that the 547 action the parties are Marcellus Williams represented by the Prosecuting Attorney, not as his friend, not as, you know, his attorney, but he's been given representational capacity. Like I told you in chambers, under Randall Aluminum, that used to occur in employment discrimination cases.

Now the question is who is the judgment against. The State of Missouri. It has to be. Because this Court could not vacate a conviction if it wasn't -- or vacate the conviction if the judgment wasn't entered against the State. And here the Prosecuting Attorney can't represent both sides of the V. So that falls to the Attorney General. So whether this Court can enter a consent judgment or not, it can't under 547.031 both on authority here and jurisdiction and authority in the criminal case.

Now as for the DNA evidence, just to be clear about what happened in this case, what's been marked as Respondent's Exhibit FF is a supplemental DNA case report from BODE Technology dated August 19, 2024. And in that report provided by

19

Mr. Williams' counsel BODE was asked to consider an analysis of Short Tandem Repeat loci on the Y chromosome - Y-STR - for two individuals, Keith Larner, the individual who prosecuted this case, and Edward Magee, the chief investigator at the time.  And they returned that, those standards with the information, and when I believe the parties compared that BODE Technology report to the reports of Fienup from the Special Master report and from Dr. Rudin, which was the Prosecuting Attorney's witness both in this action and Marcellus Williams' witness in other actions.  When he compared there, Dr. Fienup, 15 of 15 loci are Edward Magee, the chief investigator.  And when you compare it to Dr. Rudin's it's even worse; 21.

So what happened here is the Prosecuting Attorney made an allegation about the DNA evidence.  They made an allegation that the DNA evidence exonerated or may exonerate Marcellus Williams.  After investigating that they found out that the DNA on the knife swab is consistent with Edward Magee.  And rather than do the right thing and dismiss the case they asked this Court to do something by consent that it can't do by consent and couldn't do after a hearing.

20

As the Missouri Supreme Court said in its opinion on the motion to recall the mandate -- or recall the warrant filed by Mr. Williams, it said this Court is equally aware prosecutor's motion is based on claims this Court previously rejected in Williams' unsuccessful direct appeal, unsuccessful Rule 29.15 motion for post-conviction relief, and its unsuccessful petitions for writ of habeas corpus. Moreover, there is no allegation of additional DNA testing conducted since the Master oversaw DNA testing and this Court denied Williams' habeas petitions.

What happened here is that the Prosecuting Attorney's raised claims have been denied many times, again and again and again. And they raised a DNA claim that upon further investigation didn't pan out, and rather than dismiss it because it didn't exonerate Mr. Williams they asked this Court to do it by consent. It can't. And it violates Article 5, Section 2 of the Missouri Constitution which makes the Supreme Court the Supreme Court of Missouri. That court has denied these claims many times.

And on that, Your Honor, we'd ask both that the consent judgment not be entered and that

Mr. Williams not be resentenced because this Court lacks authority in the civil case, authority and jurisdiction - I'm sorry - authority in the civil case, authority and jurisdiction in the criminal case, and the actions of this Court violate Article 5, Section 2 of Missouri's constitution.

THE COURT:  Thank you, Mr. Clark. You're not suggesting the Court upon a hearing and obviously by stipulation of counsel couldn't make a finding that there may be error in the original trial?

MR. CLARK:  Yes, well, the Court could by stipulation find an error.  Well, not by stipulation of two parties on the same side of the v.

THE COURT:  Okay.  Thank you.  Any response?

MS. HATHAWAY:  State of Missouri would take issue with the characterization that we do not represent the interest of the State of Missouri in this matter.

I would also suggest to the Court that the consent order has the effect of reopening the original criminal case.  So for purposes of the record the Court might want to at least -- or note

22

that.  And when we proceed with the plea the State of Missouri is prepared to make a factual basis for the plea as would, you know, happen normally in a plea.

THE COURT:  So it's my understanding that, and pursuant to the consent judgment, you are asking me to make findings that the Prosecuting Attorney concedes that constitutional errors did occur in the original trial that undermine confidence in the original judgment?

MS. HATHAWAY:  Yes, Your Honor.

THE COURT:  The Court also finds, following discussions between representatives of the victim's family both with the Prosecuting Attorney's Office and the Attorney General's Office regarding this consent judgment, the Court held a telephonic conference in chambers with that representative on August 21, 2024, wherein the representation expressed to the Court the family's desire that the death penalty not be carried out in this case, as well as the family's desire for finality.

The Court having been informed that Mr. Williams acknowledges, understands, and agrees that being resentenced pursuant to this judgment he

23

voluntarily waives the right to appeal or collaterally attack the judgment sentencing him following the entry of this judgment except on grounds of newly discovered evidence or changes in the law made retroactive to the cases on collateral review.

The Court further finds that the State of Missouri through the St. Louis County Prosecuting Attorney and Mr. Williams are the proper parties to this negotiated settlement of this matter pursuant to Section 547.031, noting your objection for the record.  The Court finds the consent judgment is a proper remedy in this case.

The Court further finds in accordance with Section 547.031(2) the Attorney General has been given notice of the motion to vacate previously filed and enters their appearance and has participated in all proceedings to date, including providing its objections to the consent order and judgment.

The Court has taken judicial notice of the entire consents of its files and notes that the Attorney General filed a very well written and argued motion to dismiss which the Court took with this case.

24

The Court, after taking judicial notice of the motion to vacate the evidence presented in the original trial, direct appeal, and post-conviction proceedings, including all state or federal habeas actions, finds the consent order and judgment is supported by the record.

The Court further finds that other pending matters or motions before the Court in this proceeding are hereby denied.

The Court will defer sentencing of Mr. Williams until 8:30 a.m. tomorrow so we can hear from the victim's family.

Any additional record need to be made?

MR. CLARK: For the record, Your Honor, as discussed in your chambers, I request at this time a stay of the consent judgment. The Attorney General demonstrated all four database factors that a stay is necessary and needed; namely, that the likelihood of success on any appeal or writ is high and that this Court should issue a stay.

THE COURT: The Court will grant your request. Obviously the dilemma the Court has been under since the inception of this matter being assigned to me is the timing of all of this. So that's why I'll grant your stay. And I hope this

25

is expedited by the Supreme Court.

It's also this Court's opinion that the Supreme Court should have original jurisdiction on all these matters.  But of course that's not what the statute says.  Subject to anything further?

MS. HATHAWAY:  Your Honor, was it Your Honor's intention that Mr. Williams plead guilty to murder in the first degree?

THE COURT:  It is.

MS. HATHAWAY:  Do you believe there needs to be an additional record made more like a standard plea of guilty since the original conviction and sentence has been vacated?

THE COURT:  Well I think in order to make the record clear and Mr. Williams' rights are protected I believe that he's already indicated to the Court that he does plead guilty.

MS. HATHAWAY:  Your Honor, some of the other lawyers are mentioning that we think it could have been interrupted by an objection.

THE COURT:  Oh.

MS. HATHAWAY:  Maybe just to make the record extra clear.

MS. HURLA:  Your Honor, if I may, I believe also in addition to what the Attorney

General is arguing, at this moment in this proceeding, in the civil proceeding the Court is vacating the conviction, but I believe we may then have to end this proceeding and call up the original criminal case in order to take a plea.

THE COURT:  That's my understanding.

MS. HURLA:  So we are not currently in the criminal case so the plea would have to be taken.

THE COURT:  In that case, that's correct.

MR. CLARK:  Just procedurally, Your Honor - I'm sorry - you granted the stay.  The effect of granting the stay would mean that the Court cannot take up the plea because the civil consent judgment doesn't take effect under the stay, unless that's not the intent of the stay.

THE COURT:  That's not the intent of the stay.

MR. CLARK:  Okay.  Just so the record is clear, the stay is denied as to resentencing and conviction?

THE COURT:  Correct.  So I guess with that said, I guess you'll present to me tomorrow the criminal file so that I can resentence and take

27

the plea?  Or you want to do that now?

MS. HATHAWAY:  I think what we envisioned is we would do the guilty plea today and defer sentencing until tomorrow.

THE COURT:  All right.

MS. HURLA:  Your Honor, I do just want to clarify that we been hearing the words guilty plea but this is an Alford plea, a no contest plea, and that is what Mr. Williams has agreed to.

THE COURT:  Right.  Let me pull that up.

In Cause 99CR-5297 - Again I'll remind you, Mr. Williams, you're under oath - how do you plead to the charge of first degree murder under North Carolina vs. Alford.

MARCELLUS WILLIAMS:  No contest.

THE COURT:  Anything further?

MR. CLARK:  Your Honor, we've switched case numbers here.  The Attorney General would just reassert its prior objection in full.  I won't restate it, but the prior objection in the civil case and stipulate this Court has no jurisdiction or authority in the criminal case.

THE COURT:  I appreciate that, Mr. Clark.  We'll go ahead and do sentencing first

28

thing in the morning after I hear from the victim. At that time I'll also do my examination under Rule 24.035.

MS. HATHAWAY:  Thank you, Your Honor.

THE COURT:  Anything further from anyone?

MR. CLARK:  Your Honor, just to make the record clear, I would ask that Exhibit FF be admitted in these proceedings.

THE COURT:  Any objection?

MS. HATHAWAY:  No, Your Honor.

THE COURT:  Exhibit FF will be received.  Any objection to I guess Exhibit 1 being received, which is the consent?

MR. CLARK:  Other than the objection we raised, no.

THE COURT:  Thank you.  That will also be received.  That will conclude the record. Anything further?  Thank you.  Court will be in recess until tomorrow morning at 8:30.

***

REPORTER'S CERTIFICATE

I, Rhonda J. Laurentius, a Certified Court Reporter and Registered Professional Reporter, hereby certify that I am the official court reporter for Division 13 of the Circuit Court of the County of St. Louis, State of Missouri; that on the 21st day of August, 2024, I was present and reported all the proceedings had in the case of IN RE:  PROSECUTING ATTORNEY, 21ST JUDICIAL CIRCUIT, ex rel. MARCELLUS WILLIAMS, MOVANT/PETITIONER, VS. STATE OF MISSOURI, RESPONDENT, CAUSE NO. 24SL-CC00422.

I further certify that the foregoing pages contain a true and accurate reproduction of the proceedings had that day.

I further certify that this transcript contains pages 1 through 30 inclusive and that this reporter takes no responsibility for missing or damaged pages of this transcript when same transcript is copied by any party other than this reporter.

/s/ Rhonda J. Laurentius, CCR #0419
Official Court Reporter
Twenty-First Judicial Circuit
(314) 615-8070

# Attachment C

IN THE CIRCUIT COURT OF THE COUNTY OF ST. LOUIS
TWENTY-FIRST JUDICIAL CIRCUIT
Division No. 13
The Honorable Bruce F. Hilton, Presiding

IN RE:                              )
PROSECUTING ATTORNEY,               )
21ST JUDICIAL CIRCUIT,              )
ex rel. MARCELLUS WILLIAMS,         )
                                    )
        MOVANT/PETITIONER,          )
                                    )
        vs.                         )CAUSE NO. 24SL-CC00422
                                    )
STATE OF MISSOURI,                  )
                                    )
        RESPONDENT.                 )


TRANSCRIPT OF HEARING

Volume 1 of 2

AUGUST 28, 2024


Reported By:
Rhonda J. Laurentius, CCR, RPR
Official Court Reporter
Twenty-First Judicial Circuit

A P P E A R A N C E S

ON BEHALF OF THE MOVANT/PETITIONER:
SPECIAL COUNSEL FOR ST. LOUIS COUNTY
PROSECUTING ATTORNEY'S OFFICE:
LATHROP GPM
MR. MATTHEW JACOBER
190 Carondelet Plaza
Clayton, MO 63105


ON BEHALF OF MOVANT/PETITIONER MARCELLUS WILLIAMS:
MIDWEST INNOCENCE PROJECT
MS. TRICIA J. ROJO BUSHNELL
MS. ALANA MCMULLIN
MR. JONATHAN B. POTTS
300 East 39th Street
Kansas City, MO 64111


ON BEHALF OF RESPONDENT:
MISSOURI ATTORNEY GENERAL'S OFFICE
MR. MICHAEL J. SPILLANE
MR. ANDREW J. CLARKE
MS. KIRSTEN PRYDE
MS. KELLY L. SNYDER
Assistant Attorney Generals
PO Box 899
Jefferson City, MO 65102

2

I N D E X

Page

Preliminary Matters.......................... 4

Opening Statement on behalf of Movant (waived)  17

Opening Statement on behalf of Respondent..... 18

MOVANT'S EVIDENCE:
    DAVID THOMPSON
    Direct Examination by Ms. McMullin........ 25
    Cross Examination by Mr. Clarke........... 48
    Redirect Examination by Ms. McMullin...... 61
    Recross Examination by Mr. Clarke......... 62

    JUDGE JOSEPH GREEN
    Direct Examination by Mr. Jacober......... 64
    Cross Examination by Ms. Snyder........... 83
    Cross Examination by Mr. Potts............ 90

    DR. CHARLOTTE WORD
    Direct Examination by Mr. Jacober......... 98
    Cross Examination by Ms. Pryde............ 129
    Cross Examination by Mr. Potts............ 152

Reporter's Certificate....................... 155

3

THE COURT:  Good morning.  Welcome to Division 13.

We're on the record in Cause Number 24SL-CC00422, Prosecuting Attorney for the Twenty-First Judicial Circuit, ex rel. Marcellus Williams, Movant/Petitioner vs State of Missouri.

Let the record reflect this matter was previously set last Wednesday and rescheduled for today on the prosecutor's motion to vacate Mr. Williams' first degree murder conviction and death sentence pursuant to Section 547.031 RSMo.  Sub 2021.

Let the record further reflect that Prosecuting Attorney appears through lead counsel Matthew Jacober.  Mr. Williams appears by lead counsel Ms. Trisha Jessica Bushnell.  State of Missouri appears through lead counsel Michael Joseph Spillane.

A couple of administrative procedures. Pursuant to my earlier orders, it is strictly prohibited pursuant to our local rule that any recording of these proceedings do not take place to maintain the integrity of these proceedings given the sensitive nature of these proceedings.  In the event that it is brought to my attention that

4

anyone is recording these proceedings without my permission you will be asked to leave.

In addition, pursuant to pretrial conferences with counsel, I have limited this proceeding to six hours. I have allocated two hours to the Prosecuting Attorney, two hours to Mr. Williams' counsel, and two hours to the State of Missouri.

With that said, Mr. Jacober, you may proceed, unless there's any proceedings that need to take place prior to the start of the proceedings.

MR. SPILLANE: I have a couple of objections, Your Honor.

First of all, I would object to any evidence being heard or considered under actual innocence on the basis of judicial estoppel. And I have a case if I may approach.

THE COURT: You may.

MR. SPILLANE: The line is at page 235 in Vacca. What it says in Missouri judicial estoppel the only requirement is taking inconsistent positions. There isn't a four part test like there is in other states. If you take inconsistent positions you're stuck because of the

5

dignity of the Court.  It is impugned.  The Supreme Court says no playing fast and loose with the Court.

I can't imagine any more inconsistent positions than last week saying there's a factual basis for a plea and then coming in this week if they want to and saying no clear and convincing evidence shows his actual innocence.  So I believe under Vacca that's out by judicial estoppel.

THE COURT:  Thank you.  That request will be denied.

MR. SPILLANE:  Okay.  The other thing I have is they have new witnesses that were not on the original list.  I would ask that they be limited to testifying on the new claim because they were announced to us well after the time for witnesses were closed.  So if they have something to say about the supplemental claim five that's fine, but I don't think they can bring in new witnesses two days before to testify about the other claims.  So I would object to them testifying to anything except claim five, and I believe that would be Judge Green, Judge McGraugh, and Mr. Henson.

THE COURT:  And I'll take up your

objection at the time those witnesses may or may not be called.

MR. SPILLANE:  And the other two things I have.  They have a report from Dr. Budowle and from Dr. Napatoff, and as far as I know those were never in the record anyplace so I don't think they are before this Court by affidavit or report alone. I don't know if you have any thoughts on that.

THE COURT:  Well as I indicated previously, it's the Court's position that this statute has created unchartered waters.  Nowhere in the statute is there a definition for information and that is what this Court is struggling with.  So having said that, I'll go ahead and rule accordingly when the proffered evidence is attempted to be introduced.

MR. SPILLANE:  Thank you, Your Honor. And I think all of our exhibits are in except for Dr. Picus which they objected to because they're already in the record.  And I think their exhibits are in except for what I just talked about.  Is that fair?

MR. JACOBER:  I believe that's an accurate representation.

THE COURT:  Thank you, Mr. Jacober.  So

7

can you just identify just for the record the exhibits that are being received without objection.

MR. SPILLANE:  Someone got the list here?  I can read it, Your Honor, or I can just tell you if you've got a list.  But I can read it in the record if you want.

THE COURT:  Please.

MR. SPILLANE:  A is the trial transcript.  B is trial transcripts exhibits.  C is the direct appeal legal file.  C-1 being the direct appeal legal file.  C-2 being the supplemental legal file.  C-3 being the supplemental transcript on appeal.  C-4 being Appellant's brief.  C-5 being the Respondent's brief.  C-6, Appellant's brief.  C-7, the direct appeal opinion.

D is the post-conviction legal file, with D-1 being the evidentiary hearing transcript, D-2 being the post-conviction relief legal file, D-3 being Appellant's brief, D-4 being Appellant's appendix, D-5 being Respondent's brief, D-6 being Respondent's appendix, D-17 being Appellant's reply brief, D-8 being the post-conviction appeal opinion.

E is the federal habeas petition file. E-1 is the docket sheet.  E-2 is the petition.  E-3

8

is Petitioner's motion for discovery.  E-4 is Petitioner's motion for evidentiary hearing.  E-5 is Respondent's reply.  E-6 is Petitioner's traverse.  E-7 is order denying evidentiary hearing.  E-8 is Petitioner's supplemental traverse.  E-9 is response to the show cause order. E-10 is the memorandum and order.  E-11 is the judgment.  E-12 is the motion to alter or amend. E-13 is the suggestions in opposition to the motion to alter or amend.  E-14 is the reply to the suggestions in opposition to the motion to alter or amend.  E-15 is the order denying the motion to alter or amend.  E-16 is the notice of appeal. E-17 is the order of dismissal after remand.

F is the federal habeas appeal file. F-1 is the application for certificate of appealability.  F-2 is the suggestions in opposition to the certificate of appealability. F-3 is the order dismissing the application.  F-4 is Petitioner's petition for rehearing en banc. F-5 is Respondent's suggestion in opposition to rehearing en banc.  F-6 is the order denying rehearing en banc.  F-7 is petition for writ of certiorari.  F-8 is a brief in opposition to petition for certiorari.  F-9 is an order denying

petition for certiorari.

G is the federal habeas appeal file. G-1 is the Appellant's brief. G-2 is Appellee's brief. G-3 is Appellant's reply brief. G-4 is the opinion. G-5 is the judgment. G-6 is the petition for certiorari. G-7 is the brief in opposition to petition for certiorari. G-8 is the Petitioner's reply brief. G-9 is the order denying certiorari.

H is execution proceedings in case SC83934. H-1 is motion to set execution date. H-2 is suggestions in opposition to motion to set execution date. H-3 is the order setting an execution date. H-4 is the warrant of execution.

I is the habeas file from SC94720. I-1 is the petition for habeas corpus. I-2 is the motion for stay of execution. I-3 is exhibits in support of petition. I-4 is suggestions in opposition to petition for habeas corpus. I-5 is the reply suggestions. I-6 is exhibits in support of Petitioner's reply. I-7 is an order vacating an execution order. I-8 is an order for stay. I-9 is suggestions in opposition to petition for writ of habeas corpus. I-10 is Petitioner's reply. I-11 is a letter to the Special Master. I-12 is the oath of the Special Master. I-13 is the file

before the Special Master.  I-13.1 is the docket sheet.  I-13.2 is a status report.  I-13.3 is a status report.  I-13.4 is a joint proposed protocol.  I-13.5 is a status report.  I-13.6 is a status report.  I-13.7 is a status report.  I-13.8 is a status report.  I-13.9 is a status report. I-13.10 is a joint status report.  I-13.11 is a joint status report.  I-13.12 is a joint timeline. I-13.13 is the BODE forensic case report.  I-13.14 is the April 18, 2016, status report.  And Petitioner's response to a show cause order is I-13.15.  I-13.16 is a joint status report. I-13.17 is a joint status report.  I-13.18 is a status report.  I-13.19 is a forensic case report. I-13.20 is a status report and motion for scheduling conference.  I-13.21 is suggestions in opposition to the scheduling conference.  I-13.22 is a status report.  I-13.23 is a status report. I-13.24 is a prehearing brief.  I-13.25 is the deposition of the expert Jennifer Fienup.  I-13.26 is a Deposition Exhibit 1.  I-13.27 is Deposition Exhibit 2.  I-13.28 is Deposition Exhibit 3. I-13.29 is Petitioner's post-hearing brief. I-13.30 is Respondent's post-hearing brief. I-13.31 is a post-hearing order.  I-13.32 is the

11

docket entry of dismissal.  I-15 is the order denying petition for the writ of habeas corpus.

J is state habeas certiorari file. Petition for certiorari is J-1.  Appendix is J-2. Motion for stay of execution is J-3.  Brief in opposition to certiorari is J-4.  Supplemental appendix is J-5.  And order denying certiorari is J-6.

K is the 2017 execution proceedings. K-1 is the renewed motion to set execution date. K-2 is suggestions in opposition.  K-3 is the order and warrant of execution.

L is a federal habeas motion file. L-1, motion for relief from judgment.  L-2, suggestions in opposition to motion for relief from judgment.  L-3, reply in support of motion for relief from judgment.  L-4, order denying motion for relief from judgment.

M is a federal habeas appeal on that motion.  M-1 is the notice of appeal.  M-2 is the application for certificate of appealability.  M-3 is a motion for stay.  M-4 is suggestions in opposition.  M-5 is Petitioner's reply in support. M-6 is judgment.  M-7 is mandate.  M-8 is petition for certiorari.  M-9 is petition for stay.  M-10 is

12

brief in opposition to petition for certiorari. M-11 is Respondent's supplemental appendix.  M-12 is Petitioner's reply.  M-13 is order denying certiorari.

N is the file -- state habeas file in SC96625.  N-1 is the petition for certiorari.  N-2 is the exhibits in support of the petition.  N-3 is the motion for stay.  N-4 is suggestions in opposition to the habeas corpus petition and motion for stay.  N-5 is order denying petition for writ of habeas corpus and motion for stay.

O, state habeas certiorari file in case number 17-5641.  O-1, petition for certiorari. O-2, appendix.  O-3, brief in opposition to certiorari.  O-4, supplemental appendix.  O-5, order denying certiorari.

2023 execution proceedings, P.  P-1 is the motion to set execution date.  P-2 is suggestions in opposition.  P-3 is reply in support of motion to set execution date.  P-4 is notice of proceedings.  P-5 is suggestions in opposition to notice of proceedings and attached exhibits.  P-6 is reply suggestions in support of notice of proceedings.  P-7 is an order and warrant of execution.  P-8 is a motion to withdraw warrant of

13

execution.  P-9 is suggestions in opposition to the motion to withdraw.  P-10 is reply in support of the motion to withdraw.  P-11 is supplemental suggestions in support of motion to withdraw execution warrant.  P-12 is opinion overruling motion to withdraw execution warrant.  P-13 is counter motion for rehearing.  P-14 is order for overruling motion for rehearing.

Q, declaratory judgment file.  Q-1, petition for declaratory judgment.  Q-2, Petitioner's Exhibit 1.  Q-3, Petitioner's Exhibit 2.  Q-4, answer.  Q-5, motion to dismiss by Attorney General.  Q-6, defendant's motion for judgment on the pleadings.  Q-7, defendant's motion to stay discovery.  Q-8, suggestions in opposition to motion to dismiss Attorney General.  Q-9, suggestions in opposition to motion for judgment on the pleadings.  Q-10, suggestions in opposition to motion to stay discovery.  Q-11, order dismissing Attorney General.  Q-12, order denying motion for judgment on the pleadings.  Sub-file of proceedings before the Missouri Court of Appeals, Western District is Q-13.  Q-13.1 is the writ summary.  13.2 is the petition for writ of prohibition.  13.3 is -- Q-13.3 is suggestions in opposition in

support of petition.  Q-13.4 is Relator's exhibit index.  Q-13.5 is Relator's exhibits.  Q-13.6 is Relator's certificate of service.  Q-13.7 is order denying writ of prohibition or mandamus.  The next thing is sub-file of writ of proceedings before the Missouri Supreme Court, Q-14.  Q-14.1 is writ summary.  Q-14.2 is petition for writ of prohibition or mandamus.  Q-14.3 is suggestions in support of petition.  Q-14.4 is Relator's exhibit index.  Q-14.5 is Relator's exhibits.  Q-14.6 is certificate of service.  Q-14.7 is a preliminary writ.  Q-14.8 is an order to show cause.  Q-14.9 is a return.  Q-14.10 is Relator's brief.  Q-14.11 is Relator's appendix.  Q-14.12 is Relator's Exhibit W.  Q-14.13 is Respondent's brief.  Q-14.4 is Respondent's - 14 - I'm sorry - is Respondent's appendix.  Q-14.15 is Relator's reply brief.  Q-14.16 is docket entries setting oral argument.  Q-14.17 is opinion granting the petition for writ of prohibition.  Q-14.18 is Respondent's motion for rehearing.  Q-14.19 is order overruling the motion for rehearing.  Q-14.20 is writ of prohibition made permanent.  Q-14 -- Excuse me.

R is the Daniel Picus affidavit which has not been accepted by the Court.  S is the Mr.

15

Magee affidavit.  T is the Mr. Larner affidavit.  U is Mr. Williams' criminal priors.  V is Mr. Williams' DOC conduct violations.  That's V.  W is Johnifer Griffen criminal priors.  X is Ronnie Cole criminal priors.  Y is Durwin Cole criminal priors.  Z is a map which is a demonstrative exhibit.  P-8 is the -- I think that's it.

Last page.  AA is the Brentwood Police Department report and attachments.  BB is a Kansas City Police Department investigative report and attachments.  CC is St. Louis Metropolitan Police Department report and attachment.  DD is the prosecutor's file excerpts.  And EE is prosecutor's file excerpts.  And FF is the BODE supplement that I believe Mr. Clarke put in last Friday.  And we're done.

THE COURT:  Thank you.  Mr. Spillane, the Attorney General has previously provided in an app I think called The App Box most of those exhibits, is that an accurate statement?

MR. SPILLANE:  Yeah, I think everything is in there.  Am I accurate?

MS. PRYDE:  Yes, Your Honor.

THE COURT:  I don't think I had FF until last Wednesday.

16

MS. PRYDE: That's correct. Nor did we.

THE COURT: With that notation, do you have any idea of the number of pages that you have submitted to this court for review?

MS. PRYDE: Yes, Your Honor. It is 12,000 pages is one copy of the record.

THE COURT: Thank you. Anything further, Mr. Spillane?

MR. SPILLANE: No, Your Honor. I think we're ready for opening if they're ready.

THE COURT: An opening is not necessary but if you would like to make one that's fine.

MR. JACOBER: Your Honor, we would not like to take our time by making an opening statement but would ask the Court to invoke the rule and exclude any witnesses from the courtroom who may testify today.

THE COURT: I don't believe there are any witnesses present except Mr. Williams and he has a right to be here.

MR. SPILLANE: The only thing, Your Honor, is they're going to call the evidence custodian, so I'm not sure he can custode the evidence and be a witness at the same time here

17

unless someone else can watch it.

THE COURT:  That's part of your opening?

MR. SPILLANE:  No, that's just you asking about excluding witnesses.

THE COURT:  Right.  I'll go ahead and invoke the local rule and any witnesses that are going to be called will be excluded during opening, unless you want to go ahead and not make an opening, Mr. Spillane.

MR. SPILLANE:  No, I will make an opening, Your Honor.

I will talk about the evidence, but this case is about the rule of law.  And every claim except the new claim, which is claim five that was raised earlier this week about bad faith destruction of evidence, has already been rejected by the Missouri Supreme Court.

The first thing I want to say about the new claim on bad faith destruction of evidence is that Missouri law requires there actually be bad faith.  Here this happened in 2001.  I suspect you're going to hear testimony from Mr. Larner and from Mr. Magee that in 2001 they had no idea what touch DNA was.  I know it existed someplace in the

18

world but it wasn't in St. Louis where they knew about it. So they did absolutely nothing wrong. There's no bad faith, there's no negligence. And we can talk a little bit about how they handled the evidence and how the transcript shows that.

The transcript shows - I believe it's 2203 - that whoever broke in and committed the murder wore gloves because they left glove marks on both sides of the pane that was removed. So it's a reasonable inference, even if anybody knew about touch DNA, which they didn't, that the killer wouldn't have taken off their gloves after breaking in and then killed someone.

We also know that there were no fingerprints on the knife. That was Detective Krull's testimony. And there's a new complaint about fingerprints being destroyed. But if you look at both page 95 and 96 in the opening, those were prints that were useless. And if you look at Detective Krull's testimony about when he destroyed prints he said, We destroyed prints that we couldn't use, that's what we do, that's our normal practice. Under Missouri case law if they're following the normal practice that's not a bad faith violation.

19

The next thing I want to talk about is other evidence that was handled. The fingernail clippings were tested, were in a plastic case, and Prosecutor Larner, if you look at the transcript there, he said, I'm not going to open these because I'm not wearing gloves and I don't want to contaminate them. He had no reason to believe he could contaminate the handle of the knife. I'm not even sure if he could if the fella wore gloves and if they weren't set up to do touch DNA in 2001. But he did nothing wrong and nothing in bad faith.

You're also going to hear evidence that the stuff did come in sealed containers which I think is inconsistent with what Mr. Larner first remembered, that the handle was sticking out. But I think since then he's read the transcript and looked at the evidence this morning and he now recalls it was in a sealed container. So there's no problem there.

He handed the knife, according to the transcript, to Detective Wunderlich and then to fingerprint examiner Krull and he said on the record, I'm holding the knife in my hand. Nobody thought there was anything wrong with that. Defense counsel didn't jump up and down and say,

20

You're holding the knife, because there was nothing wrong with holding the knife.  There's not even negligence there.  And I think both Larner and Magee, if I'm not mistaken, will likely testify that they've done many dozens of cases where after evidence was tested and everything that could be done to it was done they handled the knife all the time.  That was normal practice.  I believe that will be their testimony.

I'm going to talk a little bit about the Batson because at page 55 of their motion they allege that Mr. Larner was involved in Batson violations in McFadden.  That's not true.  There were four McFadden cases in the trial court.  Two were overturned for Batson and two weren't.  The two that Mr. Larner worked on there were no Batson violations.  As far as I know he's never had a Batson violation sustained all the way up in his career.  My belief is that he had one violation in Purkett vs Elem that wasn't a violation at all, and the U.S. Supreme Court issued a writ overturning it and saying he did nothing wrong.

So I don't like him being accused of Batson violations because he didn't.  And the Missouri Supreme Court found he did not in this

21

case in the direct appeal.  And I don't like him being accused of sloppy evidence practices because he didn't.

Something else that's important is both Larner and Magee are going to testify that Laura Asaro never asked for a reward.  And if it comes in Mr. Magee will testify that she gave it away after she got it.  So I don't like her character being attacked for supposedly testifying based on a reward.

That's essentially it.  Every claim they have made except the new one has already been rejected by the Missouri Supreme Court.

I'll talk a little bit about their original witnesses.  Marcellus Williams already testified by deposition.  I'm sure you read the PCR legal file, end of Volume 3, beginning of Volume 4. At that point he admitted to lying under oath to get what he wanted in a court proceeding.  And then he was asked, Are you lying in this case, and he said, You would know that better than I do.  So that's not a real credible thing there.  And I think you have to look at that in accord with whatever he says today.

Also, if you look at Judge McGraugh's

22

testimony back in the PCR hearing it was I think five or six times he said, That was too long ago, I don't remember.  And that was 20 years ago.  If you look at Judge Green's testimony he said, I had a strategy for penalty phase which was residual doubt as well as saying he was well involved with his family and he was a benefit to his children and was staying in contact with them even in prison.  So that testimony is in.  And the Missouri Supreme Court found there was no ineffectiveness either on prejudice or on reasonable conduct in not putting in the different strategy that he now alleges he should have put in which was one of an abusive childhood strategy, 180 degrees from what he alleged before.

So I think that's about all I have to say in opening is to say that Mr. Larner and Mr. Magee did absolutely nothing wrong.  And it's not a nice thing to say that they did when there's no evidence to support it.  And they'll testify that Ms. Asaro didn't want a reward.  So I think that's what I have to say, Your Honor.

