**IN THE UNITED STATES DISTRICT**
**FOR THE EASTERN DISTRICT OF MISSOURI**

| | | |
|---|---|---|
| MARCELLUS WILLIAMS, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Case No. 4:05-CV-1474-RWS |
| | ) | |
| DONALD ROPER, | ) | DEATH PENALTY CASE |
| | ) | EXECUTION SCHEDULED |
| Respondent. | ) | 9/24/24 at 6:00 P.M. |

## PETITIONER'S REPLY IN SUPPORT OF HIS MOTION FOR RELIEF FROM A JUDGMENT OR ORDER PURSUANT TO FED. R. CIV. P. 60(b)

On September 17, 2024, Petitioner moved, pursuant to Fed. R. Civ. P. 60(b), for relief from this Court's Judgment. (R. 121). Later that day, Respondent opposed Petitioner's Motion.  (R. 122).  Petitioner now timely files his reply in support.

Respondent's reply is brazenly wrong about the law and the facts and is an improper minimization of the glaring racism that occurred here. It is a sad day when the Attorney General's Office of a state defends the improper use of race to exclude jurors simply to bring about an execution no other interested party except for the Attorney General wants.

This Court should address the Supreme Court's warning: "Racial bias [is] a familiar and recurring evil that, **if left unaddressed**, would risk systemic injury to the administration of justice." *Pena-Rodriguez v. Colorado,* 580 U.S. 206, 224 (2017) (emphasis added). Mr. Williams asks this Court to address the racial bias that infected his trial. Evidence just recently that came to light demonstrates that the basis of the state court ruling is now rebutted by clear and convincing evidence and that Mr. Williams' *Batson* claim should be reheard.

The starting and ending point of this Court's analysis is Respondent's concession that the recent testimony "contradicts the transcript of Petitioner's original criminal trial."

1

R. 122 p. 6. This is exactly the point. Larner's testimony at the August 28, 2024 hearing contradicts the self-serving *Batson* colloquy from trial.  Mr. Williams should not suffer the ultimate consequence of Larner's racially-based strike against a Black venireperson because he looked so much like Mr. Williams that he could have been his "brother."

## I.    Larner stated race was a factor—and this is an evil this Court should address.

Before getting to Respondent's erroneous factual statements, it is critical to note what Respondent chooses to avoid altogether:

- Larner's sworn statements about how Mr. Williams and a Black venireperson looked like "brothers," and then his immediate discomfort and backpedaling explanation that he did not mean that in a racially divisive way (HT2 212) ("I don't mean black people.");

- Where are Larner's voir dire notes? He stated that he had taken notes during voir dire. Why were they destroyed other than to cover-up the real bases for the peremptory strikes? Respondent has no response to the evil described in *Amadeo v. Zant*, 486 U.S. 214 (1988).

Respondent wrongly accuses Mr. Williams's of mischaracterizing the record. That simply is not true. Mr. Williams accurately recounted the following statements that, as Respondent concedes, "contradicts the transcript of Petitioner's original criminal trial":

- "A. They were both young black men. Q. Okay. A. But that's not necessarily the **full reason** that I thought they were so similar." (HT2 p. 211) (emphasis added).

2

- "Q. So you struck them because they were both young black men with glasses? A. Wrong. **That's part of the reason**." (*Id.* p. 212) (emphasis added);

- "I thought they looked like they were brothers." (*Id.*);

- The juror and Mr. Williams, both Black men, "looked like they were brothers." (*Id.* p. 213).

Respondent takes liberties describing what the circuit court held regarding Larner, intimating the trial court made findings that Larner did not act in an improper manner. A close review reveals the trial court indicates Larner only denied that he had struck jurors based on their race—but the circuit court did **not** specifically find that Larner's strikes were in fact race-neutral. *See* R. 122-1 p. 16. The trial court simply recited his testimony. Unlike in other findings, however, the court did not credit it. *See* R. 122-1 p. 15 ("Larner testified credibly…" referring to other areas of testimony). The absence of that statement about the truth of Larner's testimony undercuts Respondent's argument that the circuit court concluded the peremptory strikes were race-neutral.

The absence of a finding that the strikes were race-neutral makes sense given Larner's actual testimony, as set forth above, as well as other instances revealing racial animus in Larner's testimony. When asked about other potential *Batson* issues, Larner forcefully responded he had "never" done wrong.