THE COURT:  Thank you, Mr. Spillane. In reference to the direct appeal and the PCR, it's my understanding those opinions were written by

23

Judge Richard Teitelman.

MR. SPILLANE:  I think so.  I have it in my pile here, but I don't remember.

THE COURT:  That's my recollection. Thank you.

Wish to proceed, prosecuting attorney?

MS. MCMULLIN:  Yes.  Our first witness -- the prosecution's first witness is David Thompson.  For the record, he'll be appearing via Webex.

THE COURT:  Great.  Is there any objection to him appearing by Webex?

MR. CLARKE:  Your Honor, at this point there would be two objections, one to the Webex appearance, Your Honor, and the second to, as I understand it Mr. Thompson's testimony will go solely to the credibility of other witnesses and that sort of testimony is categorically inadmissible.  It's this Court's job to determine the credibility of witnesses, not experts.

THE COURT:  So what is your legal objection to him appearing by Webex?

MR. CLARKE:  That the rule allows for him to appear by Webex with the consent of the parties, and this case, Your Honor, is a very

serious case and that Mr. Thompson should appear in person.

THE COURT: Out of the abundance of fairness I'm going to overrule your objection.

Will you please raise your right hand.

DAVID THOMPSON,

having been sworn, testified via Webex as follows:

THE COURT: You may inquire.

DIRECT EXAMINATION

BY MS. MCMULLIN:

Q. Will you please introduce yourself?

A. Yes. The name is Dave Thompson. I'm a certified forensic interviewer and president of a training firm Wicklander-Zuwalski & Associates.

Q. And what is a certified forensic interviewer?

A. A certified forensic interviewer is a designation that I've earned over a decade ago where you pass a test that qualifies your knowledge in the field of investigative interviewing, requires continuing education credits to complete such designation, and that's part of my qualifications that I currently have at Wicklander-Zuwalski.

Q. Besides the certification you just

25

talked about and the test, do you have any other qualifications that would allow you to be a certified forensic interviewer?

A.   Sure.  A combination of both practical experience and academic experience.  So my formal education, my undergrad, my bachelor's degree is in psychology in criminal justice.  And I received a secondary degree, a master's in forensic psychology.  And over the last over ten years working at Wicklander-Zuwalski in that capacity I routinely work with the academic communities, either contribute to their studies, consult on their studies, or have also brought them into our firm to be a part and recipient of training for continuing education.

Q.   Mr. Thompson, do you have what I'm marking now as State's Exhibit 18A?  Which is at Tab 3 in your binder, Judge.  Do you have your CV in front of you?

A.   Yes, I have an electronic version of that in front of me.

Q.   Okay.  And can you take a look at it. Does it have in the lower right-hand corner a Bate stamp that says STLCPA30?

A.   Yes, it does.

26

Q. Can you take a look through that and let us know if this is your -- an accurate and true copy of your CV?

A. Yes, it appears to be. Yes.

MS. MCMULLIN: Judge, we offer Exhibit 18A.

MR. CLARKE: No objection.

THE COURT: That will be received.

Q. Mr. Thompson, are you being paid for your time here today?

A. I been retained by The Innocence Project and paid an hourly rate for my time that I contribute to this case.

Q. Do you typically get paid for your time when you're an expert in cases like this?

A. Yes, I do.

Q. And how much are you being paid?

A. I have an hourly rate of $300 per hour.

Q. Briefly can you explain what training you have involving investigative interviews and if you do any training as a forensic interviewer?

A. Yes. My training outside of my formal education as I mentioned and my master's program I had a capstone in false confessions --

Q. You have to slow down for the court

27

reporter.

A.   Sure.   Sorry about that.

Q.   So you were talking about your training that you have.

A.   Yes.   To recap the last part of that answer, in the completion of my master's degree I did a capstone project on false confessions which was a focus on investigative interviewing.   In addition to that I'm a member of several associations and attend several conferences including the Academy of Criminal Justice Sciences, the International Investigative Interviewing Research Group, and, as I mentioned earlier, routinely bring in the academic community on a monthly basis to train myself and my other instructors specifically on evidence-based investigative interviewing.

Q.   And you said that you train others on investigative interviewing.   Do you train law enforcement?

A.   I do, and we do collectively as an organization as well.   My primary full-time job is leading a training firm that teaches both benefactor organizations and law enforcement professionals across the globe.   We've trained

28

groups like the Chicago Police Department's criminal investigations divisions, some agencies in the State of Missouri specifically on investigative interviewing techniques in a variety of types within them.

MS. MCMULLIN:  Judge, at this time we move to enter David Thompson an expert in evidence based investigative interview practices.

MR. CLARKE:  Judge, we would just ask that the objection to the categorical inadmissibility be continuing.  But besides that, no objection, Your Honor.

THE COURT:  Thank you.  He will be received as an expert based upon his training and expertise on investigative based interviewing.

BY MS. MCMULLIN:

Q.  Dr. Thompson, did you write a report in this case?

A.  I did write a report, yes.

Q.  And do you have that report in front of you?

A.  I do.

Q.  Okay.  I'm marking it as Prosecutor's Exhibit 18B.

That's also at Tab 3 in your binder,

Judge.

Can you take a look at this report and make sure it's complete.  It starts with Bate stamp STLCPA75.

A.   Yes, this looks complete.

Q.   What were you asked to do in this specific case?

A.   I was asked to review statements obtained through investigative interviews of Henry Cole and Laura Asaro and opine on the reliability of the information gained based off of my experience and expertise.

Q.   And why is the reliability of witnesses important in criminal cases?

A.   The reliability of information gained can be instrumental in identifying further steps to take in an investigation.  That process, the evaluation process of an interview is something that we focus primarily on when we teach evidence-based interview practices is assessing the reliability of statements obtained through those conversations or the investigation.

Q.   And how do you typically go about analyzing the reliability of a witness statement?

A.   As I mentioned, part of our process is

30

what we call an evaluation stage.  At the end of the investigative interview or the interaction with that witness one of the first things that we would look at is any potential incentive or reason that the witness or subject interviewee may come forward with information.  An incentive does not necessarily mean that information is untruthful but it would be something that we would want to consider as to the reliability of that information.

We would also look at the details provided throughout that engagement with the investigator, were those details verifiable, were they consistent with potential evidence, consistent with their own story, and then was there any contamination present in advance of those details being shared by the interviewer themselves.

Q.   And through those factors that you mention that you analyze reliability through did you come to conclusions in this case about Henry Cole and Laura Asaro?

A.   I did.  I found both witnesses appear to have an incentive to provide information, which again does not immediately render it as untruthful but something I would consider in the totality of the reliability.

31

I also determined that there were several assertions made by both Cole and Asaro that either conflicted with each other, conflicted with evidence if it was available, or were assertions made that I could not verify and, therefore, it didn't add any weight on its reliability.

And lastly found that the majority of the information that both Cole and Asaro provided was susceptible to contaminating factors, meaning it was maybe either available publicly or previously known to law enforcement before it was disclosed by either witness.

Q.   We'll get into that in a second.  But are your conclusions contained in your report?

A.   Yes, they are.

MS. MCMULLIN:  Judge, we offer Exhibit 18B, Mr. Thompson's expert report.

MR. CLARKE:  Your Honor, objection. Cumulative.  Mr. Thompson is here, he can testify about the findings of his report.

THE COURT:  Thank you.  It will be received.

BY MS. MCMULLIN:

Q.   Let's talk about reliability.  So you mentioned four different factors, but is body

32

language, physical behavior or demeanor affecting reliability as well?

A. Body language is something that is I would say amiss in the investigative world that is often used improperly to classify somebody's statement as being truthful or untruthful. The research shows us there were actually about 54 percent accurate in identifying truth versus a lie based on physical behavior.

The problem with that, however, to your question of reliability is often on the surface people might observe body language and assume truth or guilt based off of these kind of gut feelings which may not necessarily be accurate.

Q. Let's start with the first factor in your report and that you mention, incentive to cooperate. Can you describe this factor and how it would affect reliability?

A. Incentive to cooperate could be something that we see, whether it's a witness interview or even maybe the interview or interrogation of a suspect. If somebody has an incentive, meaning it could be a financial reward, it could be avoiding of, you know, perceived consequences, an incentive could even be a person

33

who is in custody has an incentive to escape that situation.

And so what the research has shown us is that when there is an incentive to provide information it could undermine the reliability of the information that is obtained.

Q.   And from the documents that you reviewed in this case, including the statements of Henry Cole and Laura Asaro, did Henry Cole have an incentive to cooperate in your opinion?

A.   Yes, in my opinion, and what I reviewed in Mr. Cole's deposition and his statements is that he was very persistent on obtaining a financial reward throughout this process and seemed to weigh heavily on his decision to cooperate.

Q.   Does timing play a role in the reliability and incentive to cooperate in your analysis, the timing of the statement?

A.   Yeah, I might need you to clarify if I'm not answering correctly what you're...

Q.   That's a good point.  If a witness were to bring up an incentive before providing information would that affect your analysis about reliability of their statement?

A.   Yes.  I would say obviously the

34

knowledge of the incentive or the immediacy of needing such incentive creates desperation for somebody to provide information. We see the same thing in false confession research is that a person, an interviewee who is in custody has a more immediate need, whether it's to escape the room or to obtain some type of deal, it increases the likelihood they're going to provide information.

Q. And did you find that incentive to cooperate here with Henry Cole?

A. Yes, I did. With Henry Cole I believe there was multiple times in which he requested or asked about the reward money. And then I was also made aware through what I reviewed that in advance of I believe it was a deposition that he provided that he requested half the reward money at that time or was potentially refusing or not going to be available to testify.

Q. What about Laura Asaro, what did you conclude as to her potential incentive to cooperate?

A. Yes, Laura Asaro also was aware of the reward money. And it also appeared from what I reviewed that Laura had multiple times in which she was engaged with law enforcement and was questioned

35

about her knowledge about this case and provided little to no details until I believe it was over a year later. I may have the exact time wrong. But at that time the incentive appeared to be avoiding perceived consequences or other charges unrelated to this case.

And then I believe there was also a few witness statements that I was made aware of through what I reviewed that Laura Asaro had a history of being an informant or providing information in lieu of preventing other consequences, which was similar here. And the other incentive again potentially is that there was another statement that a key piece of evidence, a laptop, is something that Laura Asaro was implicated in having either possession or prior knowledge of which would also give her incentive to implicate somebody else.

Q.   Does this factor alone, the incentive to cooperate, necessarily mean a witness statement is untruthful or unreliable?

A.   No.  No, it does not.

Q.   What's the next step in your analysis?

A.   Once we identify what type of incentives or the context of the situation then we're going to look at the specific details or

assertions that were provided by the witness or the interviewee, and then we can measure those against if they're reliable - I'm sorry - if they're verifiable, if there are things that we can even substantiate to prove or disprove, if they're consistent with known evidence or with each other, if there's any contaminating factors present in those specific assertions.

Q.   Let's talk about verifiability first. In your analysis did you determine whether any facts provided by Henry Cole to the police -- that Henry Cole provided to the police were facts that the police or the public did not already know?

A.   Umm, the only information -- No, the facts that the police or public did not know, no, I did not.  The information that Henry Cole provided was either publicly available, whether it was through media reports, newspaper, or news coverage, or was information that was known to investigators prior to their interaction with Mr. Cole.

Q.   Did you determine whether there were any facts provided by Henry Cole that were unverifiable?

A.   Yes, there's a variety of assertions. For example, I believe Mr. Cole alleged that the

37

victim made some verbal remarks to the intruder, What are you doing, who's down there, things to that nature that I have no way to verify if that was true or untrue. So there's a variety of assertions in that capacity that again could be truthful, could be untruthful, but without the ability to substantiate it it's unverifiable and doesn't impact the reliability in my opinion.

Q. Let's move onto Laura Asaro and verifiability. In your analysis did you determine whether there were any facts provided by Asaro to police that the police or the public did not already know?

A. Yes. I believe the sole fact that I identified was the location of a stolen or missing laptop that I believe police were then able to chase down or further investigate that lead.

Q. If the location of the laptop was provided by Asaro does that automatically make her statements reliable in your opinion?

A. No. On the surface it could. And on its surface in my review of that information she's providing something that was previously unknown to police which would suggest reliability. On review of all the documents I was provided it also

appeared that there is conflicting statements from other witnesses that suggest Laura Asaro may have had prior knowledge or even possession of that laptop outside of implicating directly Mr. Williams.  And so I take that into account that, yes, she had that information, that information could have come from other sources and potentially even given her an incentive to falsely implicate somebody else.

Q.   Next let's talk about consistency with evidence and potential contamination.  Do you have the chart from your report handy, Mr. Thompson?

A.   Yeah, I do.

MS. MCMULLIN:  Judge, the chart is at Tab 4 if you want to look.

Q.   Mr. Thompson, can you briefly describe what you mean by consistency in the context of reliability?

A.   Yes.  When I put consistency in the chart which you'll see is a change in story.  So what I'm looking for kind of between the second and third column there is the change in the story, meaning did a witness or interviewee have an evolution of their statements whether it was between an interview and a deposition or further

39

conversations with law enforcement.  And then that third column, again to consistency, is was it consistent with either known evidence if there was any forensic evidence to match it up against or even consistent with other witness testimony.

Q.   We won't go through all of these, but let's take a look at the first one for Henry Cole. Williams told Cole about the murder after reading the article in the St. Louis Post-Dispatch.  So is that a verifiable fact?

A.   The way for that to be verifiable is if you interviewed any other parties that were involved.  But to my ability, no.

Q.   Then you have in the second column, Change in story:  Cole testified that this discussion happened after he and Williams watched news coverage of the story.  So does that go to your opinion that there are potential inconsistencies with his own statements?

A.   Correct.

Q.   Let's go to the bottom of the -- or the middle of the chart there where it says -- Or I'm sorry.  Yes, the bottom.  Williams went upstairs in the Gayle residence during the incident.  Is that a verifiable fact?

40

A.   Again, it could be if there was forensic evidence that either supported or disproved that, but without that ability then, no, I wouldn't have the ability to verify that.

Q.   And then the third column you have Conflict with evidence/Asaro and you have:  Asaro claims that Williams never went upstairs.  What does that mean for your reliability analysis?

A.   Again, when you don't have any other either forensic evidence or video surveillance when comparing witness statements against each other what happens often is investigators may have confirmation bias or may fall kind of victim to the believability of one person over another for a variety of reasons.  So looking at this objectively we have two different witnesses providing two conflicting statements, and so it undermines the reliability of each.  We don't know what's truthful or untruthful in that capacity.

Q.   When it comes to this chart did you put every single fact that Henry Cole or Laura Asaro had in their statements in these charts?

A.   No, I did not.  There was a variety of assertions or facts that I thought were either duplicative to what was already in the report,

41

ambiguous, unverifiable.  You know, for example, I know Mr. Cole described some of the layout of the property, including the landing and the floors were squeaky.  And so I felt like those types of statements were again, in the totality of my review, either previously known to investigators or potentially unverifiable or from other sources. And so I did not provide every assertion within either chart but wanted to give a visual to the Court of the totality of my review.

Q.   Next let's move on to the chart of Laura Asaro.  So if we go down to the third box you have:  Williams entered the Gayle residence through the back door.  Now what is your analysis of consistency with that statement?

A.   In this specific statement, as you see in the chart, we have both the conflict with the potential forensic or actual crime scene evidence that looked like forced entry was through the front door.  And we also have a conflicting statement with Mr. Cole's opinion or assertion asserting or alleging that Mr. Williams entered through the front door.  So we've got multiple conflicts here in the story.

Q.   You also mention potential sources of

42

contamination and that's on your chart here as well in the fourth column.  What do you mean by that?

A.   Contamination is -- When you are trying to determine reliability the most reliable of information is something that a interviewee provides an investigator that was completely unknown to investigators, such as the location of a murder weapon, that they were then able to go out and investigate and discover.

Contamination would be, or potential sources of contamination could be news reports, revealing of crime scene photos, witnesses talking to each other, which happens in the leap of time. Contamination can also be unintentional by good investigators, and there's a history of that occurring across the country where investigators, just through simple questioning, story-telling, or interactions with subjects may reveal details about the crime that are then simply regurgitated or assumed by the interviewee as a truthful piece of information.

Q.   In this case in the time since Henry Cole and Laura Asaro gave their statements from when the murder happened can we know all the potential sources of contamination that could have

43

occurred?

A.   No.   And to my knowledge I believe this case was covered publicly in some news coverage and I had the opportunity to review a few news articles.   So between the public release of information, between unknowing who was involved or not involved in the situation that could have discussed it, witnesses engaging with each other, multiple investigators involved, it's hard to keep track of what information was intentionally withheld from the public.

Q.   You mentioned multiple witnesses talking to each other.   What's your understanding of that happening in this case?

A.   Specific to what I reviewed I know in the interaction that law enforcement had with Mr. Cole and in their pursuit of the investigation was hopeful that Mr. Cole could potentially leverage a relationship or connection with Ms. Asaro and tried to obtain any type of evidence to substantiate the story.   So whether it was -- I believe they even quoted a backpack, it was a $10,000 backpack, and kind of reasserting that there's an incentive tied to if you're able to retrieve this information.   So I believe Mr. Cole had attempted contact.   I don't

44

know what the extent of those conversations were.

Q.   Were you also aware or made aware of contact between law enforcement and Henry Cole prior to his statement in this case?

A.   Yes.  I reviewed -- I believe the origination of that was a letter written by Mr. Cole that suggested he had information about the case and inquiring about next steps.  I don't have again the knowledge.  If there's information or if there's interactions that are not recorded or fully documented I don't know what those interactions look like.  But I know there was some type of interaction between that point and the first recording I believe in June of '99 of the interview of Mr. Cole with law enforcement.

Q.   That was my next question.  Do you know if -- To your knowledge was the statements or the calls between Henry Cole and Laura Asaro, the two witnesses in this case, recorded by law enforcement?

A.   I reviewed transcripts and recordings of engagements that they had with both Cole and Asaro, but to my knowledge not every engagement was recorded or fully documented so I'm unable to make an opinion on what happened during those

45

conversations.

Q. And I should clarify. What I meant was the conversations between Laura Asaro and Henry Cole, were those recorded to your knowledge?

A. Sorry if I misheard you there. No, I don't believe so. I wasn't given any report of what those conversations would have looked like or what information was shared.

Q. So in terms of the reliability of Henry Cole's statements in this case what did you conclude?

A. I concluded again, based off of the main objective of looking for actionable, reliable information that could be independently corroborated, meaning he provided information that investigators did not know, was consistent with evidence they were to investigate, I did not see that in the statement provided by Mr. Cole, and so I felt like the information he provided and the way in which it was provided undermines the reliability of that information.

Q. And in terms of reliability for Laura Asaro and her statements in this case, what was your conclusion about the reliability of those statements?

46

A.   Same context for that response.  And I did not find that Laura Asaro was able to provide any information other than location of the laptop that was independently verifiable by investigators. And then that piece of information, as I mentioned earlier, has some conflicting statements as to maybe what the source of that information actually was.  So again, I believe her statement, based on the qualifications I looked at or the criteria I looked at, undermines the reliability of it in its totality.

Q.   When it comes to inconsistent and potentially unreliable statements like you said that there might be in this case, as a trainer of law enforcement what would you have recommended the investigators in this case do?

A.   Umm, further investigate, which I know sounds like a very superficial and simple answer. But often witness statements or circumstantial evidence should require investigators to further investigate to either substantiate, disprove, or perform the same type of evaluation I did to determine the reliability of that information.

Q.   Thank you, Mr. Thompson.

A.   Yes.

47

THE COURT:  Mr. Spillane, Mr. Clarke.

MR. CLARKE:  Yes, Your Honor.

CROSS EXAMINATION

BY MR. CLARKE:

Q.   Mr. Thompson, can you hear me?

Mr. Thompson, can you hear me?

A.   Yes, I can.

Q.   Okay.  If you can't hear me just tell me to stop and we'll ask you again.  All right.

So Mr. Thompson, in this case I want to talk to you about what you reviewed.  You reviewed interviews of Henry Cole and related transcripts, is that right?

A.   Correct.

Q.   And your report didn't identify which interviews or how many interviews.  Do you know how many you reviewed?

A.   They were broken down into a handful of video segments.  I don't have the number of those interviews.

Q.   Okay, they were broken down into a handful of video segments.  How did you receive those video segments?

A.   I believe it was through either a Dropbox file or some type of electronic sharing.

48

Q.   And that was given to you by Mr. Williams' counsel?

A.   Correct.

Q.   Okay.  And same goes for the interviews of Laura Asaro?

A.   Correct.

Q.   And your report says you reviewed Exhibit 5, Henry Cole letter; Exhibit 6, Henry Cole deposition 4/2/01; Exhibit 7, Henry Cole deposition 4/12/01; Exhibit 9, Laura Asaro's deposition 4/11/01, is that right?

A.   Yeah, that's correct.

Q.   And you reviewed those documents?

A.   Yes, correct.

Q.   And you also reviewed Exhibit 10, interview Laura Asaro notes?

A.   Correct.

Q.   And Exhibit 12, Laura Asaro 11/17/99 transcript?

A.   Yes, correct.

Q.   And a Henry Cole deposition from 4/3 of 2001?

A.   Correct.

Q.   You reviewed the prosecuting attorney's motion to vacate filed --

49

A.   I did.

Q.   -- 1/26/2024?

A.   Yes.

Q.   And you identified unidentified Henry Cole handwritten notes, is that right?

A.   Yes, correct.

Q.   How many notes?

A.   I believe it was one page of a note with a number of bullet points on that note.

Q.   So that's the entirety of what you reviewed in this case?

A.   The only other information that's not listed here was three or four articles from I think it was St. Louis Post-Dispatch that I requested from counsel as potential sources of contamination.

Q.   Okay, from which counsel did you request that?

A.   Umm, from Mr. Williams' counsel, from Alana or Mr. Adnan Sultan.

Q.   Okay, and you said three or four newspaper reports?

A.   Correct.

Q.   Were those contemporaneous newspaper reports or reports from the day?  What were those reports?

A.   They were copies of the St. Louis Post-Dispatch articles relating specifically to this case.  I believe they were referenced or cited within the motion to vacate.

Q.   Okay.  So with those three or four newspaper reports and everything I just listed that's the entirety of what you reviewed in this case, is that right?

A.   Yes.  From what I recall, yes, I believe so.

Q.   Okay.  So when you're doing your review do you find it worthwhile to speak to individuals who were involved in cases?

A.   It can depend on the type of review.

Q.   So would you normally want to talk to the police officer who did the investigation?

A.   No, normally I'm not.

Q.   You don't want to talk to the police officer at all?

A.   The request that I was given to review these statements was not to have engagement with the police officer about their opinion about the statements.

Q.   Okay.  So you were -- just obtained these things that Williams' counsel gave you,

51

right?  And to give an answer, is that right?

A.   Yeah, I was asked to review the information that was given to me and look objectively at the reliability based on the factors I mentioned earlier.

Q.   So you spoke to no police officer who interviewed Williams' case, correct?

A.   Correct.

Q.   Okay.  You spoke to no witness in Williams' case, is that right?

A.   That's correct.

Q.   You didn't speak to Henry Cole?

A.   Correct.

Q.   Or Laura Asaro?

A.   Correct.

Q.   Do you know if you could have spoken to Henry Cole?

A.   No, I don't believe so.

Q.   So you know nothing about Henry Cole at all except what you were given?

A.   I don't -- I'm not sure if Henry Cole is still with us, but I don't have any other information about Mr. Cole.

Q.   Okay.  So do you have an idea about how many pages approximately you reviewed when you did

your report?

A.   No, I don't have an approximate number.

Q.   Would it be a thousand, would that be fair?

A.   Probably less than a thousand.

Q.   Less than a thousand.  Okay.  So if I were to tell you that there are more than 12,000 pages in the state court record, or approximately 12,000 pages in the state court record, you reviewed less than a thousand of those, is that right?

A.   Yeah, approximately.  I don't have a specific page count but --

Q.   Okay.  So do you know that Mr. Williams went to trial?

A.   Yes.

Q.   Then you know that there were witnesses who testified in that case?

A.   Yes.

Q.   And that those witnesses were police officers and other people?

A.   Yes, I would assume.

Q.   Okay.  But you didn't review the trial transcript in this case?

A.   Correct.

53

Q. So if the police officers talked about the interview of Henry Cole or Laura Asaro you wouldn't know, is that right?

A. Right, outside of the depositions I reviewed.

Q. And those are depositions of Henry Cole and Laura Asaro, is that right?

A. Correct, yes, sir.

Q. And those are the ones that Williams' counsel gave you?

A. Correct.

Q. So you didn't do any independent investigation in this case?

A. No.

Q. Okay.

A. Not outside of what I was provided.

Q. All right. So if the trial transcript shows that an individual -- that the defense, Mr. Williams' counsel called a contamination witness from the St. Louis Post-Dispatch you would have no idea?

A. Correct.

Q. Okay. And if that witness made similar arguments to what you're making today about contamination in the media you wouldn't know would

you?

A.   Not outside of what I reviewed.

Q.   And you didn't review the trial transcript, right?

A.   Correct.

Q.   Okay.  So if that testimony was presented at trial -- Do you know Mr. Williams was convicted, right?

A.   Correct.

Q.   So the jury didn't believe the contamination witness, is that correct?

A.   I don't know.  I can't speak to the mind of the jury.

Q.   Okay.  So now you spoke about what the investigators may have done when you talked about contamination, about what they may have said or may have done.  You didn't speak to any investigator, correct?  You said that many times now, right?

A.   Correct.

Q.   So you don't know what the investigators knew at the time?

A.   I knew investigators -- it was clear what information investigators did know, such as there was a victim who was stabbed in the house and what the crime scene would have looked like would

55

be general knowledge investigators would have had.

Q.    Okay.  So I'm looking at your report here on the first page of what you reviewed.  You did not include police reports, is that right?

A.    Correct.

Q.    So you didn't review any of the police reports in this case beside the interviews?

A.    Correct.  And the -- wouldn't be a police report but interview Laura Asaro notes were I believe notes prepared by investigators in preparation of engagement with Laura Asaro.

Q.    But if there were other police reports you have no idea what they say?

A.    Correct.

Q.    Okay.  Because Mr. Williams didn't give them to you?

A.    That's correct.

Q.    Okay.  Now you said that Laura Asaro was aware of the reward money.  Did she request the reward money?

A.    If I may just go back to my chart that you're referring to?

Q.    Sure.

A.    I believe there was -- Ms. Asaro was aware of the reward money at the time it was made.

56

It was public knowledge at the time.

Q. Okay. Did she request the reward money?

A. Not that I can recall or that's within my report.

Q. Okay. So your recommendation -- when you were asked about a recommendation about what the investigator should have done and you said further investigate, but you hadn't reviewed the police reports, is that right, in this case?

A. Correct.

Q. So you don't know what the police did?

A. Umm, not the full extent of their investigation.

Q. Or what they didn't do?

A. Correct.

Q. You've never spoken to a police officer about Marcellus Williams?

A. That's correct.

Q. You've never spoken to any witness about Marcellus Williams, is that right?

A. That is correct.

Q. The only people you've spoken to are Mr. Williams' counsel, is that right?

A. Correct.

57

Q.   Okay.  So your report is based on what Mr. Williams' counsel gave you entirely, is that correct?

A.   My report is based on the information that I listed that was provided to me and then my opinion on that information.

Q.   So Mr. Williams has paid you in this case, is that right?

A.   I been retained by The Innocence Project.

Q.   Okay.  And I have a number that as of 7/22 you made $1,200, is that correct?

A.   I haven't collected any funds at this point.  That was probably the approximate number of hours spent at that time.

Q.   How many hours do you think you spent through today?

A.   Roughly 20 I would say.

Q.   Okay.  And what's your hourly rate?

A.   $300 an hour.

Q.   So 20 times 300 is what you're going to be paid by The Innocence Project, is that right?

A.   Yes, correct.

Q.   Any other payments coming your way from The Innocence Project?

A.   Not relative to this case, no.

Q.   Relative to other cases?

A.   I been retained on cases in the past or other legislative work with The Innocence Project.

Q.   How many cases?

A.   I believe I can recall one case I was retained by The Innocence Project in which there was billing involved.

Q.   Okay.  Now how many cases when there weren't billing involved?

A.   I don't recall any off the top of my head.  I've been called to discuss cases and sometimes I'm not retained.  So there was only one case that I can recall that I was retained on by The Innocence Project out of New York in which I invoiced for.

Q.   To date how much do you think that you are either owed or have been paid by The Innocence Project?

A.   Just to clarify, when you say Innocence Project, there's a variety of innocence projects across the country so a variety of jurisdictions that are not necessarily connected together.  So I just want to clarify when I answer your questions.

Q.   Okay.  Earlier you said The Innocence

59

Project and you said New York Innocence Project. So how much has The Innocence Project, the New York Innocence Project paid you?

A.   I believe the only other case I had invoiced and worked with that innocence project was a case out of Texas and that would have been invoiced probably two or three years ago.

Q.   Okay.  So it's fair to say you've worked with The Innocence Project before?

A.   Yes, correct.

Q.   All right.

MR. CLARKE:  One moment, Your Honor.

Q.   Now if witnesses gave statements about the victim's ID in this case and a type font ruler, do you know anything about that?

A.   Umm, I know that there was -- there were statements made by Mr. Cole I believe that there was an assertion that Mr. Williams took an ID and pocketbook and few other things if that's what you're referring to.

Q.   Do you know anything about a type font ruler, about a ruler that an editor would use for a paper?

A.   I don't recall that.

Q.   So you have no idea about that?

60

A.   I don't recall that.

Q.   Okay.

MR. CLARKE:  Nothing further, Your Honor.

THE COURT:  Thank you.

MS. MCMULLIN:  Just a brief couple of questions.

THE COURT:  Redirect.

REDIRECT EXAMINATION

BY MS. MCMULLIN:

Q.   Mr. Thompson, just to clarify a couple of things that you just went through with the Attorney General's Office.  Did you review the motion to vacate that was filed in this case as part of your analysis?

A.   Yes, I did, correct.

Q.   In that motion did you see quotes and citations to other documents in the record including police reports?

A.   Correct.  That's where I sourced a lot of information from, including the request for the St. Louis Post-Dispatch articles, from those citations.

Q.   And for purposes of your analysis you assumed that those quotes and citations to the

record documents were accurate, right?

A.   Yes, correct.

MS. MCMULLIN:   Nothing further, Judge.

RECROSS EXAMINATION

BY MR. CLARKE:

Q.   Mr. Thompson, so you're going on faith that the prosecuting attorney's office and Marcellus Williams' counsel accurately summarized the exhibits and trial transcripts in this case?

A.   In reviewing quotes directly from the motion to vacate I would assume those quotes were directly taken from the trial transcript or other respective sources.

Q.   Didn't want to read it yourself?

A.   I assume that information was accurate and true and was enough information for me to provide the opinion I provided.  I'd be open to review contradictory information to those direct quotes that were in the motion to vacate if that's the case.

MR. CLARKE:   Nothing further.

THE COURT:   Thank you.  Can this witness stand down?  Oh.

MR. POTTS:   Yes, Your Honor.  I just was going to stand up for the record.  No questions

62

on behalf of Mr. Williams.

THE COURT: Thank you.

MS. MCMULLIN: Thank you, Mr. Thompson.

THE COURT: The witness can stand down. You can go ahead and log out of Webex.

THE WITNESS: Thank you. Thank you for the Court allowing me to testify remotely. Appreciate that. Thank you.

THE COURT: Next witness.

MR. JACOBER: Your Honor, at this time the State would call Judge Joseph Green.

THE COURT: Judge Green, you're an officer of the Court, I don't think it's necessary for me to swear you in but I will for the sake of this record.

JUDGE JOSEPH GREEN, having been sworn, testified as follows:

THE COURT: Would you please have a seat in the witness chair. When the witness is comfortable you may inquire.

THE WITNESS: Judge Hilton, is it okay if I have this (indicating)?

THE COURT: As long as there's nothing illicit in there.

THE WITNESS: There isn't.

63

MR. JACOBER:  Your Honor, may I stand here instead of sitting at counsel table?

THE COURT:  The problem with that is we have an overflow room and they can't hear you without the microphone.  You're more than welcome to keep your voice up.  I can move the podium over if you would prefer.  Would you prefer the podium?

MR. JACOBER:  I would prefer the podium if possible, Judge, if it's not too much trouble.

THE COURT:  Mr. Jacobs.

(Podium positioned.)

THE COURT:  You may inquire.

MR. JACOBER:  Thank you, Your Honor. Is that picking me up?

THE COURT:  Yes.

MR. JACOBER:  Okay.