Q. Have you ever been found to have violated Batson v. Kentucky in another case?

A. **Now let me say this perfectly clear. Never**.

Q. Never?

3

A. **Never**.

HT2 218 (emphasis added). Despite his unequivocal averment that he had committed no *Batson* violation ever, Larner then quickly backtracked and agreed that his "never" needed to be amended. *Id.* Indeed, in *State v. McFadden*, another case where Larner was the trial prosecutor, the trial judge found Larner had failed to provide race neutral reasons for excluding three Black jurors, and also found that his initial reason for striking a Black juror was pretextual. *Id.* at 218-19. Larner blamed his failure to mention, or even acknowledge, this history at first on thinking the question asked whether he ever been "reversed" on *Batson*, which of course is nowhere in the question.[1] *Id.*

The trial court's failure to credit Larner also makes sense given his attempt at the hearing to minimize the number of peremptory challenges he used on Black jurors. Larner repeatedly and argumentatively asserted he had only exercised a peremptory against Black venirepersons three times, cutting in half the real number.

A. I know how many I struck. I had nine peremptory strikes. I struck three. Three of nine blacks -- not three of nine blacks. Three of nine people were black. Six of nine people were white. I struck six whites, three blacks. Leaving one black on the jury is the way it came out.

Q. We'll get to that, but I think you have those numbers reversed.

A. No. I think you have them reversed, actually.

---

[1] And even when explicitly asked, "So you have been found to have violated Batson?" Larner gave a non-answer, blustering, "Yes and no. It depends . . ." HT2 218. Whether he violated *Batson* is not a question that calls for an "It depends" answer—it is either a yes or a no.

4

HT2 218. Actually, Larner was wrong. During jury selection, Larner utilized six of his nine peremptory strikes (67% of the available strikes) against six of the seven (86%) Black venirepersons. (Tr. 1568-69).

In *Miller-El v. Dretke*, 545 U.S. 231, 232 (2005), the Supreme Court required consideration of "the totality of the relevant facts" about a prosecutor's conduct during the trial. It is not enough for the Respondent to rely on one instance where Larner vehemently said "Absolutely not" that his peremptory strikes were race-based. This Court is required to look at everything Larner said and view them in context and in relation with each other.

Larner's testimony in this case is shifting. He uses the term "brother" and then attempts to shift away from the racial overtones that term carries. He says "never," but then immediately shifts to a "yes and no, it depends." He says "I did not" but then states it was "part" but not the "full reason." Larner misrepresented the number of peremptory challenges he exercised against Blacks. All of these shifting explanations are significant under the Supreme Court's decision in *Foster v. Chatman*, 578 U.S. 488 (2016),

In *Foster*, the Court found troubling: "There are also the shifting explanations, the misrepresentations of the record, and the persistent focus on race in the prosecution's file." *Id*. at 512. As a result, the Court lifted the procedural bar imposed by the State and granted relief. This case is even more troubling—worse than in *Foster*, the prosecutor's voir dire notes in this case are mysteriously missing from the file.

Racism has no place in a capital trial.  It injures not just a defendant, but "the law as an institution, . . . the community at large, and . . . the democratic ideal reflected in the processes of our courts." *Rose v. Mitchell*, 443 U.S. 545, 556 (1979). And importantly for the procedural posture before this Court: "Such concerns are precisely among those we have

identified as supporting relief under Rule 60(b)(6)." *Buck v. Davis*, 580 U.S. 100, 124 (2017) quoting *Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847, 864 (1988).

Respondent misses altogether the significance of Mr. Williams' discussion of *Flowers v. Mississippi*, 588 U.S. 284 (2019). Mr. Williams cites *Flowers* to highlight the significance of Larner's failure to explain why he questioned Black jurors differently than white jurors. Critically, Larner could offer no explanation for the disparate treatment when confronted with evidence of it. Notably, Respondent does not defend his failure. The obvious reason is that Larner had no race-neutral explanation.

A prosecutor's role is to see that justice is done. *Connick v. Thompson*, 563 U.S. 51, 71 (2011) (citing *Berger v. United States*, 295 U.S. 78, 88 (1935). "'It is as much [the prosecutor's] duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one. The prosecutor's role is to protect those innocent of crimes and to uphold the constitutional rights of the accused--to seek justice and fairness, not solely convictions.'" *Smith v. Groose*, 205 F.3d 1045, 1054-55 (8th Cir. 2000) (quoting *Berger*, 295 U.S. at 88)). The prosecutor's role is decidedly not to win at any cost and is certainly not to win via racially discriminatory practices. In conclusion, because the recent testimony contradicts the self-serving trial colloquy (as conceded by Respondent), there is clear and convincing evidence to rebut this Court's earlier ruling.

## II.   Mr. Williams properly filed a 60(b) motion.

Respondent claims this is a successor. That is not true. Perhaps Respondent's confusion is best displayed by their mischaracterization or total failure to understand *Buck v. Davis*, 580 U.S. 100 (2017).