DIRECT EXAMINATION

BY MR. JACOBER:

Q.  Good morning.  Could you state your name for the record, please?

A.  Joseph Green.

Q.  And you're an attorney, correct?

A.  I am.

Q.  You're licensed to practice law in the State of Missouri?

64

A.   I am.

Q.   Anywhere else?

A.   United States Supreme Court, multiple federal jurisdictions.

Q.   No other states besides Missouri?

A.   No.

Q.   How long have you been an attorney?

A.   Since 1988.

Q.   And presently you're employed as an associate circuit court judge in St. Louis County, Missouri, correct?

A.   I am.

Q.   How long have you been on the bench?

A.   Eight years.

Q.   Prior to taking the bench what type of law did you practice?

A.   My practice had several different areas.  About 50 percent of my practice was made up of federal capital litigation, I did employment law, and then I represented professionals such as judges and attorneys and doctors and nurses and accountants before various licensing boards when complaints were filed against them.

Q.   And you've referenced that at some point early in your career you were on the capital

65

litigation unit for the Eastern Division of Missouri, is that correct?

A. That's correct.

Q. And you were also a public defender for a period of time?

A. Couple years before that, yes.

Q. During your time on the capital litigation team how many capital murders did you handle?

A. Handle?

Q. Yes.

A. Somewhere between 30 to 40 I think. We were overwhelmed at that time.

Q. And for purposes of the record, a capital murder case is one in which the government has to plead certain elements and the only available punishment under Missouri law is either life without the possibility of parole or execution, is that correct?

A. Yes.

Q. While you were on the capital litigation team did you represent Marcellus Williams?

A. No.

Q. That was outside of the capital

66

litigation team?

A.   I had already left the capital litigation office, was in private practice with my own firm in St. Charles, and Chris McGraugh was a member of another firm called Leritz, Plunkert & Bruning.

Q.   How is it that you came to represent Mr. Williams?

A.   Some conflict that I'm unaware of occurred in the public defender system and then we were called by, I'm not sure, I think it was Barbara Hoppe but I'm not sure, to see if we would take it as a contract case.

Q.   So you were paid by the State of Missouri, not by Mr. Williams?

A.   That's correct.

Q.   And Mr. Williams had appointed counsel because, to the best of your knowledge, he wasn't able to retain his own counsel?

A.   He was indigent, yes.

Q.   During this period of time while you were representing Mr. Williams did you have any other capital murder cases that you were --

MS. SNYDER:  Your Honor, at this time I'm going to object.  I don't believe this witness

67

should be permitted to testify to anything other than claim five because this witness was not disclosed prior to the addition of claim five and that's what he's trying to testify to now.

MR. JACOBER:  Your Honor, Judge Green was always on our witness list.

THE COURT:  I appreciate that, counsel. Your objection is overruled.  Let's go ahead and limit the inquiry.  You know how much time you have.

MR. JACOBER:  I do, Judge, and I'm just trying to lay the groundwork here.

BY MR. JACOBER:

Q.  Do you need me to repeat the question?

A.  No.  I had several death penalty cases pending.

Q.  Did you have any that were pending right around the same time where you were in trial near in time to Mr. Williams' case?

A.  Yes, the Ken Baumruk case.

Q.  Tell us briefly what the Ken Baumruk case was.

A.  Ken Baumruk was the gentleman who was -- during divorce proceedings brought two weapons into the courthouse, executed his wife, shot a

68

couple of bailiffs and the attorneys, took shots, tried to kill the Judge, a shootout occurred on the second floor I believe of this courthouse.  And again, I was in private practice and because there were public defenders in the courthouse they were conflicted out so it was a contract case from the Public Defender's Office.

Q.   Did that case take a significant amount of your time?

A.   Of course it did.

Q.   Was it finished -- The Baumruk matter, was it finished when you started the Marcellus Williams matter?

A.   No.

Q.   Had a verdict been reached?

A.   A jury had returned a verdict of death -- of not only guilt but also death.

Q.   When was the death sentence reached by the jury?

A.   The month before we started Marcellus's trial or a couple weeks.  I don't know, somewhere between 30 days and three weeks.

Q.   During the Marcellus Williams trial there was a recess wasn't there?

A.   There was.

69

Q. And what was that recess for?

A. Judge Seigel had asked Judge O'Brien if he could borrow me for half a day so we could finish the judgment and sentence in the Baumruk case.

Q. And did that require time for you to prepare for that case as well?

A. Yes. Judge O'Brien suspended the proceedings in Marcellus's case and then I had to attend the proceedings in the Baumruk case.

Q. Thank you. So I want to make sure the record is clear. During Mr. Williams' trial you were required to take a break and presumably prepare at some point in time for a hearing in another capital murder case, leave Mr. Williams' case, and go deal with a hearing in another capital murder case?

A. Yes.

Q. Did that make your time even more precious than what it already was?

A. Of course it did.

Q. Did it prohibit you from preparing Mr. Williams' trial in your typical fashion?

A. Of course it did.

Q. And I know it's been some time, Judge,

70

but if we could, kind of explain to the Court your normal approach to defend a capital murder case. How would you approach those cases?

A.   That's a --

THE COURT:  Mr. Jacober, you are well aware that I have reviewed the entire contents of the file, including Judge Green's verified motion with respect to his testimony here today, in addition to the PCR file and the testimony there, so don't belabor this.

MR. JACOBER:  Okay.  Thank you, Judge.

A.   Am I to answer?

THE COURT:  No.  I'm sorry.  I just...

BY MR. JACOBER:

Q.   You don't have to answer that question. I'll move on to something else.

There were two primary witnesses in this case who weren't law enforcement, correct?

A.   Correct.

Q.   Henry Cole and Laura Asaro?

A.   Yes.

Q.   I want to focus a little bit on Henry Cole.  Do you recall when you first received handwritten notes that Henry Cole prepared in this case?

71

A.   I don't recall independently but I've been provided transcripts that helped refresh my memory on that, and it appears that we received them in April, the April before the June trial.

Q.   So pretty close in time?

A.   Yes.

Q.   Were you able to approach those notes and do what you would normally do with notes from a witness in preparation for the trial?

A.   No.

Q.   And what would you normally do?

A.   When we represent a client, or when I say we I mean Chris McGraugh and I but also when I had cases without Chris, every available defense as is professional is available to my client, even regardless of what conversations I may have with my client.  Otherwise the client should be representing themselves.  I'm the professional.  So I let the evidence through my investigation dictate what is the most credible defense to put before a fact-finder.

Q.   And in this case were you able to evaluate Mr. Cole's notes against what he had previously provided in statements, what he testified to in his deposition, and --

72

A.   No, because I was also preparing for the Baumruk trial.

Q.   We've now learned that there were bloody fingerprints at the crime scene that were --

MS. SNYDER:  Objection, Your Honor. That misstates the record.  Nowhere in the record does it show there were bloody fingerprints anywhere.

MR. JACOBER:  I believe Mr. Spillane argued that this morning.

THE COURT:  Partial prints.  Just so the record is accurate.

MR. JACOBER:  I'll correct my statement.

THE COURT:  Thank you.

BY MR. JACOBER:

Q.   We've now learned that there were partial bloody fingerprints --

MS. SNYDER:  Your Honor, objection. No, we did not.  There are not bloody fingerprints present in the record or the photographs at all.

THE COURT:  Yeah, the opening statement was that there was glove smudges or something I recall.  Is that what you're referring to?

MR. JACOBER:  That's what I'm referring

73

to.

MS. SNYDER:  Which is different than blood of course.

THE COURT:  Correct.

MS. SNYDER:  Thank you, Judge.

THE COURT:  Sustained.

BY MR. JACOBER:

Q.   Judge Green, we've now learned that there were smudges from a glove that were left somewhere on the second floor of the victim's home.

MS. SNYDER:  Your Honor, I'm gonna object.  I think there's a misunderstanding here about how fingerprints are collected and not smudges from a glove, as smudges being dusted for prints.  The testimony about the glove would be from the glass from the front door that was taken out.

THE COURT:  Overruled.  I'll allow it. Let's move on.

Q.   Were you aware of that during your representation of Mr. Williams?

A.   About a glove print on a piece of glass, no, I was not.  This is the first I'm hearing of it.

Q.   Okay.  I'm sorry, I think I've confused

74

it and I didn't get a chance to finish my question before it was objected to by the State.

We've now learned that there were smudges allegedly from a glove on the second floor of the victim's home.

A.   Okay.

Q.   Were you aware of those?

A.   No.  The information I had at the time of trial that we received less than 60 days before trial was that there were fingerprints that were obtained from the second floor, and I wanted our forensic examiner to have an opportunity to look at them but they couldn't produce any record to that. I also wanted to know what the procedure was for destroying such evidence that was seized.

Q.   So whatever they were – And we don't know 'cause they've been destroyed – they were destroyed before they were provided to the defense?

A.   Right.  So all we have is the word of whoever gave us that information.

Q.   In addition to that, those points of evidence, there were other burglaries in this area of St. Louis right around this time, is that correct?

A.   Yes.

75

Q.  Did you have time to investigate those burglaries?

A.  No.

Q.  Why not?

A.  There's only so many hours in a day.  I had multiple cases I was working at the time, including the Baumruk case.

Q.  I want to shift your focus a little bit, Judge, and talk to you about the penalty phase for Mr. Williams.

Were Marcellus Williams' prison records used by the State of Missouri in the penalty phase, at least in part to support the death penalty?

A.  Yes.

Q.  Did you attempt to get those prison records in advance of the penalty phase?

A.  Yes.

Q.  In advance of the trial?

A.  Yes.

Q.  Were you able to do so?

A.  No.

Q.  Why not?

A.  Different reasons were given at different times.  At first I believe the Department of Corrections had said that they were sent to the

76

Justice Center here in St. Louis County.  I believe - And I'm -- this is based in part on some of the testimony that I just read in preparing for this testimony - that Keith Larner had told me that -- 'cause they at one time told me Keith -- that they were assigned out to Keith and that Keith said he had sent them back.  But while all that was going on we were never given access to them.

Q.   Did Mr. Larner ever give you a copy of them if he had checked them out?

A.   No.

Q.   Did you at some point in time -- I'm sorry, let me back up.

Based on your recollection of the trial and the penalty phase, were those incarceration records impactful to the jury in reaching a sentence of death?

A.   Well I can't -- I don't know what was in the minds of the jurors so I can't speak to that.  But were they impactful to the case, absolutely.

Q.   And why is that?

A.   Well it's a standard procedure, especially for any -- when the government is seeking death that they are going to -- in order to

77

obtain death they have to put on what are called aggravating circumstances. And the State in this case was using the behavior of Marcellus in the penitentiary as aggravating factors that would promote an argument for future dangerousness.

From the defense standpoint what you want to do is look at the underlying facts that they're relying upon or the underlying incident that they're relying upon for the future dangerousness to see who was the initial aggressor if there was an assault or what were the surrounding circumstances that could be mitigating with respect to the incident they are putting forth before the jury.

Q. So, in other words, you needed the records to put them into context?

A. Correct.

Q. And you did not have the records in advance of the penalty phase?

A. Correct.

Q. Or in advance of the trial at all?

A. Correct.

Q. Now at some point in time did you file a motion and then an amended motion for continuance?

78

A.   I did.

MR. JACOBER:  And, Your Honor, these are at Tab 31 which contain the verified motion for continuance, order denying the motion for continuance, supplemental verified motion for continuance, and order denying the supplemental motion for continuance.

Q.   I'm going to show you --

MS. SNYDER:  Your Honor, at this point can I have a continuing objection to this witness testifying to anything outside of claim five so I don't have to stand up every time?

THE COURT:  You may.  And just for the record, the Court has taken judicial notice of the entire contents of the underlying file, including the records that you just handed Judge Green which are part of that court file.

MR. JACOBER:  I just have one question that I need to ask on this point, Judge.

BY MR. JACOBER:

Q.   During the argument on these motions the record reflects that you made reference, as you do in the motion, to your inability to get the incarceration records of Mr. Williams, is that correct?

79

A.   Correct.

Q.   Do you recall if Mr. Larner at that time said, I have them, you can -- here they are?

A.   I don't have a recollection of that.

Q.   And, in fact, you know you didn't get them before trial?

A.   That I do know.

Q.   Were you shocked to learn at the sentencing hearing that the State actually had those records and used them as evidence?

MS. SNYDER:  Objection, relevance, as to the witness's state of mind.

THE COURT:  Sustained.  Can you turn your microphone on though, please.

Q.   When the State used those records at the sentencing hearing were you able to effectively put those records into context?

A.   No.

Q.   Is there anything else that was going on at this time that impacted your ability to provide Mr. Williams with a defense?

A.   There was a lot going on during that period of time.  Are you talking professionally, personally?

Q.   Well let's break them down.

80

Professionally first.

A.   Yeah.  As I say, and as I made the Court aware at the time, this murder had happened several years beforehand but there was a flurry of activity that was occurring just months before the trial with -- especially in the forensic area that we were just learning for the first time even though the investigation had supposedly been concluded years ago.  And so given all that new information, especially the forensic information that late in the game, while I'm also preparing for another death penalty case in the same courthouse that had a national impact on how we run security in courthouses, now limited the amount of time to dedicate to this case.

Q.   How much did it limit your time?

A.   I can't quantify it.  I just know there's only so many hours in a day, there's only so many days in the week, and if I -- especially during April and May when all this was occurring, and I was trying the Baumruk in May, I'm preparing for that one also while also trying to, you know, raise a family and take care of day-to-day activities, you know.  So no matter what I did some aspect of either case was going to suffer because

81

of the time.

Q.  And did Mr. Williams' case suffer as a result of that timing?

A.  I believe it did.

Q.  Do you believe that you were able to effectively represent him in this case?

A.  I don't believe he got our best.

Q.  Do you believe he got what you would think is a constitutionally sufficient defense?

MS. SNYDER:  Objection, Your Honor. Calls for a legal conclusion.

THE COURT:  Sustained.

Q.  Are you satisfied that the job you performed for Mr. Williams was the best you could do?

MS. SNYDER:  Objection.  Relevance.

THE COURT:  Sustained.

MR. JACOBER:  One second, Your Honor.

BY MR. JACOBER:

Q.  I do want to go back to one issue. During the trial do you recall anyone touching the murder weapon, the knife, without wearing proper protective gloves?

A.  I don't.

Q.  You don't recall that one way or the

82

other?

A.   I don't.

Q.   Do you recall if gloves were used during the trial?

A.   I don't.

MR. JACOBER:  That's all I have, Judge.

THE COURT:  Thank you.  Cross.

MS. SNYDER:  Yes, Your Honor.

CROSS EXAMINATION

BY MS. SNYDER:

Q.   Judge Green, I think it's fair to say that you were a very experienced criminal defense attorney, is that right?

A.   I have my good days and bad days.

Q.   I know you said you handled 30 to 40 capital cases while you were with the capital unit in the public defender system.  But overall, regardless of what system you were with, how many capital cases did you try?

A.   About 25 I think.

Q.   And for this particular case for Mr. Williams, you were there, you filed pretrial motions, you made objections, you had the trial, is that right?

A.   Well, yeah, all that's right.

83

Q.   And the defense also called witnesses and had hired experts, is that right?

A.   We called witnesses, we hired experts, but we didn't call our expert.

Q.   Okay.  And this trial happened of course over 20 years ago?

A.   Yes, over half -- or a quarter century.

Q.   So if there are things in the trial transcript or in your testimony from the PCR or in your affidavit that are different than what you remember today would your memory then have been more accurate?

A.   Yes, it would have been.

Q.   You were asked a number of questions about your investigation into this case, and one of those was about whether you had time to investigate other burglaries in the University City area.  Do you remember that?

A.   Yes.

Q.   Do you also remember that witness Henry Cole had said that your client, Mr. Williams, had committed several burglaries in that area?

A.   I just read the transcripts.  Umm, I remember the robbery.  I don't remember -- Oh, I think I do remember burglaries, yes.  Yes.  Okay,

84

yes.

Q.   Okay.  You were also asked some statements about what happened during trial, very few, but let me ask you this as a trial attorney. There's things you read on paper and that can be different than how a person appears on the stand, is that fair to say?

A.   Sure.  We as judges, all the time we have to -- if we're determining the credibility of a witness we have to take into account their demeanor.

Q.   So I want you to assume that everything that Henry Cole and Laura Asaro said is true.  I know you probably don't agree with that but we're going to assume that for right now, okay?

A.   Okay.

Q.   For the things that Henry Cole was testifying to, most of what he said came from Marcellus Williams, right?

MR. JACOBER:  I'm going to object to the form of the question.  It's a hypothetical question.

MS. SNYDER:  Your Honor, this particular one is not a hypothetical.

THE COURT:  Overruled.

85

Q.   Most of the things that Henry Cole said he attributed to hearing directly from Marcellus Williams, is that right?

A.   I don't know how you define most, but his position was, and why he wanted the reward money was because of what he said Marcellus told him.

Q.   So if Henry Cole says something on the witness stand, like calls something a sweater that maybe someone else would call a zip-up hoodie, that's information that Marcellus Williams would have told him, assuming Henry Cole is telling the truth, right?

A.   Say that again.  I don't understand the question.

Q.   In other words, any discrepancies that might have come out of Henry Cole's mouth --

A.   Okay.

Q.   -- if he's telling the truth would be discrepancies that really came from Marcellus Williams?

A.   Not necessarily.

Q.   Okay.  Now for Laura Asaro, a number of things that she testified to were actually her direct observations, right?

86

A.   Not necessarily.

Q.   Well, like when she claimed that she saw the purse that had the victim's ID inside the defendant's car, that's something she said that she saw herself, right?

A.   Well that's in the record, yes.

Q.   Okay.  And sometimes Laura Asaro would testify to things that she claimed Marcellus Williams had told her, right?

A.   Yes, she did do that.

Q.   Okay, same point there.

You were asked questions about Missouri Department of Corrections records.  Do you remember those questions?

A.   Um-hum.

Q.   Is that a yes?

A.   I'm sorry.  Yes.  Broke my own rule. Yes.

Q.   So my understanding of the record is that there were two binders that the Missouri Department of Corrections said they sent to St. Louis County Justice Center.  Do you remember that detail?

A.   Yeah, I do remember -- I think I read that in one of the transcripts, yes.

87

Q. And that ultimately Mr. Larner, the prosecutor, had received some of those records, one binder full, do you remember that?

A. That I do not remember.

Q. But if it's in the transcript it's in the transcript, right?

A. Yeah. I'm not going to dispute the transcript.

Q. And ultimately what Mr. Larner himself had received was disclosed to the defense, right?

A. No, 'cause there's a lot of things that was not disclosed to defense during that trial by Mr. Larner.

Q. But you again will defer to the transcript?

A. I will.

Q. And you understand that these ineffective assistance of counsel claims that are being discussed, it's already been denied during the PCR hearing for this case years ago, right?

A. Right, I understand that.

Q. And the Supreme Court has already affirmed that denial, is that fair to say?

A. They did.

Q. Do you also recall saying at all during

88

trial - And this would be outside of the presence of the jury - I'm not criticizing the State for the late production of these things.  In fact, Keith came to the case late and I'm not criticizing them, we got them at this time, I'm just laying it out as a fact.  If anything, they should be commended for being so thorough.  That would be on page 93.  Do you remember saying that at all?

A.   I do not.

Q.   You were asked questions about fingerprints and fingerprint samples from the residence, do you remember that?

A.   Yes.

Q.   Okay.  Do you have any independent recollection at all of bloody fingerprints anywhere in this case?

A.   Bloody?  Independent, no.  Independent, no.

Q.   So it's possible -- Well you know that the house was dusted for fingerprints in some locations, right?

A.   Yes.

Q.   And you know that there were partial lifts found in certain locations, right?

A.   Yes.

89

Q.   All right.  And then isn't it also true that you wanted Laura Asaro's prints to be compared to that, right?

A.   Right.

Q.   And Mr. Larner represented on the record that he had taken Ms. Asaro's prints and had that done, right?

A.   He may have.  I don't recall that.

Q.   During trial you weren't the one who cross-examined Ms. Asaro or Mr. Cole, is that correct?

A.   At trial Chris McGraugh cross examined Mr. Cole, that's correct.

Q.   I have no further questions.

THE COURT:  Thank you.  How do you want to play this?  You've also listed him as a witness.

MR. POTTS:  I'm happy to jump in right now and I'm happy to go round-robin, if that makes sense, Your Honor.

THE COURT:  It does.

MR. POTTS:  I just have a few questions.

THE COURT:  You may proceed.

                CROSS EXAMINATION

BY MR. POTTS:

90

Q.   Good morning, Judge Green.

A.   Morning.

Q.   The Baumruk case was a pretty notorious case at the time wasn't it?

A.   All capital murder cases are notorious.

Q.   Yeah, but especially in this courthouse.  It would be hard to find someone who was working in this courthouse who wasn't aware of it, right?

A.   We were appointed because all the public defenders were excused.

Q.   Before Mr. Williams' trial you made the prosecution aware that you were essentially double booked between the Baumruk case and the Williams case, right?

A.   Yeah.

Q.   When you decided to ask for a continuance did you approach the prosecution before you filed your motion?

A.   Typically that would be my practice.

Q.   Yeah.  Did the prosecution voluntarily agree to that continuance?

MS. SNYDER:  Your Honor, at this point I'm going to object to relevance as to what's in the motion.

91

THE COURT:  Sustained.

Q.   As you were barrelling towards trial in those last few months was the prosecution providing the information you needed in a cooperative and timely fashion?

MS. SNYDER:  Objection to the characterization.  Calls for improper conclusion.

THE COURT:  I'll allow it.  Overruled.

A.   As I said in the motion for the continuance, there was a flurry of activity.  And if the record says -- You know, I wasn't there to criticize the actions of my adversaries.  I just wanted to make sure that Mr. Marcellus was given a fair trial consistent with his constitutional rights under Missouri and the United States.

The prosecution always doesn't have control over how they receive evidence.  There's other law enforcement agencies that are involved and I recognize that.  But it still prevented us I believe, the defense team, from being adequately prepared to defend him like we typically could do.

Q.   A few minutes ago I think you testified - And I wrote this down - that there were a lot of things that weren't disclosed to the defense by Mr. Larner.  Could you explain that, please?

92

A.   Well, for example, the medical records, the medical records of Cole that there -- was in the depositions, and we were arguing over that, we were making motions for that.  That goes obviously to his credibility, his ability to remember, whether or not he was suffering delusions or whatever.  But we were never able to investigate that.

The forensic evidence with respect to -- We may have been told by Mr. Larner what things happened, but that's not how it's done.  We're allowed to do our own independent investigation when it comes to forensic evidence.  We didn't have that opportunity in this case.

There was news statements that Mr. Cole made after we did the depositions that Mr. Larner tried to get in that he didn't disclose to us until at trial.  That's not even an exhaustive list.

I just know that we were doing our best in trying to meet the evidence in the late time period it was being given to us.

Q.   Thank you.  And during this -- Just very roughly speaking, at this point in your career how experienced were you with forensic evidence, using it at trials?

93

A.   Pretty experienced.  Marcellus's case was probably my -- As I said, I had already handled 30 or 40 death penalty cases before his.  At that time I believe I was going around the country giving seminars with a doctor from Emory University called Diane Lavett in DNA evidence.  But what they used back then is completely different than what they use today.  I was giving seminars in front of the Florida Criminal Bar Association, the Colorado Criminal Bar Association, Missouri Public Defender's Office.

Q.   And at that time were you aware of the risk of contamination of forensic evidence as a defense attorney?

MS. SNYDER:  Objection.  Relevance.

THE COURT:  Counsel?

MR. POTTS:  This goes to the ungloved claim, Your Honor.

THE COURT:  I'm sorry?

MR. POTTS:  This is going directly to the ungloved claim.  If you give me little bit of leeway here I promise it will make sense.

THE COURT:  Sustained.

BY MR. POTTS:

Q.   Judge Green, at any time before this

94

trial did the prosecution tell you that they had been handling the murder weapon without gloves?

A.   No.

Q.   At any time before this trial did the prosecution tell you that investigators had been handling the murder weapon without gloves?

A.   No.

Q.   As an experienced defense attorney were you aware of Arizona vs Youngblood?

A.   Yes.

Q.   If you had learned that the prosecution was handling the murder weapon without gloves is that the type of argument that you would have raised on behalf of your client?

MS. SNYDER:  Objection.  Relevance and speculation.

THE COURT:  Sustained.

MR. POTTS:  No further questions.

THE COURT:  Thank you.  Recross.

MS. SNYDER:  No, Your Honor.

THE COURT:  No cross?

MS. SNYDER:  No.

THE COURT:  Any redirect?

MR. JACOBER:  No redirect, Your Honor.

THE COURT:  Judge Green, I have one

95

question. Difficult question.

EXAMINATION

BY THE COURT:

Q. You were a contract attorney through the Public Defender's Office. Knowing that you had another high profile case that you had to get prepared for, could you have rejected or not accepted that contract?

A. Not -- I didn't know the trial setting at the time that I took the contract. So I had no way of knowing that the two would be scheduled right behind each other like that at the time I took the contracts.

Q. Okay. And just so that I'm clear, upon your entry of appearance you didn't file a motion for continuance at that time. Did you know when the Baumruk case was set when you accepted this?

A. I don't remember.

Q. Okay. That's all.

THE COURT: Any questions based upon mine?

MR. POTTS: No, Your Honor.

MS. SNYDER: No, Your Honor.

THE COURT: Thank you. Can this witness stand down?

96

MR. JACOBER:  Yes, Your Honor.

THE COURT:  Thank you.  This is probably a great time to take our morning recess. It is 11:45ish.  So let's come back at five after.

(A recess was taken.)

***

(The proceedings returned to open court.)

THE COURT:  We're back on the record in Cause Number 24SL-CC00422.

Again, I apologize, I sound like a broken record.  Several members of the public have come in and come out.  I just want to make sure that everybody understands the Court's ruling with respect to recording these proceedings or taking photographs.  I know that it may seem onerous, but for the integrity of these proceedings that is the ruling of the Court.  So please refrain from recording or taking photographs with those marvelous little computers that we all own.  If someone sees you from this office or otherwise you will be asked to leave.  So please make sure you turn your phones off, there's no recording allowed.

With that said, Mr. Jacober, you want to call your next witness.

97

MS. SNYDER:  Judge, if I may, I would like to ask the Court to please take judicial notice of the CaseNet docket entries in State v. Kenneth Baumruk, 2198RO1736.

THE COURT:  Any objection?

MR. JACOBER:  No objection, Your Honor.

THE COURT:  The Court will take judicial notice of the Kenneth Baumruk case.

MR. JACOBER:  Your Honor, at this time the State would call Dr. Charlotte Word.

THE COURT:  Dr. Word, good morning. Could you raise your right hand for me.

DR. CHARLOTTE WORD,

having been sworn, testified as follows:

DIRECT EXAMINATION

BY MR. JACOBER:

Q.   Good morning, Dr. Word.

A.   Good morning.

Q.   How are you currently employed?

A.   I'm currently self-employed as a consultant.

Q.   And what is your educational background?

A.   I have a bachelor's of science in biology from the college of William & Mary in

98

Virginia.  I have a Ph.D. in molecular biology with specialities in immunology and -- Sorry.  I said that wrong.  A Ph.D. in microbiology with specialties in molecular biology and immunology from the University of Virginia.  I did post-graduate fellowship work at the University of Texas Southwestern Medical School in Dallas, Texas for approximately three and a half years, again in the areas of molecular biology and immunology.  And I was on the faculty of the University of New Mexico School of Medicine for approximately five and a half years.

Q.  Thank you, Dr. Word.  I'd like to briefly go through your work history as well. After you left the faculty at University of New Mexico School of Medicine where did you go next?

A.  I moved to Germantown, Maryland and I was employed by a new private lab doing DNA testing called Cellmark - C-E-L-L-M-A-R-K - Diagnostics.

Q.  And I think you've already kind of answered this, but what did Cellmark Diagnostics do?

A.  It was a company that was doing DNA testing for paternity, biological relationship, and for criminal cases, so any forensic application of

99

DNA.

Q.   And what did you do while you were employed at Cellmark Diagnostics?

A.   One of my major responsibilities was to review the work that was being done by the analysts in the laboratory, review their testing, review their data, and see that things were done according to our standard operating procedures and co-sign the reports with them stating the results and conclusions of the testing.  I was also responsible for going to court and testifying to those findings.

I was responsible for some of the training in the laboratory, for managing a number of contracts that we had for doing testing in various types of situations.  I was responsible for some of the validation studies that we did bringing on new DNA tests and whatever other job responsibilities that were necessitated.

Q.   Thank you.  Are you being paid to be here today?

A.   I charge a consulting fee, yes.

Q.   And what is your hourly rate?

A.   $300 an hour.

Q.   Who's paying you for your appearance in

100

this matter and your work in this matter?

A.   The Innocence Project I believe.

Q.   Do you have an estimate of how much time you've already billed in this matter?

A.   I don't recall.  I certainly have it on a computer, but I have no idea.

Q.   Have you testified -- You mentioned that one of your job duties at Cellmark was to testify in court.  Have you testified before before a court?

A.   Yes, I have.

Q.   If you could estimate the number of times?

A.   Well over 300.

Q.   And in those well over 300 - I'm not asking for a breakdown of cases - but can you generally break down between your testimony for the prosecution or for the defendant in a criminal case?

A.   The bulk of my testimony in criminal cases was while I was working at Cellmark Diagnostics and most of that was for the prosecution.

Q.   And have you also done -- Have you also testified in other exoneration cases?

101

A. Yes. I've testified in other post-conviction cases and in civil cases that have resulted after the exonerations in those cases as well.

Q. Do you have an estimate of how many of those cases you testified in?

A. I actually haven't thought about it. I don't know, 10, 20 maybe. I don't know.

Q. In all of those -- Strike that.

In those cases did you testify for the -- either the person seeking an exoneration, seeking post-conviction review, or who had been exonerated, or did you testify for the government?

A. I believe most of those times it's been on behalf of the defendant or the former defendant. I don't track this because who I work for is negligible. I work for the science. So I don't keep those numbers. I don't know the answers.

Q. Thank you. Separate from your work as an expert who's testified in court, have you ever done work on any forensic DNA commissions or national studies or anything of that nature?

A. Yes, sir.

Q. Could you tell us about that?

A. Yes. In the late nineties I was on a

102

working group under Janet Reno's National Commission of the Future of DNA that met to go over issues on post-conviction DNA testing and was one of the co-authors of a publication that came out of the National Institute of Justice regarding post-conviction testing recommendations for the community.

And then in, I guess it was right before COVID, so the 2016, '17, '18, '19, somewhere in there, there was another national commission on forensic sciences that I also participated in several of those working groups writing documents to provide recommendations and advisory to the Attorney General of the United States regarding DNA testing in federal labs and was on a number of those panels.  The group I was in I believe was called Reporting and Testimony working group.

Q.   And The National Commission on the Future of DNA Evidence, that ran from 1998 to 2000?

A.   Yes, sir.

Q.   The work was completed in 2000?

A.   That's my recollection, yes.

Q.   And it resulted in multiple publications?

A.   Yes.  There were a number of working

103

groups each working on their own project and publication.

Q. What was the purpose of this commission?

A. My understanding it was formed by Attorney General Janet Reno under the Bill Clinton administration to look at what was going on in the world of DNA and how it impacted the judicial system based on the number of exonerations that had come out in the early to mid 1990's.

Q. And the working group that you referenced, was it called The Post-Conviction DNA Testing: Recommendations for Handling Requests?

A. That was the name of the publication that came out of our working group. I think we were just called a post-conviction working group.

Q. But that's the publication?

A. Yes, sir.

Q. And you were a co-author of that publication?

A. I was. I was the DNA expert on that and the laboratory representative on that working group.

MR. JACOBER: May I approach the witness, Your Honor?

104

THE COURT:  You may.

Q.   Dr. Word, I'm handing you a document that is captioned Post-Conviction DNA Testing: Recommendations for Handling Requests.  Are you familiar with that document?

A.   Yes, I am.  This is the document that I was one of the co-authors of.

Q.   And was this document published by the National Institute of Justice?

A.   Yes, sir, it was.

Q.   And distributed nationally as far as you're aware?

A.   It is on their website.  You can download it any day.

Q.   Now referencing Attorney General Janet Reno.  In the foreword there's a message from the attorney general and at least in part it says --

MS. PRYDE:  Objection.  Hearsay, Your Honor.  Mr. Jacober hasn't entered this into the record.

THE COURT:  Sustained.

MR. JACOBER:  Your Honor, we would move for admission of the Post-Conviction DNA Testing: Recommendations for Handling Requests as Exhibit 80, Your Honor.

105

THE COURT:  Any objection?

MS. PRYDE:  No objection to its being entered into the record, Your Honor.

THE COURT:  Thank you.  Exhibit 80 will be part of the record.