Respondent again misses the point altogether—*Buck* is a 60(b)(6) case. *Buck*, 580 U.S. at 104 ("In 2014, Buck sought to reopen that 2006 judgment by filing a motion under Federal Rule of Civil Procedure 60(b)(6)"). The *Buck* Court found that a 60(b) was appropriate. *Buck* also involved racism (as here) and an admission of error (as here). *Buck* then applied 60(b)(6) and *Gonzalez v. Crosby*, 545 U.S. 524 (2005) principles. *Buck*, 580 U.S. at 104. It could not be more relevant and applicable.

This Court was quite clear in its earlier denial of Mr. Williams's Fifth Ground that he failed to satisfy the AEDPA standard of either § 2254(d)(2) or (e)(1): "This decision is supported by the record and Williams has failed to overcome the presumption that this determination was correct by clear and convincing evidence." R. 58 p. 25. At no point did this Court pierce the veil of the merits. Rather, it restricted itself to the cold, antiseptic, and required AEDPA review that must be satisfied before considering the § 2254(a) question.

As explained in his Motion, Mr. Williams pursues a reopening of a habeas claim denied on the basis that no clear and convincing evidence rebutted the basis of the state court ruling. That clear and convincing evidence now exists—and what damning evidence it is that undermines the Court's previous finding.

A Rule 60(b) motion is appropriate here because the judgment entered on the § 2254 Petition makes clear that the denial of the claim was on the basis of an application of § 2254 (e)(1), meaning there was no clear and convincing evidence undermining the state court ruling. Thus, this Court found it was precluded from a proper consideration of the merits of Petitioner's Fifth Claim. Petitioner's allegation here is a "true" 60(b), as envisioned by *Gonzalez*, 545 U.S. 524, and cannot be construed as a successive petition pursuant to § 2244(b)(2).

7

Indeed, In *Miller-El v. Cockrell*, 537 U.S. 322 (2003), another case involving a *Batson* violation, the Supreme Court explained that AEDPA considerations constitute a threshold question. The Court stated that "The concept of a threshold, or gateway, test was not the innovation of AEDPA. . . . By enacting AEDPA, using the specific standards the Court had elaborated earlier for the threshold test, Congress confirmed the necessity and the requirement of differential treatment for those appeals deserving of attention from those that plainly do not." If AEDPA were not a threshold inquiry the Court must find has been satisfied before it reaches the merits of a petition, there would be no point whatsoever to a tiered review structure—the Court could consider the merits automatically in what would be merely another normal round of appellate review. *Cf. Renico v. Lett*, 559 U.S. 766, 773 (2010) ("Indeed, 'a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.' Rather, that application must be 'objectively unreasonable.' This distinction creates 'a substantially higher threshold for obtaining relief than *de novo* review." (quoting *Williams v. Taylor*, 529 U.S. 362, 410 (2000), and citing *Schiro v. Landrigan*, 550 U.S. 465, 473 (2007))). Where "AEDPA's purpose [is] to further the principles of comity, finality, and federalism," the only logical conclusion is that AEDPA is a threshold determination that must be decided before a court can even reach the merits of a petition.

Petitioner is not presenting a claim. Rather, Petitioner "merely asserts that a previous ruling which precluded a merits determination was in error ... ." Because Petitioner challenges the Court's inability to consider evidence that had not been fairly

presented in state court due to no fault of the Petitioner. Because this is not a new claim, Petitioner's request properly invokes 60(b).

Petitioner has not filed a disguised second or successive motion under § 2254. Petitioner's 60(b) Motion should be evaluated on its own merit. Petitioner is not trying to present a new reason why he should be relieved of either his conviction or his sentence. Instead, he seeks to reopen his existing § 2254 proceeding on the basis of the recent testimony, which contradicted the prosecutor's self-serving trial colloquy, and overcome a barrier to the proper adjudication of his Fifth Habeas Ground.

The reality of the situation rebuts Respondent's arguments. If Petitioner were pursuing a true claim, Petitioner would be entitled to relief. Petitioner is not asking for such – only that the habeas be reopened and *then* the merits be addressed. He still may lose. This reality embraces the principles underlying *Gonzales* by establishing that Petitioner is not pursuing a successor. Thus, this basis of Respondent's opposition should be denied.

## III.   Mr. Williams satisfies the applicable, liberal standard this Court is bound to employ.

Respondent does not dispute this Court has the inherent power in these habeas proceedings to "vacate judgments whenever such action is appropriate to accomplish justice." *Klaprott v. United States*, 335 U.S. 601, 615 (1949). Respondent fails to mention altogether that the standard to be employed by this Court "should be liberally construed." *Mohammed v. Sullivan*, 866 F.2d 258, 260 (8th Cir. 1989). Applying this liberal standard, Petitioner satisfies the 60(b) requirements, and the judgment should be reopened.