BY MR. JACOBER:

Q.  And actually, while we're dealing with exhibits, Dr. Word, you provided an affidavit in this matter, is that correct?

A.  Uh, yes.

Q.  And your affidavit is dated May 31st of 2018, is that correct?

A.  I know it's 2018.  I don't recall the date but...

Q.  Attached to your affidavit is Exhibit A, that being your curriculum vitae?

A.  Yes, sir.

Q.  And at least as of the time that you signed your affidavit was that CV a true and correct copy of your CV?

A.  Yes, sir.

MR. JACOBER:  Judge, we would also move for admission of the affidavit of Dr. Word and the CV which is attached.  That is in the record already as Exhibit 1.

106

THE COURT:  Tab 1, Exhibit 13, the CV will be received.

MS. PRYDE:  Your Honor, for clarification, does this also include her updated report from August 15th?

MR. JACOBER:  Not yet.

MS. PRYDE:  Thank you.

BY MR. JACOBER:

Q.   Now there were other -- As you reference, there were other working groups and other reports prepared as part of this commission formed by Attorney General Reno, correct?

A.   Yes, sir.

MR. JACOBER:  May I approach the witness, Your Honor?

THE COURT:  You may.

MR. JACOBER:  Thank you.

THE COURT:  Is this 81?

MR. JACOBER:  It will be 81, Your Honor.

BY MR. JACOBER:

Q.   Dr. Word, I've handed you a document captioned The Future of Forensic DNA Testing.  Was this prepared by the working group that you were on?

107

A.   No, it was not.  It was prepared, as the title says, by the research and development working group.

Q.   And have you reviewed this document?

A.   I have briefly, yes.

Q.   Do you agree with the statements that are made in this document?

A.   Certainly to the extent that they were making predictions of what was going to likely happen in the next two to ten years in DNA testing they were certainly appropriate.

MR. JACOBER:  Judge, we would move for admission of The Future of Forensic DNA Testing as Exhibit 81.

MS. PRYDE:  Your Honor, we have several objections.

THE COURT:  Okay.

MS. PRYDE:  The first is a lack of foundation.  The second is a lack of authenticity.  The third is relevance.  The fourth is hearsay.  As the witness has testified, she had nothing to do with these experts, and they don't meet the definition of a learned treatise.

THE COURT:  Did the witness rely on this information in forming her opinions?

108

MR. JACOBER:  I thought I asked her that but I think I missed that question on my outline.

MS. PRYDE:  That was not disclosed to the State, Your Honor.

THE COURT:  Objection as to lack of foundation sustained.

MR. JACOBER:  We'll move forward.

MS. PRYDE:  Thank you, Your Honor.

MR. JACOBER:  Your Honor, at this time we would move for Dr. Word to be recognized as an expert and to be allowed to provide her expert testimony in this matter.

MS. PRYDE:  Your Honor, we would just request that Mr. Jacober confirm what she's being certified as an expert in.

THE COURT:  I can't predict what questions Mr. Jacober is going to ask, but I will find that she is qualified to testify as an expert in these proceedings.

MR. JACOBER:  Thank you, Your Honor.

BY MR. JACOBER:

Q.   And Dr. Word, to address that last issue, are you an expert in the forensic handling of biological samples in DNA testing?

109

A.   Certainly as it applies to any testing of biological fluids and generating DNA, yes.

MR. JACOBER:  To make the record clear, Judge, we would move for her to be admitted as an expert in forensic handling of biological samples in DNA testing.

MS. PRYDE:  And, Your Honor, we would object to the instance of -- the term handling.  It was -- It's our understanding that Dr. Word does DNA testing in the lab, in laboratory conditions, as in she has a sample, she tests it, and not necessarily handling, which might confuse the issue, because one of the issues in this case, as Your Honor is well aware, is the use and -- the use and handling of evidence in the field.

In addition -- So strike that.  I'm sorry.  We just request that handling be clarified for the sake of the record.

THE COURT:  Mr. Jacober, I agree. Could you clarify.

BY MR. JACOBER:

Q.   Yes.  Dr. Word, are you an expert in how the forensic handling -- Strike that.

Are you an expert in how evidence should be collected and maintained --

110

MS. PRYDE:  Objection, Your Honor.

MR. JACOBER:  -- throughout --

THE COURT:  Let him finish his question.

MR. JACOBER:  Your Honor, I can't even finish my question without an objection.

THE COURT:  Thank you.

Q.   Are you an expert in how evidence should be collected in criminal cases to maintain the integrity of the DNA evidence that may be on that evidence?

A.   Yes.

MR. JACOBER:  Judge, we would move for her to be admitted as an expert in that area.

MS. PRYDE:  Objection, Your Honor. There's been no foundation for that series of expertise.  We've heard from Dr. Word.  She clearly has extensive knowledge and expertise in the use and delineation of DNA testing and how that process is taken through in the lab.  We've heard no testimony from Dr. Word about whether or not she has any experience or qualification in the preparation of samples for being taken into the lab, whether or not she's ever talked to law enforcement agencies about these sorts of issues as

111

far as trainings, et cetera.  We would just object that we're putting the cart before the horse, Your Honor.

THE COURT:  And that will be subject to cross-examination.  I'll allow some leeway here, counsel.

MR. JACOBER:  Thank you.

THE COURT:  Objection is overruled.

MR. JACOBER:  I'm sorry?

THE COURT:  I'm making the record clear that the objection is overruled.

MR. JACOBER:  Thank you, Judge.

BY MR. JACOBER:

Q.   And Dr. Word, have you testified as an expert across the country in forensic DNA testing?

A.   I have, yes.

Q.   In fact, have you ever not been qualified as an expert when you been presented as one?

A.   I have not.

Q.   As part of your testimony through these 300-plus cases did you provide testimony as to the preservation of biological samples for DNA testing?

A.   In many cases, yes.

Q.   Now I think we should start kind of at

112

the beginning and not deal with the preservation just yet just to get a background for the Court. What is DNA?

A. DNA stands for Deoxyribonucleic Acid. It's the genetic material that's present in each of the nucleated cells of our body. It makes us human, gives us all of our characteristics. It's inherited from our parents. Half of our DNA comes from our mother, half comes from our father. And there are portions of the DNA that are highly variable in the population, and these are regions that we focus in on for forensic DNA testing because they allow us to differentiate the DNA from one individual to another.

Q. Where can you find DNA on an individual? I think you answered but I want to make sure we're clear.

A. Pretty much any bodily fluid or any tissue. So saliva, semen, blood, perhaps sweat, tissue, fingernail, skin cells, bone. Any portion of our body.

Q. I want to focus specifically on skin cells. Do we have DNA on our hands?

A. Yes, we do.

Q. Would my DNA on my hand as I stand here

113

right now be just my DNA?

A.    It depends.  It might be just yours or it may be DNA from other individuals that you been in contact with or items that you have handled that other individuals have been in contact with.

Q.    So if I pick up this pen and someone else had used this pen I could have their DNA on my hand as well as my DNA and maybe DNA that they got from touching something else?

A.    Certainly.  Research studies have shown any of those variables are possible and have been demonstrated.

Q.    Now is this kind of DNA commonly called touch DNA?

A.    Yes.

Q.    Is that a nomenclature or designation that you necessarily agree with?

A.    I agree with the use of the term that the type of DNA recovered from a handled item is a little bit different than the type of DNA we get from nucleated cells and in that context it's appropriate to call it touch DNA.

There is a movement to stop using that word in the field because the word touch implies an activity that would get associated with the DNA

114

that may not necessarily be associated with that DNA. I don't have to touch something to deposit DNA on an item. And so the mixing of the DNA results with the possible activity that allowed to the deposition of that gets complicated with the use of that term and can be misleading.

Q. To make sure we're clear though, when you touch something you could be leaving your DNA behind or leaving other DNA that's on your hands behind. Could you also be taking DNA off of the item that you're touching?

A. Yes, sir, that's correct, that's been demonstrated in research studies as well.

Q. If you -- So if you touch a piece of evidence without wearing proper protection or attempting to not disturb the DNA could you be destroying the DNA that's on that piece of evidence?

A. It's possible it could be removed or certainly contaminated with that individual's DNA that isn't directly associated with the crime.

Q. I want to direct your attention to kind of a specific period of time in history and it's the late 90's to the early 2000's. Were there policies and protocols that were in existence at

115

that period in time regarding the collection, preservation, and handling of forensic evidence in law enforcement?

MS. PRYDE:  Objection, Your Honor. Vague.

THE COURT:  Can you lay a better foundation for her to give that opinion?

MR. JACOBER:  I can attempt to, yes, Judge.

THE COURT:  Thank you.

BY MR. JACOBER:

Q.  As part of your work as a scientist is it important for – I'm sorry – as a scientist focusing on DNA evidence and DNA analysis, is it important for you to understand how that evidence is collected?

A.  To do the testing the answer is no. But to understand the test results that are generated and the meaning of those results the whole prior chain of custody and information about who may have knowingly or unknowingly handled those items or been involved in those items becomes very, very important to know what the meaning of the DNA test results are.  So because of that it is critical to know every individual that's come in

116

contact with a particular item, when it was collected, how it was collected, what method was used, was it collected individually by an individual wearing gloves, wearing a face mask and not talking over it or sneezing over it, was it properly labeled and sealed in a tamper evidence envelope with evidence tape, was it stored properly in the appropriate dried room temperature or frozen conditions for that type of biological sample.  All of that occurs before it comes into the DNA lab.

So any issues or problems with the manner of collection, contamination, mislabeling, improper storage under the wrong conditions all is going to impact what comes out of those DNA results and the ability for us to get usable, interpretable profiles and be able to evaluate and provide any meaning regarding the DNA data that are obtained.

MS. PRYDE:  Objection, Your Honor.  Mr. Jacober has not laid a foundation for this individual's expertise as to these before-the-lab policies.

THE COURT:  That's my concern.

MR. JACOBER:  And I was --

THE COURT:  And that wasn't responsive to the question that you asked.

117

MR. JACOBER:  It was a long answer.

BY MR. JACOBER:

Q.   I want to back up a little bit, Dr. Word.  As a DNA scientist I think you answered more of why the policies and procedures that we want to talk about are important.  What I want to focus on first as opposed to the why is are scientists such as yourself -- Actually let me ask it more specifically.

Were you involved in helping to develop policies and procedures that would be used for the collection of DNA evidence?

A.   Not directly, no.

Q.   Were other scientists involved in the development of policies and procedures for the collection of DNA evidence?

A.   Certainly, yes.

Q.   Did you have occasion to review those policies and procedures as part of your work as a DNA scientist?

A.   Yes.

Q.   And was that part of how you would eventually analyze DNA evidence as a scientist?

A.   To some degree, yes.

Q.   Did you come to rely on those policies

118

and procedures as part of what you were doing in analyzing DNA evidence?

A.   Yes.

MR. JACOBER:  Your Honor, I think this addresses the foundational aspects that these are things developed by other scientists, Dr. Word relied on them in part of her work as a DNA scientist.

THE COURT:  The objection is sustained.

MR. JACOBER:  Your Honor, if I could, on what basis?  I want to make sure I can address the Court's concern.

THE COURT:  I don't think the proper foundation has been laid for this witness to opine, despite her area of expertise, as to what the protocols were in the late 90's, early 2000's.

MR. JACOBER:  Thank you, Judge.  I'll continue to inquire and try to satisfy the Court.

THE COURT:  Thank you.

BY MR. JACOBER:

Q.   During this period of the late 90's or early 2000's as part of your work as a DNA scientist were you -- did you actively review and take into consideration the policies and procedures that were being developed regarding the handling of

119

DNA?

MS. PRYDE:  Objection.  Vague, Your Honor.

THE COURT:  Overruled.

A.   Well I know Cellmark Diagnostics had a multipage document that we sent out to offices or individuals interested in sending evidence to us that documented what we advise as procedures that should be followed for collection, packaging, labeling, storage, and then mailing the evidence to us.  So we had a document that I wasn't a part of writing but it was from our company that certainly was written by scientists documenting the proper way to handle all of those different procedures.

And as part of my interaction with various individuals in the field throughout my career I've been to meetings, I've met with police officers, crime scene investigators who have talked to me about the policies and the procedures they use.  Some in the early 90's and mid 90's had very detailed policies.  They would wear, you know, the full body suit and masks and head gear and everything because they were aware that they could be leaving evidence behind.

So throughout the 90's there were

120

certainly agencies that were well-informed on procedures that needed to be followed and had those in place for the preservation and risk of contamination of evidence at that time.

Q.   And Dr. Word, the document that you were a co-author on, the Post-Conviction DNA Testing:  Recommendations for Handling Requests, does this have any -- does this include any discussion about the policies and procedures, or policies and protocols rather for the DNA evidence collection and handling?

A.   I don't think directly.  It does comment in multiple situations about the proper preservation of evidence that has been collected, that it be stored appropriately to preserve the integrity of that evidence.

Q.   So it doesn't lay out specific steps but it does reference that it's important that DNA be preserved in a way to maintain its integrity?

A.   That's correct.  The collection of evidence was not a part of the focus for that particular working group.  But I think there were clearly procedures in laboratories, in all laboratories about how evidence had to be handled. And in many jurisdictions many crime laboratory

121

personnel were training the police officers and the crime scene investigators in those different procedures. And this would be not just for DNA but for fingerprint collection, guns, ballistics, cartridges. Any other type of evidence that was being collected the laboratory personnel were training individuals based on the policies they used in the laboratory on how to do those procedures correctly to maintain the integrity of the evidence.

Q. If the evidence isn't maintained in a way that maintains its integrity what are the results from a scientific perspective?

A. They may be impacted in a way that the information obtained is useless or it may -- in the case of DNA it may lead to a presence of a mixture of DNA that becomes more complicated to interpret and evaluate. So knowing what happened and knowing some of that information may help with the evaluation of the data, but depending on what occurred it may invalidate the use of those results in any way.

Certainly if an item has been stored inappropriately such as the DNA is totally degraded or contaminated to an extent that the original DNA

122

can't be observed, that significantly impacts the testing outcome because no results can be observed from whomever's DNA was on that original item.  So it depends on, you know, whatever the scenario is.

Q.  So you again focused on the integrity of the DNA.  What are the best ways to ensure that the DNA evidence that is on an item of evidence is preserved for future testing?

MS. PRYDE:  Objection.  Lack of foundation.

THE COURT:  Overruled.

A.  So in the lab the procedures that we follow are very similar to the procedures that would need to be followed in the field as well.

THE COURT:  Doctor, I appreciate your narrative response, but if you could just answer the question that was posed by Mr. Jacober, please.

A.  So each item should be handled singly, one at a time and wearing gloves, and if not wearing a face mask no one should be talking over that item so that DNA won't be deposited on that item.  Gloves should be changed in between the handling of each of those items.  Each item should be individually packaged in the appropriate container depending on what that item is.  If the

123

item has blood or semen or saliva and it's wet that needs to be dried first and then stored in a dried manner.

Generally paper bags or boxes are the best way to preserve evidence. Storing wet items in plastic promotes bacterial and other micro-organism growth which will destroy the DNA. The items need to be individually labeled - I think I already mentioned this - with tamper evidence tape stored properly.

And then, you know, in the lab the same procedure happens. They have to be opened individually, handled one at a time, changing gloves in between. If we use scissors or a knife or a cutting tool to cut a swab off, for instance, that's a one-time use instrument, that all gets thrown away and we start fresh with a new item of evidence.

THE COURT: Thank you.

Q. Now you mentioned gloves several times in that answer, Dr. Word. If you touch an item of evidence without gloves does it impact the integrity of the DNA for future testing?

A. It can. It can remove DNA from that item as well. So individuals handling an item with

124

gloves need to be very careful of where they touch. The same concept of, you know, touching an item that might have fingerprints on it.  You want to be very careful that you don't handle it in an area that may have fingerprints or biological materials. If the gloves are contaminated or haven't been changed from the last item there may be DNA from the person wearing those gloves or from a previous handled item that now gets deposited on the next item.

Q.   Thank you.  And at least as of 1999 when Attorney General Reno formed this commission it was recognized by law enforcement that DNA testing could become -- already was and could become even more of part of future exoneration matters, correct?

A.   Oh absolutely, yes.

Q.   So if the evidence is not handled at the time of the crime in a way that preserves that DNA that takes away a future exoneration chance -- or it could take away a future exoneration chance, correct?

A.   Potentially, yes.

Q.   In the 1990's and going forward was there anything happening that would caution people

125

against touching items of evidence that had blood on them?

A.   Well certainly in the early 90's the discovery of the HIV virus and its resulting AIDS epidemic put everyone on note about touching items that had blood on them.  And, you know, by the very early 90's all law enforcement, hospitals, first responders, medical individuals --

MS. PRYDE:  Objection, Your Honor. Lack of foundation.  We're talking about something --

THE COURT:  How is this helping me, Mr. Jacober?

MR. JACOBER:  I'll move forward, Judge.

THE COURT:  Thank you.

BY MR. JACOBER:

Q.   We've learned in this case that the prosecutor and the special investigator for the prosecutor's office have now testified to or have signed an affidavit indicating that they touched the murder weapon in this case without any evidence preservation techniques, is that correct?

A.   That's -- I been informed of that, yes.

Q.   And further DNA testing has shown that the DNA that was left on the knife could be matched

126

to either of those two gentlemen, is that correct?

A.   The results can be explained by their profiles, yes.

Q.   Based on the results that you reviewed are you able to determine if Mr. Williams -- Marcellus Williams' DNA is on that knife?

A.   He's excluded as the DNA that was detected from the knife.  He cannot be a source.

Q.   Because of what we've learned now can you make a definitive determination though as to Mr. Williams and the DNA that's on that knife?

A.   For the DNA that was recovered it is not his DNA.  No DNA recovered and tested includes him as a possible source.  He's excluded as either of the two sources.

Q.   You don't know though if that means his DNA was never on the knife because of what we've now learned, is that correct?

A.   That's correct.

MR. JACOBER:  And, Your Honor, in support of that I would -- Your Honor, I misspoke earlier.  I didn't realize that the August 19, 2024 test results from BODE Technology were also part of Exhibit 1, and we would move for that to be admitted into evidence as well.  That's Exhibit B

127

of Exhibit 1.

THE COURT:  Is that the same as FF?

MR. JACOBER:  Yes.  Yes, Your Honor.

MS. PRYDE:  Just for clarification, Mr. Jacober, you said Exhibit 1.  Are you talking about Tab 1, Exhibit 16?

MR. JACOBER:  Tab 1.  Tab 1.  I'm sorry.

MS. PRYDE:  Great.  Just want to be sure.  Thank you.

THE COURT:  The Court's confused too. Tab 1 and then it's got exhibit numbers on there. I've already received -- Is this under Exhibit B?

MR. JACOBER:  Yes, Your Honor.

THE COURT:  Any objection?

MS. PRYDE:  No objection, Your Honor.

THE COURT:  So Exhibit B will be received.

MR. JACOBER:  One second, Your Honor.

(Pause.)

Judge, at this point I have no further questions.

THE COURT:  Thank you.  Does someone mind checking the halls.

MR. JACOBER:  We're supposed to be

128

getting a text message when he shows up.

THE COURT: Very good. I appreciate that. Cross.

MR. JACOBER: Judge, when Judge McGraugh is here I'll just give you a sign.

THE COURT: Thank you. You may inquire.

MS. PRYDE: Thank you, Your Honor. I'm just going to get set up for a moment if that's okay with the Court.

CROSS EXAMINATION

BY MS. PRYDE:

Q. Good morning, Dr. Word.

A. Good morning.

Q. You have an extensive history and an extensive scientific background, would you agree with that? Not to toot your own horn.

A. It's relative, yeah. I have a background.

THE COURT: She got her Ph.D. when she was 21.

A. Not.

Q. And as part of that history you have become very familiar with the grunt work of obtaining data, would you agree?

129

A.   I don't actually know what that even means.

Q.   Okay, I'll rephrase.  When you are doing your scientific testing I notice that in your CV you do -- your early work appears to be in immunoglobulin, if that's correct.

A.   Yes.

Q.   It's been awhile since I took biology.

So when you were doing those tests were you -- were you producing data to support the conclusions that you were hypothesizing about?

A.   Well the molecular biology aspect of what I was doing at that point was actually generating DNA sequences, so we didn't really have a hypothesis under the classical biology; you know, form a hypothesis, do the testing.  We were simply isolating DNA from organisms and sequencing that DNA to determine what the sequence of the DNA was for the immunoglobulin genes at that time.

Q.   And when you isolated those genes did you use just one sample or did you replicate it?

A.   Well for that particular project some of it was replicated.  We tried to get overlapping sequences but not always.

Q.   Fair enough.  Would you agree that

130

during the scientific process your result can only be just as good as what you have to determine that result?

A.   Absolutely, yes.

Q.   And in this case you were hired as an expert witness, would you agree?

A.   Well as a consultant.  I wasn't part of the process at that point.  I was consulting on the data.

Q.   Thank you for the clarification.

And you were approached by The Innocence Project, is that correct.

A.   Yes, I believe so.

Q.   And so The Innocence Project hired you in this case?

A.   Yes.

Q.   And at least in my experience with experts, experts are often asked to answer a question.  We heard it in earlier testimony with an earlier expert today, he was answering a particular question by The Innocence Project.  Were you also asked to answer a particular question?

A.   I was -- I don't know if I was asked a question per se.  I was asked to review the case file and form my independent conclusions based on

131

the results they obtained.

Q.    And what was involved in that case file?

A.    I got the entire case file from the BODE laboratory.  So all of their testing notes, the data, their reports, anything that they had in their file.

Q.    And would you agree that that's what's been described as the BODE supplemental report?  It was those bench notes, is that correct?

A.    Well the bench notes and the report are independent.  The bench notes are the whole file that contains all the documentation from the lab; you know, what evidence they received, what testing procedures they followed, how much of the material they used for testing, so their whole testing process.  The original report and the supplemental report are the reporting of their findings and their conclusions based on the data that they obtained.  And those - I believe there were two reports - were part of that case file.

Q.    Thank you, Dr. Word.  If you don't mind my moving around a bit.  I'm so sorry, there's so much paper.  I'm going to hand you a really big binder but I'm going to try to put it on your

132

surface.

I just handed you what's been previously marked as Respondent's Exhibit I-13.27. Does that look accurate to you? It's under the 27 tab in that binder.

A. Yes.

Q. Great. And does that look like the notes that you reviewed in this case?

A. Oh, I just looked at the report. The report, yes.

THE WITNESS: May I stand up --

THE COURT: Yeah, whatever makes you comfortable.

THE WITNESS: -- so I can look at this easier?

THE COURT: Sure.

BY MS. PRYDE:

Q. And please take all the time that you need.

A. I'm just going to flip through it.

Q. Of course.

A. Yes, this looks like the materials that I received. I'm sorry.

Q. Thank you very much. And was that the only data that you were given with this case?

133

A.   No.   There was a subsequent submission to the evidence -- of evidence from Mr. Williams' known reference sample.

Q.   Okay.   So that wasn't contained in the bench notes that you're looking at there?

A.   Oh.   Well I didn't see the second report in the second part of that.   Because for me it came as a separate file so I was expecting it to be in a separate place.

Q.   Fair enough.

A.   Is it in this Tab 27?

Q.   So there were two reports in this case. The first one was the case forensic report which has been previously marked as I-13  --

THE COURT:   Counsel, can we have a stipulation that both those reports --

A.   Oh, here it is.   Yeah, it's under tab -- As I suspected, it's under Tab 28 is the supplemental report.

Q.   Great.   So you reviewed that as well?

A.   Yes.

Q.   So you reviewed Respondent's Exhibit I-13.27 and I-13.28, would you agree?

A.   To the best of my knowledge, yes.

Q.   And were you given any other

134

information about this case?

A.   At the time I did the first review?

Q.   Um-hum.

A.   No.  I was given no information about the case.  They were very careful to make sure I knew nothing about it; just look at the case file, look at the data, and we'll talk later.  Which is how I handle pretty much all of my cases.

Q.   And when you talked later what sorts of questions were you asked about this particular data?

A.   Oh, I have no idea.  I was certainly asked what my opinion was and could I make any conclusions regarding Mr. Williams and the knife handle, Item O3B.

Q.   And while you were talking to Mr. Jacober - And I realize I gave you a bit of guff and I apologize - you talked a lot about how the protocols that are used to collect the evidence that you're talking about matter, correct?

A.   Certainly, yes.

Q.   And here were you told any of those sorts of protocols from the St. Louis County Police Department or the University City Police Department?  Were you told any of those sorts of

135

protocols?

A.   At some point -- No, not for collection, no.

Q.   And were you told whether or not that evidence was handled before by any other individuals or -- Were you told whether or not that evidence was, specifically the knife, whether it was handled by individuals with or without gloves?

A.   I don't believe in 2018, which is when I was first involved in this case, that I knew anything about that.  I just -- I simply don't recall.  It was way too long ago.

Q.   Understandable.  So initially you just were given these bench notes, these reports, and asked to come to a conclusion about Mr. Williams, correct?

A.   I was given the case file to review to come to an independent conclusion.  Then I looked at the reports.  And then I talked to the attorneys.  But I formed -- I didn't look at the reports prior to doing any of my review.  I formed my independent evaluation of the information without knowing what BODE had done and reported.

Q.   And the reports don't make it entirely clear, but were you made aware that the case itself

136

had occurred -- the murder itself had occurred not in 2016 when this testing, when all the reports were dated but much earlier?

A.   May or may not have known that, I don't know.  To me it doesn't -- In terms of what I was asked to do that doesn't directly impact my initial review of the file.

Q.   But it might impact a later review, is that what you're implying?

A.   Well it may impact understanding of the information about the test results.

Q.   Understood.  And when you were evaluating this data and these notes and this file you also -- you supplied a little bit of data as well in the form of assumptions, is that correct?

A.   Well data are not assumptions.  I made assumptions to evaluate the data which is required. For any type of DNA testing one of the first things that has to be done is to make decisions about what allele peaks are going to be interpreted, what data are there, and then based on that data assumptions have to be made regarding whether there's DNA from one individual, two individuals, three individuals. Then the comparisons can be done to state what the meaning of those results might be.

137

Q.   Understandable.  Now I'm going to hand you what's previously been marked as Petitioner's Exhibit 16A is what we're calling the original report, is that correct?  16A.  And I would like you to turn to page 5 of that report, paragraph specifically 12 and 13.  I'm sorry, 13 and 14.

A.   Page 5 is my CV.

Q.   I'm sorry.  Page 5 of the affidavit if that helps you.  I believe it's the end of the -- your initial -- or it's at the end.

A.   Page 5 of the affidavit?

Q.   Yes, page 5 of the affidavit.

A.   I have that.  Thank you.

Q.   Can you turn to page -- And so the paragraphs 13 and 14.  So paragraph 13 starts: Under the assumption that the DNA profile from sample EO3B1 is from a single contributor.  Did I read that correctly?

A.   Yes.

Q.   And so when you made that assumption was that something that you introduced into this interpretation method or were you told that by someone from The Innocence Project or otherwise?

A.   No, that's a normal part of any DNA analyst's first thing they do is this profile; does

138

it look like it's from a single individual or does it look like it's a mixture and if so what are the number of individuals.

So based on the DNA profile that was obtained I independently said this could be a single source profile with some artifacts present or it might be a mixture, and I can interpret it under both of those two starting assumptions.  And this is done in every single DNA case.

Q.  Of course.  And when you said it looked like a single sample, what sorts of factors are you looking at when you determine whether or not it looks like a single sample or more?

A.  So it might be helpful to start with what a mixture looks like because a single sample doesn't have those characteristics.  But for a single sample for y-str testing which was done here we expect to see only one peak at each of the loci that are tested.  Once we see two peaks that suggests that there may be a mixture in that sample, with the exception of one locus that complicates everything because it gives two peaks. So I have to qualify that.

The y-str testing, however, does have a higher propensity for introducing some artifacts.

139

And so when smaller peaks are occasionally seen, particularly in certain positions, it has to be considered whether those are in fact artifacts of the testing and aren't contributing to the sample being a mixture and therefore it's a single source profile, or if they might be true alleles from a second individual.

So looking for a single peak at each locus would be consistent with a single source profile. A single peak at each locus with one or two peaks that we call stutter are common and we expect those to be there in single source samples. But those extra peaks may also be indicative of mixture from a second individual. Because that wasn't clear in this sample I chose to evaluate it under both of those starting assumptions, if it's a single source or if it's a mixture of two individuals.

Q. And before we get to the -- I do want to come back to the peaks in just a moment. But now you're talking about this as if it's only one or two individuals. Is there ever an instance where there might be three or more profiles in a mixture?

A. Oh, certainly.

140

Q.   And how would you tell if there are three people or four people?

A.   To know definitive there are three or four people I would have to see indication in the DNA of each of those individuals.

Q.   And what counts as an indication?  I don't --

A.   So for y-str testing to know that there were four individuals I would have to see four peaks at at least one, if not multiple locations. That would tell me I know there are DNA from at least four males in this sample.  And we only ever know what the minimum number is.  There could be more individuals, but their profile isn't distinguishable enough from the other individuals.

Q.   Great.  And so when you're talking about these peaks it's my understanding that there are about three different thresholds that are applicable in DNA testing; the analytical threshold - I'm sorry - the peak detection threshold - Let's start out with that first - would you agree?

A.   If you're talking about BODE's procedures, yes.

Q.   Okay.

141

A.   What they do is not common.  So following their procedures, yes, they have three thresholds.

Q.   Okay.  And those are the peak detection threshold at 30RFU or relative reactive fluorescence units, is that correct?

A.   I think theirs is 35.

Q.   Thank you for the clarification.  And then the analytical threshold and that's at 70, correct?

A.   I think it was 75.

Q.   Okay.  And then there's the --

(Reporter asks for clarification.)

A.   Wrong word.

Q.   Oh, I'm sorry.  In the BODE procedures it appears they call it a --

A.   Stochastic, S-T-O-C-H-A-S-T-I-C, threshold.

Q.   And at stochastic threshold that's where we know that there's no DNA missing, is that correct?  There's nothing missing from the sample?

A.   No.

Q.   Okay.

A.   Well, no.

Q.   Okay.  Fair enough.

142

A.   I can explain if you'd like.

Q.   So at the analytical threshold that just means that there's something there, would you agree?

A.   The analytical threshold is used to say anything we see above this level we have pretty high confidence this is real data, this is probably a true allele, or it could be an artifact.  It's separating background noise from what we think are true data that can be interpreted.

Q.   And the analytical threshold in this case is set by BODE, correct?

A.   Yes, for their procedures they set what they use to interpret their data.

Q.   And they set that based on what you were calling earlier validation studies, is that correct?

A.   That's correct.

Q.   And those are unique to the lab, correct?

A.   Each lab does their own validation studies and based on those sets their own protocols, yes.

Q.   Great.  So using the data that you were given and these assumptions that are a normal part

143

of your process you came to a result in this case, is that correct?

A.   I stated some conclusions.

Q.   Okay.  And you concluded that according to the evidence that you reviewed and the data that you reviewed you believe that Mr. Williams could be excluded as a source of this DNA mixture or profile, is that correct?

A.   That's correct.

Q.   And that's under your assumption --
Let's throw out the single contributor for the moment.  That's under the assumption that there are only two people who touched who were DNA contributors to this knife, is that correct?

A.   Under the assumption that there are only two DNA contributors, which is all the data support, he is not either of those two contributors.

Q.   And at this point in time the contributors to a DNA is a little bit hard to define in practical -- in practicality.  So if an individual were to touch something, if I were to hold this pen am I a contributor to this DNA?  If this pen is later DNA tested would I be a contributor?

144

A.   If your DNA is detected and it matches to your profile, yes, that would be consistent with you being a contributor to the DNA detected.

Q.   But there might be plenty of other people that have touched this pen, would you agree?

A.   I have no idea.  Under the assumption that other people touched it, yes.

Q.   And other people -- Just by touching something other people can also leave DNA, is that correct?

A.   Certainly.

Q.   Great.

A.   Or not.  I mean, it's variable.

Q.   Fair enough.  There are lots of factors, and sometimes these results are just inconclusive, would you agree?  When you are looking at DNA results and you're evaluating all of the data that you're given sometimes the answer is just inconclusive, is that right?

A.   In some limited situations the quality of the data are so inadequate and/or the limited information available makes it either impossible to make any conclusions or it's inconclusive for certain individuals in the comparison to certain individuals.

145

Q.   And does the effort that an individual interpreter will go to to not result in any conclusive results, does that depend on the interpreter or is that industry standard.

(The reporter requests that the question be restated.)

Q.   When you are determining what is inconclusive do you -- is there a point when you stop looking for data, when you stop seeing data as being important even if there's data there, or do you just keep looking; as long as it was detected it's not inconclusive?