9

"'The fundamental requisite of due process of law is the opportunity to be heard.'. The hearing must be at 'a meaningful time and in a meaningful manner.'." *Goldberg v. Kelly*, 397 U.S. 254, 267 (1970) (citations omitted). At minimum, Respondent's arguments support the existence of factual disputes that support the need for a hearing. *See Philos Technologies, Inc. v. Philos & D, Inc.*, 645 F.3d 851 (7th Cir. 2011) (remanding for hearing in 60(b)(4) context for resolution of factual dispute). In appropriate circumstances, a hearing may occur. *See Schultz v. Commerce First Fin.*, 24 F.3d 1023 (8th Cir. 1994). This Court should exercise that discretion, particularly in light of the evidence that the pernicious factor of racism is present here and represents clear and convincing evidence rebutting this Court's previous ruling.

## IV.    Mr. Williams did not delay because he brought this to the Court within 20 days of discovering evidence that "contradicts the transcript of Petitioner's original criminal trial."

Respondent dusts off the well-worn accusation of delay. This is rich, given that Respondent took 131 days to respond to the § 547.031 petition, 121 days of which occurred after they notified the circuit court they would respond.[2] Mr. Williams comes to this Court 111 days, or 101 days respectively, faster than Respondent filed a promised response.

Delay also occurred when Respondent indicated unavailability for a July evidentiary hearing date due to an Assistant Attorney General's' schedule—but then that attorney never participated, or even attended, either the August 21 or August 28 hearing. This cost Mr.

---

[2] However, when it benefitted them, Respondent made sure not to delay. Once the Missouri Supreme Court set an execution date for Mr. Williams, it was to their tactical advantage to respond quickly at that point, because they could try to protest that the circuit court did not have jurisdiction when there was an active execution warrant. Respondent filed their response *the next day* after the Missouri Supreme Court set the date, despite waiting 131 days from the filing of the Motion to Vacate.

10

Williams another 30 plus days. Again, this is over 10 days more than it took Mr. Williams to act in bringing this new evidence to this Court.

Any delay was the fault of Respondent. Further, it bears repeating Larner's mysteriously disappeared voir dire notes and Larner's revelation of the true reasons behind his peremptory strikes, contradictory to his trial colloquy, constitute evidence solely in the possession of the State of Missouri that only recently came to light. It is their lack of diligence and candor in exploring with Larner his colloquy, and their failure to maintain their files in a way that preserved crucial evidence, that contributed to Mr. Williams' inability to learn earlier of the evidence upon which he now relies.

## V.  Extraordinary circumstances exist.

Mr. Williams presents extraordinary circumstances, and thus, he properly invokes Rule 60(b)(6).  Mr. Williams is set to die in a matter of days for a conviction where there is clear and convincing evidence that contradicts (as Respondent concedes) the *Batson* trial colloquy. In this manner, nearly all of the extraordinary factors described in *Buck* are satisfied.

Further and similar to *Buck*, almost no one wants this execution to be carried out— Respondent stands alone in their bloodlust, with the St. Louis community, the prosecuting attorney, and the family of the victim all calling for this pursuit for Mr. Williams' death to end. In an unprecedented move, the St. Louis County Prosecuting Attorney conceded constitutional error and admitted that in 2001, they struck venirepersons on account of their race. The same office that brought about Mr. Williams' death sentence seeks now to prevent it because they know they have committed wrong.

11

These are extraordinary circumstances. Express admittance that a prosecutor struck Black venirepersons because they were Black is an affront not just to Mr. Williams as a defendant, but to the St. Louis community. That racial animus invaded the civic duty of this community is not something that should be allowed to stand. This Court can remedy that.

## **CONCLUSION**

WHEREFORE, for the above stated reasons, this Court should GRANT Petitioner's request, and reopen habeas proceedings.

Respectfully submitted,

/s/ Laurence E. Komp
LAURENCE E. KOMP, #40446
FAITH J. TAN, IL Bar #6342729
Federal Public Defender
Western District of Missouri
1000 Walnut Street, Suite 600
Kansas City, MO 64106
816-675-0923
laurence_komp@fd.org
faith_tan@fd.org

/s/ Kent E. Gipson
KENT E. GIPSON, #34524
Law Office of Kent Gipson, LLC
121 E. Gregory Blvd.
Kansas City, MO 64114
816-363-4400 • Fax 816-363-4300
kent.gipson@kentgipsonlaw.com

ATTORNEYS FOR PETITIONER

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was filed and sent to the following counsel of record for Respondent, Mr. Michael Spillane and Ms. Katherine Griesbach, Assistant Attorney Generals, P.O. Box 899, Jefferson City, Missouri 65102, via the ECF system on this 18th day of September 2024.

*/s/Laurence E. Komp*
Attorney for Petitioner