A.   I don't think I understand your question.  To me all data are important.

Q.   Okay.

A.   Whether they are useful and sufficient to make the type of comparison that we need to do is what determines whether a conclusion can be made or whether no conclusion can be made and, therefore, inconclusive.  If we do testing and we get absolutely no data there's no conclusion that can be made because there's nothing for comparison.

If only a single allele is recovered many labs call that inconclusive.  My position is, well, if you've got one allele and you think it's

146

true data you could use that to say, This is an 11; the person I'm comparing it to doesn't have an 11 so therefore they are excluded as the source of that single allele.

Whereas, another individual who has that 11 technically isn't excluded but that "inclusion" really has no meaning because you're only looking at a single allele, and for that reason many labs will call that an inconclusive finding.  And it varies from lab to lab and data to data.

Q.   And that might be based on their validation studies, would you agree?

A.   Well in theory they -- all interpretations should be based on their validation studies.  Unfortunately BODE and other labs leave this analyst discretion where the analyst get to decide what they want to do and the procedures are not sufficiently detailed such that everyone in the lab would be assured of getting the same results.

Q.   And --

A.   Sorry, reaching the same conclusion off of the same results.

Q.   Did you review anything in this case that indicates that these results were not reviewed

147

or signed off on by multiple people in BODE?

A.   No.  There's a requirement for a technical review on each of the reports and that's documented.

Q.   So multiple people do sign off on, you know, whether or not that data should be interpreted in that particular way?

A.   That's correct.  In theory, assuming the policies were followed, yes.  If the appropriate technical review was done it should mean that a second individual agreed with what was in that report.

Q.   Great.  And in this instance just matching up one allele to the next, that's how you do inclusion exclusion, is that correct?  In just basic, basic terms, yes or no?

A.   Basic terms you compare the data at one locus from the evidence to the data at that same locus from a known individual and then you step down each locus of the data.

Q.   And in 2024 you did that with Ed Magee and Keith Larner as compared to the sample that was produced back in 2016, is that correct?

A.   I did, yes.

Q.   And at every site where there's data --

148

(The reporter asks for repeat of question.)

THE WITNESS:  I'm missing it too.

Q.   At every point, at every locus where there was data from the original sample, that allele number matches Ed Magee, is that correct?

A.   I don't recall.  It matched one of the individuals.  The primary data I'm calling either the single source or the major contributor did match one of those individuals.  I don't remember who it was.

Q.   Okay.

A.   But I need to clarify.  That doesn't mean he's the source.

THE COURT:  There's no question.

Q.   Now let's move on to the DNA, the transfer situation.  So you talked about with Mr. Jacober there's a lot of factors --

A.   Can you -- I'm having a really hard time following you.  You're flying and I'm -- I can't hear and process and think.  Thank you.

Q.   When you're talking about DNA transfer on an object after years or any period of time there are factors that you discussed with Mr. Jacober that affect how -- what DNA is left behind

149

and how much of that DNA is left behind, would you agree?

A.   I think -- I'm not sure I understand the question.  But, yes, transfer is the process of moving DNA from one area to another either by putting it on or removing or both.

Q.   And that depends on things like storage.  You talked a lot about storage with Mr. Jacober, is that correct?  Storage could affect how DNA is preserved over time?

A.   How DNA is preserved, not how it's transferred, unless it's stored in close contact with some material that the DNA then gets transferred off of that original item onto the storage packaging for instance.  But storage and transfer are two --

Q.   Just yes or no on the storage.  Where it's stored could affect what DNA is preserved?  Just yes --

A.   Yes.

Q.   And in this case were you told how the St. Louis County Prosecuting Attorney's Office or any other individual stored this sample?

A.   Not to my recollection.  I don't know.

Q.   And were you told where it was kept?

150

A.   Again, if I was I don't remember.  I don't know.

Q.   And you mentioned before you didn't note the timeline so you didn't know the time between the depositing the DNA and the collection of the DNA, is that correct?

A.   When I did the analysis of the data?

Q.   Um-hum.

A.   I don't recall whether I knew any of that or not.  I don't know.

Q.   So there were a lot of factors that you talked about being important with Mr. Jacober that you didn't know about in this case, would you agree?

A.   Well I think your question is misleading, but the answer is yes.

Q.   Okay.  Were you told anything in this case about the St. Louis County Prosecuting Attorney's Office protocol with regard to evidence handling or testing?

A.   I don't believe so.  I'm not aware they have a protocol.  If I knew about it I don't recall it at this point.

Q.   And were you told anything about the St. Louis County crime lab, what protocols they had

151

for keeping evidence?

A.   I don't recall.  I don't believe so.

MS. PRYDE:  No further questions, Your Honor.

THE COURT:  Thank you.  You may inquire.

MR. POTTS:  Thank you, Your Honor.

CROSS EXAMINATION

BY MR. POTTS:

Q.   Good afternoon, Dr. Word.

A.   Good afternoon.

Q.   Quick reset.  The DNA profiles that were just found on the knife can be explained by two people - Keith Larner and Ed Magee, right?

A.   That's correct.

Q.   When you were -- I don't want to close the loop on this.  When you were speaking with Mr. Jacober a few minutes ago I think one of the concepts that came out was that we don't know if Mr. Williams' DNA was on the knife because it may have been removed by those men handling the knife without gloves, right?

A.   I don't know anything about whose DNA was on it.  I can only tell you who might be the sources based on the data that were obtained by

152

BODE.

Q.   And I think you're jumping right in front of me.  And here's all I want to ask.  Whoever committed this murder we don't know if their DNA was on the knife because it may have gotten removed by their handling of the evidence, right?

A.   That's certainly a possibility.  I don't know.

Q.   Thank you.

MR. JACOBER:  No redirect, Your Honor.

THE COURT:  Thank you.

MS. PRYDE:  Nothing.

THE COURT:  Thank you.  Can this witness stand down?

MR. JACOBER:  Yes, Your Honor.

THE COURT:  Safe travels.

MR. JACOBER:  Your Honor, I'm going to step out to see if one of the witnesses is available.

(Pause.)

MR. JACOBER:  Judge McGraugh is parking right now, so we expect him to be here momentarily.

THE COURT:  We're switching out court reporters, so we'll be in temporary recess.

153

(A recess was taken.)

***

REPORTER'S CERTIFICATE

I, Rhonda J. Laurentius, a Certified Court Reporter and Registered Professional Reporter, hereby certify that I am the official court reporter for Division 13 of the Circuit Court of the County of St. Louis, State of Missouri; that on the 28th day of August, 2024, I was present and reported all the proceedings had in the case of IN RE:  PROSECUTING ATTORNEY, 21ST JUDICIAL CIRCUIT, ex rel. MARCELLUS WILLIAMS, MOVANT/PETITIONER, VS. STATE OF MISSOURI, RESPONDENT, CAUSE NO. 24SL-CC00422.

I further certify that the foregoing 154 pages contain a true and accurate reproduction of the proceedings had that day.

I further certify that this transcript contains pages 1 through 155 inclusive and that this reporter takes no responsibility for missing or damaged pages of this transcript when same transcript is copied by any party other than this reporter.

/s/ Rhonda J. Laurentius, CCR #0419
Official Court Reporter
Twenty-First Judicial Circuit
(314) 615-8070

155

# Attachment D

IN THE CIRCUIT COURT OF THE COUNTY OF ST. LOUIS
TWENTY-FIRST JUDICIAL CIRCUIT
Division No. 13
**The Honorable Bruce F. Hilton, Presiding**

**IN RE:**
PROSECUTING ATTORNEY,            )
21ST JUDICIAL CIRCUIT            )
ex rel, MARCELLUS WILLIAMS       ) **Cause #24SL-CC00422**
                                 )
                                 )
**MOVANT/PETITIONER,**           )
                                 )
vs.                              )

**STATE OF MISSOURI,**

RESPONDENT.
========================================================

**TRANSCRIPT OF HEARING**

Volume 2 of 2

AUGUST 28, 2024

**Susan Lucht, CCR#332
Official Court Reporter
Twenty-First Judicial Circuit
St. Louis, Missouri**

INDEX

VOLUME 2

MOVANT'S EVIDENCE


Judge Christopher McGraugh

        Direct Examination---------------158
        Cross-examination---------------164


Keith Larner

        Direct Examination---------------166
        Cross-examination---------------238
        Cross-Examination---------------251


Patrick Henson

        Direct Examination---------------263
        Cross-examination---------------266

Closing Argument by Mr. Jacober---------275

Closing Argument by Mr. Potts-----------282

Closing Argument by Mr. Clarke---------297

Reporter's Certificate Page------------306

VOLUME II

(The Court reconvened at 12:35 on August 28, 2024, and the further following proceedings were had:)

THE COURT:  We're back on the record in Cause Number 24SL-CC00422.  Let the record reflect we took a brief recess in order to take a witness.

Again, I need to remind everyone here and in the overflow room about the prohibition against any recording or photographing any of these proceedings.

If it happens, you will be asked to leave.  Just a reminder.

Mr. Jacober, with that you may call your next witness.

MR. JACOBER:  Thank you, Your Honor. The State would call Judge Christopher McGraugh.

THE COURT:  You're an officer of the Court.  I don't think it's necessary, but for the record...  (Witness sworn.)

JUDGE CHRISTOPHER MCGRAUGH, Having been sworn, testified as follows:

DIRECT EXAMINATION

BY MR. JACOBER:

Q.   Thank you, Judge McGraugh.  You're an

158

attorney licensed in the State of Missouri, correct?

A.   I am.

Q.   Are you licensed in any other state or jurisdiction?

A.   I'm licensed in a number of federal jurisdictions, but no other state.

Q.   Thank you.  You're presently a circuit court judge for the City of St. Louis, correct?

A.   I am.

Q.   How long have you been on the bench?

A.   I was appointed November of 2012.

Q.   Prior to your appointment in 2012 what type of law did you practice?

A.   Right before I was appointed I had a general criminal, civil, appellate practice in private practice.  I was in private practice.

Q.   Thank you.  At some point in your career you were on the Capital Litigation Unit for the Eastern Division of Missouri, is that correct?

A.   I was from 1990 to 1992.

Q.   Once you were off the Capital Litigation Unit did you take capital cases from a capital unit when they would have a conflict or some other reason why they couldn't handle it?

159

A.   I would.

Q.   And was one of those cases Marcellus Williams?

A.   It was.

Q.   I want to direct your attention, Judge McGraugh, to the trial in this case. Specifically the handling of the evidence.

The record will reflect what the record will reflect, but do you recall at any time during the trial anyone touching the murder weapon without wearing gloves?

A.   Outside the container or the bag, the evidence bag?  No.

Q.   If you had seen that, what would you have done?

MS. SNYDER:  Objection.  Speculation.

THE COURT:  Sustained.

Q.   (By Mr. Jacober)  Would someone touching the knife without wearing gloves have stuck out in your mind?

MS. SNYDER:  Objection.  Relevance.

THE COURT:  I'm sorry?

MS. SNYDER:  Objection.  Relevance.

MR. JACOBER:  Well, Judge, I would ask for a little bit of leeway because I think

Judge McGraugh was an experienced trial attorney at that time who had tried a lot of these types of cases, and handling of evidence is something that trial lawyers would keep in mind as they were going through the trial.

THE COURT:  This case was tried how many years ago?

MR. JACOBER:  Twenty-four years ago, give or take.

THE COURT:  Judge McGraugh's memory is better than mine.  Sustained.

Q.  (By Mr. Jacober)  Specifically do you recall if Keith Larner or Ed Magee touched the murder weapon without wearing gloves?

A.  Not outside the evidence bag.

Q.  Based on your knowledge at the time was it important to maintain the integrity of the evidence so any future testing could be done for DNA evidence on the murder weapon?

A.  Yes.

MS. SNYDER:  Objection.  Calls for improper conclusion.

THE COURT:  I will allow it.  Overruled.

A.  Yes, it would.

Q.  (By Mr. Jacober)  Why is that?

161

A.   Well, not only particularly for biological evidence, it was always sort of protocol that --

MS. SNYDER:  Objection as to any protocol is hearsay and lack of foundation.

THE COURT:  Nonresponsive.  Sustained. Rephrase.

Q.   (By Mr. Jacober)  Was it your understanding at the time that touching the knife without wearing gloves would contaminate it?

A.   Yes.

Q.   Would it surprise you to learn, Judge, that Revised Statute of Missouri 547.035, the Missouri statute that allows for post-conviction DNA testing, became effective on August 28th, 2001?

MS. SNYDER:  Your Honor, at this time I'm going to object to the relevance of this witness' emotional response to that statute.

THE COURT:  Counsel?  Sustained.

MR. JACOBER:  I'll rephrase the question.

Q.   (By Mr. Jacober)  Are you aware that Revised Statute of Missouri 547.035 became -- that's the statute allowing for post-conviction

162

DNA testing -- became effective on August 28th, 2001?

MS. SNYDER: Objection. Relevance.

THE COURT: Court will take judicial notice of the statute.

Q. (By Mr. Jacober) Are you aware of that?

A. I was aware it was enacted, but I couldn't give you the date in which it was enacted.

Q. And that's right around the time of the Marcellus Williams trial, isn't it?

A. I believe it was the summer of 2001.

Q. Based on your understanding that touching the murder weapon without wearing gloves would contaminate the DNA, was that option taken away by what we have now learned was the touching of the murder weapon by Mr. Larner and Mr. Magee prior to trial?

MS. SNYDER: Objection. Speculation and improper opinion from this witness.

THE COURT: Sustained.

MR. JACOBER: One second, Your Honor.

Q. (By Mr. Jacober) When you reviewed the physical evidence in this case, were you required to wear gloves?

163

MS. SNYDER:  Objection.  Relevance.

THE COURT:  I'll allow it.  Overruled.

A.   Yes.

Q.   (By Mr. Jacober)  And did you?

A.   Yes.

MR. JACOBER:  Judge, I have no further questions.

THE COURT:  Thank you.

MS. SNYDER:  No cross-examination.

THE COURT:  Thank you.

CROSS-EXAMINATION BY MR. POTTS:

Q.   Good afternoon, Judge McGraugh.

A.   Good afternoon.

Q.   At any time prior to trial did the prosecution ever inform you that they had been handling the murder weapon without gloves?

A.   No.

Q.   At any time prior to trial did the prosecution inform you that investigators had been handling the murder weapon without gloves?

A.   No.

MR. POTTS:  Thank you.

MS. SNYDER:  Nothing further.

THE COURT:  Mr. Jacober?

MR. JACOBER:  Nothing further.

164

THE COURT:  Thank you.  Can this witness stand down?

MR. JACOBER:  Yes, Your Honor.

THE COURT:  Thank you, Judge McGraugh. Get back to your jury trial.

JUDGE MCGRAUGH:  Thank you, Judge Hilton.

THE COURT:  Given the hour and so that everyone can reenergize, or not, by having some lunch, the Court is going to be in recess for lunch.

It is almost 12:45.  Let's come back, would that be 1:45, an hour?  Is an hour enough time to get Mr. Williams something to eat and everything?  Will that be okay with DOC?  Okay. So the Court will stand in recess until 1:45.

(A recess was taken at 12:45 p.m.  The court reconvened at 1:50 p.m., and the further following proceedings were had:)

THE COURT:  Again, I'd like to remind any new members of the gallery against the prohibition of recording any of these proceedings or taking photographs.  That also is germane to the overflow room.  And I appreciate you complying with that order.

165

with that said, let's go back on the record. We're back on the record in Cause 24SL-CC00422. According to the clock on my computer it's approximately 1:50 p.m. this 28th day of August 2024. With that said, Mr. Jacober.

MR. JACOBER: Your Honor, at this time the State would call Keith Larner. Mr. Potts will be taking the lead on that examination.

THE COURT: Thank you.

STATE'S EVIDENCE

KEITH LARNER,

Having been sworn, testified:

DIRECT EXAMINATION BY MR. POTTS:

Q. Good afternoon.

A. Good afternoon.

Q. One last time, would you mind stating your name for the record?

A. Keith Larner.

Q. Mr. Larner, you're a former assistant prosecuting attorney for St. Louis County; correct?

A. That's correct.

Q. What years were you an assistant prosecutor?

A. June 7th, 1982, until May 1st, 2014.

166

Q.    You were also the trial prosecutor in the Marcellus Williams case when he was tried for the murder of Felicia Gayle?

A.    Correct.

Q.    Ms. Gayle was murdered in August of 1998.  Does that sound right?

A.    August 11th.

Q.    When were you first assigned on this case?

A.    After the case was indicted in 1999. I'm guessing November or December of '99. Whenever the indictment occurred.  I was not involved prior to that time.

Q.    So by November or December of 1999 how many murder cases have you tried in your career?

A.    Between two and three dozen.

Q.    By that point in your career how many felony cases had you tried?

A.    Well, I tried between 95 and 100.  Back then I would have tried probably more than half of those trials.  So 50 or more.

Q.    Let's talk about Laura Asaro and Henry Cole.  As you have been preparing to testify today have you gone back and looked through any of your records?

167

A.   I have looked at the trial transcript for Henry Cole.  I have not looked at the trial transcript for Laura Asaro.

Q.   Beyond the trial transcript have you reviewed anything to prepare for your testimony today?

A.   I read Ed Magee's statement that he made back in two thousand -- I don't know when he made it -- 2015, 2018.  2018 he made it.

Q.   Anything else?

A.   No.  Just the trial transcript and that.

Q.   Ms. Asaro and Mr. Cole weren't the two strongest witnesses you've ever had in a murder case, right?

A.   I think they were probably the two strongest witnesses I've ever had in a murder case.  Yes, they were.

Q.   They were?

A.   And I'll tell you why if you want to know.  Whenever you want.

Q.   We'll get there.  Now, Ms. Asaro was a crack cocaine addict, right?

A.   Yes.

Q.   And Ms. Asaro was also a sex worker?

A.   She was a prostitute.

168

Q.   Mr. Cole had about 12 criminal
convictions?

A.   I'd say that's a fair amount.  True.

Q.   Those convictions included robberies,
possession of stolen property, and carrying
concealed weapons?

A.   I don't think he had any robbery first
degrees.  I don't think he was one that would
carry knives and guns.  Robbery second degree
maybe.  He had a drug problem.  He did crimes to
pay for his drug addiction.  Lots of them, like
you said.

Q.   Lots of them.  Right.  And he was facing
a robbery charge when he was released in June of
1999 right before he went to the police department
about this case, right?

A.   What kind of robbery are you talking
about?  Robbery what, first or second?

Q.   Well, it was a robbery charge.  Right?

A.   Well, I told you it wasn't a robbery
first.  I wasn't aware that he was facing any
charges.  I knew he had been in the city jail and
he had been released on June 4th, 1999.  He
immediately went to the police with his story.  I
don't know what the crimes he was charged with.

169

Somehow he got out on bond that day or he was released that day for different reasons.

Q.   Okay.  And Mr. Cole also had a history of drug addiction, correct?

MR. SPILLANE:  I'm going to object to asked and answered.

THE COURT:  Overruled.

A.   Yes.

Q.   (By Mr. Potts)  Both of the witnesses expressed interest in the family's monetary reward?

A.   At some point -- not Laura Asaro at the beginning.  Then she found out about the reward. And when she found out about it, yes, she was interested.  But that's not why she came forward. Henry Cole on the other hand came forward predominantly for the reward.

Q.   Yeah.

A.   And to tell the truth.

Q.   And he was promised $5,000 for his deposition testimony in April of 2001, right?

A.   After he did his deposition in New York, he had to come back -- that was a deposition conducted by the defense.  And then we were going to do a deposition to preserve testimony in

170

St. Louis, which was going to be video recorded. And we did do that. And he was promised the 5,000 after he did that.

Q. And so he did get the $5,000?

A. After the trial.

Q. Okay. And you actually approached Dr. Picus, the victim's husband?

A. I'm sorry. I think he got it before the trial.

Q. Oh, he got it before the trial?

A. I think he got it after the deposition that he did in St. Louis a month or so prior to the trial. We gave him the $5,000. That was a promise we made to him. And we said, please come back for the trial.

Q. Yeah.

A. We've given you the money. Please come back. And he did.

Q. So he had that $5,000 in his pocket before he showed up to testify?

A. No. He testified under oath twice, but not testified at trial. He had the money before he testified at trial. That's correct.

Q. And you approached Dr. Picus about giving that portion of reward money to Mr. Cole

about four to six weeks before the deposition?

A.   Probably so.  I had to get his permission.  It was his money, I believe.

Q.   Yeah.  And Dr. Picus actually met with Mr. Cole at the St. Louis Prosecuting Attorney's Office to physically hand him that $5,000 in cash, right?

A.   That's true.

Q.   And those were the two strongest witnesses you've ever had in a murder trial?

A.   Informants?  Absolutely.

Q.   Now, there were no eyewitnesses -- Excuse me.  Strike that.  There were no eyewitnesses to the murder, right?

A.   That's correct.  That's correct.

Q.   The murder weapon in the Gayle case was a knife.  Right?

A.   Yes.  It was a butcher knife.

Q.   It was a violent murder, right?

A.   The most violent murder I've ever seen in 40 years.  That is correct.

Q.   And that knife was examined and tested by the St. Louis County Laboratory personnel for fingerprints and other evidence before you were involved in the case.  Right?

172

A.    That's correct.  It was tested by Detective Krull for fingerprints one day after the murder.  It was brought there from the autopsy by Dr. Wunderlich.  He seized it from the body. Dr. Nanduri took the knife out of Ms. Gayle's neck, handed it to Detective Wunderlich. Detective Wunderlich put it in an envelope, sealed it, and signed his name.  He hand carried that over to Detective Krull, who is the fingerprint expert for St. Louis County.  And Detective Krull looked at that knife handle, and he found no fingerprints whatsoever on that knife handle.  The knife blade had blood on it.

It was then sent over to the County Lab to test for blood.  It tested positive for blood. It was Ms. Gayle's blood.  The knife was all the way into her neck.

Then that knife was packaged by the St. Louis County Lab in a box, and it was sent then over to U City to wait until they found someone that committed the crime.

So this was all within two or three days.  That knife had been fully forensically tested.  Sufficient for me and sufficient for the defense attorneys.  We were all satisfied with the

173

testing.  Neither side asked for any additional testing at any time prior to that trial.

Q.    You said that was all within three days?

A.    I know the fingerprints was within one day.  And I know that it went from there to the -- to the lab to test for blood.  And I don't know for sure that it was within three days.

If you show me the box that it was in, it's probably labeled and dated by the lady or the man that tested it at the lab.  I'm guessing between within three days.  I'm pretty darn sure it was within a week.  There was a rush on this.  This was not something to sit and wait.

Q.    And so that would have been back in when?  What month and year?

A.    August of two thousand -- I'm sorry, August of 1998.

Q.    So as far as you were concerned the forensics were finished in August of 1998?

A.    I wasn't going to ask for any more forensic testing.  The St. Louis County Lab are the experts, and they did what they could do.  I was satisfied with that.  I was not going to ask for any more testing.

However, I always knew that the other

174

side, whoever they may be, and they were appointed shortly after indictment too, may want to test it. And so I kept it pristine. I had not taken it out of that box. It was sealed. That box was sealed from the St. Louis County Lab with tape. And I waited until I knew that they were not going to ask for any further testing, that they were satisfied with the tests that were done. Yes, I knew that to be the case before I touched the knife.

Q. When did you touch the knife?

A. Well, I got the evidence, I'm guessing, I said in my affidavit about a year before the trial. The trial occurred two years and ten months after the murder. So you can do the math. But I would like to see the evidence receipt which is State's Exhibit 91 to see what date my investigator brought that from U City Police Department to the prosecutor's office. I'm thinking it was sometime approximately a year before the trial I had possession of that knife, enclosed in the box from the lab, sealed. Completely. One hundred percent enclosed in that box. Not sticking out of the box in any way, shape, or form.

175

Q.   Okay.  Mr. Larner, who is Ed Magee?

A.   My investigator at the time.

Q.   When you say your investigator, what do you mean?

A.   He was assigned to help me on this case.

Q.   What does an investigator -- so who employed Mr. Magee?

A.   St. Louis County Prosecuting Attorney's Office.

Q.   So he wasn't a police detective, right?

A.   I don't know if they were licensed police officers.  I know he carried a gun.  I don't know if he was licensed by St. Louis County. He came from the City where he had a career in the City as a lieutenant with the Metropolitan Police Department.  Then he came out to the prosecutor's office to work until he retired.

Q.   So what are the types of duties that an investigator had with the St. Louis County Prosecuting Attorney's Office?

A.   Basically anything I asked him to do. Talk to witnesses, locate witnesses, handle evidence, discuss strategy with me.  Anything that could help me, he was going to do, within the law.

Q.   Was it you or Mr. Magee who originally

176

took possession of the knife?

A.   I think it was Magee.  He got it from the U City Police Department.  Brought it to me in the prosecutor's office.  We lock it in a room right down the hall from my office.  I had a key and Magee had a key, and I believe that's all.

Q.   All right.  So let's back this up a little bit.  So Mr. Magee took possession of the evidence from University City Police Department?

A.   I believe that's correct.

Q.   And then he brought it directly to the St. Louis County Prosecuting Attorney's Office?

A.   That's what I asked him to do, yes.

Q.   All right.  And would Mr. Magee have been the one who walked it into the building personally?

A.   Yes.

Q.   Okay.  And then Mr. Magee would have taken it to this locked room that you're describing, right?

A.   That's right.

Q.   And you said that both you and Mr. Magee had keys to that room?

A.   Mr. Magee gave me a key, and so I had a key.  He was the chief investigator.  Although, at

177

that time he was probably not the chief investigator in the prosecuting attorney's office. Maybe he was.  I don't recall when he became the chief.

Q.    So that was a locked room?

A.    It was.

Q.    There were only two keys?

A.    That I knew of, yes.

Q.    One key for you, and one key for Mr. Magee?

A.    I believe that's true.

Q.    Now everything that we're talking about, you've already disclosed this in an affidavit. Correct?

A.    Not everything.  Are you kidding?  We're going to talk for an hour.  My affidavit is a page and a half.

Q.    Well, what I'm saying is you've at least previewed these issues for everyone in your affidavit, correct?

A.    Some of them.  I don't know which issues you're talking about.  Could you be more specific?

Q.    Yeah.  Well, I mean, we were talking about how the evidence actually made its way to the St. Louis County Prosecuting Attorney's

178

Office, right? Talked about that in your affidavit?

A. Well, I know I didn't get it from U City. I believe it was Mr. Magee.

Q. And you were truthful in your affidavit, correct?

A. With regard to what point? I made a mistake in there, and I'm willing to admit it right now. Let's talk about it.

Q. Are you aware of any subsequent DNA testing on the knife?

A. Yes. I think testing was done by, I don't know, the defendant's -- I say, the defendant. I mean Mr. Williams, his attorneys, in around 2015.

Q. Okay.

A. Approximately.

Q. Are you aware of additional testing that came out last week?

A. I was told that Mr. Magee's DNA is on the knife handle, and that's all I know.

Q. What did you learn about your DNA?

A. I don't know if my DNA is on there or not. I would like to know. Was it? I'd love to know. I touched the knife. I touched the knife

179

at some point before two thousand -- before the trial.

Q.   And when you touched the knife before trial, you touched it without gloves?

A.   Yes.

Q.   How many times before trial did you touch the knife without gloves?

A.   I touched it when I put the Exhibit 90 sticker on there.  I touched it when I showed it to State's witnesses before they testified. That's about all I can recall, touching it twice -- or not twice, but there were many witnesses that I showed it to and touched it in preparation for their testimony a month or two before trial.

Q.   Okay.  So you're saying that there are two different categories of occasions when you were handling the murder weapon without gloves. The first is when you were affixing the exhibit sticker, and the second is when you were discussing the weapon with witnesses.  Correct?

A.   Yes.

Q.   And that process started approximately two months before the trial?

A.   Hard to say.  I just don't want to be so

180

definite.  I know I met with witnesses before trial.  Several times I met with each witness, I would say, in the case.  I would have showed the knife to Detective Krull.  I would have shown it to Dr. Picus.  I would have shown it to Detective Wunderlich, and I would have showed it to Dr. Nanduri, the medical examiner.  I would have showed it to them.  Whether I handed it to them at that time, I can't say for sure.  I know I touched it at that time, and I'm sitting across the table from them, and I'm holding the knife.  Did I hand it to them at that time?  I do not recall.

Q.   So I want to make sure I got this list correct.  So I heard that you handled the knife without gloves when you were with Detective Krull, Dr. Picus, Detective Wunderlich, and Dr. Nanduri.  Is that right, those four people?

A.   That's right.

Q.   All right.  How many times did you meet with Detective Krull when you were handling the knife?

A.   Just the one time to show him the knife.  I met with him several times about his testimony.

Q.   How many times did you meet with

181

Dr. Picus when you were handling the knife without gloves?

A.   One time, and I did not have him touch the knife.  It would have been too painful to have him touch his wife's murder weapon.  I showed it to him because I wanted him to identify it in court, if he could.

Q.   And how many times when you met with Detective Wunderlich did you handle the knife without gloves?

A.   Once.  Again, with Krull and Wunderlich I was going to have them identify it if they could at court in trial.  So I wanted to show it to them before they testified.

Q.   And then how many times did you meet with Dr. Nanduri when you were handling the knife without gloves?

A.   One time.

Q.   So I want you to --

A.   She also identified the knife in court. I wanted her to be able to do that.  And so I met with her and showed her the knife.  I don't remember if I handed it to her or not.

Q.   Okay.  So I just want to make sure I got this right.  I've got five different occasions

182

where you handled the knife without gloves.  Once with Detective Krull, once with Dr. Picus, once with Detective Wunderlich, once with Dr. Nanduri, and once when you were affixing the exhibit sticker.  Is that correct?

A.    Yes.

Q.    Can you think of any other times when you were handling the knife without gloves?

A.    Not until the trial.

Q.    Okay.

A.    Again, the defense attorneys at that point had said they didn't want any testing on the knife.  The knife was fully tested.  I also knew at that time that the killer wore gloves.  So whether -- I knew the killer's DNA and the killer's fingerprints would never be found on the knife because the killer wore gloves.  And I knew the killer wore gloves before I touched the knife.  So I knew that that knife was irrelevant in that regard.

Q.    That's really interesting.

A.    In my opinion.  In my opinion.

Q.    So you knew or it was your opinion that the killer wore gloves?

A.    Oh, I knew because I had talked to

183

Detective Creach.  He laid it out in his trial testimony.  And I met with him before trial.  On Page 2001, 2002, 2003, and 2004 of the trial transcript Detective Creach tells you exactly how he knew that the person that broke into the house wore gloves.  And you let me know when you want me to tell you what he said.

Q.    So you say you knew --

A.    I also knew --

Q.    Excuse me.

A.    -- for other reasons.

Q.    Excuse me one second.  We'll get there.

A.    Okay.

Q.    You weren't an eyewitness to the murder?

A.    I beg your pardon?

Q.    You were not an eyewitness to the murder, correct?

A.    Correct.

Q.    You did not see what happened inside that house?  Correct?

A.    No.  Not when it happened I didn't.  No.

Q.    So what you're saying is, you just decided that your opinion gave you the right to handle the knife?

A.    You know --

184

MR. SPILLANE:  I'm going to object to that.  That's misstating his testimony.

A.   Detective Creach --

Q.   (By Mr. Potts)  Fair question --

THE COURT:  Hold on.  Hold on.  Let me rule.  Overruled.

A.   Detective Creach is the one that told me that the killer wore gloves.  He was a crime scene investigator for the St. Louis County Police Department.  On the day of the crime he did the crime scene investigation on this case along with other crime scene investigators.  But he looked at the window that was broken out, the glass pane of window, which was the point of entry.  He looked at the glass that was broken, and he found no fingerprints on the glass whatsoever.

He did find two clear marks on -- if this phone was a piece of glass.  There was a piece of glass -- you mind if I go into this now?

Q.   (By Mr. Potts)  Let's stop right there.

MR. SPILLANE:  Your Honor, can he answer the question?

MR. POTTS:  It was not responsive.

MR. SPILLANE:  He's been stopped twice from explaining why he believed that the killer

185

wore gloves.  Each time he tries to answer he's stopped.

MR. POTTS:  That wasn't the question.

THE COURT:  You can rehabilitate him. Next question.

Q.   (By Mr. Potts)  I want to go back to when you were handling the knife without gloves prior to trial.

Now, I can tell you the knife is right there.  I'm not going to get it out because I don't think we need to do that.

What I'm interested in is --

MR. POTTS:  You mind if I -- may I approach the witness?  May I approach the witness, Your Honor?

THE COURT:  For what purpose?

MR. POTTS:  I was going to have him show how he was handling the knife.

THE COURT:  I'm sorry?

MR. POTTS:  I was going to have him show us how he handled the knife.

THE COURT:  All right.

Q.   (By Mr. Potts)  Just, will you show me, when you were handling -- I'm just going to hand you this.

186

A.    I touched the knife handle.  I did not touch the knife blade.

Q.    Okay.

A.    How did I touch it?  I don't even have any idea how I touched it.  But I touched it enough to be able to hold it.

Q.    Did you lift it up?

A.    To show, yes.

Q.    How long would you hold it for in your hand?

A.    Well, when I took it to put the State's Exhibit 90 sticker on there, I pulled it out of the box.  That would have been the first time I took it out of the box.

Q.    Okay.

A.    And I probably set it down on the table.

Q.    Okay.

A.    I got out State's Exhibit Number 90, wrote the word -- numbers 90 on it, and I stuck that sticker onto the knife handle.  And I did see the knife this morning.  I know exactly what it looks like just from today.

Q.    And what about with Detective Krull, would you hold it up again?

A.    About the same.

187

Q.    Yeah.  Hold it up?  With Dr. Picus did you hold it up?

A.    That's correct.

Q.    With Detective Wunderlich you picked it up, held it in your hand by the handle?

A.    Correct, before he testified at trial.

Q.    With Dr. Nanduri, picked it up, held it in your hands with the handle?

A.    Same way, same place, on the end, on the handle end.

Q.    And for each of those people you were also open to them handling the knife if they wanted to?

A.    At that point in time, yes, I was open to it.  I didn't give it to Dr. Picus for the reason I stated.  I didn't let him touch it.

Q.    You didn't make them wear gloves?

A.    Not that I recall.

Q.    Did you ever see anyone handle the knife with gloves?

A.    I did handle it with gloves with a witness during the trial.

Q.    During trial?

A.    During the trial.  One of the witnesses I did.  That would have been Dr. -- I'm sorry,

188

would have been Detective Wunderlich.  I gave him gloves not to handle the knife, but because after he handled the knife he was going to handle the State's Exhibit 93, which was the bloody purple shirt that the victim was wearing.  That had dried blood on it, and I thought he wouldn't want to touch that, and neither did I.  So we both put on gloves for his testimony.  And I state that in the record when I say "put these on".  I'm saying gloves, in case you didn't know.

Q.   Now, by the time of the Williams trial you had been a prosecutor for about 17 years, right?

A.   That's the math.

Q.   Okay.  Before then have you ever had a trial that resulted in a hung jury?

A.   Yes.

Q.   Had you ever had a judge declare a mistrial for any other reason?

A.   I think the very first case I ever tried was a misdemeanor DWI.  And I asked the defendant, because he said he didn't drink, and I said, well, you just got out of inpatient treatment for alcoholism.  He was trying to imply that he never drank.  And I said that.  And the judge said,

189

that's a mistrial.  And you know what?  I retried it and won.  That's the way it goes.  That's the only time other than hung juries.

Q.    Have you ever had a case reversed on appeal?

A.    Not for anything that I did personally, but yes, I've had two.

Q.    Okay.

A.    I recall two.  One of them we didn't instruct down to voluntary manslaughter.  I convicted him of murder second.  The Supreme Court said you should have instructed down one more time to voluntary manslaughter, and they reversed it for that.

The second one was a case where the judge -- I won the motion to suppress regarding the defendant's statement.  And the Court -- the Supreme Court said the judge -- you should have lost that motion to suppress.

By the way, I didn't try that motion to suppress.  That was another prosecutor in the office that did that.  I didn't get on the case until after that.  That prosecutor left the office.  Then I got on the case.  But that was the case I was involved with that was reversed.

190

Q.    In all those instances the end result is you have to go retry the case, right?

A.    That's right.

Q.    You ever had a defendant seek post-conviction or habeas corpus relief after one of your trials?

A.    I'm sorry.  What was that?

Q.    Have you ever had a defendant seek post-conviction --

A.    Seek it?

Q.    Yeah.

A.    Yes.  They all do.

Q.    Yeah.  They all do?

A.    They all do, yeah.

Q.    Have you ever had defense counsel ask for a trial continuance?

A.    Of course.

Q.    All the time, right?

A.    Not all the time, but sometimes.

Q.    Yeah.  And sometimes those are granted, right?

A.    Not in this case they weren't.  They asked for a continuance.  They didn't get it.  So no, it was not in this case.  In some other case -- I mean, I tried a hundred cases so I'm

191

sure.

Q. But in other cases they are granted, right?

A. They can be, and they have.

Q. So at what exact point of these proceedings did you believe that it was appropriate for you to contaminate the murder weapon?

MR. SPILLANE: I'm going to object to the form of the question, Your Honor. There's been no foundation he contaminated the murder weapon. He said he held it after it was tested.

THE COURT: Sustained.

Q. (By Mr. Potts) So what exact point of these proceedings did you believe that it became appropriate for you to handle the murder weapon without gloves?

A. When I knew that I wanted no more testing of this knife. I thought all the testing -- I didn't even know of any other tests that could be done. I didn't. And I assumed the lab did the most thorough job that they could. So I didn't ask for any, and I knew I wasn't going to ask for any tests. There were no fingerprints on there. There was nothing to link anybody to the

192

crime on that knife.

And I also knew before I touched that knife that Detective Creach gave his opinion to me. And why -- what formulated his opinion, what facts were there for him to conclude, not me, but for him to conclude that the person that entered the home wore gloves.

Second, Henry Cole testified at the trial that the defendant, Mr. Williams, told Henry Cole -- they were cellmates in the city jail. That's how Henry Cole got all the information. They were cellmates. He -- Henry Cole testified that the defendant told Henry Cole that the defendant wore gloves when he committed the crime so that he would not leave fingerprints in the house. Those were -- that's how Henry Cole testified at trial. And I knew he was going to testify that way in trial.

And the third reason I felt I could touch the knife was because there were no prints on it. There was nothing there. There was nothing to link anybody to the crime. It was worthless in my view at that time.

Q. And so I think that what you just said, though, is that it would have been within seven

193

days of this murder being committed that forensic evidence testing had been finished, right?

A.   I mean, if you're going to hold me to seven, it could have been two, three days.  It could have been ten days.  If you give me that box that I looked at this morning, there's a date on it, I'm sure.

Q.   Let's just say that roughly three- to ten-day window.  Any time after that three- to ten-day window had elapsed that's when it became appropriate for you to handle the knife without gloves?

A.   No.  I didn't even get involved in the case until 15 months later.  And I told you, it wasn't until I talked to Detective Creach and he told me his opinion, that based on his knowledge, his training, and what he saw that night that the person wore gloves.  And that was real close to the trial.  That was closer to the trial.  Not closer to the murder.  Closer to the trial.

Q.   In this case the defense counsel was specifically requesting continuances of the trial date, right?

A.   I know that they requested a continuance at some point.  I don't know when they asked for

194

it.  Maybe they asked for more than once.  But I don't think the judge gave it to them, is my recollection.

Q.  And they were asking for continuances because they wanted to conduct further forensic testing, right?

A.  Wrong.

Q.  Wrong?

A.  Wrong.

Q.  Okay.  Why do you think that's wrong?

A.  Because they never asked for any forensic testing.  If they had asked me for forensic testing, I would have said, sure.  And if I didn't say sure, the judge would have said yes, they may do it.

Q.  Did you oppose the continuance in this case?

A.  I don't remember.  I probably did.  I was ready to go.

Q.  So you didn't -- when you told them that you wouldn't agree to the continuance, did you tell them that you had been handling the evidence without gloves?

A.  I said I probably opposed it.  I know the judge would have none of it.  Judge O'Brien

195

would have none of it.

Q.   And so you took that position to oppose the continuance after you had already contaminated -- I'm sorry.  I want to strike that.  I don't want an objection here.  You took that position that you were going to oppose the continuance after you had already been handling the knife without gloves?

A.   Well, you tell me when I opposed the continuance.  It should be in the Court record.

Q.   Does around early May sound right?

A.   May of what year?

Q.   Well, it was right before trial, wasn't it?  You said --

A.   The trial was in June.  I think it started on June 4th of 2001.  So May.  That sounds -- that could -- if you say I opposed it, it very well could have been in May.

Q.   Yeah.  And, in fact, they filed a supplemental request for continuance on May 25th, right?

A.   I don't know.  If it's in the record, then it was.

Q.   Yeah.  And when they filed that supplement, you still opposed the continuance?

196

A.    If the record says that, then I did.

Q.    In seeking the continuance, defense counsel was also trying to get copies of Mr. Williams' incarceration records from the Department of Corrections, right?

A.    I have no idea what the reasons were for their continuance.

Q.    Well, was that one of the -- Okay.  You had those records, didn't you?

A.    Incarceration records?

Q.    Yes.

A.    I wanted to prove that he was in jail, the same cell as the informant.  I wanted to show that they were together in jail so that the information could have been transferred as the informant said it was.

Q.    I appreciate that.  That's not quite the question.  I'm saying, you had possession of those records, didn't you?

A.    Was that an exhibit that I used in the case?  If it was, I had possession of them.  I don't know when I got possession of them.  I might have got -- I don't know when I got possession of those records.  They're probably dated by the person that made those records at the jail.

197

They're official records.  They're dated.

Q.    Now, this case involved a stolen laptop, right?

A.    That was one of the things stolen, yes.

Q.    Yeah.  And Dr. Picus had to also look at the laptop that was recovered, correct?

A.    That's correct.

Q.    And Dr. Picus had to wear gloves when he was handling the laptop, right?

A.    I don't recall that one way or the other.  The laptop was never forensically tested like the knife was.  I don't believe the laptop was ever -- any testing was done on it.  I don't recall any being done.  I don't see any reason to have used gloves on that if it wasn't going to be tested.  And I don't know whether gloves were used.  I just don't remember.

Q.    Now, did you allow the jurors to handle the knife at trial?

A.    Absolutely not.

Q.    Why not?

A.    The judge wouldn't have allowed that.

Q.    Okay.  But I mean, would you have had a problem with the jurors handling the knife at trial?

198

A.    That calls for speculation on my part, and I guess I don't really know.  I do not want the jurors touching any piece of evidence other than maybe a photograph or something that they would need to touch.  So I don't think in any case a juror should touch a knife or a gun.  After all, they might stab each other.  Who knows.

Q.    You said that doctor -- I mean, Detective Wunderlich was wearing gloves when he handled the knife at trial?

A.    I handed him gloves, yes.  I said, Put these on.  Those were my exact words.

Q.    But you didn't hand them to him when he was handling the purple shirt.  You handed them to him when he was handling the knife.  Correct?

A.    I handed him those gloves before he touched any exhibit.  It was right at the beginning of his testimony.  I thought, why not start him with gloves.  Why interrupt his testimony with putting on gloves right in the beginning.  And the beginning was the knife.  That's when I started talking about the knife.  And then from the knife I went into the bloody purple shirt he seized at the autopsy.  He seized the knife and the purple shirt.  And those were

199

the items that I was going to talk to him about when he testified.  That's when I gave him the gloves, and that's why I put them on too.

Q.   And that's because evidence with blood on it should be handled wearing gloves, right?

A.   That's a matter of personal opinion.  I just thought, you know, I don't know if I discussed it with him in advance, but the purple shirt was just loaded, drenched in blood.  You could imagine.  It was dried blood.  And I didn't really care to touch it, and I knew or figured he didn't either.

Q.   Let's talk about jury selection.

A.   All right.

Q.   There were over 100 potential jurors who responded to their summonses and showed up for this case, right?

A.   Probably so.  In fact, I think you're right.  Had to have been a hundred.  It was a death penalty case.

Q.   Exactly.  I'll tell you, does 131 sound right for a death penalty case?

A.   Yeah.

Q.   Okay.  Of more than a hundred potential jurors, only a handful of them were black?

200

A.    I don't know how many were black.

Q.    You don't?

A.    You tell me.

Q.    Through alternates who went through selection of seven black members of the veneer. Did that sound right?

A.    I know how many I struck.  I had nine peremptory strikes.  I struck three.  Three of nine blacks -- not three of nine blacks.  Three of nine people were black.  Six of nine people were white.  I struck six whites, three blacks. Leaving one black on the jury is the way it came out.

Q.    We'll get to that, but I think you have those numbers reversed.

A.    No.  I think you have them reversed, actually.

Q.    Okay.  All right.

A.    I know for a fact -- I read the Supreme Court opinion.  I struck Juror Number 64, 65, and 72.  Those were my peremptory strikes.  And you know what a peremptory is?

Q.    Yes.

A.    Okay.  I have nine strikes I can use. Okay?  I got to strike nine.  And I struck three

201

African Americans, and I struck six whites, leaving one African American on the jury.

And the Supreme Court has outlined my strikes. And they said that my strikes were lawful, the Missouri Supreme Court.

Q. So would it bother you if the numbers were reversed and you struck six black instead of --

A. Peremptory?

Q. Yeah.

A. I read the Supreme Court case. I think I have it with me right here.

Q. Okay.

A. And it's three. It's Number 64, 65, and 72. Now, were other blacks struck along the way because they couldn't consider -- for example, if you couldn't consider the death penalty as one of the options in the case, then you were automatically struck by -- whether you're black or white because you couldn't follow the law. The law was you had to be able to consider both penalties.

If someone said, I would only vote for death, they were struck by the court. If someone said, I can only consider life without parole,

202

then they were struck by the court.

Then after that's all done, if they couldn't follow the law for any reason, then they're struck by the court.

I don't know how many of them -- people, black or white, were struck on that basis. But once we got everyone that was qualified, there were apparently there were four left. I struck three of the four. And I gave my reasons to the Supreme Court, or the Attorney General represented those reasons -- well, the record showed what the reasons were, the three that I struck. And the Supreme Court affirmed the case and said there was no constitutional error. I struck properly.

In other words, I had race neutral reasons to strike the African Americans, which is required by the Kentucky v. Batson 19 -- I believe -- 84 case.

Q.   Now, that was a very long answer, but I want to circle back to what my actual question was. And that was, would it be a problem if you had used six of the nine strikes on black jurors instead of white jurors?

A.   You didn't say peremptory, did you?

Q.   Would it have been a problem if you had

203

used six of your nine peremptory strikes on black jurors instead of white jurors?

A.   Would it have been a problem?  Well, if I did it, which I didn't, but if I did and the Supreme Court says it was lawful, then no, that's not a problem.

Q.   Okay.  Does that sound like a high number to you?

A.   I struck three.  Number 64, 65, and 72, and I have the case right here.

Q.   Let's talk about those potential black jurors that you struck.  You struck one of those jurors because she was an unwed mother, right?

A.   Wait a minute.  I struck -- why I struck them?  Okay.  Why I struck, I don't know.  Look at the Supreme Court case.  It outlines my -- it quotes me, I believe.

Q.   Yeah.

A.   Read it.

Q.   Did you read the Supreme Court case?

A.   Let me look at it now.

Q.   No, no.  I don't want you to read it right now.  We'll do the questions.  Did you read the Supreme Court case before you came in today?

A.   Not today I didn't read it.

204

Q.    Well, I mean as you prepared for today did you reread the case?

A.    I read it last week.  And that's how I remember that 64, 65, and 72, those numbers.  You know, there's a 133.  You said a 131.  Each juror has a number, one, two, three, four, five.  Well, we were already up to, you know, we used a lot of those jurors.

Q.    All right.  So one of the ones you remember was Juror Number 64?

A.    I don't remember why I struck Juror Number 64.  Nor do I remember why I struck 65.  Nor do I remember why I struck 72.  It's right there in the opinion, and it's in the record.  It's in the record of the trial.

Q.    Do you remember telling the Court that you struck Juror Number 64 because he looked very similar --

MR. SPILLANE:  I'm going to object.

Q.    (By Mr. Potts)  -- to the defendant?

MR. SPILLANE:  Objection.

Q.    (By Mr. Potts)  He reminded you of the defendant?

THE COURT:  Let him finish his question.  Then you can object.

205

MR. POTTS:  I will say it again so we can get it on the record.

THE COURT:  Thank you.

Q.    (By Mr. Potts)  Do you remember that you struck Juror Number 64 because he looked very similar to the defendant and reminded you of the defendant?

MR. SPILLANE:  Are you done with your question?

MR. POTTS:  Yes.

MR. SPILLANE:  I'm going to object.  The reasons are in the trial transcript.  They're in the Missouri Supreme Court opinion.  They're in the 8th Circuit opinion, and the witness has already said he doesn't remember.

THE COURT:  Maybe he's using it to refresh his recollection.

A.    If you show me the case, it will refresh my recollection.  Show me that Supreme Court case, and I'll read it.  It will tell you exactly why I did.  Whatever I did, the Supreme Court said it was lawful.  Not a violation of the defendant's constitutional rights.  On all three jurors.  And you know what?  If one of them was messed up, if I made a mistake on one of those three, this case

206

would have been reversed in 2003.

THE COURT:  Mr. Larner, wait for a question, please.

MR. POTTS:  May I approach the witness, Your Honor?

THE COURT:  You may.

Q.    (By Mr. Potts)  So I'm going to hand you -- this is just an excerpt from the trial transcript which is already in the record.  This is Page 1586.  I'm going to direct you to Lines 12 through 20.  And you can read that quietly.

A.    Are you talking about Juror Number 64?

Q.    I am indeed.

A.    Well, it starts on the previous page, actually.  So I'm not going to read part of what I said.

Q.    Well, you're more than welcome to read all of it.  I was just directing you to the part where --

A.    No.  I'm going to read it all.

THE COURT:  Let's not have a conversation.  Let's have a question and an answer.

MR. POTTS:  No problem, Your Honor.

Q.    (By Mr. Potts)  You're more than welcome

207

to read all of that.

A.   Can I read it out loud?

Q.   No.

A.   I give many reasons, many reasons for striking that juror.

Q.   Yes.  And so one of those reasons, though, that you gave was that Juror Number 64 looked very similar to the defendant.  Right?

A.   Wrong.  I want to read what I said on that one reason.  You stated like part of it, you know, just like half of it or not even half of it. I know what it says.  I see it right here.  So you're wrong.

I said -- that's part of what I said.  I said, He also to my view looked very similar to the defendant.  He reminded me of the defendant, in fact.  He had the very similar type glasses as the defendant.  He had the same piercing eyes as the defendant.  And I went on and on with additional reasons.  That was one reason.  But I gave many other reasons why I didn't like that juror and why I struck that juror.  And the Supreme Court said, No problem.

Q.   So when you said that he looked very similar to the defendant, these were two younger

208

black guys who looked alike.  Right?

MR. SPILLANE:  I'm going to object to mischaracterization of the testimony.  He said that he had the same glasses and he had basically the same demeanor.  Not that they were black guys that looked alike.  He's mischaracterizing the testimony.

THE COURT:  Thank you.  Overruled.  The transcript is the best evidence of what was said at trial.  So I would prefer, Mr. Potts, if you could identify the page number and the line numbers of that transcript so the record is clear.

MR. POTTS:  All right.  Thank you, Your Honor.  So right now I am talking about Page 1586 Lines 12 and 13.

Do you see where you say, He also in my view looked very similar to the defendant?  Do you see that.

A.  Read the rest of Line 13.  You said you were going to read 12 and 13.  You haven't done that.

Q.  I promise we'll get there.  I'm just going one sentence at a time.

A.  Okay.  One sentence at a time?

Q.  Yeah.

209

A.   To my view, he also to my view looked very similar to the defendant.  That is a sentence I said.

Q.   Okay.  And so these were both young black men, right?

MR. SPILLANE:  I'm going to object again.  He said he was going to get there.  He didn't get there.  He started talking about both young black men.

MR. POTTS:  How can I not explore what he meant by that statement, Your Honor?

THE COURT:  We can't have a stipulation that they were both young black men at the time of the trial?

MR. SPILLANE:  Yeah, I think that's fine.

THE COURT:  I mean, I don't know how it's relevant but --

MR. SPILLANE:  Yeah.

THE COURT:  Okay.  So why are we objecting?  You may answer.

MR. SPILLANE:  He's saying that's the reason why he struck him, and he's never said that.

A.   So he did look very similar to the

210

defendant, yes.

Q.    (By Mr. Potts)  And by that, they were both young black men; right?

A.    They were both young black men.

Q.    Okay.

A.    But that's not necessarily the full reason that I thought they were so similar.  Not because he was black and the defendant was black. I mean, if the juror, potential juror was black and the defendant was black and I struck him, that would have been kicked out by the Supreme Court in a second.  That would have come back for a complete retrial.

Q.    They both wore glasses?

A.    Similar type glasses.  Not just glasses. They looked to me like they were identical.  They were similar type glasses, yes.  That was the second reason.

Q.    So they liked the same brand of glasses potentially.  Is that right?

A.    I don't know what they liked.  All I know is the glasses were very similar.  And I said something more about their similarities, several things.

Q.    And they both had goatees, is that

211

right?

A.   I don't know what page you're referring to on that.  I said he reminded me of the defendant.  Had similar type glasses.  He had the same piercing eyes as the defendant.  I said that juror had piercing eyes, and so did the defendant.  I thought they looked like they were brothers.

Q.   They looked like brothers?

A.   Familial brothers.

Q.   Okay.

A.   I don't mean black people.  I mean, like, you know, you got the same mother, you got the same father.  You know, you're brothers, you're both men, you're brothers.

Q.   So you struck them because they were both young black men with glasses?

A.   Wrong.  That's part of the reason.  And not just glasses.  I said the same type glasses.  And I said they had the same piercing eyes.

Q.   So part of the reason was that they had piercing eyes, right?

A.   The same piercing eyes.

Q.   Same piercing eyes.  Part of the reason was they had the same piercing eyes?  Right?

A.   Yes, part of the reason.

212

Q.    Part of the reason was that they both had the same type of glasses, right?

A.    That's part of the reason.

Q.    Part of the reason is that they were both young.  Right?

A.    I didn't say about the age.  I said in my view he looked very similar to the defendant. I didn't talk about age.  But I think they were about the same age, they looked to me.  They looked like they were brothers.

Q.    And part of the reason is that they were both black?

A.    No.  Absolutely not.  Absolutely not. If I strike someone because they're black, under the Supreme Court of the United States Batson and other cases, then the case gets sent back for a new trial.  It gets reversed if I do that.

Q.    Now I want to direct you to the same page, 1586.  Do you see Lines 8 through 11?  And I'll let you read those.

A.    Yes.

Q.    So that juror was wearing a shirt with an orange dragon and Chinese or Arabic letters on it.  Right?

A.    That's right.

213

Q.    All right.  Was the defendant also wearing that type of shirt at trial?

A.    No.

Q.    No.  Okay.  Now, I want to now direct you to Page 1586.  Let's look at Lines 9 through 11.  I'm going to let you read those.

A.    To myself or out loud?

Q.    You can read it to yourself.

A.    All right.  I see it.

Q.    Okay.  The juror was wearing a large gold cross outside of his shirt.  Right?

A.    That's part of the sentence.  But you got to read it all.  You're taking it out of context.

Q.    No.  No.

A.    He had a large gold cross very prominent outside his shirt, which I thought was ostentatious looking.

Q.    Yeah.

A.    That was my reason.  That was another reason why I didn't like him.

Q.    Was Mr. Williams wearing a large gold cross outside of his shirt?

A.    No.

Q.    Okay.  Now, let's also look at Lines 18

214

through 20. The juror was wearing gray shiny pants, right?

A. With that wild shirt, yes.

Q. Yeah, with the wild shirt. Was the defendant wearing gray shiny pants at trial?

A. No. But the juror was similar in the other ways that I said.

Q. Okay.

A. Not every single way. Didn't have the same shoes on. It's not every single way were they the same.

Q. And let's actually go back to Page 1585, and let's look at Lines 22 through 25. Juror Number 64 also had two earrings in his ear. Right?

A. In his left ear.

Q. Yeah?

A. Which I went on to describe why I don't like that.

Q. Did Mr. Williams have two -- let's see. I want to make sure -- two earrings in his left ear?

A. I don't think so. I don't have any reason to believe that. If he did, I would have said they both had two earrings.

215

Q.   Okay.  So to summarize, this was a young black man --

A.   I'm sorry, but you didn't finish the sentence about the earrings.  You cut it off right in the middle.

Q.   You can have the State ask you some more questions.

MR. SPILLANE:  I ask he be allowed to finish his answer, Your Honor.

THE COURT:  He answered the question. Overruled.

MR. POTTS:  To summarize, Juror Number 64 was a young black man who was wearing a shirt with an orange dragon and either Chinese or Arabic letters with a large gold cross on his chest, gray shiny pants, glasses and had a goatee, and he reminded you of the defendant.

A.   There was more than that.  You haven't hit all the reasons.  I told you about the piercing eyes the same as the defendant.  I said the glasses were similar-type glasses as the defendant.  I said that the cross, the large gold cross, very prominent, which I thought was ostentatious.  And I also said that -- I gave a lot more reasons, actually.  A lot more.

216

Q.    Now, during voir dire in this case did you take notes?

A.    Very few notes.  Very few, but yes, I took a few.  I was busy talking to people.  It's hard to write and talk, but I took a few.

Q.    You did?  Okay.  I mean, at the same time, you have a 131 people potentially whose answers you have to be managing to these questions.  Right?

A.    As best you can, yeah.

Q.    Best you can.  What did you do with those notes?

A.    Saved them.  You probably have them.

Q.    Would you be surprised if the prosecuting attorney's office could not find those notes in their box?

A.    I haven't been with the prosecutor's office in ten years.  Since then you've done DNA.  I wasn't involved in any of that DNA in 2015.  I have no idea what happened to that file since May 1st, 2014.  I have been gone, retired.  That's over ten years.  I have no idea what happened to that.  I would like to see it, though.  I'm curious myself about those notes.  Actually, the prosecutor's office is the one trying to overthrow

217

the conviction.  You guys should have the notes.

Q.    Have you ever been found to have violated Batson v. Kentucky in another case?

A.    Now let me say this perfectly clear. Never.

Q.    Never?

A.    Never.

Q.    So no judge has ever found that you have failed to provide a race neutral reason for using a peremptory strike on a black juror?

A.    I thought you said have I ever been reversed.

Q.    I said, Has any judge ever found you have violated Batson in another case?

A.    Oh, okay.  Okay.

Q.    So different answer?

A.    Yeah.

Q.    Okay.  So you have been found to have violated Batson?

A.    Yes and no.  It depends what -- can you be more specific?

Q.    Well, you were the trial prosecutor in McFadden case, right?

A.    Yes.

Q.    Judge Ross was the trial judge in that

218

case, right?

A.   That's right.

Q.   And Judge Ross found that you had failed to provide race neutral reasons for exercising peremptory strikes on black jurors, correct?

A.   On three black jurors, that's right.  I disagreed with him, but he's the judge.  And we put those jurors back on the jury.  And they were on that case, and they voted death.  They were put back on that jury.  But yes, I was wrong on that.  But it was not by a -- I've never been reversed on Batson.  And that's what I thought you were asking.  I tried all those cases.  Most of them I won, almost all.  And they were all appealed on Batson.  If any black was struck, they appealed on Batson.

In all those cases, and I'd say there's probably 25 to 50 that were appealed on Batson, none of those by any court, appellate court, reversed me on Batson.

On that one case Judge Ross, he thought I didn't have sufficient reasons.  He actually, he told me that, he says, before I even struck them he said, if you strike them, I'm going to put them back on.  And I struck them anyway because I

219

thought I was right.  And you know what?  He put them back on, and they stayed on, and they voted for death.

Q.   You struck them anyway?

A.   Yeah, because I thought he was wrong. But he's the judge, and he ruled that I was wrong. And I don't have a problem with his ruling at all. I mean, I did at the moment, but it is what it is.

Q.   So as we have been sitting here talking, you know, is it still your memory that you only used six of your nine peremptory strikes on black jurors in the Williams case?

A.   No, no.  Three.

Q.   Sorry.  I actually did not mean to do that.  It's still your memory that you only used it on three black jurors in this case, right?

A.   That's what the Supreme Court opinion says.

Q.   Okay.  So I want to talk about how you selected the jury in this case.  Okay.  So we already went through this a little bit, but the reason the potential jury pool is so large in this case is because it's a death penalty case.  Right?

A.   Correct.

Q.   And it's more difficult than other

220

felony cases to get a proper jury pool in a death penalty case, right?

A.   That's correct.

Q.   Because some people have pretty strong feelings about capital murder, right?

A.   One way or the other.

Q.   One way or the other.  There's a name for the type of jury that's eligible to get seated, right?

A.   To get what, sir?

Q.   That's eligible to get seated in a capital murder case, right?

A.   There's a name for it?

Q.   A death-qualified jury, right?

A.   I would say that's -- I've used that term.

Q.   Okay.  So typically jury selection in a death penalty case goes through a couple different phases, right?

A.   Tell me what you mean.

Q.   Yeah.  So starting out first you need to eliminate jurors who have potential conflicts, you know, for example, work or family conflicts that are going to prevent them from being able to serve on the jury; right?

221

A.    That's right.  It was a sequestered jury.

Q.    Okay.  And then next you move on to death qualification with the remaining jurors, right?

A.    If that was the second thing the judge did, it could very well be.

Q.    Fair enough.  That's what they did here, they moved on to death qualification for the remaining jurors.

A.    Okay.

Q.    And then finally after that, after any more strikes for cause you moved on to a more general voir dire with the remaining jurors; right?

A.    That's right.

Q.    Okay.  So what does it mean to have a death-qualified jury?

A.    That meant that the jurors could consider death or life without parole.  Both.  If they could only consider death, if that's the only one -- some people say an eye for an eye and if you kill someone you're going to get death.  You know what I say to that?  You're not on the jury. I don't say it to them, but I tell the judge, get

222

rid of them.  And so does the defense attorney.
They don't want a juror like that either.  That's
against the law.

Q.  That means all jurors, including black
jurors, have to be death qualified.  Right?

A.  All jurors must be able to consider both
punishments.  That's the law.

Q.  And you're kind of getting into this,
but there's a sequence of questions that you
typically ask jurors to figure out whether they're
fit to serve on a death penalty jury.  Right?

A.  I mean, there's a ton of questions that
you ask them.

Q.  Yeah.

A.  And you ask every juror the same
question.

MR. POTTS:  And if you'll give me one
moment, Your Honor.  I'm thinking this will help.
Don't worry, it's just a standup chart.  Can you
see that, Your Honor?

THE COURT:  I can.

MR. POTTS:  You might have to go in the
jury box, Mr. Spillane.  I'm sorry.  I'm not
trying to do that to you.

Q.  (By Mr. Potts)  All right.  So let's go

223

through how you pick jurors for a death penalty case. Okay? I'm going to put a title up here jury selection. Okay?

So first of all, to serve on a jury in a death penalty case a juror can't be categorically opposed to the death penalty; right?

A. Right. They have to be able to consider both punishments.

Q. Okay. I put death right there. Next, a juror alternatively can't believe that the death penalty should be imposed in every capital murder case, right?

A. Correct.

Q. Meaning they have to be able to consider life without parole?

A. They have to be able to consider both punishments. If they're only going to vote death, even though I might like that juror as a prosecutor, that's illegal, and I know that. I ask them if they can consider both punishments. I always ask every juror, can you consider this one and can you consider that one. Both of them. I don't just pick one.

Q. Okay. So in other words, a death-qualified juror must be willing to consider

224

both types of potential punishment?

A.   Two punishments that are allowed under the law for murder first degree.

Q.   Now, also the juror needs to be willing to weigh aggravating and mitigating factors to determine whether the death penalty is appropriate, right?

A.   That's right.

Q.   Okay.  There's some other problems that can happen with jurors.  Jurors must be willing to -- must agree to follow the Court's instructions at trial.  Right?

A.   Every juror in every case, that's correct.

Q.   Yep.  And jurors must be willing to hold the prosecution to its burden of proof, right?

A.   Beyond a reasonable doubt is the burden of proof, and you are right.

Q.   Okay.  Okay.  Also jurors need to wait to hear all the evidence before they make up their minds?

A.   Yes.

Q.   Right?

A.   Yes.

Q.   Now, as a prosecutor do you generally

225

want more or fewer death-qualified jurors?

A.   Well, depends what you mean by death qualified.  What I mean by death qualified is they can consider both punishments and they'll keep their mind open on both punishments until the absolute very end.  They can't make up their mind before that which way they're going to go.

Q.   Yeah.  So maybe another way to put that is you don't want it to be automatic one way or the other?

A.   Correct.

Q.   Right?

A.   That would be illegal.

Q.   That would be illegal.  Now, throughout jury selection there are certain ways to protect the jurors that you potentially want, right?

A.   You'll have to give me an example.

Q.   Well, for example, you can ask those jurors leading questions instead of open-ended questions.  Right?

A.   I think both sides can do that.

Q.   Yeah.  No, I'm saying both sides can do it.

A.   Yeah.

Q.   Okay.  And also you can rehabilitate --

226

A.    I don't know what you mean by leading. Are you, like, putting words in their mouth?  Is that what you mean by leading?  You don't put words in the juror's mouth.  You want to hear their honest opinion whether they can do it or not.

Q.    You can ask them a direct yes or no question, right?

A.    Yes.

Q.    Like the one I just asked you?

A.    Yes.

Q.    Okay.  Now also you can rehabilitate those jurors afterwards if they potentially give an answer that's not favorable to you when they're being asked questions by defense counsel, right?

A.    I question the jurors first, and I'm done.  Then the defense attorney questions the jurors, and they're done.  I don't get another shot at the jurors.  I don't get another chance.

Q.    You're absolutely right.  I misspoke. You can rehabilitate jurors after they give you a question that maybe wasn't the perfect answer but you still think they might be a good juror for you, right?

A.    I don't know what you mean.  You have to

227

give me example.

Q.    Okay.  No.  That's totally fine.  So let's start by looking at your questioning of Juror Number 8.

MR. POTTS:  Your Honor, this is just an excerpt from the trial transcript Pages 205 and 206.

Q.    (By Mr. Potts)  Are you able to see up on that screen?

A.    No.

Q.    Okay.  I do have a courtesy copy for you right here.  There you go.

A.    Thank you.

Q.    So I have blacked out the names of the jurors for the ones I'm putting up on the screen.

A.    Okay.

Q.    But you should have the un-redacted copy in front of you.  Now, let's go ahead and walk through these questions.  So one of the things that you're doing here is with Juror Number 8 you're asking can you legitimately consider imposing the death penalty.  Right?

A.    In the proper case.

Q.    Yeah, in the proper case?

A.    Yes.

228

Q.   Yes?

A.   Yes.

Q.   So that's the very first question up here on the chart, right?  I'm talking about the chart that's right here.  Whether they're willing to sentence someone to death?

A.   Okay.  Your question is what, please? I'm sorry.

Q.   All right.  And so --

A.   Oh, yeah.  Okay.

Q.   Yeah, that's Line 7 through 9.  Sorry. And then later in Line 17 through 22 you're asking whether the juror can also consider life without the possibility of parole.  Right?

A.   Yeah.

Q.   Okay.  You clarify on -- at the bottom of the Page 24 and 25, you consider both punishments.  Right?  Then you ask the juror whether she could stand up in open court and announce the verdict if that was the death penalty.  And that's Lines 2 through 4.  Do you see that?

A.   Yes.

Q.   Then in Lines 6 through 11 you're clarifying that the burden of proof is always with

229

the State.  That's one of these questions right here.  Right?

A.    That's right.

Q.    Burden of proof?

A.    I clarified that.

Q.    Okay.  Now, did you ask -- you didn't ask any specific questions about following the judge's instructions that you can see, did you?

A.    I don't know.  I'd have to read all the testimony from that witness -- that jury, I mean.

Q.    I thought you said that once you're done with the juror, you're done; right?

A.    I ask questions until I decide I have gotten answers from the jury, juror, that are -- that we know what they meant.

Q.    Okay.

A.    Sometimes they equivocate.  You have to dig a little deeper.

Q.    Did you ask the juror whether she'd be able to weigh aggravating against mitigating factors?

A.    If there's more aggravating than mitigating, could you still consider life without parole.  Yes, I asked her that.

Q.    You asked whether she could weigh.

230

A.   Do I use the word weigh?

Q.   No, you don't.  Right?

A.   No.  I use -- I compare them.  If there's more aggravating -- even if there's zero mitigating.  Only aggravating could you still vote for life without parole.  And she says, Yes.

Q.   Okay.  And did you ask the juror whether she would wait to hear all the evidence before making up her mind?

A.   What line?

Q.   I'm asking you.  You can review that. Did you ask her?

A.   About weighing?

Q.   No.  About whether she would wait to hear all the evidence before making up her mind.

A.   The judge instructs her of that.  I don't have to instruct her.  But I don't know that I said it to that juror.  The judge instructs the entire panel.  There's an instruction of law on that, and the judge gives it to the jury.

Q.   And I'm just asking whether you asked her the question?

A.   I don't see that I did with that --

Q.   Okay.

A.   -- particular case.  I did say, If

231

there's only bad stuff and that is only aggravating circumstances and zero mitigating, you still have to be able to consider life even if there's nothing on the defense side, even if they got nothing, you still got to consider life without parole, and she said, Yes.

Q. Did you ask her whether she would automatically decide one way or the other?

A. I asked her if she could consider both punishments, and she said, Yes. So that to me means she wasn't automatic either way.

Q. I can give you a checkmark on that one. So after looking at that do you know whether Juror Number 8 was a black or a white juror?

A. No clue.

Q. Do you remember whether Juror Number 8 made the jury?

A. No. I don't know.

Q. Well, I'll actually go ahead and represent to you Juror Number 8 was a black juror.

A. Okay.

Q. All right. And we can agree that you do know how to ask some of the right questions to black jurors. Right?

A. No. I know all the right questions to

232

ask for every juror or I wouldn't have been trying this magnitude of a case, in my opinion.

Q.   Let's go ahead and look at some of the other jurors.  Now, as part of your presentation to the jury in this case you gave them an analogy about three doorways.  Is that an analogy that you've used in other cases?

MR. SPILLANE:  I'm going to break in now that his question is finished and object to this whole line of questioning.  It has nothing to do with Batson.  The Batson questions were asked and answered.  The Missouri Supreme Court found he did nothing wrong.  There's nothing that can be done about that.  Asking about death qualification is just irrelevant.

MR. POTTS:  Under Flowers v. Mississippi and Foster v. Chapman I'm allowed to ask him about his method of questioning jurors to determine whether there's a discriminatory purpose.

THE COURT:  Thank you.  The Court has reviewed 1,936 pages of voir dire.  The Court has reviewed all the opinions in this case.  This is not helping this Court with your motion. Objection is sustained.

Q.   (By Mr. Potts)  When you were

233

questioning black jurors, did you ask them more frequently than white jurors whether they would be willing to stand up and announce their verdict in open court?

A. No. The reason I would ask that is because if someone can stand up in open court and say that they're voting for death, then they would be a good juror for the State. Because some people say, oh, I could never do that. But, you know, if you're the foreman, you have to do that. So if they can't do that, then they can't follow the law. So I don't want someone that can't stand up and announce in open court in front of everybody that they could vote for death.

THE COURT: Your answer no stands. The rest of it I didn't need.

A. Okay. Sorry.

Q. (By Mr. Potts) Out of 100 plus non-black jurors do you know how many you asked whether they would be willing to stand up in open court and announce the verdict of death?

A. No, I don't.

Q. Would five sound right to you?

A. I have no clue.

Q. Juror Number 2, Juror Number 13, Juror

234

Number 31, Juror Number 44, and Juror Number 53.

MR. SPILLANE:  I'm going to object to counsel testifying.  He says he has no clue.  So counsel gives him the answer.  That's leading as well as counsel testifying.

THE COURT:  I know he's trying to refresh his recollection.  I'm giving him a little leeway.  I'm sure his answer is going to be the same as he did just a minute ago.

A.   I don't know who those jurors were.  It doesn't say whether they're black or white or another race.

Q.   By contrast, when you were questioning white jurors did you reassure them more frequently than black jurors that there would be 12 people who needed to agree on the verdict?

A.   I have no idea how many times or to whom I asked that particular question.

Q.   Do you know the specific number of white jurors that you reassured about needing 12 people to agree on the verdict?

A.   I told every juror in voir dire that all 12 had to vote the same way to have a verdict.  It's call unanimity of the jury.  There's an instruction of law that they got that specifically

says that. When they went back to the jury room they had that instruction in their hand.

Q. Did you tell that specifically to Juror Number 11, Juror Number 18, Juror Number 21, Juror Number 22, Juror Number 26, Juror Number 27, Juror Number 29, Juror Number 30, Juror Number 32, Juror Number 34, Juror Number 35, Juror Number 41, Juror Number 43, Juror Number 50, Juror Number 63, Juror Number 67, Juror Number 70, Juror Number 71, Juror Number 106, and Juror Number 126?

MR. SPILLANE: Now that the question is finished, I'm going to object. He already said he doesn't remember. Reading a list of numbers isn't going to change that.

MR. POTTS: I asked him whether he knew the specific number, Your Honor.

A. I do not.

THE COURT: Answer stands. Objection overruled.

Q. (By Mr. Potts) How many black jurors did you reassure that there would be 12 people who had to vote that way?

A. I have no idea. I don't know who the blacks and the whites were.

Q. Well, you were asking them questions;

236

right?

A.   But I didn't know if they were black or white.  I mean, I didn't care.  I could care less if they're black or white.

Q.   Would it surprise you if you didn't tell a single black juror that there would be 12 people who had to agree on the verdict when you were questioning them individually?

A.   If the record reflects that, then I would agree.  If not, I don't agree.

Q.   Okay.  So the record would reflect that the message to the non-black jurors was that there was safety in numbers.  Right?

A.   Wrong.  All 12 had to agree for a verdict whether it's death, whether it's life, or whether it's not guilty.  All 12 have to agree. The jurors were all told that at one point or another during voir dire by me, every one of them.

Q.   And the message to the black jurors was that they were all on their own?

A.   No.  Are you kidding?  What are you talking about?  I don't have any idea.  So the answer is no.

MR. POTTS:  I'll pass the witness.

THE COURT:  Cross-examination.

237

MR. SPILLANE: Yes, sir.

CROSS-EXAMINATION BY MR. SPILLANE:

Q. Thank you for coming in, sir. I was going to ask you about Laura Asaro. Could you tell me about your interaction with her in relation to the reward? Tell me what happened when she asked for it, if she ever asked for it, that sort of thing.

A. I don't recall talking about the reward with her. I don't know when, at some point it came up. I think she got $5,000 afterwards, but that wasn't the focus of my conversations with her. I don't recall whether I mentioned it or not. She didn't know about the reward when I first talked to her, as I recall.

Q. I'll ask you a better question. Do you recall her ever asking you for a reward?

A. Never.

Q. Do you recall how Dr. Picus ended up giving her a reward?

A. Yeah. I think he gave her $5,000. It was after the trial.

Q. Right. But I mean, did you or Mr. Magee say, hey, give her a reward because she earned it by showing us the things?

238

A.   I thought she earned it.  I thought the other fellow earned it as well.  So they got five.  That was my opinion.  But ultimately it was up to Dr. Picus.  It was his money.

Q.   Right.  But you didn't feel that it was a motivating factor for Ms. Asaro, if I understand you correctly, because she came forward before the reward was ever discussed?

A.   That's correct.

Q.   Let me ask you something that he never got back to that he said he was going to.  Why did you think Mr. Cole and Ms. Asaro were such good witnesses?

A.   They knew things that the killer told them that no one else knew.  For example, Henry Cole said that the defendant told him that he jammed the knife in her neck and he twisted it and left it in her neck.  And that's exactly how they found the body.  And the knife was bent.  And no one knew that.  That was not on the news.  That was not in the newspapers.  The only people that knew that were the police.  And Cole had written it on a piece of paper while he was in the jail.  He wrote down a list of facts that the defendant said.  And every one of those facts, as I recall,

239

and there were a dozen of them approximately, were true.

I couldn't catch Cole in anything that wasn't true.  I couldn't catch him.  I was trying to catch him if I could, because they were going to catch him.  I couldn't find anything that Cole said, nothing, that was false.  I'll continue with what Cole said.

Q.    And why was Ms. Asaro such a good witness?

A.    She was amazing.  She said -- first of all, she was with the defendant when he sold the computer to Glenn Roberts.  She was there in the car.  He walked up to Glenn Roberts' house and he sold him the computer.  She took the police to the house where the computer was.  She said, The guy that lives in that house has the computer.  And the police knock on the door.  Glenn Roberts comes to the door and says, What can I do for you?  Officers say, Do you have a computer?  He says, Yes, I do.  The police said, Bring it to me.  He brought it to them, and it was the computer.  They said, Who gave it to you.  And he said, Roberts said Marcellus Williams.

Marcellus was staying about three houses

down living out of his car.  Inside his car was Mrs. Gayle's calculator and Post Dispatch ruler in his car 15 months later.  The computer, these are the things taken at the crime.  The computer was found at Glenn Roberts' house about three doors down from his grandfather's house where he was staying in a car, a Buick, on the front yard or the side yard.

Q.   In 2001 had you ever heard of touch DNA?

A.   No.

Q.   When was the first time you heard of it?

A.   In this case.  Probably about 2015 maybe when they asked for additional DNA.  They asked for DNA testing on the handle.  And I thought, what DNA?  And someone said, well, there's possibly something called touch DNA.  If you touch something, you might leave DNA.  Used to not be that way.

Q.   Let me ask you this:  What was your procedure in the prosecuting attorney's office for dealing with evidence, particularly weapons, that had already been fully tested in your view?  Did you wear gloves?

A.   No.  No reason to.

Q.   How many cases besides this one did you

241

do where you handled the murder weapon or some other evidence that you didn't wear gloves because testing was done?

A.   Probably all of them.

Q.   And how many would all of them be?

A.   Well, I don't know how many cases had guns and knives, but the majority of my -- most of my cases, I would say, were homicides.  So they could have very well involved a knife or a gun. And if it had been tested -- sometimes there's no issue that you can touch it.  There's no reason not to touch it.  Who knows that someone is going to come in 17 years later or 15 years later and ask for a DNA test when they knew the killer wore gloves?

Q.   Let me ask you this.  Even if you hadn't known that he wore gloves, the standard procedure wouldn't have been to wear gloves after everything was fully tested.  Am I understanding you correctly?

A.   You are absolutely correct.

Q.   Let me ask you about the packaging.  You looked at it earlier today in the evidence.  I guess, I say the evidence room, but it was basically the jury room.  And did that refresh

242

your recollection of what the evidence looked like when you saw it?

A.   Yes, it did.

Q.   Tell me how?

A.   Well, if you read the transcript on Page 2261, Detective Wunderlich talks about how it was packaged in front of the jury.  He said that when the knife was pulled out of victim's neck, it was handed to Detective Wunderlich.  Wunderlich put it in an evidence envelope, sealed it, and took it over to the fingerprint Krull.

Krull then opened up the package and tested the handle for fingerprints and found none on that knife handle anywhere.

He then sent it over to the lab, St. Louis County Lab, and they then tested it for blood, which they found.

Then the lab put the knife in a new package, a box.  So when it was -- first you had Detective Wunderlich putting it in an evidence envelope, and then you had the lab transferring that knife after they had tested it into a box.  I saw that box today.  That refreshed my recollection.  I remember the box.  The box was longer than the knife.  The whole knife was

243

inserted into the box and sealed.  Also in the box was the evidence envelope that was brought by -- it was put -- initially used by Detective Wunderlich.  It was all there.  The box is what I saw today.  And that refreshed my memory about the box.  I forgot about the box until I read it in the transcript.  And I said to the witness at the trial, I said to Detective Wunderlich, What's this box?  And he said, That's the box that the lab repackaged the knife in after they tested it.  And that's how I got it from U City Police.

Q.    Am I understanding your testimony correctly that the knife was inside a sealed package inside a sealed box when you got it?  Is that accurate?

A.    The package, the evidence envelope was folded.  It wasn't inside the evidence envelope. The evidence envelope was in the box, and the knife was in the box.

Q.    And the box was sealed?

A.    The box was sealed.

Q.    And the knife was completely inside the sealed box?

A.    Completely.  Completely concealed.

244

MR. SPILLANE: Would it be any use to you if I showed you the box and the package or everything or not? Would that be any use to the Court?

THE COURT: No.

MR. SPILLANE: All right.

THE COURT: I saw it this morning.

MR. SPILLANE: That's what I wanted to know.

Q. (By Mr. Spillane) As far as preservation of evidence at trial, did you make an effort to preserve every piece of evidence that you thought could possibly be used in the future?

A. No. Everybody touched that laptop, for example.

Q. Okay. Well, let me see about things that could be tested. Did you make an effort to preserve the fingernail clippings?

A. They were put in a package by the medical examiner that cut the fingernail clippings off the victim and put them in some kind of a package. And the defense asked for half of those to test them for DNA. And we gave them half. And the DNA came back being the victim's DNA only. It was her nails. It was her DNA. There was nothing

245

else on those nails.

My half of the nails I didn't do anything with them.  I didn't test them.  I figured they tested them.  Why do I need to retest them?

Q.   Well, my recollection of the testimony, and you tell me if I'm wrong, is that when you were looking at your fingernail clippings, you said, I'm not going to open those because I'm not wearing gloves and I don't want to contaminate them?

A.   That's true.  I did say that.

Q.   And so you were making an effort to preserve evidence that you thought might be useful in the future?

A.   If they would have let me open those nails without gloves, I would have done so.  But the defense attorney said, Don't do it.  Don't open those nails.  And then he asked the judge about that.  And I said, Well, I'll ask the witness, the expert witness on the DNA what her opinion is.  And she said, You really shouldn't open those nails unless you've got gloves on.  And I said, Fine.

Q.   Let me ask you this:  Your testimony is

246

you were walking around that trial holding the knife. I think at one point you said, The knife is in my left hand. You handed it to Detective -- well, to Detective Krull. Did defense counsel at any point jump up and say, no, bad, why aren't you wearing gloves?

A.  On Page 2313 Line 17 and 18, I walk up to Detective Krull and I ask him, I say, Let me hand you State's Exhibit 90, comma, a wood-handled knife. I handed it to him. I said, Let me hand you. He didn't have gloves on, and neither did I, on that witness.

Q.  And nobody said anything?

A.  No one said anything.

Q.  And they could see your hands that you weren't wearing gloves?

A.  That's correct. And they didn't ask for any tests as well.

Q.  And it was always your practice -- I hate to beat ground that's already been plowed here -- that you never wore gloves on a weapon after it was tested in all of your trials because there was no point in it?

A.  That's correct.

MR. SPILLANE:  Does the Court have any

247

questions in case I missed something?

THE COURT:  No.

MR. SPILLANE:  Oh, maybe I did miss something.  Oh, okay.  I am told that I did miss something.

Q.  (By Mr. Spillane)  You talked earlier on direct about a mistake in the affidavit.  And I think they were going to come back to that, and I'm not sure they did.  Could you tell me about the mistake in the affidavit and what the actual truth is?

A.  I referenced that in my testimony.  I said I made a mistake.  When I did the affidavit I said that when I received the knife it was -- the handle, the knife handle was exposed, not completely concealed but exposed so that anyone could pick it up.  You know, the knife handle was just there.  I confused that with another death penalty case I had where a guy used a knife in the kitchen to stab a woman, and he's been executed.

Q.  Roberts?

A.  Roberts.  Michael Roberts.  About five or ten years before this murder Michael Roberts took a knife from the kitchen, a butcher knife, just similar to this knife, and he killed a woman

248

who lived in the house, similar to this case.  And that knife was exposed.  When I got that -- but it wasn't a question of who did it.  That was not a who did it.  That was a psychiatric case.  Not a whodunit case.  That knife was never tested, period.  But it was sticking out of the container that it was in.  It was an evidence envelope, and the handle was sticking out.  I thought that was very odd.

I confused that case with this case.  In my affidavit I said that the knife was exposed, the handle.  I'm wrong, and I admit I'm wrong.  I saw what it was exposed in today.  The box.  I read the testimony from Detective Wunderlich, and it was the box.

Q.   And the triangular box that's in that bag on the table is what it was in when it came to you and it was sealed?

A.   That very box.

Q.   You recognize the same box?

A.   Absolutely do.  I can look at the writing on the box too.

Q.   It's not necessary.  I don't want to take it out and be accused of --

A.   Same box.

249

Q.    That sounds good.  Let me ask you about Purkett v. Elem, your St. Louis US Supreme Court case.  Tell me about that.

A.    Well, that was a Batson issue.  It was -- in fact, it happened in this courthouse in Division 6 back in around 1990 or so.  It was a -- I struck two African Americans, and the defense attorney objected to that.  It went all the way up to the United States Supreme Court on two witnesses that were black.

The United States Supreme Court affirmed me, affirmed the case and said those strikes are proper.  The US Supreme Court, on a robbery second degree case.  With Batson it's that important that it had to be -- it went all the way to the Supreme Court.  I won that one.

Q.    Do you remember what reasons you struck them for?

A.    Well, the one African American had long hair, unkempt long hair, shoulder length or longer and he had a goatee.  And I said that that hair looks suspicious to me.

Back in the day people didn't wear -- men didn't wear their hair shoulder length.  And the other juror, as I recall, he had a goatee as

250

well and his hair, I don't remember what I said about his hair, but I said that it looks --

Q.   I think it was unkempt.

A.   Unkempt.

Q.   I'm not sure.

A.   I didn't like the hair.  There was no one else in the courtroom on that case that had facial hair.  I picked the two people that had the beard, the goatee.  I didn't like the way that looked.  And it looked suspicious to me.  And the long, unkempt hair looked suspicious to me.  And Supreme Court said, That's fine.

Q.   Because it's race neutral?

A.   It's race neutral.  It had nothing to do with race.

Q.   Earrings, glasses, I'm jumping around, don't have to do with race.  Unkempt hair doesn't have to do with race.  That's race neutral.

A.   And the Supreme Court said that.

MR. SPILLANE:  I think I'm done if I haven't missed anything else.

THE COURT:  Mr. Jacober, do you have anything else?

CROSS-EXAMINATION BY MR. JACOBER:

Q.   Hi, Mr. Larner.  Matthew Jacober on

251

behalf of the prosecuting attorney's office.

You testified earlier that you didn't have a clear recollection of the reasons behind the motions for continuance that were filed by the defense in the month prior to trial.  Is that correct?

A.  Yes.

Q.  I would like to read from the motion for you.  Specifically this is Paragraph 4(B).  On May 1st, 2001, the State advised defense counsel -- I'm sorry.  This is the verified motion for continuance filed on May 7th, 2001.  I'm actually looking at 4(C), not 4(B).  I apologize.

Defense counsel has made numerous requests to the Missouri Department of Corrections for a complete copy of defendant's incarceration records.  These incarceration records contain both psychiatric and medical records needed for the preparation of the penalty phase by defendant. These records are particularly important for mitigation and experts retained by defense counsel for consultation and preparation for the penalty phase.

I know you don't have it in front of you, but do you have any reason to doubt that I

252

read that accurately?

A.    I'll trust you on that.

Q.    Okay.  This was argued at the hearing on the motion for continuance.  Do you recall that?

A.    If you say so.  I don't dispute what you're saying.  I mean, it could have happened that way.

Q.    Do you recall telling the defendant's counsel at that time, Well, I have those records. You can just come get a copy from me?

A.    No, I don't remember that.  I probably had them, if that's what the record says.

Q.    And you just didn't volunteer that you could produce them to the defendant at that time?

A.    If they knew I had them, all they had to do was ask for them.  They came to my office and looked at every single exhibit that I had.  I had 350 or more exhibits.  And the defense attorneys, Green and McGraugh, two gentlemen who are now judges, came to my office and they looked through all my exhibits that they wanted to.  They had permission.  That's under the law.  I have to do that.  Supreme Court Rule 25.03, the rules of discovery, I have to let them come and examine or look at my exhibits.

253

I also gave an exhibit list which listed every single exhibit.  Number 90 happens to be the knife.  I had 1 through 350.  I gave a copy to him, defense attorneys.  I gave a copy to the judge.

So they looked at all my exhibits.  They would have seen my -- if I had a serial record, they would have seen it.

Q.   And if you could answer my question.  My question is:  Did you say, I have those records.  You can have them?  Not whether they could come and get them.  I'm asking if you volunteered them?

A.   If that's what the record says.  I don't recall if I said what you just quoted.  If you say so, okay.

Q.   That motion was denied by the court on May 9th, 2001.  Then a supplemental verified motion was filed on May 25th, 2001.  And in that supplemental motion on Paragraph 4 -- I'm sorry.  Paragraph 5 at the time of the drafting of this motion Department of Correction records on defendant still remain lost.  Volume 2 of defendant's Department of Correction records cannot be found by the custodian of the Missouri Department of Corrections.  The last entry for the

254

whereabouts of the records are that they were last checked out to St. Louis County Justice Center. The absence of these records has prejudiced the defendant in that they would contain information not only to defendant's behavior and conduct while in the custody of the Department of Corrections but would also contain mental and psychological evaluations of the defendant.

I'm not going to read the rest of it. Well, I will. This information is not only relevant to rebut the aggravating circumstance of the State whereby it alleges the defendant does not adjust well to incarceration and future dangerousness but would be relevant as proof of mitigation the defendant does, in fact, adjust well to a structured environment as necessary for defense expert Dr. Cunningham to evaluate and offer opinions as to the character and mental makeup of the defendant.

That motion was heard and denied on --

MR. SPILLANE: Is there -- I'm going to object, Your Honor. Is there a question here someplace? He's just reading.

THE COURT: Oh, I think he's trying to aid the witness. I mean, he doesn't have the

255

motion in front of him so I think he's just trying to circumvent handing it to him and having him read it.

MR. JACOBER:  That's correct, Your Honor.

THE COURT:  Overruled.

Q.   (By Mr. Jacober)  That was heard and denied on May 25th.  Do you recall at that time telling the defendant, defendant's counsel, I have those records, you can just come and get them from me?

A.   No.  You'll have to show me that.

MR. SPILLANE:  I'm going to object now that the question is over.  This is completely irrelevant.  The Court struck the continuance claim from the pleading.  This has nothing to do with anything except the claim about the continuance.

MR. JACOBER:  Judge, this still weighs into the ineffective assistance of counsel claim which remains before the Court.  It was pled in the original motion.  And under the statute every claim that is still before the Court is one that the Court can rule on in this matter.

MR. SPILLANE:  If I could respond, Your

256

Honor.

THE COURT:  You may.

MR. SPILLANE:  The ineffective assistance of counsel claim is two things.  Not better impeaching Ms. Asaro and Mr. Cole with their family members and friends and not putting on different mitigating evidence.  It has nothing to do with this.

MR. JACOBER:  This goes directly to mitigating evidence, Judge.  They reference mitigation a number of times in this motion.

THE COURT:  As I have indicated before, I'm not happy with the verbiage in this statute, especially when there's no definition of what information means.  So I'm going to go ahead and allow it.  But you're close on running out of your time.

MR. JACOBER:  I understand, Your Honor, and I'm being conscious of that.

Q.   (By Mr. Jacober)  Do you recall if at that point in time you told them, I have those records, you can come get them whenever you want?

A.   No.  I never had those records.  I don't know what you're talking about.  The records I had I thought you were talking about were serial

257

records which are records of his incarceration. It says what crimes he committed, when he was received by the Department of Corrections, and when he got paroled. Those are serial records. I had those, because I wanted to know what his prior convictions were.

Q. You didn't use the records of his incarceration and alleged escape attempt and alleged assault while he was in prison as part of your penalty phase?

A. That's a different question. You asked me a different question. You wanted to know about records of his mental health and all of that. I never saw any of that. I would have liked to have seen that.

Q. No --

A. I never saw that.

Q. It also contained the mental and psychological evaluations?

A. I really don't know.

Q. The Missouri Department of Corrections records.

A. If I had it, the defense had it. I will swear to that. Everything I had, the defense had it. And if I didn't have it, they would have made

258

a big stink, and they would have made a big record and would have appealed on that basis. They had everything that I had. I didn't have one thing that they didn't have.

Q. Well, they made a record here that they didn't have it?

A. Well, if I had it, they had it. I didn't have it then. I did introduce evidence that he tried to break out of the city jail. I absolutely introduced that at trial. That's evidence of guilt. I could go into that. That was very devastating evidence against him.

Q. And the defense didn't have those records before --

A. I don't know what records you're talking about. I had witnesses come in and testify that the defendant hit him over the head with a barbell and almost killed him. And then he took the barbell and tried to bash out the window of the city jail to break out, but it only scratched the window because it's unbreakable glass. And he did that right after he got sentenced to 20 years for the armed robbery of the donut shop in the City. That night he tried to break out of the jail, the way I just described it. That was the evidence at

259

trial.  That was no surprise to the defense that that evidence was coming in.

Q.   Again, what I'm asking is, did you let the defense know that you had those records when they were telling the Court weeks before the trial that you had those records?

A.   When you say "those records", I don't know what you're talking about.  You talked about mental health records.  I didn't have any mental health records of the defendant.

Q.   Sir, I'm not talking about mental health records.  I'm talking about Department of Correction records.

A.   Well, he didn't try and break out of the Department of Corrections.  He tried to break out of the city jail.  So there were records from the city jail about that breakout, about that escape attempt.  The defense attorneys had that.  I had that.  They had that.  That's the only records I'm talking -- I know about.  I don't know any Department of Corrections records.  That's not where he tried to break out.

Q.   One additional reason the defense noted that they needed a continuance is counsel is also still waiting for the forensic test results from

260

its own experts with regard to forensic evidence seized by the State.

Did that flag for you at all that maybe it was important to keep pristine evidence in the case so further testing could be done?

A.   They never had possession of the knife. So I don't know what forensic testing you're talking about.  They never asked for testing of the knife.

The only forensic testing they did was on the nails, the fingernail clippings.  They wanted to know if there was anything other than the victim's under his nails -- under her nails in case she during the altercation, if you want to call it, she somehow got his DNA under the nails, the killer's DNA.  So it was tested for that, and there was no other DNA under their nails except hers.  And that was all testified to.  Those were your witnesses.

MR. JACOBER:  No further questions, Your Honor.

THE COURT:  Thank you.  I'm not sure who gets to go now.

MR. POTTS:  Nothing further.

THE COURT:  Thank you.  Mr. Spillane.

261

MR. SPILLANE:  I just wanted to thank you for your service to St. Louis, sir.  Thank you.

MR. LARNER:  Thank you very much.

THE COURT:  I have one question, and I apologize.  I know this was several years ago.

Did the trial court give you a reason as to why you couldn't consent to the continuance requested by defense counsel?

A.   We had a policy in our office that we didn't agree to continuances.  I couldn't agree to that without permission of Bob McCulloch, and he was not going to give that permission.

Our witnesses were ready to go.  A month later I don't know where our witnesses -- one came in from New York on a bus, and the other was a prostitute who was living all over town. Anywhere.

So we were not in any mood, and there was no additional evidence that anyone was going to produce by a continuance is my recollection.

THE COURT:  Thank you.  Any questions based upon my question?

MR. POTTS:  No, Your Honor.

THE COURT:  Thank you.  Can this witness

262

stand down?

MR. POTTS:  Yes, Your Honor.

MR. JACOBER:  Yes, Your Honor.

THE COURT:  I think we need to take a little bit of recess, if you don't mind.  We will be in temporary recess until quarter to 4:00.

(At 3:32 a recess was taken.  The Court reconvened at 3:45 and the further following proceedings were had:)

THE COURT:  We are back on the record in Cause Number 24SL-CC00422.  We finished our afternoon recess.  It is now approximately 3:45 p.m.  Mr. Jacober?

MR. JACOBER:  Yes.  Thank you, Your Honor.  We have one final witness.  Patrick Henson.

PATRICK HENSON,

Having been sworn, testified:

DIRECT EXAMINATION

BY MR. JACOBER:

Q.   Good afternoon, Mr. Henson.

A.   Good afternoon.

Q.   For the record, where are you currently employed?

A.   At the St. Louis County Prosecuting

263

Attorney's Office.

Q.    And what is your position there?

A.    I am an investigator in the Conviction & Incident Review Unit.

Q.    How long have you been employed in that position?

A.    Three years and ten months.

Q.    So sometime in the year 2020?

A.    Yes, sir.

Q.    Are part of your duties to maintain and supervise the maintenance of various files in the prosecuting attorney's office?

A.    Yes, sir, with the caveat of those under the auspices of the Conviction & Incident Review Unit.

Q.    So you don't -- if it's a case that's being presently tried by an assistant prosecutor, you don't have any supervision over those files?

A.    That's correct.

Q.    Only the files in the CIU?

A.    That is correct.

Q.    Are one of those files the file in the Marcellus Williams matter?

A.    Yes, sir.

Q.    Can you tell us briefly about when the

264

Marcellus Williams file came back into the St. Louis County Prosecuting Attorney's Office?

A.   Certainly I have to refresh my memory, but I believe we received those files sometimes perhaps in February of 2024.

Q.   And since February of 2024 have those -- has that file been under your care, custody, and control?

A.   Yes, sir.

Q.   Where has it been stored in the St. Louis County Prosecuting Attorney's Office?

A.   We have an evidence room that's locked, that's locked, and that's where it's stored.

Q.   Who has access to that evidence room?

A.   Certainly myself, the chief investigators -- or chief investigator and other investigators because they also store their evidence there as well.

Q.   Anyone else besides investigators?

A.   No, sir, not to my knowledge.

Q.   And did I ask you to review that file?

A.   Yes.

Q.   Have you done so?

A.   Yes, sir.

Q.   Did I specifically ask you to review

265

that file to see if you could find any notes relating to voir dire in the underlying criminal trial which happened in 2001?

A.   You did.

Q.   And did you do that?

A.   I did.

Q.   Did you find any notes relating to voir dire?

A.   I did not.

MR. JACOBER:   No further questions, Your Honor.

THE COURT:   Thank you.   Mr. Clarke?

MR. CLARKE:   Yes, Your Honor.

CROSS-EXAMINATION BY MR. CLARKE:

Q.   Mr. Henson, you said you received the Marcellus Williams file in February of 2024.   Is that correct?

A.   I believe that's right, sir.   Yes, I said that.

Q.   Okay.   So you didn't have the file when the motion to vacate was filed?

A.   I'd have to go back and look.   I'm not sure.

Q.   Okay.   But you said February 2024, is that correct?

266

A.   I believe so, yes.

Q.   Okay.  Now you said it came from somewhere, the file came from somewhere.  The file was always in the St. Louis County Prosecutor's Office, isn't that correct?

A.   It's my understanding, sir, that those files or cases are kept in the basement in a secure area.  I don't have access to that so we had to have the then assistant chief investigator retrieve those and bring them up where I took custody and put them in that room.

Q.   You say it's a secure room downstairs, is that right?

A.   Yes, sir.

Q.   Referred to as the vault sometimes?

A.   Yes, sir.

Q.   Okay.  The vault can't just be accessed by any person off the street, right?

A.   Correct.

Q.   It has to be accessed by the St. Louis County Prosecuting Attorney's Office, employees, officers, investigators; is that correct?

A.   Well, to be specific and my understanding, only the chief investigator and the assistant chief have access to that room.

267

Q.   Okay.  So the chief investigator and the assistant chief investigator.  If an attorney wants a record, they have to go down and grab it?

A.   They have to ask the assistant chief to retrieve it for them.

Q.   Okay.  So no one else has access to that room?

A.   Yes, sir.

Q.   Okay.  So someone couldn't come off the street and pull notes out of a file?

A.   No, sir.

Q.   Couldn't destroy them?

A.   No, sir.  I couldn't even go and retrieve a record.  So we know a person off the street couldn't do that.

Q.   Okay.  But from -- how long were they in the file at that point?  I'm sorry.  How long from before 2024 was the Marcellus Williams file in the vault?

A.   I don't have direct knowledge of that. I would only be guessing to say -- I just -- I don't know the answer to that.

Q.   Okay.

A.   I did not know about the Marcellus Williams file until this came about, this case,

268

and they were brought to us.  That's the only time I knew about it.

Q.    Okay.  But files are stored in the vault or in your CIU storage.  Is that right?

A.    Correct.

Q.    Only one of a few places?

A.    Evidence room.

Q.    Okay.  And you said for files stored in the vault the chief investigator or his deputy -- I don't know his title.

A.    The assistant chief investigator.

Q.    Has to go down there.  They're the only ones who have access?

A.    And retrieve them, yes.

Q.    Now, in your CIU file storage, who has access there?

A.    As I said, myself, chief investigator, the assistant chief investigator, and the other investigators within the prosecuting attorney's office.

Q.    So no attorneys whatsoever?

A.    No, sir, not to my understanding, no.

MR. CLARKE:  One moment, Your Honor.

Q.    (By Mr. Clarke)  Now, the Attorney General's Office, myself, and individuals from the

269

AG's office came to review the file.  Is that correct?

A.    Correct, sir.

Q.    And you sat with us during that review?

A.    Yes, sir.

Q.    Okay.  Now when we reviewed that evidence, we didn't see the physical evidence.  Is that right?

A.    To my understanding that's correct.

Q.    Okay.  Where was the physical evidence stored?

A.    The physical evidence was stored in the room that is secured within the prosecuting attorney's office.

Q.    Okay.  So is there a reason the physical evidence wasn't brought up at that time?

A.    I can't answer that, sir.

Q.    Now, the State's trial exhibits were in the possession of the Supreme Court.  Did you ever seek to review those trial exhibits?

A.    No, sir.

Q.    At any time did any attorney from the St. Louis County Prosecuting Attorney's Office ask you to retrieve those in the Supreme Court?

A.    No, sir.

270

MR. JACOBER:  I object.  It calls for speculation as to what other people did.

THE COURT:  If he knows.  Overruled.

A.    No, sir.

Q.    (By Mr. Clarke)  So at the time the motion to vacate was filed you had never gone, retrieved the trial exhibits from the Supreme Court?

A.    That's correct.

MR. CLARKE:  Thank you.  No further questions.

MR. POTTS:  No questions, Your Honor.

THE COURT:  Thank you.

MR. JACOBER:  No redirect, Your Honor.

THE COURT:  Thank you.  Can this witness stand down?

MR. JACOBER:  Yes, Your Honor.

THE COURT:  Thank you.  Any additional evidence on behalf of the prosecuting attorney's office.

MR. JACOBER:  On behalf of the prosecuting attorney's office we have no further witnesses to call or evidence to present.

We would ask the Court to conform the evidence to the pleadings of the evidence that was

271

submitted today.

In addition, Judge, Ms. McMullin is going to address our exhibits to make sure that they're all in the record as Mr. Spillane did at the beginning of the day.

MS. MCMULLIN:  Your Honor, in lieu of listing off every single exhibit, we have prepared a box file for you similar to the prior box file that you had gotten before that will have all the prosecuting attorney's exhibits and the index for the record, if that's all right.

THE COURT:  So I have prosecuting attorney's exhibit list.

MS. MCMULLIN:  Yes, those exhibits.

THE COURT:  That has been shared with the Attorney General's Office.

Is there any specific objections to any of these exhibits?

MR. SPILLANE:  Just the ones that I brought up at the beginning, Your Honor. Dr. Bodowle, Dr. Napatoff.

Anything I'm missing?  Those weren't in the record before.

THE COURT:  Thank you.  Then Petitioner's Exhibits 1 through -- didn't we have

272

an 81 too?

MS. MCMULLIN:  We have an 80, Your Honor.

MR. JACOBER:  I believe we had an 80 and an 81.

THE COURT:  1 through --  There was an 81.  It was that additional forensic DNA testing.

MR. JACOBER:  Yes.

THE COURT:  Those will be received.

MR. SPILLANE:  I have an objection.  I heard someone say that the pleadings should be conformed to the exhibits or the exhibits conformed to the pleadings.  I have no idea what that means.

THE COURT:  I'm not sure either, but I'll go ahead, as I indicated earlier, I'm allowing everything to come in so I can have a complete record of these proceedings.

MR. JACOBER:  Your Honor, if I said exhibits, I misspoke, and I apologize.  I meant to say --

THE COURT:  You mean the evidence to conform to the pleadings?

MR. JACOBER:  Yes.

THE COURT:  Your request will be

273

granted.

MR. JACOBER:  Thank you.

MR. SPILLANE:  And that doesn't mean they're getting any new claims.  That just means something else.

THE COURT:  Correct.

MR. SPILLANE:  Okay.

THE COURT:  With that said, Mr. Potts?

MR. POTTS:  Nothing further from us, Your Honor.

MR. SPILLANE:  If you want, I can do closing.  If you don't, I won't.

THE COURT:  Wax poetically for the Court.

MR. SPILLANE:  Okay.  You guys want to go first?

MR. JACOBER:  I think you should go first.  We bear the burden.

MR. SPILLANE:  Oh, okay.  Well, yeah, you bear the burden so you get to go first.

MR. JACOBER:  Your Honor, could we take a recess to maybe prepare for a few minutes?

THE COURT:  Sure.  Not a problem.  The court will be in recess for ten minutes.  How does that sound?

274

MR. JACOBER:  Thank you.

THE COURT:  We will go off the record.

(A recess was taken.  The Court reconvened at 4:15 and the further following proceedings were had:)

THE COURT:  We're back on the record in Cause Number 24SL-CC00422.

The evidence and exhibits have been received.  Closing statement, Mr. Jacober.

MR. JACOBER:  Thank you, Your Honor.

CLOSING ARGUMENT BY MR JACOBER:

MR. JACOBER:  Initially, Your Honor, we want to thank the Court for the significant amount of work today.  We know the Court has spent considerable time reviewing the record to ensure it's prepared for the hearing today.  And on behalf of the prosecuting attorney's office we appreciate that heavy lift that you've been asked to do, Judge.

This case is about contamination.  I'm going to go through some of the evidence. Certainly not all of it.

We heard from David Thompson, an expert in forensic interviewing, that there was potential witness contamination.  While we've heard from

275

every other witness here today that there was potential evidence contamination.  Both of which occurred prior to and during Mr. Williams' trial.

Dr. Word provided detailed technical testimony to the Court supporting the need and the well-known knowledge at the time of the need to keep evidence in attestable state.

Mr. Larner admitted to multiple instances of his touching the knife because he decided no further testing needed to be accomplished.

Given the backdrop of the known state of art at the time, it is impossible to believe a seasoned prosecutor who tried as many cases as Mr. Larner said he did was unaware of the rapidly advancing technology around DNA.

In addition, evidence in the record shows fingerprints were collected from the scene. And Ms. Asaro testified in the underlying case that Williams allegedly told her he washed his hands and the knife, demonstrating there was evidence that gloves may not have been worn.

To make the record clear, the initial motion to vacate filed pursuant to Revised Statute of Missouri 547.031 remains part of the record.

276

In addition, the Court granted our request to amend the claim per Youngblood v. Arizona and again today granted our request to conform the evidence to the pleadings -- the pleadings to the evidence. I keep flip flopping those, Judge. I apologize.

All claims contained in the original motion to vacate as well as in the Youngblood claim and any claims supported by the evidence today are before the Court.

When reviewing the evidence adduced today, the Court should not only focus on its extensive knowledge of the file, 547.031, which I will read in part into the record. The Court shall grant the motion of the prosecuting or circuit attorney to vacate or set aside the judgment where the Court finds that there's clear and convincing evidence of actual innocence or constitutional error at the original trial and plea that undermined the confidence in the judgment.

In considering the motion the Court shall take into consideration the evidence presented at the original trial or plea, the evidence presented at any direct appeal or

277

post-conviction proceeding, including state, federal habeas actions, and the information and evidence presented at the hearing on the motion. The court should also consider the evidence adduced today, obviously.

Beginning with 547.031, the AGO would have the Court believe if a court has previously ruled on a claim it is excluded from consideration. But that is not a conclusion the Court can reach on the plain reading of the statute that I just put into the record.

Indeed, it is the opposite of what the statute provides. Given the prior record of all post-conviction proceedings should be taken into consideration. All claims and information are available for the court to review.

Turning back to the evidence a little bit, Judge. Today we heard from Judge Green and Judge McGraugh, trial counsel for Mr. Williams in the underlying criminal case.

Judge Green was very candid in that he had insufficient time to adequately prepare for Mr. Williams' trial and asked the Court on at least two separate occasions for a continuance to cure that issue.

278

This was compounded, of course, by Judge Green's other capital murder case which was scheduled immediately before and shockingly during Mr. Williams' trial.

And the failure of the prosecutor to timely disclose numerous pieces of evidence, including Henry Cole's notes, Henry Cole's medical records, the DOC record prosecutor used to support its request for a death sentence, and fingerprint evidence taken from the crime scene which were destroyed before the defense was able to independently analyze the evidence as they had the right to do.

Williams' attorneys were also never told that either the prosecutor or his investigator touched or handled the knife without gloves prior to trial.

Judge McGraugh was required to wear gloves and did so while handling the murder weapon in this case.

Going back to Dr. Word.  She told us that the DNA profiles found on the murder were consistent with Investigator Magee and Prosecutor Larner, demonstrating their mishandling of the evidence.

279

She also told us that touching or handling evidence without gloves can destroy and remove, both add and remove DNA that might otherwise be there.  Which could take away a future exoneration.

That's the whole reason that Attorney General Janet Reno formed the commission, which Dr. Word sat on, and the Court has accepted at least one of those papers into evidence.

In addition to all of this evidence, St. Louis Prosecuting Attorney's Office has conceded the constitutional error of mishandling the evidence in the Marcellus Williams trial.

Finally, the Court heard from Mr. Larner who admitted to touching the knife and thereby robbing Mr. Williams of his ability to conduct effective testing of the knife as DNA technology continues to develop and was rapidly developing at that time.

In addition to this, Mr. Larner's testimony was instructive as to the jury selection process.  Mr. Larner in addressing pointed questions from Mr. Potts relating to race-neutral reasons for his venire strikes was unable to explain the difference in how questions were posed

280

to different jurors of different races.

He also admitted to striking a juror for looking similar to defendant, which in his own words looked like a brother to Mr. Williams.

In addition, the prosecutor's voir dire notes, as we learned from Mr. Henson, are missing from the file.  Making it impossible to determine whether his true intentions on strikes were race neutral.

When all the evidence both in the file and as presented to the Court today, the motion to vacate is well taken.  Clear and convincing evidence has been presented to the Court of numerous constitutional errors in the prosecution of Mr. Williams.  Evidence was mishandled.

Mr. Williams' trial counsel was placed in a shockingly difficult position of having to prepare for two capital murder cases simultaneously.

Judge Green provided convincing testimony of how unprepared his team was in lead up to the trial.

And all of those reasons were noted in the motions for continuance that were denied by Judge O'Brien.

281

Given the constraints on his time, including having to recess this case and finish the Baumruk matter, this alone is sufficient and we would request that the Court grant the motion to vacate in this matter.

THE COURT: Thank you, Mr. Jacober.

MR. JACOBER: Thank you, Your Honor.

THE COURT: Mr. Potts?

MR. POTTS: Your Honor, if it's all right with you and considering the State, I would like to go last, consistent with the sequence we have been doing today.

THE COURT: Any objection?

MR. SPILLANE: They're kind of on the same side so I would kind of like to go last.

THE COURT: Mr. Potts.

CLOSING ARGUMENT BY MR. POTTS:

MR. POTTS: Thank you, Your Honor.

Like Mr. Jacober, I do want to sincerely thank you. I think we all know that this wasn't the ideal thing to land on your desk, and we all really appreciate the amount of effort that you've put into this.

There's nothing triumphant about the DNA test results that we received last week. Those

282

results only serve as the newest round of proof that Mr. Williams received a death sentence without a fair trial.

This case was originally filed because of Mr. Williams' factual innocence.  From the inception of this case Mr. Williams has had nothing to hide, and we've always welcomed every round of DNA testing because we've always known that there was going to be no chance that his DNA would be found on the murder weapon.  On that point we were right.

At the same time, everyone believed that the DNA on the knife must belong to the killer because no one could fathom a prosecutor who showed that level of disregard and disrespect for the law.  There we were wrong.

Last week's test results were infuriating.  Even a crystal clear constitutional violation like this with clear contamination of the evidence is not the result that anyone on this side of the table wanted.

This was a horrible and tragic crime that Mr. Williams did not commit.

These DNA results were a sobering revelation that for more than 20 years the full

283

extent of the State's disregard for Mr. Williams' rights has been lying in wait.  That disregard for his rights has destroyed what is likely the last and best chance for him ever to prove his innocence.

What's worse, after contaminating the trial evidence, we're somehow still before this court debating whether he received a fair trial.

This wasn't a fair trial.  It never was. These DNA test results only represent the final blow.

Here's what we've always known.  Trial evidence was weak.  There were no eyewitnesses. Then and now there's no forensic evidence connecting Mr. Williams to the crime scene. Bloody footprints didn't belong to Mr. Williams. Even before the contamination we're talking about today there's always been a destroyed fingerprint where we just have to take the prosecution's word for it about what that fingerprint was and what it represented.

The only two material witnesses were unreliable people with a host of baggage, no prospects, and a desire for a reward.

On that evidence there are a lot of

284

prosecutors who would have declined to prosecute or maybe charge him for a lesser crime.

Instead, the State sought the death penalty.

Leading up to trial Williams' defense team was met with gamesmanship. While Mr. Williams' trial counsel was hamstrung with back-to-back death penalty trials.

People cannot be in two places at once. It is quite literally impossible to simultaneously defend one client in one courtroom while adequately preparing another client in a different courtroom right down the hall.

As the court heard today, defense counsel was unprepared for this trial. Didn't have the information they needed and needed more time. That wasn't because they were bad lawyers. They're great lawyers.

Every single person in this room has the greatest respect for Judge Green and Judge McGraugh. We hold them in the highest regard. But sometimes circumstances get in the way.

Then jury selection began. Mr. Williams didn't receive a jury of his peers. Prosecution

285

made sure of that by eliminating six of seven black jurors.

When you heard Mr. Larner today, he couldn't even, evidently couldn't even believe that he had eliminated six of seven black jurors. He kept insisting that it must have been three out of seven. Because when you have over a hundred people show up and only seven are black and you get rid of six of them, we all know what's going on.

Most notably, Mr. Larner made sure to eliminate the only black juror who seemed to be Mr. Williams' actual peer precisely because they looked alike.

When you review the transcript, and I made sure that we listed this, he admits that he exercised the peremptory strike on that juror in part because he was black. That's in the record. That is a Batson violation.

Now, the Supreme Court upheld the jury selection on direct appeal. But the Supreme Court was operating with a different record. It was based purely on representations the Court made 23 years ago. There's never been a time when Mr. Larner actually had to sit on the stand under

286

oath and be subjected to cross-examination. Basically, 23 years ago he got to provide whatever silver lining coating that he wanted to put on his justification.  But then when he had to be actually subjected to cross-examination, he made that crucial admission.

When the Court reviews the record, and we're going to help the Court with our findings, you're going to see that it was a lot more nefarious than systematic.  That will jump off of the page when you're reading it, directly start to finish.

What actually is happening, and as I tried to talk about with Mr. Larner, is that there were very subtle ways of discouraging black people from being willing or being qualified to serve on this jury and at the same time there were subtle ways of shepherding white people onto the jury with his methods of questioning.

There were closed-ended questions. There were easy yeses to white people.  There were open-ended questions with difficult answers for black people.

And what that does is it opens up the opportunity for pretext to find those

287

justifications that at least seem valid for those six or seven people.

At the same time that doesn't necessarily matter because we heard that admission today.  And as the Supreme Court said, one juror who's struck for racially discriminatory reason is one juror too many and requires a reversal of the conviction.

That brings us back to the DNA.  While the prosecution was playing those games with the jury, the prosecution knew that it had spent the past two months contaminating the critical trial evidence.  None of that was known 23 years ago.

You heard that from both Judge Green and Judge McGraugh who said Mr. Larner never told them that he was handling the murder weapon without gloves for trial.

Any seasoned defense lawyer would have jumped up on the table if they had heard that the prosecutor was walking around without gloves, handing it to witnesses, contaminating evidence.

The reason that we haven't heard about this until last week is because for 23 years the reasonable people in this room thought that that was impossible.

288

whether in 2000 or today, there is no good faith basis for a prosecutor to handle a murder weapon without wearing gloves.  Period.  Full stop.

That principle is even more true in a case in which that prosecutor is asking a jury to sentence the defendant to death.

Now, we asked Dr. Word to come in here to tell us what, frankly, everyone in the courtroom already knows.  That handling the knife without gloves was a flagrant violation based on protocols.  It really doesn't matter who you ask, though.  You can ask a forensic expert like Dr. Word.  You can ask a stranger at the supermarket.  You can ask a middle schooler.  Everyone knows.  The prosecutors cannot contaminate crime scene evidence.

Remarkably, Mr. Larner was unrepentant.  On one level he showed us a level of candor that I, frankly, didn't expect.  He told us that there were five separate occasions when he was handling that weapon without gloves.  Two months leading up to trial, the same time that the defense is fighting for a continuance, including when they're asking to conduct additional forensic testing.

289

He's handling it when he's putting the exhibit sticker on.  He's handling it when he's working with Detective Krull.  He's handling it when he's working with Detective Wunderlich.  He's handling it when he's talking to Dr. Picus.  He's handling it when he's talking to Dr. Nanduri.  Five times.

And he never told the defense about that, and that speaks for itself.  Because his actions are completely inconsistent and show constant dissidence.  He knows that you need to wear gloves but just not when he wants to do it.

His hubris just does not square with any notion of fairness.  His supposed justification is that touching the knife without gloves made sense to him.  According to his own personal theory of the case the killer wore gloves.  That is an admission that he has total disregard for the rights of the defense.  Pure nonsense.

Prosecutors don't find facts.  Prosecutors do not have special powers that allow them to decide what did or did not occur at the crime scene.  And courts can't condone this behavior or look away from it, especially when someone's going to be executed in a month.

290

It is quite literally the position the prosecutors are above the rest of the justice system. They're not. This is bad faith. It violated Mr. Williams' right to due process, and it must be corrected.

That brings us to the new statute. Mr. Jacober was just saying under plain reading of the law it requires the Court to vacate Mr. Williams' conviction upon finding a constitutional violation. And there were several violations that were shown today.

Nevertheless, over the past few weeks we've spent a lot of time debating these uncharted waters, I think is what the Court's term is, and what this law is trying to tell us.

Here's what the law is saying. This case belongs to this community, St. Louis County. The crime occurred just a few miles away from where we're standing. The charges against Mr. Williams were filed in this courthouse. It was members of this community who responded to their jury summons, and it was members of this community who rendered that verdict and death sentence more than 20 years ago.

In the new law the legislature could

291

have granted the right to file this motion to Mr. Williams itself. It didn't. In the law the legislature could have granted that right to the Attorney General. But it didn't. Instead, when the legislature enacted this law, they placed decision-making power in two representatives of the people of this community, the prosecuting attorney and this court.

The law reaffirms that the prosecuting attorney is a minister of justice in this community with responsibility that's broader than securing criminal convictions.

Ninety years ago the US Supreme Court wrote that a prosecutor's interest is not that it shall win a case but that justice shall be done.

The point of this law is that the local prosecutor, and only the local prosecutor, has the ability to come forward, admit that an injustice has occurred in his own community, and ensure that he restores his community's favor in the justice system.

Now the attorney general gets the opportunity to appear, question witnesses, state his peace. But then the attorney general drives back to Jefferson City, and the rest of us are

292

left with what this decision represents today.

That's why the statute doesn't give the attorney general the right to appeal Your Honor's decision.

Over the past few days we've heard the attorney general talk about respecting the decision of the jury.  The problem is that the jury -- the State didn't respect the jury 25 years ago.

Members of this community were excluded because of their race.  The State certainly never told those people on the jury that they were quietly contaminating evidence, including the murder weapon that was being passed around.

Setting aside this decision is how we show respect for the jury and the other members of our community who show up in this courthouse and participate in our criminal justice system.

Today there's only one voice clamoring for death, and that's the attorney general.  That's a stark reminder that the attorney general is only a participant and not an advocate for anyone in this case.

The attorney general represents the different constituency from St. Louis County.

I am acutely aware that I do not speak for Ms. Gayle's family.  But everyone else in this room has listened to their wishes as of last week.  And this entire problem began because the prosecution decided to seek the death penalty over their wishes.

And as we all heard Dr. Picus tell us on the phone, that decision only led to years of pain.  And last year, last week it looked like we had a resolution.  And again there was only one dissenting voice that departed from the family's wishes.

I expect that the attorney general is going to continue to criticize Mr. Williams for his willingness to take that Alford plea last week.

As everyone knows, a no contest plea doesn't represent the culpability of Mr. Williams.  It only represents what Mr. Williams was forced to accept in an imperfect world, in an imperfect system.

When you hear the attorney general claim that no innocent person would take this deal, it shows a point of view that's divorced from the real decisions that real people have to make.

294

Mr. Williams is scheduled for execution less than a month from now.  He was given a Hobson's choice.  Live in prison or die next month.

Whether you're staring down the barrel of a gun or the needle of a syringe, it's an understandable choice.  Largely, the attorney general is just an advocate for an abstract concept that office calls finality.  Finality has nothing to do with the justice system.  It's about bureaucracy.  Finality is a code word that it's better to get it over with than to get it right.

Mr. Williams' execution doesn't represent finality, much less closure.  It only leaves lingering questions about the unfairness impacting this trial.  There's no court opinion that can persuade the community that this was a fair trial after what we heard today.

Here's the biggest takeaway from this new law and why we're here today.  The law symbolizes an opportunity for our local justice system to recognize its mistakes and rebuild trust with the community.

You don't build trust by denying your mistakes.  You build trust by owning them.

295

Admitting your mistakes is not a sign of weakness. It's a sign of strength. That our justice system is strong enough to fix itself.

Today when you heard from Judge Green, he could have come in here and testified that he did his best. That justice system is tough but fair, that it always reaches the right result, and then he could return to his own courtroom. He didn't.

It took courage for him to come in here voluntarily and admit that 23 years ago he fell short. But even if he fell short, the truth of the matter is that no one in this courtroom respects him less. We only respect him more.

So here's where we stand. Mr. Williams didn't receive the defense he deserved. The prosecution deliberately tainted evidence. The prosecution deliberately ensured that he wouldn't be judged by a jury of his peers, including the prosecutor who admitted that he struck a black juror in part precisely because he was black.

As a result of those errors, Mr. Williams isn't scheduled to wake up on September 25th unless this court acts.

In the meantime, there are a million

296

other people in this community who are going to wake up that day.  We're all going to have an opportunity to understand how our justice system works and whether it really is as strong as we believe it is.

So on that, Your Honor, we ask that you set aside Mr. Williams' conviction.  And we thank you again for your time.

THE COURT:  Thank you, Mr. Potts.  Mr. Spillane.

MR. SPILLANE:  Thank you, Your Honor.

CLOSING ARGUMENT BY MR. SPILLANE:

MR. SPILLANE:  May it please the court, Your Honor.

THE COURT:  It does.

MR. SPILLANE:  This case is about the rule of law.  We've heard a lot of things here about the community and this and that.  We didn't hear one thing about Article V Section 22 of the Missouri Constitution that says a lower court must follow the decisions of a higher court.  547.031 if it tried to overrule that, which it couldn't, would be unconstitutional.

The only claim left in this case is the bad faith destruction of evidence.  And not only

297

was that not proved by clear and convincing evidence, it was not proved by any evidence.

The prosecutor came here and testified today that it was always his practice to once the evidence was tested not to use evidence-saving techniques.

And if you look at State v. Deroy 623 S.W.3d 778, 791 it says:  When he acts in good faith and in accord with their normal practice, no due process violation lies when potentially useful evidence is destroyed.

There is no bad faith here.  There's been argument after argument attempting to impune the character of the prosecutor, and that's terrible.

They said that he admitted he struck somebody because he was black.  You heard the same testimony I heard today.  He never said that. They just say it like it's true.  And that's kind of offensive.

Let's talk about they mention the bloody footprint.  I think it didn't come in any evidence on it, but the bloody footprint didn't match the shoes that williams was wearing when he was arrested because he was arrested long after the

298

crime.

We know from the trial transcript that the clothing he wore that day went in a backpack and into the sewer.  We also know from testimony that sewer workers went to look for it, but it was too late because it had already been vacuumed up and put in a dump.

So saying it doesn't match his shoes doesn't tell the whole story.  It didn't match the shoes he was wearing much later.

Let me talk about Mr. Thompson who came in and testified.  He didn't read the transcript of any of the investigating officers that was in the trial transcript.  He had no idea about the ruler or the ID or the purse.

The only thing that they told him about was the laptop.  And then he says, well, there's nothing to back up her story because it's only the laptop and other people say that she had the laptop.  Just ignores everything else that was in the car.  His testimony is useless.

Dr. Word come in and she actually helped, I mean, us, not them.  She said a couple of things that were important.  She had no idea what the protocol was in the St. Louis County

299

Prosecutor's Office for testing evidence -- for preserving evidence that had already been completely tested and was done.  She had no idea. That was an important question.

And another important question is that she indicated a couple of times that Marcellus Williams' DNA could have been on the knife.  I don't think it was because of the gloves.  But she said it could have been taken off by the prosecutor.  So she's actually weakened their earlier argument that he could be excluded.

Let's talk about Prosecutor Larner.  He came in and did everything right.  He didn't do anything wrong.  He didn't do anything in bad faith.  And I don't even know, you know, why they say that he did.  There's no evidence.

And they refer to the evidence in this case as being weak.  It was overwhelming.  Read the Missouri Supreme Court decision.  You have over and over, and you've read the transcript. This isn't weak evidence.  This isn't evidence on which no reasonable jury could convict by -- prove by pure -- excuse me, clear and convincing evidence, which is evidence that instantly tilts the balance in their favor and overcomes

everything else.

Even if the actual innocence claim was still in this case, which I think it isn't, it loses horribly.

And something else, Martin Footnote 4 says:  Actual innocence has to be based on new evidence.  And the Missouri Supreme Court defined that as evidence that wasn't available at trial.

They've got really nothing going to innocence that wasn't available at trial.  They just restate the thing that was rejected about the computer testimony that was excluded and the stuff about ineffective assistance of counsel that already lost in the Missouri Supreme Court.

So they have nothing that can win under the standard.

Judge McGraugh and Judge Green, I don't think they said anything that was untrue.  But this was a quarter century ago.  One could read the transcript and listen to Mr. Larner and see that he handled the evidence without gloves.  They don't remember that, and I think their memories are flawed in the sense of that.  Because he didn't wear gloves and they didn't jump up and down and scream because everybody didn't wear

301

gloves then because nobody -- I won't say nobody in the world had ever heard of touch DNA, but people in St. Louis County didn't know about it. And that's the standard.  Did he use bad faith? He didn't.  He wasn't even negligent.  And if he was negligent, we would still win.  But he certainly didn't use bad faith because he used the protocol that his office always used.  He did what he always does.  Which is, if there's nothing to test, he doesn't use evidence-saving techniques. And we know that from the testimony in the transcript about the fingernail clipping.  Because when he thought maybe that could be tested, he wore gloves -- well, he didn't open the package.

Something else we learned today that was helpful is that this didn't come in an unsealed package with the handle sticking out like was the former memory of Mr. Larner because he went and he read the transcript and he looked at the package and he remembered this thing was completely sealed.

And so I think the fingerprints -- excuse me, the fact that he wore gloves is a good reason.  But if you listen to the question I asked him about, even if he didn't wear gloves, would

302

you have done the same thing because the evidence was tested?  And the answer is, yes, that's what I always do.

There's no bad faith here.  And they can't win without bad faith.  I mean, something could be invented, be in some laboratory right now in 20 years that's going to help some case in your court, but nobody is responsible for knowing that now.  And that judge wasn't responsible for knowing that.  No one knew.  There was no bad faith.

That's essentially it.  This is about the rule of law.  I don't like the disparagement of the prosecutor.  That's not the way you win a case.  You argue what the law is and what the facts are.  You don't call the prosecutor names.

The Missouri Supreme Court has already rejected everything in its place except the bad faith claim, and that loses.  They present no evidence that shows bad faith.

Like I say, where it helped us on that, and I just wanted to say that everybody here should appreciate the crime victims because, you know, this is about them.  And I don't think dragging this out for year after year on claims

303

that they know or should know are legally

meritless does anything for the crime victims.

Thank you, Your Honor.

THE COURT:  Thank you, Mr. Spillane.

I would like to thank the attorneys for

their professionalism throughout this process.

This is very difficult procedure for everyone.

This is going to be a decision that I

will weigh heavily.

Our court reporters indicate that they

will try to expedite a copy of the transcript as

humanly possibly, which I think will be sometime

Monday or early Tuesday morning.  And we will

e-mail copies of the transcripts to everyone.

Again, I want to thank you for your

patience with the court and your understanding of

how difficult this matter has been for this

particular division.

With that said, the Court will be -- I

need a memo that the matter has been heard and

submitted and indicate to me that you will submit

proposed findings of fact and conclusions of law

pursuant to the statute by next Wednesday, which

is September 4th.

And as I indicated off the record, those

304

can be submitted to me both by e-filing and to my direct e-mail address in Word.  Appreciate it. The court will be in recess.  Court is not in recess.  We're done.  Thank you.

-o-

Reporter's Certificate

I, Susan M. Lucht, a Certified Court Reporter, hereby certify that I was the official court reporter for Division 13 of the Circuit Court of the County of St. Louis, State of Missouri; that on August 28, 2024, I was present and reported the proceedings had in the case of In Re:  Prosecuting Attorney, 21st Judicial Circuit, ex rel Marcellus Williams v. State of Missouri, Cause Number 24SL-CC00422; and I further certify that the foregoing pages contain a true and accurate reproduction of the proceedings had on that date.

Susan M. Lucht, CCR #302

Official Court Reporter

Twenty-First Judicial Circuit

(314) 615-2685

306